# No. 26-04928

IN THE

# United States Court of Appeals

FOR THE NINTH CIRCUIT

GIUSEPPE PAMPENA, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED; STEVE GARRETT; NANCY PRICE; JOHN GARRETT; BRIAN BELGRAVE; TWITTER INVESTOR GROUP,

*Plaintiffs-Appellees*,

v.

ELON MUSK,

*Defendant-Appellant*.

*On Appeal From The United States District Court*
*For The Northern District Of California*
*Honorable Charles R. Breyer*
*No. 3:22-cv-05937-CRB*

## APPELLANT'S EXCERPTS OF RECORD
## VOLUME I OF XII (ER-1 – ER-75)

Michael T. Lifrak
Stephen A. Broome
Alex Bergjans
QUINN EMANUEL URQUHART & SULLIVAN, LLP
865 S. Figueroa St., 10th Floor
Los Angeles, CA 90017
(213) 443-3000

Alex Spiro
Ellyde R. Thompson
Jesse A. Bernstein
Marielle P. Greenblatt
Chelsea Sincox
QUINN EMANUEL URQUHART & SULLIVAN, LLP
295 Fifth Avenue
New York, NY 10016
(212) 849-7100

*Counsel for Defendant-Appellant*

November 23, 2026

United States District Court
Northern District of California

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA

GIUSEPPE PAMPENA, et al.,
Plaintiffs,
v.
ELON MUSK,
Defendant.

Case No. 22-cv-05937-CRB

**ORDER ON POST-TRIAL MOTIONS**

Buyer's remorse is not an exception to the securities laws. These laws, in their essence, are about trust. Trust that the country's financial markets are fair, honest, and transparent. The market always picks winners and losers, but it is vital that those outcomes are free of manipulation. The Securities Exchange Act of 1934 seeks to protect public investors—big and small—by ensuring a level playing field. By insisting that public statements which could affect the market be truthful, Congress sought to guarantee that all members of the investing public have equal access to information and, most importantly, that the information be accurate. A speaker's motive is not dispositive; what matters is whether the statements were made with knowledge of their falsity or with a deliberately reckless disregard for their accuracy. Even if the speaker has a change of heart or a momentary regret about a transaction, such qualms do not justify lying to the investing public.

This is a case about a breach of trust by Elon Musk. In April 2022, Musk sought to buy Twitter, Inc., and take it private. He offered to buy the company at a significant premium, $54.20 per share or about $44 billion total. Then, in order to sweeten the deal, Musk offered to waive due diligence, making the agreement "seller-friendly." Twitter

United States District Court
Northern District of California

accepted the offer. The deal was publicly announced on April 25, 2022.

But Musk started having second thoughts. The purchase price was high and the Tesla stock that he planned to use for financing was taking a hit, meaning he might have to sell even more of it to compensate. So on May 13, despite waiving due diligence, Musk tweeted that the deal was temporarily on hold until he received more details on how Twitter calculated the level of bots/spam on its platform. Despite Musk's public statement, the deal was not on hold and Musk had been aware of bot issues on Twitter since before he made his tender offer. The Twitter share price dropped immediately and significantly. On May 17, Musk made a similar tweet, asserting that the number of bots on Twitter was much higher than Twitter was representing and that the deal could not move forward until he received more information. The Twitter share price remained low until October 4, when Musk announced that he would go through with the deal. On that day, the price spiked.

Plaintiffs sued. They represent all sellers of Twitter stock between May 13 and October 4. They brought claims based on Musk's two tweets, a separate statement made on May 16, and a purported months-long scheme by Musk to artificially depress Twitter's share price. After a two-week trial and more than three days of deliberations, a jury unanimously found that Musk's two tweets were false, and that the investing public was damaged.

Musk now seeks to set aside this verdict and moves for a judgment as a matter of law or, alternatively, for a new trial. JMOL (dkt. 570). He also asks this Court to decertify the class based on the general nature of the verdict. Mot. to Decertify (dkt. 571). Plaintiffs bring post-trial motions of their own. They seek an award of prejudgment interest and approval of their class notice of the verdict and proposed claims administration process. MPI (dkt. 565); MFA (dkt. 567). As explained below, the Court **GRANTS** Musk's motion for a judgment as a matter of law as to his May 17 tweet and **DENIES** it in all other respects. The Court also **DENIES** his motion to decertify the class. The Court **GRANTS** Plaintiffs' motion for prejudgment interest and motion for approval of their

United States District Court
Northern District of California

proposed class notice and claims administration procedure.

## I. MOTION FOR JUDGMENT AS A MATTER OF LAW OR, IN THE ALTERNATIVE, A NEW TRIAL

Musk argues that Plaintiffs, as a matter of law, failed to prove (1) loss causation, (2) material falsity, (3) scienter, (4) reliance, and (5) damages. JMOL at 2–4. He also asserts that he is entitled to a new trial, in the alternative. The Court **GRANTS** the motion only as to loss causation for Musk's May 17 tweet. The Court addresses each argument in turn.

### A. Legal Standard

A motion for judgment as a matter of law is appropriate where "a reasonable jury would not have a legally sufficient evidentiary basis to find for the [nonmoving] party on that issue." Fed. R. Civ. P. 50(a)(1). A court can grant a judgment as a matter of law "if the evidence, construed in the light most favorable to the nonmoving party, permits only one reasonable conclusion, and that conclusion is contrary to the jury's verdict." Pavao v. Pagay, 307 F.3d 915 918 (9th Cir. 2002). A court must uphold a jury's verdict if "it is supported by substantial evidence that is adequate to support the jury's findings, even if contrary findings are also possible." Escriba v. Foster Poultry Farms, Inc., 743 F. 3d 1236, 1242 (9th Cir. 2014). A court must review the evidence as a whole and "disregard evidence favorable to the moving party that the jury is not required to believe," and the court "may not substitute its view of the evidence for that of the jury." Johnson v. Paradise Valley Unified Sch. Dist., 251 F.3d 1222, 1227 (9th Cir. 2001) (internal quotations omitted).

Under Rule 59(a)(1)(A) of the Federal Rules of Civil Procedure, a trial court may grant a new trial after a jury trial "for any reason for which a new trial has heretofore been granted in an action at law in federal court." Specifically, a court may grant a new trial "only if the verdict is contrary to the clear weight of the evidence, is based upon false or perjurious evidence, or to prevent a miscarriage of justice." Shimko v. Guenther, 505 F.3d 987, 993 (9th Cir. 2007) (internal quotations omitted). Such a motion may be granted on insufficiency of evidence grounds "only if the verdict is against the great weight of the

evidence, or it is quite clear that the jury has reached a seriously erroneous result." Incalza v. Fendi N. Am., Inc., 479 F.3d 1005, 1013 (9th Cir. 2007) (internal quotation marks omitted).

**B. Loss Causation**

Musk challenges the sufficiency of the evidence that his May 13 and 17 tweets caused the class to suffer a loss in the market. JMOL at 14. For the May 13 tweet, Musk asserts that Plaintiffs failed to prove (1) proximate causation, (2) that the market perceived his statements as true, (3) that there was a corrective disclosure, and (4) that the misrepresentation caused loss after his July 8 termination letter. Id. at 15–19. Plaintiffs respond that there was sufficient evidence of proximate causation and corrective disclosure. JMOL Opp'n at 8–10. Musk also argues that there was no market reaction to the May 17 tweet, so Plaintiffs had no evidence of loss. JMOL at 15. Plaintiffs counter that the May 17 tweet helped maintain the price deflation caused by the May 13 tweet. JMOL Opp'n at 7–8. The Court agrees with Musk as to the May 17 tweet.

**1. May 13 Tweet**

**a. Proximate Causation**

"Loss causation is shorthand for the requirement that investors must demonstrate that the defendant's deceptive conduct caused their claimed economic loss." Lloyd v. CVB Fin. Corp., 811 F.3d 1200, 1209 (9th Cir. 2016) (citation modified). It is "simply a variant of proximate cause" and "the ultimate issue is whether the defendant's misstatement, as opposed to some other fact, foreseeably caused the plaintiff's loss." Id. at 1210. "A plaintiff is not required to show 'that a misrepresentation was the sole reason for the investment's decline in value' to establish loss causation. '[A]s long as the misrepresentation is one substantial cause of the investment's decline in value, other contributing forces will not bar recovery under the loss causation requirement.'" Nuveen Mun. High Income Opportunity Fund v. City of Alameda, 730 F.3d 1111, 1119 (9th Cir. 2013) (emphasis in original) (quoting In re Daou Sys., 411 F.3d 1006, 1025 (9th Cir. 2005)).

United States District Court
Northern District of California

"Typically, in securities cases, loss causation is shown by the drop in share price due to a misstatement or omission by the defendant." See Edenbrook Cap., LLC v. RhythmOne Plc, No. 19-CV-00615-WHO, 2019 WL 1791419, at *8 (N.D. Cal. Apr. 24, 2019). Here, Dr. Tabak testified that there was direct evidence that the May 13 tweet caused an immediate, significant drop in Twitter's share price. Trial Tr. at 1865:12–1866:6 (Tabak). Musk argues that there was no evidence that the false statement—that the deal was temporarily on hold—caused the impact on the share price. JMOL at 15. Not so. Dr. Tabak testified that he evaluated news stories and analyst reports about the tweet and that they were "generally in accord" that Musk's "declaring the deal temporarily on hold[]" was causing the price decline.[1] Trial Tr. at 1866:12–1867:7.

**b. Market Perception**

Next, Musk asserts that there was insufficient evidence of loss causation because the market knew the truth that the deal was not actually on hold. JMOL at 16. He points to Dr. Tabak's testimony that everyone knew that "Twitter did not agree to put the deal on hold" and there were comments "that you can't put it on hold." Id. (quoting Trial Tr. at 1908:23–1909:19). But as Plaintiffs note, Twitter's public statements had nothing to do with Musk and his position on the merger. See JMOL Opp'n at 9. To the public, it could have been entirely possible that Musk was unilaterally holding up the deal. Musk also notes that there was no statistically significant price reaction to his later comments about working on his deal financing, which he argues supports his position that the market knew the deal was not on hold. JMOL at 17. That is certainly evidence that cuts against Plaintiffs. But it does not necessarily mean that the deal generally was not continuing as usual. See Pavao, 307 F.3d at 918 (courts must construe evidence "in the light most

[1] Musk also argues that Dr. Tabak did not distinguish any price impact from the true information that Musk had concerns about the deal. JMOL at 18. But Dr. Tabak testified that his investigation showed that the literal falsity of Musk's tweet was what the news was reporting. Moreover, Dr. Tabak explained that Musk's heightened concerns could potentially play a part in the market's interpretation. Trial Tr. at 1905:4–13. But, he continued, Musk "didn't just imply that he had heightened concern; he suggested he was taking a certain action by temporarily putting the deal on hold." Id.; see also Nuveen, 730 F.3d at 1119 (misrepresentations need not be the sole reason for a decline in share price).

favorable to the nonmoving party"). And it does not render Plaintiffs' other evidence—as discussed above—about market perception insubstantial. Castro v. Cnty. of Los Angeles, 833 F.3d 1060, 1066 (9th Cir. 2016) (courts must uphold verdicts if there is "evidence adequate to support the jury's conclusion, even if it is also possible to draw a contrary conclusion").

Musk also argues that Dr. Tabak did not disaggregate non-fraud factors that could have impacted Twitter's price drop, such as the May 15 publication of the SparkToro report about bots on Twitter. JMOL at 18. Additionally, he posits that Dr. Tabak's decision to "attribute the May 16 stock market drop to the purported fraud" was defective. Id. Neither argument persuades. As to the SparkToro report, there was no evidence that it affected Twitter's share price. Indeed, Dr. Tabak testified that he did not "see it in any news stories or any analyst reports in that period." Trial Tr. at 1893:19–24. And as discussed below regarding damages, Dr. Tabak sought to exclude unrelated stock impacts from his analysis. See infra Section I.F.

As to Dr. Tabak's two-day damage calculation window for May 13 and 16, "there are many cases that find that multi-day event windows are appropriate for event study analysis in securities fraud class actions." Monroe Cnty. Employees' Ret. Sys. v. S. Co., 332 F.R.D. 370, 391 (N.D. Ga. 2019) (collecting cases); see Hsu v. Puma Biotechnology, Inc., No. SACV1500865AGJCGX, 2018 WL 4956520, at *4 (C.D. Cal. Oct. 5, 2018) ("no disqualifying problem" with two-day loss causation window); In re Vivendi Universal, S.A. Sec. Litig., 634 F. Supp. 2d 352, 372 (S.D.N.Y. 2009) (three-day window). Dr. Tabak explained that he concluded May 16 was a continuation of the May 13 decline because, after market close, there are news stories, analyst reports, and individuals who do not trade during the day that can affect the next trading day. Trial Tr. at 1896:15–20. Although Musk relies on In re Omnicom Group, Inc. Securities Litigation to argue that news of already-public information is insufficient for loss causation, the news in that case was reporting facts that had been disclosed much earlier. See JMOL at 19 (citing In re Omnicom Group, Inc. Securities Litigation, 597 F.3d 501, 505–06 (2d Cir. 2010) (negative

article describing events transpiring months earlier)). Here, the news Dr. Tabak reviewed was between trading days. See Trial Tr. at 1896:15–20.

**c. Corrective Disclosure**

Musk contends that Plaintiffs failed to prove a corrective disclosure theory of loss causation. JMOL at 19. Plaintiffs respond that they do not have to prove a corrective disclosure in a seller case and that they did prove one, in any event. JMOL Opp'n at 9–11. The Court agrees with Plaintiffs.

For starters, Musk is incorrect that the law requires Plaintiffs to prove a corrective disclosure for loss causation. See Richardson v. TVIA, Inc., No. C 06 06304 RMW, 2007 WL 1129344, at *5 (N.D. Cal. Apr. 16, 2007) ("Other courts have similarly held that a corrective disclosure is not necessary where the subject of the misrepresentation and omissions caused the loss."). Nevertheless, Musk argues that the Supreme Court's logic in Dura Pharmaceuticals, Inc. v. Broudo means a seller does not suffer a loss if they sell and rebuy shares before a corrective disclosure. JMOL at 19. But Plaintiffs are right that, in a seller case, loss is realized before a corrective disclosure. See JMOL Opp'n at 10.

Dura merely stands for the proposition that "an inflated purchase price will not itself constitute or proximately cause the relevant economic loss." 544 U.S. 336, 342 (2005). The Supreme Court reasoned that a purchaser of an inflated price could sell shares before the truth comes out, meaning "the misrepresentation will not have led to any loss." Id. In a seller case, by contrast, a seller suffers a loss at the moment of sale. The seller is forced to sell at an artificially deflated price, immediately realizing their loss. And it would be the misrepresentation that caused the artificial deflation in the first place. If the seller were later to rebuy at the same price, it would be a different transaction entirely and distinguishable from the principle espoused in Dura. See id. ("Shares are normally purchased with an eye toward a later sale.").

Regardless, Plaintiffs provided substantial evidence of a corrective disclosure on October 4, 2022. Dr. Tabak testified that, when Musk filed his statement that he would go through with the Twitter deal, the share price jumped over 20%, resulting in two trading

United States District Court
Northern District of California

suspensions for the stock. See Trial Tr. at 1868:3–1869:22. Dr. Tabak concluded that there was nothing other than Musk's statement that could have accounted for the sharp increase in price. Id. at 1869:23–1870:2 (Tabak) ("The only other news was basically commentary reaction to the SEC filing."). Musk asserts that Dr. Tabak's testimony is still not evidence of a corrective disclosure because Dr. Tabak said it was not part of his expert opinion. JMOL Reply at 12. But this mischaracterizes the testimony—especially in the light most favorable to Plaintiffs.

Musk's counsel's question on this point was very specific. He asked Dr. Tabak to confirm that he was "not claiming that any information that came out was corrective of Mr. Musk's alleged false statement." Trial Tr. at 1907:11–13 (emphasis added). Dr. Tabak answered that it was "not part of [his] opinion." Id. at 1907:14. Dr. Tabak did not say that there was no corrective disclosure. He simply said that whether or not the disclosure was, in fact, corrective was not a part of his opinion. See In re Vaxart, Inc. Sec. Litig., No. 20-CV-05949-VC, 2025 WL 1869694, at *2 n.2 (N.D. Cal. July 7, 2025) (noting that what constitutes a corrective disclosure is for the trier of fact).

**d. Post-July 8 Loss**

Musk asserts that his July 8 termination letter was an intervening event and that Plaintiffs did not have evidence of loss causation after that date. JMOL at 19–20. The Court disagrees. As explained further regarding damages, Dr. Tabak calculated the loss attributable to the May 13 tweet by creating a constant percentage of deflation derived from the "merger discount" between Musk's offered price per share and the actual stock price. Trial Tr. at 1846:13–1847:3 (Tabak); see also infra Section I.F. And he made sure to exclude additional deflation stemming from Musk's letter from his analysis. See id. at 1849:20–1850:9. Nevertheless, Dr. Tabak concluded that there was still deflation attributable to May 13 after July 8, even though it was a smaller percentage of the merger discount. Id. at 1850:4–9. He testified that the deflation only vanished when Musk finally announced he would go through with the deal on October 4. See Trial Tr. at 1868:3–1869:22. Musk raises the fair point that Dr. Tabak did not analyze whether Twitter's share

United States District Court
Northern District of California

price would have fallen to the same level if Musk issued the termination letter but never tweeted on May 13. JMOL at 20 (quoting Trial Tr. at 1918:25–1919:15). But although that undermines Plaintiffs' position, the argument does not mean the jury was without sufficient evidence of loss causation after July 8. See In re Genius Brands Int'l, Inc. Sec. Litig., 97 F.4th 1171, 1183 (9th Cir. 2024) (misrepresentations need not be the sole reason for price decline).

**2. May 17 Tweet**

Musk argues that the lack of a market reaction to the May 17 tweet meant there was no loss causation attributable to it. JMOL at 15. Plaintiffs point out that Dr. Tabak testified that the May 17 tweet maintained the deflation from the May 13 tweet. JMOL Opp'n at 7. The Court agrees with Musk.

Dr. Tabak did not provide an expert opinion on price maintenance. In fact, he affirmatively disclaimed such an opinion. To be sure, he did testify that the May 17 "maintained the prior deflation." Trial Tr. at 1881:14–20 (Tabak); id. at 1882:1–6 ("[I]f the question that the jury wants to address is what would have happened if, you know, having spoken and said something incorrect, Mr. Musk should have corrected it, then the answer should be that these maintained the deflation from May 13th."). But Dr. Tabak then clarified that he was "not affirmatively saying this is a price maintenance case." Trial Tr. at 1882:16–20; see also id. at 1882:14–15 ("Q. And you said you're not offering that opinion, right? A. If that's what I said, that's what I said, yes.").

Without an expert opinion on price maintenance, Plaintiffs lack substantial evidence to support a finding of loss causation with respect to the May 17 tweet. See In re REMEC Inc. Sec. Litig., 702 F. Supp. 2d 1202, 1275 (S.D. Cal. 2010) (granting summary judgment on loss causation as plaintiffs lacked expert testimony to prove it). Because Plaintiffs did not have sufficient evidence for a key element of their case, the Court **GRANTS** Musk's motion for a judgment as a matter of law for the May 17 tweet.[2]

[2] As the Court grants Musk's motion as to the May 17 tweet, it will not address arguments pertaining to that tweet for the remainder of the order.

United States District Court
Northern District of California

### C. Material Falsity

Musk asserts that the May 13 tweet was neither false nor material. JMOL at 20. Plaintiffs disagree. See JMOL Opp'n at 12–14. As Musk's arguments primarily go to his view of the evidence, rather than its sufficiency, the Court denies his motion as to material falsity.

#### 1. Falsity

Musk argues that the May 13 tweet was not false because it only stated that the deal was temporarily on hold pending details, and the evidence at trial showed that the merger was held up while Musk sought spam information. JMOL at 20. Not so. There was substantial evidence of falsity.

In his tweet, Musk stated, "Twitter deal temporarily on hold pending details supporting calculation that spam/fake accounts do indeed represent less than 5 percent of users." Trial Ex. 97. Despite his public statement, Musk did not instruct his team or lawyers to stop work on the deal. See Trial Tr. at 772:25–773:6 (Musk). Indeed, one of his bankers at Morgan Stanley testified that the tweet surprised her and that Musk never put the deal on hold or directed his team to do so. Trial Tr. at 1602:23–1603:14 (Claassen) ("We were never directed to put the deal on hold."). Even a member of the Twitter team testified that Musk had never notified them about a hold and that the deal was not, in fact, on hold—temporarily or otherwise. See id. at 1103:7–17 (Segal) ("Q. Was the Twitter deal on hold? A. No."); see also id. at 395:12–16 (Gadde) ("Q. Did [Musk] tell Twitter to stop working on the deal? A. Not to my recollection."). That is sufficient evidence for the jury to find that the tweet was literally not true.

Additionally, Plaintiffs assert that the tweet represented to the public that Musk had the right to put the deal on hold, despite Musk waiving due diligence in a seller-friendly agreement. JMOL Opp'n at 13. Musk responds that his statement would be "an opinion not actionable under the securities laws even if incorrect." JMOL at 21. But opinions can still be actionable if they affirm that the speaker holds the stated belief, they embed statements of fact, and a reasonable investor could understand them to convey facts about

the speaker's basis for the view. Golub v. Gigamon Inc., 994 F.3d 1102, 1106 (9th Cir. 2021) (citing Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund, 575 U.S. 175 (2015)); see also Jury Instructions (dkt. 527) at 20 (instruction on actionable opinions). Here, a jury could rely on evidence that Musk publicly claimed a right that he did not enforce in private to find that his professed opinion was false.

**2. Materiality**

Musk also contends that the falsity of the tweet was not material. JMOL at 21. For a misrepresentation to be material, "there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." Basic Inc. v. Levinson, 485 U.S. 224, 232 (1988) (citation modified). There was substantial evidence that the May 13 tweet was material.

First off, Musk—a Twitter investor seeking to purchase all outstanding common stock at the time—testified that his tweets about the deal were "material information" about the deal's status that "the public should know." Trial Tr. at 667:12–668:5 (Musk). Brian Belgrave, one of the Plaintiffs, testified that he believed the deal being on hold "created the concern, created the uncertainty that created the fear in the market." Id. at 305:13–22 (Belgrave). The tweet was also quickly followed by a significant reduction in Twitter's share price. See In re Alphabet, Inc. Sec. Litig., 1 F.4th 687, 703 (9th Cir. 2021) (immediate market reaction supported materiality). And Dr. Tabak testified that this "basically instantaneous" reaction was statistically significant. Trial Tr. at 1825:23–1826:20 (Tabak). That is enough evidence to support the jury's finding of materiality.

**D. Scienter**

Musk contends that there was no evidence of scienter because he acted in good faith, believing his statements were true when he made them. JMOL at 22. He relies primarily on his own testimony to support his position. See id. at 22–23. But "it is rare that perpetrators of a fraud would confess outright." In re Peoplesoft, Inc., No. C 99-00472 WHA, 2000 WL 1737936, at *3 (N.D. Cal. May 25, 2000). That is why "proof of

United States District Court
Northern District of California

scienter in fraud cases is often a matter of inference from circumstantial evidence." DSAM Glob. Value Fund v. Altris Software, Inc., 288 F.3d 385, 390 (9th Cir. 2002) (internal citation omitted). Courts may consider evidence of "motive" or "personal financial gain" for inferences of scienter. Tellabs, Inc. v. Makor Issues & Rts., Ltd., 551 U.S. 308, 325 (2007). The Court concludes that there was substantial evidence to support a finding that Musk knowingly made "an untrue statement with the knowledge that the statement was false or with deliberate reckless disregard for whether the statement was true." See Jury Instructions at 21.

For starters, there was sufficient evidence that Musk had a motive to back out of, or at least renegotiate, the deal. Musk had planned to—and eventually did—use stock from his other company, Tesla, Inc., to buy Twitter. See Trial Tr. at 555:14–556:25 (Birchall). Tesla had "a special place in [Musk's] heart" but the Tesla share price dropped significantly after he agreed to buy Twitter. See id. at 742:5–7; Trial Ex. 261 (showing decline in Tesla share price). As Plaintiffs note, it could mean Musk may have had to sell more Tesla stock to pay for the deal as it was then-structured. See JMOL Opp'n at 16. And there was evidence Musk told his biographer that the cost of the deal would require him to "take on a lot of debt" and he believed it would "work out at a much lower price . . . literally half or something." Trial Tr. at 976:11–23 (Isaacson).

There was also evidence that Musk's publicly-stated reason for his problem with the deal—the number of bots on Twitter—was something he knew he was misrepresenting. As he stated in his May 13 tweet (and others), Musk was publicly arguing that the number of bots on Twitter was much higher than Twitter represented and that he would not close until Twitter gave him answers regarding its methodology. He testified that his impression of the high number of bots came from his user experience on the platform. Trial Tr. at 690:24–691:6 (Musk). In fact, he conceded that even before he signed the merger agreement, he thought there were more bots on Twitter than it represented. See id. at 693:6–18. Musk testified that, before he signed the deal, he believed spam was "running rampant" and thought he could fix it. Id. at 694:4–17.

United States District Court
Northern District of California

But at the same time, Musk said he knew that Twitter estimated its bot percentage by looking at the number of people or accounts that logged into Twitter on a given day, or the monetizable daily active users ("mDAU"). Id. at 711:14–712:8. Musk was aware that mDAU included users who merely lurked on the app and did not leave a publicly noticeable footprint, which he understood included "most of the people in mDAU." Id. at 712:4–11. Nevertheless, Musk repeatedly insisted that there were more bots on Twitter than it claimed merely because bot activity was actually visible, even though mDAU mostly included users without online footprints. See id. at 789:22–25 ("Q. You're using the wrong denominator, though, aren't you? A. It's—I'm using the number that people can experience. Like what is their experience in the platform? Does it seem like only 5 percent is bots and spam?").

Accordingly, the evidence at trial supports a jury finding of scienter. A jury could conclude that Musk had a motive to get out of the existing deal and used bots as a pretext to do so. The evidence also showed that Musk was aware of the impact his tweets could have on the stock market. Trial Tr. at 664:13–21. And his conduct behind the scenes, such as not actually telling Twitter or his team that the deal was on hold, supports a strong inference of knowledge—or at least deliberate recklessness—as to the falsity of his statements.

**E. Reliance**

Musk asserts that Plaintiffs did not offer evidence that the fraud-on-the-market presumption applied and that there was also no evidence of individual reliance. JMOL at 23–24. Plaintiffs argue that they did not need evidence of individual reliance because the evidence properly established the fraud-on-the-market presumption. JMOL Opp'n at 18. The Court agrees with Plaintiffs that the presumption applied and was not rebutted.

The fraud-on-the-market theory recognizes a "rebuttable presumption of reliance on material misrepresentations aired to the general public." Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds, 568 U.S. 455, 461 (2013). It "rests on the premise that certain well developed markets are efficient processors of public information." Id. Accordingly, the

market price will reflect "all publicly available information, and hence, any material misrepresentations." Basic, 485 U.S. at 246. "[A]nyone who purchases the stock at the market price may be considered to have done so in reliance on the misrepresentation." Halliburton Co. v. Erica P. John Fund, Inc., 573 U.S. 258, 284 (2014). "To invoke the Basic presumption, a plaintiff must prove: (1) that the alleged misrepresentation was publicly known; (2) that it was material; (3) that the stock traded in an efficient market; and (4) that the plaintiff traded the stock between the time the misrepresentation was made and when the truth was revealed." Goldman Sachs Grp., Inc. v. Arkansas Tchr. Ret. Sys., 594 U.S. 113, 118 (2021). The Court determines that Plaintiffs availed themselves of the fraud-on-the-market presumption because they provided sufficient evidence for each of the Basic factors.

For the first factor, it is undisputed that Musk's tweets were publicly known on Twitter. And for the second factor, as previously discussed, Musk's tweets were materially false. For the third factor, Dr. Tabak testified that Twitter stock traded on an efficient market. See Trial Tr. at 1809:24–1810:10 (Tabak).[3] As to the fourth factor, the Class Period is limited to class members who sold between Musk's misrepresentation and when the truth—that he was going to buy Twitter—was revealed. See JMOL Opp'n at 19.

Musk asserts that he rebutted the presumption by providing evidence that the market already knew the truth and so his misrepresentations could not have affected the market price. JMOL at 24. A defendant can rebut the presumption with a "showing that severs the link between the alleged misrepresentation and either the price received (or paid) by the plaintiff." Basic, 485 U.S. at 248. Musk points out that the market knew he had "waived diligence well before May 13," so his tweet could not have affected Twitter's

---

[3] Musk argues that the Plaintiffs' theory of loss causation did not show an efficient market because there was no immediate market response to his May 13 tweet. JMOL at 23. "But an immediate response is not required for loss causation." Miller v. Thane Int'l, Inc., 615 F.3d 1095, 1103 (9th Cir. 2010) (emphasis in original). Regardless, Musk misconstrues the evidence. Dr. Tabak did testify that there was an immediate decline in the Twitter stock price after the May 13 tweet. Trial Tr. at 1892:25–1893:2. Musk's argument against the inclusion of May 16 in Dr. Tabak's event study confuses the timing of the reaction with its duration. See JMOL at 23 (inclusion of May 16 stock drop "is incompatible with an efficient market").

stock price. JMOL at 24. But Musk did not carry his burden here "by a preponderance of the evidence." See Goldman, 594 U.S. at 126. As Plaintiffs note, Musk himself presented evidence to contest what waiving due diligence meant and, therefore, what the market may have known. See, e.g., Trial Tr. at 732:7–9 (Musk) ("Q. You knowingly, voluntarily, strategically waived due diligence in order to make this offer more attractive to Twitter, right? A. On the assumption that the public filings were accurate."); id. at 1752:5–13 (Armstrong) ("Q. And due diligence can be used to gain a better understanding of the disclosures and the financial statements in a company's annual report, right? A. No, I disagree with that comment.").

Musk's second rebuttal argument also fails. He contends that the market learned the merger was not on hold at the same time as the May 13 tweet. JMOL at 24. On this point, Musk cites Dr. Tabak's testimony that people were "immediately saying things and saying that Twitter has not put it on hold, so it would be folded in with May 13th and 16th." See id. (citing Trial Tr. at 1909:10–15 (Tabak)). But Musk is reaching beyond what Dr. Tabak actually said. Dr. Tabak's testimony was limited to Twitter's position—that Twitter did not agree and the market was aware of that. Id. at 1909:16–19 ("Q. Okay. So your testimony is that people knew as of May 13 that Twitter had not agreed to put the deal on hold? A. Yes. They said they hadn't seen anything from Twitter."). Knowledge that Twitter did not agree to a hold does not equate to knowledge that the deal was not, in fact, on hold. It says nothing of Musk's position, which was the opposite of Twitter's as represented in his tweet.

Accordingly, the Court concludes that there was insufficient evidence for Musk to have rebutted the presumption.

**F. Damages**

Musk argues that Plaintiffs failed to prove legally sufficient damages because their expert, Dr. Tabak, did not perform the proper analysis for the measure of damages and failed to disaggregate economic loss by market or industry factors. JMOL at 10–14. The Court disagrees.

United States District Court
Northern District of California

**1. Measure of Damages**

Musk contends that Dr. Tabak's "out-of-pocket" damages model was flawed. JMOL at 11. Out-of-pocket loss is "the difference between the value of what the plaintiff gave up and the value of what the plaintiff received." Ambassador Hotel Co. v. Wei-Chuan Inv., 189 F.3d 1017, 1030 (9th Cir. 1999). The Court's jury instructions describe damages as "the difference between the price at which a stock sold and the price at which the stock would have sold had the statement or fraudulent acts reflected the true state of affairs." Jury Instructions at 27.

At the start of the Class Period, the true state of affairs was that there was an ongoing deal to buy Twitter. See Trial Tr. at 608:1–24 (Birchall) (deal work was pushing ahead as usual). Consequently, on May 13, Musk had three options. He could either say nothing, comment on the true state of affairs that the deal was proceeding as usual, or make a misrepresentation. As the jury concluded, Musk made an affirmative misrepresentation.

According to Musk, Dr. Tabak only opined on the difference between the actual stock price and the "but-for price" had Musk said nothing, instead of what the price would have been had his statements reflected the truth. JMOL at 11. Essentially, Musk contends that saying nothing is different from affirmatively speaking the truth. Id. at 12. But this mischaracterizes Dr. Tabak's testimony. Dr. Tabak repeatedly testified that, for his analysis, saying nothing was "just taking away the false stuff." Trial Tr. at 1901:3–4 (Tabak). He clarified that "Saying nothing is essentially not presenting that misrepresentation." Id. at 1901:11–14 (emphasis added).

None of Dr. Tabak's testimony is incompatible with the standard in the jury instructions. Plaintiffs pursued the theory that Musk misrepresented the literal state of the Twitter deal.[4] See FAC (dkt. 31). For example, Musk's May 13 tweet represented that the

[4] At the motion hearing, Musk argued that the true state of affairs was the existence of a dispute between him and Twitter or that he was getting cold feet for the deal. See June 18, 2026 Hr'g Tr. (dkt. 587) at 31:11–25. Perhaps. But there are many possibilities for what the true state of affairs was at the time—and Plaintiffs' theory is one of them. Ultimately, it is a factual question for the jury, and the Court concludes there was substantial evidence to support Plaintiffs' position.

Twitter deal was "temporarily on hold." Trial Ex. 97. Evidence at trial showed that the deal was never on hold. See, e.g., Trial Tr. 1603:12–14 (Claassen) ("Q. Isn't it a fact that he didn't put the deal on hold? A. Correct. We were never directed to put the deal on hold, to my knowledge."). In other words, Musk's statement was the opposite of the true state of affairs. Had he said nothing, thereby omitting the false representation, it would reflect the true state of affairs just as if he had merely said that the deal was proceeding as usual—the then-existing status quo. Accordingly, Dr. Tabak's damages model could still measure the stock price as if Musk's statement reflected the true state of affairs or, in other words, "the difference between the price [Plaintiffs received] for a security and the actual value of that security at the time." Cf. Chassin Holdings Corp. v. Formula VC Ltd., No. 15-CV-02294-EMC, 2017 WL 66873, at *13 (N.D. Cal. Jan. 6, 2017) (emphasis added) (discussing out-of-pocket damages in the context of a buyer case).

**2. Disaggregation**

Musk also argues that the jury did not have "sufficient evidence to disaggregate and isolate economic loss" caused by his misrepresentations "from price drops caused by general market or industry factors during the Class Period." JMOL at 12. He contends that Dr. Tabak failed to disaggregate market and industry effects and included impacts on share price unrelated to fraud in the damages calculations. Id. at 13. Plaintiffs respond that Dr. Tabak's damage calculation methodology—using event studies and a constant percentage measure of deflation—is entirely appropriate and adequately disaggregates damages. JMOL Opp'n (dkt. 573) at 6. The Court agrees with Plaintiffs.

It is well-settled that "a damage calculation requires courts to adjust for any share price gains that are unrelated to the fraud." Luna v. Marvell Tech. Grp., Ltd., No. C 15-05447 WHA, 2017 WL 4865559, at *3 (N.D. Cal. Oct. 27, 2017). There are many methods to disaggregate unrelated factors. As Plaintiffs point out, Dr. Tabak relied on two of them: constant percentage and event studies. See JMOL Opp'n at 6–7.

The constant percentage method determines the amount of artificial inflation or deflation on each date of a Class Period. See Homyk v. ChemoCentryx, Inc., No. 21-CV-

03343-JST, 2025 WL 1547625, at *16 (N.D. Cal. May 30, 2025). The method uses a "ribbon," or the daily level of artificial inflation or deflation caused by fraud, based on the "constant percentage" a share price was calculated to have been inflated or deflated by throughout the period. See id. The method can reliably disaggregate out-of-pocket damages from market and industry factors. Id. ("[C]ourts regularly find that the constant percentage [] methodology . . . is reliable and appropriate."); see also Police Ret. Sys. of St. Louis v. Granite Constr. Inc., No. C 19-04744 WHA, 2021 WL 229310, at *7 (N.D. Cal. Jan. 21, 2021) (measure of inflation per share over the class period could be accomplished via "constant percentage inflation"). And Dr. Tabak utilized this method to calculate a constant percentage of deflation over the Class Period, with reductions in the percentage to exclude certain non-fraud factors that significantly depressed the share price. See Trial Ex. 342; see also Trial Tr. at 1849:17–1853:17 (Tabak) (explaining deflation over the Class Period).

While Musk still criticizes constant percentage methodology, he concedes that it "is appropriate . . . when based on an event study that removes non-fraud-related factors." JMOL Reply (dkt. 578) at 8. Dr. Tabak did conduct an event study. See Trial Tr. at 1843:12–16. But because only two events were excluded, Musk argues that Dr. Tabak's analysis insufficiently removes "unrelated market movements." JMOL Reply at 8. That is not correct.

An event study considers "whether and to what extent any non-fraud related information (i.e. 'confounding information') contributed to the observed price movement" during a class period. In re FibroGen Sec. Litig., No. 21-CV-02623-EMC, 2024 WL 1064665, at *16 (N.D. Cal. Mar. 11, 2024). It is "widely accepted for calculating damages of a class of stockholders." SEB Inv. Mgmt. AB v. Symantec Corp., 335 F.R.D. 276, 288 (N.D. Cal. 2020). Event studies can be performed using a regression model, which is a statistical technique for measuring the ability of one or more variables to explain another variable of interest. See id. The model can be used to observe the typical relationship between the stock price and market factors. Id. Dr. Tabak conducted a regression analysis

for his event study to determine whether there were any statistically significant price decreases. Trial Tr. at 1843:7–1850:22. He only found two non-fraud related events that were statistically significant: Musk's termination letter on July 8, 2022 and Twitter whistleblower allegations on August 23, 2022. Id. at 1845:2–20. And he excluded them both from the damages calculation. Id. at 1850:4–16. Musk offers no evidence to suggest that any other events ought to have also been excluded.[5]

Accordingly, the Court concludes that there was substantial evidence from which the jury could disaggregate market and industry factors from Plaintiffs' damages.

### G. New Trial

Despite prevailing on two claims, Musk asks the Court for a new trial because he asserts that (1) the verdict was contrary to the weight of the evidence, (2) there was juror bias, (3) there was taint from Plaintiffs' unsuccessful theory of scheme liability, and (4) there was cumulative error from trial.[6] JMOL at 25–30. Plaintiffs disagree. JMOL Opp'n at 21–30. The Court takes each argument in turn.

#### 1. Contrary to the Weight of the Evidence

Musk reincorporates his arguments from his motion for a judgment as a matter of law to argue that, even if substantial evidence supports the verdict, the verdict is contrary to the clear weight of the evidence. JMOL at 25. The Court disagrees. As discussed regarding Musk's motion for a judgment as a matter of law, the Court does not find that the verdict is contrary to the clear weight of the evidence—far from it. To be sure, there is "substantial evidence that goes both ways" on some of the issues, but that is not enough to warrant a new trial. See Union Oil Co. of California v. Terrible Herbst, Inc., 331 F.3d 735, 743 (9th Cir. 2003) (reversing grant of new trial where the trial court "believed that the jury had failed to appreciate certain facts"). It is not the Court's "place to substitute [its]

[5] Musk did not call a rebuttal expert—or any expert for that matter. Dr. Tabak's testimony was the only expert evidence before the jury on damages.

[6] Musk also asks that the Court amend the judgment to include only judgment for the class representatives, as he argues that the verdict did not reflect fraud-on-the-market reliance for class-wide liability. JMOL at 30. As Musk advances the same argument in his motion to decertify the class, the Court addresses this point in its discussion of that motion.

United States District Court
Northern District of California

evaluations for those of the jurors." Id. at 742–43.

**2. Juror Bias**

Musk argues that the entire verdict is a product of bias and must be thrown out. JMOL at 25. He highlights three points that he believes demonstrate bias: (1) a prejudiced jury pool; (2) Plaintiffs' counsel's conduct; and (3) the verdict form. Id. The Court takes these one by one.

**a. Jury Pool**

For Musk's first argument, he reaches back to before the jury was even selected. He asserts that the jury pool exhibited significant hostility to him—so much that he could not get a fair trial. See JMOL at 26. The Court disagrees.

Musk is correct that that much of the pool did not like him. It is to be expected that Musk is polarizing; he is a public figure and businessman who has recently been involved in American politics at the highest levels. As the Court noted during jury selection, "people feel strongly about Mr. Musk one way or the other." Trial Tr. at 21:19–22:2 (Jury Voir Dire). That is not to say that Musk was universally hated. Some prospective jurors liked him. See, e.g., id. at 100:15–16 (prospective juror believing Musk is "a good person and he put a lot of effort to support humanity"). And some were neutral. See, eg., id. at 53:25–54:4 (prospective juror with "[n]o views" on Musk). Nevertheless, the Court agrees that there were more negative views than positive ones.

But that does not mean that the eventual jury will be similarly biased in its makeup. Courts have significant experience in finding ways to filter out partial jurors. For example, the Court has "broad discretion" to question potential jurors to detect bias. See Mu'Min v. Virginia, 500 U.S. 415, 423–24 (1991). And it exercised that discretion during jury selection to seek out potential bias and evaluate whether potential jurors could be rehabilitated. See, e.g., Trial Tr. at 47:8–48:3 (questioning juror about potential bias); see also United States v. Martinez-Salazar, 146 F.3d 653, 656 (9th Cir. 1998) (courts have leeway to keep jurors "who initially admit[] bias as long as [they] ultimately assert[] an ability to be fair and impartial"), rev'd on other grounds, 528 U.S. 304 (2000).

There is another reason Musk's objection falls flat: he had the ability to strike jurors. "Challenges for cause are the means by which partial or biased jurors should be eliminated." United States v. Gonzalez, 214 F.3d 1109, 1111 (9th Cir. 2000). Musk's counsel had the opportunity to strike potential jurors for cause, even with the Court denying a few challenges. See Trial Tr. at 134:1–147:14; cf. Carpenter v. Chappelle, No. C 98-2444 MMC, 2012 WL 2343615, at *11 (N.D. Cal. June 20, 2012) ("A trial court's failure to strike even a biased juror for cause will not constitute a Sixth Amendment violation so long as the jury that hears the case is impartial."). And the Court granted Musk—and Plaintiffs—six peremptory challenges to further eliminate jurors he felt were prejudiced against him. Trial Tr. at 148:12–19. Notably, Musk does not point to any individual juror in his eventual jury that he believes should have been removed. He merely criticizes the pool and attributes bias to the jurors that made the final cut.

Consequently, the Court determines that issues with the jury pool did not deprive Musk of a fair trial.

**b. Counsel Conduct**

Musk argues that Plaintiffs' counsel acted improperly throughout the trial to bias the jury. JMOL at 26. The Court disagrees that counsel's conduct warrants a new trial.

Musk asserts that Plaintiffs' counsel cultivated an "us-versus-them" theme by asking witnesses about their local ties and emphasizing their own, while at the same time asking Musk about his decision to move himself and his business out of California. JMOL at 26. The Court did not observe such questions rising to the level of attorney misconduct or prejudice. Lawyers regularly attempt to establish camaraderie with witnesses through a shared background. And as Plaintiffs note, the questions did not draw objections from Musk. See JMOL Opp'n at 23. Moreover, while the Court understands Musk's concern with questions about his leaving the state, Plaintiffs' counsel is entitled to establish basic background about witnesses and did not go so far that it became troubling. See Apple, Inc. v. Samsung Elecs. Co., No. 11-CV-01846-LHK, 2014 WL 549324, at *13 (N.D. Cal. Feb. 7, 2014) (new trials are only appropriate where the misconduct permeates the entire

proceeding).

Next, Musk contends that Plaintiffs' counsel's statement in closing argument about sending a message with a verdict improperly biased the jury. JMOL at 27. Although the Court agrees that it was an improper statement, it does not warrant a new trial. During closing argument, Plaintiffs' counsel stated:

> And I'm going to tell you now that there are a lot of people in this courtroom—and it's all about a message, and the message is: Are we going to allow people like Ms. Price, Mr. Belgrave, and the millions of people in between to not be protected? And that seal protects them, and that's why we came in this courtroom.

Trial Tr. at 2291:6–12 (Plaintiffs' Rebuttal). The Court previously instructed Plaintiffs' counsel that he could say a finding of liability would send a message but not that the jury should find a practice wrong because it would send a message. Trial Tr. 2136:11–15 (Charging Conference).

"[W] here punitive damages are not at issue, urging the jury to 'send a message' by its verdict is generally considered an improper appeal to the jurors' passion and prejudice." Hammonds v. Yeager, No. EDCV 15-1036 SS, 2017 WL 10560471, at *1 (C.D. Cal. Aug. 9, 2017). The Court concludes that counsel's statement violated the nature of the Court's restriction on argument. Counsel essentially asked the jury to find for Plaintiffs because it would send a message. But while counsel's statement could potentially evoke prejudice, it is not enough to warrant a new trial.

For reversal on grounds of attorney misconduct, the flavor of the misconduct "must sufficiently permeate an entire proceeding to provide conviction that the jury was influenced by passion and prejudice in reaching its verdict." McKinley v. City of Eloy, 705 F.2d 1110, 1117 (9th Cir.1983). Counsel's statement did not rise to this threshold. It did not permeate the proceedings and was "confined to a few seconds of the closing argument."[7] Apple, 2014 WL 549324, at *14. The attorney who made the statement had a

[7] The Court notes that Musk did not object when Plaintiffs' counsel made the statement. See Kehr v. Smith Barney, Harris Upham & Co., 736 F.2d 1283, 1286 (9th Cir. 1984) (considering lack of objection to closing argument in affirming denial of new trial motion).

more limited role at trial compared to other counsel for Plaintiffs. And, most importantly, a new trial "is warranted only if counsel's misconduct affected the verdict." Mateyko v. Felix, 924 F.2d 824, 828 (9th Cir. 1990). That is not the case here, where the jury found in Musk's favor for two out of four claims.[8]

**c. Jury Verdict**

Musk also challenges the completed verdict form as proof of prejudice. JMOL at 27. Musk points to the table for deflation per share over the Class Period and notes that all the deflation values are in black ink except for one. Verdict (dkt. 538) at 6–10. The only number in blue ink was $4.20. See id. at 8. Musk argues that the number 420 is often negatively associated with him, and that it proves the jury used its verdict to send a message. JMOL at 27–28. Musk's argument fails for several reasons.

For starters, that the jury sided with him on two claims takes the wind out of Musk's sails. See Chalmers v. City of Los Angeles, 762 F.2d 753, 761 (9th Cir. 1985) ("Without evidence of prejudice we will not grant a new trial."). It defies common sense that the jury could be so prejudiced against Musk yet absolve him of liability when they had the chance to send a message. The objective record of the jury's deliberations further undercuts Musk's picture of an impassioned jury. The jury did not immediately turn in its verdict after closing arguments. Instead, it deliberated for multiple days before making a decision. And there is evidence that the jury's deliberations were careful and thoughtful. After all, the jurors submitted six notes about the evidence at trial and the law in their jury instructions, even catching a typographical error in the instructions. See First Set of Jury Notes (dkt. 532); Second Set of Jury Notes (dkt. 537). None of this hints at anti-Musk

[8] The Court also included a jury instruction to remind the jury to base its verdict solely on the evidence it had heard, and the law provided by the Court. Jury Instructions at 2. Musk takes issue with the instruction, as he believes it prompted the jury about considering media coverage. JMOL at 27. But it is a simple fact that the case would get publicity—there were many people and reporters in the audience, particularly the days Musk testified. And the Court specifically cautioned the jury they "should not consider [publicity] in determining what [their] verdict should be." Jury Instructions at 2. It is "presume[d] that jurors carefully follow the instructions given to them." Caudle v. Bristow Optical Co., 224 F.3d 1014, 1023 (9th Cir. 2000), as amended on denial of reh'g (Nov. 2, 2000) (citation modified).

United States District Court
Northern District of California

animus.

Next, the number 420 is not necessarily indicative of prejudice against Musk. He asserts that 420 is negatively associated with him but does not offer any evidence to support it. To the contrary, 420 is a reference to cannabis/marijuana. See, e.g., United States v. Jobe, 933 F.3d 1074, 1076 (9th Cir. 2019) (noting that 420 refers to marijuana). One need only walk around San Francisco on April 20 to observe how prevalent the celebration can be. What's more, a joke about 420 played a role in the trial. See Trial Tr. 1524:16–19 (Claassen) ("[W]e knew Mr. Musk had joked about 420 quite a bit, and so we threw it out there as 54.20."). Consequently, it is also possible that a jury in San Francisco recognized and appreciated the joke—just as Musk has.

Lastly, the verdict form has many instances where different colors of ink were used. For example, the jury only marked liability for the May 17 tweet in blue ink—the rest of the claims are in black. Verdict at 2–5. The jurors also wrote "Reference Exhibit 342" in blue above the damages section heading. Verdict at 6. The jury used different pens at different times when filling out the verdict form, not only when writing the number 4.20.

Accordingly, the Court rejects Musk's challenge to the verdict form.

**3. Scheme Liability**

Musk asserts that the trial was unfair because Plaintiffs' claim for scheme liability distracted him from defending the misrepresentation-only case and permitted all types of otherwise prejudicial evidence to be shown to the jury. JMOL at 28. His argument lacks merit.

First and foremost, Musk cannot show prejudice from the scheme claim. That is primarily because he prevailed on the claim at trial. Verdict at 5. Musk's attempt to reframe his purported prejudice as being forced to divide time and resources to defend against two theories falls apart under inspection. See JMOL at 28. He argues that the claim was invalid and that he attempted many times to exclude it from the case—citing eleven of his motions. Id. at n.1. But Musk "cannot just reassert arguments that have already been rejected in hope of a different result." See Johnson v. U.S. Dep't of the

Treasury, No. C 11-06684 WHA, 2012 WL 5269620, at *3 (N.D. Cal. Oct. 24, 2012). Litigants "play with fire if they raise the same arguments over and over and fail to acknowledge prior adverse rulings." U.S. Commodity Futures Trading Comm'n v. Lake Shore Asset Mgmt. Ltd., 540 F. Supp. 2d 994, 1015 (N.D. Ill. 2008). Musk has no excuse to contest that he was on notice of the claim; he should have been prepared to put on a defense at trial. As the Court noted on February 26, 2026 when rejecting Musk's challenge to the scheme claim, Musk "cannot now reasonably contend that he [was] prejudiced in his ability to adequately prepare a defense against a theory that was part of the complaint, brought up during discovery, permitted during summary judgment, and then permitted again after a pretrial motion in limine."[9] See Order Re Ex Parte Motion (dkt. 454) at 6.

Second, Musk argues that the Court put no bounds on the scope of the scheme claim and permitted otherwise inadmissible evidence to come in. JMOL at 28. But this is just dissatisfaction with evidentiary rulings. District courts have "broad discretion" in rendering evidentiary rulings. Harper v. City of Los Angeles, 533 F.3d 1010, 1030 (9th Cir. 2008). Erroneous evidentiary rulings only warrant new trials if the errors " more probably than not . . . tainted the verdict." Id. As an initial matter, the Court's rulings could not have tainted the verdict if Musk was successful on both the scheme claim and one misrepresentation claim. See Verdict. Moreover, there were bounds on the admissibility of evidence at trial: the Federal Rules of Evidence. Musk makes clear that the Court's rulings were guided by the Rules because he insists that every time he tried "to exclude highly prejudicial evidence wholly irrelevant to Plaintiffs' narrow Rule 10b-5(b) claims, [he] was met with the same response: It comes in for the scheme claim." That is entirely a description of how Rule 403, which permits relevant evidence if it is not substantially unfairly prejudicial, works. See Fed. R. Evid. 403. Sometimes, evidence that

[9] Musk's representation that he could not defend against two theories at the same time is undermined by the fact that the scheme theory is inclusive of the statements in the misrepresentation theory—the scheme simply covers additional conduct.





United States District Court
Northern District of California

may be irrelevant to one claim is relevant to another and is therefore admissible, even if prejudicial.

Lastly, Musk contends that the inclusion of the scheme claim precluded him from making certain arguments. JMOL at 29. The only example he provides is his apparent inability to argue that his July 8 termination letter's impact on Twitter's stock price meant that losses after that date could not be attributed to the fraud. Id. Musk states that permitting the July 8 letter "as a basis for liability even though it is protected litigation conduct" meant that he could not pursue this argument. Id. That is wrong on two fronts. First, the Court simply found that the letter was not protected litigation conduct. See Trial Tr. at 2077:4–2081:18 (Charging Conference) (finding that the July 8 letter was not protected litigation conduct as a matter of law); see also Jury Instructions at 26 (instructions on protected litigation conduct covering the Delaware litigation itself). And second, Musk does not provide a reason for why the scheme claim would bar him from arguing, even in the alternative, that the letter was an intervening event for loss. To the contrary, he did so at trial. See, e.g., Trial Tr. at 1917:8–12 (Tabak) ("Q. You would agree, though, regardless of whether it was part of a scheme or not part of a scheme, it would be expected that the termination letter that was issued on July 8th would result in a stock price decline, right? A. In this case, yes, I think that's fair.").

Consequently, the Court once again rejects Musk's argument regarding scheme liability.

#### 4. Cumulative Prejudice

Musk repackages his other bases for a new trial into a catch-all argument that the combination of errors requires a new trial. JMOL at 29. The Court rejects this argument, too.

"[E]rrors in a civil trial must be considered 'cumulatively' and . . . the combined effect of multiple errors 'may suffice to warrant a new trial even if each error standing alone may not be prejudicial.'" Sidibe v. Sutter Health, 103 F.4th 675, 688 (9th Cir. 2024) (quoting Jerden v. Amstutz, 430 F.3d 1231, 1240–41 (9th Cir. 2005)). But this principle

only applies to cumulative errors by the trial court. See id. (analyzing cumulative error of trial court rulings); Jerden, 430 F.3d at 1240–41 (same). As discussed above, the Court did not find any errors on its part. The only instance of prejudice the Court found was Plaintiffs' counsel's statement during closing argument, which the Court explained was insufficient to trigger a new trial. Accordingly, the Court denies Musk's motion.

## II. MOTION TO DECERTIFY CLASS

Musk argues that there is no basis to conclude that Plaintiffs proved the fraud-on-the-market presumption for class-wide reliance. Mot. to Decertify at 6. Because the jury rendered a general verdict, Musk contends there is no way to know if the jury made its decision based on individual reliance or the fraud-on-the-market presumption. Id. at 7. As he believes individual issues abound, Musk asserts that Plaintiffs have failed to establish the requirements of Rule 23 of the Federal Rules of Civil Procedure and so the class must be decertified. Id. at 10–12. Plaintiffs respond that Musk's motion is procedurally improper and rests on the faulty assumption that the general verdict is ambiguous. Mot. to Decertify Opp'n (dkt. 574) at 2–9. The Court **DENIES** the motion.

### A. Legal Standard

Rule 23(c)(1)(C) permits a court to "alter[] or amend[]" an order granting class certification "before final judgment." Fed. R. Civ. Pro. 23(c)(1)(C). The Ninth Circuit has similarly stated that district courts may modify a class definition as a result of developments during the course of litigation. See Armstrong v. Davis, 275 F.3d 849, 871 n.28 (9th Cir. 2001) (recognizing that Rule 23 "provides district courts with broad discretion to determine whether a class should be certified, and to revisit that certification" and that "the district court may redefine the class" (citing Penk v. Oregon State Bd. of Higher Educ., 816 F.2d 458, 467 (9th Cir. 1987))). District courts have a responsibility to continually review "the appropriateness of a certified class in light of developments subsequent to class certification." Schilling v. TransCor Am., LLC, 2012 WL 4859020, at *1 (N.D. Cal. 2012). Ultimately, whether to decertify a class is within the discretion of the

United States District Court
Northern District of California

Court. See Levya v. Medline Indus. Inc., 716 F.3d 510, 513 (9th Cir. 2013).

**B. Discussion**

Rule 23(c)(1)(C) only empowers the Court to decertify a class "before final judgment." Fed. R. Civ. Pro. 23(c)(1)(C). Musk's motion comes after the Court entered a final judgment on April 3, 2026. Dkt. 557. Moreover, as discussed regarding Musk's motion for a judgment as a matter of law, the Court concluded that Plaintiffs properly invoked the fraud-on-the-market presumption and Musk failed to present evidence that could have rebutted it. Nevertheless, the Court briefly discusses the merits in light of its responsibility to ensure appropriate certification and Musk raising the issue prior to judgment. See Response to Post-Verdict Procedures (dkt. 549). For the reasons below, the Court concludes that Musk's basis for the motion is fundamentally flawed.

At first blush, when only looking at the verdict form, Musk's argument has some appeal. The form does not include a special interrogatory where a juror could mark that Musk had rebutted the fraud-on-the-market presumption.[10] See Verdict. But Musk's assertion of ambiguity for class-wide reliance quickly falls apart upon review of the trial record.

That is because there was no evidence of individual reliance during trial. Plaintiffs did not even attempt to introduce such evidence. See Mot. to Decertify Opp'n at 5–6. One of their three class representatives, John Garrett, did not testify, so the jury could not have premised liability on evidence of his individual reliance. And his wife Nancy Price, who was also a class representative, did not testify that Garrett saw Musk's May 13 tweet, either.[11] Further, Plaintiffs' closing argument made clear that they were not advancing any argument on individual reliance, just fraud-on-the-market for class-wide reliance. Trial Tr. at 2214:7–23 (Plaintiffs' Closing) (only discussing fraud-on-the-market for reliance); id. at

---

[10] Cases with successful Rule 10b-5 claims regularly exclude special interrogatories on reliance in their verdict forms. See, e.g., Verdict Form (dkt. 998) in In re Vivendi Universal, S.A. Securities Litigation, 02 Civ. 5571 (RJH) (HBP); Jury Verdict (dkt. 1611) in Lawrence E. Jaffe Pension Plan v. Household International, Inc., 1:02-cv-05893.

[11] Price also admitted on cross-examination that she was not aware of the May 13 tweet "back in 2022." Trial Tr. at 1365:22–1366:2 (Price).

United States District Court
Northern District of California

2177:23–2178:2 (asking the jury "to compensate investors like Mr. Belgrave, Nancy Price, John Garrett, and thousands of other investors"). And Musk's closing argument only discussed fraud-on-the-market, too. Trial Tr. at 2271:24–2272:13 (Musk Closing) (arguing that Plaintiffs "can't show reliance on the market").

Faced with the actual trial record, Musk unsurprisingly urges the Court to restrict its focus to the verdict form itself. Mot. to Decertify at 7 (arguing that "the general verdict gives no indication which of these alternative theories of reliance the jury adopted"). Citing Niles v. United States, Musk contends that the Court must turn a blind eye to the record and cannot speculate on which reliance theory was the subject of the verdict. Id. at 8. In that case, the Niles court noted that, "where a matter is tried on alternate theories of recovery and a general verdict rendered, appellate courts will not speculate on what particular ground the jury may have found against (the) plaintiff." 520 F. Supp. 808, 812 (N.D. Cal. 1981) (citation modified), aff'd sub nom. Niles By & Through Niles v. United States, 710 F.2d 1391 (9th Cir. 1983).

Niles, however, is inapplicable because Musk's argument fails twice over. As discussed, the case was not tried on alternative theories; Plaintiffs pursued fraud-on-the-market only from the start. And more importantly, the Court does not have to speculate to understand that the jury relied on the fraud-on-the-market presumption. Indeed, liability could have only been premised on class-wide reliance. As explained, there was no evidence of individual reliance in the record. How else could the jury find reliance where one of the class representatives did not even testify if not for the fraud-on-the-market presumption? Cf. UniRAM Tech., Inc. v. Taiwan Semiconductor Mfg. Co., No. C 04-1268 VRW, 2008 WL 11515597, at *5 (N.D. Cal. Apr. 17, 2008) ("Any doubt in a general verdict in a civil case is resolved in favor of the prevailing party: Absent [special] interrogatories, the law presumes the existence of findings necessary to support the verdict the jury reached." (internal quotation omitted)).

Consequently, the Court denies Musk's motion.[12]

## III. MOTION FOR PREJUDGMENT INTEREST

Plaintiffs ask the Court to award prejudgment interest based on the rate set by 26 U.S.C. § 6621(a)(2), compounded daily from October 4, 2022 (the end of the Class Period) to April 3, 2026 (the entry of final judgment). MPI at 10. Musk argues that no prejudgment interest is required and, in the alternative, the Court award simple interest—or at least interest compounded annually—based on the rate set in 28 U.S.C. § 1961. MPI Opp'n (dkt. 576) at 13. The Court **GRANTS** the motion. The Court sets the rate at the Treasury bill rate pursuant to Section 1961, compounded annually, and running from October 4, 2022 through entry of final judgment.

### A. Legal Standard

Prejudgment interest serves a compensatory function, designed to make the injured party whole. Knapp v. Ernst & Whinney, 90 F.3d 1431, 1441 (9th Cir. 1996). The decision whether to award prejudgment interest is left to the sound discretion of the trial court, guided by the factors from Osterneck v. Ernst & Whinney. Those factors include: (1) whether prejudgment interest is necessary to compensate the plaintiff fully for his or her injuries; (2) the degree of personal wrongdoing by the defendant; and (3) other fundamental considerations of fairness. Osterneck v. Ernst & Whinney, 489 U.S. 169, 176 (1989). Prejudgment interest should not be "speculative" or provide a "windfall" to plaintiffs. Knapp, 90 F.3d at 1442.

Courts have broad discretion to determine what rate of interest to apply and when prejudgment interest begins. See Columbia Brick Works, Inc. v. Royal Ins. Co. of Am.,

[12] Musk also argues that "[i]mposing class-wide liability despite the lack of any jury finding" for the fraud-on-the-market presumption violates his procedural due process rights. Mot. to Decertify at 12. As discussed, the fraud-on-the-market presumption was the only basis that could support the jury's verdict of liability, so there are no due process implications for class-wide reliance here. Cf. Finjan, Inc. v. Sophos, Inc., No. 14-CV-01197-WHO, 2016 WL 2988834, at *19 (N.D. Cal. May 24, 2016) ("[A] general jury verdict can give rise to collateral estoppel only if it is clear that the jury necessarily decided a particular issue in the course of reaching its verdict." (internal quotation omitted)).

768 F.2d 1066, 1068 (9th Cir. 1985). In deciding if and how much prejudgment interest should be granted, courts must examine matters encompassed within the merits of the underlying action. Osterneck, 489 U.S. at 176.

**B. Discussion**

The Court determines that all three Osterneck factors are applicable and support an award of prejudgment interest.

**1. Necessity for Full Compensation**

Contrary to Musk's insistence, prejudgment interest is needed to fully compensate the class members. As Plaintiffs note, due to Musk's fraud, members of the class "were deprived of the use and value of their money" for almost four years. See MPI at 3; see also In re Vivendi Universal, S.A. Sec. Litig., 284 F.R.D. 144, 162 (S.D.N.Y. 2012) ("Plaintiffs have been deprived of the use of their funds for nearly ten years, and prejudgment interest is necessary to fully compensate them for their loss.").

Musk argues that there is no basis to infer that the class members would have used their proceeds and received a "predictable rate of return." MPI Opp'n at 5. But similar arguments have been rejected by courts awarding prejudgment interest. See, e.g., Hsu v. Puma Biotechnology, Inc., No. SACV 15-00865 AG (SHKX), 2019 WL 4295285, at *2 (C.D. Cal. Sept. 9, 2019) (rejecting argument that awarding interest assumes that "class members would have taken $4.50 per share and made a conservative investment"). Musk also contends that interest would serve as a windfall because "class members obtained cash the moment they sold and were able to invest the proceeds as they saw fit." MPI Opp'n at 5. But that is irrelevant because Plaintiffs are seeking interest on the amount of deflation due to Musk's fraud, not their actual proceeds when selling their stock. See MPI Reply (dkt. 581) at 4.

**2. Degree of Personal Wrongdoing**

Musk argues that the verdict did not indicate that he willfully defrauded investors and that he did not personally profit from Plaintiffs selling their shares. MPI Opp'n at 3–4. Musk is correct that the jury could have found that he acted with deliberate recklessness



United States District Court
Northern District of California

instead of with knowledge of falsity. See Jury Instructions at 21. But "although scienter is not necessary to award interest, because the focus is on compensating plaintiffs," Musk's potentially deliberate recklessness "does not weigh against an award of interest." Vivendi, 284 F.R.D. at 162. Under both standards of intent available to the jury, Musk acted intentionally. And "intentional violations of the federal securities laws support an award of prejudgment interest." Hsu, 2019 WL 4295285 at *2.

The Court does agree, however, that Musk's lack of personal profit from Plaintiffs' sales does cut against his level of wrongdoing. Nevertheless, on balance, Musk's fraudulent conduct favors an award. See id. ("[T]here is not a requirement that a defendant be unjustly enriched in order to award prejudgment interest."); see also Vivendi, 284 F.R.D. at 163 ("Vivendi's argument that it never had use of plaintiffs' money is irrelevant, because the prejudgment interest inquiry focuses on compensating plaintiffs, not disgorging inequitable gains from defendants.").

**3. Fairness**

Musk also contends that it is unfair to reward investors—particularly those who "positioned themselves to profit from the alleged fraud"—with interest. MPI Opp'n at 6. But "[s]hares are normally purchased with an eye toward a later sale." Dura, 544 U.S. at 342. It comes as no surprise that investors seek to profit from their investment. In doing so, they buy and sell stock "at the price set by the market" by relying on "the integrity of that price." Basic, 485 U.S. at 247. And an investor can still be harmed by deflation attributable to fraud even if they also sought to profit from a lower price. Accordingly, "the fair result is [still] to make the victims of [Musk's] fraud whole." Hsu, 2019 WL 4295285, at *2.

**4. Appropriate Rate**

The Court agrees with Musk that the Section 1961 rate is appropriate. The Section 6621 rate Plaintiffs propose is "generally applied by the Internal Revenue Service" to "penalize individuals and corporations for the underpayment of taxes." Hsu, 2019 WL 4295285, at *2. In contrast, the Section 1961 rate is in line with the "default rule in the

United States District Court
Northern District of California

Ninth Circuit" for securities actions. See id. The interest is based on the "rate equal to the weekly average 1-year constant maturity Treasury yield." 28 U.S.C. § 1961(a). The Court determines that the Treasury bill rate should be compounded annually pursuant to the statute. See 28 U.S.C.A. § 1961(b).

## IV. MOTION FOR APPROVAL OF CLASS NOTICE OF VERDICT AND CLAIMS PROCEDURE

Plaintiffs also move for approval of their notice of verdict and claims administration process. MFA. Musk opposes, primarily asserting that he has a right to conduct post-trial discovery to test the individual reliance of class members, with additional jury trials as necessary. MFA Opp'n (dkt. 577). The Court **GRANTS** the motion. The Court first discusses Musk's post-trial discovery request and then covers the other components of the claims process.

### A. Post-Trial Discovery

Musk asks the Court to appoint a special master to conduct a second phase of the case that scrutinizes individual issues of reliance. MFA Opp'n at 14. He cites his right to rebut the fraud-on-the-market presumption and argues that it entitles him to post-trial discovery for rebuttal. MFA Opp'n at 2–6. In Basic, the Supreme Court acknowledged that defendants "may rebut proof of the elements giving rise to the presumption" or show "that an individual plaintiff traded or would have traded despite his knowing the statement was false." 485 U.S. at 992. The Court certainly agrees that Musk had the right to rebut the presumption in this case. As discussed, he tried and was unsuccessful at trial. But that right does not extend to post-trial discovery.

Hsu v. Puma Biotechnology, Inc. is illustrative. After being held liable at trial, the defendants made the same arguments Musk does here. They argued "that they have a right to obtain reasonable discovery to challenge the reliance element of the class action suit, that targeted discovery on individual reliance is necessary to prevent manifest injustice, and that [their] discovery requests are reasonable and proportionate." Hsu v. Puma

Biotechnology, Inc., No. SA CV 15-00865-DOC-SHK, 2021 WL 2644100, at *2 (C.D. Cal. June 11, 2021). The Hsu court disagreed. It held that the defendants did not have "a right to obtain reasonable post-trial discovery to challenge the reliance element of the class action suit." Id. The court concluded that Supreme Court precedent permitting rebuttal of the fraud-on-the-market presumption on an individual basis did not extend that "right to challenge reliance through reasonable discovery [] post-trial." Id. The court rejected the post-trial discovery request despite its final pretrial orders "permit[ting] an opportunity for post-trial discovery" because that was "only an opportunity and not a right." Id.

Hsu is on all fours with the instant case. Musk was well-aware of his ability to rebut the presumption before trial—and he actually did so for one plaintiff. The Court agreed that Musk rebutted the presumption when it deemed Steve Garrett "not an appropriate class representative" because he did not rely on Musk's fraud or the market price when he sold his shares. Order Granting Class Certification (dkt. 106) at 9–10. Musk's post-trial insistence that he should now get additional discovery and trials runs contrary to the purpose of the class action device. Cf. Smith v. Pac. Pers. Servs., Inc., No. 17-CV-03594-SK, 2018 WL 11437641, at *4 (N.D. Cal. Oct. 11, 2018) ("[R]esolving disputes in a single class action is far more efficient than litigating individual cases.").

Further, Musk's cited authority in support of his position is inapposite. See MFA Opp'n at 3 (citing Lawrence E. Jaffe Pension Plan v. Household Int'l Inc., 2005 WL 3801463 (N.D. Ill. Apr. 18, 2005) and In re Vivendi Universal, S.A. Sec. Litig., 284 F.R.D. 144 (S.D.N.Y. 2012)). As the Hsu court noted, "the defendants in those cases sought discovery on individual reliance issues during the pre-trial fact discovery period, the discovery was expressly stayed until after trial, and the final pretrial orders specifically provided for post-trial discovery."[13] 2021 WL 2644100, at *2. Musk also cites

[13] At the motion hearing, Musk urged the Court to consider a pretrial dispute where Plaintiffs objected to discovery about unnamed plaintiffs and said it was a post-judgment claims process issue. See June 18, 2026 Hr'g Tr. at 89:9–91:18 (discussing Joint Discovery Letter Brief (dkt. 175)). But as Musk conceded, that dispute "wasn't about reliance." Id. at 89:15. And Musk never sought review after Magistrate Judge Ryu ruled on the issue. Id. at 94:7–10;

Jaroslawicz v. Engelhard Corp. MFA Opp'n at 1. Although that court ordered post-trial rebuttal proceedings, it decided that issue before trial alongside a motion to dismiss. Jaroslawicz v. Engelhard Corp., 724 F. Supp. 294, 303 (D.N.J. 1989).

Accordingly, the Court denies Musk's request.[14]

**B. Schedule**

The Court adopts Plaintiffs' proposed notice and claims schedule. See MFA at 1–2. Musk only objects to the extent it does not permit him sufficient time (30 days) to evaluate claims to test individual reliance or damages and asks for 120 days to review claims. MFA Opp'n at 14. But as Plaintiffs note, Musk will actually have more than 30 days to review claims. MFA Reply (dkt. 582) at 9. Starting 60 days after publication of the notice, the Claims Administrator will start providing the parties with a summary update on the received claims. See MFA at 1. The Administrator will then send updates to the summaries every 30 days. Id. This builds in enough time for advanced preparation.

The approved schedule is reproduced below:

| Date | Action |
|---|---|
| 21 days following this Order. | Claims administrator to publish and initiate mailing of the notice. |
| 60 days following publication of the notice. | Claims administrator to provide parties with a summary update on received claims. Updated summaries to be provided thereafter every 30 days. |
| 120 days following publication of the notice. | Deadline for Class Members to submit a claim. |
| 180 days following the deadline to submit a claim. | Claims administrator to provide parties and file with the Court a claims report listing all claims determined to be valid. |
| 30 days after filing of the claims report. | Deadline for Defendant, following meet and confer with Lead Plaintiffs, to file with the Court any issues concerning claims and basis. |
| 30 days after any claims related filings by Defendant. | Deadline for Lead Plaintiffs and/or claimant to file a response to any filings by Defendant. |
| 21 days after any responses to any filings related to any claims. | Deadline for Lead Plaintiffs to move for distribution of funds, attorney fees and expenses, and service awards. |
| 21 days before hearing on motion for distribution of funds, claim issues, attorney fees, expenses, and service awards. | Deadline for objections to attorney fees, expenses, or service awards. |
| 14 days before hearing on motion for distribution of funds, claim challenges, attorneys' fees, expenses, and service awards. | Deadline for replies in support of motion for distribution of funds, attorney fees, expenses, and service awards. |

[14] To the extent Musk makes his post-trial discovery argument to challenge other parts of the claims process, the Court rejects it.

United States District Court
Northern District of California

**C. Claims Administrator**

As both parties agree, the Court appoints Epiq Class Action and Claims Solutions as the Claims Administrator. See MFA at 2; MFA Opp'n at 10.

**D. Notice of Verdict and Proof of Claim Form**

The Court also adopts Plaintiffs' proposed notice of verdict and proof of claim form. The proposed notice concisely covers the necessary information regarding the case, judgment, and class member rights. Musk's request for additional information would only create confusion and potential intimidation. Aside from his rejected right to post-trial discovery, Musk asks the Court to include language that he will have access to the submitted information and has the right to challenge submissions. MFA Opp'n at 13. The Court agrees with Plaintiffs that the proposed claim form adequately explains that claims and documentation will be reviewed without raising the specter that Musk—a significant public figure—will be waiting in the wings for a potential challenge. See MFA Reply at 8. Plaintiffs must, however, fix the mistaken inclusion of "Settlement" on page three of the notice, as Musk identified. See MFA Opp'n at 10.

In addition to his post-trial discovery argument, Musk makes a host of challenges to the proof of claim and its underlying process.

First, he argues that the Court should make clear to Epiq that its "validation" of claims is not adjudication. MFA Opp'n at 11. That is easy enough. Plaintiffs point out that the "validation" Musk is referring to is simply verification of information for the Court's eventual approval. MFA Reply at 6.

Second, Musk asserts that the proposed process does not actually require claimants to submit documentation in support of their claim. MFA Opp'n at 11. That is wrong. Epiq requires documentation and flags ineligibility when it is missing. Azari Decl. (dkt. 567-3) ¶¶ 51–52. Even claim forms submitted electronically are flagged for deficiencies and follow up. Id. ¶577.

Third, Musk asks the Court to require claimants to submit government-issued identification to verify identity. MFA Opp'n at 12. That is unnecessary; the

United States District Court
Northern District of California

documentation requested in the claim form is sufficient. Claimants must already submit their names, contact information, addresses, Social Security Numbers or Taxpayer Identification Numbers, and trading account numbers. See Claim Form (dkt. 567-5). Musk provides no reason why additional verification would be required.

Fourth, Musk requests that Epiq provide the parties with "read-only" access to the claims database so he can prepare in advance for any challenges. MFA Opp'n at 12. As Plaintiffs note, the process already contemplates real-time access and monthly reports. MFA Reply at 7; Azari Decl. ¶ 68 (party access to file transfer protocol site for document storage).

And fifth, Musk objects that the Court should not permit late claims. MFA Opp'n at 13. Plaintiffs propose that Epiq should be able to accept all late, but valid, claims that are filed before it submits its final claims report with the Court. MFA at 6. Plaintiffs assert that this process would sweep in otherwise valid claims from claimants who may be abroad or difficult to reach. MFA Reply at 8. As there is still a hard deadline for such late claims, the Court agrees with Plaintiffs that the process is appropriate. Cf. Lemus v. H & R Block Enters., LLC, No. C 09-03179 SI, 2013 WL 3831866, at *2 (N.D. Cal. July 23, 2013) ("A district court has discretion to allow late claims to a settlement fund.").

### E. Calculating Damages

The parties have two disputes as to damages calculation. They disagree on which accounting method to use and whether class members who did not purchase stock during the Class Period need documentation for when they bought it.

As to the accounting method, courts apply either the first-in-first-out method ("FIFO") or the last-in-first-out method ("LIFO"). Both methods aim to evaluate the order in which securities sold during the Class Period will be matched against securities held or bought in the period. Under FIFO, sales of stock during the Class Period are matched first against holdings at the start of the Class Period and then purchases made during the Period in chronological order. LIFO operates in reverse, matching sales against the most recent shares purchased. Plaintiffs urge the Court to adopt FIFO. MFA at 9. Musk asks for

United States District Court
Northern District of California

LIFO. MFA Opp'n at 8.

The Court adopts FIFO. It is an accepted method of calculating damages. See, e.g., Plumbers & Pipefitters Loc. 572 Pension Fund v. Cisco Sys., Inc., No. C 01-20418 JW, 2004 WL 5326262, at *3 (N.D. Cal. May 27, 2004) (FIFO is "a legitimate method for computing losses or gains from stock purchases or sales."); Gruber v. Gilbertson, 647 F. Supp. 3d 100, 120 (S.D.N.Y. 2022) (approving FIFO). Musk rightly points out that many courts prefer LIFO. See MFA Opp'n at 9. But the concerns some courts have about using FIFO are not applicable here. Courts prefer LIFO because it accounts for "gains that might have accrued to plaintiffs during the class period due to the inflation of the stock price." Cf. Gruber, 647 F. Supp. 3d at 119–20 (internal quotation omitted). That is not an issue in a seller case with deflation. And Plaintiffs have also proposed adjustments to offset windfalls. See MFA Reply at 5.

Musk also urges the Court to require class members who only purchased before the Class Period to provide records of when they bought their shares as it would be relevant to damages calculation. MFA Opp'n at 10. The Court disagrees. As Plaintiffs point out, for shares purchased before the Class Period, the date of purchase does not matter as there was no fraud-related deflation at the time—a deflated price upon sale is the damage. See MFA Reply at 6.

## V. CONCLUSION

For the foregoing reasons, the Court **GRANTS** Musk's motion for judgment as a matter of law for Musk's May 17 tweet and **DENIES** the remainder of the motion. The Court also **DENIES** Musk's motion to decertify the class. The Court **GRANTS** both Plaintiffs' motion for prejudgment interest and motion for approval of class notice of verdict and claims administration procedure.

**IT IS SO ORDERED.**

Dated: July 6, 2026

CHARLES R. BREYER
United States District Judge

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| GIUSEPPE PAMPENA, on behalf of himself and all others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>ELON R. MUSK,<br><br>Defendant. | CASE NO. 3:22-CV-05937-CRB<br><br>**CLASS ACTION**<br><br>**[PROPOSED] JUDGMENT**<br><br>Judge: Hon. Charles R. Breyer |

This action was tried by a jury with the Honorable Charles R. Breyer presiding. The jury rendered its verdict on March 20, 2026, finding that defendant Elon Musk committed securities fraud by violating §10(b) of the Securities Exchange Act of 1934 and Rule 10b-5(b) promulgated thereunder.

IT IS ORDERED AND ADJUDGED that judgment is hereby entered in favor of Lead Plaintiffs Brian Belgrave, Nancy Price, and John Garrett, on behalf of themselves and the following Class:

> All persons and entities who sold the publicly traded stock or call options, or purchased the put options, of Twitter, Inc. during the period from May 13, 2022 through October 4, 2022, both dates inclusive (the "Class Period"), and who suffered damages by Defendant's violations of § 10(b) and of the Exchange Act.

IT IS FURTHER ORDERED AND ADJUDGED that Defendant Elon Musk and all persons who previously requested exclusion from the case at the class certification stage, as set forth at ECF 226, are hereby excluded from the Class and this judgment.

IT IS FURTHER ORDERED AND ADJUDGED that Plaintiffs and the Class shall recover damages from Defendant Elon Musk in an amount calculated pursuant to the out-of-pocket measure of damages in which the number of Twitter shares or call options sold or put options purchased by each Class Member on a given day during the Class Period is multiplied by the amount of damages per share or per option awarded by the jury for that day, less any deflation for any shares or put options purchased and any inflation for any call options sold during the Class Period, plus prejudgment and post-judgment interest to be determined by the Court. These calculations and the plan of allocation governing the claims administration process will be performed by the Claims Administrator for all Class Members who submit valid claims.

IT IS FURTHER ORDERED AND ADJUDGED that the Court shall retain jurisdiction over the notice and claims process, including an appropriate claims procedure, plan of allocation, and distribution to all Class Members who submit valid claims.

IT IS FURTHER ORDERED AND ADJUDGED that the Court shall retain jurisdiction over the determination of prejudgment and post-judgment interest.

IT IS FURTHER ORDERED AND ADJUDGED that the Court shall retain jurisdiction over any claim for attorneys' fees and costs, any application to tax costs, and any award or reimbursement to the Lead Plaintiffs. In accordance with Federal Rule of Civil Procedure 54(d), the time for Lead Plaintiffs and their counsel to make any such motion or application shall be extended until such time as the Court shall hereafter direct.

DATED: April 3, 2026

HONORABLE CHARLES R. BREYER
UNITED STATES DISTRICT COURT JUDGE

**Volume 12**

**Pages 2142 - 2296**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Charles R. Breyer, Judge

GIUSEPPE PAMPENA, individually and on behalf of all others similarly situated, et al.,

Plaintiffs,

VS.

ELON MUSK,

Defendant.

**NO. C 3:22-cv-05937-CRB**

San Francisco, California
Tuesday, March 17, 2026

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:
For Plaintiffs:

COTCHETT, PITRE & MCCARTHY LLP
840 Malcolm Road
Burlingame, California 94010
**BY: JOSEPH W. COTCHETT, ATTORNEY AT LAW**
**MARK C. MOLUMPHY, ATTORNEY AT LAW**
**TYSON C. REDENBARGER, ATTORNEY AT LAW**
**GIA JUNG, ATTORNEY AT LAW**
**CAROLINE A. YUEN, ATTORNEY AT LAW**
**ELLE D. LEWIS, ATTORNEY AT LAW**

BOTTINI & BOTTINI, INC.
7817 Ivanhoe Avenue - Suite 102
La Jolla, California 92037
**BY: FRANCIS A. BOTTINI, JR., ATTORNEY AT LAW**
**AARON P. ARNZEN, ATTORNEY AT LAW**

**(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

Reported By: Ruth Levine Ekhaus, RMR, RDR, FCRR, CCG
CSR No. 12219, Official United States Reporter

Mr. Musk took the stand and said, "Yeah, he's on my team." He described him. There's countless e-mails.

**THE COURT:** You're satisfied there's enough in the record to establish that Mr. Lynch is actually associated either by banker or part of his team?

**MR. REDENBARGER:** Absolutely.

**MR. BERGJANS:** The record indicates otherwise.

**THE COURT:** On that representation, I'm permitting it.

**MR. REDENBARGER:** Thank you.

**THE COURT:** Over objection. Okay.

(Recess taken at 9:18 a.m.)

(Proceedings resumed at 9:23 a.m.)

(Proceedings were heard out of the presence of the jury.)

**THE COURTROOM DEPUTY:** Come to order. Court is in session.

**THE COURT:** Okay. Please be seated.

(The jury enters the courtroom.)

(Proceedings were heard in the presence of the jury.)

**THE COURT:** Let the record reflect all jurors are present. Parties are present.

**JURY INSTRUCTIONS**

**THE COURT:** Ladies and gentlemen of the jury, you have heard all of the evidence, and it is now my duty to instruct you on the law as it applies to this case.

A copy of these instructions will be sent to the jury room

for each of you, and you may consult them during your deliberations.

It is your duty to find the facts from all the evidence in the case. To those facts, you will apply the law as I give it to you. You must follow the law as I give it to you whether you agree with it or not.

And you must not be influenced by any personal likes or dislikes, opinions, prejudices, or sympathy. That means you must decide the case solely on the evidence before you. You will recall that you took an oath to do so.

This case, as you know, has received publicity. It is a reasonable assumption that your verdict, whatever it may be, will also be publicized. You are cautioned, however, that you should not consider this fact in determining what your verdict should be. That verdict must be based solely on the evidence you have heard and on the law as I have stated it.

Please do not read into these instructions or anything I may say or have done or said that I have an opinion regarding the evidence or what your verdict should be.

When a party has the burden of proving a claim by a preponderance of the evidence, it means you must be persuaded by the evidence that the claim is more probably true than not true.

You should base your decision on all of the evidence regardless of which party presented it. The evidence you are

to consider in deciding what the facts are consists of the sworn testimony of any witness, the exhibits that have been admitted into evidence, any facts to which the lawyers have agreed, and any facts that I've instructed you to accept as proved.

In reaching your verdict, you may consider only the testimony and exhibits received into evidence. Certain things are not evidence, and you may not consider them in deciding what the facts are. I will list them for you.

Arguments and statements by lawyers are not evidence. The lawyers are not witnesses. What they have said in their opening statements, what they will say in their closing arguments and at other times is intended to help you interpret the evidence, but it is not evidence. If the facts as you remember them differ from the way the lawyers have stated them, your memory of them controls.

Questions and objections by lawyers are not evidence. Attorneys have a duty to their clients to object when they believe a question is improper under the Rules of Evidence. You should not be influenced by the objection or by the Court's ruling on it.

Testimony that is excluded or stricken or that you have been instructed to disregard is not evidence and must not be considered.

In addition, some evidence was received only for a limited

purpose. When I've instructed you to consider certain evidence only for a limited purpose, you must do so, and you may not consider that evidence for any other purpose.

Anything you may see have seen or heard when the court was not in session is not evidence. You are to decide this case solely on the evidence received in trial.

Some evidence, as I indicated, has been admitted only for a limited purpose. When I've instructed you that an item of evidence has been admitted only for a limited purpose, you may consider it -- you must consider it only for that limited purpose and not for any other purpose.

Evidence may be direct or circumstantial. You should consider both kinds of evidence. The law makes no distinction between the weight to be given to either direct or circumstantial evidence. It is for you to decide how much weight to give to any evidence.

Certain charts and summaries not admitted into evidence have been shown to you to help explain the contents of books, records, documents, or other evidence in the case. Charts and summaries are only as good as the underlying evidence that supports them. You should therefore give them only such weight as you think the underlying evidence deserves.

Certain charts and summaries have been admitted into evidence to illustrate information brought out in the trial. Charts and summaries are only as good as the testimony or other

admitted evidence that supports them. You should therefore give them only such weight as you think the underlying evidence deserves.

In deciding the facts in this case, you may have to decide which testimony to believe and which testimony not to believe.

You may believe everything a witness says or part of it or none of it.

In considering the testimony of any witness, you may take into account the opportunity and ability of the witness to see or hear or know the things testified to; the witness's memory, the witness's manner while testifying; the witness's interest in the outcome of the case, if any; the witness's bias or prejudice, if any; whether other evidence contradicted the witness's testimony; the reasonableness of the witness's testimony in light of all the evidence and any other factors that bear on believability.

Sometimes a witness may say something that is not consistent with something else he or she said. Sometimes different witnesses will give different versions of what happened. People often forget things or make mistakes in what they remember. Also, two people may see the same event but remember it differently.

You may consider these differences, but do not decide that testimony is untrue just because it differs from other testimony.

However, if you decide that a witness has deliberately testified untruthfully about something important, you may choose not to believe anything that witness said.

On the other hand, if you think that the witness testified untruthfully about some things but told the truth about others, you may accept that part you think is true and ignore the rest.

The weight of the evidence as to a fact does not necessarily depend on the number of witnesses who testify. What is important is how believable the witnesses were and how much weight you think their testimony deserves.

A deposition is the sworn testimony of a witness taken before trial. The witness is placed under oath to tell the truth, and the lawyers for each parties -- each party may ask questions. The questions and answers are recorded. When a person is unavailable to testify at trial, the deposition of that person may be used at trial.

Insofar as possible, you should consider deposition testimony presented to you in court in lieu of live testimony in the same way as if the witness had been present to testify.

Evidence was presented to you in the form of answers of one of the parties to written interrogatories submitted by the other side. These answers were given in writing and under oath before the trial in response to questions that were submitted under established court procedures. You should consider the answers insofar as possible in the same way as if they were

made from the witness stand.

You have heard testimony from Adam Badawi and David Tabak, who testified about their opinions and reasons for their opinions. This opinion testimony is allowed because of the specialized knowledge, skill, experience, training, or education of the witness. Such opinion testimony should be judged just like any other testimony. You may accept it or reject it and give it as much weight as you think it deserves considering the witness's specialized knowledge, skill, experience, training or education, the reasons given for the opinion, and all the evidence in this case.

You have heard testimony regarding data privacy laws in relation with Twitter user data that was sought by the defendant during the merger. The United States and European Union have data privacy laws that permit disclosure of privacy data based on consent. Twitter's privacy policy permitted disclosure of user data during a merger or acquisition. There is no evidence that any privacy law, domestic or international, prohibited the disclosure of Twitter's private user data to the defendant as part of the merger.

However, there are protocols on how this information may be disseminated or disclosed. You are not to construe any testimony or anything the Court may have said as inferring such a bar on disclosure.

Further, the fact that the law may have permitted Twitter

to disclose private information to the defendant does not affect informational rights under the merger agreement.

Congress enacted the securities laws to protect the integrity of financial markets. The plaintiffs claim to have suffered a loss caused by the defendant's alleged violation of Rule 10b-5 during the class period, which was from May 13th, 2022, to October 4th, 2022. There are terms concerning securities laws that have a specific legal meaning. The following definitions apply throughout these instructions unless noted otherwise:

A security is an investment of money in a commercial financial, or other business enterprise with the expectation of profit or gain produced by the efforts of others. Some common types of securities are stocks and options.

The buying and selling of securities are controlled by the securities laws. Many of these laws are administered by the United States Securities and Exchange Commission, known as the SEC. A 10b-5 claim is a claim brought under a federal statute, Section 10b of the Securities Exchange Act of 1934, which prohibits acts of fraud in connection with the purchase or sale of a security and in violation of rules and regulations that the SEC has the duty and power to issue.

A corresponding SEC rule, Rule 10b-5, prohibits any act, practice, or scheme to defraud and/or the misrepresentation of material facts in connection with the purchase or sale of

securities. A person or business entity who violates the securities laws, including Rule 10b-5 may be liable for damages caused by the violation.

An act, practice, or scheme to defraud is any conduct that has the principal purpose and effect of creating a false appearance of fact in furtherance of the scheme to defraud.

A misrepresentation is a statement of material fact that is false or misleading when it is made. A statement may be misleading even if it is literally true if the context in which the statement was made caused the listener or reader to remain unaware of the actual state of affairs. A statement is misleading if it would give a reasonable investor the impression of a state of affairs that differs in a material way from the one that actually exists.

Words cannot be viewed in complete isolation but must instead be read in the light of all the information then available to the market to decide if they conveyed a false or misleading impression.

"In connection with" means that there was some relationship or nexus between the allegedly fraudulent conduct and the sale of securities. The defendant's conduct may be in connection with the purchase or sale of a security even if the defendant did not actually participate in any securities transaction.

An instrumentality of interstate commerce includes the

postal mails, e-mails, telephone, telegraph, telefax, interstate highway system, Internet, and similar methods of communication and travel from one state to another within the United States.

The plaintiffs inclusive of the class allege that the defendant engaged in securities fraud in violation of the federal securities laws during the class period, May 13th, 2022, to October 4th, 2022. This is referred to as "the plaintiffs' 10b-5 claim." To succeed on this claim, the plaintiffs have the burden of proving each of the following five elements by a preponderance of the evidence:

First, the defendant, Elon Musk, A, employed a device, scheme, or artifice to defraud;

Or, B, made an untrue statement of a material fact;

Or, C, engaged in an act, practice, or course of business which operated or would operate as a fraud or deceit upon any person in connection with the sale of securities.

Plaintiffs allege that the following statements were materially false and misleading under Rule 10b-5.

One, a May 13th, 2022, tweet quote [as read]:

> "Twitter deal temporarily on hold pending details supporting calculation that spam/fake accounts do indeed represent less than 5 percent of users."

End quote.

Two, a May 16th, 2022, statement regarding the prevalence of spam/fake accounts on Twitter that [as read]:

"I think it's some number that is probably at least four or five times."

End quote.

Twitter's 5 percent representation and that [as read]:

"The lowest estimate would probably be 20 percent, and this -- and this is a bunch of quite smart outside" -- pardon me -- "a bunch of quite smart outside firms have done the analysis of Twitter and looked at the daily users, and their conclusion is also about -- it's about 20 percent."

End quote.

And, three, a May 17th, 2022, tweet, quote [as read]:

"20 percent fake spam accounts while four times what Twitter claims could be much higher. My offer was based on Twitter's SEC filings being accurate. Yesterday Twitter's CEO publicly refused to show proof of less than 5 percent. The deal cannot move forward until it does."

End quote.

These three statements are the only ones that are alleged to be materially false or misleading and the only ones that can form the basis for liability under Rule 10b-5(b).

Plaintiffs separately bring a claim under Rule 10b-5 (a)

and/or (c) alleging that the defendant engaged in a scheme to defraud Twitter investors by carrying out fraudulent acts that had the principal purpose and effect of creating a false appearance of fact in furtherance of the scheme to defraud.

You have heard testimony regarding other statements or tweets made by the defendant. These statements must be treated differently under the context of plaintiffs' two claims.

Under Rule 10b-5(b), you may consider those separate statements in determining whether the three at-issue statements were false and misleading.

Under Rule 10b-5(a) or (c), you may consider those separate statements in determining whether they were part of a larger scheme allegedly carried out by the defendant.

The second element. Defendant Elon Musk acted knowingly or with deliberate recklessness.

Third, defendant Elon Musk used or caused the use of an instrumentality of interstate commerce such as mail, telephone, Internet, or any facility of a national securities exchange in connection with the purchase or sale of securities regardless of whether the instrumentality or facility itself was used to engage in the alleged fraudulent acts or to make an alleged untrue statement of material fact.

Fourth, plaintiffs justifiably relied on the alleged untrue statements and material fact or alleged fraudulent conduct.

And fifth, defendant Elon Musk alleged material misrepresentations or fraudulent acts caused the plaintiffs to suffer damages.

If you find that the plaintiffs have proved each of these elements for their claim or claims, your verdict should be for the plaintiffs on that claim or claims.

If, on the other hand, you find that the plaintiffs have failed to prove any of these elements for their claim or claims, your verdict should be for the defendant on that claim or claims.

The plaintiffs must prove by a preponderance of the evidence that the defendant's misrepresentation was materially false or misleading. Under Rule 10b-5(b), a factual representation concerning a security is material if there is a substantial likelihood a reasonable investor would consider that fact important in deciding whether to buy or sell that security.

A material misrepresentation gives a reasonable investor the impression of a state of affairs that differs in a material way from the one that actually exists.

The plaintiffs must also prove by a preponderance of the evidence that the defendant's purported scheme was material. Under 10b-5(a) or (c), a scheme is material if there is a substantial likelihood a reasonable investor would consider the facts important in deciding whether to buy or sell that

security.

If the purported scheme is material, it would give a reasonable investor the impression of a state of affairs that differs in a material way from the one that actually exists. You must decide whether something was material based on the circumstances as they existed at the time that -- of the statement or the duration of the scheme.

A statement of opinion does not constitute an untrue statement of material fact simply because the stated opinion ultimately proves incorrect, but an opinion is actionable as a false statement if the speaker does not sincerely hold the view or belief expressed regarding the material representation or if the opinion contains material verifiable statement of fact that is untrue.

A plaintiff -- the plaintiffs must prove by a preponderance of the evidence that the defendant acted with the intent to defraud.

A defendant acts knowingly at the time he makes an untrue statement with the knowledge that the statement was false or with deliberate reckless disregard for whether the statement was true.

A defendant acts with deliberate recklessness when he engages in highly unreasonable conduct that is an extreme departure from ordinary care, presenting a danger of misleading investors which is either known to the defendant or is so

obvious that the defendant must have been aware of it.

Mere recklessness or motive to commit fraud and opportunity to do so provides some reasonable inference of intent but are not sufficient standing alone to establish a strong inference of deliberate recklessness.

You have heard evidence of the defendant's conduct before the class period. You may consider this evidence only for its bearing, if any, on the question of the defendant's intent, motive, plan, or knowledge and for no other purpose.

A plaintiff must prove by a preponderance of the evidence reliance on the alleged material misrepresentation or fraudulent acts, and that the plaintiff was justified in doing so. A plaintiff must not intentionally close his or her eyes and refuse to investigate the circumstances or disregard known or obvious risks.

A plaintiff does not have to prove that he, she, or other members of the class individually relied on the alleged misrepresentations and/or fraudulent acts in deciding to sell the securities in question if they prove by a preponderance of the evidence the requirements were invoking a presumption that they and the class relied on the integrity of the market price, otherwise known as the "fraud on the market" presumption.

To invoke fraud on the market presumption, a plaintiff must prove by a preponderance of the evidence that, one, there was an active open market for Twitter securities during the

relevant time period. An active open market means that there were a large number of traders, high-level activity, frequent trades such that the price of the security immediately reflects all publicly available information.

Two, investors reasonably relied on that market as an accurate reflection of the current market value of securities.

Three, the alleged misrepresentations and/or fraudulent acts were publicly known, material, meaning that a reasonable investor would have regarded what was not disclosed to them as having significantly altered the total mix of information they took into account in deciding whether to sell the Twitter security.

And four, plaintiff traded the stock or options between when the alleged material misrepresentations were made and when the truth was revealed.

A defendant may rebut the presumption that the plaintiffs relied on the integrity of the market price when selling Twitter securities by proving by a preponderance of the evidence the plaintiffs did not actually rely on the integrity of the market price when they sold Twitter securities. In that event, the plaintiffs must then prove that they justifiably relied directly on the misrepresentation and/or fraudulent acts.

A defendant may also rebut that presumption that the defendants relied on the market price when selling Twitter

securities by proving by a preponderance of the evidence that the misrepresentation and/or fraudulent acts did not affect the market price of Twitter's stock.

The fraud on the market presumption of reliance is limited to the time between when the misrepresentation was made or when the fraudulent acts occurred and when the truth was revealed.

The plaintiffs must prove by a preponderance of the evidence that the alleged fraudulent acts or material misrepresentations as alleged in their Rule 10b-5 claims were the cause of their economic injury. To establish economic injury or loss, the plaintiffs must prove that the alleged fraudulent acts or a misrepresentation artificially deflated the price of Twitter's securities.

To establish causation, the plaintiffs must prove that the alleged fraudulent acts or misrepresentation played a substantial part in causing the injury or loss the plaintiffs suffered. Put more simply, proof of loss causation requires demonstrating that the subject of the alleged fraudulent acts or misrepresentation was the cause of the actual loss suffered.

The plaintiffs need not prove that the alleged fraudulent acts or misrepresentation was the sole cause of the economic injuries.

The Constitution ensures the right of all persons to bring lawsuits to vindicate their rights. In connection with the constitutional right to petition and protection of the right to

access to the courts, the law protects conduct that is incidental or sufficiently related to attempts to vindicate rights in courts.

You have heard testimony relating to litigation between Twitter and the defendant in Delaware, which was filed on July 12th, 2022. Such petitioning conduct in litigation is not illegal, and you may not base your liability on this conduct -- you may not base liability on this conduct.

When evaluating the plaintiff's claim that the defendant engage in a scheme through fraudulent acts and/or misrepresentations, you may only premise liability based upon the entire course of the defendant's conduct.

While petitioning conduct may be relevant in connection with the issues you must decide, the fact of the petitioning itself cannot be considered by you in determining liability.

If you find for the plaintiffs on their Rule 10b-5 claim or claims, then you must consider and decide the amount of money damages, if any, to be awarded to plaintiffs in class. You may award only actual damages in an amount that will reasonably and fairly compensate the plaintiffs and the class for the economic losses they and the class sustained.

Actual damages are measured by the amount of deflation caused by a misrepresentation or fraudulent acts on which you base your finding of 10b-5 liability.

In other words, actual damages are measured by the

difference between the price at which the stock sold and the price at which the stock would have sold had the statement or fraudulent acts reflected the true state of affairs.

It is the plaintiffs' burden to prove their actual damages. Actual damages are limited to losses caused by the alleged material misrepresentation and fraudulent act, and do not include losses caused by other events.

You will be asked to determine the amount, if any, by which the prices for Twitter common stock and put options were artificially affected by any material misrepresentation or fraudulent acts you may find for each day during the class period.

You will also be asked to determine the appropriate level of implied volatility, which should be used to calculate the effect of any material misrepresentation or fraudulent acts you may find on Twitter's options.

Your award must be based on evidence and not upon speculation, guesswork, or conjecture. The plaintiffs have the burden of proving damages by a preponderance of the evidence.

And now, ladies and gentlemen, we'll turn to argument. The argument will be that the plaintiffs will open. The defendants then will -- will argue, and then the plaintiffs will respond.

Okay. You may proceed.

\\\

**CERTIFICATE OF REPORTER**

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

DATE: Tuesday, March 17, 2026

Ruth Levine Ekhaus, RMR, RDR, FCRR, CCG, CSR No. 12219
Official Reporter, U.S. District Court

United States District Court
Northern District of California

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA

GIUSEPPE PAMPENA, et al.,
Plaintiffs,
v.
ELON MUSK,
Defendant.

Case No. 22-cv-05937-CRB

**ORDER GRANTING CLASS CERTIFICATION**

Lead Plaintiffs Steve Garrett, Nancy Price, John Garrett, and Brian Belgrave bring this securities class action against Defendant Elon Musk, alleging that Musk violated Section 10(b) of the Securities Exchange Act of 1934, as well as Rule 10b-5, by making multiple misstatements to artificially depress the price of Twitter stock. Lead Plaintiffs now move for certification of a class defined as follows:

> All persons and entities who sold the publicly traded stock or call options, or purchased the put options, of Twitter, Inc. during the period from May 13, 2022 through October 4, 2022, both dates inclusive (the "Class Period"), and who suffered damages by Defendant's alleged violations of § 10(b) and of the Exchange Act.

Lead Plaintiffs move to appoint themselves as class representatives and to appoint Cotchett Pitre & McCarthy LLP and Bottini & Bottini, Inc. as class counsel. The Court **GRANTS** Plaintiffs' motion **EXCEPT** as to the appointment of Steve Garrett as class representative.

## I. BACKGROUND

### A. Factual History

The Court has already described the facts giving rise to this lawsuit on multiple occasions. See Order Granting in Part & Denying in Part Mot. to Dismiss (dkt. 48), 705 F.

Supp. 3d 1018 (N.D. Cal. 2023); Order Denying J. on the Pleadings (dkt. 89), 2024 WL 3678002 (N.D. Cal. Aug. 5, 2024). In this order, the Court repeats only those facts necessary to resolve the motion at hand.

In April 2022, Twitter entered an agreement (the "Merger Agreement") to be acquired by an entity wholly owned by Musk for $54.20 per share. First Am. Compl. (dkt. 31) ¶ 85. In the following weeks, Musk made several tweets and public comments about the agreement. Plaintiffs allege that the following were misstatements:

- Musk tweeted on May 13, 2022: "Twitter deal temporarily on hold pending details supporting calculation that spam/fake accounts do indeed represent less than 5% of users." Id. ¶ 111.
- Musk said at a tech conference on May 16, 2022 that fake and spam accounts make up at least 20% of Twitter's users. Id. ¶ 120.
- Musk tweeted on May 17, 2022: "20% fake/spam accounts, while 4 times what Twitter claims, could be *much* higher. My offer was based on Twitter's SEC filings being accurate. Yesterday, Twitter's CEO publicly refused to show proof of <5%. This deal cannot move forward until he does." Id. ¶ 125.

After these statements, Twitter's stock declined from $45.08 per share (its value on May 12, 2022) to $35.76 per share (its value on May 24). Id. ¶¶ 113, 131.

On October 4, 2022, Musk publicly announced that he had informed Twitter that he intended to go through with the Merger Agreement at the initial offer price. Id. ¶ 41. By the close of the next day, Twitter's stock had risen to $51.30 per share. Id.

**B. Lead Plaintiffs**

The Court appointed Steve Garrett, Nancy Price, John Garrett, and Brian Belgrave as Lead Plaintiffs under the Private Securities Litigation Reform Act of 1995. See Order Denying/Granting Mot. to Appoint Lead Pl. & Lead Counsel (dkt. 30), 2023 WL 3082341 (Apr. 24, 2023). Lead Plaintiffs are individual investors who collectively sold 28,389 shares of Twitter common stock during the Class Period (May 13 to October 4, 2022) and allegedly suffered financial losses of over $500,000. See Summary Loss Chart (dkt. 8-4).

United States District Court
Northern District of California

**Brian Belgrave** is a business owner with a bachelor's degree in accounting from the University of Oregon and with "decades" of experience investing in the stock market. Joint Decl. (dkt. 8-5) at 1. Belgrave bought Twitter stock in the immediate aftermath of Musk's statements in May 2022 because he still "thought" and "hoped" that Musk's purchase of Twitter would close. Belgrave Dep. Tr. (dkt. 99-4) at 82:2–16, 181:2–7. Belgrave did not, however, believe that Musk's statements in May 2022 were false. Id. at 178:25–179:1. And as the value of Twitter's stock continued to drop, Belgrave became worried that the deal would not go through and sold his shares. Id. at 119:24–120:1, 151:1–8.

**Steve Garrett** is a commercial pilot with over 35 years of experience investing in the stock market. Joint Decl. at 1. Much like Belgrave, Steve bought Twitter stock in mid-May because he "believed" that the deal would close. S. Garrett Dep. Tr. (dkt. 99-5) at 61:15–18. He then sold his shares in July after Musk stated that he was "terminating" the deal. Id. at 31:3–6. In his deposition, Steve did not indicate familiarity with Musk's statements from May 2022, and he did not state that he relied on those statements when he sold his shares. See id. at 30:25–31:16.

**John Garrett** has over 50 years of experience investing in the stock market. Joint Decl. at 1. He "traded on the information that … [Musk] was going to buy the shares [in Twitter] for $54.20." J. Garrett Dep. Tr. (dkt. 102-5) at 102:8–10. And when "it turned out … that [Musk] wasn't going to buy the company," John sold his shares in Twitter. Id. at 103:7–10.

**Nancy Price**, John Garrett's domestic partner of over 30 years, "also has years of experience investing with [John] Garrett in the stock market." Joint Decl. at 1. At her deposition, Price testified that her awareness of Musk's statements largely comes from conversations she had with John Garrett. See Price Dep. Tr. (dkt. 99-3) at 67:7–14, 68:13–69:17, 74:18–23. She repeatedly expressed uncertainty as to what John told her about Musk's statements, id. at 67:18 (Musk's statements were "probably from television"); when he told her Musk had lied, id. at 69:15–16 ("I would imagine it was perhaps May of

’22”); and what he did after finding out that Musk had lied, id. at 72:16–17 (“I think he probably sold Twitter stock”).

## II. LEGAL STANDARD

Rule 23 of the Federal Rules of Civil Procedure, which governs class actions, requires that the Court find by a preponderance of the evidence that the requirements of Rule 23(a), as well as one of three possible requirements under Rule 23(b), are met. See Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 615 (1997). The Rule 23(a) requirements are that (1) “the class is so numerous that joinder of all members is impracticable,” (2) “there are questions of law or fact common to the class,” (3) “the claims or defenses of the representative parties are typical of the claims or defenses of the class,” and (4) “the representative parties will fairly and adequately protect the interests of the class.” Plaintiffs seek certification under Rule 23(b)(3), which requires that “the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.” At the class certification stage, the Court considers the merits of Plaintiffs’ case “only to the extent [] that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied.” In re Diamond Foods, Inc. Sec. Litig., 295 F.R.D. 240, 245 (N.D. Cal. 2013) (quoting Amgen Inc. v. Conn. Ret. Plans & Tr. Funds, 568 U.S. 455, 466 (2013)).

## III. DISCUSSION

Musk does not appear to contest that Plaintiffs satisfy the first two Rule 23(a) requirements—numerosity and commonality. Rather, he focuses his arguments on the latter two requirements—typicality and adequacy—as well as Rule 23(b)(3)’s requirement that common questions of fact and law predominate. He also challenges the class definition as overbroad, asserting that it includes class members who did not suffer harm.

### A. Predominance of Common Questions

Musk’s primary argument against class certification is that common questions do not predominate over individual questions and, as a result, a class action is not superior to

United States District Court
Northern District of California

other available methods. Musk contends that whether class members relied on his allegedly misleading statements is "inherently" an individual question, specifically arguing that "sophisticated" investors could have immediately realized the falsity of his statements such that they would not rely on those statements. Opp. (dkt. 99) at 8–9.

Plaintiffs do not intend to prove individual reliance, however. Instead, they assert that they are entitled to a presumption of reliance under the fraud-on-the-market doctrine, which the Supreme Court blessed in Basic Inc. v. Levinson, 485 U.S. 224, 244–47 (1988). See Mot. (dkt. 76) at 11. In Basic, the Court held that "if a market is shown to be efficient, courts may presume that investors who traded securities in that market relied on public, material misrepresentations regarding those securities." Amgen, 568 U.S. at 462 (citing Basic, 485 U.S. at 245–47). The Basic presumption is rebuttable, however: "Any showing that severs the link between the alleged misrepresentation and either the price received (or paid) by the plaintiff, or his decision to trade at a fair market price, will be sufficient to rebut the presumption of reliance." Basic, 485 U.S. at 248. So, for example, if "the 'market makers' were privy to the truth," if the truth "credibly entered the market and dissipated the effects of the misstatements," or if individual plaintiffs would have traded how they did "without relying on the integrity of the market," the Basic presumption would be rebutted. Id. at 248–49.[1]

Musk argues that Plaintiffs cannot rely on Basic's presumption for three reasons. First, Musk asserts that Basic does not apply out of the gate because Plaintiffs' argument rests on the market for Twitter shares being inefficient. Second, Musk argues that the Basic presumption would be rebutted by evidence that his alleged misrepresentations did not impact the value of Twitter shares. Third, Musk argues that, even if the Basic presumption applies and is not rebutted at the class level, Rule 23(b)(3) is not satisfied because the individual question (whether individual investors relied on Musk's statements)

---

[1] The parties also dispute whether a different presumption of reliance applies under Affiliated Ute Citizens v. United States, 406 U.S. 128 (1972). Because the Court holds that Plaintiffs are entitled to a presumption of reliance under Basic, the Court need not reach whether a presumption would also exist under Affiliated Ute.

predominates over any common questions.

**1. Basic's requirement of an efficient market is satisfied.**

Musk's argument regarding an efficient market is somewhat unusual in that he does not appear to contest that Twitter is an efficient market in fact; instead, he argues that Plaintiffs' "own theories of falsity and loss causation are fundamentally incompatible with" an efficient market. Opp. at 9. That is because, as Musk puts it, Plaintiffs allege that some segment of the market was misled by Musk's statements but that sophisticated investors were not misled. Id. Indeed, Musk states that Plaintiffs "conceded" that sophisticated investors were not misled. Id. at 10–11 (citing Pl.'s Opp. to Mot. for J. on the Pleadings (dkt. 62) at 10–12). So, Musk's argument goes, if sophisticated investors knew that Musk's statements were false but the market reacted to Musk's statements anyway, then the market must be inefficient because it failed to take into account all the relevant information. Id.

Musk's argument proves too much. To start, Plaintiffs never conceded that sophisticated investors were not misled by Musk's tweets. See Pl.'s Opp. to Mot. for J. on the Pleadings at 11 ("[T]he test is not whether experienced and skilled professionals in the field would know that Musk's tweets were false"); see also id. (pointing out that "Musk's own citations to analysts' opinions and finance articles show the uncertainty, speculation, and inconsistent information in the market"). Moreover, even if Musk is correct that some hypothetical sophisticated investor "knew" that Musk's statements were untrue (though Musk does not identify any such investor) that does not change the calculus. An efficient market presumes that all publicly available information—not investors' "comments" on, or their "aggregation" or "summary" of, that information—is reflected in the stock price. See Bonanno v. Cellular Biomedicine Grp., Inc., 2016 WL 4585753, at *4–5 (N.D. Cal. Sept. 2, 2016). And as the Court has already held, the publicly available information in this case (namely, the Merger Agreement) does not clearly showcase the falsity of Musk's statements. MTD Order at 20 n.8, 23–25. In other words, Plaintiffs' theory of the case accounts for the Merger Agreement in their efficient market hypothesis. Their theory is

simply that Musk's statements were misleading—even to sophisticated investors and even in light of the Merger Agreement—and that his statements affected Twitter's stock price as a result. That Musk contests whether his statements were misleading when considered alongside the Merger Agreement does not change Plaintiffs' facially viable theory.[2]

Because Plaintiffs adequately allege an efficient market, and Musk does not contest the other prerequisites to establish the Basic presumption of reliance at the class certification stage,[3] the Basic presumption of reliance applies.

**2. There is insufficient evidence to rebut the Basic presumption.**

Musk next contends that the Basic presumption is rebutted by evidence that Musk's alleged misrepresentations did not impact Twitter's stock price. His argument on this front takes two forms: (1) that the market was already aware of the truth behind his statements, and (2) that his statements did not impact the market. Opp. at 12.

Both points are premature. As to the first, a "truth-on-the-market" defense like Musk's "is a matter for trial," not for class certification. Amgen, 568 U.S. at 481–82; see also In re Diamond Foods, 295 F.R.D. at 250. As to the second, the Supreme Court has explained that disputes about loss causation "ha[ve] nothing to do with whether an investor relied on the misrepresentation in the first place, either directly or presumptively through the fraud-on-the-market theory [i.e., the Basic presumption]." Halliburton I, 563 U.S. at 813.

To be sure, the Court cannot "ignore a defendant's direct, more salient evidence showing that [an] alleged misrepresentation did not actually affect the stock's market price." Halliburton Co. v. Erica P. John Fund, Inc. (Halliburton II), 573 U.S. 258, 282 (2014). Musk does not provide such evidence. He concedes that Twitter's stock price

---

[2] Musk also suggests that Plaintiffs' efficient market hypothesis fails because "Plaintiffs' own counsel possessed sufficient information" to assert claims against Musk. Opp. at 10 (emphasis in original). The Court rejects this view, which, if adopted, would have the perverse effect of penalizing plaintiffs and their lawyers for enforcing the securities laws.

[3] Namely, that his alleged misstatements were public and that the class members sold shares after he made his statements but before he corrected them. Erica P. John Fund, Inc. v. Halliburton Co. (Halliburton I), 563 U.S. 804, 811 (2011).

dropped on May 13, the day of his first allegedly misleading statement, but he argues that any decrease in value is due to the "uncertainty" created by his statement. Opp. at 13. That is a distinction without a difference: the Court is aware of no authority that would suggest one degree of separation defeats the causal link between allegedly misleading statements and their impact on the market. Plus, there is more evidence that Musk's statements affected the Twitter's stock price. His own expert witness identified over a dozen institutional investors who sold Twitter stock when shares were well under the $54.20 merger price. Saha Rpt. (dkt. 99-6) at 42.[4] And as the Court has already explained, the fact that Twitter's stock price rose after Musk's October 4, 2022 correction of his allegedly misleading statements is evidence that the statements themselves had an impact on Twitter's stock price. MTD Order at 35–37.

Musk's rebuttal evidence is insufficient to rebut the Basic presumption at this stage, so class-wide reliance is presumed.

**3. The Basic presumption satisfies Rule 23(b)(3).**

Musk also argues that, even if Plaintiffs are entitled to the Basic presumption and the presumption is not rebutted, individual inquiries into individual class members' reliance on Musk's allegedly misleading statements predominate over common questions of law and fact. Opp. at 16. This argument is not viable from the start. Once a plaintiff proves that the Basic presumption applies, the predominance requirement of Rule 23(b)(3) is met. See Halliburton II, 573 U.S. at 276; see also Amgen, 568 U.S. at 462–63 ("Absent the fraud-on-the-market theory, the requirement that Rule 10b-5 plaintiffs establish reliance would ordinarily preclude certification of a class action seeking money damages because individual reliance issues would overwhelm questions common to the class."); Hanon v. Dataproducts Corp., 976 F.2d 497, 509 (9th Cir. 1992) ("the defense of non-reliance is not a basis for denial of class certification"). The Court's determination that the Basic presumption of reliance applies therefore means that Plaintiffs satisfy Rule 23(b)(3).

[4] Certification of the class moots Plaintiffs' pending motion to strike Dr. Saha's report. This does not preclude Plaintiffs from raising future Daubert challenges as to Dr. Saha.

United States District Court
Northern District of California

**B. Typicality of Lead Plaintiffs' Claims**

Musk's first argument under Rule 23(a) is that Lead Plaintiffs' claims are atypical because Lead Plaintiffs did not rely on Musk's alleged misstatements when trading Twitter stock. This, Musk contends, opens Lead Plaintiffs up to unique defenses and makes them improper class representatives. Opp. at 19–20.

This challenge to the typicality of Lead Plaintiffs' claims is in large part the same as the challenge to the Basic presumption, just targeted specifically at Lead Plaintiffs. To that extent—i.e., to the extent that Musk argues that Lead Plaintiffs were sophisticated enough to not be misled by Musk's statements—his argument fails. "Sophisticated investors are as entitled to rely on the fraud-on-the-market theory as anyone else." Hanon, 976 F.2d at 506.

In any case, Musk's assertion that Lead Plaintiffs were aware at the time that his statements were false is not supported by their deposition testimony. Aside from a few stray quotes suggesting that some Lead Plaintiffs "believed the deal would close" even after Musk's allegedly misleading statements, e.g., Belgrave Dep. Tr. (dkt. 99-4) at 181:7, three of the four Lead Plaintiffs indicated that Musk's statements and their impact on the market caused them to sell Twitter stock. See, e.g., id. at 179:24–25 ("Like I say, it's everything that [Musk] said which led me to sell."); Price Dep. Tr. (dkt. 102-6) at 24:6–12 (describing John Garrett's decision to sell Twitter shares when he became "worried that this [the deal] wouldn't come to fruition").

The evidence does, however, preclude Steve Garrett from establishing reliance on any of Musk's allegedly misleading statements. Steve testified that he sold his shares in July 2022 because Musk said that he was terminating the deal, and he ruled out any other reason for doing so. S. Garrett Dep. Tr. (dkt. 99-5) at 30:25–31:6 ("Q: Are there any other statements that Mr. Musk made that caused you to enter or exit positions, to buy or sell Twitter stock or options? A: Nothing that sticks out. It was a pretty firm statement that he made that he is terminating the deal. The word 'terminated' is a pretty strongly worded statement."). Steve's specific identification of something other than the integrity of the

market (and, of course, other than Musk's allegedly misleading statements) that caused him to sell Twitter stock "severs" any causal chain linking his decision to Musk's statements and rebuts the presumption that he relied on Musk's statements. See Basic, 485 U.S. at 248. He therefore is not an appropriate class representative.

**C. Adequacy of Lead Plaintiffs**

Musk further contends that Lead Plaintiffs are inadequate class representatives "because they are so unfamiliar with the basic facts, theory, and elements of their claims that 'there is no sense that there is an actual party behind the prosecution of the action.'" Opp. at 20 (cleaned up) (citation omitted). In particular, Musk argues that Price is "ignorant of the contents of [] Musk's statements" and that Belgrave and John Garrett are "ignorant of … why the statements at issue were purportedly misleading." Id.

Musk is correct that Price expressed limited familiarity with his allegedly misleading statements. That said, it is too much to say that she lacks any familiarity with those statements. She knew, for example, that Musk complained about not receiving "information" related to "the percentage of [] something" and that "bots" were involved (though she did not know what Twitter bots are). Price Dep. Tr. (dkt. 99-3) at 70:6–7, 70:25–71:4, 71:8–11. That is not a problem: courts can approve class representatives even when the prospective representatives do "not know the specific misrepresentations alleged in the complaint." In re Storage Tech. Corp. Sec. Litig., 113 F.R.D. 113, 119 (D. Colo. 1986). The more important inquiry is whether the prospective class representative "understands the underlying legal basis of [their] action" and their "duty to represent class members." Id. Price clearly meets these criteria. See Price Dep. Tr. (dkt. 102-6) at 30:6–7 (describing the class), 55:19–23 (describing the underlying legal basis of the action). She is therefore an adequate class representative.

As for Belgrave and John Garrett's testimony, Musk mischaracterizes it. Both show at least some basic understanding of why Musk's statements were allegedly misleading: Belgrave explained that Musk's statement that "the deal cannot move forward" was misleading because Musk waived due diligence and so did not have the right to stop the

United States District Court
Northern District of California

deal. Belgrave Dep. Tr. (dkt. 102-4) at 177:15–24. And John Garrett testified that Musk's statements suggesting that the deal "was on and off" and that "he wasn't going to buy the company" were misleading because Musk "was going to keep his commitment to pay all existing shareholders [$]54.20." J. Garrett Dep. Tr. (dkt. 99-2) at 106:5–6; J. Garrett Dep. Tr. (dkt. 102-5) at 103:2–10. Belgrave and Garrett's testimony describes, if in simplified terms, Plaintiffs' legal theory as to what makes Musk's statements misleading. That is enough. See Koenig v. Benson, 117 F.R.D. 330, 337 (E.D.N.Y. 1987) ("named plaintiffs require only a basic knowledge of the facts"); see also, e.g., In re Storage Tech., 113 F.R.D. at 119 (approving class representatives when they understood "the underlying legal basis of [the] action" and were "familiar with … the subject of the alleged misrepresentations"). Belgrave and John Garrett are thus adequate class representatives.[5]

**D. Class Definition**

Musk's final challenge is to the definition of the class as overbroad. Musk argues that the class definition includes some investors who made money—and perhaps even made a net profit—as a result of Twitter's lower stock price during the Class Period. Opp. at 18–19. Relatedly, Musk argues that Plaintiffs' damages model runs afoul of Comcast Corp. v. Behrend, 569 U.S. 27 (2013), because it does not net out potential earnings by class members who bought Twitter stock during the Class Period.

As to the class definition, "fortuitous non-injury to a subset of class members does not necessarily defeat certification of the entire class," and it is appropriate to wait until the damages phase of the litigation to "winnow out those non-injured members" at that time. Ruiz Torres v. Mercer Canyons, Inc., 835 F.3d 1125, 1137 (9th Cir. 2016). Musk does not offer any evidence to suggest that there is such "a great number of members" who were not harmed that "the class definition is fatally overbroad." See Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC, 31 F.4th 651, 669 n.14 (9th Cir. 2022) (en banc). Nor does he explain in any detail why individualized questions about damages would

---

[5] Musk does not challenge the adequacy of class counsel. See Amchem, 521 U.S. at 626 n.20 ("The adequacy heading also factors in competency and conflicts of class counsel.").

"render [the] adjudication unmanageable." Id. at 669 n.13 (citation omitted).[6]

Musk's challenge to Plaintiffs' damages model also fails. Musk argues that Comcast requires Plaintiffs' damages model to be capable of class-wide measurement. Opp. at 19. But "[t]he Ninth Circuit reads Comcast to demand only that plaintiffs 'be able to show that their damages stemmed from the defendant's actions that created the legal liability.'" Hatamian v. Advanced Micro Devices, Inc., 2016 WL 1042502, at *8 (N.D. Cal. Mar. 16, 2016) (quoting Leyva v. Medline Indus., Inc., 716 F.3d 510, 514 (9th Cir. 2013)). Other circuits reach the same outcome. See id. (collecting cases). The damages model is appropriate so long as "damages could feasibly and efficiently be calculated once the common liability questions are adjudicated." Leyva, 716 F.3d at 514. Musk offers no argument to the contrary.

## IV. CONCLUSION

For the foregoing reasons, the Court **CERTIFIES** the following class in this action:

> All persons and entities who sold the publicly traded stock or call options, or purchased the put options, of Twitter, Inc. during the period from May 13, 2022 through October 4, 2022, both dates inclusive, and who suffered damages by Defendant's alleged violations of § 10(b) and of the Exchange Act.

The Court **APPOINTS** Cotchett Pitre & McCarthy LLP and Bottini & Bottini, Inc. as class counsel and Nancy Price, John Garrett, and Brian Belgrave as class representatives.

**IT IS SO ORDERED.**

Dated: September 27, 2024

CHARLES R. BREYER
United States District Judge

[6] Musk is correct that, in some circumstances, an investor who made money by buying and selling Twitter stock during the class period might not have been injured at all if they made a net profit. That said, the calculations necessary to determine if an investor was injured are identical to those necessary to determine how much an investor was damaged. In other words, the class will "rely on the same body of common evidence to establish the common issue," see Olean Wholesale Grocery, 31 F.4th at 670 n.14, even if some investors are ultimately excluded from the class on the basis that they suffered no injury.