# No. 26-04928

IN THE

# United States Court of Appeals

FOR THE NINTH CIRCUIT

GIUSEPPE PAMPENA, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED; STEVE GARRETT; NANCY PRICE; JOHN GARRETT; BRIAN BELGRAVE; TWITTER INVESTOR GROUP,

*Plaintiffs-Appellees*,

v.

ELON MUSK,

*Defendant-Appellant*.

*On Appeal From The United States District Court*
*For The Northern District Of California*
*Honorable Charles R. Breyer*
*No. 3:22-cv-05937-CRB*

## APPELLANT'S EXCERPTS OF RECORD VOLUME IX OF XII (ER-2127 – ER-2426)

Michael T. Lifrak
Stephen A. Broome
Alex Bergjans
QUINN EMANUEL URQUHART & SULLIVAN, LLP
865 S. Figueroa St., 10th Floor
Los Angeles, CA 90017
(213) 443-3000

Alex Spiro
Ellyde R. Thompson
Jesse A. Bernstein
Marielle P. Greenblatt
Chelsea Sincox
QUINN EMANUEL URQUHART & SULLIVAN, LLP
295 Fifth Avenue
New York, NY 10016
(212) 849-7100

*Counsel for Defendant-Appellant*

November 23, 2026

and -- you and your staff prepared under your direction?

**A.** Yes, it was.

**Q.** Could you explain to the jury what it shows?

**A.** So for each option over here, we have a description of the option, what the strike price is, whether it's a call or a put, and when it expires. And then the inflation or deflation would be different on every day in the class period.

So rather than showing all of that in this printout exhibit, we simply say just to give an idea what the maximum possible deflation or inflation, the difference between the but-for value and the actual trading price would be.

**Q.** Right, because there were thousands of options that traded during the class period; right?

**A.** We do have all the options listed, but I'm only showing one figure under the misrepresentation claim and under the scheme claim rather than on every single day during the class period.

**Q.** Okay.

**MR. BOTTINI:** And can we show the witness Exhibit 298, please.

**THE WITNESS:** Okay.

**BY MR. BOTTINI:**

**Q.** We get a placeholder. All right. Here's the -- here's the actual Excel spreadsheet.

Can you explain what this is?

**A.** So here we've got a list of each of those options, and if you scroll down, you will see just how many they are. You have to go a lot faster.

**THE COURT:** 298 admitted.

**MR. BERNSTEIN:** Your Honor --

**THE COURT:** Subject to a motion to strike.

**MR. BERNSTEIN:** Thank you.

(Trial Exhibit 298 received in evidence.)

**BY MR. BOTTINI:**

**Q.** A lot of options, huh?

**A.** A lot of options. Over 1,500 so far, and we haven't hit the bottom yet.

**Q.** All right. Fair to say this represents all the options that are part of the class in this case; is that right?

**A.** Yes.

**Q.** And you calculated the precise damages for each option for each day of the class period; right?

**A.** That is correct.

**Q.** And does this exhibit accurately reflect your calculation of the damages for those option?

**A.** The four other tabs do, yes.

**Q.** Okay. It's four more tabs at the bottom?

**A.** Correct.

**Q.** Okay. Sir, do you -- can you explain to the jury what a corrective disclosure is?

**A.** Sure. So in a securities fraud case, the general allegation is somebody -- often the company, could be an individual -- makes a statement that is alleged to be false. So the market is then trading based on incorrect information.

At some point, typically, you have a corrective disclosure. The correct information comes out and says -- it can say what was said before was false, or it can correct it by explaining the general truth behind things. But it corrects the fraud in a misrepresentation case.

**Q.** All right. Are you saying it's basically the way to prove loss causation?

**A.** I wasn't saying that, but that is one thing that it does to say that if, on the correction, the stock price moves, we get some evidence of the difference between the trading price and the but-for price. It moves from the incorrect price to a correct price.

**Q.** Okay. And could you just explain to the jury what loss causation is in the context of a shareholder case?

**A.** So, again, from an economic point of view, it's showing that the losses someone suffered actually relate to the allegations. So remember my -- way back when, my example? I said if someone buys shares of a company but the price goes down because the company just does poorly for reasons unrelated to the fraud, those losses are not caused by the fraud. So loss causation is basically saying can we show that the losses

are caused by the fraud if there is a fraud.

**Q.** Okay. And do you have an opinion in this case on the issue of loss causation?

**A.** Yes.

**Q.** What is your opinion?

**A.** My opinion is that if the jury finds liability, then the amount of losses suffered by the class members, as I show in the various exhibits we've seen, were indeed caused by the fraud or the scheme.

**Q.** For both the stock and the options?

**A.** For both the stock and the options.

**Q.** Do you believe there's evidence of direct causation in this case?

**A.** Yes, I do.

**Q.** What is your opinion about such direct evidence?

**A.** So, again, it's in 4B or 276. We've got pretty clear evidence over here that when Mr. Musk made his tweet in the morning of May 13th, that's not 276 -- yes.

We've got pretty direct evidence here. This is what happened when he made his tweet. So if that tweet was improper, we've got, you know, direct evidence over here of the effect that it had on the stock price.

**Q.** You're talking about the elevator drop here?

**A.** The drop at the vertical dashed line.

**Q.** You feel that this direct evidence is strong?

**A.** I do. I mean, I don't think anyone should dispute that his tweet caused the price to go down. You may argue whether there's liability or not, but clearly the tweet caused the price movement that we see initially over here, and I believe it's the reason for the later price movements over May 13th and May 16th.

**Q.** All right. On May 13th, did you do an analysis to determine: Hey, could there be something else other than Mr. Musk's tweet that caused this vertical statistically significant drop in Twitter stock price?

**A.** Yes, I did.

**Q.** Did you find any other cause?

**A.** Well, first, I did find something earlier in the day that's later mentioned in the news stories that Twitter announced some layoffs, but that was earlier in the day. And as you can see, as we lead up to the tweet, the stock price is already pretty flat, and it drops immediately. So that takes care of the earlier news about layoffs at Twitter.

We also had, you know, other tweets by Mr. Musk. We discussed the one right above the word "on" over here about how he's still committed to the deal, but I looked at news stories, and I mention in my report various news stories that say it's his declaring the deal temporarily on holds that's causing the price decline.

I look at the headlines of analyst reports. They were

generally in accord.

After my report, I looked through more analyst reports, and basically, the answer is that everything ultimately ties back to this one tweet and what the market thought of it.

**Q.** So his tweet caused the damages? Is that what you're saying?

**A.** Assuming liability, yes.

**Q.** Well, let go to October 4th, because you mentioned October 4th. And there was a statistically significant price move on October 4th in response to a disclosure by Mr. Musk; right?

**A.** Correct.

**Q.** What was that disclosure?

**A.** The disclosure was an SEC filing saying he was going to go through with the deal at the price of $54.20 subject to some financing and finishing up some litigation related to this in Delaware. But basically, he was going to go through at the 54.20.

**MR. BOTTINI:** All right. Could we show the witness Exhibit 278, please.

**THE COURT:** 278 admitted.

(Trial Exhibit 278 received in evidence.)

**BY MR. BOTTINI:**

**Q.** Could you explain --

Well, first of all, is this a chart that your staff

prepared under your direction?

**A.** Yes, it is.

**Q.** And could you -- and then this is -- fair to say this shows the price movement of Twitter stock on October 4th, 2022?

**A.** It does.

**Q.** This is the last day of the class period; right?

**A.** Correct.

**Q.** And could you explain to the jury what's shown in this exhibit?

**A.** Sure. So the blue line is called VWAP, volume-weighted average price. So we look at all the trades over any minute and average them out, weighting them by volume, to get the price. You can see it's, you know, fairly stable, just a little above the prior day's closing price, until right before you get the news story about his filing. It comes probably a little bit before, because it's easier to simply trade than for a reporter to actually write up a news story, so you get the movement right before.

The price jumps up. It's halted for a brief amount of time. You can see then 12:10, trading is resumed. The price bounces around a little bit. It's halted again due to the news and volume, and at 3:39, trading is resumed again at a higher price?

So overall, all of this is the effect of his October 4th filing and being reported in the news.

**Q.** So you're saying that that disclosure he made on October 4th was so material and important that they had to suspend trading twice that day in Twitter stock?
**A.** They suspended trading twice in Twitter stock that day, yes.
**Q.** And up on the right side of the chart, that shows the -- how the price jumped up significantly in response to Mr. Musk's filing; is that right?
**A.** Both kind of in the middle and at the right, yes.
**Q.** And how much did Twitter stock go up on October 4th when Mr. Musk filed a 13D saying he was going to go ahead with the merger at the original $54.20 price?
**A.** So he was going to see right before that vertical line the stock price, let's say, around $43, and by the end of the day, it's around $52, so ballpark of $9.
**Q.** Well, did it go up about 20 percent? Does that sound accurate?
**A.** $9 out of a little under 45 will give you 20 percent plus, yes.
**Q.** And 20 percent, I assume, is statistically significant?
**A.** In this particular case, for a single day, it certainly would be.
**Q.** Did you look at whether there was any other Twitter-specific news that day that could have accounted for this huge 20 percent stock increase?

**A.** I did. The only other news was basically commentary reaction to the SEC filing.

**MR. BOTTINI:** All right. Thank you.

I have no further questions at this time, Your Honor.

**THE COURT:** Okay. Thank you.

Let's take a recess. We will be in recess until a quarter of 3:00.

Remember the admonition given to you: Don't discuss the case, allow anyone to discuss it with you, form or express any opinion.

(Recess taken at 2:26 p.m.)

(Proceedings resumed at 2:51 p.m.)

(Proceedings were heard out of the presence of the jury.)

**THE COURTROOM DEPUTY:** Come to order. Court is now in session.

**THE COURT:** Bring in the jury.

(The jury enters the courtroom.)

(Proceedings were heard in the presence of the jury.)

**THE COURT:** Please be seated. Let the record reflect all jurors are present. The parties are present.

You may proceed. Cross-examination.

**CROSS-EXAMINATION**

**BY MR. BERNSTEIN:**

**Q.** Good afternoon, Dr. Tabak. Nice to see you again.

**A.** Good afternoon, Mr. Bernstein.

**MR. BERNSTEIN:** Good afternoon to the jury. My name is Jesse Bernstein. I'm one of the lawyers representing Mr. Musk.

**BY MR. BERNSTEIN:**

**Q.** Sir, you understand you're not here to offer an opinion as to whether Mr. Musk made any alleged false statements?

**A.** Yes, that's my understanding.

**Q.** All right. And you're not offering any opinion that Mr. Musk made any alleged false statements?

**A.** No, I'm not. I think I was pretty clear it. I said it depends on what the jury finds on liability.

**Q.** You're also not offering any opinion that Mr. Musk engaged in any scheme?

**A.** I am not offering any such opinion.

**Q.** You're also not offering any opinion that Mr. Musk should not have made any statements at all simply because the statements may have caused the stock price to go down; right?

**A.** I'm not making any -- offering any such opinion.

**Q.** Okay. You agree, sir, just because something makes the stock go down doesn't mean it's securities fraud?

**A.** That is my understanding, yes.

**Q.** Truthful information can make a stock go down; correct?

**A.** Correct.

**Q.** Okay. What you are here to testify about is how much alleged investor harm was caused by the conduct plaintiffs

complain of, assuming -- assuming plaintiffs prove that the conduct was securities fraud; right?

**A.** Yes, that's my understanding.

**Q.** Now, but even with that assumption, you're not claiming that every tweet, meme, statement, or act by Mr. Musk during the class period caused any investor losses; right?

**A.** I'm not -- certainly not saying that about every statement, tweet, or act.

**Q.** Okay. So the jury has seen a lot of tweets, memes, statements, letters. So I just want to walk through some of them and see which ones are relevant to your analysis and which ones are not.

**A.** Okay.

**Q.** So let's turn to Exhibit 2.

**THE COURT:** It will be on the screen.

**THE WITNESS:** Thank you.

**BY MR. BERNSTEIN:**

**Q.** It will be on the screen and it will also be over here. It's probably easier to see on the computer screen right in front of you, but if you want to look a little further, it's here too.

**MR. BOTTINI:** Objection, Your Honor. This tweet is from 2018, and it's beyond the scope of his expert report.

**THE COURT:** Well, I'm going to allow it. Go ahead.

**MR. BERNSTEIN:** Thank you, Your Honor.

**BY MR. BERNSTEIN:**

**Q.** You didn't consider Exhibit 2, a tweet nearly four years before the start of the class period, in forming your opinions; right?

**A.** That is correct.

**Q.** You're not claiming that this tweet from 2018 caused any investor losses; right?

**A.** That is right.

**Q.** Turning to Exhibit 3, you didn't consider Exhibit 3, a tweet more than two years before the start of the class period, in forming your opinions?

**MR. BOTTINI:** Same objection, Your Honor. Outside the scope.

**THE COURT:** Same ruling. Go ahead.

**THE WITNESS:** You're correct, Mr. Bernstein.

**BY MR. BERNSTEIN:**

**Q.** You're not claiming that this 2020 tweet caused any investor losses; true?

**A.** True.

**Q.** Let's turn to Exhibit 9. You're not claiming that this tweet about crypto scammers from January 2022 caused any investor losses; right?

**A.** That is true.

**Q.** Turning to Exhibit 19, same answer; right? Not claiming

any investor losses?
**A.** That is also true.
**Q.** Putting up Exhibit 30, same answer for this April 5th, 2022, tweet; right?
**A.** Correct, same answer.
**Q.** Let's turn to Exhibit 40. Sorry -- Exhibit 16, page 2.
Sir, the jury has seen Mr. Musk's 13G disclosing his stake in Twitter a number of times in this case, but you're not claiming any investor losses from Exhibit 16, Mr. Musk's 13G; correct?
**A.** Correct, I'm not claiming any losses from this.
**Q.** And you're not claiming that Mr. Musk's purchase of Twitter shares caused any investor losses either; correct?
**A.** That is correct.
**MR. BERNSTEIN:** Let's show Exhibit 34. It's another tweet the jury has seen quite a few times.
**BY MR. BERNSTEIN:**
**Q.** You're not claiming a single penny of losses were caused by this tweet; correct?
**A.** That is correct.
**Q.** Exhibit 40. This should be on your screen now.
**A.** It doesn't seem to match what's on your board.
**Q.** We'll come back to that one if it's -- if we need to.
Exhibit 40 is a -- an SEC form disclosing Mr. Musk's offer to buy Twitter.

Do you see that?

**A.** I'm sorry. This is an attachment? This is a letter. It doesn't look like an SEC form to me.

**Q.** This is a letter disclose -- where Mr. Musk discloses his offer to by buy the company; correct?

**MR. BOTTINI:** Objection, Your Honor, mischaracterizes the exhibit.

We assert a standing objection, Your Honor, to any of the exhibits before May 13th.

**BY MR. BERNSTEIN:**

**Q.** Do you see a letter from Mr. Musk?

**A.** I do.

**Q.** Okay. You're not claiming that this letter caused any investor losses; correct?

**A.** That is correct.

**Q.** Okay. Let's turn to Exhibit 42. This is an April 16th, 2022, tweet.

Do you see that?

**A.** I do.

**Q.** Do you recognize this as a reference to an Elvis song?

**A.** I do.

**Q.** And you're not claiming any investor losses from Mr. Musk's reference to an Elvis song; right?

**A.** That is correct.

**Q.** Okay. Turning to Exhibit 46.

The last tweet was a reference to music, and Exhibit 46 is a literature reference; right?

**A.** I believe so.

**Q.** A reference to an F. Scott Fitzgerald book?

**A.** I will take your word for it, Counsel.

**Q.** Whether it is or isn't, you agree you're not claiming any investor losses from Exhibit 46; correct?

**A.** That is correct.

**MR. BERNSTEIN:** Exhibit 47. If we could turn to page 3.

**BY MR. BERNSTEIN:**

**Q.** Do you see this Schedule 13D, sir?

**A.** Appears to be a Schedule 13D, yes.

**Q.** You're not claiming that this Schedule 13D caused any investor losses; correct?

**A.** Just to be sure, what's the date of the 13D? I'm pretty sure the answer is "no," but I just would like to check.

**Q.** This is from April 20th, 2022.

**A.** I'm not claiming that caused any losses.

**MR. BERNSTEIN:** Okay. Let's turn to Exhibit 49.

**BY MR. BERNSTEIN:**

**Q.** This is another tweet that the jury has been shown. You're not claiming that Exhibit 49 tweet from April 21 caused any investor losses; right?

**A.** That is correct.

**MR. BERNSTEIN:** Let's turn to Exhibit 65.

**BY MR. BERNSTEIN:**

**Q.** You recognize this as the merger agreement between X Holdings and Twitter dated April 25, 2022?

**A.** Looks like the cover, yes.

**Q.** And this was publicly filed; right?

**A.** That's my understanding, yes.

**Q.** And so, as you testified on direct, the terms and conditions, those would be public information?

**A.** Yes.

**Q.** And they'd be incorporated into the stock price within a day or two of the public release of this document; right?

**A.** Yes.

**Q.** And you're not claiming that the merger agreement caused any investor losses; right?

**A.** That is right.

**MR. BERNSTEIN:** Show Exhibit 69, please.

**BY MR. BERNSTEIN:**

**Q.** Do you see this is an April 28, 2022, tweet?

**A.** I see two April 28, 2022, tweets, yes.

**Q.** You're not claiming that Mr. Musk's April 28, 2022, tweet caused any investor losses; right?

**A.** That is right.

**MR. BERNSTEIN:** Turn to Exhibit 86.

\\\

**BY MR. BERNSTEIN:**

**Q.** It's a tweet from May 9th.

Do you see that?

**A.** I do.

**Q.** You're not claiming this caused any investor losses either; right?

**A.** That is correct.

**MR. BERNSTEIN:** Let's turn to Exhibit 581.

**BY MR. BERNSTEIN:**

**Q.** This is a tweet chain from May 13, and I know we're going to talk about a different tweet from May 13, but the one that's on the screen, Exhibit 581, you're not claiming that these tweets caused any investor losses; right?

**A.** That is correct.

**Q.** Too many tweets.

**MR. BERNSTEIN:** Exhibit 116 -- which is different than what I have here. That's it.

**BY MR. BERNSTEIN:**

**Q.** Exhibit 116, this is another tweet that you're not claiming caused any investor losses; correct?

**A.** I'll say again no, but to the -- certainly doesn't directly to the extent it's part of the scheme it doesn't affect my analysis, but I'm not going to say anything in the class period is or is not part of the scheme.

But it doesn't enter directly into my damages analysis.

**Q.** Understood.
Whether part of a scheme or not, you're not claiming this tweet caused any investor losses; true?
**A.** It certainly didn't add to it or change it. Doesn't matter for my analysis.
**Q.** Do you see Exhibit 118?
**MR. BERNSTEIN:** Let me put that on the screen.
**BY MR. BERNSTEIN:**
**Q.** Same answer for Exhibit 118; right? You're not claiming this caused any investor losses; right?
**A.** Same answer, yes.
**Q.** In fact, this one, we discussed at your deposition.
Do you recall that?
**A.** I believe so.
**Q.** And your view was you hadn't seen any evidence in favor of this tweet having any economic importance; right?
**A.** I don't remember the exact words, but I believe I did say something like that.
**Q.** And that's your view right now?
**A.** Still is my view, yes.
**MR. BERNSTEIN:** Turn to Exhibit 346.
If we go to page 3.
**BY MR. BERNSTEIN:**
**Q.** Sir, in this federal securities fraud case, did you consider whether the poop emoji caused any investor losses?

**A.** I did not consider it to have caused any losses.
**Q.** And you're not claiming it caused any losses; correct?
**A.** That is correct.
**Q.** I have some good news. The second one is lot shorter than the first one, but there are, unfortunately, more tweets.
Exhibit 126, which is the All In conference video. You're familiar with the All In conference?
**A.** Generally, yes.
**Q.** The jury has seen this video a few times, so I won't play it, but this is one of the statements you actually specifically analyzed; correct?
**A.** That is correct.
**Q.** And on direct, I think there may have been some suggestion -- maybe I misunderstood -- that the May 16th statements at the All In conference caused the decline on May 16.
**A.** I do not believe I said that on direct.
**Q.** You wouldn't have said that because it's not true; right?
**A.** The -- these statements occurred after the price decline on May 16.
**Q.** Right. So any suggestion that the statements that were made at the All In conference caused any investor losses on May 16 wouldn't make sense?
**A.** Unless they're going to say that, as we just talked about, they maintained the price, that -- there is a theory that

sometimes when you say something wrong, the alternative is to have corrected it, and that would have caused the price to go up.

**Q.** By you're not offering --

I'm sorry. I didn't mean to cut you off.

**A.** That's okay. It happens.

So I'm not saying it added to anything, but if the theory is that the alternative was that he should have corrected the prior misrepresentation, then this could have maintained the deflation and continued it -- not added to it, just continued it.

**Q.** It could not have caused the decline on May 16; true?

**A.** That is correct.

**Q.** And you're not offering a price maintenance theory in this case; correct?

**A.** Well, I did mention price maintenance in my class certification report and at least one deposition, so if you want to say that the May 16th and May 17th misrepresentations maintained the prior deflation, yes. But I'm starting with a May 13th tweet that introduced deflation.

**Q.** Sir, you're not offering the opinion that price maintenance is appropriate here; right?

**MR. BOTTINI:** Objection, asked and answered, argumentative.

**THE COURT:** I'll allow it.

**THE WITNESS:** To the extent it's a legal question, I can't answer. But if the question -- if the question that the jury wants to address is what would have happened if, you know, having spoken and said something incorrect, Mr. Musk should have corrected it, then the answer should be that these maintained the deflation from May 13th.

**BY MR. BERNSTEIN:**

**Q.** You didn't offer that opinion in your damages report; correct?

**A.** I don't remember if I used the words "price maintenance."

**Q.** Okay. And I actually asked you at your deposition whether you thought price maintenance was appropriate; right?

**A.** You may have. I believe you if you say that.

**Q.** And you said you're not offering that opinion; correct?

**A.** If that's what I said, that's what I said, yes.

**Q.** You're not offering the opinion here that price maintenance is appropriate; correct?

**A.** I'm not adding to it. I'm talking about what I did, which is based on May 13th. So I'm not affirmatively saying this is a price maintenance case.

**Q.** And you're not offering the opinion that price maintenance is appropriate; right?

**THE COURT:** That's been asked and answered.

**MR. BERNSTEIN:** Your Honor, I'd like to play 206/21 through 207/1 from Dr. Tabak's deposition.

**MR. BOTTINI:** Objection, Your Honor. This is not appropriate impeachment.

**THE COURT:** Well, let me take a look at it. What is it?

**MR. BERNSTEIN:** Volume 2, 206/21 through 207/1.

**THE COURT:** I'm trying to find out where it is.

**MR. BERNSTEIN:** It would be in the black binder.

**THE COURT:** Pardon me?

**THE WITNESS:** It will be in the black binder.

**THE COURT:** I've got about five of them.

**MR. BERNSTEIN:** Volume 2.

**THE COURT:** This is the deposition of July 16th?

**MR. BERNSTEIN:** Yes.

**THE COURT:** Okay. What page?

**MR. BERNSTEIN:** 206/20 through 207/1.

**THE COURT:** Where are you starting?

**MR. BERNSTEIN:** 206/20.

**THE COURT:** Okay.

Okay. Start on line 12 -- line 11.

(Video played but not reported.)

**BY MR. BERNSTEIN:**

**Q.** I asked those questions, and you gave those answers?

**A.** You did, and I did.

**Q.** Okay. And just to close this out, the All In conference, if anyone were to suggest that it caused the stock to go down

on May 16, that this was the cause of the May 16 decline, that would be an impossibility; right?

**A.** I would say that that would be an impossibility. I agree with you.

**Q.** Because the drop happened before the comments at the All In conference; right?

**A.** That is correct.

**Q.** Let's turn to -- in fact, your opinion is that there's little evidence of any economic importance of the May 16 All In conference statements; right?

**A.** Probably said words to that effect, yes.

**Q.** Okay. And that is your opinion; correct?

**A.** Yes.

**Q.** Okay.

**MR. BERNSTEIN:** Let's look at Exhibit 130.

**BY MR. BERNSTEIN:**

**Q.** This is a tweet you considered; right?

**A.** Yes.

**Q.** And you determined that it did not cause new investor losses; right?

**A.** Correct.

**MR. BERNSTEIN:** Let's turn to Exhibit 129.

**BY MR. BERNSTEIN:**

**Q.** It's a May 17th, 2022, tweet.

Do you see that?

**A.** I do.

**Q.** You're not claiming this tweet caused any investor losses; correct?

**A.** That is correct.

**Q.** Let's turn to Exhibit 616. This is a May 19th, 2022, tweet with a meme.

Do you see that?

**A.** I do see that.

**Q.** Not claiming the meme caused any investor losses; right?

**A.** That is correct.

**Q.** Turn to Exhibit 315. It's another meme from May 19; right?

**A.** That is correct.

**Q.** Not claiming any investor losses from this one either?

**A.** That is also correct.

**Q.** Let's turn to Exhibit 143. This is a May 21st tweet.

You didn't consider this tweet; correct?

**A.** That is correct.

**Q.** You're not claiming it caused even a single penny of investor losses; correct?

**A.** Does not enter into my damages analysis, so that is correct.

**Q.** You're not claiming it caused even a single penny of investor losses because there was no statistically significant stock reaction following this tweet; right?

**A.** That is correct.

**Q.** Since it did not have a statistically significant effect on the stock price, you would say it didn't have economic importance to the market; right?

**A.** Or at least minimal. Minimal or none, sure.

**Q.** And the lack of a statistically significant stock reaction means you can't distinguish the movement following this tweet from the normal ups and downs that happen every day in the stock market; right?

**A.** Generally, yes, that's correct.

**Q.** You're also not claiming that anything different would have happened had Mr. Musk's tweet said: No, they still have failed to explain how they calculate that 5 percent of daily users are fake/spam, very suspicious.

Right?

**A.** I haven't thought about it, so I'm certainly not offering an opinion on that.

**Q.** Okay. Turning to Exhibit 756. This is a tweet from May 21st.

Do you see that?

**A.** I do.

**Q.** You're not claiming this tweet caused any investor losses either; right?

**A.** That is also correct.

**Q.** Turn to Exhibit 198. We have another meme.

Do you see that?

**A.** I do.

**Q.** Not claiming this meme caused any investor losses; correct?

**A.** Correct.

**Q.** Turn to Exhibit 317. This is a tweet from August 2nd, 2022. You're not claiming this tweet caused any investor losses; correct?

**A.** Correct.

**Q.** Turning to Exhibit 227. This is a tweet from February 2nd, 2023.

Do you see that?

**A.** I do.

**Q.** You're not claiming any investor losses from this tweet either; right?

**A.** No. Well, after the class period.

**Q.** And last but not least, if we could turn to Exhibit 230. This is a tweet from December 11, 2023. You're not claiming that Exhibit 230 caused any investor losses; right?

**A.** That is correct.

**Q.** So I tried to cover all the tweets and memes and statements, but just to summarize, in case I missed any, with the exception of the May 13th "temporarily on hold" tweet and the July 8th termination letter, you do not attribute a single penny of investor losses to any other statement or any other

action by Mr. Musk; correct?
**A.** That is correct, Mr. Bernstein.
**Q.** So May 13 is the first day that you calculate any alleged investor losses; right?
**A.** Correct.
**Q.** Hopefully I don't need to reach the top of that.
You were shown this on direct; correct?
**A.** Yes, I was.
**Q.** And on direct, you testified multiple times that your methodology was conservative; right?
**A.** There are numerous conservative portions to my methodology, yes.
**Q.** You say that -- strike that.
And in your supposedly conservative methodology, you said if someone sold a hundred shares on May 13, they would have $617 in damages; right?
**A.** I believe that's what was my testimony, yes.
**Q.** That's 617 times a hundred; right?
**A.** Correct.
**Q.** But, sir, Twitter stock only fell by $4.93 on May 13; right?
**A.** I believe that's correct.
**Q.** Okay. So just so I understand this, you're giving someone $6.17 per share for damages; right?
**A.** Correct.

**Q.** If they sold on May 13?

**A.** Yes.

**Q.** Even though the stock only fell by $4.93 that day?

**A.** So can I explain why?

**THE COURT:** Yes.

**THE WITNESS:** Yeah. Okay.

So the way that damages are typically done is we look at what happens over the course of an event. Say over here, for example, we have daily numbers, even though we know that the stock price changed over the course of each day. So if I had, for example, the 45.7 percent, I would just use the -- that percentage applied to the closing price for the day, even though it would vary.

May 13th and May 16th is one event. Mr. Bernstein just pointed out it all comes down to one tweet. So I applied the same methodology that I do for every event to this event that occurred over two days, which has shown the equivalent of one intraday figure. And you'll see that in any securities fraud case. If you look intraday or within the period of an event, you'll find sometimes the price is high, sometimes the price is low. It won't match what happens at the end.

But if you want, as Mr. Bernstein says, you can take it, look at the raw drop on that day. You could also look at the raw drop intraday every day, but that would be a ton of work.

\\\

**BY MR. BERNSTEIN:**

**Q.** Sir, no one who sold on May 13th could have $6.17 in damages; true?

**A.** No. Remember how the price dropped by a lot initially? You're looking at the closing price over there when it had bounded back up.

People who sold at, you know, the bottom -- remember just a few minutes after the tweet before it went back up -- would have had a much bigger damages figure.

**Q.** But you're using the closing price for purposes of your calculations; right?

**A.** Yes.

**Q.** And the closing price on May 13th was not $6.17 lower than the closing price on May 12th; correct?

**A.** That is correct.

**Q.** Okay. In fact, $6.17 is about 40 percent higher than what the stock fell by the close of market on May 13th; right?

**A.** I will trust your math, Mr. Bernstein. I haven't done it.

**Q.** Now, you just explained that the reason you have calculated $6.17 is because you looked at May 13th and May 16th combined as one window; right?

**A.** Correct.

**Q.** And what you did was you took the total stock decline on May 13 and May 16?

**A.** Yes.

**Q.** And that's how you got your 45.7 and your $6.17; true?
**A.** That is correct.
**Q.** But someone who sold on May 13th can't be affected by a decline on May 16th; right?
**A.** That is correct.
**Q.** Okay. So let's test your two-day window. Okay?
**A.** I think you're allowed to ask whatever questions you want.
**Q.** Thank you.
Your opinion is that Mr. Musk's May 13 tweet caused the stock decline on May 13 and May 16; correct?
**A.** Correct.
**Q.** Okay. Now, you agree that the stock is not going to react to Mr. Musk's tweet forever; correct?
**A.** That should be true, yes.
**Q.** As you said if Twitter trades in an efficient market, it'll start reacting very quickly?
**A.** Correct.
**Q.** And you said often it will incorporate within one trading day; correct?
**A.** Also correct.
**Q.** And on direct, you were focused on what I believe plaintiffs have described as the "elevator drop"?
**A.** I heard that term used once today. I haven't heard it before, but sure.
**Q.** What I'd like to focus on is what happens from 1:00 p.m.

to 7:00 p.m.

**A.** Okay. Would it be possible to get the chart here on the screen as well?

**Q.** Yes.

**MR. BERNSTEIN:** Put up 276, please.

**BY MR. BERNSTEIN:**

**Q.** Now, from 1:00 p.m. to 7:00 p.m., stock is pretty flat. Wouldn't you agree?

**A.** I think that's fair, yes.

**Q.** Doesn't look like an elevator, sir; correct?

**A.** That's fair.

**Q.** Looks more like the moving walkways at the airport?

**A.** Sure.

**Q.** From 1:00 to 3:00 to 5:00, all the way to the end of the chart, it's a pretty flat line?

**A.** Reasonably flat, yes.

**Q.** After the hours and hours and hours of the stock on a flat line, on the morning of May 16th, the stock had another statistically significant drop; correct?

**A.** Correct.

**Q.** You claim that drop hours and hours after the flat line was caused by the May 13th tweet that happened before the flat line; right?

**A.** Yes.

**Q.** And just so I understand, the May 13th tweet made the

stock go down almost immediately; right?
**A.** It did.
**Q.** Then there's a long pause for hours and hours and hours?
**A.** When you say "then," it goes up and then there's a long pause, I think is what you're trying to say.
**Q.** From 1:00 to 7:00 there's a long pause for hours and hours and hours; right?
**A.** Not a pause, but relatively flat, sure.
**Q.** Relatively flat. Not statistically significant?
**A.** I haven't tested, but I don't think it would be.
**Q.** And then your view is that same tweet made the stock go down again on May 16th?
**A.** Yes. And there's a reason for that.
**Q.** But you agree other things happened in the world after the flat line but before the May 16th drop; right?
**A.** Sure. The world isn't static.
**Q.** The All In conference is not one of those things; true?
**A.** Correct, but that was after the May 16th drop.
**Q.** One thing that did happen was the release of the SparkToro report; correct?
**A.** Well, I didn't see it in any news stories or any analyst reports in that period, so if you say it happened then, okay. But there's no -- the market certainly didn't get a lot of news about it.
**Q.** You weren't even aware of the SparkToro report when you

wrote your report; correct?
**A.** That's true, because it wasn't in any of the news stories.
**Q.** You didn't see any news stories with the SparkToro report?
**A.** Not in this window, no.
**Q.** And you looked for news stories?
**A.** Well, I didn't look for news stories about the SparkToro report. It would be kind of hard to look for that without knowing of its existence. But I looked at all the news stories in that window.
**MR. BERNSTEIN:** Let's show Exhibit 599.
**BY MR. BERNSTEIN:**
**Q.** Do you see this is the SparkToro report?
**A.** That is my understanding, yes.
**Q.** And on the title, it says they found that 19.42 percent of active accounts on Twitter were fake or spam; right?
**A.** That is what the title says.
**Q.** You didn't look to see if it was trending on Hacker News; right?
**A.** Well, again, I didn't see it in the news stories or any other -- so I didn't know about it, so obviously I couldn't see if it was trending.
**Q.** You didn't look to see if the report was mentioned in the Wall Street Journal; right?
**A.** Well, I looked at all the news stories during that period and didn't see it, but I didn't obviously specifically look for

the SparkToro report, since I didn't know about it.

**Q.** And unless the SparkToro report had no impact on Twitter stock price, the numbers you gave the jury on direct are wrong; correct?

**A.** Put it this way: If you want to say absolutely 0, of course. Every number is an estimate. It could be something like that. But we wouldn't expect an event that shows up in no news stories and no analyst reports to have a substantial or important effect on the stock price.

**Q.** Sir, at the time you wrote your report, you hadn't considered any analyst reports; right?

**A.** No. I had reviewed the headlines from analyst reports, and then you're right. I hadn't read them in full, but I read them afterwards.

**Q.** And at the time you wrote your report, you didn't look at any news stories on May 15; right?

**A.** They were not -- probably not included in the damages report because I was only referencing stories I used.

But in the market efficiency report, remember how I said I looked at the news on every day, and we talked about whether or not there was a lot of news or not? So I looked at the news, you know, on all the days, including May 15th, for that purpose.

**Q.** Okay. And -- but you agree that if the SparkToro report had any impact at all, even a small amount, the numbers you

gave in your daily deflation chart are wrong; right?

**A.** Well, again, you can certainly say that about every single thing. Sure. It's a model. It's going to miss some things. Maybe miss a little high, a little low.

So, yeah, anything that's not included in any model could have some really small effect.

**Q.** And you said you didn't look to see if the flat line from 1:00 p.m. to 7:00 p.m. was statistically significant; right?

**A.** That's correct. I didn't actually run that analysis.

**Q.** And even though you are seeking to charge Mr. Musk with all the decline on May 16th that happened after that long flat line; right?

**A.** No. First of all, it's not all. Remember it's, for example, 45.7 percent?

And secondly, we had reasons to believe that that was a continuation of May 13th because often after the close of the market, you get news stories. You get analyst reports. You get people who don't trade during the day.

So in my experience, it's not at all unusual to see a new movement at the start of the day after a news event occurs.

**Q.** You didn't cite a single analyst report in your report; correct?

**A.** That is correct.

**Q.** Okay. And none of them are listed in your documents considered?

**A.** That's correct.

**Q.** And you realize that by adding May 16th, you're potentially adding billions of dollars in potential damages if the jury were to find liability; right?

**MR. BOTTINI:** Objection, Your Honor. Misrepresents his report and calls for speculation.

**THE COURT:** Sustained.

**BY MR. BERNSTEIN:**

**Q.** You understand that by adding May 16th, you are significantly increasing the potential damages against Mr. Musk; correct?

**MR. BOTTINI:** Same objection.

**THE COURT:** I'll allow it.

**THE WITNESS:** Certainly damages are much higher with May 16th and May 13th than just May 13th, yes.

**BY MR. BERNSTEIN:**

**Q.** Okay. Let's turn to the May 13 tweet that you claim caused the May 13 decline and the May 16 decline, okay?

**MR. BERNSTEIN:** It's Exhibit 580.

**BY MR. BERNSTEIN:**

**Q.** This is, again, one of the two statements you claim caused any investor losses; correct?

**A.** Correct.

**Q.** You don't opine in any way, though, on what analysts interpreted any of Mr. Musk's statement to mean; correct?

**A.** I did not do that in my report. Correct.

**Q.** You understand that plaintiffs' theory in this case is that Mr. Musk posted this in order to drive the stock price down so he could renegotiate the Twitter deal?

**A.** That is my general understanding of their claim.

**Q.** Despite that being your understanding, you don't have an opinion on what would have happened had Mr. Musk added to this tweet "I just want to renegotiate"; right?

**A.** Well, you ask me things like that. It's not something I considered because we don't normally take a look at a misrepresentation and say: Well, let's make it something different other than the truth.

**Q.** And plaintiffs allege the truth is that Mr. Musk just wanted to renegotiate; right?

**MR. BOTTINI:** Objection, mischaracterizes the allegations.

**THE COURT:** Sustained.

**BY MR. BERNSTEIN:**

**Q.** You did not offer any opinion on what Twitter stock would have done had Mr. Musk added to this tweet "I just want to renegotiate"; right?

**MR. BOTTINI:** Asked and answered.

**THE COURT:** Sustained.

**BY MR. BERNSTEIN:**

**Q.** You can't tell the jury that Twitter stock price would

have done anything differently had Mr. Musk added to his tweet "I just want to renegotiate the price"; correct?

**THE COURT:** Sustained. Sustained.

**BY MR. BERNSTEIN:**

**Q.** Okay. You don't have an opinion on what Twitter stock would have done if that's all Mr. Musk had said; right? I am looking for ways to renegotiate the price of the deal.

**MR. BOTTINI:** Same objection. Same question rephrased.

**THE COURT:** Well, I don't know that the -- I don't know that he can testify -- I'm trying to figure out whether he can testify as to something that didn't happen.

**MR. BERNSTEIN:** That's his entire testimony.

**THE COURT:** I mean, I don't know how -- it's totally speculative.

**MR. BERNSTEIN:** Your Honor, his entire testimony is what would have happened if the truth had been disclosed.

**THE COURT:** No. What he is saying -- well, if the truth had been disclosed. That may be correct.

But what he is saying -- but, Number 1, it was -- well, whether it was or wasn't, we all agree that he didn't say "I want to renegotiate."

**MR. BERNSTEIN:** Correct, sir. Correct, Your Honor. But --

**THE COURT:** I'm trying to figure out how he gives an

opinion as to something that didn't happen. That's my question.

**MR. BERNSTEIN:** But that's the entire -- that's what a but-for analysis is. You're trying to figure out what would have happened --

**THE COURT:** But he didn't conduct an analysis.

**MR. BERNSTEIN:** That's the answer I'm trying to get. This is a different question.

**THE COURT:** Why don't you ask him: You didn't conduct an analysis that asked you what would have happened had he said X or had he said Y. He'll answer the question, and then --

That's not speculative. It's not speculative what analysis he conducted and what -- I mean, assuming that you accept his testimony, and it's up to the jury to determine what his testimony is.

But it's not speculative as to what he didn't do.

**MR. BERNSTEIN:** Right. That's -- I think I asked whether he has an opinion. That's -- but I'll --

**THE COURT:** Excuse me?

**MR. BERNSTEIN:** My question was whether he had an opinion, but let me just rephrase it.

**BY MR. BERNSTEIN:**

**Q.** You didn't do any analysis on what Twitter stock would have done if all Mr. Musk had said instead of anything on this board was "I am looking for ways to renegotiate the price of

the deal"; correct?

**A.** Correct, because my analysis is essentially on what if he had said nothing, so I'm just taking away the false stuff, not adding in something new.

**Q.** Your opinion is what would have happened if Mr. Musk had said nothing?

**A.** Right. Then there would have not been the price decline you saw after this tweet.

**Q.** So you're not trying to figure out what would have happened had Mr. Musk told the truth?

**A.** Well, put it this way: Saying nothing is essentially not presenting that misrepresentation. If you want to say "If he had told the truth," there are lots of truths out there, and we can have, you know, all kinds of different views.

**Q.** Okay. And just so it's clear --

**THE COURT:** He is giving an opinion. He is giving an opinion as to what would have happened if he had said nothing.

**THE WITNESS:** That's correct, Your Honor.

**THE COURT:** He is not giving an opinion as to what would have happened had he said X, Y, or Z, and that's the distinction. It's actually an omission in a way. He's not saying -- he's saying he looked at the statement. He was told that the statement was false. He was told to assume the statement was untrue. And then he was asked the question: Did that statement, in your opinion, have any impact on the price?

That's the extent of his inquiry. And he can't -- the reason it's speculative, he can't answer your question. He can only answer the question of the statement made and then no statement given, and that's exactly what he -- what he -- what he said.

And I think it's perfectly proper to ask him: Well, you don't know, do you, if he said he was going to renegotiate the price, what would have happened to the stock?

I assume his answer would be: No, I don't know. I didn't look at that.

**MR. BERNSTEIN:** That was my question.

**THE COURT:** If that's what you want to establish, that's fine. That's fine. That's a perfectly proper question.

**MR. BERNSTEIN:** I must have misspoken. I thought that was my question, Your Honor.

**THE COURT:** I don't think you misspoke. Maybe you're not communicating. That's all.

**MR. BERNSTEIN:** Okay.

**BY MR. BERNSTEIN:**

**Q.** Dr. Tabak, just so I understand: Was the Court's explanation of what you did correct?

**A.** Yes.

**Q.** Okay.

**A.** The Court's explanation was correct.

**Q.** So you were not looking at what would have happened had

Mr. Musk made a but-for disclosure that was true and accurate; correct?

**MR. BOTTINI:** Objection to the form of the question.

**THE WITNESS:** Unless that but-for is essentially saying nothing, not adding in something new over here.

**BY MR. BERNSTEIN:**

**Q.** Okay. Great. So your analysis is just comparing if Mr. Musk had said nothing versus what Mr. Musk said; correct?

**A.** I think that's fair.

**Q.** So you don't have an opinion, then, on what would have happened had Mr. Musk switched the words "on hold" with "not closing"; true?

So if Mr. Musk had said, "Twitter deal temporarily not closing pending details supporting calculation that spam/fake accounts do indeed represent less than 5 percent of users, still committed to acquisition," you don't have an opinion as to what would have happened; right?

**A.** Right, because, again, there's lots of ways to change things, and I haven't looked at them. And it might be speculative.

**Q.** Because you didn't undertake that analysis, you can't tell the jury that anything differently would have happened had Mr. Musk switched the words -- taken out "on hold" and put in "not closing"; correct?

**MR. BOTTINI:** Objection, asked and answered.

**THE COURT:** I'll allow it.

**THE WITNESS:** I haven't done that analysis, so I can't say.

**BY MR. BERNSTEIN:**

**Q.** Okay. You also don't have an opinion on what would have happened if Mr. Musk had said "Twitter deal in jeopardy pending detailed support calculation that bots and spam constitute less than 5 percent of users, still committed to acquisition"; right?

**A.** I mean, I might think qualitatively, but I haven't thought it through quantitively; and I'm not offering an opinion on that alternative statement.

**Q.** Okay. You don't dispute that the market interpreted Mr. Musk's May 13th tweet as him saying that he's having heightened concerns about the deal; right?

**A.** Well, I think that might be a part of it, but he isn't going on saying he has heightened concerns. He's saying he's acting on those concerns.

So that might be -- I mean, when you say "concerns about the deal," you mean concerns the deal won't go through because of his own actions?

**Q.** I'm saying the market interpreted it as Mr. Musk is getting concerned about the Twitter deal?

**A.** Okay, but maybe you can clarify for me. When you say "getting concerned about the deal," I often think of that as

being concerned the deal won't go through, so that's his action, not his concern.

What do you mean by "concerned about the deal"?

**Q.** I'm asking whether you dispute that the market interpreted Mr. Musk's statement as him saying that he was having heightened concerns about going forward with the deal.

**MR. BOTTINI:** Objection, asked and answered.

**THE COURT:** I'll allow it.

**THE WITNESS:** Certainly there are some interpretations where that would be included, but that would only also be a part, because he didn't just imply that he had heightened concern; he suggested he was taking a certain action by temporarily putting the deal on hold.

**BY MR. BERNSTEIN:**

**Q.** And you didn't do anything to isolate the impact of that part, "that part" being the market interpreting Mr. Musk as having a heightened level of concern; correct?

**A.** Oh, of course not. I don't think that would be appropriate for my damages analysis. If you like, I could explain.

**Q.** Sir, the market may not have cared about the exact words that were used by Mr. Musk because investors may have cared that there was a dispute between Mr. Musk's side and the Twitter side; right?

**A.** That would be one thing they would care about. They

probably would care about certain -- I mean, the exact words -- certain words make a difference; certain words probably would not.

**Q.** You agree as a general rule, regardless of whether or not Mr. Musk had information rights, whether bots were 5 percent or less than 5 percent or more than 5 percent, investors could have legitimate concerns that a dispute between Mr. Musk and Twitter, regardless of the merit, may result in a lower closing price; right?

**A.** I think that's true, yes.

**Q.** Sir, there are ways to test what information is actually causing a stock to move; correct?

**A.** Depends what's out there. There -- it depends on what data you have. But sometimes you can do that, yes.

**Q.** For example, information that's already public won't impact the stock price in an efficient market; right?

**A.** Do you mean a -- just the fact that it's already existing, or are you talking about a repetition of it?

**Q.** A widely circulated public statement from weeks or months earlier will not impact the stock price; correct?

**A.** Correct, unless there's new news that makes that statement somehow differentially relevant or --

**Q.** Okay. And a specific way to test whether an allegedly false statement causes a stock price reaction is to measure how the stock reacts when the supposed truth is revealed; right?

**A.** It can be. It depends on how close the revelation of the truth is to the misrepresentation, yes.

**Q.** You commonly do that in cases where you're retained as an expert; right?

**A.** Yes, I do.

**Q.** And if the truth was new and material, you'd expect the stock to react; right?

**A.** Correct.

**Q.** That's typically called a "corrective disclosure"?

**A.** Yes, it is.

**Q.** Okay. In this case, you're not claiming that any information that came out was corrective of Mr. Musk's alleged false statement; correct?

**A.** Right. That is not part of my opinion.

**Q.** Okay. Let's look at what information did come out.

And to do that, let's focus on why plaintiffs claim the May 13th statement was allegedly false.

You understand that plaintiffs claim that one of the reasons that the May 13th tweet was allegedly false was because Twitter did not agree to put the deal temporarily on hold; right?

**A.** Broadly. I'm not going to exactly characterize their claims, but I think that's fair.

**Q.** But you're not claiming it was material to investors whether Twitter agreed to put the deal on hold; correct?

**MR. BOTTINI:** Your Honor, I'll just make a scope objection. It's beyond the scope of his report.

**THE COURT:** I'll allow it.

**THE WITNESS:** I haven't looked -- I'm not offering that opinion. That's fair.

**BY MR. BERNSTEIN:**

**Q.** And, in fact, you're aware that Twitter had been conveying its views for months before the Twitter lawsuit was filed in July; right?

**A.** I'm sorry. The Twitter lawsuit was filed in July -- just to be clear -- I'm sorry. The Twitter lawsuit filed in July -- what -- just to be clear, what are you referring to?

**Q.** Sorry. Let me repeat.

You're aware that Twitter had been conveying its views for months before Mr. Musk terminated the agreement and the lawsuit ensued; correct?

**A.** Correct.

**Q.** Okay. And you did not see a single statistically significant stock reaction to Twitter conveying its views regarding its rights and Mr. Musk's obligations under the merger agreement from May 13th through July 8th; correct?

**A.** Correct, because, again, it was already known those were Twitter's views. It was repeating them.

**Q.** Twitter's views were known before they stated their views?

**A.** Well, you're talking about all of those. And -- put it

this way: Everyone knew that Twitter did not agree to put the deal on hold.

**Q.** Okay. Everyone knew that, and it did not cause a stock price reaction; right?

**A.** What did -- or what event in particular are you looking at?

**Q.** You're saying everyone knew Twitter hadn't put the deal on hold; right? That's your testimony?

**A.** Right.

**Q.** And you did not see any statistically significant stock reaction to the revelation of that news; right?

**A.** Well, the revelation came at the same time as the May 13th news. People were immediately saying things and saying that Twitter has not put it on hold, so it would be folded in with May 13th and 16th.

**Q.** Okay. So your testimony is that people knew as of May 13 that Twitter had not agreed to put the deal on hold?

**A.** Yes. They said they hadn't seen anything from Twitter. There were comments that you can't put it on hold.

**Q.** You also understand that plaintiffs allege that temporarily on hold was untrue because people continue to work on the deal?

**A.** I won't characterize their allegations, but if they said that, yes, that's their allegation.

**Q.** You understand that it was public that Mr. Musk was

continuing to work on his financing; correct?
**A.** Yes. He did make various statements about financing or end dates.
**Q.** And there was no statistically significant stock reaction to that news either; correct?
**A.** To the updates. That's fair, yes.
**Q.** You would also agree there was a significant amount of information regarding the merger and the parties' positions about the dispute between May 16th and July 8th; right?
**A.** I'm not sure how to say this -- sure, there was a lot of information. Yes.
**Q.** And yet your analysis is that between May 17 and July 7, none of the information that came out altered the market's belief as to the probability of the merger closing; correct?
**A.** At least not by a statistically significant amount on any single day, sure.
**Q.** And because you didn't see a statistically significant stock reaction on any given day, you can't attribute any of the stock going up or down to anything other than market noise; right?
**A.** Market noise, and that would affect both the true and false parts of the stock. Sure.
**Q.** Mr. Musk is not responsible for the general market moves; correct?
**A.** That is correct.

**Q.** But each day on the chart you showed the jury, Exhibit 282, the deflation numbers change; right?
**A.** Probably almost every day, yes.
**Q.** For example, on May 24th, the chart you showed the jury said deflation was $8.44; correct?
**A.** Correct.
**Q.** This is more than the stock fell on May 13th; right?
**A.** Correct.
**Q.** It's more than the combined decline of May 13 and May 16?
**A.** Yes, also correct.
**Q.** It's more than a dollar higher than just one day earlier?
**A.** Incorrect.
**Q.** It's 97 cents higher than it was just one day earlier?
**A.** There you go, Mr. Bernstein. That is correct.
**Q.** And the reason that it's almost a dollar higher than it was the day before is because the stock market went down; right?
**A.** Well, it's because Twitter's price going down, which most likely would be to market and industry factors, yes.
**Q.** Again, Mr. Musk is not responsible for marketing and industry factors; correct?
**A.** Correct, but I don't think that's -- gives the correct answer over here when you say it that way.
If you'd like, I can explain.
**Q.** Your explanation is that because you say there's an

alleged misrepresentation that's impacting investors' perception as to how likely the deal is going to occur, the value that is being placed on the stand-alone value of the company is different than it otherwise would have been; correct?
**A.** I'm saying that the value on the allegedly misrepresented part changes because of market and industry effects, so if -- may I try an explanation?
**Q.** Let me ask the questions.
I just want to make sure: You're saying that the market and industry factors are having a larger impact, according to you, on Twitter's stock price after the May 13th tweet than they were before the May 13th tweet; right?
**A.** I'm sorry. I think you said it backwards. So maybe I can either -- you can repeat it or I can have it back.
**Q.** Your claim is that the market and industry factors are having a larger impact on Twitter stock price after the May 13th tweet than they were before the May 13th tweet; right?
**A.** No.
**Q.** Okay. Why don't you tell me what your explanation is.
**A.** Well, first of all, it would be less. The stock price is lower because of the alleged deflation. So if you're going to talk about dollar movements, a 10 percent decline, for example, is going to be smaller when the price is lower than when the price is higher.

If you want to talk about percentage effects, it still would be 10 percent, so it's not a larger effect.

**Q.** Sir, you're increasing damages on May 24th because the stock market went down; right?

**A.** Yes.

**Q.** Okay. And you agree Mr. Musk was not responsible for the stock market going down on May 24th; right?

**A.** Correct.

**Q.** Okay. But nonetheless, you are increasing the amount of damages that would be charged against Mr. Musk?

**A.** Let me try the explanation here.

If I sell somebody a barrel of oil at $30 -- oil at $30 a barrel but the barrel is empty, I've sold them an empty barrel for $30.

If the price of oil the next day is $35 a barrel and I sell somebody an empty barrel, I've taken $35 away from them, but I am not responsible for the change in the price of oil in the world market. But my selling an empty barrel can have a different effect each time depending on what the price of oil is.

Similarly, if the jury finds that Mr. Musk's statements were improper, then the effect of those statements can vary with the market, just like the value or the fraud in an empty barrel of oil will -- sorry -- will vary with the market price of oil.

So this is completely to be expected.

**Q.** Okay. And just to be clear, you are charging Mr. Musk for declines that are just the general market going down; correct?

**A.** The same way that I would be charging someone empty barrels of oil if they're full, I would be charging them more after the price of oil has gone up and I sell them an empty barrel of oil at a higher market price. Sure.

**Q.** Sticking with Exhibit 282, on direct you gave examples of how damages would be calculated for each individual investor.

Do you recall that?

**A.** I do.

**Q.** Okay. If we have someone who sold a thousand shares on May 27th, you would say they have $6,420 of damages; correct?

**A.** That is correct.

**Q.** Okay.

**MR. BERNSTEIN:** Let's turn to Exhibit 303.

**BY MR. BERNSTEIN:**

**Q.** Do you see Exhibit 303 are the stock sales?

Turn to the next page, please.

Do you see these are stock sales of two of the named plaintiffs in this case?

**A.** That's my understanding, yes.

**Q.** And do you see they sold approximately a thousand shares on May 27th?

**A.** Yes.

**Q.** At prices around -- let's call it $39 and change?
**A.** Yes, I do.
**Q.** Okay. And you said your model gives them damages of $6,420 for those sales; right? Approximately?
**A.** Approximately, yes.
**Q.** Okay. Let's turn to Exhibit 744. If we could go to page 7.
Do you see that this document lists the -- Mr. Garrett and Ms. Price's stock purchases as well as their sales?
**A.** I do see that.
**Q.** All right. And on May 26, they bought about 800 shares or so at $38.45; right?
**A.** Mm-hmm. I see that, yes.
**Q.** So they actually made a profit when they sold those --
**THE COURTROOM DEPUTY:** Oh, one moment.
**MR. BERNSTEIN:** Thank you.
(Pause in proceedings.)
**BY MR. BERNSTEIN:**
**Q.** So they sold at 39 and change. They bought at 38 and change; right?
**A.** Yes, that's what I see here.
**Q.** So they made about a dollar a share on the shares they purchased on May 26 and then sold on May 27; right?
**A.** With rounding, sure.
**Q.** But your model gives them damages of $6,420 for those

shares; right?
**A.** I'm sorry. Let go back.
You've got the $6,420. Are you just multiplying their sales times that figure?
**Q.** That's correct. That's what you did on direct; right?
**A.** Okay. But not -- but if they purchased, then they were in the opposite direction on the other day. If they purchased, they purchased at too low a price, and they got a benefit.
**Q.** So you wouldn't just multiply -- like you said on direct, you wouldn't just take the number of shares and multiply it by the deflation on the chart; right?
**A.** Well, when you say "the number of shares," you mean the number of shares sold?
**Q.** Correct.
**A.** You do all the sales and those are damages, all the purchases, those are benefits, and I would offset the two.
**Q.** Okay. You didn't mention that on direct; right?
**A.** I think you're right. I did not. I wasn't asked that.
**Q.** Okay. Let's turn to Exhibit 197.
You recognized this as the termination letter from Mr. Musk's side to the Twitter side?
**A.** I do.
**Q.** And this is the only other statement other than the May 13 tweet that you claim caused any investor losses at all; right?
**A.** Right, but this only for the scheme claim.

**Q.** Okay. This is not one of your misrepresentations; right?
**A.** Correct.
**Q.** Okay. You would expect, though, a termination letter to result in a stock decline; right?
**A.** Depends. You would expect a movement from whatever the price was before to afterwards. There could be various reasons for a termination letter.
**Q.** You would agree, though, regardless of whether it was part of a scheme or not part of a scheme, it would be expected that the termination letter that was issued on July 8th would result in a stock price decline; right?
**A.** In this case, yes, I think that's fair.
**Q.** And truthful information can make a stock go down; right?
**A.** Obviously, yes.
**Q.** You're not claiming that Mr. Musk's side did not actually serve a termination letter; right?
**A.** I'm not claiming that.
**Q.** You're not claiming that Mr. Musk did not have a valid basis to terminate the merger agreement; correct?
**A.** I'm not addressing that one way or the other. It's outside the scope of my expertise.
**Q.** You're not offering any opinion on the terms of the merger agreement; correct?
**A.** Also not my expertise. I'm not offering any such opinion.
**Q.** Nor are you claiming there wasn't a real dispute here;

right?

**A.** Again, that's a factual issue. I'm not offering any opinion on that one way or the other.

**Q.** Okay. You understand as well that there are bases for termination in this letter that are unrelated to the alleged false statements in this case; correct?

**A.** There are a little bit, yes.

**Q.** Okay. If we go to page 7, do you see a reference to Section 6.1 of the merger agreement?

**A.** I do.

**Q.** Okay. You understand that's not related to the alleged misrepresentations in this case; right?

**A.** So you're talking misrepresentations, not the scheme? Correct.

**MR. BERNSTEIN:** You can take that down.

**BY MR. BERNSTEIN:**

**Q.** You don't offer an opinion on what Twitter stock price would have been if the termination letter relied solely on Section 6.1; right?

**A.** Similar to what we had before, no, I'm not doing that.

**Q.** And you're not offering an opinion as to whether that was a valid basis for termination?

**A.** Again, outside the scope of my expertise. I'm not offering any such opinion.

**Q.** You also did not do any analysis to determine whether

Twitter's stock price would have fallen to the exact same price level that it did if Mr. Musk had only issued the termination letter and not the May 13th tweet; right?
**A.** Correct. I did not do that.
**Q.** You don't know whether it would have fallen to the exact same price regardless of whether the termination letter contained any of the allegation related to this case; right?
**A.** I haven't done that analysis, so I can't answer that. Or I can't tell you what it would have done.
**Q.** Because of that, you don't know whether Twitter stock would have actually fallen more on July 8th had Mr. Musk not issued the May 13th tweet disclosing that their deal might be in jeopardy; right?
**A.** Yes. All of my analyses assume that he actually has issued the May 13th tweet. So you're right.
**Q.** Okay. And it's your opinion that we would have seen the exact same price movements from July 8th through October 4th even if Mr. Musk had never tweeted on May 13th; right?
**A.** In percentage terms. The 10 percent increase or a 10 percent decrease. Not to dollar terms.
**Q.** You also agree that the July 8th termination letter was not directly caused by any of the allegedly false statements that are part of plaintiffs' misrepresentation case; right?
**A.** Just to be clear, you're asking if the misrepresentations caused the letter? No, they did not cause the letter to be

issued.

**Q.** And because it was not -- because the termination letter was not caused by any of the alleged false statements, it was in error to include the declines due to the termination letter in your 10b-5(b) misrepresentation damages; right?

**A.** Yes. I said that, and I corrected the error.

**Q.** Right. You said that you discovered the error, but that's not quite true; right?

**A.** I don't remember the terms, but it was in my deposition. We were discussing it, and I agreed it was an error.

**Q.** I pointed it out; correct?

**A.** I don't remember the exact sequence, but we got there and I would say we discussed it, and I agreed it was an error, yes.

**Q.** It was not plaintiffs who pointed out the error to you?

**MR. BOTTINI:** Objection, asked and answered, argumentative.

**THE COURT:** You have a credit. Let's move on.

**BY MR. BERNSTEIN:**

**Q.** But it was plaintiffs who paid you for the report you submitted that contained the error; right?

**MR. BOTTINI:** Same objection, Your Honor.

**THE COURT:** Overruled.

**THE WITNESS:** I was paid by plaintiffs for my work in this case, yes.

\\\

**BY MR. BERNSTEIN:**

**Q.** It was plaintiffs who paid you for your time preparing for the deposition?

**A.** That is correct.

**Q.** It was plaintiffs who paid you to prepare the supplemental report that fixed the error?

**A.** No. I did not charge them for that.

**Q.** They're paying you for your time testifying here?

**A.** Just like with any expert. Absolutely.

**Q.** In total, in this case, plaintiffs have paid you millions for your opinion?

**MR. BOTTINI:** Objection.

**THE WITNESS:** Okay. That --

**THE COURT:** You're asking for his work? The implication. Why don't you ask it different way.

**MR. BERNSTEIN:** Let me ask it slightly differently.

**BY MR. BERNSTEIN:**

**Q.** Plaintiffs have paid millions for the work that you and your team have done on this case; correct?

**MR. BOTTINI:** Same objection, Your Honor.

**THE COURT:** Overruled.

**THE WITNESS:** No.

**BY MR. BERNSTEIN:**

**Q.** They've paid hundreds of thousands; correct?

**A.** That would be correct.

**MR. BERNSTEIN:** I have nothing further.

**THE COURT:** Okay. Ladies and gentlemen, we're going to be in recess now.

Remember the admonition given to you: Don't discuss the case, allow anyone to discuss it with you, form or express any opinion.

I'll see you at 9:15 tomorrow.

Tomorrow may be a shorter day, but I can't promise it at this point. I'm going to talk to the lawyers, and obviously if it is, it is.

Okay. Thank you.

(The jury leaves the courtroom.)

(Proceedings were heard out of the presence of the jury.)

**THE COURT:** You can step down.

Did you have a question?

**MR. BERNSTEIN:** Do you have redirect?

**MR. BOTTINI:** We will have some redirect.

**THE COURT:** Wait. Let Mr. -- let the witness leave and then everybody can sit down.

Mr. Bottini, you said you wanted to say something.

**MR. BOTTINI:** No, Your Honor. I was just saying we'll have some redirect tomorrow morning for scheduling purposes.

**THE COURT:** Okay. I do have a question, Mr. Bernstein. You asked the witness about -- is it the Spoco report? The Spokeo report?

**MR. BERNSTEIN:** SparkToro.

**THE COURT:** SparkToro. Okay. And maybe the parties can enlighten me. Is there evidence in the record that this document was disseminated publicly?

**MR. BERNSTEIN:** Yes, Your Honor. There's a tweet. I believe it's Exhibit 598.

**THE COURT:** Pardon me?

**MR. BERNSTEIN:** I believe it's Exhibit 598 shows that it was tweeted on May 15th.

**THE COURT:** 598, it was tweeted?

**MR. BERNSTEIN:** Correct. And 599 was the report.

**THE COURT:** And the date was what?

**MR. BERNSTEIN:** May 15th, Your Honor.

**MR. MOLUMPHY:** No evidence that Mr. Musk -- no evidence that we believe definitively shows Mr. Musk saw it, but for purposes of whether it was public, yes, it was public.

**THE COURT:** Okay. All right. I -- I didn't have a recollection of it one way or the other, so thank you.

So we have some redirect and then maybe some also for the cross, but be that as it may, I would think that it would -- this witness would be concluded within half an hour or so or an hour, at the outside.

Then what? Then we have the defendant?

**MR. BERGJANS:** We've got some videos, Your Honor.

**THE COURT:** Pardon?

**MR. BERGJANS:** We've got three deposition designation videos to play. One, it's a very short three minute video of Jack Dorsey, the founder and former CEO of Twitter.

We have a video of Dan Brahmy, one of the data analysts that Mr. Musk retained pretermination.

And we have a video of Emmy Anargyros, who ran Twitter's mDAU audit.

And altogether, they should be about two and a half hours.

**MR. MOLUMPHY:** I don't know how Mr. Dorsey can only be three minutes. We made about 40 minutes of designations ourselves, so unless they're not including our portions --

**MR. BERGJANS:** So we, Your Honor --

**THE COURT:** I think maybe it would be a good idea to share with them your designations.

**MR. BERGJANS:** We did, Your Honor. There's a dispute. So we had originally designated a fair amount of testimony, and then as the evidence came in, we decided that given the way the evidence is coming in, we only need three minutes. So we designated three minutes.

They have counters, but not to the -- not to the testimony that we designated. So if we want to play Mr. Dorsey's testimony in the rebuttal case, if they rebut something, they're free to. They could have played Mr. Dorsey in their case, but under the rules, under Rule 32 and under the law in the circuit, a counter has to be responsive to the testimony

being designated, and the testimony we're designating is on a very, very narrow subject matter.

**MR. MOLUMPHY:** That would be counter to everything you've done so far in this trial in which you've asked that a witness be called once. We've done both designations and played it both at the same time for every other depo designation. You want a different procedure with Mr. Dorsey, which we just found out about a few days ago.

So we would strongly object to not playing the entire video portion at the same time.

**THE COURT:** Well, here's the problem, because we've interrupted testimony. Basically, a party gets to rely on what has been designated as testimony that would be read.

So as I understand it, a lot was going to be read. Then you decided, as you advise the Court, you're not going to do all that.

Well, okay. But if they think it's relevant, it's something that Mr. Dorsey says to the testimony, I would allow them to present it.

**MR. BERGJANS:** I don't think, Your Honor, it should be presented as a counter. I mean, they can present it in their case.

**THE COURT:** Well, their case is technically not over anyway, so their case is going to be over with the understanding that, as I think -- I'm not -- as I think that

there was going to be testimony of Mr. Dorsey and here is what it would look like, and you're telling me, no, it's not going to look like that; it's going to be a lot, lot shorter.

So then they would say, okay. Not going to tell you to put on something, that they're going to say we want to play this and we want to play that. We want it in the case, and we thought you were going to put it the case, but if you're not, you don't have to, and we'll put it in the case. That's the way it --

**MR. BERGJANS:** In that case, Your Honor, then I think we have far more than -- or not far more, but probably closer to three and a half hours of video.

**THE COURT:** Well, you have what you have. I'm not saying you can't do it. I'm just trying to get it all done at one time.

And, yes, I think it does make sense to do -- when a witness is going to testify by tape or by deposition, I think it does make a lot of sense to put it all in one fell swoop. It's just easier. If it's going to take three hours or so, you take three hours.

**MR. BERGJANS:** In that case, we also do have some objections to their counters as to 404 too, so we're happy to raise to the Court tomorrow morning.

**THE COURT:** Okay. You're entitled to do that.

Why don't you -- when will we be -- maybe what we should

do with Mr. Dorsey is hear him after lunch so that we can, during a recess, go through your objections to their counters. I call them counters. They may not be counters at all. So we can do that in a recess.

**MR. BERGJANS:** Okay. Then in that case, after Dr. Tabak is done, we intend to -- we'll play Mr. Brahmy's deposition and then I think Mr. Dorsey thereafter.

**THE COURT:** Okay. And maybe go through however far we can go through that, that's great.

Okay. Anything else?

**MR. BERGJANS:** I think the rebuttal case -- are you guys disclosing exhibits for the live witnesses that you're calling? And do you know who you're calling as live witnesses?

**MR. MOLUMPHY:** So the extent we have any, I think we've already disclosed them.

**MR. BERGJANS:** But we didn't get exhibit disclosures, Mark, so I'm curious if you can, per the Court's rule, the two days -- our case is done besides the video, which you've already seen.

Are you able to disclose the exhibits that you intend to use for those witnesses in rebuttal so that we can prepare our cross-examination?

**MR. MOLUMPHY:** So if we didn't designate any exhibits, then we are not using any exhibits.

**MR. BERGJANS:** Okay.

**MR. MOLUMPHY:** One scheduling concern. We were told that their case would go until about noon, lunchtime tomorrow. Looks like it still may.

If for some reason they stop early, our rebuttal witness can't come until 1:30, so I just wanted to raise that now.

**THE COURT:** Okay. And we may put your rebuttal witness on even if they haven't concluded, but I don't know whether we will or not. It just depends on how far along you are --

**MR. MOLUMPHY:** Understood.

**THE COURT:** -- with your case.

**MR. BERGJANS:** And who is the rebuttal witness coming at 1:30, Mark?

**MR. MOLUMPHY:** Dr. Badawi.

**MR. BERGJANS:** Okay. Okay. Understood.

**THE COURT:** You look troubled.

**MR. BERGJANS:** Well, I'm a little confused because he's an expert witness, and we don't intend to call our rebuttal expert, so it's unclear to me exactly what he's rebutting, given that he has a report.

**THE COURT:** Fair enough. So we should have that discussion during the noon hour tomorrow as well.

**MR. BERGJANS:** Okay.

**THE COURT:** Okay.

**MR. MOLUMPHY:** Thank you.

**THE COURT:** Thank you very much.

(Proceedings adjourned at 4:16 p.m.)

---o0o---

**CERTIFICATE OF REPORTER**

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

DATE: Thursday, March 12, 2026

Ruth Levine Ekhaus, RMR, RDR, FCRR, CCG, CSR No. 12219
Official Reporter, U.S. District Court

**Volume 10**

**Pages 1930 - 2031**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Charles R. Breyer, Judge

GIUSEPPE PAMPENA, individually and on behalf of all others similarly situated, et al.,

Plaintiffs,

VS.

ELON MUSK,

Defendant.

**NO. C 3:22-cv-05937-CRB**

San Francisco, California
Friday, March 13, 2026

**TRANSCRIPT OF PROCEEDINGS (CORRECTED)**

**APPEARANCES:**
For Plaintiffs:

COTCHETT, PITRE & MCCARTHY LLP
840 Malcolm Road
Burlingame, California 94010
**BY: JOSEPH W. COTCHETT, ATTORNEY AT LAW**
**MARK C. MOLUMPHY, ATTORNEY AT LAW**
**TYSON C. REDENBARGER, ATTORNEY AT LAW**
**GIA JUNG, ATTORNEY AT LAW**
**CAROLINE A. YUEN, ATTORNEY AT LAW**
**ELLE D. LEWIS, ATTORNEY AT LAW**

BOTTINI & BOTTINI, INC.
7817 Ivanhoe Avenue - Suite 102
La Jolla, California 92037
**BY: FRANCIS A. BOTTINI, JR., ATTORNEY AT LAW**
**AARON P. ARNZEN, ATTORNEY AT LAW**

**(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

Reported By: Ruth Levine Ekhaus, RMR, RDR, FCRR, CCG
CSR No. 12219, Official United States Reporter

**APPEARANCES**: **(CONTINUED)**

For Defendant:

QUINN, EMANUEL, URQUHART
& SULLIVAN LLP
865 South Figueroa Street - 10th Floor
Los Angeles, California 90017

**BY: STEPHEN A. BROOME, ATTORNEY AT LAW**
**M. ALEXANDER BERGJANS, ATTORNEY AT LAW**
**MICHAEL T. LIFRAK, ATTORNEY AT LAW**

QUINN, EMANUEL, URQUART
& SULLIVAN LLP
295 Fifth Avenue
New York, New York 10016

**BY: ELLYDE R. THOMPSON, ATTORNEY AT LAW**
**JESSE A. BERNSTEIN, ATTORNEY AT LAW**
**PHILLIP JOBE, ATTORNEY AT LAW**
**STEPHANIE KELEMEN, ATTORNEY AT LAW**

QUINN EMANUEL URQUHART
& SULLIVAN, LLP
300 W 6th Street - Suite 2010
Austin, Texas 78701

**BY: EMILY F. COUTURE, ATTORNEY AT LAW**

**Also present:** **Richie DeMarco, Trial Tech**
**Raymond McLeod, Trial Tech**
**Carley Carter**

# I N D E X

Friday, March 13, 2026 - Volume 10


| | PAGE | VOL. |
|---|---|---|
| Plaintiffs Rest | 1952 | 10 |
| Defendant Rests | 1996 | 10 |
| Plaintiffs Rest | 2029 | 10 |

| **PLAINTIFFS' WITNESSES** | **PAGE** | **VOL.** |
|---|---|---|
| **TABAK, DAVID (RECALLED)** | | |
| (PREVIOUSLY SWORN) | 1938 | 10 |
| Redirect Examination by Mr. Bottini | 1938 | 10 |
| Recross-Examination by Mr. Bernstein | 1950 | 10 |
| **BADAWI, ADAM (RECALLED)** | | |
| (PREVIOUSLY SWORN) | 2003 | 10 |
| Direct Examination by Mr. Molumphy | 2003 | 10 |
| Cross-Examination by Mr. Broome | 2006 | 10 |
| Redirect Examination by Mr. Molumphy | 2011 | 10 |
| **FIX CONTI, STACEY (RECALLED)** | | |
| (PREVIOUSLY SWORN) | 2013 | 10 |
| Direct Examination by Mr. Redenbarger | 2013 | 10 |
| Cross-Examination by Mr. Lifrak | 2019 | 10 |
| Redirect Examination by Mr. Redenbarger | 2028 | 10 |

| **DEFENDANT'S WITNESSES** | **PAGE** | **VOL.** |
|---|---|---|
| **ANARGYROS, EMMY** | | |
| By Videotaped Deposition (not reported) | 1965 | 10 |
| **DORSEY, JACK** | | |
| By Videotaped Deposition (not reported) | 1993 | 10 |
| **BRAHMY, DANIEL** | | |
| By Videotaped Deposition (not reported) | 1996 | 10 |


## E X H I B I T S


| **TRIAL EXHIBITS** | **IDEN** | **EVID** | **VOL.** |
|---|---|---|---|
| 113 | | 1965 | 10 |

# I N D E X

## E X H I B I T S


| TRIAL EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| 304 | | 1965 | 10 |
| 305 | | 1965 | 10 |
| 306 | | 1965 | 10 |
| 325 | | 1944 | 10 |
| 501 | | 1965 | 10 |
| 523 | | 1965 | 10 |
| 816 | | 1965 | 10 |

**Friday - March 13, 2026** **9:19 a.m.**

**P R O C E E D I N G S**

---o0o---

(Proceedings were heard out of the presence of the jury.)

**THE COURTROOM DEPUTY:** All rise. Court is now in session. The Honorable Charles R. Breyer presiding.

**THE COURT:** Okay. We all set?

**MR. REDENBARGER:** I have one issue, Your Honor.

**THE COURT:** Sure.

**MR. REDENBARGER:** Good morning.

**THE COURT:** Let the record show the jury is not present.

**MR. REDENBARGER:** Good morning, Your Honor. Tyson Redenbarger.

Today the defense will be playing a deposition video of Mr. Brahmy, who's a data scientist, and there are several exhibits that they seek to admit which have redactions. There was a motion in limine whereby the Court ordered that if they intend to introduce any of this evidence, it would need to be filed under seal and reviewed so that it could be effectively crossed.

**THE COURT:** Right.

**MR. REDENBARGER:** They have filed it, though I don't believe there's been a ruling. So there's a ruling on some that have been filed, some exhibits.

**THE COURT:** And the exhibit numbers are what?

**MR. REDENBARGER:** I have them. They are 607, 634, 715, 718, 778. Those have been filed, Your Honor, by the defense, at ECF 491 and 492.

In addition to that there, are two exhibits that plaintiffs have cross-designated that also have redactions, and we have requested from the defense that those also be filed under seal, and they have refused thus far. Those exhibits are 181 and 511.

**THE COURT:** Okay. I'll take a look at them.

**MR. BERGJANS:** May I heard very briefly, Your Honor, about this issue?

**THE COURT:** Sure.

**MR. BERGJANS:** So first, these expert -- these exhibits from the data scientists, who were determined to be percipient witnesses in the Delaware litigation, have been available to plaintiffs for a very long time. They never challenged the privilege assertions and redactions until trial, and under the law their opportunity to challenge any assertion of privilege is in the discovery period.

We've provided the redactions to the exhibits that the defense intends to submit to Your Honor *in camera*. We have the other exhibits available as well.

**THE COURT:** I have a question. You say the -- this all generated out of the Delaware litigation?

**MR. BERGJANS:** So the -- not the exhibits themselves. The evidence itself was prepared prior to the Delaware litigation, but the documents were produced in Delaware. Indeed, every single document in this case was produced in the Delaware --

**THE COURT:** That's the Delaware litigation.

**MR. BERGJANS:** It's all a prelitigation activity.

So the data scientist is going to testify about the work he did for Mr. Musk from May 20th through July 8th, so through the termination. So it's actually not about work he performed in the course of the litigation; it's about the work that occurred before the merger was purportedly terminated.

**THE COURT:** Before the merger was terminated?

**MR. BERGJANS:** Exactly, Your Honor.

**THE COURT:** I see. Okay. And it was communicated to Mr. Musk?

**MR. BERGJANS:** So, yes. Mr. Musk testified under oath that he had seen and had gotten updates about the reports that were -- or the analysis that was prepared by the experts, and the expert will testify about a conversation he had with Mr. Musk about his work -- or not expert, sorry, scientist.

**MR. REDENBARGER:** I don't believe it's in the record that Mr. Musk saw these records, and it's also untrue that we didn't challenge this information.

**THE COURT:** Okay. Okay. I'm going to -- I'm not

going to do it right now. I'm going to ask for a more detailed offer of proof with respect to this testimony before we proceed.

Okay. Thank you. Let's conclude this witness.

(David Tabak steps forward to resume the stand.)

**THE COURT:** And with respect to this witness -- not this witness, but the one who's the data scientist -- we don't need to call him -- you don't need to call him right after this witness, do you?

**MR. BERGJANS:** So he is the next witness we intend a call.

**THE COURT:** Well, is it a live witness?

**MR. BERGJANS:** No, it's video.

**THE COURT:** So it can go the other way.

**MR. REDENBARGER:** We could play it later.

**THE COURT:** You can put on some other video.

**MR. BERGJANS:** Yes, we can put on another video.

**THE COURT:** Okay. Let do that so we don't waste the jury's time.

**MR. BERGJANS:** And, Your Honor, I was reminded by my colleague, after Dr. Tabak is finished with his testimony, the defense intends to make a motion following plaintiffs resting their case-in-chief.

**THE COURT:** Okay. That's fine.

(The jury enters the courtroom.)

(Proceedings were heard in the presence of the jury.)

**THE COURT:** Okay. Please be seated.

Let the record reflect all jurors are present.

You may proceed. Parties are present.

**DAVID TABAK**,

called as a witness for the Plaintiffs, having been previously duly sworn, testified further as follows:

**REDIRECT EXAMINATION**

**BY MR. BOTTINI:**

**Q.** Good morning, Dr. Tabak. How are you today?

**A.** Okay. Good morning, Mr. Bottini.

**Q.** Yesterday, defendant's counsel showed you tweet after tweet after tweet on this easel, and after each tweet, he asked you: Did this tweet cause the plaintiffs' damages?

Do you recall those questions?

**A.** Generally, yes.

**Q.** And one of them was a tweet, do you recall, from 2018, four years before the class period in this case?

Do you remember that?

**A.** Yes, I do.

**Q.** And another one was a picture of Mr. Musk and a picture of Mars, and he -- it was something about Mr. Musk wanting to populate Mars.

Do you remember that one?

**A.** I remember the picture of Mars, yes.

**Q.** And he asked you whether -- whether that tweet caused the damages in this case; right?
**A.** Yes, I remember that.
**Q.** Did any of those tweets that you were shown yesterday have anything whatsoever to do with your opinions in this case?
**A.** Unless he showed me the March 13th tweet, the answer would be no, they did not.
**Q.** Did any of those tweets have anything whatsoever to do with your damages calculations in this case?
**A.** Again, unless the March 13th tweet was up there, the answer would be no.
**Q.** This is my briefcase. Can you see it?
**A.** Yes.
**Q.** Did my briefcase have anything do with plaintiffs' losses in this case?
**A.** I assume no. I have no reason to think that.
**Q.** Okay. You were asked about the May 16th stock decline.
Do you remember that?
**A.** I do.
**Q.** And defendants' counsel asked you whether Mr. Musk's statements at the All In conference caused the stock decline that day.
Do you recall that?
**A.** I do recall that.
**Q.** And your answer was "no," correct?

**A.** Correct.

**Q.** But there was a statistically significant stock decline on May 16th, was there not?

**A.** There was.

**Q.** And you included that in your damages calculations; correct?

**A.** That is correct.

**Q.** Why was that?

**A.** Because I interpreted it as a continuing reaction to the May 13th tweet at issue here.

**Q.** Okay. And May 13th was a Friday; correct?

**A.** That is correct.

**Q.** And May 16th was what? A Monday?

**A.** Yes.

**Q.** And the stock market is not open on the weekend, is it?

**A.** It is not open on the weekend.

**Q.** And in your experience as an expert, Dr. Tabak, is it appropriate to use a two-day window to measure price impact?

**A.** It depends on the circumstances.

So, again, I did not include a three-day window because there was not a statistically significant decline on the third day, and had there not been on the second day, I would not have included it.

But in my experience, I've seen a number of cases where the market reacts on one day. There is no news between that

day and the next day, other than people following up on the original news, and the market does react in a statistically significant way on day two, let's call it, or the second day that the market is open.

**Q.** Have you ever written an academic paper about that issue?

**A.** I have.

**Q.** And could you describe that for the jury.

**A.** Sure. It's a working paper that some colleagues and I put out several years ago, and one of things we did is we looked at news events and measured how long there was a statistically significant reaction; in other words, how many days there was. And we found a large percentage of times, there was more than one day with a statistically significant reaction, even when there was absolutely no other news out there.

It was a working paper, but it's been cited by a number of academic articles that have employed that methodology of looking at the number of days with a statistically significant movement on each individual day to measure the full effect of news.

**Q.** Okay. So in certain instances, it's appropriate to measure price impact over a two-day period; is that right?

**A.** Yes. And particularly here, when the two days both have statistically significant price movements and then the third day does not.

**Q.** Okay. And that's what you did here; right? You measured

the impact from Mr. Musk's May 13th statement, and then you added to that the decline for May 16th as a continuing price impact from that statement; is that right?

**A.** That is correct.

**Q.** Okay. Let's talk about -- we talked a little bit before about what didn't cause the losses. Let's talk about what actually caused Twitter's stock price decline in this case.

**MR. BOTTINI:** Could we bring back up Exhibit 276, please.

**BY MR. BOTTINI:**

**Q.** Can you see that, Dr. Tabak?

**A.** I can.

**Q.** Delayed reaction.

So we've seen this before. We went -- you were asked about this yesterday; correct?

**A.** I was.

**Q.** And your conclusion, again, was what with respect to the price impact here from Mr. Musk's tweet?

**A.** It's very clear there's an immediate impact from the tweet at 5:44 a.m., and the overall movement over the whole day was statistically significant, meaning an unusual decline.

**Q.** Okay. And you looked at news report and analysts, what people were doing, and there was nothing else going on this day other than Mr. Musk's tweet; right?

**A.** Well, there were obviously other things going on this day,

but when I looked at what the news reports and later the analyst reports were attributing this to, it was to Mr. Musk's tweet, the 5:44 a.m. tweet.

**Q.** Okay. And it had basically an instantaneous reaction in the stock price; right? Within minutes?

**A.** Within that minute, yes.

**Q.** Okay. Is there any doubt in your mind that Mr. Musk's tweet caused the stock decline on this date?

**A.** No, no doubt.

**Q.** Okay. So Mr. Musk's tweet caused the price to decline this day, and it stayed at a deflated level throughout the class period; is that right?

**A.** The level of deflation varied, as we discussed yesterday, but that is correct.

**Q.** Okay. And never recovered to the level where it was until October 4th, when there was another disclosure by Mr. Musk; right?

**A.** That is correct.

**MR. BOTTINI:** Okay. Could we pull up Exhibit 325, please.

**BY MR. BOTTINI:**

**Q.** Now, Dr. Tabak, this is a chart of Twitter stock price during the class period.

Can you see that?

**A.** I can.

**Q.** And on the left is the beginning of the class period, and on the right side is the end of the class period when the stock shot up over 20 percent when Mr. Musk filed a disclosure saying he was going to go through with the deal.

Do you see that?

**A.** I do.

**Q.** And so does -- does this chart reflect the fact that when Mr. Musk made his May 13th statement that drove the stock down that the stock maintained that deflation, stayed at that deflated level throughout the class period, and didn't go back up above that level until October 4th, when he made the disclosure that he was going to go through with the deal?

**A.** Well, let me just correct you. When you say "that deflated level," the level of deflation changes, you can see over here. And again, as I said, the stock price on the close before the May 13th tweet was 45.08. The minute before it was 45.80, switching the two digits. We didn't include that 72 cents, but even if you take the 45.08, you'll see the stock price did not again close above 45.08 until you get to that large increase on October 4th.

**MR. BOTTINI:** Your Honor, plaintiffs move to admit 325.

**THE COURT:** Admitted.

(Trial Exhibit 325 received in evidence.)

**MR. BOTTINI:** Could we please show the witness

Exhibit 246.

Could we show -- before we move on to that, did the jury see 325 or not?

They saw it. Okay. I want to make sure all the technology is working right.

All right. Could we show Exhibit 246, please.

**BY MR. BOTTINI:**

**Q.** Now, Dr. Tabak, this is also an exhibit that we showed you yesterday; right?

**A.** Yes, you did.

**Q.** And could you explain to the jury again what this shows.

**A.** Sure. There are a bunch of calculations here, but for each day in the class period, the main things that I considered was column 4, the market capitalization or the value of all the shares outstanding at their market price, and column 8, the float as a percent of shares outstanding, meaning the number of shares held by the public and therefore could be freely traded.

**Q.** Okay. And your testimony yesterday was that Mr. Musk's May 13th tweet caused an approximately $3.3 billion loss in market cap of Twitter; is that right?

**A.** On May 13th?

**Q.** Yes. Just on May 13th alone, 3.3 billion; right?

**A.** That was the decline in market cap on May 13th, yes.

**Q.** And then you testified that between May 13th and May 16th, Twitter lost 5.8 or $5.9 billion in market capitalization; is

that right?

**A.** Yes, over those two trading days; correct.

**Q.** Okay. And defense counsel didn't challenge those calculations yesterday, did they?

**A.** I don't -- I don't think they did.

**Q.** Okay. And you offer an opinion in this case on loss causation, and is it your opinion that Mr. Musk's May 13th tweet directly caused the plaintiffs' losses in this case?

**A.** The losses that I calculate as damages, yes.

**Q.** All right. Well, there were also some questions yesterday about the plaintiff -- at least one of plaintiff's specific losses. We had a chart about Mr. Belgrave's losses, and he sold 15,000 shares in the -- during the class period; is that right?

**A.** That's my recollection, yes.

**Q.** And then you were asked a question by defense counsel about "Hey, there were some purchases" -- and I don't think he used Belgrave; he used another one of the plaintiffs. But he said, "Another one of the plaintiffs had some purchases, and don't you need to include those purchases in the analysis?"

Do you remember that question?

**A.** Generally, yes.

**Q.** Well, isn't it true that in every class action case, the issue whether people had purchases and losses, buys and sells, that that gets worked out at the end in something called a

claim form?

**A.** Well, in every securities class action. There are other cases where people don't buy and sell.

But, yes, in securities class actions, there's a claims administrator. People submit all of their purchase and sale data, and the claims administrator handles the calculations.

**Q.** So that is something that will be done later in this case if it results in a recovery; right?

**A.** Assuming it does what all the other cases do, yes.

**Q.** That's not part of what you do as an expert, is it?

**A.** That is correct.

**Q.** So at the end, if there's a recovery, people -- and people probably have seen them in the mail. You get these things. There's a settlement. You fill out a claim form, and people would have to list their purchases and sales.

And your model, as you testified yesterday, is an out-of-pocket damages model; correct?

**A.** That is correct.

**Q.** And that's -- you've used that in every case? It's never been challenged; right?

**A.** Again, as I said, often the other side may have an expert that will challenge the inputs when they think I've done something that they disagree with, but not the concept of out-of-pocket in accounting for purchases and sales at inflated or deflated prices.

**Q.** Okay. And if members of the class have purchases and they're relevant to whether they have a net loss or suffered an out-of-pocket loss, that would get worked out in the claim form; right?
**A.** Well, we put in the claims form, and there's a process that a claims administrator typically will handle to work that out.
**Q.** Okay. Defendant's counsel yesterday suggested you made millions and millions of dollars for your work on this case.
Is that true?
**A.** Well, he asked. I said no, and then he asked about hundreds of thousands of dollars, and I agreed that my firm, paying for me, my staff, and everything else, did receive hundreds of thousands of dollars, yes.
**MR. BOTTINI:** Could we show the witness Exhibit 282, please.
**BY MR. BOTTINI:**
**Q.** Do you recall our discussion of Exhibit 282 yesterday, Dr. Tabak?
**A.** I do.
**Q.** And, again, these are your calculations of the amount of damages per day under -- for the scheme liability claim?
**A.** Well, we seem to have cut out the letter G, but this is -- yes --
**Q.** Okay.

**A.** -- 10(b)(5) A and C in the title refers to the scheme claim.
**Q.** Okay. And for each day of the class period, this shows the amount of deflation per share; right?
**A.** Correct.
**Q.** Which is what the plaintiffs are asking the jury to award?
**A.** Correct.
**Q.** And the jury will have this exhibit during deliberations for reference, but you stand behind these calculations and these are true and accurate, to the best of your knowledge; correct?
**A.** Correct.
**Q.** Now, the defendant has criticized some aspects of your methodology and claimed maybe this is too high or they don't like that, but the defendants have never offered an alternative measure of damages, nor have they calculated any alternative amount of per-share damages in this case, have they?
**MR. BERNSTEIN:** Objection. Burden-shifting.
**THE COURT:** Sustained.
**BY MR. BOTTINI:**
**Q.** Dr. Tabak, it's always easier to claim there's a few bugs in a software program than it is to write your own code, isn't it?
**A.** I think that's generally true, yes.
**MR. BOTTINI:** Thank you. I have no further questions.

**THE COURT:** Anything further?

**MR. BERNSTEIN:** May we have one minute?

**THE COURT:** Sure.

(Defense counsel conferring.)

**RECROSS-EXAMINATION**

**BY MR. BERNSTEIN:**

**Q.** Good morning, Dr. Tabak.

**A.** Good morning, Mr. Bernstein.

**Q.** You testified that you concluded the decline on May 16th was caused by the May 13th tweet; right?

**A.** Yes.

**Q.** But in your expert report on damages, you only cite one article between May 13 and May 16; correct?

**A.** If you say so; I haven't kept count.

**Q.** If you -- I believe you have your reports in front of you.

**A.** It's in one of the binders?

**Q.** Should be. The Redwell, actually.

**A.** Okay. The Redwell.

That's a different report.

**THE COURT:** What would you like him to look at, Mr. Bernstein?

**MR. BERNSTEIN:** Exhibit 2, his materials considered.

**THE WITNESS:** So you're talking about my July 13th report?

\\\

**BY MR. BERNSTEIN:**

**Q.** Yes.

**A.** Exhibit 2, materials considered. Yes.

**Q.** And when you're there, there's only one article after May 13th through May 17th; correct?

**A.** So you're not asking after the close of May 13th?

**Q.** I'm asking after May 13th through May 17th.

**A.** In this report, this lists only one article, but I believe I also say that I've already -- I'm including in here all the materials I considered in my class certification report, which has a lot of other articles.

**Q.** Okay. You didn't read all those articles; correct?

**A.** I didn't read the ones during the middle of the class period generally, but I read those in the -- around the dates that I was considering, so May 13th, May 16th, July 8th, August 23rd.

**Q.** Whatever articles you read from your class certification report, you weren't considering them, you didn't rely upon them, and you didn't cite them in your damages report; correct?

**A.** So -- yeah. Not to consider or relied upon. Correct, I didn't cite all of them again.

**Q.** In fact, you only cited one?

**A.** Within that period that you're talking about; correct.

**MR. BERNSTEIN:** Okay. No further questions.

**THE COURT:** Mr. Bottini, anything else?

**MR. BOTTINI:** No.

**THE COURT:** Okay. You're excused. Thank you very much.

**THE WITNESS:** Thank you.

(Witness excused.)

**MR. MOLUMPHY:** Your Honor, subject to any rebuttals, plaintiffs rest.

**THE COURT:** Right. And also, there's an issue as to the cross-designation of Mr. Dorsey's statement, so that -- that -- whatever we ultimately decide or is played, that will also be part of the plaintiffs' case.

**MR. MOLUMPHY:** Yes, Your Honor. Thank you.

**THE COURT:** Okay. All right. So let's proceed now.

**MS. THOMPSON:** Your Honor, Mr. Musk does need to make his 50(a) motion at this point in time.

**THE COURT:** Ladies and gentlemen, we're going to take, as I hope, a brief recess. We'll be -- we'll take a 15 minute recess. I will see you at 10:00.

Remember the admonition given to you: Don't discuss the case, allow anyone to discuss it with you, form or express any opinion.

(The jury leaves the courtroom.)

(Proceedings were heard out of the presence of the jury.)

**THE COURT:** Let the record reflect all jurors have left.

You may proceed.

**MS. THOMPSON:** Thank you, Your Honor. Ellyde Thompson for defendant Elon Musk.

Mr. Musk moves for judgment as a matter of law under Rule 50(a). No reasonable juror could find in plaintiffs' favor on their 10(b)(5) claim. Mr. Musk moves for judgment as a matter of law on every element of the claim under each theory and additionally moves for judgment in his favor to the extent based on *Noerr-Pennington*-protected conduct and because any scheme liability theory is legally deficient.

**THE COURT:** I'm looking for Rule 50(a), so it's not like I'm not paying attention to you.

**MS. THOMPSON:** Thank you, Your Honor.

First, no reasonable jury --

**THE COURT:** Wait, wait.

**MS. THOMPSON:** Okay.

(Pause in proceedings.)

**THE COURT:** And just give me one minute.

(Pause in proceedings.)

**THE COURT:** Thank you very much. Go ahead.

**MS. THOMPSON:** First, no reasonable jury could find material falsity as to any misrepresentations, and no reasonable jury could find the existence of a scheme to defraud. There is no legally sufficient proof of a material difference between Mr. Musk's three May 2022 statements alleged

to be false and the true state of affairs. There is no legally sufficient evidence of a monthslong effort to drive down the Twitter stock price. There's no evidence that any statement or conduct other than the May 13th tweet, which was true and not misleading, and the July 8th termination, which is protected litigation conduct, affected the Twitter stock price.

There was no discussion of price renegotiation with Twitter until September 2022, on the eve of the Delaware trial, at which point Mr. Musk turned down an offer for discounted price, nor is there any legally sufficient evidence of scienter.

The evidence shows that Mr. Musk believed his statement and had no knowledge of any falsity at the time. The Supreme Court has never held that deliberate recklessness would be sufficient, and thus, Mr. Musk objects to that standard applying to him.

But even if it were sufficient, there's no evidence of deliberate recklessness here. Mr. Musk's concerns about the spam and bots on Twitter were genuine, and he believed the opinions he offered as to the fact that the spam and bot percentage was higher than 5 percent.

Finally, evidence of Mr. Musk's supposed capitulation in the Delaware litigation cannot be evidence of scienter because the Court already held in precluding Mr. Spiro from testifying about the litigation that Mr. Musk had a meritorious case and

settled it because he believed he could not get a fair trial.

Nor could any reasonable jury find sufficient evidence of reliance. There was no evidence of individual reliance. Neither plaintiff who testified testified they sold based on the May 13th tweet. Even if they had, reliance would not be justifiable because the merger agreement, the possibility of renegotiation, and information on the number of spam and bots on Twitter were already known to the market.

In any event, there's no legally sufficient proof to establish the fraud on the market presumption. As to the supposed scheme, there's no evidence that the challenged conduct was public such that the market could have relied on it.

There was no proof of material falsity as to the three alleged misstatements. The May 16th and 17th statements had no economic impact. Therefore, there is no materiality as to those statements at all, a required element of the fraud on the market presumption.

The May 13th statement was accurate or, in any case, not materially different from the true state of affairs.

Even if a reasonable jury could find the fraud on the market presumption met, such presumption would not extend throughout the entire class period because the market had the information necessary to assess the accuracy of the statements long before October 4th.

Plaintiff admitted he knew the deal was not halted. The public knew Mr. Musk's rights under the merger agreement.

Finally, even if presumption is established, Mr. Musk has rebutted the presumption because the statements and conduct did not affect the market price except for the May 13th tweet and July 8th termination.

The market had the information necessary to assess the accuracy of the tweet, and the July 8th termination is not even alleged to be false or misleading.

Nor could any reasonable jury find plaintiffs proved the element of loss causation. There's no proof that any alleged false statement as opposed to other non-fraud factor caused the price impact. Dr. Tabak conceded there was no impact as to the May 16th and 17th statements, and plaintiffs presented no evidence as to how the market would have reacted to the true state of affairs such that there is no evidence of a link between any alleged fraud and any alleged loss.

Finally, plaintiffs pled but did not seek to establish the existence of any corrective disclosure.

For similar reasons, there's no legally sufficient proof of damages. Plaintiffs failed to disaggregate any stock price movement from any alleged fraud from any other company or market factors affecting the Twitter stock price. Dr. Tabak just used raw stock price drops without isolating drops from other market factors.

Separately, judgment should be entered for Mr. Musk to the extent plaintiffs seek to base liability on protected litigation conduct.

No law, not even *Clipper Express*, permits liability to be raised in any part on protected litigation conduct unless the sham exception applies. That exception was neither pled, preserved, nor an issue to be -- preserved as an issue to be tried, nor proven.

Finally, plaintiffs' scheme to defraud claim is legally deficient because the maker of an allegedly false statement cannot be held liable under a scheme theory and certainly cannot be held liable absent some additional alleged conduct.

No such conduct has been proven here. It can't be based on true statements. It can't be based on protected litigation conduct. It can't be based on statements dismissed at the pleadings stage. It can't be based on statements never pled in the complaint. And it can't be pled on statements or conduct not alleged in accordance with Rule 9(b).

For all of these reasons, judgment should be entered in favor of Mr. Musk.

Mr. Musk also is concurrently filing a brief with these arguments on the docket.

Thank you, Your Honor.

**THE COURT:** Okay. I will not rule at this time. Pursuant to Rule 50(b), I will defer ruling on the motion.

Thank you.

**MR. ARNZEN:** Thank you, Your Honor.

**THE COURT:** So let's see. So we really are ready to -- we don't have to resume until 10:00, but we're ready to play some testimony? Is that it?

**MR. BERGJANS:** Yes, Your Honor. So we have three videos we're playing today. Two of them are subject to further discussion, but one of them, Emmy Anargyros, we can play now.

**THE COURT:** The one we can play now is who?

**MR. BERGJANS:** Emmy Anargyros. She is the person at Twitter who was responsible for running the spam --

**THE COURT:** And how long is her video?

**MR. BERGJANS:** Her video is an hour and 22 minutes.

**THE COURT:** Okay. An hour and 22 minutes. So 11, 11:20. And then we have two other videos, one -- the one involving the data scientist?

**MR. BERGJANS:** Yes. And I'm actually prepared to make the offer of proof now.

**THE COURT:** Here is -- I wanted to ask you some questions about that. Might as well at this point.

**MR. BERGJANS:** Sure.

**THE COURT:** Because there are a number of exhibits, and I've looked at these exhibits. And these exhibits are basically, as I understand them, exhibits relating to the witness of -- what he was doing at the time and his activities

at the time, all contemporaneous, by the way, with -- with these tweets, or at least in the operative period in May.

**MR. BERGJANS:** In the May-June period, yes, Your Honor.

**THE COURT:** And you're -- as I understand it, you're not offering any of this for the truth of the matter; you're offering it for the defendant's state of mind.

**MR. BERGJANS:** So the defendant's state of mind and also, as plaintiffs have noted and Dr. Tabak has testified, the -- one of the two bases for their damages is the termination letter on July 8th, and the termination letter refers to these studies. And rule -- refers to the studies performed by the data scientists.

**THE COURT:** Okay. Let's separate that out for a minute.

**MR. BERGJANS:** Sure.

**THE COURT:** Let's just deal with the first part.

The first part, again, or maybe common to both of your theories, none of this is being introduced for the truth of the matter; it's all being introduced to show that when Mr. Musk said words to the effect -- and now I'm paraphrasing him -- words to the effect that experts have told me or serious people have told me -- or whatever his words were -- that there are more bots than is represented by the -- by Twitter, therefore I'm acting -- essentially what he's saying: I'm acting in good

faith when I question the bots.

**MR. BERGJANS:** That's right, Your Honor. But just for the -- just to make sure we have the timeline right, the -- this is referencing his post -- his later comments in the June and particularly the July 8th time frame. Like the -- the statements made in the July 8th letter about concerns of the -- of the accuracy of the bot data.

**THE COURT:** And I'm trying -- and there's no evidence that any of these exhibits were shown to him.

**MR. REDENBARGER:** That's true.

**MR. BERGJANS:** So in Mr. Brahmy's testimony, Mr. Brahmy discusses a meeting he had with Mr. Musk where he says over 20 to 30 -- a 20- to 25-minute meeting we discussed the background of the company, and we went to explain the Phase I findings in methodologies because we weren't sure if Mr. Musk was aware of all the details, because he's a busy guy.

And then we went on to discuss, you know, what would be the best approach of the methodology --

**THE COURT:** I'm sorry. Are you saying he did -- he showed them these documents?

**MR. BERGJANS:** He showed them at least this Phase I and discussed the procedures going forward, yes. That's what he's testifying to about a meeting he had with Mr. Musk.

**THE COURT:** He showed him Phase 1?

**MS. COUTURE:** Yes.

**THE COURT:** What -- is there -- there's a document called Phase I?

**MR. BERGJANS:** There's a document called Phase 1, yes.

**THE COURT:** And which one is that?

**MR. BERGJANS:** I'll have the exhibit number...

**THE COURT:** Well, we're talking about exhibits.

**MR. BERGJANS:** Yeah.

**THE COURT:** It's useful to have an exhibit number.

**MR. BERGJANS:** I appreciate that, Your Honor. Let me pull it up.

**THE COURT:** No, I appreciate it.

**MR. BERGJANS:** And the video -- the issue is just a numbering thing in the video versus --

**THE COURT:** Go ahead. Go ahead.

**MR. BERGJANS:** -- the exhibits.

**THE COURT:** Well, do you have it?

**MR. BERGJANS:** Yes.

**THE COURT:** Which one is it?

**MR. BERGJANS:** The Phase 1 results is 639.

**THE COURT:** Okay. It's Exhibit 639?

**MR. BERGJANS:** Yes.

**THE COURT:** Okay. This was not one of the ones that were --

(Reporter interruption for clarity of the record.)

**THE COURT:** Okay. Is 639 admitted? Has it been

admitted?

**MR. BERGJANS:** I do not believe it's been admitted.

**THE COURT:** I'll have to take a look at 639.

Okay. But that's the only one that you are citing he actually showed, and the testimony is he showed it to Mr. Musk.

**MR. BERGJANS:** Yes, the testimony is they discussed the results of Phase 1.

**THE COURT:** Well, I don't know what that means. I mean, yes, I -- there may be evidence -- there is evidence. As you point out, there's evidence in the record there was a discussion.

Now, a document isn't the same thing as a -- as shown to somebody or not shown to somebody. It's the same thing as a discussion. It may have been the basis of a discussion. It may have been why the person who is discussing it with Mr. Musk discussed this issue with Mr. Musk. But that's -- that's not a basis for admissibility.

Anyway, it's now 10:00, and as you point out, you can proceed with the other witness, which we'll do.

And then the next witness -- is the next witness the -- after this witness, we have two more; right? Isn't Mr. Dorsey somewhere? I thought we had Mr. Dorsey.

**MR. BERGJANS:** So the next two videos are two videos that we have some disputes over, so it is Mr. Brahmy and Mr. Dorsey.

**MR. MOLUMPHY:** I thought we resolved Mr. Dorsey yesterday.

**THE COURT:** What are we doing with Mr. Dorsey?

**MR. BERGJANS:** We have some objections to some of their designations. I mean, we can work that out now.

**THE COURT:** That sounds like a good idea.

**MR. REDENBARGER:** We'd still like to be heard on this data scientist issue. We have a disagreement over the meeting that was described --

**THE COURT:** I think it would be helpful if you can cite to the record. I have a record, like everybody else. If you cite to the record what exactly is in the record with respect to what Mr. Musk was asked and what he responded to.

**MR. REDENBARGER:** And I can preview that --

**THE COURT:** By the way, if there's -- if a witness has testified, "I showed this to Mr. Musk," I'd like to see that citation too.

**MR. BERGJANS:** Sure.

**THE COURT:** Okay? Okay.

So let's -- of course, I haven't heard from you yet. I'm just trying to lay a foundation here as to what I ought to look at, what should I look at in order to bring myself up to speed on what the record is with respect to allowing this information in. Okay.

**MR. REDENBARGER:** Thank you, Your Honor.

**MR. BOTTINI:** Okay.

**THE COURT:** Okay. Well, let's take five minutes, ten minutes, to give the court reporter a break.

(Recess taken at 10:00 a.m.)

(Proceedings resumed at 10:07 a.m.)

(Proceedings were heard out of the presence of the jury.)

**THE COURT:** Are we all set?

Bring in the jury.

(The jury enters the courtroom.)

(Proceedings were heard in the presence of the jury.)

**THE COURTROOM DEPUTY:** You may be seated.

**MR. BERGJANS:** Good morning.

**THE COURT:** Let the record reflect all jurors are present.

Go right ahead.

**MR. BERGJANS:** At this point, Mr. Musk will be calling Emmy Anargyros via deposition designation and video. Ms. Anargyros was the technical program manager on the human computation team, or HCOMP, for Twitter. She was deposed on September 2nd, 2022, in the Delaware litigation by Ron Hagiz for Mr. Musk.

And with Ms. Anargyros's deposition, we will be introducing or showing Exhibits 113, 304, which is in evidence, 305, 306, 501, 523, and 816. And I request that they be moved into evidence with the deposition.

**THE COURT:** 113, 305. Sorry?

**MR. BERGJANS:** 113, 304, 305, 306, 501, 523, and 816.

**THE COURT:** Okay. They are admitted.

(Trial Exhibits 113, 304, 305, 306, 501, 523, and 816 received in evidence.)

**MR. BERGJANS:** Thank you, Your Honor.

(Video Deposition of Emmy Anargyros taken on September 22, 2022, was played but not reported.)

**THE COURT:** Okay. What's next?

**MR. BERGJANS:** Your Honor, the remaining two videos are the two that we have remaining discussions on.

**THE COURT:** Okay. Ladies and gentlemen, we'll take an early recess. We'll be in recess until 12:30.

Remember the admonition given to you: Don't discuss the case, allow anyone to discuss it with you, form or express any opinion.

(The jury leaves the courtroom.)

(Proceedings were heard out of the presence of the jury.)

**THE COURT:** Okay. The jury has retired.

**MR. BERGJANS:** So I think we have the issue of the data scientists and also relatedly or related to the rebuttal case -- and you had mentioned this yesterday -- discussing the issue of them calling back their expert, Adam Badawi, who was an expert who issued a report under Rule 26 and is not responding to any expert we brought in and can't give any

opinion outside of his report in any event, per Rule 26 and this Court's rules.

So it's unclear to us how he can be a proper rebuttal witness. It would either be cumulative of what he's already given or something that he should have been expected to be given before.

**THE COURT:** Okay.

**MR. REDENBARGER:** Do you want to discuss the data scientist or --

**THE COURT:** Yeah, let's discuss the data scientist first.

**MR. REDENBARGER:** So we object to playing the deposition and all of the exhibits that have been proposed to come in.

**THE COURT:** Right.

**MR. REDENBARGER:** From a starting position, there's no evidence in this case that Mr. Musk saw, relied on, or even heard about the data scientist at issue that they'd like to play the deposition from. There's no evidence in this trial that he actually saw these reports or even was told about the reports.

The deposition section that they'd like to play that might be relevant describes one meeting in late June, one meeting in late June in which there was discussions regarding findings and methodologies, but that's it. It is not clear whatsoever that

any conclusions or percentages, which are what matters here, were provided to Mr. Musk.

I'd also like to point out that there was quite a few lawyers at that meeting -- at those meetings and that this issue raises all kinds of other issues in this case.

And if they'd like to present this for state of mind of Mr. Musk, we believe that it should be clear that he actually saw the reports and understood what was in them at that time, which is not in evidence at this point.

**MR. BERGJANS:** So, Your Honor --

**MR. REDENBARGER:** May I just real quickly on the exhibits?

None of the exhibits include Mr. Musk -- none. Not a single one have any mention of Mr. Musk on them. They are e-mails between the data scientists and lawyers, and neither Mr. Ringler -- Mr. Ringler didn't take the stand, for one, and Mr. Spiro did not talk about any of these communications, which again raises issues regarding lawyers and how this information went from a data scientist to the lawyer to Mr. Musk, and there's no evidence that that happened either.

So we object to all of the exhibits that they seek to introduce. In particular, I believe they'd like to get in this Phase 1 report that Cyabra created, a Phase I report.

(Reporter interruption for clarity of the record.)

**MR. REDENBARGER:** There's no evidence that that went

to Mr. Musk. In fact, in the documents, it goes to, I believe, lawyers at Quinn Emanuel or Skadden, and so there's no evidence that it actually went to Mr. Musk.

**MR. BERGJANS:** So, Your Honor, as to the Phase 1 findings, there will be evidence that Mr. Musk learned of them. Mr. Brahmy, in this deposition, testifies --

**THE COURT:** No, wait. We're now asking -- okay.

You're not citing -- you're about to cite to the record that was shown to the jury; right?

**MR. BERGJANS:** No, I'm citing to the record that would be shown to the jury in this deposition that lays the foundation at least as to the Phase I findings.

**THE COURT:** What do I look at?

**MR. BERGJANS:** It is the Brahmy deposition, page 97/23 through 99/17.

**THE COURT:** Page.

**MR. BERGJANS:** 97/23 through 99/17, and the specific page and line is 98/16 through 98/20. And in this discussion, Mr. Brahmy is explaining a meeting that he had with Mr. Musk in late June, a Zoom call, and he says [as read]:

"And we then went on to explain the Phase I findings and the methodologies because we weren't sure if he was aware of all the details because I heard he's a busy guy. and then we went on to discuss, you know, the best approach and the

methodology to measure either inauthenticity or authenticity on the platform."

But he discusses -- he says that we explained the Phase 1 findings, so at the very least, the Phase 1 findings should come in.

As to the additional findings, plaintiffs have claimed that the termination letter on July 8th, which the Court dismissed as not a misrepresentation, is nonetheless part of a fraudulent scheme. The termination letter -- one of the things it states in the termination letter is it describes reports that Mr. -- that informed the termination letter, and one of these reports is what Mr. Brahmy will testify about in his deposition.

As to the concerns about privilege, I would raise a few issues. First, plaintiffs have been aware since the time they filed this case -- it's in their first amended complaint -- that there was a fight in the Delaware action about these experts -- these data scientists, I should say -- and that the Court in Delaware found they were percipient witnesses, ordered the production of their communications and findings subject to some, you know, potential work product assertions.

Those were produced to plaintiffs way back in 2023 -- or 2024, end of 2024. Plaintiffs have had that information for the entire course of discovery, and they've had this deposition for the entire course of discovery. They didn't take a

deposition of Mr. Brahmy. They didn't take a deposition of any of the data scientists that assisted Mr. Musk between May and July 2022, and they didn't challenge any of the redactions until now.

And the law is pretty clear --

**THE COURT:** Let me ask you: You're calling Mr. Brahmy?

**MR. BERGJANS:** Mr. Brahmy is being called via deposition.

**THE COURT:** Well, I thought you just said they didn't take his deposition.

**MR. BERGJANS:** So his deposition was taken in the Delaware action.

**THE COURT:** Oh, in the Delaware action.

**MR. BERGJANS:** Yes. So much of -- so just for context -- and I know that you weren't involved in discovery -- every single document that Mr. Musk produced in this case came from the Delaware action. The plaintiffs agreed at the outset of this case that the only discovery -- that in exchange for getting every single document, deposition, anything that was exchanged or produced pursuant to any discovery order in Delaware, they would get no other discovery from Mr. Musk.

That was the agreement that they made, with full knowledge of what was contained in the Delaware discovery. They agreed to that. And if they had a problem with an assertion of

privilege, they could have raised it during discovery and said, "Hey, we want to be able to explore this. We want to be able to test this. Raise it with us. Raise it with Judge Ryu."

That never occurred in this case. The first time that was raised is now.

And the law in the circuit is very clear that if you have a problem with discovery, you raise it during discovery. You don't wait until trial to say, "Now, wait a second. This was an improper assertion of privilege."

And I do think that since their primary objection was the redactions, they've waived their ability to essentially seek an exclusion remedy or an exclusion sanction, effectively, for the redactions by not raising it first in discovery.

And I think that to the extent that they are permitted to argue that the July 8th termination letter was evidence of some sort of fraudulent scheme or, as Ms.-- Dr. Tabak argued, caused damage, we ought to be able to present evidence through a competent witness that "I prepared this analysis; I presented it to the people that wrote the letter," and the jury can see that and evaluate it for what it's worth.

It's not being presented for the truth that this is the definitive answer to the number of spam and bots on the platform. In fact, to the contrary: It's our position and it's the position in the letter that Mr. Musk's team didn't have the sufficient information to be able to make that

determination. But it was a data point that Mr. Musk's -- that was relied upon in that letter, referenced in that letter, and part of the back-and-forth between Twitter and -- between Twitter and Mr. Musk from May to the termination. That is relevant to the jury's determination whether or not the termination letter was a fraudulent scheme.

Now, if they're precluded from arguing there was no evidence of whatever -- of bots, that's one thing. But they're going to make the argument that the termination letter was fraudulent in, you know, sum and substance, was the culmination of the scheme. And we ought to be able to put on competent evidence that Mr. Brahmy can provide through his deposition designated testimony that shows that there was at least something there.

**MR. REDENBARGER:** So a couple of points, Your Honor.

One, if you take a look at the deposition transcript after this, I suggest that you start at page 96, which introduces an exhibit, Exhibit 18, which is not the Phase I report. So in that deposition testimony, they are not talking about the Phase I report at the line and page that Mr. Bergjans cited to be relevant.

And all that section says is they explained Phase 1 findings and methodology. It also says that the meeting was only 20 minutes -- 20 to 25 minutes, and Mr. Musk spoke for two minutes, in which part of it he was telling jokes.

But they do not say that the report was provided to him, that they gave him the data from the report. And we put forth that under 403, like with the other expert reports, allowing this document to come in, which it's not obvious and I don't think it happened that he was actually shown --

**THE COURT:** The document would be which document?

**MR. REDENBARGER:** It's the Phase 1 report.

**THE COURT:** Number what?

**MR. BERGJANS:** That's 639, Your Honor.

**MR. REDENBARGER:** Yes, 639. So that document, we believe, should not come in under 403, especially given the fact that it's not clear it was discussed here at all, nor did Mr. Musk say that he had it.

**THE COURT:** Okay. All right.

**MR. REDENBARGER:** In fact, counsel just said it was Musk -- Mr. Musk's team who saw it and Mr. Musk's team who wrote the termination letter. If they're offering it for state of mind --

**THE COURT:** I don't think anybody thinks that Mr. Musk wrote the termination letter.

**MR. REDENBARGER:** Sure. But if they want to offer it for state of mind of Mr. Musk, I believe they'd have to have Mr. Musk say he saw it and he's aware of it.

**THE COURT:** Well, that's the question. That's the question.

**MR. REDENBARGER:** Last point on -- I believe he raised a couple of times that we didn't challenge this information during discovery.

**THE COURT:** Well, I'm less impressed by that because, in fact, the -- the issue of the attorney-client privilege has been evolving. What does it mean? Does it mean just communications? Does it mean conduct of the litigators? What does it mean? What are the -- what are the parameters of it? What are the prohibitions involving it?

So I'm not looking at waivers and so forth in connection with it because it's -- because basically it's unfair to both sides. One may have one view of it and one may have another view of it. Okay.

I got it. That's what happens in litigation. Things change.

So you don't have to answer that one.

I think what I need to do is to take a look at this deposition. Is it a -- do you have a transcript?

**MR. BERGJANS:** We have a clip report, Your Honor, that has everything that both parties have proposed to be played.

**THE COURT:** Does it go back to page 96?

**MR. BERGJANS:** Yeah, it has page 96 on it, but I can give you the full transcript if you'd like to review that.

**THE COURT:** Will you do that?

**MR. BERGJANS:** Yeah. Not a problem, Your Honor.

**THE COURT:** Okay. And I can look at it during the lunch hour.

**MR. REDENBARGER:** I'm sorry. On that last point, pages 95, from our perspective --

**THE COURT:** 95 through?

**MR. REDENBARGER:** -- 103 are the relevant pages.

**THE COURT:** Okay. I'll take a look at it. Thank you.

**MR. BERGJANS:** And just to be clear, just to make the record, I think the issue we have here is plaintiffs are trying to hold Mr. Musk liable for a letter sent by his lawyers; and in that case, Mr. Musk ought to be able to present evidence, nonprivileged evidence, underlying that letter, supporting that letter.

And if lawyers are not a part of the case and the mere fact that this document was sent to lawyers, who then wrote a letter, how is it the case that Mr. Musk can be held liable for a letter that everybody knows he didn't write that was prepared by his lawyer?

And that's exactly what they're seeking to do here. They are -- the only basis, independent economic reaction they've identified outside of the May 13 tweet and the only public information relating to the back-and-forth information requests that is in evidence, because none of the other letters were made public, is the July 8th termination letter.

And if lawyers aren't a part of this case and if the mere

fact that a document was sent to lawyers before it became a part of the letter, how can Mr. Musk be held liable?

**THE COURT:** I'm trying to figure in my own mind whether -- what is significant about the termination letter is the termination or the reasons for the termination.

Now, can that be -- by the way, you would argue they can't be separated. They are integral to the -- to the entire transaction.

And then I have to figure out, okay, that's -- as a general proposition, I think that's correct. But then when we get into the reasons for the termination, whose reasons are we really talking about? Are we talking about Mr. Musk saying "Here's a reason I'm not doing it and here's a reason I'm not going to do it," or are we talking about a lawyer writing the letter, putting in 10 reasons why it's not being done?

That's -- I have to figure that out in my mind to figure out what the answer is to this particular -- this particular problem.

**MR. BERGJANS:** And I think, as you mentioned, Your Honor, it's inseparable, and I think that's also part of the issue we've had with the notion that the letter itself could give rise to liability if its contents have been dismissed as --

**THE COURT:** Well, it may or may not be. I mean, it may or may not be inseparable, and it may or may not be subject

to a limiting instruction. I don't know. I don't know.

You know, we've created this construct of separating out lawyers from what a person's state of mind is. You know? And that's -- that's one of the great problems that we have with this litigation.

I got it, but, I mean, I -- you play the hand you're dealt. That's the hand we were dealt. We were dealt it with the privilege being asserted. And then you're trying to figure out how in any given case you play that card.

**MR. BERGJANS:** And I think that there are -- I think we have presented Your Honor with --

**THE COURT:** That's fair. That's fair to Musk, fair to the plaintiffs.

I don't have an answer yet, except the way I generally approach it is take a look at exactly what is being offered and using that as the platform to figure out what -- what one could say about it or whether it comes in.

**MR. BERGJANS:** Okay.

**MR. REDENBARGER:** What we're offering here is Mr. Musk's state of mind, not what his lawyers did. We've also been precluded from inquiring about what Mr. Musk and his lawyers were talking about.

**THE COURT:** That is exactly the problem. Okay.

So that's the deposition. How long is that deposition?

**MR. BERGJANS:** That deposition is 52 minutes,

Your Honor.

**THE COURT:** Oh, okay. And if I exclude this, how long is the deposition? Are there other things --

**MR. REDENBARGER:** Zero.

**THE COURT:** Are there other things in the deposition?

**MR. REDENBARGER:** We're objecting to the entire deposition.

**THE COURT:** Pardon?

**MR. REDENBARGER:** We're objecting to the entire deposition.

**THE COURT:** Okay. What else is he going to say in addition to this --

**MR. BERGJANS:** I mean, his deposition is about the -- so first, his reach-out to Mr. Musk's team. He independently -- this Phase 1 analysis was independent and, actually was made public, the details not necessarily, but the result was made public.

He reaches out to Mr. Musk's team, also reaches out to Twitter about conducting the analysis for them, and then he also provides testimony about their efforts to get data from Twitter and the limitations in their analysis without the data that they required and needed.

**THE COURT:** Why wouldn't that come in? Why wouldn't that come in?

**MR. REDENBARGER:** None of it is relevant, Your Honor,

because what they've offered this for is for Mr. Musk's state of mind. That's the whole purpose. So what they did before, what public things they may have done -- none of it is relevant.

**THE COURT:** Why isn't it relevant if, in fact, Mr. Musk is saying and we have -- the record is replete -- he's saying, "You're not giving me the information I need" -- in so many words, "You're not giving me the information I need." And so they want to bring in a witness who, contemporaneously working for Mr. Musk, came to the same conclusion.

**MR. REDENBARGER:** There's no evidence that Mr. Musk and these data scientists ever communicated about that issue.

**THE COURT:** They may not have, but independent -- isn't there an independent basis? In other words, independent of Mr. Musk's state of mind, is it significant -- is it of any significance that Twitter was or was not forthcoming in terms of the evidence that they -- in terms of the materials that they were or were not, were or were not, obligated to produce.

**MR. REDENBARGER:** From our perspective, that then raises the lawyer issue, because you have lawyers dealing with these data scientists, and it's lawyers who are providing assignments to the data scientists. That brings us into this redaction issue, and we think, based upon all of these issues, the fact that lawyers may have been guiding this project and drafting the requests --

**THE COURT:** Maybe they have, but let's say data scientists -- let's say you have a data scientist sitting down with Twitter during this period of time. After all, the invitation was: Let's have my data scientist talk to your data scientist.

Well, let's say there was evidence -- which there isn't -- but evidence that the data scientists came in and met with the Twitter data scientist and said, "We need A, B, and C," and the Twitter data scientist says, "I'm not giving it to you"?

**MR. REDENBARGER:** Well, that's not the case.

**THE COURT:** I know. I know it's not the case. But I'm trying to figure out whether there is a basis, independent of "What did Mr. Musk know at the time," that is relevant to the transaction, to this issue of whether or not he committed a fraud.

That's the question. Did he commit a fraud in his communication?

And what Musk is saying -- or the defendant is saying -- is that the fact of whether or not this data was produced is a fact that is relevant as to whether or not Mr. Musk deceived the market when he said: I wasn't getting the data.

That's what they're saying.

**MR. BERGJANS:** I think that they're -- yeah, I agree with you, Your Honor. And I also think that relatedly, the fact that Mr. Musk had hired these people to do the

investigation and ask for the data is also --

**THE COURT:** Well, that's an easy thing. I mean, if that were the only thing that you wanted in, that would come in in five seconds.

Mr. Musk, the record stipulated that if Jones testified, Jones would say that he works at a data company and he was retained in this period of time to determine X.

That's easy. I can do that in a minute. That's not a problem.

The question is: What did this data scientist do exactly? What did he find exactly? And a third related issue is what did he say about it?

I don't know that it's all wrapped part and parcel with the lawyers. I think maybe it could be parsed out independent of the lawyers.

But I have to -- I have to first look at it. Then I'll try to figure it out.

But I understand your position, I think I understand.

**MR. REDENBARGER:** And one final point, it all comes back to Mr. Musk here. So they're going to argue that Mr. Musk was reasonable, he was acting in good faith, he terminated in good faith in part because his data scientists wanted certain information. And our point is that there's no evidence that he did, in fact, think that. That did not come into the case.

If they'd like to recall Mr. Musk and establish that any

of his actions were in good faith because of what his data scientists were doing, which there's no indication they were communicating, that's fine --

**THE COURT:** But he says there was.

**MR. REDENBARGER:** There's one. I agree there's one.

**THE COURT:** He says there was. So I'll look at it. That's what it means.

**MR. REDENBARGER:** Thank you.

**THE COURT:** Okay. So we have that person.

Anything else?

**MR. BERGJANS:** Yeah. I think we only have two disagreements with Mr. Dorsey at this point.

Is that right, Mark?

**MR. MOLUMPHY:** I think we were able to work out much during the last deposition video, so I think there's only two issues with respect to Mr. Dorsey.

**THE COURT:** So you think you can work it out or not?

**MR. MOLUMPHY:** We tried to, and I think we reached an impasse. So I think they're easy for Your Honor to call balls and strikes on these two issues. I'll try to be easy.

**THE COURT:** Well --

**MR. MOLUMPHY:** The first -- can I give it a try?

**THE COURT:** Sure. I'm just a little reluctant in balls and strikes. Now, with player replays on balls and strikes. It's --

**MR. BERGJANS:** It's interlocutory appeal, I think is what's happening.

**THE COURT:** Pardon me?

**MR. BERGJANS:** In the game, it's -- I think it's a version of interlocutory appeal in -- with the replays on the balls and strikes.

**THE COURT:** Okay. There we go.

**MR. MOLUMPHY:** Okay. So the first passage has to do with Mr. Dorsey's description of a conversation he had with Parag Agrawal and Elon Musk early in the process after he agreed to purchase the company, but before his tweets in which they're discussing his demand that Mr. Agrawal fire Gadde -- Ms. Gadde, who testified, and the reasons for that that -- they say that's irrelevant, but that testimony came in through Ms. Gadde. It's part of the record. It's also relevant to her bias with respect to Mr. Musk.

It's also relevant to Mr. Musk's views on Twitter's management, which we viewed to be very negative at the time he purchased the company, so he can't come in and say, eyes wide open, "I believed everything these guys were saying." At the same time, days after he purchases the company, he wants to fire the company's general counsel.

**THE COURT:** Well, here's what -- here's what bothers me about that -- I mean, I don't know if it bothers me about it -- but there's evidence in the record that was adduced by

the defendant which suggested that in connection -- I think it came in through Spiro, came in saying -- in connection with the renegotiation of the price or in connection with the settlement of the action.

The evidence that came in was that these people wanted -- I'm going to use the term "golden parachutes," but they wanted -- they wanted a particular type of severance pay.

Now, the -- or they wanted severance pay and they wanted to acknowledge it as severance pay, and they wanted a graceful way out of the company, or at least a way out of the company consistent with what their desires were at the time.

So the question is and the suggestion is: Well, why are they doing that? What's going on here? Why are they talking about leaving the company?

And you may be able to say a lot of things about it. One thing you'll be able to say about it or -- well, they were afraid they'd be investigated and that their statements, if not true, would form the basis of litigation against them personally or professionally or however.

So they wanted a termination of all of this, and they had -- and the reason they did was that perhaps they believed that it was -- to their advantage to get some closure on these things at that time.

So the question is: Well, how legitimate was their concern? And -- and, you know, the argument, I would assume,

the defense would make is sure, their concern was legitimate because they had done things that were inappropriate, so of course they were concerned. You'd be too if you did something inappropriate and knew that you were going to be found out.

And their concern, arguably, was they weren't being fired because of the bot issue or because of something that they represented. They were being fired because the new owner thought they didn't know what they were doing or thought that they had better people to do it or that they had done a bad job, basically. A bad job.

And so -- and this was known before. This -- this -- this attitude of Mr. Musk to terminate these people was a known fact, and this is the evidence that it was a known fact because there was this type of discussion.

So since some of it comes in, I don't know to what extent I allow -- I allow the context of this was a known fact prior to the consummation of the merger. I don't know. I have to figure that out. Is it too prejudicial? Is it probative?

**MR. MOLUMPHY:** Just to be clear, plaintiffs want this in. So plaintiffs --

**THE COURT:** I understand that.

**MR. MOLUMPHY:** Because I agree. I think the implication was that these guys were fraudsters and they're asking for a sweetheart deal; and here we have evidence a day after he purchases the company that he wants to fire them,

before he even knows them.

**THE COURT:** That's right. Okay.

**MR. BERGJANS:** I think it's irrelevant. It's 403 as well, Your Honor. I mean, it's not -- Mr. Musk isn't -- at least in this testimony, isn't suggesting that Ms. Gadde should be terminated because of some sort --

**THE COURT:** I understand that.

Okay. Anything else?

**MR. BERGJANS:** The last one, Your Honor, it's a question of did Twitter at the time consider that type of information confidential, something they tried to protect against being leaked outside of Twitter. Mr. Dorsey's answer is "I'm not sure specifically," and then he goes on to speculate, "I would imagine that we would keep that fairly close because making public has privacy implications for individuals."

So the question and answer -- or the answer indicated that Mr. Dorsey had no foundation and had no specific recollection or no specific knowledge in response to the question, so it's speculative, and we would ask that it be excluded on that basis.

**MR. MOLUMPHY:** Mr. Dorsey is on the board of directors. He's being asked the very information we've been talking about in this case is considered private internally. And he says, "We keep it fairly close because making that

public has privacy implications for the individuals and opens up new lines of attack for adversaries."

He basically is answering --

**THE COURT:** I got the issue.

Thank you. I'll see you at 12:30.

**MR. MOLUMPHY:** Thank you, Your Honor.

**THE COURT:** What about the expert thing?

**MR. BERGJANS:** I'm happy to discuss it right now, Your Honor.

**THE COURT:** Well, unfortunately, I'm not. It's too late.

(Recess taken at 12:02 p.m.)

(Proceedings resumed at 12:36 p.m.)

(Proceedings were heard out of the presence of the jury.)

**THE COURTROOM DEPUTY:** Come to order. Court is in session.

**THE COURT:** Okay. Let the record reflect parties are present.

In terms of the witness Mr. Brahmy, the Court will permit the following excerpts of the transcript to be read:

Commencing page 98, line 23, through 102, line 12.

And no exhibits.

**MR. REDENBARGER:** Thank you, Your Honor.

**MR. BERGJANS:** 98/23.

**THE COURT:** Pardon me?

**MR. BERGJANS:** I'm sorry. Can you repeat the --

**THE COURT:** The end?

**MR. BERGJANS:** The beginning. 98/23 is in the middle of an answer.

**THE COURT:** 98/23 through 1 --

**MR. BERGJANS:** 97/23, Your Honor?

**THE COURT:** Yes, I'm sure you're right. 97/23 through 102, line 12. Through that.

**MR. BERGJANS:** And no other portion of his deposition?

**THE COURT:** Oh, I haven't read this whole thing. I mean, I have no idea what you're talking about.

I have no idea what you're talking about. I mean -- well, my guess is you're talking about all of the work that they did and so forth? That's out.

**MR. REDENBARGER:** Thank you, Your Honor.

**THE COURT:** Fair enough. I'm not being --

**MR. BERGJANS:** So I just want to be clear. So your order is we would only be permitted to play the --

**THE COURT:** I'm only permitting you to play that excerpt that has been pointed out to me which relates to the conversation that occurred with the defendant. That's what I'm doing.

**MR. BERGJANS:** And we're not permitted to show what the Phase I results that --

**THE COURT:** That's correct, under 403, because while

you're introducing it not for the truth of the matter, you're introducing it for -- I don't know if you are introducing it for the truth of the matter. I don't know what you're introducing it for, to tell you the truth.

**MR. BERGJANS:** Well, I think, to go back, if they're taking the position that the termination itself was fraudulent, the basis for the termination is independent -- whether or not it's presented for the truth of the matter, the significance of the fact that the work was done and these reports were produced goes to whether or not the termination -- whether or not the termination was baseless or not, whether there was some sort of something supporting it.

Whether or not that some sort of something is ultimately true -- and we're not taking the position that it showed definitively what the spam results were; in fact, we're taking the position that we couldn't figure it out without Twitter's data -- if they're going to say that Mr. Musk had no basis to terminate, we get to -- we ought to be able to put in evidence, and it is extremely probative, what that basis was.

**THE COURT:** I think you can put into evidence the fact that you retained, at Mr. Musk's direction, an expert to provide a report as to the existence or nonexistence of spam, if that's the general topic; of course you can do that.

I thought we already had a lot of evidence to that effect in the record.

He refers to the -- the Spoco or whatever it is.

**MR. REDENBARGER:** SparkToro.

**MR. BERGJANS:** SparkToro is separate, Your Honor.

**THE COURT:** That was a study that was told. And he can refer -- and you can cite to the fact of this conversation with Mr. Musk which you knew about that an expert was retained to -- to make a further inquiry into it. That's fine.

But then if we start to measure, that's under 403. See, the problem is if we start to measure the efficacy and all the details of these reports without, by the way, having the expert here to be subject to cross-examination on these reports, then it becomes -- it becomes highly speculative.

**MR. BERGJANS:** Your Honor --

**THE COURT:** It becomes far less relevant. And see, I'm trying to figure out its probative value here, and the probative value is, I think, that you went ahead and hired an expert, an expert to conduct this study.

**MR. BERGJANS:** Well, so there are --

**THE COURT:** The study itself, I'm not sure is -- is probative any more than -- I mean, it's not -- obviously, it's not inconsistent.

**MR. BERGJANS:** Well, so, Your Honor, the termination letter itself references studies performed by Mr. Musk's team that suggested the number of spam accounts was larger than 5 percent.

**THE COURT:** Well, I think this -- so fine. Yes, that's right. But I don't think they can get up and argue in their closing: By the way, you see what the termination report said, that it related to studies? You didn't see any studies in this case, did you? So it was all made up.

No, they can't say that. I mean, that's -- that's just basic fairness. If I exclude evidence, the other side can't get up and say there is no evidence.

You can in certain circumstances, but it's not unlike a motion to suppress. It's not unlike if the Court excludes something because it tends to be confusing, misleading, undue consumption of time, it fits right within the criteria of 403. The other side can't get up and point to its absence and say: There. They failed to demonstrate that.

That's just basic fairness. So I don't think --

**MR. BERGJANS:** Okay. And I just wanted to be clear there. So the other side --

**THE COURT:** And that's fine.

**MR. BERGJANS:** -- can't -- they can't point to that portion of the letter and they can't say: Mr. Musk did not come in here and show you any report --

**THE COURT:** Yes, that's correct.

**MR. BERGJANS:** -- any support for that statement in the letter.

**THE COURT:** Absolutely correct.

**MR. BERGJANS:** Okay. Thank you, Your Honor.

**THE COURT:** Absolutely correct.

**MR. REDENBARGER:** Thank you, Your Honor.

**THE COURT:** And if they do and you object, which you probably would, I'll make a statement to that effect.

Okay. What else do I want to say? I have probably said enough.

**MR. MOLUMPHY:** Do you want --

**THE COURT:** Oh, yes. I want to address Dorsey. I knew I had another thing to say.

The issue on the firing is out under 403. The second thing, whatever that was, is in.

**MR. MOLUMPHY:** Okay. Thank you.

**MR. BERGJANS:** And I think there's one other issue because I think we can do this pretty streamlined once this last issue gets resolved, which is Professor Badawi's testimony and whether he ought to be able to come in and provide rebuttal testimony.

Our position is he was an expert retained in this case. Under Rule 26, what he's allowed to say was in his expert report. He already testified to it, and there's nothing else that he can add that's not otherwise cumulative or not otherwise known to Mr. Badawi and the plaintiff before our case was put on because he put it in his report.

**THE COURT:** Can I ask a question? Now that I've set

forth the parameters of the -- of your witnesses, how much time is it going to take?

**MR. BERGJANS:** I suspect it will take less than an hour.

**THE COURT:** Good. Let's do that, and then I'll return to the expert.

**MR. BERGJANS:** Okay.

**THE COURTROOM DEPUTY:** Please rise for the jury.

(The jury enters the courtroom.)

(Proceedings were heard in the presence of the jury.)

**THE COURT:** Okay. Please be seated.

All right. All jurors are present.

You may call your next witness.

**MR. BERGJANS:** Your Honor, good afternoon.

Defense will call Jack Dorsey via deposition designation.

Mr. Dorsey was the founder of Twitter, co-founder of Twitter. He served as CEO from 2017 through November 2021.

He took -- we will be playing two designations. The first designation is from the Delaware action. It was a deposition taken in 2022 by Christopher Kercher for the -- for Mr. Musk. And the second deposition designation volume was taken in this action in 2025 by Mr. Bottini for plaintiffs and Mr. Broome for Mr. Musk.

(Video Deposition of Jack Dorsey taken in 2022 and 2025, was played but not reported.)

**THE COURT:** Okay. Call your next witness.

**MR. BERGJANS:** Your Honor, can we have a brief sidebar to discuss the next witness?

**THE COURT:** Sure. You may talk.

(The following proceedings were heard at the sidebar:)

**MR. BERGJANS:** So I think there's a little disagreement as to the introduction. When we spoke, we said that we could put into evidence the fact that they were retained, and the fact that they were retained to provide a report.

And so I would propose reading the introduction --

**THE COURT:** Let me look at it.

**MR. BERGJANS:** And I can --

**THE COURT:** Do we have the deposition?

**MR. REDENBARGER:** No, I don't think they said that they could -- they were retained to provide a report. We didn't talk about that on the record, so --

**MR. BERGJANS:** Your Honor, I can pull the -- I can go back and grab the transcripts.

**THE COURT:** I have them right here.

**MR. REDENBARGER:** I think he's referring to today's discussion, not that. And I think he just wanted to just say that --

**MR. BERGJANS:** I would like to enter the introduction --

(Reporter interruption for clarity of the record.)

**MR. BERGJANS:** You said on the record that we could put into evidence the fact that he was retained at Mr. Musk's direction, an expert to provide a report as to the existence or nonexistence of spam.

The way that the testimony comes in is the retention gets into all the other stuff, so I would like to read --

**THE COURT:** Fine. Go ahead. You can say it.

**MR. BERGJANS:** Okay.

**MR. REDENBARGER:** And so what are you going to say?

**THE COURT:** Just what he said.

**MR. BERGJANS:** I will say Mr. Musk -- they retained Cyabra and they were retained to provide a report as to the prevalence of spam on Twitter.

**MR. REDENBARGER:** And then just the introduction --

**MR. BERGJANS:** And then just the clips that we had previously designated and the Court permitted.

(Counsel conferring.)

(Proceedings heard in open court.)

**MR. BERGJANS:** Thanks for your patience, and sorry for all the back-and-forth.

All of this for what will be a two- minute clip.

Mr. Musk calls Dan Brahmy via deposition designation.

Mr. Brahmy is the co-founder and CEO of Cyabra, a data science firm. In May 2022, Mr. Musk's team retained Cyabra to

analyze and determine the prevalence of spam and fake accounts on Twitter's platform and to provide a report.

(Video Deposition of Dan Brahmy was played but not reported.)

**THE COURT:** That's it?

**MR. BERGJANS:** As I said, a lot of back-and-forth for a very short clip.

And at this point, Mr. Musk rests.

**THE COURT:** Okay.

So, ladies and gentlemen, let's take 10 minutes, and we'll see where we are.

Okay. Remember the admonition given to you: Don't discuss the case, allow anyone to discuss it with you, form or express any opinion.

(The jury leaves the courtroom.)

(Proceedings were heard out of the presence of the jury.)

**THE COURT:** The jury has retired.

Well, so it's clear, I allowed you to play more of the deposition. You chose not to do so. I mean, that's your right, but --

**MR. BERGJANS:** Yes, we just chose to play that portion that referred to the discussion.

**THE COURT:** It's your right. Pardon? Okay.

All right. So now we're on the question of who's on next.

**MR. MOLUMPHY:** So the plaintiffs have two rebuttal

witnesses, expected to be short, five to ten minutes each.

**THE COURT:** Okay. I mean go ahead.

**MR. MOLUMPHY:** The first one is Adam Badawi. He was the expert on M&A. He will be to respond to Mr. Armstrong's testimony yesterday put on about due diligence. So he's responding to a fact witness that was presented by Mr. Musk's team at the end of the day -- excuse me -- the beginning of the day yesterday.

I have the quotes, if it's relevant to Your Honor, but he's going to be basically responding to a couple of positions that Mr. Armstrong took.

And then we'll be calling Ms. Conti, who was the one doing the work after the May 6th meeting to assemble the information. She'll be rebutting some of the testimony, including by Mr. Armstrong, about what information was compiled and the purpose of that information.

**MR. BERGJANS:** We have no objection to Ms. Conti's testimony. We do have concerns about Professor Badawi's.

First, it's unclear to us exactly what Professor Badawi will be testifying to. Under Rule 26 any expert is required to disclose the opinions they're going to be offering, and either it has already been disclosed, in which case it's not really rebuttal testimony because it was already something that he disclosed and testified to within his report or ought to have testified to before because it was in his report, or it's

something new, in which case it's in violation of Rule 26.

**THE COURT:** Or it was in his report and he didn't testify to it and it would be relevant in light of the -- in light of what the case is.

**MR. BERGJANS:** But we don't know that either.

**THE COURT:** Pardon?

**MR. BERGJANS:** It's unclear to me --

**THE COURT:** Maybe it's unclear. I agree with that. But there's a third way that it's admissible, which is it's in his report, he's discussed it in his report, but it is now being raised -- it wasn't earlier discussed -- because of the testimony that came in in the --

**MR. BERGJANS:** But --

**THE COURT:** -- in the defense case.

**MR. BERGJANS:** But I would argue, sir, and I think the law supports this notion, that if it's in the expert's report, it's not true rebuttal testimony because the expert knew about this potential issue coming up.

**THE COURT:** The law is that an expert has to testify to everything in his report because if he doesn't, he thereby waives it, so if he gives a complete, he has to do it all --

I mean, if that's the law, that's the law. I mean, yeah; right. Okay.

That can't be the law. I'm sorry; it just can't be the law an expert has to say everything in his report, not knowing

whether or not it's going to be particularly relevant, and then it becomes relevant by virtue of what the defense says. I mean, there are notice and so forth, but I don't think that -- that what you stated is exactly an accurate statement of the law.

Anyway, you know what? I'm going to allow it.

Next. Okay. Bring in the witnesses.

**MR. BROOME:** Your Honor, I just want to note for the record that what he is about to testify on has still not been disclosed to us, despite the fact that we've asked several times. All we know is that he is purporting to rebut something that Anthony Armstrong said, but we don't know what and they won't tell us.

**THE COURT:** I think that's a fair comment. So why don't you say what he's going to testify...

**MR. MOLUMPHY:** Sure. And I did actually tell Mr. Broome this --

**THE COURT:** Fine.

**MR. MOLUMPHY:** -- but the questions that were asked of Mr. Armstrong -- and I gave him the pages from the testimony, 4 through 7 yesterday -- relate to the use of due diligence in an M&A deal and Mr. Armstrong's position that, given the context of this case, where you have an individual purchasing a company versus a corporation purchasing a company, the basic purpose of due diligence no longer exists.

He also testified about the SEC disclosures, if you remember that, Your Honor. And basically, you don't do due diligence on SEC disclosures. He spent a half an hour doing that. So we're going to ask Mr. Badawi about that.

**MR. BROOME:** I don't believe he disclosed any information about -- in his report about the first issue.

**MR. MOLUMPHY:** Because his testimony was you do due diligence in every public company transaction.

**MR. BROOME:** He didn't make any distinction about addressing -- addressing an individual buying a company versus the company buying the company.

**THE COURT:** Is it an expert giving a report can't anticipate, in giving the report, every way that it's going to be approached by the -- by testimony that is in the defense case? It has to be broad enough that it's a general subject, that it was discussed in some manner in the report, and how it exactly fits and how it is exactly portrayed is something that is impossible to predict, because that's not the way trials work.

Trials work completely -- they're works of creation in progress. Every trial lawyer knows that. What is -- what is important at the beginning becomes slightly less important through the contours of --

Remember, I listened to your colleague get up and tell me he wanted to introduce eight pages of a deposition. Then he

sat down. I said, okay, I'll -- more. He sat down, and then they put in two-pages of the deposition.

**MR. BROOME:** Respectfully, Your Honor, that's because you disallowed other portions, not because of a choice on our part.

**THE COURT:** Maybe so, but that's a good example. I'm not saying it's his fault. It may very well be the Court's fault and the Court's decisions.

But it proves what I'm trying to say, which is cases, courts, trials -- trials are works in progress. They change according to what a judge says, rightly or wrongly -- what a judge says, what a party says, the way a witness portrays something. It's all -- it's an exercise in dynamics.

Then the question is that you should raise -- and that's why when you came up here, I agreed with you -- is if you've had no notice of what he's going to say, how do you know what he's going to say? That, I agree with.

So now he has said what he's -- what -- the subject that he's going to address.

**MR. BROOME:** Respectfully, Your Honor, I don't think Rule 26 allows him to get up at the end of trial and make their disclosures. It has to done before the trial begins.

**THE COURT:** The disclosure is within the original testimony -- the original report, as I understand it.

**MR. BROOME:** According to the plaintiffs. We

disagree.

**THE COURT:** Then you -- fine. You certainly have cross-examination. Certainly you can point out: You nowhere say this in your report, do you? It's not even inferentially related to your report, is it?

That's -- have at it, Mr. Broome. Do your Clarence Darrow. Do your best examinations that you want of this witness and demonstrate that you basically had no notice, directly or indirectly, of this testimony, and then you can move to strike.

(Adam Badawi steps forward to resume the stand.)

**THE COURT:** Bring in the jury.

So then I'm going to excuse the jury for the day. You're going to rest?

**MR. MOLUMPHY:** Yes, we are.

**THE COURT:** Do you have any surrebuttal?

**MR. BROOME:** I don't think so, no.

**THE COURT:** No? Okay. So then I'll tell them what the plan is.

**MR. MOLUMPHY:** After -- we have our second person.

**THE COURT:** I know you do.

**MR. MOLUMPHY:** Sure. Just want to make sure.

**THE COURT:** Okay.

(The jury enters the courtroom.)

(Proceedings heard in the presence of the jury.)

**THE COURT:** Let the record reflect --

Please be seated. Ladies and gentlemen of the jury, the record should indicate you're all here.

The defense has rested. The plaintiff have what they have told the Court very short, very brief surrebuttal -- rebuttal testimony, which will be two witnesses. And here's the first, and then we'll follow with the second.

Go ahead.

**ADAM BADAWI**,

called as a witness for the Plaintiffs, having been previously duly sworn, testified further as follows:

**MR. MOLUMPHY:** Thank you, Your Honor.

**DIRECT EXAMINATION**

**BY MR. MOLUMPHY:**

**Q.** Professor Badawi, please just quickly reintroduce yourself to the jury. State your name and your position.

**A.** I'm Adam Badawi. I'm a professor at law of at UC Berkeley.

**Q.** Professor Badawi, you are a professor in mergers and acquisitions; correct?

**A.** That's correct.

**Q.** I want to focus on two specific areas that the jury has heard some evidence from.

The first one, during yesterday's trial, Mr. Musk's banker Anthony Armstrong testified about the purposes of conducting

due diligence and gave testimony about whether or not they were applicable when an individual is purchasing a corporation versus a company purchasing a corporation.

Do you have any opinions regarding that distinction?

**A.** I don't think -- with respect to due diligence, I don't think there's much of a difference. It's like if an individual purchases a house -- purchases a house versus a company purchasing a house. You're both going to care about the house; right? You're going to care about its condition and that you might be buying something different from what you expected.

**Q.** And the initial proposal that was made by Mr. Musk in this case was called "confirmatory due diligence."

Do you remember that?

**A.** I do.

**Q.** Okay. And do you have an opinion on what confirmatory due diligence means and whether there's any distinction between an individual making that inquiry or a company making that inquiry?

**A.** I don't see a distinction between the two. You're kicking the tires, so to speak. You're curious about what it is you're buying.

And, again, it doesn't matter if it's an individual -- individual or a company that's doing that. As I explained last week, one of the biggest risks is you don't know what you're getting, and the identity of the buyer doesn't change that.

**Q.** Mr. Armstrong also testified a bit about relying on SEC financials. And it's true, is it not, that it is typical in mergers and acquisitions involving a publicly traded company to take into account a company's SEC filings?

**A.** That's where you start -- right? -- you have public filings from the company, and they can be helpful. They tell you quite a bit. But it's certainly not everything.

And I'd make two points: One is you want to confirm the information that's in the SEC filings because what the company thinks is important might be different from what you think is important.

And then it's also important to remember that -- you know, let's say you're buying a company in April. Okay? And the quarter just ended; right? Those quarterly SEC statements have not come out yet; right? The last SEC filings will only cover until the end of the year. So you've got three, four months where you don't have SEC filings, so you've got to look into what happened in that situation.

So it's both important to confirm the SEC filings and to look in that period where you don't have the SEC filings.

**Q.** Is it also fair, in your opinion, Professor Badawi, that within an SEC filing, there may be metrics or statements or estimations or processes that are described that -- perhaps not in so much detail for the public; correct?

**A.** Yes. There's a difference between public filings and the

nonpublic information. They are typically described not in great detail, and so if that's something you're interested in, you can use due diligence to investigate those metrics.

**Q.** And when is that diligence usually taking place?

**A.** Prior to signing an agreement.

**MR. MOLUMPHY:** Thank you, Your Honor.

**THE COURT:** Cross.

**CROSS-EXAMINATION**

**BY MR. BROOME:**

**Q.** Good afternoon, Professor Badawi.

**A.** Good afternoon.

**Q.** You were asked some questions in response to or about your views on Mr. Armstrong's testimony with respect to due diligence yesterday.

Mr. Armstrong testified that he has conducted -- worked on hundreds of M&A transactions. Can you remind the jury how many M&A transactions you have worked on?

**A.** A couple.

**Q.** Due diligence is typically done pursuant to an NDA; correct, sir?

**A.** Usually, yes.

**Q.** It's confidential?

**A.** Typically, yes.

**Q.** The requests -- information requests being made, the responses being given, all under NDA?

**A.** Typically, yes.
**Q.** Unless you're working on the transaction, you wouldn't have any insight into what's actually happening in the due diligence process; correct?
**A.** Well, it's a pretty standardized process, and so usually it's conducted in a similar way.
**Q.** Well, every transaction is different; right?
**A.** There are different aspects of the transaction, but the diligence process is something that's been developed over many years.
**Q.** The topics that would come up in diligence will vary from transaction to transaction; right?
**A.** Yes, it would. It would depend on industry, for example.
**Q.** To know -- in order to know what is actually happening, the nitty-gritty of the diligence process, you would need to be involved in the transaction; right?
**A.** I mean, if there were specific questions about specific transactions, then you would probably need to be involved in them. But as I said, diligence is a pretty standardized process.
**Q.** And that's based on the two transactions that you worked on?
**A.** That's based on 17 years of teaching, writing on the topic, talking to people who do this stuff. I gave a talk in front of 400 people on due diligence in January.

**Q.** If you can't -- if the diligence process is covered by an NDA, then outsiders can't know what's actually -- what information is being requested and provided; correct, sir?

**A.** Well, people will talk about diligence at -- about trends in diligence -- right? -- which would cover those sorts of things. It wouldn't cover what's happening in a specific deal. But I talk to people about diligence often.

**Q.** Okay. But you don't actually have any insight into the diligence that was actually conducted in any specific transactions in the last 15 years; right?

**A.** I've spoken to lawyers about the diligence they've done on transactions, so I have some insights on that, but I haven't been -- had my hands on a deal in some time.

**Q.** So are you saying that you've spoken to lawyers and they've breached their NDAs and disclosed to you the information that was exchanged in due diligence?

**MR. MOLUMPHY:** Objection, argumentative.

**THE COURT:** Overruled.

**THE WITNESS:** I don't know what the content of the NDAs were. They may have expired by the time I talked to them.

**BY MR. BROOME:**

**Q.** Do NDAs typically expire? Is that what you're saying?

**A.** Some aspects of them, at least.

**Q.** I think you testified that there's a strong divide between diligence conducted -- sorry -- a strong divide between before

you sign the deal and after you sign the deal with respect to due diligence; correct, sir?

**A.** Absolutely.

**Q.** Your view is that due diligence is done pre-signing?

**A.** Yes.

**Q.** So if the jury has heard testimony from witnesses saying that in this case, they conducted diligence after signing, that would be atypical, in your view; is that right?

**A.** Well, I -- I don't have that testimony in front of me, so I don't know the context.

I have experienced that bankers and lawyers talk about diligence in different ways, so the way some people might refer to diligence might be a little bit different.

But when I talk to lawyers, diligence is what you do before a deal.

**Q.** So if the -- that's your testimony is that typically due diligence is conducted pre-signing?

**A.** In almost every case.

**Q.** Okay. So if the actual M&A practitioners, the people who were actually working on this M&A transaction in this case, referred repeatedly to conducting due diligence in the period after signing, that would be atypical, in your view?

**MR. MOLUMPHY:** Objection, assumes facts not in evidence.

**THE COURT:** Sustained.

**MR. BROOME:** Your Honor, there's lots of facts in evidence.

**MR. MOLUMPHY:** There's not.

**THE COURT:** Well, why don't you reask the question. Let's listen to it again.

**BY MR. BROOME:**

**Q.** In the jury has heard evidence from the actual M&A practitioners who were working on this transaction that they engaged in due diligence meetings, exchanged due diligence, had a due diligence tracker. Would your view be that that was atypical for an M&A transaction?

**A.** It would depend on the context. As I said, bankers can use those terms in different ways.

**Q.** Sir, would you agree that a buyer in an M&A transaction is entitled to confirm the reps and warranties up until the date of closing?

**MR. MOLUMPHY:** Your Honor, beyond the scope.

**THE COURT:** I'll allow it.

**THE WITNESS:** It would depend on the merger agreement. It would depend on the information rights, whether they had the right to the information, and it would depend on what we call the bring-down process, which is where there's an ability to check the reps and warranties.

But, again, you have to have the right to the information, which you may not have. And so it would -- really, it would

depend on the agreement.

**BY MR. BROOME:**

**Q.** And typically, the bring-down process occurs after signing and before closing; correct, sir?

**A.** It's usually close to closing.

**Q.** Okay.

**MR. BROOME:** No further questions.

**REDIRECT EXAMINATION**

**BY MR. MOLUMPHY:**

**Q.** Professor Badawi, since it was brought up, how long have you taught mergers and acquisitions?

**MR. BROOME:** Objection. I didn't bring that up.

**THE COURT:** Overruled.

**THE WITNESS:** 17 years.

**BY MR. MOLUMPHY:**

**Q.** And over the 17 years, how many merger and acquisition agreements have you personally reviewed?

**A.** Thousands.

**Q.** And of those thousands, how many of those have you seen involving a public company transaction in which the company waived pre-signing due diligence?

**A.** It's very rare. As I discussed in my initial testimony, I've seen a study of similar deals; I think there were 86 of them. In only one did they waive due diligence.

**Q.** And you were also asked about what if the deal attorneys

said X or Y.

Now, without telling the jury your opinion, you did, as part of your assignment in this case, render an opinion regarding the underlying transaction itself; right?

**A.** I did.

**Q.** Yeah.

Do you know who the deal attorney was for Mr. Musk on this case?

**MR. BROOME:** Objection, Your Honor, beyond the scope, relevance.

**THE COURT:** Sustained.

**BY MR. MOLUMPHY:**

**Q.** Is it fair to say in your underlying opinion you did take that into account, though?

**A.** Yes.

**Q.** Final question:

Have you ever seen, in your experience either teaching, reviewing, any merger agreement that allowed a party to unilaterally put a deal on hold?

**MR. BROOME:** Objection, beyond the scope. I didn't ask him anything about that.

**THE COURT:** Sustained.

**MR. MOLUMPHY:** Thank you, Your Honor.

**THE COURT:** Anything further?

**MR. BROOME:** Nothing further.

**THE COURT:** Thank you very much.

(Witness excused.)

**THE COURT:** Next witness.

**MR. MOLUMPHY:** We next call Stacey Conti.

**THE COURT:** Okay.

(Stacey Fix Conti steps forward to resume the stand.)

**STACEY CONTI**,

called as a witness for the Plaintiffs, having been previously duly sworn, testified further as follows:

**THE COURT:** I want to remind you you're still under oath.

**THE WITNESS:** Okay. Thank you.

**DIRECT EXAMINATION**

**BY MR. REDENBARGER:**

**Q.** Good afternoon.

**A.** Good afternoon.

**Q.** Welcome back.

**A.** Thank you.

**Q.** Okay. You testified just a few days ago.

Do you remember that?

**A.** Yes.

**Q.** Okay. Just briefly, for the jury, can you remind them of your position at Twitter in May of 2022?

**A.** Yes. My name is Stacey Conti, and as part of the acquisition, I was responsible for the diligence process

between sign and close and then, post-close, part of the integration and privatization of the company.

**Q.** During your testimony a couple of days ago, I believe you said that right from the start, right after you first got involved, your team at Twitter was working night and day to compile information to provide to Mr. Musk's side; is that right?

**A.** That is correct.

**Q.** Okay. You also testified that Twitter used personal data when it conducted its estimate for the spam accounts on its platform; is that right?

**A.** That's correct.

**Q.** Okay. And I believe you also testified that Twitter could not simply share that personal private data or even promise to share it without first considering whether sharing that type of information was possible; correct?

**A.** That is correct.

**MR. REDENBARGER:** Okay. Can we please show for everyone -- it's already in evidence -- Exhibit 567.

**BY MR. REDENBARGER:**

**Q.** Do you recall looking at this when you testified before?

**A.** Yes.

**Q.** Okay. And I'd like to direct you to the rows 1.02 and 1.03, but first I'll ask:

Do you recognize this as the first tracker that you

received from Morgan Stanley?

**A.** Yes. This is the first Morgan Stanley request. And, yes, I recognize it.

**Q.** Okay. And it came in on May 9th .

Do you see that?

**A.** Yes.

**Q.** Okay. And 1.02 asks [as read]:

"How do you estimate that fewer than 5 percent of mDAU are false or spam accounts?"

Do you see that?

**A.** Yes.

**Q.** And that was a discussion topic?

**A.** That's correct.

**Q.** It's not a request for information?

**A.** That's correct.

**Q.** Okay. And underneath that, you have 1.03, which is [as read]:

"User database containing key metrics, including, but not limited to, number of users, number of verified users, number of monthly active users, and number of handles."

Do you see that?

**A.** Yes.

**Q.** Okay. In the week leading up to the May 13th meeting, was this the active tracker that Morgan Stanley had sent over?

**A.** Yes.
**Q.** Okay. And to be clear, Morgan Stanley created this document; right?
**A.** To my understanding, yes.
**Q.** These were the requests that Morgan Stanley was interested in at that time; right?
**A.** That's correct.
**Q.** Okay. And this -- this tracker does not reflect any request for any internal private user data concerning Twitter's spam audit, does it?
**A.** It does not.
**Q.** Okay. And to your knowledge, did anyone from Mr. Musk's team ask for the underlying private user data concerning the spam estimate before the May 13th meeting?
**A.** Not that I know of, no.
**Q.** So is it fair to say that between May 6th and May 13th, there were no requests for the raw data, the underlying data regarding the private user information that Twitter used to estimate its spam accounts?
**A.** Not that I know of or not that was communicated to me, and I was the one that was gathering the data.
**Q.** Okay. And Twitter would have never promised to provide that because promising that type of information, Twitter would have had to take steps internally before agreeing to turn that over; correct?

**A.** That's correct, because it was a combination of public and private data that we use to come to that conclusion -- you know, that analysis.

**Q.** Okay. And on May 12th, you opened the data room.

Do you recall that?

**A.** Yes.

**Q.** Okay. And it was around 9:00 a.m. that morning that you sent the first e-mail with some information.

Do you recall that?

**A.** That's correct.

**Q.** Okay. And at that point, was Twitter trying to quickly provide as much information as possible?

**A.** Yes. We were trying to be as collaborative, as fast, and as accurate as possible.

**Q.** Okay. And as of May 12th, Twitter had told Mr. Musk's side that information was going to be coming on a rolling basis; correct?

**A.** That's correct. As soon as we had it, we would provide the information.

**Q.** Okay. So was any of the information posted on May 12th meant to relay to Mr. Musk's side that they weren't going to be getting any other information?

**A.** No.

**Q.** So was that provision of information on May 12th meant to signal a shift in the relationship such that Mr. Musk's side

should believe that no further information was coming?
**A.** No, the opposite. We took many action items from that May 13th meeting for more information, and we were to provide more information.
**Q.** Indeed, actually, on May 12th, you posted some information at 9:00 a.m., and then you sent more information that same day, like at 11:00 p.m.; right?
**A.** That is correct.
**Q.** Okay.
**A.** I believe at 1.03 was -- in the evening.
**Q.** And May 12th was not the last time that Twitter provided Mr. Musk information as part of this deal, was it?
**A.** No. We provided information until October 27th.
**Q.** Okay. And at the end of the day, if the jury wants to find out exactly what Mr. Musk was requesting coming out of the May 6th meeting and before the May 13th meeting, they would just have to look at the May 9th tracker; correct?
**A.** That is correct.
**Q.** Okay. And if you look at row 103 -- 1.03, if Mr. Musk's team had really wanted the underlying spam raw data, they could have written the words "spam raw data" in 1.03; correct?
**A.** That is correct.
**Q.** Because they knew at that point about the spam calculation? They wrote "spam" in the row above that, the discussion topic; right?

**A.** That's correct.

**Q.** But they did not write in 1.03 that they were asking for the raw spam data; correct?

**A.** That is correct.

**Q.** And, again, this was Morgan Stanley's tracker, so if they wanted to write that, they could have, presumably?

**A.** Yes.

**Q.** But they didn't?

**A.** No.

**MR. REDENBARGER:** All right. No further questions.

**CROSS-EXAMINATION**

**BY MR. LIFRAK:**

**Q.** Good afternoon, Ms. Conti.

**A.** Good afternoon.

**Q.** We'll be quick as possible. I know it's a Friday afternoon. There are other places you'd rather be than here talking about May 2022 again.

**A.** Yes.

**Q.** It's probably a long list.

Let's take a look at what you were just looking at, which is Exhibit 567, the diligence tracker.

And, again, just to remind everyone, you were the person at Twitter in charge of kind of this due diligence data exchange; is that right?

**A.** That is correct.

**Q.** And these -- this is dated -- if you see, it's dated May 9th, the date of these requests?
**A.** Yes.
**Q.** And so if we look at the calendar, the May 6th meeting was on a Friday. This is the following Monday?
**A.** That's correct.
**Q.** And you weren't at the May 6th meeting?
**A.** I was not.
**Q.** You got your information about what was requested at the May 6th meeting from Mr. Segal?
**A.** That is correct.
**Q.** And so if Jared Birchall, Elon Musk, Kate Claassen, Kristina Salen, Anthony Armstrong all testified that they asked for raw data at the May 6th meeting, you don't have anything to contradict that personally?
**MR. REDENBARGER:** Objection.
**THE COURT:** I think that's -- I'll allow it.
**THE WITNESS:** I was not in that meeting.
**BY MR. LIFRAK:**
**Q.** And so you can't contradict what any other witness said about what was requested at that meeting specifically?
**A.** Only what I was told from the meeting. I was not in the meeting.
**Q.** Did Mr. Segal tell you they didn't ask for raw data?
**A.** No. He told me to provide the information on this list

that was provided from Morgan Stanley.

**Q.** And nothing more than that?

**A.** Nothing more than that.

Until the meeting itself, and then we had action items that -- we had additional things that came on this list after May 9th .

**Q.** Right. Okay.

Let's take a look at Exhibit 88, which is in evidence, page 2. And I want you to look at a May 9th e-mail from Mr. Armstrong.

Do you see that -- to a group of people at Goldman Sachs?

**A.** Yes.

**Q.** And so that's Mr. Armstrong, one of Mr. Musk's team, e-mailing the Twitter team; right?

**A.** Yes.

**Q.** And this is May 9th, the same date as the diligence tracker we just looked at; right?

**A.** That's correct.

**Q.** And do you see where it says [as read]:

"Users data dump"?

**A.** Yes.

**Q.** [as read]:

"We'd like to do a small group Zoom meeting on users as soon as possible. We are not asking for new analysis and will leave it to you to compile the most

relevant data that's readily available. Goal is to look at all metrics from as many angles as possible."

Do you see that?

**A.** Yes.

**Q.** Did you know that Morgan Stanley on May 9th was asking in writing for a users data dump?

**A.** That was the 1.03 request for number of verified users, number of accounts, number of high-volume, low-volume. It was all of our data cut in different ways, 1.03.

**Q.** Right. Let's go back to what you're talking about, which is the diligence tracker 1.03. You're referring to --

**A.** Yes.

**Q.** -- the user database; right?

**A.** Yeah.

**Q.** And if you could go, Ms. Conti, to Exhibit 560 -- I'm sorry -- Exhibit 94.

This is a May 12th e-mail from Stefani Silverstein at Goldman to you and others at Twitter.

Do you see that?

**A.** Yes.

**Q.** And, again, so this is a couple of days later. It's on the Thursday; right?

**A.** Yes.

**Q.** And it says [as read]:

"To recap the feedback from Anthony we talked

through, Elon is most focused on receiving two key items as soon as possible."

Do you see that?

**A.** Yes.

**Q.** And then it says [as read]:

"Number 2. Users data dump. Goal is to look at all metrics from as many angles as possible, including, but not limited to, number of users, number of verified users, number of monthly active users, number of handles, et cetera. Essentially, they want to understand how Parag/you slice and dice users at all the metrics, KPIs you analyze on an ongoing basis."

Do you see that?

**A.** Yes.

**Q.** And is that -- it was your interpretation of that it was the same thing that was in the tracker at 1.03?

**A.** Yes.

**Q.** Ms. Conti, in 2022, do you remember stating that you understood this e-mail that we're looking at -- that you understood that for -- the Musk team was asking for data about spam in this data dump that's referred in this e-mail?

Do you recall that?

**A.** I do not recall that.

**Q.** You have your deposition in front of you. I'd like you

just to take a look and read it to yourself, page 109. And when you're there, starting at line 22, going to the next page, line 16. If you could just read that to yourself, and then I'll return to the question.

(Pause in proceedings.)

**THE WITNESS:** Yes.

**BY MR. LIFRAK:**

**Q.** Yes. And now having read that, do you remember that when you saw the request for a data dump in 2022 that you understood that the Musk team was asking for data about spam?

**A.** I'm unclear. That was four years ago, so I'm unclear as to what I was remembering then versus now versus what we're discussing.

**Q.** That's what you said then; right?

**A.** I think there was an objection here, and it said that I was putting all of this in the "run the business" category, and spam was one piece of that, yes.

**Q.** And so you knew they were asking about spam and asking for data about spam?

**A.** I don't remember.

**Q.** Let's look, Ms. Conti, at another document, Exhibit 89. And this is -- do you see this is an e-mail from Bill Fox at Goldman to people at Twitter, including yourself?

**A.** Yes.

**Q.** Then do you see where it says [as read]:

"Ned and team: Ahead of our session tomorrow, we want to share the latest diligence tracker in Google Sheets as well as a few specific updates/notes."

Do you see that?

**A.** Yes.

**Q.** And then do you see it says "tracker" -- the second bullet point? It says [as read]:

"MS also included a list of discussions they would like to have with management, tab diligence sessions, once they receive the data."

Do you see that?

**A.** Yes.

**Q.** And then one of those subtopics is "Users"?

**A.** Yes.

**Q.** So you understand -- you understood at this point that what Mr. Musk's team was asking for was data, then a discussion about the data?

**A.** Yes.

**Q.** If we could go back to Exhibit 88, specifically the e-mail from Mr. Armstrong on the first page, May 10th, so this is the next day.

And, again, it's Mr. Armstrong to people at Goldman Sachs.

Do you see that?

**A.** Yes.

**Q.** So Mr. Musk to Twitter; correct? Mr. Musk's team to Twitter's team?
**A.** Yes.
**Q.** And then do you see where it says [as read]:
"I will let the team respond to other items, but as it relates to the two most important calls, users and financial model that Elon is focused on, attendees for those calls will be Elon and likely about three others, combination of Morgan Stanley and finance exec. Agenda will be to dig into the raw data you provide for each session."
Do you see that?
**A.** Yes.
**Q.** So, again, did you understand at this time what Mr. Musk's team was asking for was data and a discussion about the data?
**A.** Yes. They had asked for information about users for the financial model conversation.
**Q.** And then they wanted the data first; then you could have a discussion?
**A.** Yes.
**Q.** You mentioned -- well, let's take a step back.
Whether or not -- and whatever data you think Mr. Musk and his team was asking for, there was no data in that -- the May 12th one-page document; right?
**A.** For the spam specific, no, there was no data in that

one-pager, no.

**Q.** And, again, there was no data in the May 21st document that was provided?

**A.** Related to the spam information? Because we gave a lot of data on users. I mean, like we spent many, many sessions talking about the users and the different kind of -- you know, how we sliced and diced the data.

**Q.** Imprecise question. I'm sorry.

In that May 21st document, there was no data of any kind, private, whatever, about spam; correct?

**A.** That's correct. Just the methodology document that we had created.

**Q.** And finally, you mentioned concerns about privacy and providing certain information to Mr. Musk's team.

Do you recall that?

**A.** Yes.

**Q.** Did you know the contents of the Twitter privacy policy during that time period?

**A.** I guess I would have to -- I would have to look at that today. But at the time, you know, we discussed what was -- what was okay to share and what wasn't in the context of an acquisition.

**Q.** Let's look at the privacy policy, which is in evidence at 813. Page 13.

And -- and do you see Section 3.5? Do you see where it

says [as read]:

"We may share, sell, or transfer information about you in connection with a merger, acquisition, reorganization, sale of assets, or bankruptcy."

Do you see that?

**A.** Yes.

**Q.** And do you see it goes on to say [as read]:

"This privacy policy will apply to your personal information that is shared with before and after the close of any transaction or transferred to the new entity"?

**MR. REDENBARGER:** Objection, beyond the scope.

**THE COURT:** I'll allow it.

**BY MR. LIFRAK:**

**Q.** Did I read that right?

**A.** Yes.

**Q.** Did you know this existed in June of 2022?

**A.** I did not.

**MR. LIFRAK:** Nothing further. Thank you.

**THE WITNESS:** Okay. Thank you.

**REDIRECT EXAMINATION**

**BY MR. REDENBARGER:**

**Q.** Hello.

**A.** Hello.

**Q.** Was your job at Twitter to determine what laws and

regulations might apply to personal private data?
**A.** No.
**Q.** Okay. In any of the e-mails that you were just shown during that examination, did anybody use the word "spam" or "false account" in any of these user data requests?
**A.** No.
**MR. REDENBARGER:** No further questions.
**MR. LIFRAK:** Nothing further. Thank you.
**THE COURT:** Thank you. You are excused.
**THE WITNESS:** Thank you.
(Witness excused.)
**THE COURT:** Anything further from the plaintiffs?
**MR. REDENBARGER:** No, Your Honor. Plaintiffs rest.
**THE COURT:** Anything from the defense?
**MR. LIFRAK:** Nothing, Your Honor. Thank you.
**THE COURT:** Okay.
Ladies and gentlemen, so here is the schedule:
I understand, reading reports, that Monday is supposed to be one of the nicest days in our calendar year so far, so I thought that it's fair that you take that day off and come back Tuesday morning. And we will be working, but Tuesday at 9:15, we will -- I will read the Court's instructions as to the law, and the parties will argue their case, and at some point on Tuesday, you will get the case for deliberations.
And in terms of timing, it's really up to you. You're in

charge of your own schedule with certain, you know, requirements that you do meet every day and so forth.

As I said at the outset, and I'm sure you may recall, all eight of you participate in the -- in the deliberations. So it makes no difference whether you were picked first or picked last; you're all in it together. All of you, each one of you, which -- would be expected to participate.

So with that, remember the admonition given to you: Don't discuss the case, allow anyone to discuss it with you, form or express any opinion.

And I will see you Tuesday morning at 9:15.

(The jury leaves the courtroom.)

(Proceedings were heard out of the presence of the jury.)

**THE COURT:** Okay. So be seated.

So I'm going to file, before the end of the day, some tentative instructions.

Yes? You want to address the Court?

**MS. THOMPSON:** Yes, Your Honor. I just wanted to renew Mr. Musk's Rule 50(a) motion at this point in name.

**THE COURT:** I'm going to deal with it as Rule 50(b).

**MS. THOMPSON:** Thank you, Your Honor.

**THE COURT:** So what I'd like to do: I have set out the instructions as I intend to give them subject to any discussion that you wish to have over these instructions. So it's -- it won't be helpful for you to necessarily go back to

instructions that you have already submitted. If they're not in this, there's probably a reason that I think that they were not what I intended to say.

Now, on the other hand, you are free to object to anything that's in here. It would be helpful, I think, that if you -- for example, I know you object to anything dealing with the scheme because you're -- because of arguments that you have been -- you have raised. Nevertheless, I think it would be helpful when I do discuss the scheme here, if you think that there are ways that it could be better stated or are in some ways deficient on that particular issue. But that's up to you. You object or supplement anything the way you feel appropriate.

However, I would want to get any of your objections and suggestions -- I'd like to receive them by Sunday at noon -- that's California time -- so that we will have an opportunity to review it before Monday morning.

I thought that we should convene Monday -- I would think what? About 11 or -- 11:00?

**THE COURTROOM DEPUTY:** Do you want to do 11?

**THE COURT:** Is that all right?

**MR. COTCHETT:** Excellent.

**THE COURT:** There's no reason to get here at 9:15. So I will see you Monday at 11:00. Thank you.

(Proceedings adjourned at 2:28 p.m.)

---o0o---

**CERTIFICATE OF REPORTER**

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

DATE: Friday, March 13, 2026

Ruth Levine Ekhaus, RMR, RDR, FCRR, CCG, CSR No. 12219
Official Reporter, U.S. District Court

**Volume 11**

**Pages 2032 - 2141**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Charles R. Breyer, Judge

GIUSEPPE PAMPENA, individually and on behalf of all others similarly situated, et al.,

Plaintiffs,

VS.

ELON MUSK,

Defendant.

**NO. C 3:22-cv-05937-CRB**

San Francisco, California
Monday, March 16, 2026

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiffs:

COTCHETT, PITRE & MCCARTHY LLP
840 Malcolm Road
Burlingame, California 94010

**BY: JOSEPH W. COTCHETT, ATTORNEY AT LAW**
**MARK C. MOLUMPHY, ATTORNEY AT LAW**
**TYSON C. REDENBARGER, ATTORNEY AT LAW**
**GIA JUNG, ATTORNEY AT LAW**
**CAROLINE A. YUEN, ATTORNEY AT LAW**
**ELLE D. LEWIS, ATTORNEY AT LAW**

BOTTINI & BOTTINI, INC.
7817 Ivanhoe Avenue - Suite 102
La Jolla, California 92037

**BY: FRANCIS A. BOTTINI, JR., ATTORNEY AT LAW**
**AARON P. ARNZEN, ATTORNEY AT LAW**

**(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

Reported By: Ruth Levine Ekhaus, RMR, RDR, FCRR, CCG
CSR No. 12219, Official United States Reporter

**APPEARANCES**: **(CONTINUED)**

For Defendant:

QUINN, EMANUEL, URQUHART
& SULLIVAN LLP
865 South Figueroa Street - 10th Floor
Los Angeles, California 90017

**BY: STEPHEN A. BROOME, ATTORNEY AT LAW**
**M. ALEXANDER BERGJANS, ATTORNEY AT LAW**
**MICHAEL T. LIFRAK, ATTORNEY AT LAW**

QUINN, EMANUEL, URQUART
& SULLIVAN LLP
295 Fifth Avenue
New York, New York 10016

**BY: ELLYDE R. THOMPSON, ATTORNEY AT LAW**
**JESSE A. BERNSTEIN, ATTORNEY AT LAW**
**PHILLIP JOBE, ATTORNEY AT LAW**
**STEPHANIE KELEMEN, ATTORNEY AT LAW**

QUINN EMANUEL URQUHART
& SULLIVAN, LLP
300 W 6th Street - Suite 2010
Austin, Texas 78701

**BY: EMILY F. COUTURE, ATTORNEY AT LAW**

**Also present:** **Richie DeMarco, Trial Tech**
**Raymond McLeod, Trial Tech**
**Carley Carter**

**I N D E X**

Monday, March 16, 2026 - Volume 11


| | **PAGE** | **VOL.** |
|---|---|---|
| Charging Conference | 2035 | 11 |

**Monday - March 16, 2026** **11:00 a.m.**

**P R O C E E D I N G S**

**---o0o---**

(Proceedings were heard out of the presence of the jury.)

**THE COURTROOM DEPUTY:** All rise. Court is now in session. The Honorable Charles R. Breyer presiding.

You may be seated.

**THE COURT:** Okay. Let the record reflect the parties are present. The jury is not.

This is the time set for charging conference. The Court has received, of course, initially proposed instructions. Then -- I'm not quite sure of the timing. The Court reviewed all those, issued tentative jury instructions, received from the parties the -- their views on those tentative instructions, then revised instructions, which I sent out. My apologies, but I sent them out when they were done, which was 10 or 10:30 or whatever time it was. So that's what I think we should talk about plus other issues.

I do want to address in some detail the issue of what the plaintiffs should be entitled to argue. I received a brief on that this morning or whenever it came in. I want to talk about that.

I want to make sure that a couple of things are clear for the record, two things in particular: Number 1, the motion for mistrial is denied.

Number 2, there is a motion to strike the -- the Delaware claim; right?

**MS. THOMPSON:** The --

**THE COURT:** The Delaware lawsuit.

**MS. THOMPSON:** The complaint, Your Honor, Exhibit 204. You already granted that.

**THE COURT:** That's granted.

**MS. THOMPSON:** Thank you.

**THE COURT:** Okay. So let's go through the revised instructions and see where everybody is on that.

I think there are only a couple that -- well, I don't know a couple. I don't have to characterize it.

As to the so-called boilerplate instructions, nobody seemed to have any issue with that.

I have a -- my copy. I'll see whether -- well, let's start with Number 12, data privacy, because that's a matter that is contested, and let's see that we're all on the same page on that instruction. It's number -- page 12 on -- on mine. Is that --

**MR. BROOME:** Good morning Your Honor.

**THE COURT:** I revised it.

**MR. BROOME:** I think we are fine with this instruction, Your Honor.

**THE COURT:** Pardon?

**MR. BROOME:** For the defense, we are fine with this

instruction with two exceptions.

**THE COURT:** Okay. And the exceptions are what?

**MR. BROOME:** In the sentence that you added that begins with "However," we would request that the "however" be removed because it suggests that it's sort of -- there's some -- sort of undermines the language before it.

But the rest of that, I think we would be fine with if "however" was removed.

**THE COURT:** But the "however" is the law. I mean --

**MR. BROOME:** No, I think what follows is --

**THE COURT:** Pardon?

**MR. BROOME:** What follows is a statement that there are -- it's not the law.

**THE COURT:** It's not that there are agreed-upon protocols as to how -- maybe it shouldn't be "agreed-upon." Maybe it should simply say "protocols."

There's nothing in the -- now, again, I'm going off of what lawyers tell me, and I will defer -- at least listen to your argument, since you are the head of the data privacy Quinn Emanuel strike force.

But there are protocols, which is always what I thought but I didn't know the law. I always thought that you -- that there's some kind of restriction on the dissemination of this information. You can't simply let it out willy-nilly.

And nor have you ever suggested that. I'm not suggesting

you suggested that.

But there are certain requirements, one requirement being -- which is the one you highlighted, by the way -- consent. If a party gives consent, it can be disseminated.

So the question is: Does the consent -- is it a -- is it a blanket or unfettered consent, or is it consent that it can be released -- well, obviously, under certain circumstances, because that's exactly what your policy or Twitter's policy dictates.

And secondly, does it have any kind of further restriction with respect to its dissemination? That is, I agree that I'm -- I can give -- that you can take my personal information and give it to Jones. Okay. Jones is about to buy my company.

But am I also agreeing that Jones can take that information and publish it in the Wall Street Journal, am as an example? He can do whatever he wants to -- he, it, they, she, them, whatever it is, can do with the document.

And the answer is: As I understand the law, the answer is no; that is, that there still attains to that private information some degree of privacy or restrictive use; and it may be an argument whether it's violative of its restrictive use if -- if, as an example, in this case, Mr. Musk wants to give it to his -- his statistical person or his people.

I would -- you know, if faced with a problem, I would say of course he can. Of course he can.

But it may have to be -- they have to then be under some stricture that they can't turn around and disseminate it to the New York Times.

So all I'm saying is that's my understanding of the law. If that's incorrect, then I would agree with you. I'd take out -- I'm taking out the "agreed-upon" anyway because I think that only -- that suggests that one party or other has a veto power over the terms and conditions. I don't think that's the case, so I would agree with that.

**MR. BROOME:** Yeah, and I think -- but you also need to take out "however," Your Honor, because it suggests that the statement before it is -- is subject to the agreed-upon protocols. And, as I understand, plaintiffs are going to argue that it was Mr. Musk's obligation to propose protocols, and the authority that they have submitted GDPR Article 5, says exactly the opposite.

**THE COURT:** Yeah, I don't know who -- I never looked at that. I don't want to leave the impression that it's one side or the other. I think you're right in that regard.

All I'm saying is "however" -- I say "However, there are" -- well, the first, "There is no evidence that any privacy law, domestic, international, prohibited disclosure" -- "prohibited the disclosure."

That's true. That's a correct statement.

Then I say, "However, there are protocols on how this

information may be disseminated or disclosed."

I think that's a correct statement of law. I don't know what "however" does. Of course, it's limiting. "However" is a limiting factor, but the law is a limiting factor.

**MR. BROOME:** As I understand what plaintiffs are going to argue, Your Honor --

**THE COURT:** Pardon me?

**MR. BROOME:** As I understand what plaintiffs are going to argue, I think this plays into their argument, which is the preceding statement needs to be subjugated to the following statement about the protocols, because they are going to argue that it was Musk's obligation to propose protocols, and that is not a correct statement of the law.

**THE COURT:** I don't think that would be a correct argument. I think the argument, as I understand it -- and, again, I'm going on my recollection of the testimony, which may or may not be accurate. My recollection is that there was a letter that was written by -- who?

**MS. JUNG:** Mr. Korman.

**THE COURT:** Thank you. See, you're up here for a legitimate purpose.

That Mr. Korman wrote a letter and said, "Here are -- here the six things we want or the eight things we want" and so forth, to which, as I understand it, there was never a response.

Maybe there was.

**MR. BROOME:** That's incorrect, Your Honor.

**THE COURT:** Okay. So I don't think it's a suggestion that Mr. Musk -- has to originate protocols to the contrary. I mean, my guess is -- again, this is just sort of based on nothing more than what I call common sense -- is a person who's about to give information to somebody else has a further obligation. It would be the plaintiffs' obligation. I say the plaintiff. It would be Twitter's obligation to set forth a suggested set of protocols.

But I'm not there yet. I don't have to rule on that. It's not in front of me. It's just whether or not this sentence is misleading.

I think that what they can argue -- what they can argue is protocols were important because it was private information, and we suggested a set of protocols and we never got a response. Period. They can argue it, and you could say, "Well, that's not how we see it. We see it that" -- da-da-da-da-da, whatever your argument is in that regard. That's argument.

**MR. BROOME:** Yeah. And I think that's probably fine, Your Honor. I think that you -- I think you are about to need to decide the legal issue because it comes up in some of the other issues that plaintiffs have raised, but just for the record, plaintiffs cited Article 5 of GDPR. They didn't

specify a provision, but I think they're referring to provision 1(f), which says that data must be processed in a manner that ensures appropriate security of the personal data.

I just want to note for the record that provision 2 says the controller is responsible for that; and the controller in this situation is Twitter, not Mr. Musk.

**THE COURT:** Okay. And, by the way, you may very well argue -- I'm not foreclosing you from arguing, "Look, we set up a data room, and that data room was four square -- like a vault somewhere. Nobody could get into it," and so forth and so on. And there, that should satisfy the protocols. That's your argument. That's your argument.

I -- look, your argument is whatever you're going to argue. I can't tell you how to argue the case. I can't tell you, though, of course -- okay. I can't tell you how to argue the case and I'm not going to tell you how to argue the case.

But that's fair argument on both sides. Okay?

**MR. BROOME:** The second issue that we had, Your Honor, was just the last sentence. We don't think this is relevant to the data privacy instruction. It's -- you know, the issue here is -- on the data privacy instruction, we understand that the issue is whether Twitter was permitted to provide the data to Mr. Musk. We don't think it's appropriate to get into whether that was, you know, subject to his rights under the merger agreement or anything like that.

And as I understand it, plaintiffs are going to argue that -- that the -- Mr. Musk's -- that Twitter did not actually produce the information pursuant to Mr. Musk's information rights but rather produced it voluntarily.

So I think this becomes kind of confusing for the jury when we're saying that the -- Twitter's ability to produce the information subject to GDPR is -- you know, needs to be limited by the terms of the merger agreement.

**THE COURT:** And the reason I put this sentence is to avoid confusing the jury. In the Court's view, that sentence clarifies that I'm not commenting on whether or not Twitter had the obligation to provide this information.

And that -- that's clear. That's a clear difference of opinion. I mean, you know, you're arguing they have the informational rights. How else are they going to do it? Or whatever you're going to argue -- I don't need to tell you -- whatever you're going to argue. And, by the way, there was no bar to their presenting this private information because you heard the Court's instructions in that regard.

And the problem is that a jury could very well conclude that because it's legal, therefore they had to do it. There was no impediment to it. And this, I think, clarifies that I'm not speaking to that issue.

Anyway, okay. You've noted your objections. Let's move on to --

**MS. JUNG:** Your Honor, I do have a couple --

**THE COURT:** Oh, you have some objections.

**MS. JUNG:** Yes. Thank you, Your Honor.

We certainly agree that "agreed-upon" is confusing and should be deleted. Appreciate that.

I do agree with defense counsel, though, that the last sentence as written is confusing. I would suggest that, as Your Honor just stated, it does not affect it one way or another. As written, it says [as read]:

"The law may have permitted Twitter to disclose private information to the defendant. Does not affect informational rights under the agreement,"

which sort of goes back to this issue of --

**THE COURT:** What language would you suggest?

**MS. JUNG:** "Does not mean that any provision of the merger agreement required or disallowed production or" --

**THE COURT:** Does not -- I don't know. I mean, that I'm not sure that helps.

I mean, you may be right that this isn't the best sentence in the world. There's a lot of sentences that aren't the best sentences in the world. But I -- unless you suggest something that -- your argument is that -- that it's ambiguous? I say to the defendant does not affect --

Well, probably I should say "does not affect the" -- it's really the existence of informational rights or the presence of

informational rights.

Is it the plaintiffs' view that there are informational rights or not informational rights? What's the plaintiffs' view?

**MS. JUNG:** There are limited information rights.

**THE COURT:** Pardon?

**MS. JUNG:** There are limited information rights.

**THE COURT:** There are limited information rights.

**MS. JUNG:** But they don't -- in this -- in this scenario, though --

**THE COURT:** So they exist. So why isn't the last sentence appropriate? Because it's just -- I'm just saying it doesn't affect them.

**MS. JUNG:** That's fair, Your Honor.

**THE COURT:** Okay. Moving ahead.

You know, and I'm not trying to circumscribe -- limit arguments. I'll get to some arguments that I'm going to limit, but not in this way.

Okay. What's next? Another objection on something.

**MS. THOMPSON:** Your Honor, as I understood it, you were going to order --

**THE COURT:** Well, I'm going to page 13.

**MS. THOMPSON:** 13 is what I am on as well.

We did have an objection to the statement on lines 24 to 26, that a statement may be misleading even if it is literally

true if the context in which the statement was made caused a listener or reader to remain unaware of the actual state of affairs.

As we have argued, that seems to be going to a price maintenance theory; that is not at issue there. Dr. Tabak specifically testified that there was no price maintenance theory on which he was offering an opinion, so we do not think that sentence should be given.

If the Court is going to give this sentence, then "to remain aware," at a minimum, should be changed to "to be misled."

**THE COURT:** To be what?

**MS. THOMPSON:** "Misled." Misled.

**THE COURT:** I'm not quite sure how that reads, but let me suggest something that I -- that was in my mind when the instruction was written.

Mr. Musk sends out a tweet which says the deal is on hold. Now, what does that mean?

What that means to a reader, I think, or a hearer or listener of that statement is the deal is on hold.

Now, if what he meant is "I'm going to put the deal on hold" or "I can put the deal on hold" or "I have the right to put the deal on hold" and therefore it is on hold is therefore misleading. What would be -- it would be misleading because the reader would think the deal is on hold.

Now, all the evidence that I've seen that came from your side is the deal wasn't on hold. Everybody was working full-time, working on everything. The deal wasn't on hold. It was going ahead.

Now, you could make the argument it was going ahead subject to certain things being satisfied, but the question is: Did somebody who will look at it, listen to it, hear it think that the deal in some manner was placed on hold?

So it is an incomplete statement leading a listener to possibly think that the deal is literally on hold.

To this day -- I don't know -- maybe you think you've explained it or the parties have explained it. Was the deal on hold? What did it mean to say the deal was on hold? Did it -- everybody was working on it, so -- except for, I guess, in a sense, Mr. Musk, Mr. Musk thought the deal was on hold unless he was satisfied as to certain things.

So you say it's a true statement. He didn't -- he didn't mislead anybody. But it suggests that he had a right to do what he did, and it's the plaintiffs' view that he didn't have a right to do what he did. That's their view. Right or wrong, that's their view.

And if their view is correct, the statement is misleading.

**MS. THOMPSON:** Your Honor, may I respond briefly?

**THE COURT:** Go ahead.

**MS. THOMPSON:** I think actually what you just said

illustrates why this is a confusing instruction with no application here, because what it says is "to remain unaware of the actual state of affairs."

What you just described is the next sentence [as read]:

"A statement is misleading if it would give a reasonable investor the impression of a state of affairs that differs in a material way from the one that actually exists."

So the sentence before that is inapplicable as Your Honor has described it, but also confusing and really goes to the idea of a price maintenance theory, which is not at issue. So we would maintain our objection to that sentence.

**THE COURT:** I don't see how it goes to a price maintenance theory.

**MS. JUNG:** Agreed, Your Honor.

**THE COURT:** Okay. So I'm leaving that in.

Okay. What's next?

**MS. THOMPSON:** Your Honor, on the next instruction, page 15.

**THE COURT:** 15? I think it will be useful if I now turn to the plaintiffs and say do you have any comments on page 13 and 14?

**MS. JUNG:** Thank you, Your Honor.

Minor thing on page 13. I think you've included defendant's proposed language regarding [as read]:

"The principal purpose and effect of creating a false appearance of fact in furtherance of the scheme to defraud."

Compared to our private -- or -- and that's at lines 21 through 22.

Defense, I believe, took that from a primary violators versus secondary actors case, and we think that the prior instruction that Your Honor had is more accurate to this case regarding misleading investors.

**THE COURT:** Okay. Let me look at that. You're saying line 21 and 22?

**MS. JUNG:** Yes, Your Honor.

**THE COURT:** [as read]:

"That practice or scheme to defraud is any conduct that has the principal purpose and effect of creating a false impression of fact in furtherance of the scheme to defraud."

And you say that -- you're not saying it's wrong; you're saying it's been covered by something earlier. Or are you saying it's wrong? I don't know.

**MS. JUNG:** So we're saying that the prior language you had, Your Honor, which was [as read]:

"An act, practice, or scheme to defraud is any conduct intended to mislead investors, including by artificially affecting market activity..."

That was a more accurate statement and would better serve the jury in this case.

**THE COURT:** No. I think it's better to leave it as it is.

Okay. Thank you. Anything else?

**MS. JUNG:** No, Your Honor. Not on this one.

**THE COURT:** Okay. Page 15.

**MS. THOMPSON:** Yes, Your Honor. We would ask that the Court remove on pages 8 to 10 the reference to 10b-5 -- 10b-5(c).

Your Honor actually explicitly said at the pretrial conference that subsection (c) is not at issue in this case, so we believe it should be removed. I'm happy --

**THE COURT:** I think what I said was that there were two claims; right? That's what you --

**MS. THOMPSON:** You said that there are three bases under Rule 10b-5, that the ones at issue here are (a) and (b), and obviously the Court can't insert subsection (c) after evidence has closed. So --

**THE COURT:** No, no, no.

**MS. THOMPSON:** -- subsection (c) should be removed.

**THE COURT:** Subsection (c) was in at the very beginning. Really. Really. I mean, that just misconstrues the record. And if I said two and I meant three or I described what it was, it was a form -- a different form -- a different

language which is also violative, and I've -- the record is -- listen, I don't want to -- I think it's very dangerous for me to try to say, I said it then, I said it now, and so forth and so on. Because, as soon as I say something, if it's not fully stated with every bell and whistle and caveat and context, it's thrown back at me as saying, "Well, Judge, you know, you said this. Well, Judge, you know, you said that."

You tried the case. I saw it. You tried the case based upon violations of (a), (b), and (c). I said that was -- I said at the pretrial conference that's what I was going to do. There's no difference in it.

If you didn't put on some -- you had some special evidence that somehow was going to refute (c), I didn't hear what it is, because it could have refuted (a). And I -- you put on your case. So that's in.

And let's -- let's go to the next issue.

**MS. THOMPSON:** Sure. So defendant maintains our objection to any reference to 10b-5(c) in either the instructions or the verdict form.

**THE COURT:** Yes. Good.

**MS. THOMPSON:** Turning to the next page, page 16, line 8. We believe, as Your Honor is aware, that recklessness is --

**THE COURT:** Sorry?

**MS. THOMPSON:** We believe, as Your Honor is aware,

that recklessness is not sufficient. However, under Ninth Circuit law, it has to be deliberate recklessness. So if the Court is going to refer to recklessness, it should add --

**THE COURT:** Deliberately reckless.

**MS. THOMPSON:** -- "deliberately."

**THE COURT:** Okay. I will add the word "deliberately reckless." Okay?

How's that?

Perfect.

You don't have to agree to it.

**MS. JUNG:** Thank you, Your Honor.

**THE COURT:** What's next?

**MS. THOMPSON:** I can move on to materiality unless plaintiffs have anything to raise.

**MS. JUNG:** We can move on.

**MS. THOMPSON:** Okay. On materiality, we would request the Court give the instruction proposed --

**THE COURT:** Oh, no, I'm not there yet. I want to ask -- I'm going to go back and forth. I'm asking your opponent here whether she has any.

**MS. THOMPSON:** As did I, and she said she did not.

**MS. JUNG:** We can move on, Your Honor. Thank you.

**THE COURT:** Okay. Now we're on page 17, materiality.

**MS. THOMPSON:** Yes, Your Honor. We would request that the instruction that a factual misrepresentation can be untrue

but not material be given. We would also request that the instruction that [as read]:

"The absence of a stock price reaction to the correction of a misstated fact may be evidence that the fact is not material," because immaterial facts and information, by definition, do not affect stock price in an efficient market."

Finally, we would request the Court instruct that a statement regarding a material fact is not rendered false or misleading when made merely because subsequent events prove it to have been erroneous.

Those are all issues that have been directly raised in the factual presentation of this case, and it's a correct statement of the law. Therefore, we believe that the Court should give it to properly instruct the jury as to materiality.

**MS. JUNG:** We disagree with that, Your Honor. We think, as written, this is a fine instruction to give to the jury. Defense's proposals adds argument disguised as instruction, improperly expands this instruction, and adds burdens that do not apply to materiality, including falsity and causation.

In addition, regarding the "subsequent events prove it to have been erroneous," it is prototypical that subsequent corrective disclosures are used to show that the prior statements were false.

**THE COURT:** Okay. I'm going to give it as stated.

What's next?

**MS. THOMPSON:** I don't have anything further on materiality, Your Honor.

**THE COURT:** So 18 is okay? 19 is okay?

**MS. THOMPSON:** No. On that instruction, I was giving plaintiffs a chance --

**THE COURT:** Okay. 18. Do you have anything on 18?

**MS. THOMPSON:** No, Your Honor, nothing on 18.

**THE COURT:** Anything on 18?

**MS. JUNG:** Nothing on 18, Your Honor.

**THE COURT:** 19.

**MS. THOMPSON:** Yes, Your Honor. We would specifically request that the Court, in this instance, give the instruction that it is not sufficient to show that a later statement turns out to be false or misleading, a plaintiff must show that a defendant did not believe in the truth or accuracy of the statement at the time it was made.

It is black letter law that scienter is assessed at the time a statement was made. We have cited numerous cases to that effect throughout this case, but in particular at our briefing submitted yesterday at Docket 514, at pages 17 to 18, Ninth Circuit case law that explicitly says that -- the fact that scienter is assessed at the time the statement is made. So we would ask --

**THE COURT:** I think that's true. In other words, I think you're right. I think you're right that if I didn't -- if I -- that I can't look at subsequent -- well, he -- he must have made to -- he must knowingly have made an untrue statement at the time he made the statement.

Is that -- is that your point? In other words, at the time he uttered the statement, he must know it to be untrue or with deliberate recklessness as to whether or not it's true or not.

**MS. THOMPSON:** Yes, Your Honor.

**THE COURT:** At the time.

**MS. THOMPSON:** Exactly, at the time. We, of course, as you know, maintained our objection to the deliberate recklessness standard, but, yes, it must be assessed at the time the statement was made.

**MS. JUNG:** So, Your Honor, I -- I think that the issue here is that this is confusing the jury by injecting Mr. Musk's subjective belief as an issue. But an objective standard is used to determine the falsity of a statement, so -- and that's *In re: Alphabet*, which we've cited.

So I think that while it's true that it's assessed at the time, I think, as written, this properly instructs the jury as to the standard for scienter.

**MS. THOMPSON:** And, Your Honor, it is Mr. Musk's state of mind.

**THE COURT:** Well, let me think about that.

You're saying that the standard is an objective -- I mean, is a subjective. They're saying it's a subjective standard; you're saying it's an objective standard.

It's an objective standard whether or not the person made the statement knowing he -- knowingly it was false. We're not really talking about that, because I don't know how you would -- I don't know how you would parse that with subsequent events.

**MS. THOMPSON:** Your Honor, it's -- scienter is state of mind. It is Mr. Musk's state of mind. It's not objectively what anyone else thought.

**THE COURT:** Yeah, that's what I would think.

**MS. THOMPSON:** And that state of mind that Mr. Musk has to have under the scienter requirement must have existed at the time the statements were made.

**THE COURT:** Exactly right. I agree with you 100 percent.

So I'm trying to figure out what the problem is -- what the problem is here with what I've said. And again --

**MS. THOMPSON:** So --

**THE COURT:** -- maybe it's cured by saying "A defendant acts knowingly when at the time he makes an untrue statement with the knowledge" -- I have to work out the words. But you want to show the temporal relationship.

**MS. THOMPSON:** Yes, Your Honor.

**THE COURT:** Well, I think that's -- I'll go back and look at the temp- -- I think that's correct. I think that seems to be a correct statement of the law. I'd be surprised if it's not. I mean, I don't know how you punish somebody or find liability on subsequent events. I agree with that.

So let me -- if it's unclear -- and maybe it is -- I'll go back and put a temporal -- and, by the way, I'll send it all to you today so you won't be in a position that you make your argument.

Anything else out of that?

**MS. THOMPSON:** We'll take a look at that.

Nothing else on the scienter instruction. And if I --

**THE COURT:** Okay. Do you have page 20? Maybe you don't.

**MS. THOMPSON:** Nothing for --

**THE COURT:** Okay.

**MS. THOMPSON:** -- for defendant on the reliance instruction.

**THE COURT:** Okay. Before that instruction, I want to give another instruction. Let me give a background of it.

There's been a lot of the -- what the defendant has said and what they continue to say in their brief to me about argument is their concern -- which, by the way is legitimate -- that acts that occurred prior to the class period are somehow

going to be construed by the -- by the jury as being acts that -- that -- to which liability will be found, that these acts, which acts they are, whether they be earlier tweets, whether they be SEC filings, whatever -- whatever occurred prior to May 13th. This is a big thing on the -- in the argument thing that we're getting to, but I might as well address it now.

The concern is that pre-class period -- what is the relevance of those things that occurred pre-class period?

And it appears to the Court it's highly relevant to the -- to the determinations that have to be made as to the truth or falsity of the statements, one; and, two, the existence of the scheme. Okay.

Now, the context -- the question is: How do you draw the line between its relevance and its impact on and its -- and whether it serves as an independent basis for liability? Because the concern the defendants have is that all of this conduct -- and the record is replete with evidence that occurred before the class period, all sorts of things happen going back four years -- how is it relevant? Because it's all in evidence.

Okay.

And it's relevant as other acts of the -- of the defendant.

And what I propose to do is give the following instruction

[as read]:

"You have heard evidence of defendant's conduct before the class period. You may consider this evidence only for its bearing, if any, on the question of defendant's intent, motive, plan, or knowledge and for no other purpose."

Do you want to hand this to the parties.

So I'm going to give -- first, I give it to you so you can see it.

**MR. ARNZEN:** Thank you.

**THE COURT:** And it is --

**MS. THOMPSON:** Thank you.

**THE COURT:** I think that then addresses a whole -- a whole issue of -- which has been raised by the defendants that they think there ought to be no argument on this, and I think it's -- I think it encompasses it.

**MR. ARNZEN:** And it's a standard 404(b) instruction.

**THE COURT:** Pardon?

**MR. ARNZEN:** Isn't is it effectively a 404(b) --

**THE COURT:** That's exactly what it is. And when it comes up in the context, usually it comes up in the criminal context, and that's why it's in the criminal model instructions.

But it's entirely appropriate when 404(b) material is introduced.

**MR. ARNZEN:** We think it's an elegant solution, Your Honor.

**MS. THOMPSON:** Your Honor, defense does not think that instruction is sufficient because it does not specifically identify the fact that, for instance, Mr. Musk did not -- is not alleged to have violated any law.

**THE COURT:** If you want to give me a counter-instruction, I'll entertain it.

**MS. THOMPSON:** So, Your Honor, I think we would ask that the Court add the proposed instructions contained at Docket 514.

**THE COURT:** Pardon me?

**MS. THOMPSON:** The proposed instructions contained in Docket 514, which we filed yesterday.

**THE COURT:** 514? Okay.

**MS. THOMPSON:** Okay. At pages 35 --

**THE COURT:** Wait a minute. I've got to look at it.

**MS. THOMPSON:** I'm sorry.

**THE COURT:** I'm sorry. Is 514 your --

**MS. THOMPSON:** That's the docket number.

**THE COURT:** But are you talking about your motion to preclude plaintiffs from making improper closing?

**MS. THOMPSON:** Not at this moment, Your Honor. I'm discussing -- we had included in our exceptions to the jury instructions --

**THE COURT:** Okay. I've got to go get it. I've got to go get it so I know we're talking about the same thing. And my law clerk just went, so let's postpone discussion on this right now. We'll return to it. We'll return to it. I think it's --

By the way, I'm not trying to slip something in. I think it's important because I think for, among other reasons, you've made a big issue about this. When I say "a big issue," you have devoted pages to -- and argument throughout this case as to what does all this other stuff have to do and the danger of misleading the jury and the danger of this and the danger of that.

And I'm not saying that you're wrong. I'm simply saying it has to be addressed so that, one, it protects the defendant from that danger, though you may not think adequately because the best protection against it, I concede, would be not allowing it into evidence. I got that part.

But, you know, we all know how it's done. Okay. I mean, they're entitled -- they're either entitled or not entitled to present it in evidence.

Since I ruled that they were entitled to it, over your objection, then the question is: Well, what about the dangers that you've -- that doesn't mean that you haven't asserted dangers of it. And you have.

And I think that this instruction properly tells the jury, you know, if you found his May -- whatever it was, his

four-year-old tweet to be false or his two-year-old tweet to be false or this wrong or that wrong -- by the way, you found that he bought -- he bought -- great; thank you -- he bought Twitter privately. That is to say he bought a number of shares of stock in a private manner. That is to say it wasn't known to the market that he was the purchaser of the stock. You say, but that's perfectly proper, and should he be held liable on that? No.

Their argument is that that was part and parcel of the scheme to conceal the ownership of that stock until such time as he decided that he wanted to make an offering of either going on the board or buying the company or setting -- doing a tender offer or setting up a competitor, something along that nature, and therefore it was important for him, in order to buy the stock at a reasonable price or what he considered to be a reasonable price, not to disclose the fact that he was buying it.

It's preparatory to it. So it shows his plan, his intent. And it goes right to those issues, and that's perfectly proper. What a jury makes of it is entirely a question of argument and the inferences that they draw. But parties are entitled to make any reasonable argument or any argument based upon a reasonable inference. That's what this is.

Okay. You want me to look at what on 504?

**MS. THOMPSON:** There's a request at page 33 and a

request at page 35 with supporting authority. What -- the critical issue here is that there should not be any argument, insinuation, allowance of the jury to infer that any of the prior conduct was improper or was illegal. That is a -- that is the exact problem we have with the way that plaintiffs have presented this case.

**THE COURT:** Well, let's see. Let's take your words. "Illegal or improper." I don't know -- I -- and I think the argument is if the suggestion is that it was illegal or improper, then that could turn into a basis for liability, whereas it may have been improper in that it was part and parcel of a scheme to defraud, but it, in and of itself, is not illegal conduct and cannot form the basis for liability.

Now, when I say "cannot form the basis for liability," I've got to be clear about -- try to be clear about this. It may very well be the basis of liability for a scheme in that it then covers a period of time in which, even though other statements may or may not be true or may -- you know, it then still is part and parcel -- it's a course of conduct that is part and parcel of what plaintiffs characterize and what you -- and what you contest is a scheme. You say there was no scheme here.

**MS. THOMPSON:** No --

**THE COURT:** Pardon?

**MS. THOMPSON:** No, Your Honor. That -- the scheme, as

Your Honor stated -- of course, we object, but Your Honor said the scheme is from May 13th to October 4th. The stock purchases on the open market took place before May 13th. They may not be part of the scheme.

And what Your Honor just articulated is exactly the game that plaintiffs are trying to play here and try to have the jury find liability based on earlier conduct that is not part of the case.

**THE COURT:** The scheme starts -- I agree the scheme starts on May 13th. That's right. That is to say -- that is to say they can't find any -- they can't find liability based upon actions that preceded the scheme. That's right. They have to prove that the scheme took place between May 13th and whatever date -- and October 4th, I guess that's what's it is.

But they can consider those events that occurred before for the purpose of intent, motive, all those things that -- opportunity and so forth -- that you can infer that because that is relevant to how you're going to perpetrate the scheme.

If, for example, a person doesn't have an opportunity to commit -- a person is going to commit a series of bank robberies and he's going to rob bank X on Golden Gate Avenue. All right. And he sits down with his buddies, and they're going to conspire to do it.

Could you bring in any evidence before the conspiracy? The answer is yes.

For example, you could show that he drove by the bank on a particular day to see whether it was open, even though there was no conspiracy at that point, but it provided him with the knowledge that the bank operates on that day.

I've done so many criminal cases that I know that you can introduce this kind of evidence to show intent, opportunity, motive, but it can't form the basis. You can't say, "Aha, there's a conspiracy because -- because he drove by the bank two weeks before the conspiracy started."

Or maybe it wasn't even a conspiracy. It doesn't have to be that. He doesn't have to have other people. What about he's going to rob the bank all alone? And, by the way, bank robbers frequently do that and they do it repeatedly, even though they know they're going to be caught.

So the fact of the matter is that a party can -- the Government can introduce that he's familiar with the -- with the location of the bank. Typical.

**MS. THOMPSON:** Your Honor, there's no such evidence in this case. There's evidence of prior tweets that Mr. Musk made, which there's no allegation of wrongdoing as to those tweets.

**THE COURT:** Doesn't have to be that. For example, he tweets, stock drops; he tweets, stock goes up.

Does he have an impact on the market? Well, he said -- he said, no, you never know what's going to happen. He said a lot

of things, and -- I'm not going to characterize what he said.

But be that as it may, they want to introduce the fact that, you know -- what is that stock case? You know: When Merrill Lynch speaks, everybody listens. I forget -- whatever that thing is. They know when Elon Musk does something, everybody listens. Everybody listens.

Now, you can say that's not true. You can argue that doesn't happen in this case. But they can show that Elon Musk is familiar with the stock market, how stocks operate, and how his statements of what he is going to do may impact the market.

That's their argument. It's pure argument. It's a reasonable argument from the facts. And you have a -- you can rebut it. But it's not excludable because it didn't happen May 13th and subsequent dates.

**MS. THOMPSON:** Your Honor, there is slightly different problem here which is, yes, they have that testimony from Mr. Musk. Whatever he said, they may use that.

What they can't do is what they argued in opening statement improperly that certain tweets that were never pled that predate the class period were deceptive and dishonest -- those were the words they used -- or that Mr. Musk -- any suggestion that Mr. Musk violated SEC disclosure rules based on the timing of the filing --

**THE COURT:** I'm sorry. When did -- then I missed something. Was I asleep at the switch when they said that

Mr. Musk violated an SEC rule?

**MS. THOMPSON:** That was --

**THE COURT:** Wait a minute. Listen to my question, because you use words that are sort of unnecessary to your argument, and you should really not do that because it's really annoying to a judge. You say they improperly did this -- it's always an attack on the lawyers on the other side. That -- that's a leitmotif in this entire litigation, and I've seen it time and time again.

Now, if they said, as you just said, that -- that they -- that it was a violation of -- that Musk violated SEC rules, that would be I was clearly asleep at the switch.

So did they say that?

**MS. THOMPSON:** They clearly were making a suggestion that there was a violation of SEC rules.

**THE COURT:** Really?

**MS. THOMPSON:** Why else are they asking about whether he filed with the SEC? What is the relevance of that? There is no relevance.

**THE COURT:** Yes, it is.

**MS. THOMPSON:** If they wanted to say the purchases were private or confidential, that is different. Invoking the SEC and SEC requirements is highly improper and prejudicial.

**THE COURT:** They didn't. They didn't invoke the requirements. What they said, as I understand it -- but if you

have it -- come on, Mr. Bernstein.

I'll -- rather than watching you nod at your table, I'll allow you to come up and give me the citation to the record where they used the words "the requirements of the SEC."

You're going to stop everything so we can have a civil discussion afterwards, but I'm not going to sit here and watch lawyers grimace, nod, laugh in a court. That's just not the way I do it for 28 years. It's going to be done at a level of civility. With the judge. With the Court.

So if he used -- if that question, did he violate the requirements of the SEC? Because you can say, did he file -- did he publicly acknowledge. Not that he's required to do so. Did he publicly acknowledge that he did it in any filing, in anything he said? What were the words, Mr. Bernstein?

You can do it, Mr. Bernstein. Come on.

**MR. BERNSTEIN:** Sure. With the second witness, they asked Ms. Gadde, when they put up a 13G, the 13G when Mr. Musk disclosed his ownership [as read]:

"Do you know what a Schedule 13G reports to the SEC?"

**THE COURT:** Yeah.

**MR. BERNSTEIN:** [as read]:

"Yes, I do. It's generally a report that any investor who buys more than some percentage of a public company is required to file with the SEC

within a certain time period."

Your Honor, if that's not suggesting that there was some requirement to disclose within a certain time period that he purchase these shares --

**THE COURT:** Does it say -- does it say the percentage of shares?

**MR. BERNSTEIN:** On the document? Yes.

**THE COURT:** No, no. Did -- was the jury told -- because we know that he did 9 percent. Is it -- did they say to the -- that when he bought 9 percent, he was required to disclose it?

**MR. BERNSTEIN:** I don't believe they said that, Your Honor.

**THE COURT:** I don't either, because I told them not to.

**MR. BERNSTEIN:** But what to -- what relevance was it what a 13G is forced to do --

**THE COURT:** Because he didn't disclose it, and there's a manner in which he can disclose it, and ultimately he did disclose it. It was part and parcel of the whole thing.

I'm not suggesting -- and nor do I care, because it's a subject of another lawsuit, isn't it? In -- as a subject of -- he's already being challenged on his failure, and he's already lost that battle or at least half the battle because he said, oh, his rights -- we'll get to petitioning, by the way. We'll

get to that argument in a minute.

But the -- he's already -- anyway, I don't want to comment on the other lawsuit. I don't know what's going to happen in the other lawsuit. It seemed to me, I'm trying this lawsuit, which is plenty for me to try. And -- and he did not -- I don't believe the plaintiffs crossed any line with respect to SEC filings.

You take a different view, Mr. Bernstein. That's fine. Maybe there'll be an appeal and maybe there won't be.

**MR. BERNSTEIN:** We do take a different view. We don't know why it would be relevant specifically what a Schedule 13G reports as opposed to just asking "Did Mr. Musk disclose this publicly;" that was fine. Getting into the specific form and implying that there's a certain time period by which he had to report it, we think did cross the line. We understand Your Honor has a different view.

**THE COURT:** Well, do you have a curative instruction on the filing? Is there something that you want me to say about the filing?

**MS. THOMPSON:** Your Honor, we did propose a limiting instruction that we requested over the course of the trial. It is in Docket 513. It's at page 35.

**THE COURT:** And what does that say?

**MS. THOMPSON:** [as read]:

"You have heard testimony about Mr. Musk's

purchases of Twitter stock on the open market between January and April 2022. Mr. Musk is not alleged to have committed any wrongdoing based on his transactions on the open market, and plaintiffs' claim in this case is limited to the time period from May 13th to October 4th, 2022."

**MS. JUNG:** Your Honor, I don't --

**THE COURT:** Well, I want to think about that. What number is that?

**MS. THOMPSON:** Docket 514 at page 35.

**THE COURT:** Okay. I'll take a look at it. That's helpful, you see. You see, that's called "constructive argument."

**MS. JUNG:** Your Honor, if I may respond to this sort of line of argument --

**THE COURT:** Yes, of course.

**MS. JUNG:** -- and this proposed curative instruction or limiting instruction, rather.

First of all, as you've noted, our comments and -- regarding the disclosure of Mr. Musk's purchase of Twitter stock is completely in line with Your Honor's ruling on Motion in Limine 1, in which you denied the motions as to the issues related to the SEC investigation, but not investigation itself.

We have not brought up the investigation itself or the subsequent litigation. Of course the 13G is relevant, as

you've indicated.

For this limiting instruction regarding, quote/unquote, no liability for pre-class period purchases of Twitter stock, I think the limiting instruction that Your Honor proposed is more than sufficient in addition to the other instructions which clearly set out the class period, and this is -- a sort of duplicative and confusing instruction that would seek to contract or at least confuse the jury.

**THE COURT:** I'll take a look at it with that in mind.

**MS. JUNG:** Thank you, Your Honor.

**THE COURT:** Okay. What else?

**MS. THOMPSON:** Your Honor, we had also requested a limiting instruction at page 33 of Docket 514 related to the fact that no other statements other than the three statements that survived the motion to dismiss and were pled may give rise to liability, so we would ask the Court to consider that instruction as well.

**THE COURT:** I -- the problem I have -- the problem I have is what do you mean by "give rise to liability"? It can't give rise to liability in and of itself. In other words, they can't find a statement made before the class period makes the defendant liable. He's liable for a violation of the securities law that is brought in this case challenging that.

Otherwise -- otherwise, then I agree with you. Otherwise, it's a roundabout way of basically violating the earlier ruling

of the Court throwing those -- finding no basis for liability on those claims. They can't be found liable.

And so I think it's important -- and I'm now addressing the plaintiffs -- not to make the argument that these earlier statements were false or misleading, because if they were false or misleading, then I think I would have included them in -- in this lawsuit. And, in fact, I addressed them, and I -- my recollection is I threw them out.

That doesn't mean they can't be used for other purposes. And it doesn't mean that they weren't deceptive. But they weren't false or misleading.

**MS. THOMPSON:** Your Honor, we disagree and think the requested instruction should be given.

We also have a limiting instruction on page 32, just while we're on limiting instructions, related to plaintiffs' suggestion that Mr. Musk breached certain contractual obligations. We ask the Court to instruct [as read]:

"You are instructed that a breach of contract does not constitute a device, scheme, or artifice to defraud."

That's a correct instruction under Ninth Circuit law, and we understand from plaintiffs' presentation of evidence that there may be argument related to the NDA or other portions of the merger agreement.

**THE COURT:** You're saying a breach of contract

cannot -- cannot what? Cannot be --

**MS. THOMPSON:** Does not --

**THE COURT:** -- a basis -- cannot -- well, cannot what?

**MS. THOMPSON:** Does not constitute a device, scheme, or artifice to defraud.

**THE COURT:** And that means that it can't be considered as part and parcel of the scheme?

**MS. THOMPSON:** Your Honor, what we have requested --

**THE COURT:** Well, I'm asking that question.

**MS. THOMPSON:** I think there is a risk --

**THE COURT:** Pardon?

**MS. THOMPSON:** There is a risk that without this instruction, the jury would find liability based on arguments related to Mr. Musk's contractual rights, which is not permitted under Ninth Circuit law because a breach of contract is not securities fraud.

**THE COURT:** Are you saying that breach of contract can't be considered in connection with a securities violation?

**MS. THOMPSON:** I am not saying there can be no evidence of it. What I'm saying is the jury cannot be confused and shouldn't be properly instructed that a breach of contract does not constitute a device, scheme, or artifice to defraud.

**THE COURT:** In and of itself? In and of itself? Okay. I mean, I guess that's right. In and of itself. I breach contract -- you can't take every breach of contract and

make a violation of securities law. I think that's correct. That's correct.

But the breach of contract may very well be part and parcel of a scheme to defraud. May very well be.

**MS. JUNG:** That's correct, and that's our understanding as well, Your Honor. And as a result, for this breach of contract limiting instruction, I think it's completely unnecessary and confusing.

**THE COURT:** Well, it's like -- it's like taking every piece of evidence and saying, "This piece of evidence can't do it alone. That piece of evidence can't do it alone. That piece of evidence can't do it alone."

And if you don't give instruction about that piece, that piece, and that piece, you have a danger that the jury will be confused.

So I sort of do the reverse. I say this is the only basis upon which you can convict or find liability, this and this. And you can consider these things, but you can't -- they cannot form the basis, the sole basis is really what you're saying, for liability.

I hope that's clear. I think it's clear. Anyway, it's as clear as I can make it. But I'll take a look at it.

**MS. THOMPSON:** Your Honor, if I may address the instruction on protected litigation conduct, and then Mr. Bernstein --

**THE COURT:** Yes, let's address that. I've been looking forward to that discussion.

**MS. THOMPSON:** And then Mr. Bernstein will address damages and causation.

**THE COURT:** Okay.

**MS. THOMPSON:** This is page 33 of the Court's revised tentative jury instructions.

**THE COURT:** Page what?

**MS. THOMPSON:** 23.

**THE COURT:** 23?

**MS. THOMPSON:** Yes, Docket 519.

So defendant objects to the insertion of the fact that the Twitter litigation was filed on July 12th, because it gives the inaccurate -- it inaccurately conveys that protected litigation -- protection for litigation does not start until the litigation is filed.

And as Your Honor is aware, prelitigation conduct is protected under *Noerr-Pennington*. It is proper petitioning activity. That is Ninth Circuit law. Presuit demand letters, termination letters, letters in advance of termination, those are protected litigation conduct.

**THE COURT:** And you are citing the *Ecodisc Technology* case; right?

**MS. THOMPSON:** We have cited numerous cases, Your Honor, including *Ecodisc* disc.

**THE COURT:** Okay. Let me ask some questions here.

The litigation -- who initiated the litigation?

**MS. JUNG:** Twitter did, Your Honor.

**MS. THOMPSON:** Your Honor, Twitter filed a lawsuit in response to Mr. Musk's termination of the agreement.

**THE COURT:** Right. So -- so the litigation was initiated by Twitter. Wasn't initiated by Musk. And Musk wrote a letter and he said in the letter, "I am terminating the merger pursuant to the merger agreement. I'm not ignoring the merger agreement; I'm utilizing the merger agreement. The merger agreement permits me to terminate under certain circumstances."

Because we're past the -- the curative period, and so far I don't have the pay the billion dollars, da-da-da-da-da, and you're in breach, and here are 17 reasons why you're in breach. So therefore, the merger agreement is terminated.

Nowhere in that letter did I see "And if you don't agree with me, I'm going to file a declaratory relief action" or "If you don't agree with me, I'm going to file a lawsuit."

No. No, he didn't say he was filing a lawsuit, and he didn't file a lawsuit, did he? Did he file a lawsuit: Yes or no?

**MS. THOMPSON:** Your Honor, as the Court is aware, there were --

**THE COURT:** No, just answer the question. Did he file

the lawsuit?

**MS. THOMPSON:** Yes. He filed counterclaims.

**THE COURT:** He filed the lawsuit?

**MS. THOMPSON:** He filed counterclaims, Your Honor, yes.

**THE COURT:** I understand he filed counterclaims. Did he file the lawsuit?

**MS. THOMPSON:** Your Honor, my answer is the same --

**THE COURT:** Did he instigate litigation?

You know, you have such a hard time answering a straight question. Why don't you just --

Did he instigate the lawsuit?

**MS. THOMPSON:** Your Honor, the fact that Twitter filed first and Mr. Musk responded is clear --

**THE COURT:** You don't want to answer the question.

**MS. THOMPSON:** Your Honor --

**THE COURT:** Sit down. Sit down. I'm not listening to you anymore. I want -- Mr. Broome. Please come up here.

Sit down. Sit down.

Since you've refused to answer my questions directly, I'll allow you to explain it, but I want an answer.

Did he instigate the lawsuit? Did he initiate the filing of a lawsuit: Yes or no?

**MR. BROOME:** Twitter filed the first lawsuit, Your Honor.

**THE COURT:** Okay. Thank you.

Okay. Now, do you want to add anything to it? You're certainly welcome to do so.

**MR. BROOME:** I think our position, Your Honor, is that under Ninth Circuit law, the July 8th termination letter is also petitioning conduct.

**THE COURT:** Okay. And I've looked at the case, and the case is the case that Mary Ann Fellser (phonetic) wrote in 2010. It's the -- the *Ecodisc Technology*, and in that she cites the fact that it was the plaintiff -- that it was a prelitigation letter that was sent by the plaintiff in anticipation of lawsuit, and then the plaintiff filed the lawsuit. And she said within that -- within that filing, I would contemplate -- I would contemplate protected activity.

Let me make two observations. Number 1, it's a Central District case that I'm relying on. Maybe there's some Ninth Circuit case that holds otherwise, but I -- I'm -- you cited this particular case, so it's a -- it's from a federal district court judge.

And, Number 2, it's easily distinguishable. The other party filed the lawsuit. In this case, it was the other party that filed the lawsuit.

And then just stop a moment and think of what you're really saying, the implication of what you're saying.

There are literally millions of letters that are written

by lawyers or by parties saying, I don't think you've fulfilled this. I don't think you've done this. I think you're in breach of that, and all the reasons that are given for it.

And you're saying none of those letters, none of those positions taken by parties prelitigation come in because they're part of *Noerr-Pennington* protected litigation.

And even though they may be normally admissions of a party, for example, in a letter, maybe the party writes "I know that I should do X" or "I know I can do Y, but it's Z that is in breach, and therefore, I do X, Y and Z."

I'm just saying that if *Noerr-Pennington* is as expansive as you suggest, I think -- I think that would be a sea change in the law as far as I understand it to be. That's Number 1.

And Number 2, the reason I think it's important to hash out before the argument is in your brief that you submitted to me, you want to take the position that the July letter or whatever the Skadden Arps letter is is a petition and therefore can't be considered as protected conduct.

That's incorrect, and you cannot make at that argument. You cannot make at that argument. It is -- the Court finds as a matter of law this is not protected conduct, and it can be commented on by plaintiffs. And therefore, you can't make the argument that constitutionally, that letter can't be considered in connection with this lawsuit.

So I want that clear before we start the argument so you

don't have to get up and object. Don't worry; you've made your objection. They can argue it, and I've ruled on it. And you're not waiving your objection if they make the very argument if -- that you think it's improper because it's constitutionally protected.

**MR. BROOME:** To be clear, Your Honor, that was one of the statements that the Court dismissed, so that would be relevant solely with respect to their purported scheme claim.

**THE COURT:** Yeah. What?

**MS. JUNG:** Which we would -- yes, of course.

**MR. BROOME:** Okay. Well, we've made --

**THE COURT:** I know you disagree. That's fine.

Listen, I -- it's not personal. I actually don't take it personally. You may think I do, but I don't. I don't. I just see it differently. And that's fine. And you're perfectly -- it's perfectly fine that you argue it.

But argue it on the merits and you don't -- you know, that's -- and you have. And that's fine, and I appreciate it.

Okay. What's next?

**MS. JUNG:** Plaintiffs do have one objection to the protected litigation conduct, which is to inform the jury of the sham exception to *Noerr-Pennington*.

**THE COURT:** I don't think you've argued the sham.

**MR. BROOME:** They haven't pled it, I think, is the most important part.

**THE COURT:** That's what was of concern to me. You haven't pled it, and I don't think you should argue it.

**MR. MOLUMPHY:** Done.

**THE COURT:** Okay. That takes care of that.

Now, Mr. Bernstein, are we going to be treated by your cameo appearance today? This is now your second appearance.

**MS. JUNG:** And similarly, I'm going to turn it over to my colleague Frank Bottini for damages.

**THE COURT:** Okay. Here we go.

**MR. BERNSTEIN:** Your Honor, we have a few objections to the causation instruction.

**THE COURT:** Let me take a look at it.

Oh, so I don't forget, we should talk about the form of verdict too. Have you -- you've received it; right?

**MR. BERNSTEIN:** Yes, Your Honor.

**THE COURT:** Okay.

**MR. BERNSTEIN:** So a few issues. The biggest is probably the lack of any instruction to the jury that plaintiffs bear the burden to isolate the impact from the alleged misstatements from any other economic factors that may have impacted Twitter's stock price. That's a requirement under *Dura*, under *Nuveen*, under every loss causation case. That is plaintiff's burden. It was including -- it included as an instruction in the *In re: Tesla, Inc. Securities Litigation* under loss causation, and so we would submit that there should

be some language telling the jury that it's plaintiffs' burden to reasonably distinguish any security -- to separate any stock price reaction to the alleged materially false information from the market's reaction to other information affecting Twitter's securities prices.

**MR. BOTTINI:** And, Your Honor --

**THE COURT:** Mm-hmm.

**MR. BOTTINI:** -- plaintiffs do not believe that's necessary. The second paragraph says that. The first sentence says [as read]:

"To establish economic injury or loss, the plaintiffs must prove that the alleged fraudulent acts or a misrepresentation artificially deflated the price of Twitter securities."

So it already says it's the plaintiffs' burden to prove that the false statement, as opposed to something else, caused the loss.

I mean, there's a lot of things -- there's a lot of things that are arguments that could be included in the jury instruction. The Court is not required to include everything that may be discussed in the case.

**THE COURT:** I think they have a point. I mean, listen: A lot can be said about damage calculations. And I've said a lot about damage calculations, in particular in the criminal context.

But the question is: Is it important -- and I think it is -- to say that it is the burden of the plaintiff to have -- and I -- it's the burden of the plaintiff to -- to convince the jury, according to a preponderance of the evidence, that whatever figure they're asking for has properly taken into account or been discounted by any factor such as the general condition of the market and other influences in arriving at their verdict.

I am going to put a sentence like that in because I think that's fair. I think the -- I think it's important. And it's not like something you haven't addressed. You did address it. I mean, there's a discount, as I understand it. There's -- there's evidence in the record, but whether that's -- whether the evidence would convince the jury or not, that's your job. And that's -- but that's there. So I think I'm going to put some sentence in, and I'll give you that later on.

**MR. BOTTINI:** Very well, Your Honor.

**MR. BERNSTEIN:** Your Honor, sticking on causation for a moment, we also believe that the causation instruction should make clear that it's not just whether the stock price declined in response to the alleged false statement, but that it -- it was lower than it would have been had the statement reflected the truth, not just if the -- Mr. Musk had remained silent.

That comes from the *Vivendi* case in the Second Circuit, Your Honor.

**THE COURT:** Do you have a proposed instruction that deals with this?

**MR. BERNSTEIN:** Yes, Your Honor. It's in Docket 514.

**THE COURT:** And let me take a look at -- 514 what?

**MR. BERNSTEIN:** At page 23, if we're using the docket pages numbers and not the page number on the bottom of the --

**THE COURT:** That's okay.

**MR. BERNSTEIN:** It's lines 11 through 13.

**THE COURT:** I'll look at that issue as well.

**MR. BOTTINI:** And, Your Honor, a brief response, if I may?

**THE COURT:** Yeah.

**MR. BOTTINI:** So they're trying to introduce the idea of a corrective disclosure, which is contrary to the theory of our case. And the law is very clear on loss causation. The Ninth Circuit, as opposed to the Second Circuit case that they cited, that loss causation can be proven through direct evidence, and that's what our expert did.

So they repeatedly do this. They did it in a motion in limine which was denied. They try to say the only way that you can show loss causation is through a corrective disclosure, and that's just not true.

So we don't think that this instruction should be given. It's contrary to the theory of our case. And I think this instruction is fine the way it is, Your Honor. This is a

typical instruction that's given here at the Ninth Circuit.

**MR. BERNSTEIN:** Your Honor, may I respond to that last point?

**THE COURT:** Of course.

**MR. BERNSTEIN:** Thank you, Your Honor.

We are not alleging or not claiming there needs to be a corrective disclosure. I mean, we had made that argument. We reserved those arguments.

But this instruction doesn't say there needs to be a corrective disclosure. But what they do need to prove is if the truth had been disclosed, what would have happened. So they don't need to point to here's the date, here's the corrective disclosure, here's what the stock did, but they still do need to show that the stock is lower than it otherwise would have been had the truth been revealed. And --

**THE COURT:** I don't know how you do that. I'm trying to figure out why isn't that a lot of guesswork too.

**MR. BERNSTEIN:** Your Honor, I --

**THE COURT:** There are a lot of problems with damages, but I don't know that the answer to it is let's have another -- let's have another calculation in there that will be impossible to verify one way or the other. Because after all, you're proving -- you're proving -- you're asking them to prove an unknowable.

**MR. BERNSTEIN:** Your Honor --

**THE COURT:** No.

**MR. BERNSTEIN:** -- plaintiffs chose the theory that they were going to pursue. As Mr. Bottini said, they're not pursuing a corrective disclosure theory. Perhaps they could have. That's what they did in their complaint, and they then shifted. That was a choice they made. It's a fine choice to make. We don't think it's consistent with the law, but it's the choice they made. And that might bring upon themselves different levels of proof that might be more difficult.

But it's not dissimilar to the case they relied on, I think repeatedly, in their opposition to our *Daubert* of Dr. Tabak, which is the *Altimeo* case. And the *Altimeo* case, the Court said at the pleading stage -- it allowed the case to go forward based on the idea that the plaintiffs were saying that had the truth been known to the market, the price would have been higher.

And they said that will be tested in discovery. They're going to have to show that if the truth had been known, the price would have been higher. That's what they need to show: If the truth had been known, it would have been higher. And it's lower than it otherwise would have been.

**THE COURT:** But they -- as I understand it, you start with the proposition that on October 4th, which was the drop -- there was some drop-dead date. I think it was in October.

Anyway, the transaction had to be completed by a certain

date. The reasonable expectation would be that on that date, the stock would be $54.20. I mean, reasonably, within certain bounds. That is to say that if somebody bought the stock on -- if the drop-dead date was October 5th, then on October 4th, somebody buys stock at whatever price it was going for would have an expectation that the next day it would be $54.20 because of the agreement.

Let's assume there was no hitch in the agreement, no discount because he said: I'm not going to follow the agreement. I'm not going to do it.

So there we know. We know what it would be. And I think it's plaintiffs' theory, as I understand it, that this stock -- this stock didn't approach that number, or if it did, it did in such a tepid manner that it was substantially below $54.20.

You say that's -- that's the evidence that -- it's sort of based on common sense. That is, if I'm going to give you $54 tomorrow, you're going to give me up to $51 today in order to get the $54 tomorrow, something like that, $52.40, whatever it is.

I thought that's basically their theory. Now, maybe I didn't understand that. Maybe there's something wrong with that.

But didn't they -- have they, whether successfully or not, shown that there is a -- such a difference between the $54.20 -- or was it 52.40? I get them all mixed up.

**MR. BERNSTEIN:** It's $54.20, Your Honor.

**THE COURT:** 5440 or fight.

**MR. BERNSTEIN:** $54.20.

**THE COURT:** Okay. $54.20.

Okay. So there's such a disparity between that amount and what the stock was selling for during this period of time that that demonstrates the loss. That's as I understand it.

That is, that's what the -- the stock would have been higher. Would have been higher. That's what they're saying. Would have been higher.

And is it your point they have to show how much it would have been higher?

**MR. BERNSTEIN:** Your Honor, for loss causation, they have to actually prove that it would have been higher had the truth been disclosed. And their truth is not October 4th we're closing. That's not what he could have said on May 13th. On May 13th, they claim that Mr. Musk's truth was "I want to renegotiate the deal."

**THE COURT:** Or terminate it.

**MR. BERNSTEIN:** Or terminate it. Right. If Mr. Musk says, "I want to terminate." So --

**THE COURT:** What I'm not going to do is buy it. He said there are two things -- well, I could buy at a lower price. But he's saying, "I'm not going to buy it at 54.20."

**MR. BERNSTEIN:** Fair enough, Your Honor. He could

have said a whole host of things.

The question is: If he tells the truth, what they claim the truth, what they wish he had said, what would the stock have done. They can't just say: Well, $54.20 on October 4th.

It didn't even trade at $54.20 on October 4th, and it wasn't trading --

**THE COURT:** So they can't say what I'm saying.

**MR. BERNSTEIN:** I don't believe they can, Your Honor.

**THE COURT:** Okay.

**MR. BERNSTEIN:** But in any case, the -- I would say the arguments that you're articulating for the -- that the plaintiffs could possibly present to the jury is different from what they need to prove and what the jury instructions should reflect. If they want to argue that the -- what Mr. Musk should have said on May 13th is "I'm closing on October 3rd and here's the price I'm going to do it," maybe that's what they'll tell the jury; and maybe that could be sufficient to meet the standards that should be reflected in the jury instructions, but it doesn't change what the jury instructions should reflect.

**MR. BOTTINI:** So, Your Honor, this is -- the instruction the way it is is fine. And the purpose of the causation instruction is not to get into a bunch of complicated stuff about how the expert computed damages. You don't see that in any causation instruction.

Now, our expert did compute the price that the stock would have traded for but for Mr. Musk's fraud, and that's your typical formulation of the out-of-pocket measure of damages, which is what's used in every 10b-5 securities case.

We have an issue with the way they're trying to formulate it, and Mr. Bernstein repeatedly says "the true state of affairs." We're going to see that in a second in the damages instruction, but that's not what the law is. The law says you have to -- that the out-of-pocket measure of damages is the difference between the price that the stock traded for and the stock -- and the price that the stock would have traded for but for the fraud.

And it's interesting when you look it. It's exactly the formulation that Judge Chen used in the *Tesla* case, and they've submitted that to Your Honor as Exhibit 1 to their proposed modifications to the jury instructions.

And that's the tweak we want in the damages instruction, which we'll get to next. But that's the normal standard in the Ninth Circuit for a but-for causation. It's not complicated.

And that's what our expert did. He said if Mr. Musk had never made the false statements, what would the price have been, and that's what he calculated.

**MR. BERNSTEIN:** Your Honor, it sounds like Mr. Bottini is moving to the damages instruction, and I'm happy to move to that and I'm happy to address any -- it sounds like we've moved

off of causation, and we've submitted what our proposed instruction is.

It -- as to damages, they can't simply say if Mr. Musk had said nothing. That's not what "but for the alleged fraud" means. "But for the alleged fraud" means you take out the fraud part, the alleged fraud part, and just put in the truth. Otherwise, you're just punishing someone for speaking. It needs to be "What would happened if he had spoke fully and truthfully."

Now, perhaps their expert, for whatever reason, didn't test that, didn't look at that, and whatever happens with the jury happens with the jury on that point, but it doesn't change what the jury instructions should be.

In fact, the case they put forward, the Ninth Circuit case, is *Ambassador Hotel*. And all that case says is that the out-of-pocket method measures the difference between the value of what the plaintiff gave up and the value of what the plaintiff received, meaning what they got versus what they would have gotten if everything was known, if all the truth is known -- not if they don't want the actual truth to be out there. They challenge Mr. Musk's statement. They say on hold isn't true. It should have said some other words. The jury needs to decide would the other words have made any difference.

And the difference is what they're entitled to. If there's a ten-cent difference, if Mr. Musk had said -- instead

of "on hold," "I'm not voluntarily closing," and if that wouldn't have made the stock go down as much for some reason, perhaps they're entitled to some delta between what it did with the allegedly false statement versus the true statement.

**MR. BOTTINI:** So, again, the only -- the only slight modification that plaintiffs are requesting to the damages instruction is in the second paragraph, Your Honor, and, again, that's the formulation of the but-for out-of-pocket measure.

And right now, on lines 10 and 11, the instruction says -- again, I guess starting with 9 [as read]:

"Actual damages are measured by the difference between the price at which the stock sold and the price at which the stock would have sold had the statement or fraudulent acts reflected the true state of affairs."

The sentence is perfect. We just have the last few words, instead of saying "reflected the true state of affairs," we think it should just say "but for the statement or fraudulent acts."

**MR. BERNSTEIN:** And that's precisely trying to compare --

**MR. BOTTINI:** Can I finish?

**MR. BERNSTEIN:** I thought you were finished, Mr. Bottini. I apologize.

**MR. BOTTINI:** And, again, that's what I referenced

Judge Chen used that formulation in the *Tesla* jury instruction that they themselves submitted as Exhibit 1 to their modifications. It's a very simple formulation of the but-for out-of-pocket measure.

Again, the "true state of affairs," that was their language that they suggested to Your Honor, and we just -- you know, I -- you could use it, I guess, but we just think it's more accurate the way that we said.

There -- again, they're repeatedly coming back to use this phrase "the true state of affairs," which is their argument --

**THE COURT:** You said it should be "but for" --

**MR. BOTTINI:** "But for the statement or fraudulent acts."

So, in other words, on line 10, right after the phrase "would have sold," cross out the word "had" and you write in "but for the statements or fraudulent acts," and then you put a period and delete "reflected the true state of affairs."

**MR. BERNSTEIN:** Your Honor, respectfully, that would not accurately reflect the law. That would make it sound like what the jury is comparing is if Mr. Musk had stayed silent versus if Mr. Musk spoke, and the *Vivendi* case says the proper question for purposes of our inquiry into price impact is not what might have happened had a company remained silent, but what would have happened if it had spoken truthfully.

As to the Tesla instructions, there was no argument from

the plaintiffs in that case that Mr. Musk simply should have said nothing, so it was not an issue that needed to be clarified. Here, it appears it does need to be clarified because the plaintiffs are trying to make this argument that the correct calculation of damages is the difference between what happened with Mr. Musk's tweet and what happens with no tweet, no statement.

That's not the correct measure of damages. Their own case that they rely on, *Ambassador Hotel*, says it's the difference betweens what they gave up and the true value. That's the question. And the true value is not with silence; it's with a true statement.

**THE COURT:** Well, that's an interesting question.

**MR. BOTTINI:** I can respond to that, Your Honor, if I may.

**THE COURT:** Go right ahead.

**MR. BOTTINI:** So what they're talking about is, again, under a corrective disclosure theory of loss causation; right? Because -- and that's indirect evidence. That's saying at the end of the class period when there's a corrective disclosure, what happens to the price.

Then under that kind of an approach to loss causation, which is one of many you can use, you then have to go back and look at the false statement and compare the two and try to infer what the price would have been had the truth been made.

So, again, what he's talking about is under corrective disclosure theory. What we've used is direct evidence, which we think is way better, and you look on the actual day the false statement is made, as opposed to six months later, what was the effect? What was the price effect?

And so we show direct and statistically significant price effect of the false statement. And our expert factors out any market or industry factors, so what you're left with is just the price effect of the false statement.

And that's a perfectly acceptable way to show loss causation and damages. And we've cited many cases to Your Honor as part of the briefing in this case. I won't go through it all, but that's been briefed, and Your Honor went our way on summary judgment.

They made the same exact arguments on summary judgment, and they said, "Oh, corrective disclosure is the only way you can prove loss causation and damages," and it's just not true.

And so that's the difference, and if you -- so, again, if you were doing a corrective disclosure method, you would want to look at those type of things about what the truth --

**THE COURT:** See, I have a hard time -- the corrective disclosure --

Let me ask you this: Mr. Musk announces, as he has to by law, that he is acquiring Twitter. Okay. So the acquisition of -- I think he has to. I mean, I think there are filings and

so forth, but I think he has to.

**MR. BERNSTEIN:** I'm willing to work with that.

**THE COURT:** Okay. You're willing to work with that.

Now, he has a couple of options.

Number 1, say nothing, and then come October 4th, not buy Twitter; or come October 4th, buy Twitter but say nothing, nothing of his intentions.

So the market thinks that he's going to buy Twitter. Then he doesn't buy Twitter, as an example. And he's not put any disclosures and so forth, nothing publicly.

Is there -- is there a case against him in terms of a securities case?

He left the impression he was going to buy Twitter; then he didn't buy Twitter. Is that -- was that a false statement when he said, "I'm going to buy Twitter" and didn't post a corrective disclosure, which would be "I'm not buying Twitter."

**MR. BERNSTEIN:** Your Honor, I promise you if what happened in this case was that Mr. Musk said nothing on May 13th and then terminated on July 8th, we'd be in this very courtroom on a different case for all the people who bought before May 13th and July 8th that said, "Why, Mr. Musk, did you not warn me that there were issues going on?"

**THE COURT:** Okay. So -- so in that case -- right. In that case, he would be -- it would be necessary for him to have filed a corrective disclosure.

**MR. BERNSTEIN:** It's -- Your Honor, this is not about corrective --

**THE COURT:** No, I'm just trying to figure out -- I'm trying to figure out whether --

**MR. BERNSTEIN:** I think someone would say if Mr. Musk put out any tweets out there that suggested things were going according to plan, someone would say that was misleading because, in fact, there was back-and-forth and things were not going according to plan and you were in fights with Twitter. We'd be here, maybe with the same lawyers, arguing a completely different theory that Mr. Musk inflated the price by not telling the whole market there are actually some issues here that need to be worked out before we close.

**THE COURT:** I think that's probably right.

I'm just trying to figure out why is it that they had to -- why is it that they had to -- for Mr. Musk to have put a corrective disclosure. I mean, that's the question. They're saying: No, we're not basing it on a corrective disclosure; we're basing it on another theory, the out-of-pocket theory.

**MR. BERNSTEIN:** Right. We don't -- the corrective disclosure theory would still be measuring out-of-pocket damages. Out-of-pocket damages -- again, this comes from their own case that they put into their objections to their instructions. The *Ambassador Hotel* case. It's the difference between what you gave up and the true value. The true value is

the value of the stock reflecting the truth.

And the truth here is not Mr. Musk being silent. It's, they claim, Mr. Musk wanting to renegotiate, Mr. Musk not wanting to go out of the deal -- or not wanting to go through with the deal.

And so the question for the jury as far as calculating damages: What's the difference between what he said and the truth, not what he said and nothing.

What he said and nothing is just not the right inquiry.

**THE COURT:** Okay. I'm going to think about that.

**MR. BERNSTEIN:** And I think Your Honor's proposed instruction in damages accurately reflects what the law is, the difference between what -- what he said and what the stock would have done had it reflected the true state of affairs, the truth.

One way to show that could be a corrective disclosure, but it's not the only way to show that. There are other ways to show what it would have done had it reflected the truth. That's what they need to show the jury.

**MR. BOTTINI:** Well, the true state of affairs, I assume, is if he hadn't lied. If he hadn't issued a false statement saying the deal's on hold.

And what our expert did is measure the direct statistically significant price impact of the false statement he actually made on that day, and that's -- that's a perfectly

acceptable way of proving loss causation and damages, and we think there should be a slight modification of this instruction, but otherwise it's -- it's --

**THE COURT:** Okay. I'll take a look.

**MR. BERNSTEIN:** One last point. I believe Mr. Bottini did say at one point that he agreed ours was fine but thinks theirs is better. We disagree that theirs is fine. Ours is definitely fine and ours is better, Your Honor.

**THE COURT:** And your point is yours is good enough.

**MR. BERNSTEIN:** No. I think ours is -- correctly addresses the law, and I think theirs will confuse the jury into thinking the comparison is silence versus tweet, and that's not the right inquiry. And they haven't cited a single case that says that's the right inquiry. It's not. Then you're just punishing someone for speaking. They have the right to speak, but they have to speak truthfully, and the question is what would have happened if they had spoken truthfully, as plaintiffs allege.

**THE COURT:** Okay. I understand the argument. At least I hope I understand the argument. Thank you.

**MR. BOTTINI:** Thank you, Your Honor.

**MR. BERNSTEIN:** Thank you, Your Honor.

**THE COURT:** Okay. Anything else on the instructions?

**MR. BERNSTEIN:** That's what I need to check with my team. I don't believe so.

**THE COURT:** Go ahead.

(Pause in proceedings.)

**MR. BERNSTEIN:** Nothing else on instructions.

**THE COURT:** Let's make sure I've covered your motion about argument, because I agree. I don't want -- I don't want objections during argument if they can be avoided. Sometimes they can't be avoided. Sometimes unanticipated arguments are made, but by and large... Well, looking at page 2 of the brief --

**MR. BROOME:** I'm sorry. Are you on our brief or the plaintiffs' brief?

**THE COURT:** Your brief.

**MR. BROOME:** Sorry. I just got glasses and I'm learning how to use them here.

**THE COURT:** Yeah. Page 2, line 6. I think you have three issues that you're raising. You amplify them in the body of your brief, but you identify them by, in a sense, a category.

The first one: Mr. Musk -- you want to preclude the plaintiffs from arguing that Mr. Musk closed the merger because he did not have a meritorious defense against Twitter.

I think that's correct. I think by stipulation they've agreed not to argue that, and so I assume they're not going to.

**MR. BROOME:** You assume they're not going to?

**THE COURT:** Yeah.

**MR. BROOME:** I think what the -- where we take issue, Your Honor, is in -- if we're looking at their brief, which is Docket 518.

**THE COURT:** I don't have their brief. 518?

**MR. MOLUMPHY:** I have an extra copy for Your Honor.

**THE COURT:** Do you? Great.

**THE COURTROOM DEPUTY:** Thank you.

**THE COURT:** All right. Thank you.

**THE COURTROOM DEPUTY:** You're welcome.

**THE COURT:** Okay. What do you want me to look at?

**MR. BROOME:** If you look at page 1, lines 6 to 10, Your Honor.

**THE COURT:** Well, he testified. He said, "I didn't" -- [as read]:

> "I didn't go ahead with the deal because I didn't have a meritorious defense."

He said [as read]:

> "I went ahead with the deal because the judge was biased against me."

And how -- and the basis for it was an opinion that the judge -- I think we've separated out the lawyers' advice, because I think it was his lawyers told him and he agreed. I forget exactly what his words were, but he did form an independent basis, independent of the legal advice that he got for believing that the judge was biased. And his independent

basis was that the judge ruled against him in the bonus case, I thought, whether he was entitled to a bonus for Tesla stock or something like that.

Now, I think it's fair that they can comment on that.

**MR. BROOME:** Well, first of all, your Honor, I think that testimony was --

**THE COURT:** What did he say? If you have that.

**MR. BROOME:** Yeah. It's at 835, lines 14 to 23.

**THE COURT:** Okay.

**MR. BROOME:** Or 25.

He says [as read]:

"Because I was informed by my legal team that we were unlikely to win the case in Delaware because the judge was extremely biased against me. This was, in fact, the same judge that struck my Tesla option grant that was subsequently overturned by the Delaware Supreme Court, so it's accurate to say that she -- that the judge was not favorably inclined to me."

So first issue, Your Honor, is that Your Honor struck that testimony, so they can't -- they cannot rely on it.

Second issue --

**THE COURT:** I thought there was earlier testimony. Am I wrong? I did strike that; you're absolutely right. But I thought that there was something that was said earlier. Do I

not have it right?

**MR. BROOME:** Not that I'm aware of. But, Your Honor --

**THE COURT:** I think, since we're having this discussion, I've got to take a look at Mr. Musk's testimony just because I -- I went back and looked at it and I thought he said it independent of legal advice.

**MR. COTCHETT:** He did.

**MR. ARNZEN:** I think you're right, Your Honor --

**THE COURT:** Well, let's not guess. This has been -- let's just get his transcript and take a look at it, and you can reference that page and then go back.

I thought it was -- I thought it was back, but it may have been forward.

**MR. BROOME:** And while they're looking for that, Your Honor, the other issue is that the way plaintiffs have formulated this, that his reasons were patently absurd because he says the judge was biased against him because of the judge's later decisions in the case.

He didn't say the judge was biased against him because of the later decision. He said that was -- supported his view -- the judge's later decision supported the advice and the view that he had at the time.

**THE COURT:** I think that's a reasonable reference.

But what did he say? Because all of this can go out if,

in fact, I took it all out, so I don't have to go there.

And I don't know why I think what I think, but I think what I think for a reason.

Anybody find anything? Maybe I have to be handed the transcript, because --

**MR. ARNZEN:** My computer is working hard at the transcript, Your Honor.

**THE COURT:** Maybe it came out of his deposition. I don't know.

(Pause in proceedings.)

**MR. ARNZEN:** Your Honor, I think here's how it breaks down. And it's evident on page 836 of the transcript. It's Mr. Musk's testimony from the stand.

I asked him whether or not his belief was based solely on the rulings by the Delaware court. He said no, and then I played in some deposition testimony that Mr. Molumphy elicited.

**THE COURT:** And what was that? Will you read that. Just read it so I can --

**MR. ARNZEN:** Yeah, it's not reflected in the transcript because I played it, so I can go get the --

**THE COURT:** Get the transcript.

**MR. ARNZEN:** I'm trying.

**THE COURT:** This is what happens.

(Pause in proceedings.)

**MR. BROOME:** I can read it, Your Honor. I have it.

**THE COURT:** Go ahead.

**MR. BROOME:** I believe this is at 328, lines 1 to 18 or 19.

**THE COURT:** Go ahead.

**MR. BROOME:** [as read]:

"**QUESTION:** Do you remember telling the BBC that you did not go forward because you didn't believe you'd get a fair trial with the judge?

"**ANSWER:** It's possible I said that.

"**QUESTION:** Okay.

"**ANSWER:** An accurate assessment.

"**QUESTION:** Have you told that to anyone else?

"**ANSWER:** Probably. It's obviously true.

"**QUESTION:** That the judge is biased against you?

"**ANSWER:** Obviously.

"**QUESTION:** Why would she be biased against you?

"**ANSWER:** I don't know. You should ask her."

**THE COURT:** Well, okay. The evidence in the record -- that's what I was thinking about. There's evidence in the record that he said -- and I didn't strike that; right?

**MR. BROOME:** No.

**THE COURT:** No -- is that he believed that the judge was biased against him.

**MR. BROOME:** That's fine. We don't take issue with that. They can refer to that.

What they cannot refer to, Your Honor, is that -- what they -- what they've said here in the second sentence at lines 9 to 10 -- line 9 and 10 of page 1.

They say that they want to argue [as read]:

"... that he capitulated for reasons that are patently absurd, i.e., that the Delaware Court of Chancery was biased against him because of the judge's later decision in another case."

That, I think --

**THE COURT:** You're right. They have to say --

**MR. ARNZEN:** That's fine.

**THE COURT:** That's fine. You've got that; right? Okay. They can't say that because temporally it's different.

**MR. ARNZEN:** Understood, and we will not, Your Honor. Thank you.

**THE COURT:** Okay. That's Number 1, which I thought would be easy. Okay.

So we go to Number 2: His statements and beliefs regarding the number of spam accounts on Twitter's platform based on the analysis performed by data scientists he retained during the merger are unsupported or baseless.

Okay. Now, as to that, my understanding is while you're absolutely correct that the damage study, or whatever you want to call it, the Twitter study, the one that was -- that the services were retained by Mr. Musk in order to ascertain the

spam accounts, which was told to him in a conversation he had with the witness -- I don't know whether it was the witness or whether it was -- was he here --

**MR. BROOME:** There was a video designation.

**THE COURT:** -- was admissible, that -- pardon me -- inadmissible -- the documents and -- and the findings of -- that are contained in those documents were inadmissible, but the fact that they were told to the witness, to the defendant, was admissible because it goes to his state of mind. Okay.

So that was -- that was my understanding of the Court's ruling.

What I understand the defendants -- the plaintiffs to be saying in this case is that these studies, whatever they are, or these opinions, whatever they are, or the testimony affecting Mr. Musk's state of mind, whatever it was, was based upon an apples-and-oranges investigation; that is that -- and this may not -- this may not be totally correct, okay, because there's another part of it, but that they weren't looking at the same basic -- they weren't trying to compare -- or maybe they were trying to compare, but they didn't -- they didn't engage in a comparison of the same set of figures in the denominator that they would have had to in order to come to conclusion that the 5 percent was erroneous.

**MR. BROOME:** Only because Twitter would not produce the date to allow them to do that.

**THE COURT:** Okay. Whether they would produce it or not, what their argument is that -- what their argument is that your evidence of the fact that these figures were wrong is -- is a comparison of apples and oranges. They did a different sort of inquiry.

Now, you can -- they can argue -- both sides can argue. They can argue that that's what -- that they tried to explain to Musk that it was different, different, different from what he was trying to do and that --

For example, his tweet. He sends out a tweet and he says, "Hey, everybody, take a hundred cases and see whether or not you find more than 5 percent." He said, "I did it and I found 20 percent" or whatever was in that tweet.

Of course, there's no way anybody in the public could have done it because they had no access to the denominator at all, so they couldn't come up with an appropriate percentage.

Now, be that as it may, what they say is that there's no way it could have been done accurately. They can argue that. They can argue that, and you can argue while that may be true, they should have given you the information to show what it was really based on, and their failure to give that information, they're responsible, in a sense, for the calculations. There's no way they could know whether it was correct.

Their calculations -- or your calculations and, as Mr. Musk was told, had a different figure to it.

I mean, I think -- what I'm saying to you, Mr. Broome, is I think you can both argue exactly what you want to argue out of it, but -- yeah, but that's -- and that would be permitted I think that would be permitted.

And so I guess what I'm saying to you, Mr. Broome, is I don't quite understand what you want them not to say, because it seems to me that they can say that which I've just said.

**MR. BROOME:** I think the only -- the key thing that we want to prevent them from saying is that you didn't see any reports; right? That the defendant didn't show you any reports to support this -- you know, the basis in the July 8th letter that says that we had preliminary analysis. The defendant didn't show you any reports to support his belief when he got up there on the stand and said that, yeah, we got -- we got analysis from these other data scientists that showed that the bots were higher.

Since those reports were excluded, we don't think they should be permitted to make those kinds of arguments in closing.

**MR. ARNZEN:** And we believe that Your Honor has precluded that.

There are two bits of evidence that are in and admitted. One, he testified before the SEC that the number was unknowable. He didn't point to any specific. And they asked him, is there anything to or behind, underneath your numbers?

He said, "It's simply unknowable."

That's Number 1.

The second thing is that when he answered the Delaware interrogatories about the basis for his May 13th and May 17th statements, he said some things, but he did not say any analysis. He didn't say SparkToro or anything.

I think we should be able to argue that.

**THE COURT:** I think you can argue that, but you can't argue that they didn't present any reports.

**MR. ARNZEN:** Fine.

**THE COURT:** Because that's like a motion to suppress, where I suppress the evidence and then the other side says, Aha, they didn't come in with the evidence.

Okay. I agree with you, Mr. Broome.

**MR. BROOME:** The next issue, Your Honor, I think, is is with respect to the secret stock purchases. And I know we've covered this. Let me take one more run at it.

**THE COURT:** Sure.

**MR. BROOME:** First, Your Honor has bought stock, presumably, at some point in your life. I take it that you did not announce it to the world --

**THE COURT:** Yes, I have several lawsuits pending, Mr. Broome. I may retain Quinn Emanuel to represent me, depending on the outcome of this case.

Go ahead.

**MR. BROOME:** Your Honor didn't announce that to the world; right? And most people buy stock; they don't announce it.

But when you suggest that a stock purchase, a run-of-the-mill stock purchase, is secret, then you're suggesting that there was some obligation, some law, to disclose it.

And so we don't think that they should be able to argue in closing that these were secret stock purchases, because the only way it is secret, you know, is if they're --

**THE COURT:** Okay. So -- so the best -- okay. Maybe we'll use the word "nonpublic." They were not publicly disclosed.

**MR. BROOME:** Nobody discloses their stock purchases unless they are obligated to under SEC rules.

**THE COURT:** No, but maybe -- I still think it's relevant --

Look, even without the SEC. Let's take the SEC totally out of it.

**MR. BROOME:** Relevance is fine.

**THE COURT:** Totally out of it. The fact of the matter is when somebody -- there's a long history of people sort of using straw men or other entities to purchase stock just so the company doesn't know. I mean the recordkeeper of the company, the person who enters the stock, the people who handle the

stock. They don't know it's Musk that's buying. They think it's X, Y, Z corporation that's buying or someone else buying, because people use entities in order to maintain privacy.

So if you say, well, no one discloses it, of course, you and I disclose it because our holdings are such that maybe we don't have a stock entity that can buy it. Maybe we just are these people who buy stock in our name.

Okay. That's a different situation. I think it can be, with a careful choice of words, not indicating in any way that it's required. I think it is an essential part of their case to be able to say that no one knew -- this is all they're saying: No one knew that Elon Musk was buying all of this stock. Full stop. Full stop. And that's just true.

Now, does it carry the -- and you argue it does, but I don't think it does. Does it carry the assumption that there was a requirement that people knew? You say yes, and obviously why mention it if it didn't? And I just disagree with that. I think they can say it in a way that doesn't implicate SEC regulations.

**MR. ARNZEN:** Can we also add, Your Honor, that Elon Musk did not want it known?

**THE COURT:** Well, that's your interpretation of the evidence.

**MR. ARNZEN:** Yeah. Okay. Good.

**THE COURT:** I mean that's a reasonable inference. And

it's certainly a reasonable inference because he's not shy about tweeting what he's doing, so if he wanted people to know, he'd simply say it.

But maybe he just -- maybe he had a lot of reasons not to let it be known, legitimate reasons, reasons -- by the way, not -- contrary to the view that they have. So, in other words, you can argue that. You can argue anything you want to out of that.

But it doesn't necessarily -- if you want to take a third run at it, it doesn't necessarily implicate SEC filings. That's my point.

**MR. BROOME:** So let me turn to the next point on this same issue, Your Honor, which does implicate SEC filings that we understand they want to argue that he did not file reports with the SEC about it.

And I know I'm taking a third or maybe a fourth run at this. But, again, that implies that there was an obligation to file a report, because when Your Honor bought stock, I doubt you filed an SEC disclosure. And when I buy stock, I don't file an SEC disclosure. And that's how the jury is going to think about it: When I buy stock, I don't file SEC disclosures.

**THE COURT:** That's a closer question. I would agree with that. That's a closer question. And I think its probative value is slight. I think its prejudicial effect can

be great. So don't argue he didn't -- even though it's the truth and even though he testified, don't argue -- I mean, I assume he testified that he didn't file SEC.

Don't argue that because they believe -- and they have a point. They believe that it would be prejudicial.

Okay. What's next? Your fifth run worked.

**MR. BROOME:** I think we've covered the scheme liability and *Noerr-Pennington*, Your Honor, unless my team tells me there's something I need to argue about that.

Same with the breach of the merger agreement.

That would then bring us to the supposedly missing text messages.

**THE COURT:** Oh. Well -- it's too late to argue spoliation. Okay. That's -- that, I think, is acceptable. And I have no idea whether there was spoliation or not. We haven't had all the -- all of the things you have to do in order to find spoliation.

However, I think it's fair for the plaintiffs to say: Here is a man who tweets constantly, and from this date to that date, there were no tweets.

**MR. BROOME:** No. Incorrect, Your Honor. We're talking about --

**THE COURT:** Okay. Well, tell me why.

**MR. BROOME:** We're talking about text messages, not tweets.

**THE COURT:** Okay. There was not a single text message.

**MR. BROOME:** Yeah. But the problem here, Your Honor, is that they did not put any evidence that the texts are missing and that what they want to do is get up there and --

**THE COURT:** Maybe they're not missing.

**MR. BROOME:** Right.

**THE COURT:** Well, I agree --

**MR. BROOME:** So they shouldn't be able to characterize it as missing.

**THE COURT:** Pardon me?

Okay. No, they're going to say they're missing from evidence. That's what they're saying. They're not saying they were destroyed; they are saying they haven't produced them.

Now, they haven't produced them. There could be two reasons why, maybe more. One, they're privileged. Two, they are -- they're nonexistent. Or three, they were destroyed.

And you can get up and give all the arguments on the other side of why they weren't produced.

But it's common in cases for parties to talk about missing evidence. That's common. It's like an element not being -- there's no evidence of the element.

But here it's there's no evidence of certain activity where, their argument is, you would expect there would be evidence.

**MR. BROOME:** Well --

**THE COURT:** That's their argument.

**MR. BROOME:** To suggest that they are missing from evidence, Your Honor, suggests that they did request them and suggests that they existed, and neither of those things is true.

**THE COURT:** They didn't request them?

**MR. BROOME:** They did not.

**THE COURT:** Fine. Then you can get up and say they didn't request them. If they didn't.

You didn't request them?

**MR. ARNZEN:** We asked for all documents that were produced in Delaware. When Mr. Musk produced in Delaware, these text messages were missing.

**A.** They were not missing. And I think this goes to a problem with these plaintiffs not having been involved in the Delaware litigation, but that's not true. The text messages just simply do not exist, and this was litigated in Delaware and the Court did not find that they were missing.

**MR. ARNZEN:** The Court --

**THE COURT:** Oh, I see. In other words, what's odd about this situation is that the plaintiffs agreed to limit their discovery to that which was produced in Delaware.

**MR. BROOME:** There's nothing missing.

**THE COURT:** And they didn't make an independent

request.

**MR. BROOME:** They could have, though.

**MR. ARNZEN:** Well, we --

**THE COURT:** Well, I don't know whether they could or not. You know, I stay out of -- I try to -- try not to have a trial based upon what happened in discovery.

But let me think about that. So they're saying that it wasn't produced is, of course, relevant. It would be relevant -- it would be relevant to the issue of -- the production of the documents that they weren't requested.

In other words, if the documents aren't requested, can you -- can you -- can you argue that they're missing when you have a right to request them? Seems to me you can't.

Now, of course -- so they could say -- I think they could say no argument -- no message texts were presented to you.

Now, you could say they weren't requested. But then, of course, they could say, don't you think if the messaging occurred between this period of time, would it have been helpful to the defense, you wouldn't have seen it?

So it's the absence of documentation. And there's no Fifth Amendment privileges here. It's the absence of documentation that is significant. And -- and what he is saying is you can get into a big discussion in front of the jury --

Maybe you can't, because I don't want to go into discovery

matters.

I think they can say -- and you can tell me why they can't. I think they can say there's no evidence in the record as to any texts that would have occurred between this date and that date.

And could they also say: Don't you think if any of these messages would have been favorable to the defense, you would have seen them?

**MR. BROOME:** No. I think that would be very prejudicial, Your Honor, because --

**THE COURT:** Why? Tell me why.

**MR. BROOME:** Because what happened in Delaware, as I understand it -- and I'm learning this from my team.

But what happened there is that Mr. Musk was away for a period in Europe, and so he did have text messages. It's not like he -- it's not like he just stops texting. He just wasn't texting very much, and there were no texts about Twitter, and therefore there were no responsive texts.

**THE COURT:** No, Mr. Broome, I'm asking a slightly different question. I said, "Don't you think you would have seen them?"

You're saying, but they weren't --

**MR. BROOME:** Existence.

**THE COURT:** No. They weren't in the Delaware litigation. Isn't that what you just said?

**MR. BROOME:** They weren't in the Delaware litigation because --

**THE COURT:** Yes, but you don't represent -- you're not here as the lawyers for the Delaware litigation. You're here as the lawyers for Mr. Musk.

And arguably, you would have -- you would have access -- if there were such statements, you would have had access to this information, whether or not it was produced in the Delaware litigation.

So what they're saying is you represent Mr. Musk, Mr. Musk had a message that would be -- a text message would be helpful, you would have seen it. Isn't that what they're saying?

**MR. BROOME:** I don't think that's remotely fair, Your Honor.

**THE COURT:** Pardon?

**MR. BROOME:** I don't think that's fair.

**THE COURT:** Why not?

**MR. BROOME:** It's very prejudicial, because if he wasn't texting in that period -- wasn't texting about Twitter. Just to be clear, there were texts. There were texts during that period, just not about Twitter.

So if he has a period where he's not texting about Twitter and that's the truth and we don't -- nobody in this room knows anything otherwise, for Mr. Arnzen to get up in front of the jury and say, "Isn't that suspicious? If he had some helpful

texts in this two-week period, you, the jury, would have seen it."

But that implies that a text exists, and nobody knows that. Nobody knows that to be the case.

**THE COURT:** Let me think about it.

**MR. ARNZEN:** May I be heard just one more point, Your Honor?

When I asked Mr. Musk about this, his only response was "I have" -- no, actually, it may have been in their questioning of Mr. Musk: "I have a certain cadence, a tempo."

And apparently that tempo did not involve any text messages after sending and receiving 954 text messages until May 15th, all of a sudden they disappear for two weeks. His answer was "I have a certain tempo or cadence."

And so we ought to be able to comment on that.

**THE COURT:** Well, why can't they say -- all right. He -- he was asked the question about the fact that there were no text messages -- I guess that was the question -- between this date and that date, and his response was "I have a cadence. I have" -- and that's the response.

**MR. BROOME:** I think that would be fine.

**MR. ARNZEN:** And we can argue the reasonable inferences therefrom.

**MR. BROOME:** Well, that's where --

(Simultaneous speaking.)

**THE COURT:** Well, that's the question. I don't think you can argue --

I think Mr. Broome is correct. Because of the way the discovery was -- and I'm not being critical of the way it was. It probably saved years of litigation, which, fortunately, I would not have been party to. I have magistrate judges.

But it really is a commentary on: You did this. You asked this. Da-da-da-da-da-da.

So they arrived at a stipulation in order to facilitate all of this. There may have been all sorts of relevant information, or not, that was not produced, and it's almost a commentary on that.

So I think that that's fine. I think I would accept Mr. Broome's representation --

**MR. ARNZEN:** And --

**THE COURT:** -- and limitation.

**MR. ARNZEN:** And so, Your Honor, just to make sure, we want to be very mindful -- very mindful to be clear what we can say in closing. And we can at least remind the jury of the testimony in which Mr. Musk said that he doesn't remember sending or receiving any text messages about Twitter during that whole period, and that he's got a certain tempo to his text messages such that it apparently stopped at this time for two whole weeks.

**THE COURT:** And you can say that's not credible.

**MR. ARNZEN:** We can say that's not credible?

**THE COURT:** Yeah, of course.

**MR. ARNZEN:** Yes, sir.

**THE COURT:** And they can say it is credible. And therein lies the lawsuit.

Okay. Anything else?

**MR. BROOME:** Yes. I think then that brings us to the privacy laws and protocols. We have an instruction.

**THE COURT:** I thought I was going to go back and look at it.

**MR. BROOME:** Yes, but there are a couple of issues that come up in plaintiffs' brief.

**THE COURT:** Yeah.

**MR. BROOME:** They asked to be permitted to argue that privacy laws precluded Twitter from providing private data to Musk unless and until he demonstrated that he would protect it. And that's -- A, that's not in evidence, and B, that's not a correct statement of the law.

As I mentioned before, Your Honor, under Article 5, which is what plaintiffs are citing, Article 5 the GDPR, it very clearly states under provision 2 that it is the controller's obligation, because it's their data; right? It's the controller's obligation to make sure that appropriate protocols are implemented.

So the record in this case shows that on May 31st,

Mr. Ringler sent a letter to Twitter saying, "Yeah, whatever you want, privacy protocols" -- or, actually, it was in the context then Twitter was raising the potential for competitive harms.

So they said, "If you want protocols to address the issue of competitive harms or privacy issues, sure, we'll agree to that."

Mr. Korman, who testified in response to plaintiffs' questions that he is not a privacy expert, then responded and said, "Well, how are we going to do this?"

And then he also testified that he and Mr. Ringler had multiple conversations about the protocols and how the data was going to be treated and such.

So I don't think it's fair -- given that it is the controller's obligation under GDPR to ensure appropriate protocols are in place, it's not fair for them to come in and say, "Oh, well, Twitter had a legal obligation to withhold the data until Musk demonstrated appropriate protocols."

**THE COURT:** Well, I sort of think this is an argument over, you know, who goes first and what -- who bears the burden, which I understand you're willing to embrace, and -- and I don't think that should be the argument. I think the argument is they were unable --

If plaintiff is going to make this argument, I think it has to be restricted not to -- not say what you think they

might say. That is to say, I think your objection is well taken on that.

I think all they say is they -- they had an obligation -- they can say it was their obligation, Twitter's obligation, if it was. Maybe it wasn't. I don't know. Twitter suggested protocols and there was no response. And until there was a response to the protocols, they felt it was -- if they did, they felt it was unsafe to disseminate this information. If they did. I don't know.

I mean, they're going to argue inferences based upon conduct.

Now, I think they can say that. As long as they don't say they had a legal right to -- and nobody should talk about what the law is. I mean, you can talk about the law in securities, but you shouldn't -- nobody should say what the law was in these areas. It's -- it's collateral and -- who knows.

**MR. ARNZEN:** Yes, sir.

**THE COURT:** Okay. If this case turns on that -- I don't know what this case is.

**MR. BROOME:** I think the next issue, Your Honor -- and we are getting close to the end here.

**THE COURT:** That's okay.

**MR. BROOME:** Mr. Musk's decision to refrain -- this is as plaintiffs frame it: Mr. Musk's decision to refrain calling his deal attorneys as witnesses. And this one, we certainly

take issue with. I don't think they should be able to get up there and say they never called Mr. Ringler, they never called anyone else, and I'm happy to explain why.

**THE COURT:** Yeah, but explain it in this context. And what I found interesting in your brief was the suggestion that I prevented Mr. Ringler from testifying, because I didn't. I prevented him from testifying as to certain subjects, but I said certainly he can come in and testify. You had a lawyer, Mr. -- whoever he was. Korman?

**MR. ARNZEN:** Korman, yes, sir.

**THE COURT:** Yeah -- who said, "This is what Ringler said."

And so I said, of course he can come in and say he didn't say it or what he meant or something else. But you chose not to put him on the stand. I didn't foreclose him from testifying. I foreclosed him from testifying as to certain areas, but I did not foreclose him from testifying, period. And certainly it was the Court's expectation, and one that I got throughout the case until we got to the moment when he was to be called, that he was going to be called.

So can they comment on the fact that Mr. Ringler never came in? Of course they can. Of course they can.

**MR. BROOME:** At a minimum, Your Honor --

**THE COURT:** And -- but it should be limited to: You heard Mr. Korman saying that da-da-da-da-da-da-da. And you

know what? That was unrebutted. That was unrebutted. The one person who could have rebutted it, if it weren't true, was Mr. Ringler, and he wasn't called.

I don't know. I'm not making the arguments. They can make their own arguments. But that is a subject that I think they can comment on.

**MR. BROOME:** In that context, Your Honor, if it was limited to that, we would have no issue with that. I think that's fine, because Mr. Ringler could have come up and rebutted certain statements that Mr. Korman made to the extent we thought that was fruitful or useful for the jury.

But the issue that we have is anything beyond that would be prejudicial because he was precluded from testifying to anything that was essentially noncumulative, and that's why we chose not to bring him in.

He was precluded from explaining the basis for the termination letter. He was precluded from explaining the bases for the letters that were sent. He was precluded from discussing any -- you know, his interactions with the data scientists. And for that reason, we don't think they should be able to put him up there and say: You never saw Mr. Ringler. Mr. Ringler was running this on the Musk side. You never saw Mr. Ringler here. They didn't call him to explain -- et cetera, et cetera.

If they're just going to say Mr. Korman testified X and

you didn't hear Mr. Ringler testify Y because they didn't call him, that, I think, we take no issue with.

**MR. ARNZEN:** May I be heard, Your Honor?

**THE COURT:** Yes, of course.

**MR. ARNZEN:** I agree that our reference to this should be limited, but not so limited as to only include rebuttal to Mr. Korman. We should be able to comment on the full scope that Mr. Ringler could have testified about under Your Honor's rulings. All of the lawyers that hit the stand were kind of constrained there --

**THE COURT:** I think that's right.

**MR. ARNZEN:** I think that should be the limit of our argument.

**THE COURT:** I think they can testify to that.

**MR. BROOME:** Your Honor, I think it would be prejudicial for them to argue anything other than what would have been responsive to Mr. Korman.

**THE COURT:** Whether it's prejudicial, yes, it's prejudicial, because it's also probative. And that's the issue. The issue is whether it's unduly prejudicial, not whether it's prejudicial.

It's an argument they want to make as to the state of the evidence that was presented. They can make that argument. They can make that argument, and you -- you know, that's -- that's fair game.

**MR. BROOME:** That really is no limitation, because I think Mr. Korman testified to a lot of things that are at issue in the case, and if -- as I understand Mr. Arnzen, he's saying that if the topic was addressed by Korman, then they can address that Ringler's -- they can argue Ringler's absence.

**THE COURT:** No, independent of Korman. If there was a point where he was going to clarify something that had been received in evidence and so forth and he -- and you chose not to call him, that was your decision.

**MR. BROOME:** No, but, Your Honor, we were precluded from -- we had very, very --

**THE COURT:** Areas that were precluded, they cannot -- they cannot -- they cannot raise. I agree with that.

Okay.

**MR. BROOME:** The next issue, Your Honor, is what plaintiffs have titled sympathy, sending a message. We heard all kinds of testimony about Mr. Garrett having cancer and having adopted an Inuit child. I mean, this is blatant pandering to the jury, pulling their heartstrings. We don't think that sort of information should be coming in in argument.

**THE COURT:** Well, I mean, it's in evidence. You know, these things are two-edged swords because if a jury feels that there was a play to the sympathies of the jury, I instruct them they cannot be influenced by sympathy in this case, nor prejudice against a party and so forth. I instruct them as to

that.

So that, you know, I'm just telling you it's two-edged. You know, if somebody gets up and -- and makes that argument, they make that argument and -- but the instruction -- if they make that argument, the instruction is contrary to it.

So that -- I think the harder question, because every case has a context to it and they're real cases and real people. And, of course, they have -- because they are individuals, they have their day in court as well, the victims, alleged victims.

So the question is whether or not the "send a message" type of thing. That's -- that's really what -- in a case in which punitive damages is not sought; right? Punitive damages obviously is directed to sending a message.

So what can be said about it?

And I think it's within certain constraints about.

**MR. BROOME:** Sorry. I can't hear you, Your Honor. There's chatter.

**MR. ARNZEN:** Sorry.

**THE COURT:** I think a certain thing can be said about, quote, sending a message, which is -- which is obvious, which is a verdict in this case will, of course, receive attention of the public, and that's obvious. And that is a factor that they know exists.

However, they cannot consider and should not consider the fact that this verdict will be publicized as evidence that they

should come -- or as a factor that will -- that will play into their decision as to whether or not they should come out one way or the other.

I mean, I think it has to be -- and I expect it has to be -- the plaintiffs have to be very careful in this area, very careful, because --

You know, we can start at the beginning. In fairness to Mr. Musk, I have never seen jury questionnaires of the type that I've seen in this case.

There is no question that as a public figure, people have very strong views, and for the most part, they're negative. I mean, just no question about it. At least with this jury pool.

And so one has to be very careful that it's not the negativity that dictates the verdict. And my guess is that defendants will do a good job of explaining why an individual who is not universally liked deserves a fair trial and how important it is to the system that that person not be treated in a -- in a discriminatory or prejudicial way. I think that that has to be communicated.

So I think that the plaintiffs have a duty when they say that this verdict will -- if they do -- will receive a lot of publicity, to couple it with a statement to the effect, however, the fact that it is a public verdict and may receive some publicity cannot influence the decision that they come to. And if they don't say it, I'll say it.

So, you know, I want it to -- I want everybody to sort of fight fair and square in this and not use -- use what they have going for them or against them to dictate the verdict. I want it to be based on the evidence to the extent it can be. I mean, I hope it will be.

**MR. BROOME:** I will just note for the record, Your Honor, that we do cite case law saying that where punitive damages are not at issue, urging the jury to send a message by its verdict is generally considered an improper appeal to the jurors' passion and prejudice.

That's at page 14 of our brief.

**THE COURT:** And I agree with that. But you can't put blinders on. You can't -- you can't -- I mean, three of the jurors already said that when Mr. Musk testified, they got alerts or their screens, you know, on their telephones. I mean, to ignore it is not even ignoring the -- it's not ignoring the elephant in the room; it's ignoring the -- ignoring the just total reality.

So I think it's important to address, and I think both sides know what the limits are and -- and should --

**MR. BROOME:** I hope you're right, Your Honor.

One last point on this Your Honor. There was other testimony that they elicited from -- I believe from Mr. Musk about, you know, you moved your factories, your Tesla factories, to Texas --

**THE COURT:** Oh, yeah. I don't think there should be any reference -- I agree with you. There should be no reference that Mr. Musk has left California because it has nothing to do with this case and it is prejudicial.

So even though that came out, which is fine, it's there, I'd be surprised if most people -- maybe they don't know it; maybe they know it. There it is. But it shouldn't be referenced.

Mr. Cotchett.

**MR. COTCHETT:** I want to speak to that "send a message."

**THE COURT:** Yeah.

**MR. COTCHETT:** I don't understand at all what he's talking about.

I put a witness on the stand. The fact that her husband was in a wheelchair, they could have objected. They could have said anything at that time. You bet this will send a message, not about Mr. Musk. It will send a message about rope-a-dope and every other scam that was used. What are they talking about, "send a message"?

I've never argued a case in my 60 years where I haven't said to the jury, Ladies and gentlemen, this will send a message to Wall Street that you can't use Jiu-Jitsu, send a message, rope-a-dope, or anything.

I am dumbfounded by this argument. Send a message. I've

never tried a case where I haven't finished up by saying, "This verdict will send a message to the conduct."

We're talking about the conduct in the case.

**THE COURT:** I think what they're saying -- what I think they're saying is that you shouldn't be afraid of -- you shouldn't come to a verdict because it's going -- one way or the other because it's going to receive a lot of publicity. What they're -- what I think -- and I think that's fair. In other words, they shouldn't base their decision on -- on how it will -- how they think -- I have to think this through because I haven't thought it through, Mr. Cotchett.

**MR. COTCHETT:** What I had in mind is how it would affect future conduct, Your Honor. I'm not talking about publicity. I'm not going to say to them, if you get a verdict, this will be in the New York Times and everywhere else. That's not my point.

My point is the conduct here was outrageous, and I am going to refer to the outrageous conduct of what happened. Little people -- let me finish, Your Honor. Little people -- remember, this is a class action. We had a person come from Ontario and on the West Coast. These are little people. These are people in pension funds. These are teachers' pension funds. It will definitely send a message that you cannot screw around with these little pension funds.

To say am I going to refer to Mr. Musk? I'm not going to

refer to Mr. Musk. I'm going to refer to the conduct that was presented here, the evidence. The evidence.

**MR. BROOME:** Case in point, Your Honor.

**MR. COTCHETT:** But to send a message -- you bet I'm going to say, "Send a message."

**THE COURT:** I think what I have to do -- I'm going to have to think about this a bit more, and maybe I can fashion -- and I'll send it to you people today -- what I can say -- what I think the constraint of sending a message is. Yes, I think verdicts send messages --

**MR. COTCHETT:** Absolutely.

**THE COURT:** -- and, by the way, they're intended to. That's one reason why we have public trials.

**MR. COTCHETT:** There you go.

**THE COURT:** We have them to send messages. But you don't want the verdict to be based on the fact that it's the message to be sent. That is to say, since it's public, therefore we should say this, as distinct from we say this and it will become public. That -- it's the direction -- it's the direction. I think we're all sort of talking about the same thing.

**MR. COTCHETT:** Absolutely.

**MR. BROOME:** I don't think so. I don't think so.

**THE COURT:** Or not.

**MR. BROOME:** I don't think so.

**THE COURT:** Let me try to do what I -- what I've just said, what I've just said, because I think what I've just said isn't a bad off-the-top opinion.

So I think you can say that, Mr. Cotchett. I think you can say these practices which you view --

**MR. COTCHETT:** That's exactly --

**THE COURT:** -- as violative of the -- based upon the evidence is violative of the securities law ought to stop, and there's no better place to stop it than in this case.

**MR. COTCHETT:** There you go.

**THE COURT:** Because it -- and you say, yes, of course. People are following this case, and this practice is wrong. And you say, "If you find it is wrong, it will send a message."

But you can't do the reverse. You can't say, "Because it will send a message, therefore, find the practice is wrong."

**MR. COTCHETT:** No, I'm not going to say that.

**THE COURT:** That's the point.

**MR. COTCHETT:** I'm going to take your exact language that you just used. I am going to look at the jury and say, "Here's what the judge said."

**THE COURT:** No, no, no. I'm out of this. Okay. Or at least I'm trying to get out of it any way I can.

**MR. COTCHETT:** Thank you, Your Honor.

**THE COURT:** Okay. Mr. Broome, anything else?

**MR. BROOME:** Yes. I think the last issue is reference

to Quinn Emanuel attorneys.

**THE COURT:** Oh, yes. That's -- well, of course, I must say, Mr. Broome, I must say that you yourself, when Mr. Spiro was on the stand, pointed out that you were his partner for a number of years and that you know each other very well. I don't think it's a secret that Quinn Emanuel represented -- represented the defendant in this transaction at some level.

However, it's irrelevant, and the fact that Quinn Emanuel was the lawyer, were lawyers involved in this transaction or Mr. Musk's lawyers on other transactions and so forth -- just irrelevant. And I want to leave the lawyers out of it. I don't want any mention about lawyers' conduct, their motivations, their prior conduct and -- out, out, out. Out.

**MR. ARNZEN:** Yes, Your Honor.

**THE COURT:** Great.

**MR. BROOME:** Nothing further.

**THE COURT:** Okay. So I've got some things I have to do, obviously, and --

Oh, the verdict form. No problem with the verdict form from the plaintiffs.

**MR. COTCHETT:** None.

**THE COURT:** And the defendants have recommended a different form of verdict. I've rejected it. But if there's anything that you think I've left out of the verdict form that

must be in the verdict form, you are the person who has been thrust front and center on the verdict form?

**MR. BERGJANS:** I am, Your Honor. And we understand our objections to the verdict form have been overruled, and we're maintaining those objections.

**THE COURT:** Yes.

**MR. BERGJANS:** But otherwise, we understand that this is the verdict form that you're going to give.

**THE COURT:** Okay.

**MR. BOTTINI:** Briefly, Your Honor, on the options part, I just --

**THE COURT:** Yeah.

**MR. BOTTINI:** I just think it's a little -- the way it's phrased is a little --

So, for example, on page 10 of the verdict form.

**THE COURT:** So what do you think it should be?

**MR. BOTTINI:** So the paragraph that's numbered 5, it says [as read]:

"Determine the but-for implied volatility percentages."

When you go to the chart, that's not what it is. It's a dollar sign.

So I think it should just state instead of "but for implied volatility percentages," just say "Determine the damages proved by plaintiffs for each option contract traded

during the class period."

**THE COURT:** Okay. That's fine. That's okay. I'll do that.

**MR. BOTTINI:** Thank you, Your Honor.

**THE COURT:** Okay. Thank you very much. We --

**MR. BERGJANS:** There's one issue. Yeah, just one issue that I want to raise, and we can discuss it tomorrow.

But the exhibits that go back to the jury, to the exhibits that go back to the jury, we have some motions to strike that were pending on some of the exhibits.

And in addition, there are a number of exhibits that include large text message chains where Your Honor had indicated that only the parts of the text messages that were shown to the jury will go back to the jury, and we are -- we're happy to meet and confer with the other side to identify those --

**THE COURT:** I think you should sit down -- sit down who -- designate one of the team on each side and go through these exhibits so we don't have a problem of something going back to the jury which is in dispute. Okay?

**MR. BERGJANS:** Happy to do that.

**THE COURT:** And they'll be given a machine or computer or something to look at these exhibits.

And also, it's frequently useful -- and I don't see it with lawyers -- is when you're talking about something, you

tell them Exhibit 518 or Exhibit 42, then you see them write it down, and then if they're interested in it, they go back, especially in a -- in a document case, it's useful for them to know.

But that's a matter of argument you do it.

There you go.

**MR. BERGJANS:** Understood. And then we had these motions to strike. I'm happy to raise them now.

**THE COURT:** You better.

**MR. BERGJANS:** So we had previously raised -- I think 204 is out. You had already stricken that.

498 was the public McCrary Twitter expert report that was introduced and admitted subject to a motion to strike I believe. As part of the Court's order on all expert reports for Delaware being out, that's out, but I wanted to confirm for the record.

**MR. ARNZEN:** Greet.

**THE COURT:** That's out.

**MR. BERGJANS:** 348 was Appendix B to Professor Badawi's expert report. It's hearsay. It's a part of an expert report.

**THE COURT:** Out.

**MR. ARNZEN:** Yup.

**MR. BERGJANS:** And then there are the remaining portions of Dr. Tabak's report that were shown to the jury. We

had previously raised a motion to strike.

**THE COURT:** It's in.

**MR. BERGJANS:** Okay. And just for the record. I want to just note those are 241, 242, 243, 246, 253, 256, 276, 278, 282, 298, 341, 342, 343, which are being admitted over the objection of defendant.

**THE COURT:** All right.

**MR. BERGJANS:** Thank you, Your Honor.

**THE COURT:** Mr. Broome.

**MR. BROOME:** One last issue, Your Honor. We have been working really hard to synthesize all the evidence down into a compelling closing argument. There's a lot of it, and we are requesting an additional 15 minutes for both sides.

**THE COURT:** No.

**MR. ARNZEN:** Agreed.

**THE COURT:** If you can't make your argument in an hour and a half, an hour and 45 minutes isn't going to do the trick.

**MR. BROOME:** I had to ask.

**THE COURT:** That's okay. And I had to rule. That's fine.

**MR. COTCHETT:** Thank you, Your Honor.

**MR. ARNZEN:** Thank you, Your Honor.

**THE COURT:** Thank you.

(Proceedings adjourned at 1:28 p.m.)

---o0o---

**CERTIFICATE OF REPORTER**

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

DATE: Monday, March 16, 2026

Ruth Levine Ekhaus, RMR, RDR, FCRR, CCG, CSR No. 12219
Official Reporter, U.S. District Court

**Volume 12**

**Pages 2142 - 2296**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Charles R. Breyer, Judge

GIUSEPPE PAMPENA, individually and on behalf of all others similarly situated, et al.,

Plaintiffs,

VS.

ELON MUSK,

Defendant.

**NO. C 3:22-cv-05937-CRB**

San Francisco, California
Tuesday, March 17, 2026

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:
For Plaintiffs:

COTCHETT, PITRE & MCCARTHY LLP
840 Malcolm Road
Burlingame, California 94010
**BY: JOSEPH W. COTCHETT, ATTORNEY AT LAW**
**MARK C. MOLUMPHY, ATTORNEY AT LAW**
**TYSON C. REDENBARGER, ATTORNEY AT LAW**
**GIA JUNG, ATTORNEY AT LAW**
**CAROLINE A. YUEN, ATTORNEY AT LAW**
**ELLE D. LEWIS, ATTORNEY AT LAW**

BOTTINI & BOTTINI, INC.
7817 Ivanhoe Avenue - Suite 102
La Jolla, California 92037
**BY: FRANCIS A. BOTTINI, JR., ATTORNEY AT LAW**
**AARON P. ARNZEN, ATTORNEY AT LAW**

**(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

Reported By: Ruth Levine Ekhaus, RMR, RDR, FCRR, CCG
CSR No. 12219, Official United States Reporter

**APPEARANCES: (CONTINUED)**

For Defendant:

QUINN, EMANUEL, URQUHART
& SULLIVAN LLP
865 South Figueroa Street - 10th Floor
Los Angeles, California 90017

**BY: STEPHEN A. BROOME, ATTORNEY AT LAW**
**M. ALEXANDER BERGJANS, ATTORNEY AT LAW**
**MICHAEL T. LIFRAK, ATTORNEY AT LAW**

QUINN, EMANUEL, URQUART
& SULLIVAN LLP
295 Fifth Avenue
New York, New York 10016

**BY: ELLYDE R. THOMPSON, ATTORNEY AT LAW**
**JESSE A. BERNSTEIN, ATTORNEY AT LAW**
**PHILLIP JOBE, ATTORNEY AT LAW**
**STEPHANIE KELEMEN, ATTORNEY AT LAW**

QUINN EMANUEL URQUHART
& SULLIVAN, LLP
300 W 6th Street - Suite 2010
Austin, Texas 78701

**BY: EMILY F. COUTURE, ATTORNEY AT LAW**

**Also present:** **Richie DeMarco, Trial Tech**
**Raymond McLeod, Trial Tech**
**Carley Carter**

**I N D E X**

Tuesday, March 17, 2026 - Volume 12


| | PAGE | VOL. |
|---|---|---|
| Jury Instructions | 2156 | 12 |
| Closing Argument by Mr. Molumphy | 2174 | 12 |
| Closing Argument by Mr. Lifrak | 2220 | 12 |
| Rebuttal Closing Argument by Mr. Cotchett | 2276 | 12 |
| Final Jury Instructions | 2291 | 12 |

**Tuesday - March 17, 2026** **9:03 a.m.**

**P R O C E E D I N G S**

---o0o---

(Call to order at 9:03 a.m.)

(Proceedings were heard out of the presence of the jury.)

**THE COURTROOM DEPUTY:** All rise. Court is now in session. The Honorable Charles R. Breyer presiding.

You may be seated.

**THE COURT:** Good morning. Let the record show the jurors are not present. The parties are present.

I had a question. I'm trying to figure out this verdict form in connection with the options, and -- because that is something that I want to address before the -- before argument.

First, is there -- based upon the record, is there a -- any distinction that can be drawn between damages for the -- for the stock and damages for the options? Is there a difference between the two? I mean, I understand options aren't the same as stock. I mean, they're shares. There's a difference, but is there a difference in terms of the outcome --

**MR. BOTTINI:** May it please the --

**THE COURT:** -- based upon the record?

**MR. BOTTINI:** Your Honor, Frank Bottini for the plaintiffs.

The testimony at trial from our expert, Dr. Tabak, was the

damages to the options are tied directly to the deflation in the stock.

So now there are some additional things that are necessary to calculate the damages to the options, but the most important element of that formula, which is the Black-Scholes formula, is the deflation in the stock.

Now, the problem with the verdict form that the defendants submitted is it only has one line for each day of the class period, and there's more than one options that traded. And they know that. They know that, and they submitted a form that they know is not correct, and in their opposition this morning, they didn't address the merits at all. They just said: Well, it's too late; let's just use this form.

As an officer of the court, I'm trying to get it right. I want to make sure that the form that the jury has is one that they can actually fill out accurately. So one line for each day of the class period doesn't cut it. There's thousands of options, and what's in the record is Exhibit 298. Exhibit 298 --

**THE COURT:** 298?

**MR. BOTTINI:** 298, Your Honor. 298 is an Excel spreadsheet that contains all the calculations, so what we've proposed -- and they can't do it. They can't calculate the implied volatility.

And I could give Your Honor an easy example. I have a

chart. If defendant's counsel can calculate the implied volatility, I'll be shocked. If I could just pass this up to the Court with Your Honor's permission. Let me make sure it's the right -- yeah. And one for defense counsel.

If Mr. Bergjans -- these are two options that are part of 298. If Mr. Bergjans can calculate the implied volatility, which I've left blank but which I have the answer to here -- they're asking the jury to calculate it.

**MR. BERGJANS:** Well, I think if I'm unable to calculate it and the jury is unable to calculate it, it's an issue with the way it was presented to the jury and less an issue with the intelligence and the sophistication of the jurors and counsel. That's why you present an expert, to perform the preferred calculation and to present something that the jurors can determine whether you have met your burden to prove options damages.

**THE COURT:** Okay. Well, here is my question:

What you're going to say to the jury, I assume, is: Look at Exhibit 298. It's calculated there. This is what the expert testified. And if you find liability -- if you find liability -- these are the amounts that should be written in the -- these are the amounts that you should find.

But you're saying -- so you're saying that the -- that that's what your paragraph 5 does.

**MR. BOTTINI:** Yes, Your Honor, and --

**THE COURT:** And it relates to an exhibit.

**MR. BOTTINI:** Yes. It's already in evidence, and that the jury will have it --

**THE COURT:** This exhibit? This piece of paper?

**MR. BOTTINI:** No, no, no. This was an example of how difficult it is to compute it, why you need expert testimony. And we had expert testimony, and it is calculated in 298.

**THE COURT:** Okay. So the jury is now in the jury room. And so let's say they find liability. What is it that you want them to do? They take a piece of paper. What is that piece of paper? It's 298? And they just -- and they -- and they look at 298 and they accept it?

**MR. BOTTINI:** Yes.

**THE COURT:** And that's what you say, the amount of damages calculated based upon the existence of the -- 298.

**MR. BOTTINI:** Yes, and based on the expert's testimony at trial, which they heard. And so they're adopting -- they have four options on paragraph 5 that we submitted. They can either choose -- right, because there's two calculations: There's either based on a scheme or false statement. So they have those two options, or they could have -- they can also choose a lower amount, Your Honor. They're not required to choose the calculations of our expert.

So in paragraph 4 that's already part of the verdict form, they're going to fill in an amount of deflation for stock for

each day of the class period.

**THE COURT:** Right.

**MR. BOTTINI:** That's what they wanted. They're getting that. They could write in a lower number. Now, if they write in a lower number, then in paragraph 5, that's the third option; it's going to be damages calculated based on that lower amount of deflation.

And then they've got a fourth option saying we're not going to award any damages for options. And we think that's the fairest thing. They check a box.

**THE COURT:** Now, and --

**MR. BERGJANS:** Obviously we object, Your Honor. First, the -- Mr. -- Dr. Tabak performed a different analysis, not simply "a take the deflation and turn it into implied volatility." It's unclear to us how Option 4 that they presented even works in practice. If they're just saying "Go with some stock deflation and that's going to be our options number," that's not really what was presented to the jury.

So the jury -- and in prior cases -- this isn't the first time options cases and options damages have been presented to juries. I think if you look at the *In Re: Tesla* verdict form, it provides a chart for them to fill out the implied volatility.

And whether or not plaintiffs were -- you know, it's plaintiffs' burden to prove damages. They should have

presented a chart or something that the jury could have filled out accurately, and I think that's the issue we have here, and we tried to present a solution, which is: Here's the implied volatility on each day for --

**THE COURT:** Aren't they saying 298 is that? They're saying 298 is that. You may think there's no basis for 298 or it's wrong or -- you know, it's made up or it's -- ought not to be followed. But they did that. I mean, they gave this piece of paper.

And the fact is that there is -- if you -- if you leave the options as it was in the original proposed verdict, which I think yesterday everybody said was fine --

**MR. BOTTINI:** They did, Your Honor.

**THE COURT:** -- but that's another argument. That's yesterday. Of course, that was yesterday. Now it's today.

I'm trying to figure out what is the difference between paragraph 5 in yesterday's verdict and paragraph 5 in today's verdict, and my understanding is that the difference is that because it's more complicated in terms of just deflation, there's no way that a jury could really calculate it. And if they did calculate it, I'd hear from you the next day on a motion for new trial or to set aside the verdict that there was no way for them to do it.

**MR. BOTTINI:** They say it was error. It's invited error, Your Honor. They submitted a form they know is wrong,

and it will not allow the jury to do it correctly. That way, if they lose, it is going to be an appeal. They say, oh, this is all wrong. They know it, and in their opposition, they don't try to defend their form. They don't say it's right. They don't say the jury can do it correctly --

(Reporter interruption for clarity of the record.)

**MR. BOTTINI:** Look --

**THE COURT:** I'm going to give the new proposed 5, and you should argue that.

**MR. BOTTINI:** Thank you, Your Honor.

**THE COURT:** Okay. Thank you.

**MR. BERGJANS:** And, Your Honor, there's one other issue.

**THE COURT:** Yes.

**MR. BERGJANS:** Exhibit 10.

**THE COURT:** Pardon me?

**MR. BERGJANS:** Exhibit 10 to the -- we have resolved all the exhibit issues going back to the jury, but there's one issue that remains open that we would like to resolve before closing.

**THE COURT:** Sure.

**MR. BERGJANS:** So -- and I'll pass up Exhibit 10.

**THE COURT:** The case has now come down to this?

**MR. BERGJANS:** It's --

**THE COURT:** Congratulations, everybody.

**MR. BERGJANS:** It's a remaining issue, but we have worked out everything except for this.

**THE COURT:** Okay. Let me look at it.

**MR. BERGJANS:** Sure.

**THE COURT:** Of course it's going to assume that I can see it. Not an easy task here. Okay.

(Pause in proceedings.)

**THE COURT:** It would be helpful if you told me --

**MR. BERGJANS:** Sure.

**THE COURT:** -- what is this problem.

**MR. BERGJANS:** The context for this is, this is a text chain from Mr. -- these are text messages belonging to Mr. Birchall, but this text message was not shown to Mr. Birchall, the top one; it was shown to Kate Claassen over our objection. She is not on that text message, and so there was no foundation for the text message from Mr. Lynch to Mr. Birchall to come into evidence.

We had raised that objection. Plaintiffs moved on after identifying the text message, but what had happened was Ms. Claassen was being asked about the text message before, which she was on, but had revealed the text message above, which she wasn't on. There was no foundation. There was not a proper question to ask of Ms. Claassen.

There was no way for Mr. Claassen to move that -- to lay the foundation to move the Sean Lynch text message into

evidence because she was never sent that message. First time she ever saw it was in court when plaintiffs' counsel revealed the message above, but she had no foundation for it. We had raised an objection. Plaintiffs' counsel moved beyond asking who Sean Lynch is.

And so we ask that this particular message just simply not go back into evidence because there was no foundation for it to be --

**THE COURT:** And the foundation goes to -- what does it go to? The foundation goes to authenticity or the foundation goes to what?

**MR. BERGJANS:** It would go to authenticity. It would go to --

**THE COURT:** Well, you're not -- you're saying this was not a document or record of a -- of --

**MR. REDENBARGER:** Mr. Birchall's texts. No, they're not challenging that. And there was discussion --

Tyson Redenbarger for the plaintiffs. Thank you.

There was discussion on the record, and Ms. Claassen said she knew who Sean Lynch was, and it was a relevant text on May 13th. I don't see the issue here.

**MR. BERGJANS:** Well, I mean, it was not properly used with that witness. If they wanted to show it to Mr. Birchall and ask him about it, that would have been fine; but they showed it to a witness who was not on the text message.

So if we think of it as like an e-mail, if they had -- if instead of text messages these are separate e-mails, if they had shown this e-mail between Sean Lynch and Mr. Birchall to Ms. Claassen, it would not have come in. There would have been no foundation for the witness to ask the question.

The only difference is because the way text messages are produced, this text message happened to be on top of one that she was a part of, but she otherwise had no foundation to ask about it, to answer any questions about it, had never seen it. And they put it in through her or attempted to put it in through her. So just --

**THE COURT:** It's not her text message. I understand that.

But my question is: Is it like a document under the business record? Is it a document of the company? Is it a document -- is it -- this is -- this refers to -- to Mr. Musk. This is his team.

**MR. REDENBARGER:** Correct. And we offered this originally at trial under 801(d)(2)(D). Mr. Birchall is Musk's agent. There was an objection, I believe, to that offering into evidence. I think they --

**MR. BERGJANS:** 801(d)(2)(D) --

**THE COURT:** I'm denying the motion to strike.

**MR. BERGJANS:** Just for the record, 801(d)(2)(D) wouldn't apply because Mr. Lynch is not an agent. It's not

Mr. Birchall's text message; it's Mr. Lynch's text message.

**MR. REDENBARGER:** To Mr. Birchall.

Thank you, Your Honor.

**MR. BERGJANS:** But it wouldn't apply under 801(d)(2)(D) because Mr. Lynch is not an agent.

**THE COURT:** But isn't it a statement of the company?

**MR. BERGJANS:** It's not a statement of the company because it's not a Twitter statement. It's not a Musk statement. Mr. Lynch does not work for Mr. Musk. Mr. Lynch does not work for Twitter.

**MR. REDENBARGER:** Well, we disagree with that --

(Reporter interruption for clarity of the record.)

**THE COURT:** One at a time. My turn.

Okay. Mr. Lynch does not work for Mr. Musk. So this is an outside person --

**MR. BERGJANS:** Correct.

**THE COURT:** -- sending a message to a person inside who doesn't happen to be the witness --

**MR. BERGJANS:** Correct.

**THE COURT:** -- who is testifying.

**MR. BERGJANS:** Yes, Your Honor.

**THE COURT:** Well, then, I don't know how that would come in.

**MR. REDENBARGER:** May I, Your Honor?

Mr. Lynch is Mr. Musk's agent. He was his banker.

Mr. Musk took the stand and said, "Yeah, he's on my team." He described him. There's countless e-mails.

**THE COURT:** You're satisfied there's enough in the record to establish that Mr. Lynch is actually associated either by banker or part of his team?

**MR. REDENBARGER:** Absolutely.

**MR. BERGJANS:** The record indicates otherwise.

**THE COURT:** On that representation, I'm permitting it.

**MR. REDENBARGER:** Thank you.

**THE COURT:** Over objection. Okay.

(Recess taken at 9:18 a.m.)

(Proceedings resumed at 9:23 a.m.)

(Proceedings were heard out of the presence of the jury.)

**THE COURTROOM DEPUTY:** Come to order. Court is in session.

**THE COURT:** Okay. Please be seated.

(The jury enters the courtroom.)

(Proceedings were heard in the presence of the jury.)

**THE COURT:** Let the record reflect all jurors are present. Parties are present.

**JURY INSTRUCTIONS**

**THE COURT:** Ladies and gentlemen of the jury, you have heard all of the evidence, and it is now my duty to instruct you on the law as it applies to this case.

A copy of these instructions will be sent to the jury room

for each of you, and you may consult them during your deliberations.

It is your duty to find the facts from all the evidence in the case. To those facts, you will apply the law as I give it to you. You must follow the law as I give it to you whether you agree with it or not.

And you must not be influenced by any personal likes or dislikes, opinions, prejudices, or sympathy. That means you must decide the case solely on the evidence before you. You will recall that you took an oath to do so.

This case, as you know, has received publicity. It is a reasonable assumption that your verdict, whatever it may be, will also be publicized. You are cautioned, however, that you should not consider this fact in determining what your verdict should be. That verdict must be based solely on the evidence you have heard and on the law as I have stated it.

Please do not read into these instructions or anything I may say or have done or said that I have an opinion regarding the evidence or what your verdict should be.

When a party has the burden of proving a claim by a preponderance of the evidence, it means you must be persuaded by the evidence that the claim is more probably true than not true.

You should base your decision on all of the evidence regardless of which party presented it. The evidence you are

to consider in deciding what the facts are consists of the sworn testimony of any witness, the exhibits that have been admitted into evidence, any facts to which the lawyers have agreed, and any facts that I've instructed you to accept as proved.

In reaching your verdict, you may consider only the testimony and exhibits received into evidence. Certain things are not evidence, and you may not consider them in deciding what the facts are. I will list them for you.

Arguments and statements by lawyers are not evidence. The lawyers are not witnesses. What they have said in their opening statements, what they will say in their closing arguments and at other times is intended to help you interpret the evidence, but it is not evidence. If the facts as you remember them differ from the way the lawyers have stated them, your memory of them controls.

Questions and objections by lawyers are not evidence. Attorneys have a duty to their clients to object when they believe a question is improper under the Rules of Evidence. You should not be influenced by the objection or by the Court's ruling on it.

Testimony that is excluded or stricken or that you have been instructed to disregard is not evidence and must not be considered.

In addition, some evidence was received only for a limited