# No. 26-04928

IN THE

# United States Court of Appeals

FOR THE NINTH CIRCUIT

GIUSEPPE PAMPENA, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED; STEVE GARRETT; NANCY PRICE; JOHN GARRETT; BRIAN BELGRAVE; TWITTER INVESTOR GROUP,

*Plaintiffs-Appellees*,

V.

ELON MUSK,

*Defendant-Appellant*.

*On Appeal From The United States District Court*
*For The Northern District Of California*
*Honorable Charles R. Breyer*
*No. 3:22-cv-05937-CRB*

## APPELLANT'S EXCERPTS OF RECORD
## VOLUME X OF XII (ER-2427 – ER-2723)

Michael T. Lifrak
Stephen A. Broome
Alex Bergjans
QUINN EMANUEL URQUHART & SULLIVAN, LLP
865 S. Figueroa St., 10th Floor
Los Angeles, CA 90017
(213) 443-3000

Alex Spiro
Ellyde R. Thompson
Jesse A. Bernstein
Marielle P. Greenblatt
Chelsea Sincox
QUINN EMANUEL URQUHART & SULLIVAN, LLP
295 Fifth Avenue
New York, NY 10016
(212) 849-7100

*Counsel for Defendant-Appellant*

November 23, 2026

purpose. When I've instructed you to consider certain evidence only for a limited purpose, you must do so, and you may not consider that evidence for any other purpose.

Anything you may see have seen or heard when the court was not in session is not evidence. You are to decide this case solely on the evidence received in trial.

Some evidence, as I indicated, has been admitted only for a limited purpose. When I've instructed you that an item of evidence has been admitted only for a limited purpose, you may consider it -- you must consider it only for that limited purpose and not for any other purpose.

Evidence may be direct or circumstantial. You should consider both kinds of evidence. The law makes no distinction between the weight to be given to either direct or circumstantial evidence. It is for you to decide how much weight to give to any evidence.

Certain charts and summaries not admitted into evidence have been shown to you to help explain the contents of books, records, documents, or other evidence in the case. Charts and summaries are only as good as the underlying evidence that supports them. You should therefore give them only such weight as you think the underlying evidence deserves.

Certain charts and summaries have been admitted into evidence to illustrate information brought out in the trial. Charts and summaries are only as good as the testimony or other

admitted evidence that supports them. You should therefore give them only such weight as you think the underlying evidence deserves.

In deciding the facts in this case, you may have to decide which testimony to believe and which testimony not to believe.

You may believe everything a witness says or part of it or none of it.

In considering the testimony of any witness, you may take into account the opportunity and ability of the witness to see or hear or know the things testified to; the witness's memory, the witness's manner while testifying; the witness's interest in the outcome of the case, if any; the witness's bias or prejudice, if any; whether other evidence contradicted the witness's testimony; the reasonableness of the witness's testimony in light of all the evidence and any other factors that bear on believability.

Sometimes a witness may say something that is not consistent with something else he or she said. Sometimes different witnesses will give different versions of what happened. People often forget things or make mistakes in what they remember. Also, two people may see the same event but remember it differently.

You may consider these differences, but do not decide that testimony is untrue just because it differs from other testimony.

However, if you decide that a witness has deliberately testified untruthfully about something important, you may choose not to believe anything that witness said.

On the other hand, if you think that the witness testified untruthfully about some things but told the truth about others, you may accept that part you think is true and ignore the rest.

The weight of the evidence as to a fact does not necessarily depend on the number of witnesses who testify. What is important is how believable the witnesses were and how much weight you think their testimony deserves.

A deposition is the sworn testimony of a witness taken before trial. The witness is placed under oath to tell the truth, and the lawyers for each parties -- each party may ask questions. The questions and answers are recorded. When a person is unavailable to testify at trial, the deposition of that person may be used at trial.

Insofar as possible, you should consider deposition testimony presented to you in court in lieu of live testimony in the same way as if the witness had been present to testify.

Evidence was presented to you in the form of answers of one of the parties to written interrogatories submitted by the other side. These answers were given in writing and under oath before the trial in response to questions that were submitted under established court procedures. You should consider the answers insofar as possible in the same way as if they were

made from the witness stand.

You have heard testimony from Adam Badawi and David Tabak, who testified about their opinions and reasons for their opinions. This opinion testimony is allowed because of the specialized knowledge, skill, experience, training, or education of the witness. Such opinion testimony should be judged just like any other testimony. You may accept it or reject it and give it as much weight as you think it deserves considering the witness's specialized knowledge, skill, experience, training or education, the reasons given for the opinion, and all the evidence in this case.

You have heard testimony regarding data privacy laws in relation with Twitter user data that was sought by the defendant during the merger. The United States and European Union have data privacy laws that permit disclosure of privacy data based on consent. Twitter's privacy policy permitted disclosure of user data during a merger or acquisition. There is no evidence that any privacy law, domestic or international, prohibited the disclosure of Twitter's private user data to the defendant as part of the merger.

However, there are protocols on how this information may be disseminated or disclosed. You are not to construe any testimony or anything the Court may have said as inferring such a bar on disclosure.

Further, the fact that the law may have permitted Twitter

to disclose private information to the defendant does not affect informational rights under the merger agreement.

Congress enacted the securities laws to protect the integrity of financial markets. The plaintiffs claim to have suffered a loss caused by the defendant's alleged violation of Rule 10b-5 during the class period, which was from May 13th, 2022, to October 4th, 2022. There are terms concerning securities laws that have a specific legal meaning. The following definitions apply throughout these instructions unless noted otherwise:

A security is an investment of money in a commercial financial, or other business enterprise with the expectation of profit or gain produced by the efforts of others. Some common types of securities are stocks and options.

The buying and selling of securities are controlled by the securities laws. Many of these laws are administered by the United States Securities and Exchange Commission, known as the SEC. A 10b-5 claim is a claim brought under a federal statute, Section 10b of the Securities Exchange Act of 1934, which prohibits acts of fraud in connection with the purchase or sale of a security and in violation of rules and regulations that the SEC has the duty and power to issue.

A corresponding SEC rule, Rule 10b-5, prohibits any act, practice, or scheme to defraud and/or the misrepresentation of material facts in connection with the purchase or sale of

securities. A person or business entity who violates the securities laws, including Rule 10b-5 may be liable for damages caused by the violation.

An act, practice, or scheme to defraud is any conduct that has the principal purpose and effect of creating a false appearance of fact in furtherance of the scheme to defraud.

A misrepresentation is a statement of material fact that is false or misleading when it is made. A statement may be misleading even if it is literally true if the context in which the statement was made caused the listener or reader to remain unaware of the actual state of affairs. A statement is misleading if it would give a reasonable investor the impression of a state of affairs that differs in a material way from the one that actually exists.

Words cannot be viewed in complete isolation but must instead be read in the light of all the information then available to the market to decide if they conveyed a false or misleading impression.

"In connection with" means that there was some relationship or nexus between the allegedly fraudulent conduct and the sale of securities. The defendant's conduct may be in connection with the purchase or sale of a security even if the defendant did not actually participate in any securities transaction.

An instrumentality of interstate commerce includes the

postal mails, e-mails, telephone, telegraph, telefax, interstate highway system, Internet, and similar methods of communication and travel from one state to another within the United States.

The plaintiffs inclusive of the class allege that the defendant engaged in securities fraud in violation of the federal securities laws during the class period, May 13th, 2022, to October 4th, 2022. This is referred to as "the plaintiffs' 10b-5 claim." To succeed on this claim, the plaintiffs have the burden of proving each of the following five elements by a preponderance of the evidence:

First, the defendant, Elon Musk, A, employed a device, scheme, or artifice to defraud;

Or, B, made an untrue statement of a material fact;

Or, C, engaged in an act, practice, or course of business which operated or would operate as a fraud or deceit upon any person in connection with the sale of securities.

Plaintiffs allege that the following statements were materially false and misleading under Rule 10b-5.

One, a May 13th, 2022, tweet quote [as read]:

"Twitter deal temporarily on hold pending details supporting calculation that spam/fake accounts do indeed represent less than 5 percent of users."

End quote.

Two, a May 16th, 2022, statement regarding the prevalence of spam/fake accounts on Twitter that [as read]:

"I think it's some number that is probably at least four or five times."

End quote.

Twitter's 5 percent representation and that [as read]:

"The lowest estimate would probably be 20 percent, and this -- and this is a bunch of quite smart outside" -- pardon me -- "a bunch of quite smart outside firms have done the analysis of Twitter and looked at the daily users, and their conclusion is also about -- it's about 20 percent."

End quote.

And, three, a May 17th, 2022, tweet, quote [as read]:

"20 percent fake spam accounts while four times what Twitter claims could be much higher. My offer was based on Twitter's SEC filings being accurate. Yesterday Twitter's CEO publicly refused to show proof of less than 5 percent. The deal cannot move forward until it does."

End quote.

These three statements are the only ones that are alleged to be materially false or misleading and the only ones that can form the basis for liability under Rule 10b-5(b).

Plaintiffs separately bring a claim under Rule 10b-5 (a)

and/or (c) alleging that the defendant engaged in a scheme to defraud Twitter investors by carrying out fraudulent acts that had the principal purpose and effect of creating a false appearance of fact in furtherance of the scheme to defraud.

You have heard testimony regarding other statements or tweets made by the defendant. These statements must be treated differently under the context of plaintiffs' two claims.

Under Rule 10b-5(b), you may consider those separate statements in determining whether the three at-issue statements were false and misleading.

Under Rule 10b-5(a) or (c), you may consider those separate statements in determining whether they were part of a larger scheme allegedly carried out by the defendant.

The second element. Defendant Elon Musk acted knowingly or with deliberate recklessness.

Third, defendant Elon Musk used or caused the use of an instrumentality of interstate commerce such as mail, telephone, Internet, or any facility of a national securities exchange in connection with the purchase or sale of securities regardless of whether the instrumentality or facility itself was used to engage in the alleged fraudulent acts or to make an alleged untrue statement of material fact.

Fourth, plaintiffs justifiably relied on the alleged untrue statements and material fact or alleged fraudulent conduct.

And fifth, defendant Elon Musk alleged material misrepresentations or fraudulent acts caused the plaintiffs to suffer damages.

If you find that the plaintiffs have proved each of these elements for their claim or claims, your verdict should be for the plaintiffs on that claim or claims.

If, on the other hand, you find that the plaintiffs have failed to prove any of these elements for their claim or claims, your verdict should be for the defendant on that claim or claims.

The plaintiffs must prove by a preponderance of the evidence that the defendant's misrepresentation was materially false or misleading. Under Rule 10b-5(b), a factual representation concerning a security is material if there is a substantial likelihood a reasonable investor would consider that fact important in deciding whether to buy or sell that security.

A material misrepresentation gives a reasonable investor the impression of a state of affairs that differs in a material way from the one that actually exists.

The plaintiffs must also prove by a preponderance of the evidence that the defendant's purported scheme was material. Under 10b-5(a) or (c), a scheme is material if there is a substantial likelihood a reasonable investor would consider the facts important in deciding whether to buy or sell that

security.

If the purported scheme is material, it would give a reasonable investor the impression of a state of affairs that differs in a material way from the one that actually exists. You must decide whether something was material based on the circumstances as they existed at the time that -- of the statement or the duration of the scheme.

A statement of opinion does not constitute an untrue statement of material fact simply because the stated opinion ultimately proves incorrect, but an opinion is actionable as a false statement if the speaker does not sincerely hold the view or belief expressed regarding the material representation or if the opinion contains material verifiable statement of fact that is untrue.

A plaintiff -- the plaintiffs must prove by a preponderance of the evidence that the defendant acted with the intent to defraud.

A defendant acts knowingly at the time he makes an untrue statement with the knowledge that the statement was false or with deliberate reckless disregard for whether the statement was true.

A defendant acts with deliberate recklessness when he engages in highly unreasonable conduct that is an extreme departure from ordinary care, presenting a danger of misleading investors which is either known to the defendant or is so

obvious that the defendant must have been aware of it.

Mere recklessness or motive to commit fraud and opportunity to do so provides some reasonable inference of intent but are not sufficient standing alone to establish a strong inference of deliberate recklessness.

You have heard evidence of the defendant's conduct before the class period. You may consider this evidence only for its bearing, if any, on the question of the defendant's intent, motive, plan, or knowledge and for no other purpose.

A plaintiff must prove by a preponderance of the evidence reliance on the alleged material misrepresentation or fraudulent acts, and that the plaintiff was justified in doing so. A plaintiff must not intentionally close his or her eyes and refuse to investigate the circumstances or disregard known or obvious risks.

A plaintiff does not have to prove that he, she, or other members of the class individually relied on the alleged misrepresentations and/or fraudulent acts in deciding to sell the securities in question if they prove by a preponderance of the evidence the requirements were invoking a presumption that they and the class relied on the integrity of the market price, otherwise known as the "fraud on the market" presumption.

To invoke fraud on the market presumption, a plaintiff must prove by a preponderance of the evidence that, one, there was an active open market for Twitter securities during the

relevant time period. An active open market means that there were a large number of traders, high-level activity, frequent trades such that the price of the security immediately reflects all publicly available information.

Two, investors reasonably relied on that market as an accurate reflection of the current market value of securities.

Three, the alleged misrepresentations and/or fraudulent acts were publicly known, material, meaning that a reasonable investor would have regarded what was not disclosed to them as having significantly altered the total mix of information they took into account in deciding whether to sell the Twitter security.

And four, plaintiff traded the stock or options between when the alleged material misrepresentations were made and when the truth was revealed.

A defendant may rebut the presumption that the plaintiffs relied on the integrity of the market price when selling Twitter securities by proving by a preponderance of the evidence the plaintiffs did not actually rely on the integrity of the market price when they sold Twitter securities. In that event, the plaintiffs must then prove that they justifiably relied directly on the misrepresentation and/or fraudulent acts.

A defendant may also rebut that presumption that the defendants relied on the market price when selling Twitter

securities by proving by a preponderance of the evidence that the misrepresentation and/or fraudulent acts did not affect the market price of Twitter's stock.

The fraud on the market presumption of reliance is limited to the time between when the misrepresentation was made or when the fraudulent acts occurred and when the truth was revealed.

The plaintiffs must prove by a preponderance of the evidence that the alleged fraudulent acts or material misrepresentations as alleged in their Rule 10b-5 claims were the cause of their economic injury. To establish economic injury or loss, the plaintiffs must prove that the alleged fraudulent acts or a misrepresentation artificially deflated the price of Twitter's securities.

To establish causation, the plaintiffs must prove that the alleged fraudulent acts or misrepresentation played a substantial part in causing the injury or loss the plaintiffs suffered. Put more simply, proof of loss causation requires demonstrating that the subject of the alleged fraudulent acts or misrepresentation was the cause of the actual loss suffered.

The plaintiffs need not prove that the alleged fraudulent acts or misrepresentation was the sole cause of the economic injuries.

The Constitution ensures the right of all persons to bring lawsuits to vindicate their rights. In connection with the constitutional right to petition and protection of the right to

access to the courts, the law protects conduct that is incidental or sufficiently related to attempts to vindicate rights in courts.

You have heard testimony relating to litigation between Twitter and the defendant in Delaware, which was filed on July 12th, 2022. Such petitioning conduct in litigation is not illegal, and you may not base your liability on this conduct -- you may not base liability on this conduct.

When evaluating the plaintiff's claim that the defendant engage in a scheme through fraudulent acts and/or misrepresentations, you may only premise liability based upon the entire course of the defendant's conduct.

While petitioning conduct may be relevant in connection with the issues you must decide, the fact of the petitioning itself cannot be considered by you in determining liability.

If you find for the plaintiffs on their Rule 10b-5 claim or claims, then you must consider and decide the amount of money damages, if any, to be awarded to plaintiffs in class. You may award only actual damages in an amount that will reasonably and fairly compensate the plaintiffs and the class for the economic losses they and the class sustained.

Actual damages are measured by the amount of deflation caused by a misrepresentation or fraudulent acts on which you base your finding of 10b-5 liability.

In other words, actual damages are measured by the

difference between the price at which the stock sold and the price at which the stock would have sold had the statement or fraudulent acts reflected the true state of affairs.

It is the plaintiffs' burden to prove their actual damages. Actual damages are limited to losses caused by the alleged material misrepresentation and fraudulent act, and do not include losses caused by other events.

You will be asked to determine the amount, if any, by which the prices for Twitter common stock and put options were artificially affected by any material misrepresentation or fraudulent acts you may find for each day during the class period.

You will also be asked to determine the appropriate level of implied volatility, which should be used to calculate the effect of any material misrepresentation or fraudulent acts you may find on Twitter's options.

Your award must be based on evidence and not upon speculation, guesswork, or conjecture. The plaintiffs have the burden of proving damages by a preponderance of the evidence.

And now, ladies and gentlemen, we'll turn to argument. The argument will be that the plaintiffs will open. The defendants then will -- will argue, and then the plaintiffs will respond.

Okay. You may proceed.

\\\

**CLOSING ARGUMENT**

**MR. MOLUMPHY:** Thank you, Your Honor.

(Pause in proceedings.)

**MR. MOLUMPHY:** All right, Your Honor. Thank you.

Good morning. My name is Mark Molumphy. I know we've met indirectly throughout the trial, but I think this is my first opportunity to introduce myself to you.

Before I start, happy St. Patrick's Day.

I want to send a special thanks to Ms. Scott and Ms. Ekhaus, who have been working behind the scenes, I know, with all of you, but certainly with all of us as well, early mornings and late nights, and they're kind of the unsung heros of the court process here today.

Also, I'd like to thank you. I know you've taken a lot of time out of your personal lives, out of your work lives, out of your families, traveled from San Francisco, I think a couple of you from San Carlos, Newark, Alameda, a couple in San Ramon, even Windsor, which is a tremendous sacrifice that all of us appreciate. This is an important case, but this is also a tremendous sacrifice for all of you, and we appreciate the time you've taken on this case. It's a serious case, an important case, and the fact that you've taken this so seriously, I think, is important to all of us.

I want to contrast that a bit with the defendant in this case, Elon Musk. In the middle of trial, he came here, made

his appearance, trashed the company, trashed the executives, accused them of a years-long fraud, provided no evidence supporting his claims, and then he disappeared, never to be seen again.

In many ways, ladies and gentlemen, that's exactly what happened at Twitter in 2022.

Give us one second for a technical issue.

(Pause in proceedings.)

**MR. MOLUMPHY:** Do you have it on your screens now?

**THE COURTROOM DEPUTY:** In a moment. Give them a moment.

**MR. MOLUMPHY:** Thank you.

In 2022, after signing a binding agreement that Mr. Musk proposed and promising to use his best efforts to get the deal done, Mr. Musk decided just weeks later that he didn't want to pay investors what he promised to pay.

The deal, in his mind, had gotten too expensive. So he did here what he did on the stand. He trashed the company, he trashed the executives, and he tanked the stock. And then he fled the scene, never to be seen again. Instead, he relied on his team of advisors to clean up his mess.

Mr. Tweet -- Mr. Musk's tweets were not some innocent mistake, some stupid tweet that he really didn't consider, something off the top of his head. The evidence will show that they were intentional, deliberate, and carefully devised to

convey a simple message to the public markets that Twitter was overrun with spam, that it was lying to its investors, that it had way more than 5 percent spam on its platform.

As in this trial, Mr. Musk literally had no proof for these tweets that he issued. Twitter was not overrun with spam, and during two weeks of testimony, you've seen no evidence proving that allegation, four years now, almost, after the transaction.

He also knew that his tweets would impact the stock price. We know that when he sent his first tweets, and we know that because he said that in writing with his brokers.

Through investigation that we've done in this case, we were able to find the internal e-mails. And when he's tweeting to the market starting on May 13th, when he's lying that the deal is on hold, when he's lying that he's waiting for information, he's literally tracking the impact of his tweet with his brokers in realtime. And he replies when his broker tells him about the uncertainty that his tweets have created: Matches my understanding.

He knew what he was doing. This is a May 13th exchange. And we'll talk more about this smoking gun as we go through the evidence.

Four years later, we're asking you, ladies and gentlemen, to hold him accountable, to compensate investors like Mr. Belgrave, Nancy Price, John Garrett, and thousands of other

investors to make sure that he doesn't say whatever he wants, whenever he wants, without any fear of accountability.

That's why you are here today, four years later. It took us a long time to get here. But that's what this case is about.

Now, the judge has talked to you about securities fraud, spent just a couple of minutes about the Securities Exchange Act of 1934. This was an act put in place after the Great Depression. It's actually the same act that created the SEC, and it's a hallmark, a lynchpin for investor rights in this country to protect the integrity of the financial markets.

That's what's at issue in this case.

The burden of proof as we go through the elements, the judge has instructed, is a preponderance of evidence. It's not the same as a criminal trial, which means the typical scales of justice, if there's slightly more evidence on the plaintiffs' side. It is our burden, but that's all we need to show in order to satisfy the various elements of proof here.

The evidence in this case is overwhelming in our favor.

You'll be listening and you have listened -- excuse me -- to various witnesses, and you've heard different stories, so you're going to be -- have to determine credibility of the witnesses, who's telling you the truth and who's not. And the jury instructions help you how to do that, but much of this is common sense.

Do they have a good memory? We're talking about events back in 2022. How did they testify back then versus today, four years later? Have they changed their stories?

The manner of testifying. You were able to kind of assess not only what they said, but how they said it.

Do they have any interest in the outcome of this case? Are they being paid by either the plaintiff or defendant? Do they have any bias, any skin in the game?

You've heard from a number of witnesses that we presented. Twitter witnesses. Remember, we are not Twitter. We are the shareholders. None of these witnesses that came from Twitter are affiliated with us. We didn't have sessions with them before they testified about what they were going to say or a script of questions and answer to follow. None of these are paid witnesses of the plaintiffs.

And you met Ms. Gadde and Mr. Segal, Mr. Agrawal, Martin Korman. Marty Korman came here. He was the deal attorney. They even played Jack Dorsey and Emmy Anargyros, who was the person in charge of the human computation process in Toronto. And we also called back Stacey Conti twice in this case. And you met Bret Taylor, the chairman of the board.

These are, we would submit to you, honest, credible witnesses. Did not -- did not have any financial motive, four years after the fact. They told a straightforward, consistent story that matched with the documentary evidence.

Let's talk just briefly about the documentary evidence. These were contemporaneous, detailed meeting minutes drafted at the time of the meetings.

We didn't rely upon verbal agreements. We gave you the e-mails and texts not just from Twitter, but also from Mr. Musk's team, based upon our investigation. There were no gaps in the evidence we presented.

We also gave you the detailed information trackers. Remember those are the trackers that Morgan Stanley, Mr. Musk's own broker, was preparing, so you can actually see in real time what information was being requested and what information was being provided.

On the other hand, Mr. Musk's evidence included no meeting minutes, no notes. Ms. Claassen testified that they took notes of these meetings, yet none were provided to you in this case.

You also saw evidence that there were mis- -- there were texts between May 16th and May 31st from Mr. Musk, a gap. After sending hundreds and hundreds of texts just prior to May 16th, all of a sudden they stop on May 16th for two weeks. The most critical period of this case, we don't have any texts from Mr. Musk.

We also have evidence that communications were directed to be via phone with counsel involved, right at the critical juncture of this case in May.

Now, why would you tell people to put things via phone with counsel involved unless you don't want a written record of what you're about to talk about?

Keep all those factors in mind when we start to go through the evidence. And obviously, in my short time, I'm not going to be able to go through all the evidence, but you'll be able to look at various trial exhibits admitted, so you'll be able to look at the e-mails and the texts yourself and spend as much time as you think you need on those. I'm going to highlight a few of them here today.

Before Mr. Musk purchased the company -- context matters here -- he was a prolific Twitter user -- in fact, one of the most active users on the platform. And he complained about spam a lot.

We showed you a couple of the texts before the purchase, but we could show you five more. But, you know, the point is he knew spam was an issue, because on his account, he experienced, in his view, a lot of spam. Up to 50 percent of his account, he believed, were spam accounts. So he tweeted about it. He tweeted about it often.

Here's a few of those that we showed you. These are all trial exhibits. And you'll see on the bottom of the slides the actual reference to the trial exhibit numbers. But the point is he was publicly complaining about spam way before he purchased the company.

We also told you about the period right before he purchased the company when he started purchasing Twitter shares. He had not owned any Twitter shares up until January of 2022. And we showed you the testimony including communications with Jared Birchall. That was his right-hand man. And he told in this question [as read]:

"You told Mr. Birchall, let's keep this as confidential as possible, what I'm doing here.

"Yeah, I think that's generally a good -- I mean, that's broadly speaking, I think that's generally a good thing to keep confidential."

Why was he keeping his purchases confidential?

Because he knew that if he disclosed that to the market, the market would bump up.

Now, this is the man that, supposedly, transparency is his most important characteristic, yet for three months in 2022, he's purchasing 10 percent of the company shares and not telling a soul.

Why is that?

Because if investors knew, would the price increase?

Possibly. Of course he knew that.

And what happened when he finally revealed the fact that he had become Twitter's largest shareholder? The stock went up 27 percent. This is right before he purchases -- makes an offer to purchase the company.

What does that show? What is the reasonable inference? Mr. Musk knows that what he does and what he says impacts the stock market at Twitter. This is a perfect representation of that right before he makes the offer.

Once Twitter's board found out about this in April 2022, they invite him to meet. He meets with the chairman of the board, Bret Taylor; the CEO, Parag Agrawal. This is the San Jose Airbnb meeting with the donkeys that you've heard about. And Mr. Musk says "Now I'm interested, but I am really considering three different options: Joining the board, buying the company, or creating a competitor."

And just kind of as we go through this chronology, remember that preparing and possibly creating a new competitor was something Mr. Musk not only was tweeting about, but he's telling the chairman of the board and the CEO right before he makes the offer. So that's something that the board at Twitter obviously is thinking about as well.

A few days later, he's asked to join the board, and he agrees. He says [as read]:

"I'm looking forward to joining the board and making significant improvements."

Yet just days later, he issues a tweet asking, "Is Twitter dying?"

Parag Agrawal, the CEO, responds and says [as read]:

"You can tweet whatever you want, but it doesn't

really help me make Twitter better in context."

Seems like a relatively reasonable tweet or response to a tweet.

And what does Mr. Musk reply two minutes later?

[as read]:

"What did you get done this week? I'm not joining the board. This is a waste of time. We will make an offer to take Twitter private."

Two minutes later, he had changed his mind.

Join the board, no longer join the board, now going to buy the company, basically because Parag had the gall to ask him why you're tweeting that Twitter is dying.

Why did Mr. Musk buy Twitter? Well, he wanted to make a lot of money. We've heard from Ms. Claassen he wanted to quadruple his investment.

He also wanted to fix the spam issue. This was not somehow a secret to him.

Jack Dorsey -- we played his videotape, but one of the things said in his video deposition was Mr. Musk brought his own experience on Twitter to Twitter and said: Why do I have so many spam on my account?

And Mr. Dorsey said they were extremely severe but very limited to his account. They did an investigation, and they couldn't find replication of that behavior elsewhere.

So basically they took his complaints and they looked into

it, and it was confined to Mr. Musk's account. But Mr. Musk didn't believe that. He believed it was a platform-wide issue.

So after deciding that he was no longer going to join the board, he sends this text exchange to Bret Taylor, the chairman of the board, and says [as read]:

"Drastic action is needed. This is hard to do as a public company. Purging fake users will make the numbers look terrible."

In other words, Mr. Musk is telling Twitter, you've got big problems here and I need to come to fix it, and I need to do it by buying it as a private company because it's so large and so extreme that it can't be done as a publicly traded company. It will make the numbers look terrible. That's how big the problem that Mr. Musk thought spam was at Twitter.

But he also knew that Twitter had been making representations in its SEC filings about spam. Twitter regularly reported that it estimated spam and found it was less than 5 percent.

It also said that this was an exercise of judgment, meaning humans were involved in calculating this estimate, and it could be higher.

The point here is that this was not some secret. This was widely known. And, in fact, Mr. Musk didn't even believe the SEC statements.

During his testimony on the stand here, this interesting

exchange took place. He was asked whether he believed Twitter's real user numbers, and he said [as read]:

"I think the prevalence of fake accounts was higher than they were disclosing, yes.

"You thought they were exaggerating their numbers before you signed the merger agreement?"

He said, "Yes."

So this idea that, after the fact, that he was somehow -- his jaw was dropping, that he couldn't believe what they were saying, well, there's no trial testimony he says he didn't believe the numbers going into the transaction.

So he hires brokers, and you've heard reference to Jiu-Jitsu and rope-a-dope. The basic theme here is that the brokers advised him to make a weak offer followed by a strong offer, and that's what he did. His initial offer on April 13th he made subject to confirmatory due diligence, meaning, as Dr. -- Mr. -- Professor Badawi explained, the ability to look and kick the tires.

He knew what confirmatory due diligence was. He kept it in in his first offer. He could do any investigation he wanted to do before signing the agreement. And he just told you on the stand that he didn't believe their numbers, so if he didn't believe the numbers or didn't believe the processes, he had the right to ask questions about them.

Instead, a few days later, he sent a second offer, which

was no longer subject to due diligence. He waived due diligence, a very important point in this case.

And even Mr. Musk admitted on the stand that he waived due diligence.

At the same time he sent the second offer waiving due diligence, he's actually tweeting again about the bot problem. So he's waiving due diligence, yet tweeting that bots are an issue on the platform. There can't be any surprise as he goes into this transaction that he knows about spam and bots on Twitter.

On April 24th, a Sunday, his deal team sends a cover letter with an actual term sheet or an actual agreement that Mr. Musk himself calls "seller-friendly." And we've heard a lot about "seller-friendly." It's a term of art in this case.

Professor Badawi testified that seller-friendly agreements do things like waive due diligence. They have limited information rights. A best efforts, requiring the buyer to use best efforts to close the deal. They also had a non-disparagement clause here. And there was no right to put the deal on hold. These are all seller-friendly deal terms that were included in this merger agreement.

Professor Badawi actually testified -- I asked him [as read]:

"Have you ever seen a merger agreement that gives the buyer the unilateral right to pause a deal

based upon concerns about the accuracy of SEC filings?"

And he said: No, I've never seen that.

And the agreement -- we didn't spend a lot of time on this -- provides -- and you'll have as much time as you want to look at the actual agreement, but it includes a provision in which Mr. Musk says that he has conducted to his satisfaction his own independent investigation, review, and analysis of the business. He represents that in the agreement. So he waives due diligence and says: I've gotten everything I need to move forward.

And, of course, from Twitter's perspective, that was very important. They wanted deal certainty. They wanted to make sure that Mr. Musk went forward with the deal, because this was a publicly traded company that would have enormous repercussions on the market and on shareholders if he suddenly went sideways. And we later see exactly that that happened.

So they build these deal protections into the agreement. And Mr. Musk signs the agreement; in fact, he signs it twice. This is a binding agreement that Mr. Musk proposes, signs, and agrees to live up to.

Fast-forward about 10 days. This is the first meeting that you've heard a lot of testimony about. This was the initial meeting. This is kind of the lynchpin of their defense in this case, supposed promises of voluntary due diligence that

Ned Segal made to give them not just information about how they calculate spam, but the underlying data that was used by the data scientists back in Toronto.

The evidence is overwhelming that the defendant's story is simply not true.

Mr. Musk was interested in how Twitter calculated spam. He did not want the underlying private data. He didn't ask for the underlying private data. And we now know that because he said that back in 2022 when he was deposed.

It's important to put that in context. This is before any of the lawsuits have been filed by shareholders. Literally in the midst of the discussions and negotiations and litigation, Mr. Musk is asked, "What was the information you were looking for?"

And he said [as read]:

"The first question I asked when I met with Ned and Parag was how do you calculate this number, because that is -- that is what you're representing publicly, but it is not my experience."

Later in his deposition, he's asked [as read]:

"And the information in their internal data, if I understand you correctly, their methodology, how they calculate the percentage of mDAU being spam, but also underlying data that would enable you to perform your own methodologies to find out, are they both of

these things?"

In other words, the questioner is asking are you asking for both the methodology and the underlying data?

And how does Mr. Musk respond in 2022? [as read]:

"Just to be precise, how are the hundred accounts selected, and then how are the hundred accounts reviewed to determine whether they're real or fake?"

We've heard reference to labeling and sampling. So the sampling is how they choose the hundred, this random process that they use; and the labeling is how they determine if those hundred, whether they're real or fake. He wanted to know the process.

The third time in his deposition, he repeats again [as read]:

"Really, the first order of business is how does Twitter calculate the less than 5 percent. And we never got to that point, because they would not tell us their methodology."

This is in July of 2022.

Well, we know now because we've seen the evidence that he did get that methodology.

We also have the minutes. We have the contemporaneous detailed minutes -- I think they're five or six pages long -- that you can take a look at, Exhibit 80. There's no request

for underlying private user data, passwords, user names, phone numbers, geolocation data. There's no request for that type of information referenced in the minutes.

We have the contemporaneous communications back and forth on May 6th [as read]:

"Meeting went well. No reference to private data."

There's been a suggestion that Mr. Musk's jaw dropped, that Ned was incompetent at this meeting. He couldn't explain basic things. Well, that's not what they described it at the time.

Katherine Martin, who was Twitter's attorney, wrote the detailed notes. She also sent an e-mail to Twitter's board saying the meeting went very well, that they were having engaging and constructive conversations -- a totally different picture that's now being presented four years later by the defense.

You also saw a much more sinister tone taken on the other side of the aisle as of the May 6th meeting.

Mr. Musk thought he had his excuse to renegotiate, to revisit the price. And there's been a lot of suggestions in this case that we have not provided you any evidence of such a desire to renegotiate the deal price.

Well, here -- we're on May 6th -- this was a very quick videotape that we played of his biographer. He's literally

coming out of the meeting on May 6th, and he tells his biographer [as read]:

"I think Twitter may be headed off the rails and might work out at a much lower price. I mean, literally half or something."

So coming out of the meeting, he's thinking he wants a different price.

And then the first smoking gun. This is Trial Exhibit 87. This is a private exchange that Mr. Musk has with his brokers at Barclays. And Mr. Birchall, you might remember, tried to say, well, Barclays was a hanger-on-er, a spammer. They were trying to -- sending e-mails to us. We didn't understand why.

Barclays was Mr. Musk's broker on this deal, one of several. They're listed in the actual merger agreement. And they're having private communications about this deal.

Barclays suggests to Mr. Musk [as read]:

"This could be an opportunity to revisit price."

And then later [as read]:

"The threat of walking away may be sufficient to get them to agree to a lower price, given where the stock would likely trade."

Literally the theme of our case is encapsulated in this e-mail. That's exactly what happened a few days later. Four days later when he starts issuing this tweet [as read]:

"The threat of walking away may be sufficient to

get them to lower their price."

Tweet, threaten to walk away, the stock will likely trade lower -- which it did -- and maybe they'll lower their price.

He's literally telling Mr. Musk this.

And what does Mr. Musk respond?

He didn't say: Why are you saying this? Who are you, Barclays? I don't even understand why you're e-mailing me. You don't work for me.

No. He testifies -- excuse me. He responds [as read]:

"There is certainly a price at which the deal does make sense."

These are the internal communications that investors didn't have. This is the prelude to a fraud. This is the plan.

Later that day, in response to this e-mail, Jared Birchall writes [as read]:

"Please allow me to suggest that further thoughts/ideas be discussed via phone with counsel involved."

Really?

We know what this means: Don't put anything like this in writing. Don't create a written record of what you're about to do.

Why else would he send this e-mail?

When Mr. Musk later tweeted on May 13th, he was also

experiencing a rapid loss in the primary asset he was using to buy the company.

Now, in opening statement earlier, Mr. Musk's attorney circled the Tesla price around May 6th. I wanted you to take a look at the full range of the Tesla stock price that week before he issued his tweet.

Tesla shares plunged in five days almost 30 percent before he issued his tweet. Just another point to consider as to motivation. The deal got a lot more expensive when Mr. Musk went to bed on July 12th.

And then begins the scheme. You've just seen two or three days earlier his broker telling him, this is a chance to revisit the price, and here's how you do it.

And he does it. On May 13th at 2:44 a.m., he issues the first of a barrage of tweets meant to tank the company's stock in order to renegotiate a better price, exactly what they were talking about a couple days earlier.

And this tweet was about as false as it gets. Nothing in this tweet is true. The deal was not on hold. And it certainly wasn't on hold pending any details that Twitter was supposed to give him. He didn't have the right to get that information. He waived due diligence.

They don't even dispute in this case that the deal wasn't put on hold. Their own questioning elicited testimony that the deal wasn't put on hold. Everyone continued to work on the

deal after issuing this tweet.

They focused on a second tweet issued later that morning at 4:50, a couple hours later. A couple of things I wanted to point out.

It doesn't somehow mask the first tweet saying that the deal was on hold. Saying you're still committed doesn't mean that the deal is not on hold. And we see that from the market reaction. While it bumped up a little bit, it never came back.

I think the second question all of you should be asking is why is Mr. Musk sending a second tweet? Kind of strange. In the middle of the night? Why does he feel the need to send a second tweet?

Because he knows his first tweet is so misleading. The market is literally plunging within minutes of his first tweet. He's saying in the second tweet because he knows something's wrong. He knows he had created a false impression in the market. He knew the deal was not on hold. But instead of just coming clean and saying that, he issues this cryptic tweet.

We presented you evidence from all sides of the transaction that the deal wasn't on hold. This is Ms. Claassen, Mr. Musk's own broker, who said the deal wasn't on hold. We also presented you testimony from Ms. Conti, Mr. Taylor, Mr. Segal, all on Twitter's side of the transaction. They all said the deal wasn't on hold. And Mr. Birchall even said, no, work was never stopped.

Finally, Mr. Musk -- we asked him, you didn't tell your attorneys to stop working on the deal; right?

His response: At three in the morning? No.

And, of course, the deal wasn't on hold. That very day they went forward with a meeting, May 13th. So the very deal -- day that he said the deal was on hold, they're actually meeting and discussing the transaction.

We also know that there was no right to put the deal on hold. The contract didn't allow it. And we showed you, for example, Ned Segal's testimony that there was no such term. Professor Badawi said he's not aware of any such term, and they had the right if they wanted to call anyone, including their deal attorney, Michael Ringler. The deal attorney wasn't even called in this case by Mr. Musk.

We presented Marty Korman, the deal attorney from the Twitter side. Mr. Musk's counterpart, Michael Ringler, wasn't even called in this case by Mr. Musk's team.

The tweet had immediate and devastating consequences. We've seen the stock drop, so-called "the elevator drop," and it was an elevator drop. Literally within minutes of the tweet, the stock drops from 46 to 34, almost $12 a share, and it ultimately bounces back to about $40. So it closes down over 10 -- excuse me -- about 10 percent. In one fell swoop, he erased $8 billion in company value. It was immediate and it was catastrophic.

Now, can there be an argument that Mr. Musk was simply mistaken, that he didn't really know what he was doing?

That brings us to our second smoking gun in this case, Exhibit 99. This is another exchange between Mr. Musk and Barclays. This is on May 13th, after he issues the tweet. They're literally corresponding, going back and forth during the trading day. He's giving him hourly updates, almost, about how the stock is doing in response to his tweet.

Mr. Musk knows what's going on because he's being told. He's given an update, and Mr. Lynch says [as read]:

> "There's some concern in the market that we may see more tweets. The market is now pricing the stock at basically 50/50 that you're going to go forward with the deal."

The market is pricing in a greater degree of uncertainty. So basically, Mr. Musk's tweet, that single series of tweet, even including the second tweet, the market was basically saying it's now 50/50 that Mr. Musk is going to go forward with the deal. He's created the uncertainty, just per plan.

And how does Mr. Musk respond? [as read]:

"Matches my understanding of things."

I mean, I could stop there, literally, in this case. He's admitting that he's understanding exactly what he's doing and the effect of his tweets, the impact that it's having on the stock market. Things are going to plan.

And it's not as if Mr. Musk didn't appreciate that his -- his tweets had an impact on the market. He joked about it. We showed you this exchange. This is Trial Exhibit 194, in which his brokers at Barclay said [as read]:

"Twitter seems to have stopped trading on the daily news flow, though I suspect it will still move if get a material tweet," smiley face.

They know what he's doing -- he knows what he's doing. They know what he's doing. Issue a tweet and the market's going to move.

May 13th, a very traumatic day for Twitter and for the investors of Twitter. Yet what does Mr. Musk do? Does he back off? Does he say, "Okay, I understand the market's tanking"?

No, he doubles down. And over the next couple days, he issues more tweets, more disparaging tweets, calling into question whether Twitter was a fraud, essentially.

You remember this one. This was a -- on May 13th they had that meeting, and right before the meeting, Marty Korman e-mails Mike Ringler, their attorney, and says [as read]:

"What we're giving you during this meeting is meant to be confidential and subject to a nondisclosure agreement. And by the way, your client should stop disparaging the company."

Mr. Korman testified about that in this trial.

Mr. Ringler never came up to explain what he meant or if

he responded.

And why is that important? Because later that night, that same night that Mr. Korman is saying, "Don't disparage the company. You have an NDA. The information we're giving you is covered by confidentiality," Mr. Musk issues a tweet saying -- disclosing how the company was estimating its spam. He's saying, "I picked a hundred because that's what Twitter uses."

He's literally breaking the confidentiality agreement on the same day that his attorneys are being told: Don't break the confidentiality agreement.

That's what little disregard he has with respect to his contractual obligations and confidentiality.

And if you're Twitter, you're probably thinking: What's going on here? What is Musk doing? I thought he wanted to buy our company. Why is he tweeting that we're a sham? Why is he tweeting what our confidential estimation process is?

And by the way, that's false. He didn't pick a hundred because that's what Twitter did. They picked a hundred every day, every week, every month, so it was 9,000 a month, 36,000 a year. So that was a false impression anyway.

But then they have a conversation about this, and Marty Korman gets a call from Mike Ringler, and Mike Ringler, during this conversation -- next slide -- says [as read]:

"If you ask me, maybe this is going to lead to a price renegotiation."

Close quote.

That was Marty Korman's testimony on the stand. He's saying that Michael Ringler, a day after Mr. Musk issues this tweet, is bringing up renegotiation.

So when they say there's no evidence of renegotiation, we've now seen three things within an eight-day period in which Mr. Musk is bringing up renegotiation.

And, again, this is right according to plan. Tank the stock, have it go down, and then invite renegotiation. And he does it the very next day.

Twitter doesn't want to renegotiate. It has a binding deal. So Mr. Musk turns up the heat again. This is Sunday, May 15th.

This time he says it might be over 90 percent of active users. He's referring to spam here.

The next day when the market opens, Monday, May 16th, the stock drop -- the stock drops again. It goes down another 8.1 percent. So in two days, May 13th, Friday, and close -- opening of the market on May 16th, Monday, Friday the 13th, Monday the 16th, the stock drops a combined 17.8 percent on his tweets.

And Dr. Tabak has said kind of for both of those days in his damages analysis, he found that the two-day drops were both statistically significant, meaning so large that it couldn't be explained by chance, and they're both related to that May 13th

tweet.

May 16th, later that day, Mr. Musk appears at an All In conference, and that was the videotape you saw. And the portion of the statement that we are asking you to find false in this case was a statement that he had a bunch of outside firms doing analysis and they had concluded it's about 20 percent.

Well, that's -- that's false. He hadn't consulted any outside firms. He didn't receive any reports from any outside firms. There's no evidence of that in this case, and if they had it, they would have presented it to you.

The only thing they got was SparkToro, which we'll talk about in a little bit.

Later on May 16th, Parag Agrawal issues a series of tweets. We've shown one of them here, but it's actually about 17 or 18 tweets, where he's walking the market, walking investor users through the process by which they estimate spam, basically trying to rebut what Mr. Musk is publicly tweeting about the company that they have no process.

And Elon Musk responds with a poop emoji, which he testified BS, bullshit.

Really?

What evidence did he have on May 16th that Twitter's process was BS?

But that's what he tells the market. He's telling the

market that they have no process, that what Mr. Agrawal -- and you met him; he's a quiet guy, but he's a smart guy. He's the former chief technology officer. He'd been there for 11 years. And he's basically calling him a liar.

What else could that mean?

The next day he goes one step further [as read]:

"Hello, SEC gov. Anyone home?"

He's calling on the SEC to investigate Twitter. Why is he doing this, you might ask? To drive down the price of the stock, to keep it down so he could renegotiate a better deal.

And then you have the third and last of our alleged false statements in this case, the May 17th tweet. This basically is a combination of everything that he's said up to this point, that 20 percent of the accounts are false, are spam; that Twitter's CEO had publicly refused to show proof, and that the deal could not move forward until he does.

Again, none of that is true. He had no evidence that it was 20 percent. Twitter hadn't provided him anything showing it was 20 percent. He didn't have any outside analysis showing it was 20 percent.

And nor was Twitter refusing to provide him anything at this point in time. Ms. Conti testified that she was bending over backwards to provide him with information that he was requesting.

We asked Mr. Musk, does he have any basis for his

estimations, whether it's 20 percent or 50 percent or 90 percent?

And he said on the stand, just like he said in his deposition in 2022, that it was unknowable.

Really? Unknowable? So why are you saying it's 20 percent if it's unknowable? Why are you telling the market it's up to 90 percent if it's unknowable? The market is obviously listening to what you have to say.

With respect to the 90 percent, we played you this videotape of his deposition back in 2025. This is the one that I took.

(Video played but not reported.)

**MR. MOLUMPHY:** [as read]:

"I had no basis for a rational numerical calculation."

He's literally telling you he has no basis for publicly tweeting that there's 20 percent, whether it was 50 percent or, in this case, 90 percent.

Yet in this case, what did they come up with? SparkToro.

They knew they needed some explanation for trial, so this is what they've come up with, SparkToro, a blog posted on Mr. Musk's tweet -- tweet feed that he supposedly consulted with and relied upon when he issued all these statements back in 2022.

That's what he says now. But we know what he said back in

2022, and he never once mentioned SparkToro, never in a deposition testifying under oath, never in response to interrogatories, which the Court has instructed you are just like testifying under oath.

And we showed you the actual interrogatories. We walked you through those. And we asked -- excuse me -- the parties in '22 asked, what's the basis for your tweet? What's the basis for saying it's 20 percent fake and spam accounts?

Never mentions SparkToro. Rather, he says it was based on his personal experience.

So he's tweeting to the market there's 20 percent. The company is basically overrun with spam. They're lying in their financials when they say it's less than 5, and he's relying on only his personal account.

SparkToro is a red herring.

And by the way, if you read the SparkToro report -- and I invite you to do so; it's very short. It's Exhibit 143 -- they actually say, we are not even disputing Twitter's claim. Our methodology is less accurate than Twitter's own system.

Yet that's what he's relying upon in this case as his justification for two of the three statements at issue.

The other explanation you've heard in this case was that he was actually interested in the raw data. Well, we see in the deposition testimony he didn't mention raw data. He mentioned he wanted to know the methodology. In fact, he

tweeted about that on May 21st, 2022.

He's saying they refused to explain how they calculate that 5 percent of daily users are fake and spam.

That's kind of a critical date, May 21st, because we know now that that's the date they actually gave him the spam methodology memo, so the same date he's tweeting they're not giving me this information, he received it. His deal team received it.

And you've seen that memo. That's Trial Exhibit 140. This is from a May 21st three-hour meeting. This is the ambush meeting that Kate Claassen said she was ambushed at, even though the purpose of the meeting was -- excuse me -- specifically to discuss spam as a percentage of mDAU. That's why the -- that was one of the two agenda items.

And after working day and night for two weeks to prepare this memorandum, they walk her through that as well as other people from her team, and it gives the exact information that Mr. Musk says he never got, the explanation about how they pick the accounts, sampling, and how they determine whether they're true or false, labeling.

This was not an ambush. This was exactly what they were looking for. And we know that from Kate Claassen's contemporaneous a e-mails. This is her e-mail back to Mike Ringler and the rest of the Morgan Stanley team following this meeting.

She says later in this e-mail that [as read]:

"The session was constructive and ended with Bob" -- Bob Swan -- "reiterating that we are all working to close this transaction and make Twitter successful."

Ambush?

How can you be ambushed when you're receiving the exact information that Mr. Musk has been saying he didn't get and they're giving it to you in written form?

Why is her testimony changing, you may ask? Maybe because she continues to be working for Mr. Musk to this day.

Oh, by the way, two days after this meeting, she then meets with Ned Segal, the CFO, who now works at City Hall; you met him. And Mr. Segal not only offers to walk her through that; he offers to walk Elon through this and says -- this is Ms. Claassen's recollection of that call back to Mike Ringler [as read]:

"Segal offered to have a smaller group discussion with Elon."

So Mr. Segal is offering to walk Elon through this memo if he has any questions. And you'll see this was a theme that we kind of presented during this the case, this idea: Did Elon Musk really want to know? Did he really want to know this information? Because we keep trying to meet with him and explain it to him, and he keeps giving us -- what did

Mr. Armstrong say? -- The Heisman?

June 17th, Mr. Segal texts Mr. Musk [as read]:

"I'm connecting Elon, Bob, Parag, and me to find time for the four of us to cover spam."

So, again, Mr. Segal -- he's not hiding information. He wants to meet with Elon and Bob Swan, his interim CFO, and walk him through the process, to have them meet with whoever they want at the company.

But Mr. Musk didn't want to meet. He didn't want to know.

A few days later, Bob Swan cancels the meeting. This is an internal e-mail between Bob Swan and Elon canceling the meeting that Ned and Parag wanted to put together. A few days later, Bob Swan is fired.

And, of course, we know from Mr. Segal that Mr. Musk didn't even read the memo. That's how important he thought this was. He got the memo. He admitted he received it. And on June 30th, he tells Ned Segal, I haven't even read it.

And you'll remember when we asked Mr. Musk on the stand, why didn't you take Mr. Segal up on his offer to meet with their executives if you really were concerned about spam?

What did he say? Pointless. Do you remember that testimony? He thought it would be pointless. He didn't care.

On August 6th, 2022, over a month later, he actually tweets [as read]:

"If Twitter simply provides their method of

sampling a hundred accounts and how they're confirmed to be real, the deal should proceed on original terms."

They gave him this information on May 21st. They offered to walk him through it multiple times. He said he didn't read it, yet he's tweeting about it, saying: Well, if they just give me this information...

Quickly go through some of the --

How are we doing?

Quickly go through some of the spam raw data. You heard that story, and I'm sure you're going to hear it when I'm done. This is the calendar argument the -- during the week between May 6th and May 13th that Twitter promised to provide this internal data. I think the important point is the documents totally refute this explanation.

This is May 12th, an e-mail, Exhibit 94, and it's a recapping a conversation that Goldman Sachs had with Anthony Armstrong from Morgan Stanley. And they're identifying the type of user information they want: The number of users, the verified users, the number of monthly active users and handles. No mention about spam audit information.

They then send trackers, and you'll have these trackers to look at. This was the tracker that was in place right before Elon Musk issued his tweet, Exhibit 567. And it's listing as an information request the key metrics, including number of

users, number of verified users, number of monthly active users, number of handles, the same information we just saw in the prior document. That's the data that they were looking for.

As it related to spam, it was a discussion topic, and they wanted to know how do you estimate it. They wanted to know the methodology.

And that's exactly what Ms. Conti testified to several times. She also testified that they were continuing to provide information on a rolling basis. So when May 13th comes, you can't say that Twitter is refusing to provide you anything when that same night she's saying, we're going to continue to provide you this on a rolling basis.

And by the way, Twitter wasn't adverse to providing this information so long as they had protocols in place. And you heard from the jury instructions it's appropriate to have protocols in place for private information. You'd expect your information, your password, your tweeting information, your geolocation to be treated privately with protocols in place.

So Mr. Korman testified extensively about asking for protocols, sending correspondence. What protocols are you going to be putting in place to protect this information, to protect the privacy of our users?

And what was the response he received? [as read]:

"Did Mr. Musk respond with any concrete and

detailed protocols?

"ANSWER: No, Mr. Ringler did not, and I didn't hear it from anyone else."

So, again, they don't really want this information. They were looking for a way out. This was the pretext. So every time they offer, just like with the spam methodology, every time they offer to meet, every time they offer to provide information, every time they ask for reasonable protocols about protecting this information, they're ignored. And you'll see that's a constant theme in this case.

On July 8th, after never responding to the protocols, Mr. Musk said -- purports to terminate the merger agreement, claiming that it -- that Twitter was refusing to provide information. And you've seen all the information which Twitter was providing. The stock drops that day 11 percent.

Now, when we talk about later in the case damages, this 11.3 percent relates to the scheme damages. So it's an additional stock drop that we allege is related to the overall scheme in this case.

Twitter takes Mr. Musk to court on July 12th. Sues him.

And Mr. Musk treated this like a game. He issues this tweet [as read]:

"Now they want to force me to buy Twitter in court. Now they have to disclose bot information in court" -- with a big smiling face.

This is some type of joke, as if now that he's going to get access to information that he didn't get before and prove them wrong.

Yet just a few weeks later, he has his attorneys approach Twitter's deal attorneys and threaten them and say [as read]:

"Renegotiate this deal or it's going to be World War III until the end of time."

You remember that testimony by Mr. Korman. It was so surprising that he had him repeat it and then repeat it again with another attorney on the line. He repeated it three times, Mr. Ringler. And Mr. Ringler, again, didn't appear today or during this trial to dispute that testimony.

Why would you threaten the other side that it would be World War III unless you renegotiated the deal? Does that sound like legitimate business conduct by a legitimate businessperson?

Mr. Musk's other deal attorney, Alex Spiro, testified. It was a very short testimony, about five minutes. But he acknowledged when I asked him about Mr. Korman's testimony -- because Mr. Korman also testified about a conversation with Mr. Spiro in which he said it might not be comfortable if he went forward with this deal for Twitter and their heirs.

And their heirs, their family members.

And what he tried to say was: Well, what I meant was Elon Musk's heirs.

Come on.

You've got to use your common sense in this case, and that doesn't pass the smell test. He was threatening Twitter people and their heirs if they didn't renegotiate the deal.

On October 3rd, after everyone had done whatever they needed to do in the case, Mr. Musk walked away. He went forward with the deal, a $44 billion deal. After accusing Twitter of a massive fraud, he went forward with the deal -- not -- no settlement -- at full price. And the explanation he gave to you on the stand was [as read]:

"We were unlikely to win the case in Delaware because the judge was extremely biased against me."

That was his reason for not -- for going forward with the deal, that the judge in Delaware was biased against him.

Again, that doesn't pass the smell test.

And then finally, final point is after he bought the company, you may require this -- remember this testimony. He actually testified about conducting his own analysis. And remember, he owned the company at this point in time. He had access to whatever information he wanted.

And he testified about an analysis that he had done at Twitter that confirmed that he was right all along.

Where was that analysis in this trial? Don't you think that would have been Exhibit A, B, and C if it existed? If he had the goods on Twitter, if he had found out that, in fact,

Twitter had been lying, that its spam accounts were more than 5 percent, do you think he would have seen a piece of paper, an e-mail, a text in this case? Do you think they would have called a witness to present that analysis to you?

He's literally just making this up as he goes along and hoping you'll believe him without any evidence.

So that's the evidence in this case that we've presented, an overview of the evidence, but I think you understand, I think, the true facts and the true motivations and why we're alleging both a scheme case and a misrepresentation case.

Quickly through the elements that you'll be asked to answer for each of these statements:

Was it true or false? Was it misleading or not?

And for a scheme, was there an act, a device that was meant to manipulate the stock price?

Well, we've shown you the contemporaneous e-mails in which Mr. Musk, along with his brokers, were planning this exact same thing.

Was it material? Would a reasonable investor consider it to be important?

Of course. We saw the reaction when the tweets came out.

Did Mr. Musk act knowingly or recklessly?

Well, it was his deal. He was the one issuing the tweets. He knew what the contract allowed or didn't allow. This isn't a case in which he can blame it on someone else. And if he is

relying upon something like his own personal experience to tweet his 20 percent, that's reckless. That's deliberately reckless.

Interstate commerce. There's no dispute about that. He's using the Internet, his platform, to issue these tweets and misrepresentations.

The element of reliance. In the class action you heard Dr. Tabak talk about this, but there's something called a "fraud on the market presumption," which applies in class actions, which basically means when it's a very large company, publicly traded stock, an active market, you can presume that the market as a whole relied upon public statements.

Again, that testimony was unrebutted in this case.

The plaintiffs also testified about their reliance on the market. Brian Belgrave said, for example, when you sold, did you rely on the market price to be accurate?

He said, oh, yeah.

Nancy Price also testified as to their couples transactions that they're riding the ups and downs of the stock market. So they were relying upon the market price, and there's no evidence that they somehow would have purchased had they known that this was all a sham, which was their burden to show.

The final element is damages. We have to show that there's some causal relationship between the tweets and the

damages.

In this case, there's a direct correlation. In fact, it happened within minutes. You've seen the chart on May 13th. There can be no dispute that Mr. Musk's tweets caused this loss, caused this drop. This is Exhibit 276.

Dr. Tabak also testified that when the market opened -- this is Friday, on May 16th -- the stock market dropped another 8 percent, approximately.

So those two days, we're asserting, are damages, and that's what he used to evaluate damages in this case.

Dr. Tabak also showed you Exhibit 322, and just as a summary, this shows the difference between what Twitter actually traded at, the price in blue, and what it should have traded had the true state of affairs happened, had he not issued his false tweets.

There will probably be some discussion from the defense about true state of affairs, and they might try to parse some of Dr. Tabak's testimony on the stand. But the true state of affairs here is if he didn't lie in the first place, if he didn't issue these false tweets. And that's what Dr. Tabak has done with his analysis, the only analysis presented to you in this trial. They didn't call a damages expert.

On the verdict form, you'll be asked to answer about five or six questions, so there'll be one question for each of the three tweets, each of the three statements, whether there's

liability for those.

Let's quickly go through that one. The first one was statement one. This is the "deal on hold" tweet. We've talked about that at length.

The deal wasn't on hold. He knew it wasn't on hold.

The All In Summit, 20 percent, a bunch of smart outside firms have done that analysis. There was no outside firms. There's no evidence of any outside firms telling him it was 20 percent.

SparkToro? That's the only one he presented, and he said in his sworn testimony back in 2022 he didn't even rely upon them.

The May 17th tweet. That's the combination, basically, of the two. Again, no basis to say it's 20 percent. No basis to say the deal cannot move forward. He didn't have that right under the contract, didn't provide evidence of that right, and he had no right.

So for each of those three questions, we submit you can find liability for those statements.

In addition, question 4, that's the scheme case. That's in addition to these three statements, you can also find Mr. Musk liable for a scheme, for an overall plan to manipulate the price, which is what we described here.

And we've seen the evidence, contemporaneous evidence, that he knew what he was doing. And this was not some isolated

event; this was part of a plan to drive down the price. And it worked.

So the scheme question should also, respectfully, if you agree with our evidence, be submitted yes. We think the evidence is overwhelming in this case.

Which leaves us with damages.

Dr. Tabak provided you with two different approaches, depending on whether you check the box for misstatement liability or scheme liability. Essentially, if you find scheme, it's a more encompassing damages metric, and you'd use Exhibit 282.

Conversely, if you only find that the misstatements are actionable, that would be Exhibit 342.

But either way, Dr. Tabak has provided you, in his exhibits, with a description of the daily deflation.

Now, why do I say that? Because the verdict form unfortunately doesn't ask you for a single number. It asks you to go through for each of the days during the class period and put in what is the daily deflation on that day. But -- and you can kind of see that on the picture here what the verdict form looks like.

But Dr. Tabak has put for each day. If you choose, for example, scheme liability, this is Exhibit 282. The first day would be 6/17. May 16th would be 769.

Now, you may have your own damages calculation. You don't

have to follow Dr. Tabak. But that's the only damages model that's been presented to you in this case from either side.

Dr. Tabak's methodology was also conservative. He took into account the fact that the -- that there was a merger discount at the time that these tweets were issued.

Finally, with respect to options, the relevant trial exhibit is 298, and you'll be asked for the -- for the options to check a box. So you don't have to answer each day during the class period for options. Rather, because there are so many options during the class period -- 298, you may remember, was the Excel spreadsheet that Dr. Tabak talked about. It's in evidence.

But it basically lists for each of the options what the damages were during the class period, and if you agree with Dr. Tabak, you check the box saying the amount of damages, plaintiffs' expert calculated in Exhibit 298. That's the first box. And I apologize I don't have it blown up, but that's the first box under Question Number 5.

Alternatively, you can find your own damages calculations, but none other -- no other damage calculations were provided by the other side.

In conclusion, we think we provided you with overwhelming evidence of what happened here. It's consistent with the evidence. It's consistent with common sense. And Mr. Musk had no intention of learning about spam or its methodology, despite

given every opportunity to do so at the time. This was a pretext.

His alternative explanations in this case make little sense, and the few witnesses he has called are all on his payroll, with biases.

And even what they said doesn't excuse his outrageous behavior, tweeting about something literally at the top of his head without any basis. You can't do that with a publicly traded company because of the effect it has on the individual investors, like the plaintiffs in this case, all the thousands of other people like them out there.

People have the right to rely upon the securities market, that when you open your mouth, you speak the truth, you have a basis for what you say. Because if you don't, the securities laws hold you liable. And in this case, you shouldn't allow any person, no matter how powerful, how rich, how influential, to say whatever he wants whenever he wants and not be accountable.

He should be held accountable in this case.

Thank you.

**THE COURT:** Okay, ladies and gentlemen. We're going to take a recess now. We'll be in recess until 11:25.

Remember the admonition given to you: Don't discuss the case, allow anyone to discuss it with you, form or express any opinion. We'll then proceed with the defense argument.

(The jury leaves the courtroom.)

(Proceedings were heard out of the presence of the jury.)

(Recess taken at 11:09 a.m.)

(Proceedings resumed at 11:24 a.m.)

**THE COURTROOM DEPUTY:** Come to order court is in session.

(The jury enters the courtroom.)

(Proceedings were heard in the presence of the jury.)

**THE COURT:** Please be seated. Let the record reflect all jurors are present. Parties are present.

You may proceed.

**MR. LIFRAK:** Thank you, Your Honor.

**CLOSING ARGUMENT**

**MR. LIFRAK:** When I stood in front of you two weeks ago, I said that I knew you would take your jobs as jurors seriously; you would take this entire case seriously. And we've all seen that: Every day, every witness, every document, every video where you're tempted to close your eyes for a second. I join Mr. Molumphy in thanking you for that, because this is so important, and getting this right is so important.

Now, the puzzle that I talked about in opening is together. You have all the evidence that you're going to see.

Did plaintiffs prove that Mr. Musk purposely engaged in a fraudulent scheme to fabricate this concern about bots to drive down the price of Twitter stock to try to get a better deal?

That's the question before you: Did they prove that?

And I'll talk about it throughout my closing, but plaintiffs have not proven any element of any claim against Mr. Musk. Remember, it's their burden, the plaintiffs' burden, to prove every element.

During plaintiff's opening, you may remember they said keep an eye -- keep an eye on Elon Musk. And you did. He sat there over the course of two days, and he did what I said he would do, which is tell you: I didn't have a scheme to knock down Twitter stock price. I didn't lie in May of 2022.

He sat there and he told the truth.

Now, much of this trial has been about other things. It's been about what Twitter was doing, about how Mr. Musk asked for data, and then Twitter said yes but then didn't give it to him. Twitter clammed up during this process.

It's undisputed that before the termination, Twitter didn't give Mr. Musk the data he needed to test that 5 percent number. That's undisputed. They don't dispute it.

But this case isn't about whether Twitter committed fraud, whether Twitter hid things. It's not about whether they were incompetent or being difficult or maybe just slow-rolling things, hoping the deal would close before he asked too many questions about the bots. The evidence of Twitter's kind of questionable behavior is so strong, it's tempting to go back into that jury room and debate: Well, did Twitter commit

fraud?

That's an interesting question, but that's not this case. Even if you think Twitter had legitimate reasons for its conduct, that's still not this case. This case is whether plaintiffs have proven that Mr. Musk committed securities fraud. This case is about whether Mr. Musk made up concerns about bots.

He didn't care. That's what you heard in plaintiffs' closing. He didn't care about them.

And whether Mr. Musk tried purposefully to drive down Twitter's stock price -- he didn't.

And make no mistake about it. That's plaintiffs' theory. The bot concern was made up. It was a lie. And Mr. Musk was engaged in a deliberate effort to drive down Twitter stock price -- a plot, a lie and a plot.

They haven't proven any of that. They haven't proven a lie about bots. Mr. Musk's concern about bots was real. You saw it. His request for information, his wanting to get to that truth was real.

And you saw Twitter's suspicious behavior when he did that. You saw how everyone was getting suspicious about Twitter's responses, time and time again. That was very real.

And beyond that, they haven't proven a plot either. Not one shred of evidence that Mr. Musk purposely intended to drive down Twitter's stock price. Remember that. They need to prove

that to prove securities fraud. Without any of that, there's no fraud. There's no lie about bots. There's no plot to drive down the stock price. There's no case.

All of that is plaintiffs' burden to prove, and they haven't proven it.

So what do plaintiffs say instead? Well, they say Mr. Musk had a motive. He had a motive to save money. Okay. But the jury instructions specifically will tell you that even a supposed motive to commit fraud, even an opportunity to do so is not sufficient to prove intent to defraud. You need to have fraud. They haven't proven fraud.

And, of course, people were talking about a renegotiation once this bot issue came up on May 6th and after. As Mr. Armstrong talked about, when an issue comes up in a deal, there are three options; right? You go forward with the deal, you stop the deal, or you renegotiate. And there was no secret about that. Mr. Musk talked about it publicly. He tweeted about the possibility of renegotiation. He verbally said it at the All In conference. It wasn't a secret that this deal may get renegotiated.

And plaintiffs' entire theory falls apart when you know something they didn't even talk about. Mr. Musk didn't push forward. He didn't demand a renegotiation. In May, in June, in July, in August, not until Twitter called him to settle the case in September. And then what happened?

They offered him billions of dollars off, and he said no. He said no, I want to preserve my right to possibly go after the people at Twitter who had committed fraud with these bots and who had made representations for years that they were 5 percent.

What kind of fraudulent scheme to renegotiate is that? And that's their claim.

What kind of fraudulent scheme is it when you don't actually try to get a better price, when you don't actually, when they offer it, say yes?

Plaintiffs have not proven a scheme to break the securities laws.

If there's no scheme, what's the argument? Then misstatements. You may have spent most of this trial wondering, what am I being asked to decide? Which of these tweets, these statements, are alleged to be false?

You saw and you will see in the jury instructions that only three statements are alleged to be false and misleading: May 13th tweet; May 16th podcast, May 17th tweet. Two tweets and a podcast does not equal securities fraud. There are no misstatements in any of these.

He didn't say anything false in the May 13th tweet. He told the world he wanted details. He was waiting for details.

He was.

He made clear he was still committed to the acquisition.

He was.

He kept things moving forward with the transaction while this was pending. That's exactly what was going on, and that's what his tweet says.

The chairman of Twitter's board came in and testified. He quote-tweeted Mr. Musk's tweet at the time on May 13th. He amplified it. He shared it with the world. He knew it wasn't a lie. It wasn't.

All plaintiffs have done in this case is ask witnesses, "From your perspective, was the deal on hold?" They just say "on hold."

But Mr. Musk's tweet wasn't two words; it was 25 words. It told the truth about what was happening at the time.

And this is important: Not a single witness came in here and took the stand and said that Mr. Musk's tweet was false or misleading. Think about that. They have a misrepresentation case. Not a single person, including the named plaintiffs, came in and said the tweet was false or misleading. And guess what? Nobody said it at the time either. No one.

Mr. Musk's statement at the All In conference May 16th was his opinion. It wasn't a lie. 20 percent, that's what SparkToro had said the day before. And Mr. Musk said specifically, my opinion is based on these outside firms. That was true. Not a lie. May 17th tweet, same thing, same statements, also not false.

In addition to a direct misrepresentation claim, they also have to prove a number of other things. You saw some of that. They have to prove materiality, intent to defraud, reliance, loss causation, damages. I'll talk about some of those.

But for now, just keep a couple of things in mind as I go through.

For plaintiffs to meet their burden, they have to prove that the actual state of affairs was materially different than what Mr. Musk said. They have to show that the fraud, the alleged fraud, caused the stock to go down. Tweeting non-fraudulent things is not securities fraud.

They also have to show that Mr. Musk intended this, that he intended to defraud investors. They didn't prove any of that. Mr. Musk didn't break the law. He didn't commit securities fraud.

We can put the slides up.

The first thing they have to prove -- we're going to talk about their scheme claim first. They have to prove that Mr. Musk carried out fraudulent acts that had the principal purpose and effect of creating a false appearance of fact in furtherance of a scheme to defraud.

When you go in the jury room, look at this instruction. It is a mountain to overcome. They haven't -- they haven't proven any of this. They haven't proven that Mr. Musk had fraudulent acts, Number 1.

They haven't proven that the principal purpose was to create a false appearance of fact. They haven't proven that the effect was to create a false appearance of fact. And they haven't proven that all of this was in furtherance of a scheme to defraud. They haven't proven any of it. Hold them to it.

Remember plaintiffs' theory: Mr. Musk was using bots as an excuse to drive down the price of Twitter stock, lie about bots, and a plot to drive down a lie and a plot.

So let's talk about the lie. The alleged lie is on the screen. It was from plaintiffs' opening. The request, the data. The questions, all pretext.

You heard it just now. You heard that Mr. Musk didn't care. He didn't really care. His concerns about Twitter's questionable behavior when he started asking questions, that concern's made up. That's their theory, that this wasn't real. A fraud. They have to prove that this wasn't a real issue to him.

But you've seen so much evidence. You've seen the bankers. You've seen Mr. Musk. This was an issue. This was real. If it was real, there's no fraud.

You saw this concern going back years. Of course he was concerned about bots on Twitter. He was a user of Twitter, and he was concerned about it. No dispute about that. He viewed it as a real problem.

And then he got this. This is the 5 percent statement

that you saw in Twitter's public filings and the merger agreement. You've seen these plenty of times. I'm not going to keep it up for long. But in the -- in the Twitter 10-K, they said very clearly, it's 5 percent. And the merger agreement says, we promise that the statements and public filings are true. That includes the 5 percent.

So that is Mr. Musk's state of mind coming into this deal. He's skeptical. He is absolutely skeptical about this 5 percent. We agree. He said it. You heard him say it on the stand.

But people told him: Oh, it's just your account. There are these real users that you can't see. You can't really count it.

And at the end of the day, he had what you just saw, which is a promise. A promise.

You heard a lot about the May 6th meeting. Here's what's undisputed. The five percent issue was on the agenda, Morgan Stanley sent it. You saw Twitter internally saying: We know this is coming up. Give simple and summary answers only. Okay?

And every single person on Mr. Musk's side expressed surprise about the hundred-person thing and about humans reviewing it. Every single person, including Ms. Salen, who again, has -- as counsel said, has no dog in this fight. They were surprised by this. This seemed inadequate.

Mr. Musk at the meeting pressed them: Give me more information. Give me the data.

You heard the testimony from Ms. Salen. Give me the raw data. That's what was said at the meeting: Give me the data file.

Ned Segal looked across the table. He didn't say "no." He didn't say "privacy." He didn't say "not under this agreement." He said, "We'd be happy to do it. We're happy to."

And then this testimony. You heard everyone on Mr. Musk's team make it clear. They asked at the May 6th meeting for data -- not explanations, not excuses, not summaries. They wanted the data to test.

For them to have a fraud claim, for them to claim that this was all made up, every single person that you see on your screen had to have lied under oath. They didn't.

And you heard from the one neutral person, Ms. Salen -- didn't work for Elon Musk before, didn't work for him after. No skin in the game, as it was said in plaintiffs' closing. This is what she said about the May 6th meeting.

(Video played but not reported.)

**MR. LIFRAK:** All of the data.

They stood in front of you during their closing and said they didn't ask for data. Everyone makes clear, everyone you heard from said data was requested.

And this trial isn't about which one of Ms. Salen's options happened. It's not about whether Twitter was unprepared, incompetent, intentionally withholding. It doesn't matter. It's about whether what happened raised doubts in Mr. Musk's mind, in his team's mind. Why are they hiding this? Why are they -- why are we requesting data and they're not giving it to us? Was that real or was it just made up?

And then you saw what happened after May 6th. Twitter clammed up. They didn't provide data.

You saw what came next. May 12th, on the right, this is the memo, the one-pager. It's the exact same thing that was on the talking points for May 6th. They didn't provide any new information except for that last sentence that only Mr. Segal said he understood.

And you know what Ms. Conti -- Ms. Conti, the person who does this, who did the diligence process. She came in and she told you, and we saw her Slacks from the time, we knew that he would hate it. We knew he would hate it. It didn't provide anything. It didn't provide the data that was requested. It said nothing.

And you heard from Mr. Armstrong from Morgan Stanley they did hate it. Mr. Armstrong said -- that's when he said he felt like he got The Heisman, he got the stiff arm, because Twitter didn't provide anything.

Mr. Musk thought that was inadequate too. You've heard

him. And then he went on Twitter and posted the May 13th tweets, exactly what was happening. He was waiting for details supporting the calculation. They promised that, and they provided nothing on May 12th.

We'll come back to that tweet in a few minutes.

Then there's the May 13th meeting. You heard about it. Mr. Musk's team complains: Why no data? Why didn't you give it to us?

Same thing: Give us data. Twitter says, again, the testimony was "You'll get the hundred percent answer." Remember that testimony?

They didn't.

Again, he gets the stiff arm. He gets the five-page document on the 21st. Again, there's no data. You may remember testimony that there was some data in there, the actual percentages under 5 percent taken out. They wouldn't even give him the most basic data on May 21st.

No numbers, no data, not the hundred-page training manual that you saw -- nothing. They gave him nothing. And they refused to explain this -- adequately explain how they got this 5 percent number, and they refused to allow Mr. Musk to test it, which is what he always wanted. He wanted to test this number. He wanted the data.

So let's talk about data. That's what he asked for, and that's what he never got.

At first in this trial, the story was Mr. Musk didn't ask for it. Mr. Segal said expressly, "I don't remember him asking for it." Ms. Conti said they didn't ask for data at that point. Remember that?

Then the story changed. Oh, we admit they did ask for data. Mr. Segal said it. Mr. Segal said, "Oh, when I said Mr. Musk didn't ask for data, I was only referring to him, not his team." His team asked for data, yes. Look at that last answer. That asked for data.

Ms. Conti, I showed her a document on May 13th asking for data, and she said "Oh, I guess maybe I missed that."

They did ask for data.

Remember I said for their fraud claim to work, all those people talking about data on May 6th would have to be lying? Guess what? They would have to be lying too, because the Twitter executives admitted that Mr. Musk asked for data.

The facts are the facts. And the calendar -- and I have upgraded my calendar to an electronic calendar -- is the calendar.

Let's look at every time Mr. Musk and his team asked for data.

May 6th, asked at the meeting.

May 9th, Mr. Musk's team asked for a data dump. Remember that e-mail? They showed it to you in their closing. Data from every possible angle.

On the same day, Morgan Stanley made it clear in writing they wanted data and a discussion. Remember we had that discussion with Ms. Conti? Data first, then a discussion.

The fact that it's in the diligence tracker as a discussion doesn't matter. They wanted the data first and then a discussion.

You've heard about requests on the May 13th call, and then you saw May 13th e-mail, Goldman Sachs saying -- and I'm quoting from Exhibit 105 -- that they're asking for, quote [as read]:

"Data and methodology underneath the 5 percent spam accounts."

That's Exhibit 105. That's on May 13th, specifically requesting data in writing.

That's the one that Ms. Conti saw and said, "Well, maybe I missed this. I don't remember seeing this."

You saw requests in writing on May 17th, on May 21st. You saw it again on May 25th. You saw Mr. Musk's team asking again on the 31st and saying, "we'll put in whatever privacy protocols you want." That's Mr. Ringler's letter.

You saw it on June 6th in the termination letter, still asking for the data.

Again on June 17th and the 29th. Look at that.

Are they seriously still arguing in closing that Mr. Musk didn't ask for data, that he didn't want it, that he didn't

care, that this was a fraud, that he wasn't interested?

That's not true.

And here's the most -- the two most important things about the data.

Number 1, it's undisputed that before the litigation, Twitter didn't give him the private data he needed to test the 5 percent. This is what Mr. Segal said [as read]:

"We didn't provide it."

We didn't provide it. And then the next slide, Mr. Segal says he needed it. To test that 5 percent, he needed the data. We didn't provide it, and he needed it.

Maybe this was an issue of Twitter clamming up. Maybe it was partially a miscommunication. Ms. Conti did seem surprised when I showed her in writing asking for data. She said, "Oh, I don't remember that." Maybe it was Twitter trying to be vague. Maybe it was something else.

But that's not the issue. The issue is whether this was all a smoke screen, this was all Mr. Musk making it up, whether the way Twitter was acting didn't raise actual suspicions. It did. It raised all kinds of red flags. If you were in that situation and you saw all of this, you would have thought the same thing.

You saw how Mr. Armstrong wanted to cancel the May 13th meeting after all -- after they got that May 12th one-page document.

You've heard Morgan Stanley witnesses talk about how their suspicions grew and grew over time, and then the SparkToro report came out. That was kind of the straw that broke the camel's back for them. Were they in on the scheme too? Did Morgan Stanley make up their concerns and their requests?

Again, they don't get paid on this deal unless the deal goes through. They weren't making it up.

And you saw in plaintiffs' closing Mr. Musk -- statements from Mr. Musk saying, "I just want to know how it's done," implying that "how" doesn't mean data, but he made it clear on the stand and in writing he wanted to take the scientific method to this. He wanted to test it.

If Mr. Musk asks how a car runs, he doesn't want a five-page brochure talking about how great it is. He wants to get under the hood. That's what he asked for. That's what his team asked for.

Now, let's talk about some of the excuses that you heard why they didn't give Mr. Musk the data. Okay?

Before we get into that, think of how ironic that is. They're still saying he didn't request the data, but here are all the excuses for why we didn't give it to him. Okay? It doesn't make sense.

But here are some of the excuses. And, again, you're not here to decide whether these excuses are valid or not, but whether this was a legitimate effort by Mr. Musk to get the

data or whether it was part of a fraud to drive down stock prices. That's the choice.

So let's talk about the contract. This isn't a breach of contract case. It's not your job to decide whether Mr. Musk had rights under the merger agreement to get the data or not. It's plaintiffs that have to prove that he didn't really believe he has a right to data and documents from Twitter, that it was part of a scheme.

But the evidence made clear and Mr. Musk testified he did believe that Twitter had agreed to provide the data, both in the merger agreement and in these meetings and in writing.

How much did we hear that this was a seller-friendly agreement? He waived presigning due diligence. It doesn't matter. None of that matters. It's what's in the agreement. And it's undisputed that the agreement gives Mr. Musk information rights.

And there are three important facts I want to have you keep in mind. First, Section 6.4 says specifically Mr. Musk has a right to information reasonably related to closing.

Okay? That's what it says.

It's absolutely undisputed that the merger agreement says this. He had a right to information before closing.

Fact Number 2. Plaintiffs' expert went back and forth but admitted -- he admitted that information to test reps and warranties -- that includes that 5 percent number --

information necessary to do that fall within a provision to provide documents related to closing. Exactly what the merger agreement says here.

That's what Dr. Badawi said on the stand.

Documents related to closing equals documents to test reps and warranties, the 5 percent.

And that makes sense. Once you have the reps and warranties, you can test them.

Fact Number 3. We saw just a few minutes ago Twitter didn't give Mr. Musk the data he needed to test them. So think about that. The merger agreement says you get docs related to closing. The expert says docs to test the reps and warranties, that include -- that is -- fits that exact definition. And Mr. Musk didn't get the data that he requested.

Next excuse was that Twitter -- there was a concern Twitter -- at Twitter that Mr. Musk would start a competitor. You didn't hear about that in closing. I'm not going to spend much time on it, but Mr. Dorsey said that wasn't really a concern. You saw his videotape. You can't just create a competitor overnight. That didn't make sense.

Next excuse, Mr. Musk had released confidential information, and they point to Mr. Musk's tweet saying Twitter looks at a hundred accounts a day.

They made, in questioning of every witness, what a big deal this was. Right? It was such a big deal that Mr. Musk

released this information, a hundred accounts a day, such confidential information that we can't trust him to provide the data he's asking for, which now they say they didn't ask for.

But think about that. What happened? Mr. Agrawal, the CEO, came to the stand, and this is what he said.

"Silly." The excuse is silly that they spent so much time on. He admitted it.

And then Mr. Agrawal, by the way, in a tweet May 16th, he tweets to the world. This is a discussion going on at Twitter. On Twitter, he tells people what Twitter does look at when they're trying to look at spam and coming up with the 5 percent. IP address, what the account does when it's active. Way more information than they look at a hundred accounts a day.

The excuse of confidential information is silly. It makes no sense.

The next excuse you heard so much about, privacy. There's no evidence that this was an issue at the time, that Twitter told Mr. Musk's teams that because of privacy laws, he couldn't get the information.

This is what the privacy policy says [as read]:

> "Twitter can share information with someone acquiring the company before and after closing."

And you'll remember Mr. Segal took the stand, and he said: We didn't give him the information because of privacy laws. He

said that specifically. And then I showed him the privacy policy, and he claimed he never looked at it and didn't know what it was.

So this is the final word on this issue.

The Court will tell you Twitter's privacy policy permitted this. This excuse about privacy laws, privacy policy -- it was made up at trial. It wasn't an issue at the time and it isn't an issue.

And you saw this in plaintiffs' closing about protocols. Mr. Ringler, you saw evidence, specifically said, "We'll do whatever you want. We'll put whatever protocols you want in place. Just tell us."

The next excuse: Mr. Musk didn't care.

You heard a little bit about that in their closing.

Mr. Musk did care about this. He met with Mr. Agrawal, Mr. Segal weekly. You heard about his weekly discussions in June. He did an all-hands meeting, all Twitter employees, in June.

This isn't someone trying to tank the deal, tank the stock. It's somebody trying to make it work.

You heard about so many meetings, so many calls. You saw all the agendas, all the minutes. Is it really their position that there weren't enough meetings, that they didn't care enough?

This was a legitimate effort to get information about fake

accounts. This wasn't a smokescreen. It wasn't a fraud. That's their position, and it's not true.

They never got the data. They wanted data, then talk. They didn't want more talk. They just wanted the numbers. They wanted to test it themselves.

You heard testimony and in argument about Mr. Musk not reading that five-page document. The five-page document didn't have any data in it. Everyone looked at it -- his bankers, Mr. Birchall. You heard testimony about it. They want data, not words.

So those were the excuses. Those are the excuses that they came up with at trial. And it comes to one conclusion: Mr. Musk's concern about this was real. They haven't proven that it was a lie, that it was part of a fraudulent scheme. And if they don't do that, they don't win on the scheme claim.

So why did Twitter clam up? Why did they not provide the data?

Again, you don't need to answer that question. But the more questions that Mr. Musk raised, the more questions came up. They didn't want Mr. Musk to go below the surface on this.

You saw the 5 percent number. Never audited. Checked by one person, Ms. Anargyros at Twitter. You saw the people who signed those SEC disclosures 40 times had no idea what was going on, didn't know who did the calculation, didn't know how it was done. They never talked to Ms. Anargyros before.

Nothing. They signed this disclosure, this representation, numerous times, 40 times, without even checking or asking basic questions. They only did it when Mr. Musk brought it up.

And then there was Ms. Conti, freely admitting that this was a mess. Broken windows and the company's miserably inadequate, it's nutty.

This is what they didn't want Mr. Musk to see.

There's the hundred-page slide deck, talks about innocent until proven guilty, shows that the human reviewers were told you have to have three indicators of spam before you mark something as spam. They didn't want this out. They didn't give this to Mr. Musk.

Ned Segal. You remember some of these?

Stop offering diligence on spam. How clear can you be? Stop.

He's on a call, and the document on the right with Mr. Agrawal and Mr. Musk, and he's saying to his boss in all caps, "Don't walk through the numbers. Just be quiet."

They clammed up, and this is why.

And despite all this, the truth started to come out. We saw SparkToro publicly disclosed. Mr. Musk sees it on May 15th, when it comes out. Not 5 percent; 19.42 percent. And you saw in defendant's [sic] closing -- while it wasn't -- this wasn't listed in Mr. Musk's interrogatory responses. But remember when I asked him questions and it says this -- my

response is based on my personal experience? Well, this is his personal experience. He saw this.

SparkToro is an inconvenient truth. They can downplay it all they want. But at the time, Morgan Stanley and everyone else took this seriously. It was reported. It was in the Wall Street Journal. This wasn't some random tweet. It was important, and it showed that maybe Twitter isn't telling the truth.

You've heard evidence of other studies done by Mr. Musk. You saw that video of the Cyabra person who was commissioned by Mr. Musk to do a report. You heard that Mr. Musk talked to that person personally about the work, and he told you -- he told you the results of the -- the results of these studies that he did. This is his testimony.

He had independent analyses done of spam and bots, double to four times higher than 5 percent.

When he gave that testimony, he had and he identified, yes, this is the report I was talking about. He had that on the stand. It's this -- it's undisputed. They don't dispute that he had information and reports that he commissioned that showed this. This is what happened.

Again, if this is a big smokescreen, this is all fake, he doesn't really care, why is he having people do this? Why is he having people come up with these studies that show that it's over 5 percent?

He wanted the truth. The concern that he had was real.

And you know what happened after that. He eventually did, way late in the game, after Twitter had sued him, he gets some of that private information. Mr. Segal told you that. That's what he wanted all along. He wanted to understand the scope of this problem, even after he owned the company.

$44 billion. You heard him say that he was still looking into this after he bought it and that everything he saw after buying the company confirmed what he was thinking all along. It was over 5 percent. This was a real concern.

So at the end of the day, look at all of the evidence that this was a legitimate concern. This was real. This was not part of a fraud.

And what's on the other side? What did they say to show you that this bot thing was made up?

There's no evidence of that. It was real. He was right.

So that's the first part. Remember scheme claim, no lie, no plot. The issue -- the bot issue was real.

So let's turn to the supposed plot, and this is very important. This is what plaintiffs say was the plot, the whole thing: A deliberate effort, a plot to drive down Twitter's stock price.

There is zero -- zero evidence of this. None.

They have to prove this. They have to prove that he went on a campaign with the purpose of driving down Twitter's stock

price.

Where is the evidence of that? It doesn't exist. It doesn't make sense. There's no one -- this is going to be a theme. No one came in here and told you that was happening. No one said it at the time. No one called up Mr. Musk and saying: Why are you driving down the stock price?

It didn't happen. There's nobody who says that.

Mr. Musk came in here and told you: I wasn't purposely trying to drive down the stock price. That's not what was in my mind. That's not what I was trying to do.

So what is the contrary evidence? They came in their closing and said -- they pointed to Sean Lynch. Okay.

Let's talk -- and I want to talk directly about the evidence that they pointed to. They first pointed to what they called a "smoking gun." May 9th, you have an opportunity to renegotiate price. That's no secret. Mr. Musk went on Twitter and said renegotiation is a possibility. He said it at the All In conference.

That isn't having a plan to drive down Twitter's stock price. That doesn't show an intent to drive down Twitter's stock price. It's not even about Twitter's stock price. It has nothing to do with it.

That was the first supposed smoking gun. It has nothing to do with trying to drive down Twitter stock price. Nothing.

Second one was March 13th. Again, Sean Lynch saying

there's deal uncertainty, and Mr. Musk says, "That matches my understanding."

Again, that has no nothing to do with a plot to drive down stock price. It has nothing to do with Twitter's stock price.

The third was this tweet -- another e-mail from Mr. Lynch in June talking about posting a tweet. They didn't indicate when that was. That was in June, in June, after all the tweets. That has nothing to do with Twitter's stock price. It doesn't show a plot. It doesn't show any intent.

And after all, who is Mr. Lynch? Barclays was a lender on the deal. Sean Lynch works at Barclays. He has no other involvement in the deal. He's not part of the deal team. He's not part of the group of people at Barclays working on the deal. He's sending e-mails to Mr. Musk unsolicited, and he's trying to solicit business from him. Mr. Birchall made it clear. Mr. Armstrong made it clear. Nobody on the deal knows who this person is.

They could have brought Sean Lynch if he's the center of their conspiracy. But the most important point with Sean Lynch is that nothing in those e-mails indicates that the purpose of all this was to drive down Twitter's stock price. There's zero evidence of that. It's the most important thing in their story, their scheme story, making up bots and trying to drive down the Twitter stock price, and there's zero evidence of that.

There's no lie. There's no plot. There's no scheme case.

Without evidence of that, what do plaintiffs do? They're left with only saying that Mr. Musk had a motive. He had a motive to commit fraud. But a motive to commit fraud isn't fraud, and plaintiffs' theory doesn't make sense.

So let's look at what you're being instructed on.

Even a motive to commit fraud and an opportunity to do so is not sufficient to prove fraudulent intent.

So all of this doesn't matter without actual fraud.

But putting that aside, wanting a better deal, which is what they say was the motive, isn't fraud. Everyone wants to pay less and not more. You can't just say he wanted a lower price; therefore, he committed fraud. And when a big problem comes up in a deal like the bots came up in this deal, renegotiation is always a possibility. You heard that from Mr. Armstrong.

If Twitter's numbers were wrong, it made all the sense in the world to maybe renegotiate the price. There's nothing wrong with that. That's not fraud. Everyone knew it. And you know how everyone knew it? Because Mr. Musk said it publicly. This isn't part of a scheme. This isn't a hidden motive. He said -- remember that -- the tweet? Somebody speculated about renegotiation. If 25 percent are bots, maybe you should get a 25 percent discount, and he said, "Absolutely."

He's not hiding anything.

He said it publicly in the All In conference. They asked him what about renegotiation, and I'm going to show you that in a minute. He said, "Maybe." This isn't a secret motive that he's hiding.

Plaintiffs focus on a couple of internal communications. They talk about Walter Isaacson on May 6th. Mr. Musk said the same thing to them that he said on Twitter and at the All In conference. "Maybe. I want to get the data first. I want to see how big of a problem this is."

And let's watch Mr. Musk at the All In conference. This is when he says when renegotiation is brought up.

(Video played but not reported.)

**MR. LIFRAK:** Sure, it's a possibility. It's not a secret. Everybody knows it. But it's not his focus. He wants to know if this is fixable, if what is -- what he's buying is fixable.

So this chatter about renegotiation, it's not a motive. It's not a motive without actual fraud, and there was no actual fraud. And beyond that, it doesn't makes sense, because Mr. Musk is talking about it on this podcast. He's on Twitter talking about it.

Do you know who he doesn't talk to about it? He doesn't talk to Twitter about it. He doesn't go to them and say, "Give me a discount." That's what you'd do if this is a plot to drive down the price to get a discount or if his motive is to

get a discount, he would go do that. And he didn't.

If this were part of the scheme, he would have gone to Twitter once they clammed up. He would have gone to Twitter once he saw SparkToro says it's way over 5 percent. He didn't.

He didn't demand a better deal at any point. In July, you heard about a conversation between Mr. Korman and Mr. Ringler where Mr. Korman said he hadn't spoken to his client, but I'm speculating maybe we should talk about a renegotiation. No threat. No demand. It didn't go anywhere.

All throughout May, when they're fighting about data, where Mr. Musk isn't getting the data, where he's frustrated, he doesn't go to Twitter and say, "I want a price cut."

When Twitter stock does go down, he doesn't go to them and say, "Look your stock's down. Give me a better deal." He doesn't do that ever. He doesn't do it in June. He's on FaceTime with the CEO and CFO repeatedly. He doesn't say, "Give me a discount. I'm being a pain. All this will go away if you just give me a discount." He doesn't ask for a discount.

All throughout July, even when he terminates, he's not asking for a discount. And in August when Twitter's stock price is lower, he doesn't go say, "Give me a discount. I want -- I'll give up on the litigation." He doesn't say that.

And throughout August it's the same thing. It makes zero sense. Their entire theory is that his motive is to get a

renegotiation, and he never asks for it.

And then there's the litigation in Delaware. He gets the user data that he's been asking for. You heard that from Mr. Segal. What happens next? Twitter comes to him and says, "We'll give you a discount. We'll give you billions of dollars off the deal. You just have to promise not to go after these executives for committing what you think is fraud."

And he says no. He says no.

Think about that. There's a scheme to use bots as a pretext to drive down the price to get to renegotiation, and he's at the finish line, and they say okay, and he says no.

Their whole scheme claim falls apart with that. What kind of scheme claim is that?

And then you heard things about World War III. You've heard things about going after your heirs. That does tell you a lot. Those do tell you a lot.

Mr. Musk believed those executives had deceived the public for years, had deceived him, had broken their promises about this 5 percent number. That's not a scheme; that's someone who truly believes that the bots were a problem, that Twitter was lying. That proves it.

This isn't someone making up a concern to drive down stock to get a better deal. Plaintiffs haven't proven that at all.

Plaintiffs' motive theory doesn't make sense for another reason. It's not just their theory that he had a motive to

renegotiate but that their true reason was because Twitter -- Tesla stock was going down. Okay? Remember you saw the stock chart in plaintiffs' closing.

But there's zero evidence that that was an issue either. We've all sat here for two weeks, eight days of testimony, countless witnesses. Again, nobody came in and said that. No one.

And take a look at the actual numbers. When Mr. Musk walked into the May 6th meeting, the price was 865. We saw evidence that Mr. Musk the week before, on the 28th, made sales of Tesla stock going full -- fully forward with the transaction on April 28th. How does it make sense that now, when he walks into the May 6th meeting, he suddenly has a motive because the stock is going down? The stock went up. How does that make sense?

And make no mistake about it: Their theory is that this fraud by Mr. Musk started on May 6th. That's when he raised the issue of bots that supposedly he didn't care about. That's when he walked out and talked to Mr. Isaacson and said, "This is a real problem." There's e-mails about being a show-stopper. It started on May 6th, and their motive theory about Tesla stock doesn't make sense because the stock had gone up, not down.

What actually changed on May 6th was Twitter not giving him the answers on bots. And that's what changed, and it was a

real concern.

So to summarize on the scheme claim, he -- plaintiffs have not proven that this concern was a smokescreen. It wasn't a lie. This was not a lie. This was a real concern. They have to prove otherwise for their scheme claim to work, and they can't.

Plaintiffs also didn't prove a plot. There is zero evidence that he wanted Twitter stock price to go down, nothing.

And plaintiff's motive theory, it's legally not enough and it doesn't make sense. They haven't proven that either. They haven't proven a scheme case.

So let's talk about the misrepresentation claim.

Plaintiffs have shown you dozens of dozens of tweets by Mr. Musk. But you heard the judge's instructions. And maybe you were surprised for the first time to learn that you only are deciding three, three statements by Mr. Musk that they allege are false or misleading. The other ones, they don't allege are false or misleading. There are three. There are three left: The May 13th tweet, May 16th All In podcast, May 17th tweet.

They told you during the questioning of their damages expert every other tweet has as little to do with this case as Mr. Bottini's briefcase.

Why did you see them so many times? Only three are

alleged to be false or misleading. Three.

And as Dr. Tabak said, you only actually need to look at one, because Dr. Tabak admitted the other two didn't cause a single penny of investor losses. They didn't have economic importance. They weren't material.

So let's talk about May 13th. This is the instruction that you'll get on falsity: False or misleading has to give investors an impression of a state of affairs that differs in a material way from the one that actually exists.

And this is the tweet that they allege is false and misleading, the only one that they say their expert says caused harm, economic harm.

You've seen this many times. How many times did they ask witnesses, "Was the deal on hold?"

The tweet has 23 more words than that. It's misleading to take two words and ask whether it's true or not. And that's important. The context matters. The actual words he said matters.

And the Court's instruction to you on this point makes that clear. Words can't be viewed in complete isolation. You have to read everything together.

The details don't help plaintiffs' stories. Again, the question is not whether the deal was on hold. The question is whether Mr. Musk's tweet gives people an impression that is materially different than the true state of affairs.

The plaintiffs haven't shown you any evidence that what he said -- what he actually said, the 25 words -- was false and misleading. And the best evidence, as always, is not what people do or say now, but what they said at the time.

You've heard from more than 10 witnesses who were involved in this transaction on May -- on May 13th. Not a single piece of evidence that on May 13th or following, a single one of them said that the tweets were false or misleading. Nobody said it at the time.

In fact, Twitter said the opposite. You heard from Mr. Taylor. He came and testified, the chairman of the board. He spoke for the company. He said he always has Twitter's best interests in mind.

He didn't put out a press release saying "That May 13th tweet, that was false or misleading." He didn't put out a press release giving a counter-narrative. What he did is he went on Twitter and he quote-tweeted Mr. Musk's tweet, "Still committed to the acquisition."

And what happens when you do that? Mr. Musk's entire tweet comes up.

Think about that. Mr. Taylor is amplifying the entire tweet to the world. If Twitter thinks that this thing is false or misleading, he doesn't distribute it to the world again.

You heard from Parag Agrawal. He tweeted on the 13th too. Did he say what Mr. Musk said was false or misleading? Did he

present a different perspective? No. He didn't either.

What happened on May 13th? Twitter's legal department called Mr. Musk. Remember that testimony? But they didn't call about the tweet that they say is false and misleading. They called about a different tweet, the one that says they looks at a hundred accounts a day.

Think about that. Twitter's legal department didn't call him about the May 13th deal temporarily on hold tweet. They called him about a different tweet. That's what they cared about. Nobody thought at the time that this was false and misleading. There's no evidence of it.

No one went on Twitter. Nobody called him. There was nothing. The tweets were true. Everyone knew what he was saying was true.

So let's look at a list of people who said at the time that his tweets were false and misleading.

Nobody. Nobody. Where is the evidence that anyone thought that? Class representatives? Twitter employees? Anyone?

You also heard testimony -- now we're four years later. They get to ask witnesses: Did you think that was false and misleading.

They get to ask anyone that question.

You heard from Mr. Musk. He explained what he meant time after time again. You saw that what he said on the stand was

the same thing he said at his deposition about this. They asked him, "Oh, you didn't read your deposition testimony before coming here?"

He said no.

And that that's the convenient thing about telling the truth. You don't have to remember what you said before. He said the same thing. He explained what he meant. He explained how it was the truth.

And what Mr. Musk said is exactly -- exactly what happened.

The deal was going to close in June. Then he was waiting, pending details about this bot -- these bot issues. It was a gating issue. It was an obstacle. You heard that from the bankers too.

Again, how many times did they ask witnesses "Was the deal on hold?" You kept working.

They never asked witnesses "Was his tweet false or misleading? Were those 25 words describing what was going on? Was that misleading?" They never asked any witness that.

That's the evidence from Twitter's team, from Mr. Musk's team. Not one piece of evidence they brought into this trial saying that his tweet was false or misleading. Where is it?

Let's look at a list of the people who said the tweet, the whole tweet, was false or misleading, came into this courtroom under oath and said it.

Nobody.

And I know I'm throwing a lot at you. I know I -- we're going to go through elements. We're going to go through and -- we've gone through a timeline. It's a lot of facts.

But just pause for a second. They have a misrepresentation claim that a tweet was false or misleading that no one said was false or misleading at the time and that no one came in here and said was false and misleading. How is that a misrepresentation?

Let's talk about materiality. Plaintiffs have to prove falsity, but they also have to prove materiality, that what Mr. Musk said or did was materially false.

This is the instruction: "There has to be a material difference between what people think and the true state of affairs."

There has to be a difference between those two things.

So let's talk the May 13th tweet, their theory that this was materially false. They say they thought -- that people thought the deal was completely on hold, that Twitter had agreed to put it on hold. That's what their theory is.

And they say: Well, the true state of affairs was no, the deal was not completely stopped.

Okay? But plaintiffs' own marketing expert destroyed that.

This is what he said [as read]:

"People knew immediately that Twitter hadn't agreed."

That's what people thought: Twitter hadn't agreed.

Plaintiffs say that was the true state of affairs. That's what was going on, Twitter hadn't agreed. The market already understood what plaintiffs say was the true state of affairs. There's no difference. There's no material falsity at all.

What's the other reason they say the May 13th tweet was materially false?

They say: Well, the market thought that all work had stopped.

But, in fact, work had continued. There's a difference. There's a gap betweens those two things.

But Dr. Tabak sunk that theory too. This is their market expert. This is what he said [as read]:

"People understood that work was continuing."

People knew that. People knew work was continuing, and that was the true state of affairs. There's no difference. There's no material falsity. And that's so very important that they have to prove falsity, which they have no evidence of, but material falsity, that there's a material difference between what people understood and the true state of affairs, and they haven't even tried to present that.

Materiality is also an issue in the scheme claim. You'll see that in the instructions.

As we discussed, plaintiffs' theory, Mr. Musk is hiding that this is a plan to renegotiate. That was his plan. That was the secret.

But plaintiffs didn't ask their own expert whether the market would have done anything differently if Mr. Musk had just come out and said that. "I don't like this anymore. I want to renegotiate."

That's what they have to show a material difference between what they say is the truth and what people understood. And there's no evidence that the market would have cared about the reason why Mr. Musk allegedly wants to renegotiate.

So materiality is relevant to the scheme claim, and it sinks that claim as well.

So let's talk about May 16th, All In podcast. You've seen a lot of clips from the podcast, but plaintiffs only claim one part of this is false, and let's look at it again.

(Video played but not reported.)

**MR. LIFRAK:** So, again, exact words matter. What did Mr. Musk say exactly?

He said -- he's asked [as read]:

"What do you think?"

And he starts his answer with [as read]:

"I think -- I think it's some number between four and five times that."

Let's look at what you're going to be instructed about the

law on this. You're going to be instructed that an opinion -- if we can pull that up -- is only actionable if the speaker does not sincerely hold the view or belief expressed or the opinion contains a material verifiable statement of fact that is untrue.

Opinions that fit this definition are not fraud. That was his opinion. They can't prove that.

In opening, they told you that Mr. Musk's statement was deeply misleading, that he didn't have the basis, any basis, to say it was above 5 percent. But he did, and he told people on this podcast exactly what was it was based on, and that's the next clip.

(Video played but not reported.)

**MR. LIFRAK:** And that was true. It was exactly what he was talking about. It happened the day before. This was the basis for it. And he told people it's based on outside firms who did this.

And it's true. On May 16th, Mr. Musk did believe that it was probably four or five times that. He did. He still believes it. He'll believe that to his grave. You saw him on the stand. He truly believed that. They have to prove that he didn't.

And if there's any doubt over whether the May 16th statement matters, their own expert said it doesn't -- it doesn't matter. It didn't cause any economic impact on the

class. The stock didn't react.

Then we have the May 15th tweet. I'm not going to spend much time on it because it just repeats what was said before, but let's look at the context of that too, because it's important. And the context of that is Mr. Agrawal's tweets the day before.

This is what Mr. Agrawal tweeted on May 16th, the day before the May 17th tweet. He says [as read]:

"Don't worry. Twitter's numbers are good, but nobody can check them. You need public data. You need private data. And we don't give out the private data."

When Mr. Musk -- you saw in defendant's -- sorry -- in plaintiffs' opening say that the number was unknowable, that's what he's talking about. He's being told that by Twitter. You can't figure out what this actual number is because you need our private data that we won't give you.

And he wasn't satisfied with that response, so he tweets on May 17th -- this is an alleged false statement. Number 1, he says 20 percent again. It's the same thing he said at the All In conference. We saw the basis for that. He really did believe that.

Number 2, his offer is based on SEC filings. That's true too. It was in the merger agreement. I showed it to you.

Number 3, Twitter's CEO publicly refused to show it, show

his proof. That's true. That's the document we just saw. Mr. Agrawal's tweet the day before. The deal can't move forward until he does. Same thing he said on May 13th. Deal is temporarily on hold. He wants the information. He's not getting it.

And, again, plaintiffs' own expert told you this tweet was not material. The market didn't react to it.

Another completely separate reason that plaintiffs' claims fail is loss causation. Plaintiffs have to prove that Mr. Musk's fraud was the cause of their economic injury. That's what the instruction says. I'll put it up.

That it was fraud that caused it. Not merely tweeting, but fraud. So let's talk with that in mind about May 13th.

They told you over and over again: This is a scheme to drive down the stock price to renegotiate.

But you heard Dr. Tabak say he has no opinion on what would have happened if Mr. Musk had said that on May 13th, "I just want to renegotiate" or "the deal is in jeopardy." He had no opinion as to what would have happened to the stock price. The stock may have done the exact same thing.

But plaintiffs have to prove to you that what they alleged is fraud made the market go down. The only thing that they have told you through their expert is that if Mr. Musk hadn't said anything at all, the stock wouldn't have gone down. Okay, but that's not the question.

That doesn't matter. Mr. Musk can't be liable and can't be held liable just for tweeting. Plaintiffs have to prove that the alleged fraud caused the loss. They haven't done that. They haven't proven that.

You heard plaintiffs' expert admit that if there was any concern about the deal not going through, the stock would have gone down. Of course it would have gone down. But that's not going down because of fraud. They have to prove that a fraud made this stock go down.

They showed you after May 13th so many tweets that happened. You may have been wondering this entire case, like I said before: Which ones are relevant?

The truth is, you now know, none of them. Nothing except for the May 13th tweet and the July 8th termination letter -- nothing had any impact on the market. They didn't have economic importance. That was Dr. Tabak's words.

So we can knock out May 16th and May 17th right there. The game is over on those. Plaintiffs' expert told you that.

So let's talk about July 8th, the termination letter. It's the same thing. For July 8th, Dr. Tabak said if someone terminates a merger agreement, regardless of whether there's merit to it or not, you're going to expect the stock to go down.

That's not a stock going down because of fraud. The July 8th letter isn't alleged to have been false or misleading.

Damages. Plaintiffs have to prove damages too, damages numbers, and they haven't done that.

This is the jury instruction on damages:

"The difference between the price sold and the price the stock would have sold at had the statement or fraudulent acts reflected the true state of affairs."

The difference between what was sold and the true state of affairs.

But what did Dr. Tabak say? They haven't given you any basis to determine that amount. Dr. Tabak simply didn't give an opinion on what would have happened if Dr. -- if Mr. Musk's statements reflected what plaintiffs claim was the true state of affairs.

And I just talked about he's not -- he is giving an opinion as to what would have happened if Mr. Musk said nothing. If he said nothing. But that's not the right analysis. You have to measure the price sold versus the price it would have sold at if the -- if the statement had been true, had shown the actual state of affairs at the time.

He looked at silence, not the truth, and that's a big difference. It's the wrong measure of damages.

In addition to that, Dr. Tabak admitted that his numbers are wrong. And you may remember -- you may not have understood the significance of it at the time. You saw that on May 13th, the stock went down. Right? And then it remained steady for a

while, and then it went down again on May 16th. And he said that drop on May 16th, which was, he testified, billions of dollars in market cap loss, was all caused by the tweet.

Just think about that for a second.

It goes down, it stabilizes, and then it randomly goes down again three days later. And he gives all those losses -- he blames all of those losses on Mr. Musk.

And the basis for that is that he looked and he didn't see anything happen in the market between the 13th and the 16th, so it must be based on the tweets on the 13th.

But something did happen on May 15th. The SparkToro report happened. It called into question the 5 percent number, and SparkToro mattered. It mattered to the market. It mattered to the class representative, Mr. Belgrave.

You may remember -- this is going way back two weeks, but he had in his notes. He said in his notes Twitter is down based on reports that 70 percent of Elon's followers are bots. He claimed that was a typo, that he really meant 20 percent, but he admitted, yes, it was based on him reading a Wall Street Journal article about SparkToro that said that.

So, again, this is important, because Dr. Tabak's -- every one of his numbers is based on blaming Mr. Musk for that drop on May 16th, saying it must have been from his tweet three days earlier. Dr. Tabak makes that assumption in all of his numbers.

But that's not right, because other things happened. He has a duty -- and you'll see it in the instructions -- to exclude things caused by other events that aren't alleged to be fraud; and he didn't do it. It doesn't makes sense.

Proving loss causation, proving damages, that's their burden. They haven't done that either.

So those are the elements. I'm going to go through them again in a moment. Plaintiffs have the burden of proving every one of those.

But let's take a step back. Let's think: Why are we here? Why is this lawsuit here?

We heard from plaintiffs' class representatives. The best examples, the ones that were certified, as you heard, by the Court. They seem like fine people. But they weren't defrauded by Mr. Musk.

Remember, plaintiffs' theory is that Mr. Musk committed fraud. He committed securities fraud. But everything that they claim was fraud was out in the public. The bots, the issue of the bots, that's being debated on Twitter. The merger agreement, public. Possibility of renegotiation, public. The termination, public. Lawsuit, public.

And the people who are trading stocks during this period were trading based on the information that was out there, based on what they knew, based on what they heard.

And you saw Mr. Belgrave. The first time that he bought

Twitter stock was after May 13th, after the tweet when it had gone down, after Mr. Musk had allegedly made false statements, after Twitter stock had taken what they call an elevator to the basement.

That's when Mr. Belgrave decided to get on the elevator. And he has that right. But the elevator of stocks goes up and down, and people decide when to go get on and when to get off, Mr. Belgrave saw an opportunity. He saw people after Mr. Musk's tweet selling, and he thought he knew better. He thought, let's take a bet that the deal goes through. Let's take a bet that it goes to $54.20 and I'll make a profit.

Mr. Belgrave, even after May 16th and May 17th, bought hundreds of thousands of dollars of Twitter stock on May 26th, on June 24th. Why? Because he was looking at everything going on in the public. He was watching it play out in the public every day. Although some class members thought, "Well, the deal wouldn't go through, I should sell," Mr. Belgrave bet that it would, and then he sold. He sold betting that after the termination, it wouldn't go through.

That's not fraud. Mr. Belgrave said, day one of this trial, "I wasn't tricked into buying shares. I wasn't tricked into selling them." The only thing he said he was tricked by was Mr. Musk not even putting up a defense in Delaware.

But there's not accurate. We all know that. They're not going to claim otherwise.

He was upset that he sold after the termination but that other people who bought his stock eventually get the $54.20, he sold at the wrong time. That's not fraud.

Until this day, you heard Mr. Belgrave say Mr. Musk, he believes, is an honest businessman. The person that's being sued for securities fraud is an honest businessman. He still owns Tesla stock to this day. Does that make sense that this person committed fraud?

Then there's Ms. Price, who didn't sell or buy any stock during this period. Her husband made the investment decisions. She didn't know why. But they too -- you saw the testimony. They were buying and selling, buying and selling during this period.

While it is unfortunate, legitimately unfortunate, that they lost money, it wasn't because of fraud. It wasn't.

I told you at the outset there would be some noise in this trial, some things that don't matter, and sometimes it's hard to figure out when you're sitting there what matters, what's real, what you're going to be asked to decide, which you're now going to do.

But let's put -- let's keep one thing in mind:
The Court's instructed you to not be influenced by personal likes, dislikes, opinions, prejudice, sympathy. This is important when Mr. Musk is the defendant.

But let's think about some of the things you did hear in

this trial.

You heard about numerous questions about Mr. Musk making money in California, then moving to Texas. Remember that?

Remember all the questions and answers about Twitter witnesses asking about the philanthropic work they were doing in the community? What was that for?

Remember the exchange with the lawyer and the witness about selling hot dogs at Candlestick? Remember that?

Don't fall for a San Francisco us versus Elon Musk dynamic. That's not what this case is. This is a securities fraud case.

You may remember other instances where you may think this happened.

And they're going to get up -- I'm going to be done soon. They're going to get up and have a few more minutes to talk. I would love for them to engage on the law and the facts, explain to you how there can be a misrepresentation case when no one came into court and said it was false or misleading; where no one at the time said it was false or misleading.

I would love for them to get up and explain how they can have a scheme case with no scheme; how they can actually say that Mr. Musk didn't ask for data, when he did.

I'd like them to explain how they can prove materiality when the actual state of affairs matched what the market thought.

I'd like them to explain how they can prove damages when their damages expert used the wrong standard and the wrong numbers.

But ask yourselves when you're listening to them: Are they talking about the facts and the law or are they talking about this?

There are other things you heard that don't matter in this trial. Secretly buying stock before buying the company. That's not part of -- it's not part of the scheme claim. The scheme claim starts May 13th. That has nothing to do with the alleged fraud. It's not a claim in the case that it was somehow improper for him to not publicly disclose his stock purchases. You heard so much about that. It's not part of the claim.

You heard so much about Jiu-Jitsu and rope-a-dope, ways Morgan Stanley was negotiating the deal. Before the class period, not part of this scheme, not alleged misstatements, not having -- doesn't have anything to do with the alleged fraud. It's not part of the scheme. It's irrelevant.

Listen to the evidence that matters, the evidence that matters to the claims, the evidence that is relevant.

At the beginning of the case -- I mentioned this before -- plaintiffs told you, keep an eye or Mr. Musk. And you heard him directly. You heard him say the same things privately that he said publicly.

He may tweet stupid things; he said that himself on the stand. But this isn't a stupid tweeter trial. This is a trial about whether this man committed securities fraud and whether they proved it. And they didn't.

And I want to mention one other thing that plaintiffs brought up in their closing, the "still committed" tweet, May 13th.

You heard what they just said in their closing. They -- Mr. Musk in the middle of the night, two hours after he posted the first tweet, he comes in and he says -- and he tried to contain the damage a little bit, so he walked it back. That's what they said.

Well, think about that. Mr. Musk, on May 13th, under their theory, is publicly engaging in this scheme to drive down the stock price. And he tweets. And then two hours later, he, in their words, "walks it back"? That doesn't make sense.

If you really wanted to punish the stock, if his real plot was to punish the stock, he wouldn't have walked it back or whatever they say he did. That doesn't make sense. Their theory doesn't make sense.

So just to recap, they have to claim -- they have to prove scheme to defraud or a misleading statement. They haven't proven a claim. He wasn't lying about bots; it was real. The concerns were real, and they were heightened by Twitter's reaction.

There was no plot. There was zero evidence Mr. Musk was trying to drive down Twitter's stock price. Zero. Zero evidence of that. That's the entire centerpiece of their scheme theory.

They haven't proven a misleading statement. Not a single contemporaneous document, not a single witness said it at the time. Nobody came in here and said it.

They have to prove the scheme was material. They have -- that it gave an impression of a state of affairs that differs in a material way from the one that exists. But as we saw, the market's views matched the state of affairs. Nobody thought that all pens were down. Their own expert said that.

Intent to defraud. No evidence that this was his intent. Mr. Musk believes everything he said. He believes it to this day.

Like I said before, he'll go to his grave thinking that this bot thing was a problem at Twitter, that he was being lied to. He'll go to his grave thinking and knowing that it was more than 5 percent.

Plaintiffs haven't presented any evidence that he intended to defraud anyone, that he intended to drive down Twitter's stock price for some nefarious reason. It's their burden to prove that, and they didn't.

Fourth, reliance, justifiable reliance. You'll have that instruction. It's kind of a complicated instruction, but there

are two -- there are four sub-elements that they have to prove in addition to everything. That includes that plaintiff traded the stock because the truth was revealed.

But you heard their expert. What they say is the truth, that the deal wasn't fully stopped, everyone knew. They can't prove that. They can't prove reliance.

Second part of reliance that they can't prove: They also have to show that the price of the security immediately reflects all information. Immediately.

But as we saw, the entire damages theory is based on this theory that the stock went down three days later, not immediately. Without that, they can't show reliance on the market. Look at that instruction.

They haven't proven causation. No evidence that the fraud caused the stock to go down. It's not enough that a tweet makes the market go down; it has to be fraud that makes it go down.

Six, damages. They haven't proven those are reliable. Their expert looked at the wrong thing and used the wrong numbers.

So then we have the verdict form that you're going to see.

"Did plaintiffs prove statement one, that the May 13th tweet was false or misleading?"

No. There's no evidence.

"SparkToro was his opinion?"

No.

Number 3. It's the same. It's the same. May 17th, repeating what he already said.

No.

Then you're going to be asked: "Was there a scheme?"

No. This bot thing was real. His concern was real. And there's no evidence of a plot. And the motive -- remember, their motive theory doesn't make sense either.

You've now heard everything. I'm going to sit down in probably two minutes.

You can't find that Mr. Musk broke the law, violated securities laws on this record. They didn't prove it.

Plaintiffs' lawyers don't get to direct your verdict. I don't get to direct your verdict. Nobody can. It's your decision.

But I ask you to stay strong. Hold on to principle. Look at the jury instructions. Remember the evidence that both parties have presented over the past two weeks. They haven't proven a case. There was no scheme. There was no lie. There was no plot. There was no false statement, no intent, no materiality, no causation, no damages.

They have to prove all of the elements of their claims. You may not agree on all of the elements. You don't have to all agree on why a claim fails. One of you may think, "Well, they didn't prove materiality." Another one may think, "Well,

they didn't prove intent." You don't have to agree on the reasons why their claim fails.

And on the other side, to find for them, all of you have to agree that they've proven all of the elements of their claim, and they haven't. They just didn't.

You saw there are several options on the verdict form. There may be a tendency to split the baby. Don't. They haven't proven any of it.

The securities laws are meant to protect, as you saw in plaintiffs' closing, against deceptive acts. Mr. Musk didn't intend to deceive anyone. You all know that.

When all of this is over, and it soon will be, everyone in this room will go their separate ways. You'll go back to doing whatever it is you do in the real world. And I was going to give a long-winded speech about jury service and justice, about how important this is, about Lady Justice -- who I have in some of my slides -- holding the scales of justice with a blindfold on because justice is blind. I was going to talk about how it's the most important thing when somebody is standing trial that's sometimes controversial, somebody who does things like stupid tweets, who does things you may not like, who does things that you may hate.

That's when it's most important. That's when it matters most. That's when the justice system matters most. That's when principle matters most.

But I'm out of time, and so I'll just leave you with one thought: At some point when you're alone, whether you're hiking, having a glass of wine, whatever it is, you'll think back on this case, and you'll ask yourself, did I make the right decision?

But you don't get to come back. You have to make that decision now. You don't get to come back next week and say, you know what? They didn't really prove their case. Or you know what? I didn't think they proved their case but I gave in because he's a rich guy and it doesn't matter.

It does matter.

They didn't prove a fraud case against Mr. Musk. There was no fraud. Whatever you think of him, what he's said or done outside of this, that's not your burden. That's not today.

This is about what happened in 2022, whether Mr. Musk engaged in the scheme to defraud, whether he purposely was tanking Twitter's stock price, whether he lied.

He didn't. He didn't. They didn't prove it.

What Mr. Musk was doing was real. It wasn't fraud.

And the case is now with you, and it's up to you.

And thank you. Thank you, again.

**THE COURT:** Okay. Ladies and gentlemen, we're going to take our noon recess.

Remember the admonition given to you: Don't discuss the

case, allow anyone to discuss it with you, form or express any opinion.

We're going to be in recess until 1:20, and then we will hear from the plaintiffs in their closing, and then the case will be given to you for decision.

So remember the admonition given to you: Don't discuss the case, allow anyone to discuss it with you, form or express any opinion. I'll see you at 1:20.

(The jury leaves the courtroom.)

(Recess taken at 12:53 p.m.)

(Proceedings resumed at 1:21 p.m.)

(Proceedings were heard out of the presence of the jury.)

**THE COURTROOM DEPUTY:** Come to order. Court is now session.

You may be seated.

**THE COURT:** Okay. Bring in the jury.

(The jury enters the courtroom.)

(Proceedings were heard in the presence of the jury.)

**THE COURT:** Okay. Please be seated.

Let the record reflect all jurors are present. We now have the plaintiffs' rebuttal.

Mr. Cotchett.

**MR. COTCHETT:** Thank you, Your Honor.

**CLOSING ARGUMENT**

**MR. COTCHETT:** We've been here about 10, 11, 12 days

now, and we just heard counsel speak as to his position of what was going on.

I don't think there's a person in this courtroom that doesn't really know what happened. He said that many --

**THE COURT:** Would you move the microphone a little closer, Mr. Cotchett. I have a hard time hearing, so if you could --

**MR. COTCHETT:** Thank you, Your Honor.

Counsel, I want to rebut a couple of things he said, but he said, just right off the bat -- and then I'm going to talk about the case -- he said that almost all the tweets did not matter. I find that extraordinary. Makes no common sense.

We all know why he was tweeting. As a matter of fact, Mr. Musk said he tweeted it one time because he believed the price would go down.

So for him to stand here and say that all the tweets didn't matter, I just find that extraordinary.

But let's talk about the case in general. Let's talk about the big picture that he didn't talk about. And here's the big picture.

This is a class action, and what you saw was two people that were selected, or that is to say, approved by His Honor sitting up there, Judge Breyer.

It's a class action, meaning that Ms. Price came all the way here from Ontario on the East Coast. Ontario, Canada.

Sitting right over here is Brian Belgrave with his wife, from the West Coast.

So what do we have here? We have a class of people that were selected on what they bought, what they sold, and both fit within that class schedule -- excuse me -- that class definite period.

It all started on that tweet day of May 13th. You'll recall that's after he agreed to buy Twitter.

I don't want to repeat it. You've seen it. Mr. Molumphy put up notation after deposition after board showing you exactly what was said. There's no question as to what he was doing.

But I want to talk about the class action just for a moment and tell you how that works so you all understand.

When you fill out your verdict form, you will answer many questions, but that isn't the case -- that isn't the end of the case.

What happens, so you know, is that once you decide this case, and if you decide it fully with what damages occurred on that class period, it then gets assigned to a class administrator. Understand how that works. So in other words, the two class representatives that you saw, they represent everything from the East Coast to the West Coast of the United States of purchasers, sellers, whatever of that.

A class administrator decides whether or not they get any

damages that you --

**MR. LIFRAK:** Objection, Your Honor. It's a legal conclusion. No evidence of this.

**MR. COTCHETT:** I'm sorry. What?

**THE COURT:** I think it's appropriate for counsel to point out that these sums don't all go to the two people who are here in court.

**MR. COTCHETT:** Thank you.

**THE COURT:** And to say that I think that's a fair comment to explain how if there is an award, how it is ascertained and how it is distributed.

**MR. COTCHETT:** Thank you, Your Honor.

**THE COURT:** Go ahead.

**MR. COTCHETT:** So it goes to a class administrator. In other words, those two representatives represent from coast to coast, even the whole of Canada and what have you. Okay?

So I want to make sure that we're all talking about what the case is all about.

You couldn't have asked for two more deserving and, I should say, accurate people that base their testimony, their testimony -- you heard both of them -- on what he did.

Now I want to talk about what the real intent was here. There was a scheme. There was a scam. One side of the courtroom denies that, and I think everybody else understands what a scheme is, what a scam is.

As a matter of fact, one has only to look at what Morgan Stanley, the banker for Mr. Musk, said under oath in a deposition. I want to show you clearly what was said. And what was said was this [as read]:

"As a matter of fact, Mr. Musk admitted to -- admitted to it slightly when he was asked 'was there a rope-a-dope involved here?' And he said something to the effect of, 'Well, I don't know if you'd call it that.'"

Well, let's see what his advisors called it.

Let's put up -- now, Morgan Stanley, you know, is one of the major banking operations not in the United States, in the whole world. Right? And he used -- and they take care of billionaires, millionaires, people like you and I and others. But they focus on being very important people.

So let's take a look, if you don't mind, at what Mr. Anthony Armstrong said about the scheme that Mr. Musk was involved in.

He's talking about the merger agreement now here, and this is critical [as read]:

"The merger agreement that was put between Twitter by Mr. Musk that reflected the waiver of due diligence, the Jiu-Jitsu strategy, and your recommended course of action all the way from April 10th to April 25th; is that right?

"Yes."

He was then asked another one.

Would you put the second one up, please.

[as read]:

"You used the term to describe it 'Jiu-Jitsu' but from time to time, you also talked to Mr. Musk about 'rope-a-dope style'; is that correct?"

You couldn't get a simpler answer. The answer is [as read]:

"Yes, because that's what's Morgan Stanley was doing for him, and that's what he admitted to."

Let's go to Michael Grimes from Morgan Stanley. This was what his advice was to Mr. Musk as to how to pull off the scheme [as read]:

"Our advice would be a Jiu-Jitsu strategy, which is to have an offer that is nothing until the strong time and all the strength comes at once."

We know exactly what happened. As time went on and the stock leveled out, just as shown here, this was the killer day, of course. I won't waste your time with that. That's the May 13th, big drop on May 13th. That's the beginning of the class period, as you know, when people started buying or selling their stock or what have you.

Let's look at what Mr. Michael Grimes, in a video deposition, and that's where they sit in front of you under

oath just as if up on that stand. And here's what Michael Grimes said from Morgan Stanley.

Would you put that up, please.

[as read]:

"Our advice would be a Jiu-Jitsu strategy, which is to have an offer that is not strong until the -- the strong time, and all the strength comes at once."

And that's what the bankers behind the scenes were doing with Mr. Musk.

Did it get done with that? Mr. Armstrong came back.

Put the next one up, sir.

[as read]:

"QUESTION: You came up with a strategy that you thought would put him in good position to pressure Twitter into accepting his offer?

"ANSWER: Yeah. I think it had the highest likelihood of -- I thought it had the highest likelihood of winning."

So when counsel stands in front of you and tells you there was no scheme, I could go on and on and show you more, but I don't want to waste your time, nor do I have that time to play the rest of all the Morgan Stanley people that were involved.

Now, interestingly enough -- I'll quickly say that counsel stood in front of you and said nobody told him about the data.

Well, evidently counsel wasn't in the room when Ms. Conti

sat right up there under oath. Ms. Conti from Twitter. Remember her? And she said many times she offered them to come in. She even got them a room, a special lab, to look at the numbers. No one ever showed up.

As a matter of fact, Mr. Korman, Mr. Segal said the same thing under oath from that stand, that he could have looked at them any time he wanted to see their data. He didn't want to see their data. He was out there telling those conferences that "Well, it's as high as 20 percent."

Why?

To drive the price down. That's what it was all about.

And what happened in the end? In the end, while people like Ms. Price, the gentleman sitting there with his wife, in between all of these people across the country thinking -- and by the way, there's something else I want to tell you about a class.

You saw two individuals, but what do we know about the class? We know that the class is involved in pension funds -- teachers, firemen, police, 401(k)s. All of those deciding upon what you do in your verdict come to the case administrator a month, two months, three months from now and say, here's what happened to me. So it's not just these two people. I want to make sure you understand that.

Now I want to come back to Ms. Conti. Ms. Conti, who was on that stand, unless I was totally mistaken, and I don't think

anybody in this courtroom was mistaken, said she set up a little room for them to come to to look at the data.

**MR. LIFRAK:** Objection. I do disagree. That was not in evidence and not true.

**THE COURT:** Ladies and gentlemen, the -- your recollection -- lawyers state what their recollection is of the evidence. Obviously, it's your recollection that controls.

Go ahead.

**MR. COTCHETT:** Thank you very much, Your Honor.

Your recollection was Ms. Conti on that stand, I'm sure. And I'm sure you remember what Ms. Conti said. And I'm sure you remember what Mr. Segal said when he was on the stand about a meeting he set up with Mr. Musk, and Mr. Musk unfortunately never showed up to that meeting, nor did his friends, where he wanted to explain to them the so-called spam.

So we could go on and on about the facts, but the facts are so clear here. They never called any witnesses who denied what the scam was all about. Why didn't they call people from the bankers, Morgan Stanley? Why didn't they call those people, put them on the stand and ask them what was the theory here? You didn't see them. We had to play their depositions, didn't we? That's how that works.

Now I want to talk about damages just for a moment.

Dr. Tabak came to this stand from New York, from the Wall Street enterprise of New York, and did a damage study over

the months. And it is 382, number 382. This is a critical document. It's in evidence. Because it's what Dr. Tabak found for the stock sellers, stock purchasers, stock sellers during that class period. 382.

So what that means -- 282. I apologize.

Thank you, Counsel.

282, not 382. 282.

It's critical. And when you get your verdict form, which I'm going to go over with you in a moment, those are the numbers that you put down.

Now, why do I say that? Because I didn't hear -- unless I was sick or missed a day, I didn't hear a single expert called by Mr. Musk or all of his counsel here to refute what Mr. Tabak said.

I did hear him say about an hour ago that Mr. Tabak's numbers were wrong. I -- I apologize to His Honor and all of you. I didn't hear any witness come to that stand and say Mr. Tabak's numbers are wrong.

Now, they also questioned Mr. Tabak on what -- what basis he used this or he came up with these numbers.

He spent three to four weeks -- excuse me -- months. I apologize. And that, as I just said to you, was 282. Just one has to look at that. It was never contradicted.

As to the other damages, we'll go over those in a minute on the verdict form, but I find it amazing that they never

called anyone to oppose Dr. Tabak or never called a single professor or academic to contradict Adam Badawi from the University of California.

Not a bad school. I personally couldn't get in there myself when I tried years ago. Right across the beautiful bay of ours.

Professor Badawi did a report as to how he analyzed this transaction. I didn't hear a single person contradict what he said, because everyone in this courtroom knows what he was telling was the truth, that they couldn't find any -- they couldn't find a professor that would come here and say he was wrong.

The same thing with Dr. Tabak -- excuse me, Dr. Tabak. Dr. Tabak testified that he used the, quote, Scholes formula to calculate damages. That's a formula that is used on Wall Street to calculate gains or damages.

Did I hear someone? Did I miss? I know I'm getting old and my hearing is getting bad, like -- I think like His Honor; however, I didn't hear a single person come to that stand and say the Scholes formula that he used to calculate the damages was bad.

So what do we have in front of us? We have a scheme.

You've heard Mr. Molumphy, who walked his way all the way through it, there's really not a lot you can look at.

Now, there is one other document which you're going to see

on your verdict form which we'll come to on Question 5, and that's 298.

I believe that's correct; is it not?

298 is the damages that are not on the purchase and sales, and you will see in a moment how I show you how you can answer that.

You are going to get a verdict form, as His Honor told you and as counsel went over with you. The first very page is as simple as this. It is a yes-or-no question. And the question is -- I want to put my glasses on. I'm getting old.

This was the tweet of May 13th. "Twitter deal temporarily on hold pending details supporting calculation that spam/fake accounts do indeed represent less than 5 percent of users."

I read that right off here.

"Did the plaintiff prove a 10b-5 claim against the defendant based upon that statement?"

The answer is about as clear as it gets. Yes.

Why did he send that tweet? He had bought the company -- 25 days before, I believe he signed the document. 25 days before. It was on April 23rd or 24th.

On the 13th of May, he sent that tweet. Why did he send that tweet? We all know why. He now wanted to drive the price down.

The second page, under the law is His Honor asked you a statement, Number 2, and this statement Number 2 -- I think --

I'm going to just read it out loud [as read]:

"I think it's some number that is probably at least four or five times that number."

This was made just shortly after the first tweet, and this was at the conference.

Quote [as read]:

"I said that if you did sort of the lowest estimate would be probably 20 percent and this -- a bunch of quite smart outside firms have done analysis of Twitter and looked at the sort of daily users, and their conclusion is also about it's almost 20 percent."

Ladies and gentlemen, unless I just didn't show up for a day here in court, unless I missed who took the stand, I did not see a witness that Mr. Musk brought into court that said, quote, "a bunch of smart outside firms."

Where were those firms? I would like to ask counsel where they were, but I can't. I can only ask you: Where were those firms that Mr. Musk went viral on that conference, both on tweets, e-mails, everything to make that statement? Where were those firms?

That's an easy "yes" to show that that was part of the scam. That's what he was doing.

And if you go to the next question, that's a "yes" as well. He then says two days later that, quote [as read]:

"20 percent spam/fake accounts, while four times what Twitter claims, could be much higher."

Well, where are -- where is the data? Where is the data that we heard here over 10 days that says it could be have been higher? Not a single person on Twitter's team said it could have been higher.

As a matter of fact, the only one that said it could be higher was Mr. Musk himself. Not even his bankers, Morgan Stanley, could prove that it was higher.

And then you go to the next page on the verdict form, and that question is as simple too [as read]:

"Did the plaintiffs prove their Rule 10-b(5) claim against engaging in a scheme to defraud Twitter investors?"

That's the big one. The answer to that is clearly "yes," because we know what he was doing. He was trying to drive that price down.

Why?

He was going to go buy that car downstream after the rate of the actual price of it had dropped, dropped, dropped. I said "car" because that's the way he thinks, because keep putting off the sale, eventually the seller will want to buy.

Well, what happened?

What we do know is that in October, before that, he said he wasn't going to buy it, and Twitter had to sell it to him.

I don't remember whether they went to him and said, "Would you like a better deal?" No, they had to sue him.

And he ended up in a court with Delaware, and unfortunately, I think his testimony was -- I don't want to misquote it, but it was something like "The judge didn't like me," some silliness like that.

The judge didn't like him sitting under a seal like that one right up there. Right?

So there's no question that that question is a "yes," that it was all a scam.

And then we get to the damage portion, which I just went over.

**MR. LIFRAK:** Objection, Your Honor. We're over 10 minutes past the Court's strict time deadlines, so --

**THE COURT:** Well --

**MR. COTCHETT:** I will just wrap it up.

**THE COURT:** Well, I think -- objection sustained.

I think you should conclude. Take a couple of minutes and conclude, because I think your time is up.

**MR. COTCHETT:** I think I've covered everything, but what I would like to do is this:

I would like to thank you, His Honor, the staff, and behind that door over there are other staff members of this court.

And this case could never have been brought but for that

seal right up there. That's something that's never going to go away. I may go to the big courthouse in the sky. You may go to heaven. You may go to that house in the sky, but one thing is going to remain; it's that seal, and that's why this case was brought.

And I'm going to tell you now that there are a lot of people in this courtroom -- and it's all about a message, and the message is: Are we going to allow people like Ms. Price, Mr. Belgrave, and the millions of people in between to not be protected?

And that seal protects them, and that's why we came in this courtroom.

And I want to thank all of you. I want to thank this young lady. Gia, Caroline, Elle, everyone who is here. And even I want to thank the women sitting over at this table. 56 years ago you wouldn't have had women at this table. Today you have a case like this who people like this work on.

God bless you all.

Thank you, Your Honor.

**FINAL JURY INSTRUCTIONS**

**THE COURT:** Thank you.

Ladies and gentlemen, before you begin your deliberations, elect one member of the jury as your presiding juror. The presiding juror will preside over the deliberations and serve as the spokesperson for the jury in court.

You shall diligently strive to reach agreement with all of the other jurors if you can do so. Your verdict must be unanimous.

Each of you must decide the case for yourself, but you should do so only after you've considered all of the evidence, discussed it fully with the other jurors, and listened to their views. It is important that you attempt to reach unanimous verdict, but, of course, only if each of you can do so after having made your own conscientious decision.

Do not be unwilling to change your opinion if the discussion persuades you that you should, but do not come to a decision simply because other jurors think it is right or change an honest belief about the weight and effect of the evidence simply to reach a verdict.

Because you may -- must base your verdict only on the evidence received in the case and on these instructions, I remind you that you must not be exposed to any other information about the case or to the issues it involves except for discussing the case with your fellow jurors during your deliberations.

Do not communicate with anyone in any way, and do not let anyone else communicate with you in any way about the merits of the case or anything to do with it. This includes discussing the case in person, in writing, by phone, tablet, computer, or any other means, via e-mail, text messaging, or any Internet

chat room, blog, website, or application, including but not limited to Facebook, YouTube, the platform X -- formerly known as Twitter -- Instagram, LinkedIn, Snapchat, TikTok, or any other forms of social media.

This applies to communicating with your family members, your employer, the media or press, and the people involved in the trial. If you are asked or approached in any way about your jury service or anything about this case, you must respond that you have been ordered not to discuss the matter and to report the contact to the Court.

Do not read, watch, or listen to any news or media accounts or commentary about the case or anything to do with it.

Do not do any research such as consulting dictionaries, searching the Internet, or using other reference materials, and do not make any investigation or in any other way try to learn about the case on your own.

Do not visit or view any place discussed in the case. Do not use Internet programs or other devices to search for or view any place discussed during the trial.

Also, do not do any research about this case, the law, or the people involved, including the parties, the witnesses, or their lawyers until you have been excused as jurors.

If you happen to read or hear anything touching on this case in the media, turn away and report it to me as soon as

possible.

These rules protect each party's right to have this case decided only on the evidence that has been presented here in court. Witnesses here in court take an oath to tell the truth, and the accuracy of their testimony is tested through the trial process. If you do any research or investigation outside the courtroom or gain any information through improper communications, then your verdict may be influenced by inaccurate, incomplete, or misleading information that has been -- that has not been tested by the trial process.

Each of the parties is entitled to a fair trial by an impartial jury, and if you decide the case based on information not presented in court, you will have denied the parties a fair trial.

Remember you have taken an oath to follow these rules, and it is very important that you follow these rules.

A juror who violates these restrictions jeopardizes the fairness of these proceedings, and a mistrial could result which would require the entire trial process to start over.

If any juror is exposed to any outside information, please notify the Court immediately.

If it becomes necessary during your deliberations to communicate with me, you may send a note through the courtroom deputy, signed by your presiding juror or by one or more members of the jury. No member of the jury should ever attempt

to communicate with me except by a signed writing. I will communicate with any member of the jury on anything concerning the case only in writing or here in open court.

If you send out a question, I will consult with the parties before answering it, which make take some time. You may continue your deliberations while waiting for the answer to any question.

Remember that you are not to tell anyone, including me, how the jury stands, numerically or otherwise, until after you've reached a unanimous verdict or have been discharged. Do not disclose any vote count in a note to the Court.

A verdict form has been prepared for you. After you have reached a unanimous agreement on a verdict, your foreperson should complete the verdict form according to your deliberations, sign and date it, and advise the clerk that you are ready to return to the courtroom.

The verdict form -- it's been alluded to. I hope -- I hope it's clear when you see it, but obviously while we all think it's clear, you might not. Who knows. But you will have it before you. There will be one verdict form, and then, as I indicated, each of you will have a copy of the instructions.

And we are now preparing the evidence to be sent back to you so that you may view it.

So with that, the deliberations are in your hands, not mine, not the lawyers', not anybody else. It's in your hands.

So you may retire to deliberate.

(At 1:53 p.m., the jury retired to commence deliberations.)

**THE COURT:** Okay. Please provide Ms. Scott with telephone numbers that you can be reached. Parties should remain in the courthouse.

And I will try to keep you apprised as to what's happening to the extent I know what's happening; and frequently I've not the slightest idea what's happening, but that's just the way it is.

Anyway, have you gone over every exhibit so far? I mean, it's all --

**THE COURTROOM DEPUTY:** Not yet.

**THE COURT:** Pardon?

**MR. BERGJANS:** We're just double-checking.

**THE COURT:** Yeah, double-check. Triple-check.

Thank you.

(Recess taken at 1:54 p.m.)

---o0o---

**CERTIFICATE OF REPORTER**

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

DATE: Tuesday, March 17, 2026

Ruth Levine Ekhaus, RMR, RDR, FCRR, CCG, CSR No. 12219
Official Reporter, U.S. District Court

**Volume 13**

**Pages 2297 - 2311**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Charles R. Breyer, Judge

GIUSEPPE PAMPENA, individually and on behalf of all others similarly situated, et al.,

Plaintiffs,

VS.

ELON MUSK,

Defendant.

**NO. C 3:22-cv-05937-CRB**

San Francisco, California
Wednesday, March 18, 2026

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:
For Plaintiffs:

COTCHETT, PITRE & MCCARTHY LLP
840 Malcolm Road
Burlingame, California 94010
**BY: JOSEPH W. COTCHETT, ATTORNEY AT LAW**
**MARK C. MOLUMPHY, ATTORNEY AT LAW**
**TYSON C. REDENBARGER, ATTORNEY AT LAW**
**GIA JUNG, ATTORNEY AT LAW**
**CAROLINE A. YUEN, ATTORNEY AT LAW**
**ELLE D. LEWIS, ATTORNEY AT LAW**

BOTTINI & BOTTINI, INC.
7817 Ivanhoe Avenue - Suite 102
La Jolla, California 92037
**BY: FRANCIS A. BOTTINI, JR., ATTORNEY AT LAW**
**AARON P. ARNZEN, ATTORNEY AT LAW**

**(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

Reported By: Ruth Levine Ekhaus, RMR, RDR, FCRR, CCG
CSR No. 12219, Official United States Reporter

**APPEARANCES: (CONTINUED)**

For Defendant:

QUINN, EMANUEL, URQUHART
& SULLIVAN LLP
865 South Figueroa Street - 10th Floor
Los Angeles, California 90017
**BY: STEPHEN A. BROOME, ATTORNEY AT LAW**
**M. ALEXANDER BERGJANS, ATTORNEY AT LAW**
**MICHAEL T. LIFRAK, ATTORNEY AT LAW**

QUINN, EMANUEL, URQUART
& SULLIVAN LLP
295 Fifth Avenue
New York, New York 10016
**BY: ELLYDE R. THOMPSON, ATTORNEY AT LAW**
**JESSE A. BERNSTEIN, ATTORNEY AT LAW**
**PHILLIP JOBE, ATTORNEY AT LAW**
**STEPHANIE KELEMEN, ATTORNEY AT LAW**

QUINN EMANUEL URQUHART
& SULLIVAN, LLP
300 W 6th Street - Suite 2010
Austin, Texas 78701
**BY: EMILY F. COUTURE, ATTORNEY AT LAW**

**Also present:** **Richie DeMarco, Trial Tech**
**Raymond McLeod, Trial Tech**
**Carley Carter**

**Wednesday - March 18, 2026** **10:05 a.m.**

**P R O C E E D I N G S**

---o0o---

**THE COURTROOM DEPUTY:** Calling Civil Action C 22-5937 Giuseppe Pampena versus Elon R. Musk.

**MR. ARNZEN:** Good morning, Your Honor. Aaron Arnzen for plaintiffs.

**THE COURT:** Good morning.

**MS. THOMPSON:** Good morning, Your Honor. Ellyde Thompson for Mr. Musk.

**THE COURT:** Good morning. The Court has received two additional notes. The first one was the one in which -- why it's Note Number 2, is the first note was during the course of the proceedings in response to the Court's inquiry about publicity, and that was Number 1.

Number 2 says: The jury has the following question -- it's regarding jury instruction -- do you have a copy of it? Have you been given a copy?

Okay. So I don't have to read it.

It's a question of whether there was a typo or not in the instruction on page 18, line 5, because every other reference -- or at least two of the references cited were "false or misleading," and on page 18, line 5 it says "false and misleading."

That was a typo, in the Court's view, and it should be

"false or misleading." Okay.

**MR. ARNZEN:** We agree.

**MS. THOMPSON:** Your Honor, we actually disagree because --

**THE COURT:** Pardon?

**MS. THOMPSON:** We disagree because the question actually goes to materiality. And so I think in answering the jury's question, the Court must point to the fact that a statement must be materially false or materially misleading such that it -- in other words, it can't simply be misleading in a nonmaterial way.

And so I do think that this is pointing out that the jury instructions that they're pointing to omit the fact that it has to be materially false and misleading, which is what it says on page 17, lines 11 to 12. If something is materially false it is also misleading.

**THE COURT:** Well, okay. Number one, they're not asking about materiality; they're asking about whether there was a typo. That's what they're asking.

And you're -- I don't think you're telling me there wasn't a typo. I think, what you're telling me is that it's incomplete.

Is that -- is that your position?

**MS. THOMPSON:** I think the question focusing on false or misleading is leaving out the fact that it -- that there has

to be materiality, and something that is materially false or materially misleading is what the jury should be focused on.

**THE COURT:** I don't disagree with that.

**MS. THOMPSON:** Okay.

**THE COURT:** I don't disagree that it has to have an element of materiality, but the question is: Does it have to be materially false and materially misleading?

And the answer is: No, it doesn't. It has to be materially false or materially misleading.

**MS. THOMPSON:** So long as that is the response given by the Court.

**THE COURT:** But that's not the response I'm giving because they're not asking that. They're just asking -- asked "Was there a typo?" And the answer is, yes.

**MS. THOMPSON:** But, Your Honor, I think that would be an incorrect response --

**THE COURT:** You think it's misleading.

**MS. THOMPSON:** I do think it's misleading, yes, Your Honor, because it cannot be the case without -- without the materiality element incorporated, the question in isolation gives an incorrect impression to the jury.

**THE COURT:** And that can be true about almost every instruction.

Okay. So you've made your objection known. It's for the record, and I'm overruling it.

And I'm simply going to tell them it's "or" not "and."

**MS. THOMPSON:** Okay. We would also ask the Court to point the jury to the instruction on securities materiality so that there's not an incorrect impression left to the jury in response to this question which seems to be an issue that the jury is very focused on. And thus, we think it's appropriate for the Court to point the jury to page 19 of the instructions at securities materiality instruction.

**THE COURT:** And your position?

**MR. ARNZEN:** We think if the question -- if the jury had a question about materiality it would have raised one, and it did not.

**THE COURT:** Yeah. Okay. So I'm -- thank you, but I'm not going to accede to your request.

Also as a general observation, over the years I've learned that it's a good idea just to answer the jury's question and not guess what they're doing, and trying to be, quote, helpful because I think I know what they're doing, and I mean, I don't know what they're doing.

And so if they ask a simple question, is it -- should be -- it's "or" here, it's "or" here, and then it's "and" there, is that a mistake or was that intentional?

And the answer is: No, that was a mistake. It should be "or" there.

Anyway, that's my view, and your objection is noted

for the record.

**MS. THOMPSON:** Your Honor, I would also just point the Court to, in the Rule 10b-5 claim section, on line 8, this is page 17, it says [as read]:

"B, made an untrue statement of a material fact."

And so it can't simply be that a statement is misleading without the untrue statement of a material fact. It has to relate to a material fact.

**THE COURT:** There are all sorts of things it's attached to. It has to be this. It has to be that. It has to be a statement. It has to be a statement in connection with a stock transaction.

I mean, it -- if -- if I start to parse these instructions by giving the entirety of the instructions to put everything in a full context, we would be here for years -- which we might very well be; but it's not my intention. I only have this job for good behavior, and somebody may believe that I've exceeded that limit already.

So anyway, I'm not -- I'm not going to do that.

Thank you. It's noted for the record.

I'm not agreeing to it.

**MR. ARNZEN:** Thank you, Your Honor.

**THE COURT:** Okay. Let's take Note Number 3.

Note Number 3: Can we get eight printouts of the index of admitted exhibits document?

I think the answer is, yes; they want eight printouts of something that I've already given them with your consent. They're not asking for eight printouts of the exhibits. They're asking for the index.

Any problem with that?

**MR. ARNZEN:** No objection here.

**MS. THOMPSON:** No, Your Honor. No objection to the index.

**THE COURT:** A third thing I want to raise with you -- first of all, I have no indication from the jury as to what their present thinking is other than the notes. And I don't think they tell anything that -- about any directions and so forth, other than they seem to be going through the instructions. It does tell you that. So I don't know what the verdict will be.

In the event that they find liability, and I'm not saying it because I have any -- that I believe that that's going to be the case; it's just one of the outcomes that can occur. If they do find liability, they then have to fill out the damage part of the verdict. The damage part of the verdict is -- what? -- five pages or something?

**MR. ARNZEN:** Yes, sir.

**THE COURT:** Of 36 lines. So it's got to be like a 150 entries.

Now, my question to -- basically to the parties -- I

mean, but I think the defense may have more of an interest in it than the plaintiffs -- what is your view as to how to read it out and how to ask them the question in the event that a party wants a jury polled -- and it would be my expectation that on both sides they would want a jury to be polled if the case goes against them.

I normally say, we read the verdict and then ask if somebody wants the jury polled. If the answer is yes, you take -- you say "Juror Number 1, are these your verdicts?" "Yes" or "no," whatever it is. And you move to Juror Number 2 and Number 3. You go through the whole group.

Now, when you get to something that has 150 parts to it, it becomes -- you know, we can spend a day doing that or half a day doing that, but is that useful? And is there a way that the parties think it can be abbreviated?

An example may be to ask the jury, if they do come back this way and if it appears from the verdict that they simply have followed the exhibit that was -- that was provided to them through the expert, and if there's a correspondance, an identity -- an identity of correspondance between the exhibit and the damage figure, there may be a way to ask them, "Did you do that? And was that your verdict?" Or not.

I think you are entitled, so it's not like I don't believe you have a right, I think you are entitled to ask them individually as to each particular finding that they make. If

that's what you want to do, and you don't see any other way to -- to address it, that's what we'll do; if it comes to that and it may not come to that.

But I wanted to raise it now because in the heat of returning a verdict, people get emotional and they get -- and they're caught up in the moment and it's hard for them to think, to give considered opinion as to what it is.

So I'm raising it now only because now it's calm and people can think about it. And think about what they want to do and then just tell me. So I don't want any -- you don't have to discuss it now, but I want you to think about it and think about what you want to do in order to -- I don't think you want to sit here and listen to 156, or whatever that number is, readings but you might, and you may be entitled to it and there may be some discrepancies.

So I put that on the table just in the interest of saving -- not my voice; I guarantee you I'm not going to do it -- my courtroom deputy. So it's out of -- it's not out of consideration for me, it's out of consideration for Ms. Scott. But it's not, I mean, you have your rights and you should exercise your rights as you see fit, but give it some thought okay.

**MS. THOMPSON:** Thank you, Your Honor.

On the juror question that we discussed related to false or misleading, could we ask that the Court also instruct

the jury that the instructions are to be read as a whole. There was, of course, a lot of language surrounding "false or misleading" in that instruction. Of course, there're all the other instructions. We think it would be improper to permit the jury to parse individual words in isolation.

**THE COURT:** No, I'm not going to do that because, in fact, the question was very razor-like focused, and it just wanted to deal with "or." They have already been told they have to read the instructions as a whole. To say that to them, if anything, just -- it's -- in light of their question, just becomes a source of some confusion.

Why? Do you mean maybe if it's "or" rather than "and," it should be viewed in some other way because they all have to be read as a whole?

I mean, it's not helpful. And it's not what they're asking.

I frequently, when asked specific questions, will do exactly as you say, will say "But you should read this instruction in the context of all the other instructions," because I feel that is helpful. I feel it's wrong to put too much emphasis on -- you just don't want to put emphasis on a particular phrase or a particular instruction. You don't want to do that because that leads to confusion.

And -- and so I gladly give that instruction almost always when they take a particular piece of an instruction and

focus on it. But here they're focusing on the issue of "Is it a typo?" Okay.

Anyway, your objection is noted for the record.

**MS. THOMPSON:** Thank you, Your Honor.

In that case, Mr. Musk moves for a mistrial because all of the jury instructions are supposed to be read as a whole. As Your Honor indicated, it is appropriate to tell the jury that they must read these individual words in light of the Court's remaining instructions. As the Court is aware, there was a significant back-and-forth over the instructions so that it clearly conveyed the law. Without the context of that instruction, the jury will be confused and misled as to the appropriate standard.

**THE COURT:** And do you have any case that you can -- that supports the proposition that the failure of the Court to give the instruction that you wish when asked the question as to whether or not something was a typographical error is the basis for a mistrial? If you do, give me that case.

**MS. THOMPSON:** Your Honor --

**THE COURT:** Your colleague seems to have a case, so I'll -- you don't have a case. I'm so sad. I thought there would be legion cases.

**MS. THOMPSON:** May I have one moment Your Honor?

**THE COURT:** Pardon?

**MS. THOMPSON:** May I have one moment?

**THE COURT:** Of course.

**MS. THOMPSON:** Thank you.

(Pause in proceedings.)

**MS. THOMPSON:** Your Honor, I would point the Court to -- it's not a mistrial case, but --

**THE COURT:** Pardon?

**MS. THOMPSON:** It's not a mistrial case but *Wochos* --

(Reporter interruption for clarity of the record.)

**MS. THOMPSON:** W-O-C-H-O-S, *Wochos versus Tesla, Inc*. It is 985 F.3d 1180.

And the "misleading" requirement relates to an omissions theory, which was not pled in this case. So while the correct standard is materially false or misleading, "misleading" relates only to an omissions theory which is why it's inappropriate in this case for the jury to be parsing "false" from "misleading."

This is a Ninth Circuit case from 2021, Your Honor.

**THE COURT:** I'll take a look at it, thank you.

**MS. THOMPSON:** Thank you, Your Honor.

**THE COURT:** Okay. Now, I'm going to move on to the second matter.

However, I think counsel should remain here and listen to this. You don't have to, but I thought it might be -- it might be interesting to listen to what's going to take place now.

Have a seat.

**MR. ARNZEN:** Thank you, Your Honor.

**THE COURT:** You can stay at counsel table. Everybody sit down. You don't have to go anywhere.

(Recess taken at 10:20 a.m.)

(Proceedings resumed at 1:30 p.m.)

(Proceedings were heard out of the presence of the jury.)

**THE COURTROOM DEPUTY:** Come to order. Court is now in session.

**THE COURT:** Do they have a copy of the note?

**THE COURTROOM DEPUTY:** Yes.

**THE COURT:** Okay. Let the record show the parties are present; the jury is not. We received a note from the jury inquiring as to a document that they can't seem to locate because it wasn't received in evidence.

My recollection is that it is a -- it was marked for demonstrative purposes. So I would simply respond: This document was received for demonstrative purposes. You should refer to page 8 of the instructions dealing with demonstratives.

**MR. ARNZEN:** I wonder if we could do one more thing, Your Honor. Because it was available for them to look at during the trial, could we attempt to display on the screen for them, in the courtroom itself, not in the jury room, but out here just to show them what it was and then Your Honor could

explain that it was a demonstrative, and point to the instruction that you indicated?

**THE COURT:** I don't think so.

**MR. BERGJANS:** Yeah. We would object to that. We think your initial --

**THE COURT:** Nice try.

**MR. BERGJANS:** -- instruction was correct.

**THE COURT:** We want them to focus on the evidence, not things that -- not how we presented the evidence. So -- it's okay; but, no.

**MR. BERGJANS:** Thank you, Your Honor.

**THE COURT:** Okay. So that's what I would do. Okay.
Anything else?

**MR. BERGJANS:** No, Your Honor.

**THE COURT:** Okay.

**MR. ARNZEN:** Thank you, Your Honor.

**THE COURT:** Thank you.

(Recess taken at 1:32 p.m.)

(Proceedings adjourned at 4:00 p.m.)

---o0o---

**CERTIFICATE OF REPORTER**

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

DATE: Wednesday, March 18, 2026

Ruth Levine Ekhaus, RMR, RDR, FCRR, CCG, CSR No. 12219
Official Reporter, U.S. District Court

**Volume 14**

**Pages 2312 - 2343**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Charles R. Breyer, Judge

GIUSEPPE PAMPENA, individually and on behalf of all others similarly situated, et al.,

Plaintiffs,

VS.

ELON MUSK,

Defendant.

**NO. C 3:22-cv-05937-CRB**

San Francisco, California
Friday, March 20, 2026

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES:**

For Plaintiffs:

COTCHETT, PITRE & MCCARTHY LLP
840 Malcolm Road
Burlingame, California 94010

**BY: JOSEPH W. COTCHETT, ATTORNEY AT LAW**
**MARK C. MOLUMPHY, ATTORNEY AT LAW**
**TYSON C. REDENBARGER, ATTORNEY AT LAW**
**GIA JUNG, ATTORNEY AT LAW**
**CAROLINE A. YUEN, ATTORNEY AT LAW**
**ELLE D. LEWIS, ATTORNEY AT LAW**

BOTTINI & BOTTINI, INC.
7817 Ivanhoe Avenue - Suite 102
La Jolla, California 92037

**BY: FRANCIS A. BOTTINI, JR., ATTORNEY AT LAW**
**AARON P. ARNZEN, ATTORNEY AT LAW**

**(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

Reported By: Ruth Levine Ekhaus, RMR, RDR, FCRR, CCG
CSR No. 12219, Official United States Reporter

**APPEARANCES**: **(CONTINUED)**

For Defendant:

QUINN, EMANUEL, URQUHART
& SULLIVAN LLP
865 South Figueroa Street - 10th Floor
Los Angeles, California 90017
**BY: STEPHEN A. BROOME, ATTORNEY AT LAW**
**M. ALEXANDER BERGJANS, ATTORNEY AT LAW**
**MICHAEL T. LIFRAK, ATTORNEY AT LAW**

QUINN, EMANUEL, URQUART
& SULLIVAN LLP
295 Fifth Avenue
New York, New York 10016
**BY: ELLYDE R. THOMPSON, ATTORNEY AT LAW**
**JESSE A. BERNSTEIN, ATTORNEY AT LAW**
**PHILLIP JOBE, ATTORNEY AT LAW**
**STEPHANIE KELEMEN, ATTORNEY AT LAW**

QUINN EMANUEL URQUHART
& SULLIVAN, LLP
300 W 6th Street - Suite 2010
Austin, Texas 78701
**BY: EMILY F. COUTURE, ATTORNEY AT LAW**

**Also present:** **Richie DeMarco, Trial Tech**
**Raymond McLeod, Trial Tech**
**Carley Carter**

**I N D E X**

Friday, Mar 20, 2026 - Volume 14


| | PAGE | VOL. |
|---|---|---|
| Jury Question | 2315 | 14 |
| Verdict | 2332 | 14 |

**Friday - March 20, 2026** **11:46 a.m.**

**P R O C E E D I N G S**

---o0o---

(Call to order at 11:46 a.m.)

(Proceedings were heard out of the presence of the jury.)

**THE COURTROOM DEPUTY:** All rise. Court is now in session. The Honorable Charles R. Breyer presiding.

You may be seated.

**THE COURT:** Let the record show that the parties are present. The jury is not.

We received a note from the jury, Number 5, I think, which asks two questions.

First one:

"Regarding statement 4" -- and by that I think they mean the scheme because there are only three statements that are at issue in the misstatements.

Quote, To defraud Twitter investors, end quote, should this be interpreted to mean, quote, with the intent of defrauding investors, close quote, or, quote, with the effect of defrauding investors, end quote.

I think the answer is both.

**MS. THOMPSON:** Yes, Your Honor. We agree that the answer is both.

**THE COURT:** Both.

**MS. THOMPSON:** And, I think, should the Court want,

the Court could look to Footnote 5 of the *Simpson versus AOL Time Warner* case, which additionally says [as read]:

"While the scienter element ensures a culpable state of mind, it must be satisfied for recovery under Section 10b, the principal purpose prong examples instead whether the challenged conduct of the defendant had the principal purpose and not just an accidental effect of creating a false appearance as part of a deceptive transaction or fraudulent scheme."

That is a direct quote from the Ninth Circuit's decision in *Simpson versus AOL Time Warner*. We think that would be helpful to offer the jury in this instance.

**THE COURT:** And the plaintiffs' position?

**MR. ARNZEN:** In principle, we do agree that it's both. I think the current jury instructions at page 15, lines 20 through 21, Your Honor, answer this question and perhaps the Court could point to that language, because it's vetted, we've all decided upon --

**THE COURT:** Page 15?

**MR. ARNZEN:** Lines 20 through 21. This is document ECF 9 -- 524.

**MS. THOMPSON:** I agree, this is what the jury is referencing, and think what the jurors' question is about.

**THE COURT:** Yeah. I mean, I think -- I think they

don't quite understand -- they don't quite understand whether you do it by just showing purpose, as distinct from effect. And the question is:  Do both have to be proven?

And the answer is, yes.

**MS. THOMPSON:**  Yes.

**THE COURT:**  So I'm just going to say "Both."

Turning to the second question, which is:  Furthermore the definition of "scheme to defraud" on page 15, lines 20 to 21 -- which is, again, the same lines -- uses the term "defraud" in the definition.  Can we have a legal definition of the term defraud?

Because I haven't defined defraud.  The Supreme Court has in *McNally versus U.S.*, 483 U.S. 350.  And they give the following definition, but it's in the context -- it's in the context of the federal mail fraud statutes.

It's not in the context of a securities violation.  But they -- they define what the word "defraud" means on page 2881.

And the Court says as follows [as read]:

"As the Court long ago stated, however, the words 'to defraud,'" end quote, "commonly refer," quote, "to wrongdoing one in his property rights by dishonest methods or schemes," end quote, and quote, "usually signify the deprivation of something of value by trick, deceit, chicanery" -- I guess or chicane, "or overreaching," quoting a 1924 decision

of the Supreme Court

So I'm open to suggestions as to how you want to answer that. But at least there is a -- there's no definition in the -- in the Ninth Circuit that I found of the word "defraud."

But obviously if you have, that would be useful as well.

**MS. THOMPSON:** So what we had located in the few moments since we received the note was the Ninth Circuit's 2022 decision in *United States versus Saini*.

**THE COURT:** I'm sorry. Go ahead.

**MS. THOMPSON:** 23 F.4th 1155.

**THE COURT:** Give it to me again.

**MS. THOMPSON:** 23 F.4th 1155 at page 1161.

It talks about intent to defraud, and [as read]:

"Intent to defraud means an intention to deceive another person and to induce such other person in reliance upon deception to assume, create, transfer, alter, or terminate a right, obligation, or power with reference to property."

So, I think, all we would have to do is take out the "intention" part, and it would be "To deceive another person and to induce such other person, in reliance upon such deception, to assume, create, transfer, alter, or terminate a right, obligation, or power with reference to property."

It also, in that case, refers to the Black's Law dictionary definition of "defraud" means "To deprive a person

of property or any interest by fraud, deceit, or artifice."

I think the Ninth Circuit's definition is probably easier for the jury to understand here.

**THE COURT:** Well, I think you're right.

**MR. ARNZEN:** I've got to ask to confer, Your Honor.

**THE COURT:** Go ahead, confer. Confer. Take a moment.

**MR. ARNZEN:** Thank you.

**THE COURT:** It's not urgent.

(Plaintiffs' conferring.)

**MR. ARNZEN:** Your Honor, may I be heard?

**THE COURT:** Of course.

**MR. ARNZEN:** Yeah, thank you.

*McNally* seems to be a good start to us. What I -- what catches for me with the defense's suggestion is kind of invoking the idea of reliance, which has a special place here in securities fraud because there's the whole fraud on the market theory that we're relying on.

*McNally*, we think is very good in terms of its reference to wrongdoing one in his property rights by dishonest methods or schemes and usually signifying the deprivation of something of value --

**THE COURT:** I think the question is what's wrong with what the defense have said?

**MR. ARNZEN:** First of all, reliance is the wrong -- so it invokes this idea of reliance and if effectively

communicates to the jury that our lead plaintiffs need to show that they have relied upon that which was said or done by Mr. Musk; that's just not the case under the fraud on the market theory that we've invoked.

**THE COURT:** Okay. Let me -- I'm getting a copy of the -- is somebody printing it out?

**MR. ARNZEN:** And we think *McNally* as Your Honor suggested has kind of quite useful language.

**THE COURT:** Well, *McNally* doesn't talk about reliance.

**MR. ARNZEN:** Which I think is important. I don't think it should.

**THE COURT:** And that is of some significance.

**MS. THOMPSON:** Well, I think --

**THE COURT:** Why don't we wait, just so I can see the words in front of me and -- and then deal with that.

(Pause in proceedings.)

**MS. THOMPSON:** I have one other suggestion --

**THE COURT:** Sure.

**MS. THOMPSON:** -- from a securities fraud case.

It's a district court case from the Western District of Washington, affirmed by the Ninth Circuit in 2015.

It says [as read]:

"The jury was further instructed that," quote, "to defraud someone means to make a statement or representation which is untrue and known to be

untrue."

**MR. ARNZEN:** Sounds like a misstatement case as opposed to a scheme to defraud case to us. At first blush; I don't know where it's from, I haven't seen it. But that sounds like misstatement liability --

**THE COURT:** It does.

**MR. ARNZEN:** -- which I don't think applies to their question.

**MS. THOMPSON:** Obviously there are misrepresentation claims here as well. And in this instance, I think it could be -- relate to conduct as well, if we wanted to put in conduct. I think that's all the scheme claim is.

**THE COURT:** I'm going to try to work on one thing at a time.

(Pause in proceedings.)

**THE COURT:** So, you -- you would be -- it's the plaintiffs' view that that if I took the *Saini* -- the Ninth Circuit case and it read as follows:

Intent to defraud means an intention to deceive another person, and to induce such other person to assume, create, transfer, or alternate -- or terminate a right, et cetera, et cetera to property -- in other words, take out the words "in reliance upon such deception."

The problem if you take it out, is that it's -- it's not quite accurate. That is to say, it has to be in reliance

thereon. So then you go to the rest of the -- you go to another definition, intent to defraud, Black's Law Dictionary. "Defraud means to deprive a person of property or any interest by fraud, deceit, or artifice."

So they say "defraud" means to deprive a person of property by fraud. Which is what I always thought it meant. In other words, you have fraud, and then if somebody is affected by it they have been defrauded.

You can say, well, there's no difference between fraud and defraud. So I mean I think that there is a problem with the reliance issue.

And then I would have to say, then we give the instruction -- here if we used the word, we would have to go back and give the instruction on what is reliance, and then go back and say: You should consider this in light of all the other instructions that were given.

So it just -- it's like a -- it's a snake growing on itself it's a -- it just keeps on growing, growing, growing.

**MR. ARNZEN:** Yeah.

**THE COURT:** And that would be -- I would guess the plaintiffs' request -- I mean, defendant's request and -- that I keep giving everything in the context, which I understand. But if I give the simple Black's Law Dictionary, "defraud" means "To deprive a person of property or any interest by fraud, deceit, or artifice," why isn't that enough? Period?

**MR. ARNZEN:** Yeah.

**MS. THOMPSON:** I think, Your Honor, that doesn't answer the jury's question --

**THE COURT:** Their question?

**MS. THOMPSON:** -- because it refers to "defraud" and here the definition -- and I think what the jury is saying in their question is that it uses the word "defraud." Here we're using the word "fraud" in the definition we're giving to them.

So I don't think having the reliance element part of the definition of defraud is as issue because that's an accurate statement of the law; you cannot have fraud without reliance. And, of course, it's just on overarching definition that encompasses the elements of defrauding someone.

**THE COURT:** Well, but I would almost have to say -- in reliance, as that term is defined in these instructions, upon such and such -- because it's a different kind of reliance.

**MS. THOMPSON:** Sure.

**THE COURT:** So I'm just trying to figure out why I'm saying that at all, when they're not asking that question.

**MR. ARNZEN:** That's our position, Your Honor.

**MS. THOMPSON:** Because otherwise, Your Honor, the definition is inaccurate. Defraud does require reliance.

I think it would be fine to say: To deceive another person and to do such other person -- in reliance as defined in these instructions, upon deception to assume, create, transfer,

alter, or terminate a right, obligation, or power with reference to property.

I think that would be a correct statement of the law.

**MR. ARNZEN:** We think Black's does the trick, Your Honor. We think it's appropriate. It's time-honored. It's -- it conveys that which the jury is asking about without tacking on a bunch of additional stuff that needs to be conveyed to the jury when they already have a very fulsome set of instructions before them.

**THE COURT:** Well, I mean, going back to the *McNally* case which cites the *Hammerschmidt* case. It says [as read]:

"As the Court long ago stated, however, the words 'to defraud' commonly refer," quote, "to; wronging one in his property rights by dishonest methods or schemes."

I mean, that's it, isn't it? That's what it means.

Now, your -- your argument here, as I understand it, is that I've used the word "fraud" to define "defraud." I mean -- I don't know.

I mean, but it goes on to say deceit or artifice. But it -- but fraud would be an important part of it because there is a definition of fraud, people understand fraud.

Maybe I should just give -- maybe the compromise out of all of this is to just give them the Black Law Dictionary.

**MS. THOMPSON:** Well, I think, Your Honor, that's a

little bit of a tautology in this case.

**THE COURT:** How is this a tautology?

The words "to defraud" commonly refer to wronging one in his property rights by dishonest methods or schemes.

**MR. ARNZEN:** Yes.

**THE COURT:** How is that -- it's not a tautology.

**MS. THOMPSON:** Well, Your Honor, you're saying there's a scheme to defraud.

**THE COURT:** Of course it's a tautology. We understand if you say "How do you defraud somebody?" It's -- a defrauding is a successful frauding. I mean, it means if somebody has been defrauded it's because somebody else has frauded him.

**MS. THOMPSON:** Respectfully, Your Honor, I think what that would convey is that the jury is told there is a scheme to defraud, if there is fraud by scheme. That's not helpful to the jury which has been deliberating Tuesday, has posed a specific question for which the Ninth Circuit, in recent years, 2022, has provided an answer.

And that answer we think would be helpful and not confusing to the jury, it would help the jury to have the definition from the Ninth Circuit case, which is, of course, an accurate statement of the law.

I think the question is pointing out that the jury doesn't understand the definition of "defraud," and telling the jury that to defraud is, in the context of a scheme claim, is fraud

by scheme is not helpful.

**THE COURT:** So if I give the one you want, it would be "Intent to defraud means an intention to deceive another person and to induce such other person in reliance upon such deception" -- you see the problem is that you have the fraud on the market that -- which establishes a particular definition of reliance.

So it's -- it's a particular definition of reliance.

**MS. THOMPSON:** Right. So the modification I had proposed to address that point would be to say: In reliance upon such deception, as defined in these instructions, to assume, create, transfer, alter, or terminate --

**THE COURT:** As defined in these instructions --

**MS. THOMPSON:** And then the rest of that sentence.

**THE COURT:** To induce such other person -- to assume, create, transfer, alter, terminate, any right, obligation, or power with reference to the property.

Boy, that's a wordy answer.

**MR. ARNZEN:** And all of those words concern the reliance idea, Your Honor. Just it -- it is this ever-expanding language used to kind of -- tell the jury about reliance, which is not what they've asked about.

**MS. THOMPSON:** So I don't think that's about reliance, that is going to exactly the deprivation of a person from -- in this case, an investor of property or interest. So that --

that second part "to assume, create, transfer alter -- alter or terminate a right, obligation, or power with reference to property," is not going to reliance; that is going to the deprivation of a property interest.

**MR. ARNZEN:** In reliance on the scheme.

**THE COURT:** Well, let me give a couple of minutes' thought to that.

Meanwhile, I can give some thought to this. We've just received a sixth note from the jury which says: Can we have printouts of the following exhibits: 282 and 342.

And they are the damage calculations.

So we have those, and I would propose that we give them to the jury.

**MR. ARNZEN:** We concur, Your Honor.

**THE COURT:** Okay. I'm going to take five minutes and --

**MR. ARNZEN:** Your Honor, I'm sorry to interrupt. I heard you say "intent" in your last sentence. I think the defense is withdrawing those words from --

**THE COURT:** Oh, yeah. That's right.

**MR. ARNZEN:** Okay. Thank you.

**THE COURT:** Yeah. Okay. Let me -- give me a moment and I'll be back in five minutes and figure out what to do here.

**MR. ARNZEN:** Thank you, Your Honor.

(Recess taken at 12:08 p.m.)

(Proceedings resumed at 12:16 p.m.)

(Proceedings were heard out of the presence of the jury.)

**THE COURTROOM DEPUTY:** Come to order. Court is in session.

**THE COURT:** Okay. So I'm going to give these responses, over plaintiffs' objection.

I don't think you object.

**MS. THOMPSON:** I'm sorry?

**THE COURT:** Since I'm giving what you asked for, I don't think you're objecting.

**MS. THOMPSON:** Yes, Your Honor. We would request the additional language from Footnote 5.

**THE COURT:** I'm sorry?

**MS. THOMPSON:** We would request the additional language in Footnote 5 from the *Simpson* case. But otherwise we don't object to what's on the page here.

**THE COURT:** Okay.

**MR. ARNZEN:** Just to round out the record --

**THE COURT:** Yes.

**MR. ARNZEN:** Given the Court's proposed additional instruction, plaintiffs don't think that anything should be given. We have a Ninth Circuit case *United States v. McHatton*. It's 2024 Westlaw 497 --

**THE COURT:** I'm sorry?

**MR. ARNZEN:** I'm sorry. 2024 Westlaw 4972039. It simply stands for the proposition that when a jury asks for further definition of intent to defraud, the district court was appropriate in not giving any additional instruction, but rather referring back to the original instruction.

**THE COURT:** Okay. I think that's what I did here somewhat.

Okay. Fine now let me. Yeah, you may give this. You your objection is noted for the record.

**THE COURT:** Thank you.

You may give this to the jury.

So I did -- I want to now return because there's a possibility that they would return a verdict since they asked for the damage calculation, it is certainly a possibility that that's what they're considering. So I'd like to find out from the parties whether there's any -- whether what your decision is in terms of reading five pages of dates and amounts.

What is the plaintiffs' view?

**MR. ARNZEN:** We do not think it should be necessary, Your Honor. I think that the Court could simply refer specifically to that question, and as polling the jury, you could ask Juror Number 1 referring to, Question Number -- whatever it is on the verdict form, the jury has filled in the numbers, do you yourself personally agree with those numbers, if she says yes, I think that is sufficient polling for

purposes --

**THE COURT:** Well, I have to ask each juror.

**MR. ARNZEN:** Yeah, but I don't think you need to reach out each and every. I think you can refer to the question itself, is my point.

**THE COURT:** Okay. And what is the defense view.

**MS. THOMPSON:** Your Honor, we do think it's necessary to go through each number.

**THE COURT:** Okay. All right.

**MS. THOMPSON:** In part because we think that the way this has been done is unduly suggestive, and the jurors may not have actually found such numbers, but simply may have copied things over. So we would request that --

**THE COURT:** So they what?

**MS. THOMPSON:** The jury may not have actually found that such numbers were proven, but may have simply copied things over. So we do request that the Court poll as to each individual number.

**THE COURT:** Well, wait a minute. Wait. I'm not -- I mean, so it's clear, I'm not going to ask them the question in any event "Do you -- did you yourself find this number was proven?"

I'm going to ask them --

**MR. ARNZEN:** Is that your verdict?

**THE COURT:** -- whether their verdict is -- the

difference is, I'm going to ask them either, one: What plaintiff has suggested, looking at the page 5 of the verdict form, or whatever it is, four, whatever it is, reflects a damage trigger for each date. Do you agree that these are the damage figures for each date?

That's alternative Number 1.

Alternative Number 2 is having Ms. Scott read every single damage figure, and then asking them -- asking them: You've heard the damage figures written for each date as recited by Ms. Scott, are these your verdicts?

That's the way I'm going to do it.

Now the question is can I do it the plaintiffs' way, without reading each number, or do you want me to have each number read out?

**MS. THOMPSON:** We would ask the jury be polled as to each number. That is our request.

**THE COURT:** Okay. All right. Okay. I think you have that right.

**MR. ARNZEN:** One suggestion is simply time-saving without interfering with that right. Once one number is read, say May 13th, I don't think you have to say May 13th and do it every time. You can say May 13th, and all of them would, one at a time, agree with May 13th.

**THE COURT:** I can do it -- I can read all the numbers -- which Ms. Scoot will do if we go get numbers -- and

then we ask them the question: Are these your verdicts?

**MR. ARNZEN:** Okay. Thank you. As to each and every number.

Okay. We'll all go to lunch.

(Recess taken at 12:21 p.m.)

(Proceedings resumed at 2:07 p.m.)

(Proceedings were heard out of the presence of the jury.)

**VERDICT**

**THE COURTROOM DEPUTY:** All rise.

**THE COURT:** Please be seated.

**MR. MOLUMPHY:** We're still missing two.

**THE COURT:** Two what?

**MR. MOLUMPHY:** Just two people. They're on their way.

**THE COURT:** Well, we can wait. We can wait. We've waited for days.

**MR. MOLUMPHY:** They're on their way.

(Recess taken at 2:08 p.m.)

(Proceedings resumed at 2:13 p.m.)

(Proceedings were heard out of the presence of the jury.)

**THE COURTROOM DEPUTY:** All rise.

**THE COURT:** Okay. Let the record show the parties are present. The jury is not present.

The Court received a note from the jury which says the jury has reached a unanimous verdict so I'm going to bring in the jury.

Okay. Bring in the jury.

(The jury enters the courtroom.)

(Proceedings were heard in the presence of the jury.)

**THE COURT:** Okay. Please be seated.

Let the record reflect all jurors are present. Parties are present.

Good afternoon. Ladies and gentlemen of the jury, I received a notation -- a note from your foreperson you've arrived at a verdict. Is that correct?

(Jurors nod in the affirmative.)

**THE COURT:** Okay. Would you please hand it to Ms. Scott.

(Pause in proceedings.)

Okay. What I'm going to do is a little unusual; I'm going to have my courtroom deputy make copies of the verdict and hand it to the jurors and to hand it to the parties.

So everyone just be seated.

You can talk if you'd like.

**MR. ARNZEN:** I'm too nervous.

(Pause in proceedings.)

**THE COURT:** Ms. Scott, will you read the verdict.

**THE COURTROOM DEPUTY:** Ladies and gentlemen of the jury, listen to your verdict as it will stand recorded.

In the United States District Court for the Northern District of California, Giuseppe Pampena, et al. versus

Elon Musk, Case Number 22-cv-05937-CRB:

Verdict.

A, Liability.

Statement 1: Twitter deal temporarily on hold pending details supporting calculation that spam/fake accounts do indeed represent less than 5 percent of users.

Yes.

Statement 2: I think it's some number that is probably at least four or five times that number. I'd say at -- if you did sort of the -- the lowest estimate would be probably 20 percent. And this -- and this -- a bunch of quite smart outside firms have done analysis of Twitter and looked at the -- the sort of daily -- daily users, and their conclusion is also about -- it's about 20 percent.

**THE COURT:** And the question is, Number 2?

**THE COURTROOM DEPUTY:** Did the plaintiffs prove their Rule 10b-5(b) claim against the defendant for Statement 2 identified above?

No.

**THE COURT:** And are you going to go back and read the question for Number 1?

**THE COURTROOM DEPUTY:** Yes.

Number 1: Did plaintiff prove their Rule 10b-5(b) claim against the defendant for Statement 1, identified above?

Yes.

Statement 3: 20 percent fake/spam accounts, while four times what Twitter claims could be much higher. My offer was based on Twitter's SEC filings being accurate. Yesterday Twitter's CEO publicly refused to show proof of negative five percent. This deal cannot move forward unless he does.

Did the plaintiff prove their Rule 10b-5(b) claim against the defendant for Statement 3 identified above?

Yes.

4: Did the plaintiff prove their Rule 10b-5(a) and/or (c) claim against the defendant for engaging in a scheme to defraud Twitter investors?

No.

**THE COURT:** Okay. Now, would you please hand out to the jury and to the parties a copy of the entire verdict.

And that's the original?

**THE COURTROOM DEPUTY:** I have the original.

**THE COURT:** Oh, then this is mine.

**THE COURTROOM DEPUTY:** Yes.

**THE COURT:** Okay.

(Pause in proceedings.)

**THE COURT:** So now let's go to page 6, which are the damages, and it says reference Exhibit 342. And would you read the question on page 4 and the responses given.

**THE COURTROOM DEPUTY:** Okay.

Number 4: Determine the amount of artificial deflation

per share of Twitter stock proved by plaintiffs on each date during the class period and write it in the table below.

If you find that plaintiffs did not prove artificial deflation on any particular day or days, please leave that date blank.

Date amount of artificial deflation per share:

May 13, 2022: $6.17.

May 16, 2022: $7.69.

May 17, 2022: $7.26.

May 18, 2022: $7.94.

May 19, 2022: $7.74.

May 20, 2022: $7.28.

May 23, 2022: $7.47.

May 24, 2022: $8.44.

May 25, 2022: $7.80.

May 26, 2022: $6.72.

May 27, 2022: $6.42.

May 31, 2022: $6.68.

June 1, 2022: $6.82.

June 2, 2022: $6.54.

June 3, 2022: $6.42.

June 6, 2022: $6.70.

June 7, 2022: $6.44.

June 8, 2022: $6.29.

June 9, 2022: $6.71.

June 10, 2022: $6.96.
June 13, 2022: $7.85.
June 14, 2022: $7.77.
June 15, 2022: $7.42.
June 16, 2022: $7.70.
June 17, 2022: $7.51.
June 21, 2022: $6.99.
June 22, 2022: $7.17.
June 23, 2022: $7.10.
June 24, 2022: $6.77.
June 27, 2022: $6.87.
June 28, 2022: $7.05.
June 29, 2022: $7.50.
June 30, 2022: $7.69.
July 1, 2022: $7.31.
July 5, 2022: $7.24.
July 6, 2022: $7.31.
July 7, 2022: $7.05.
July 8, 2022: $7.96.
July 11, 2022: $7.96.
July 12, 2022: $7.43.
July 13, 2022: $6.44.
July 14, 2022: $6.61.
July 15, 2022: $6.08.
July 18, 2022: $5.83.

July 19, 2022: $5.43.
July 20, 2022: $5.39.
July 21, 2022: $5.42.
July 22, 2022: $5.30.
July 25, 2022: $5.52.
July 26, 2022: $5.49.
July 27, 2022: $5.30.
July 28, 2022: $4.91.
July 29, 2022: $4.65.
August 1, 2022: $4.91.
August 2, 2022: $4.88.
August 3, 2022: $4.87.
August 4, 2022: $4.85.
August 5, 2022: $4.31.
August 8, 2022: $4.16.
August 19, [sic] 2022: $4.20.
August 10, 2022: $3.61.
August 11, 2022: $3.79.
August 12, 2022: $3.67.
August 15, 2022: $3.58.
August 16, 2022: $3.62.
August 17, 2022: $3.77.
August 18, 2022: $3.82.
August 19, 2022: $3.77.
August 22, 2022: $4.13.

August 23, 2022: $4.13.
August 24, 2022: $3.86.
August 25, 2022: $3.79.
August 26, 2022: $3.96.
August 29, 2022: $4.08.
August 30, 2022: $4.29.
August 31, 2022: $4.45.
September 1, 2022: $4.49.
September 2, 2022: $4.49.
September 6, 2022: $4.48.
September 7, 2022: $3.74.
September 8, 2022: $3.56.
September 9, 2022: $3.46.
September 12, 2022: $3.68.
September 13, 2022: $3.59.
September 14, 2022: $3.54.
September 15, 2022: $3.47.
September 16, 2022: $3.67.
September 19, 2022: $3.61.
September 20, 2022: $3.61.
September 21, 2022: $3.72.
September 22, 2022: $3.69.
September 23, 2022: $3.64.
September 26, 2022: $3.65.
September 27, 2022: $3.49.

September 28, 2022: $3.15.

September 29, 2022: $3.30.

September 30, 2022: $2.98.

October 3, 2022: $3.36.

5: Determine the amount of damages to Twitter options proved by plaintiffs.

The amount of damages plaintiffs' expert calculated in Exhibit 298, based on the false statements made by Musk.

Return of verdict dated March 20, 2026, signed by Juror Foreperson Number 1.

**THE COURT:** Okay. Either side request polling the jury?

**MR. ARNZEN:** No. Thank you, Your Honor.

**MR. LIFRAK:** Yes, Your Honor.

**THE COURT:** Okay. Will you poll the jury?

**THE CLERK:** Juror Number 1, is the verdict read your verdict?

**JUROR NUMBER 1:** Yes.

**THE COURTROOM DEPUTY:** Juror Number 2, is the verdict read your verdict?

**JUROR NUMBER 2:** Yes.

**THE COURTROOM DEPUTY:** Juror Number 3, is the verdict read your verdict?

**JUROR NUMBER 3:** Yes.

**THE COURTROOM DEPUTY:** Juror Number 4, is the verdict

read your verdict?

**JUROR NUMBER 4:** Yes.

**THE COURTROOM DEPUTY:** Juror Number 6, is the verdict read your verdict?

**JUROR NUMBER 6:** Yes.

**THE COURTROOM DEPUTY:** Juror Number 7, is the verdict read your verdict?

**JUROR NUMBER 7:** Yes.

**THE COURTROOM DEPUTY:** Juror Number 8, is the verdict read your verdict?

**JUROR NUMBER 8:** Yes.

**THE COURTROOM DEPUTY:** Juror Number 9, is the verdict read your verdict?

**JUROR NUMBER 9:** Yes.

**THE COURTROOM DEPUTY:** Your Honor, the verdict is unanimous.

**THE COURT:** Okay. Enter and record the verdict.

Ladies and gentlemen of the jury, your job has been concluded. Your service has been concluded.

I want to thank you very much for this service. I observed you throughout the course of the trial. You were attentive. You were on time.

You obviously paid attention to it. Based upon notes that you sent out, it was clear that you went through a deliberative process. You read the instructions very, very carefully,

finding actually a typographical error that was contained in the instructions.

And I would say, in my experience of 28 years, you have been one of the more conscientious jurors approaching this task. So we're very, very grateful.

Now, I will say also you are free to discuss the case with anyone you choose to discuss, and you are free not to discuss the case should you choose not to do so. You have your complete First Amendment rights restored to you in their entirety. But I hope by this experience, you have seen how the justice system operates, and I will say again: It could not have been achieved without your participation.

So thank you very much.

You are now discharged. If you go back into the jury room, I have a few other comments I'd like to make to you and then send you on your way. Thank you.

(The jury was discharged and left the courtroom.)

**THE COURT:** Okay. The jury has retired.

Please be seated.

I would like the parties to submit to the Court, by noon on Tuesday, a plan for the next steps, going all the way through the entry of a judgment. I'd also like that plan to include a timeline when they believe certain things, whatever they may be -- and that's a function of what you are recommending to the Court -- would be accomplished or would be

conducted.

And with that, thank you very much.

We're in recess.

**MR. ARNZEN:** Thank you, Your Honor.

**MR. COTCHETT:** Thank you very much, Your Honor.

(Proceedings adjourned at 2:42 p.m.)

---o0o---

**CERTIFICATE OF REPORTER**

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

DATE: Friday, March 20, 2026

Ruth Levine Ekhaus, RMR, RDR, FCRR, CCG, CSR No. 12219
Official Reporter, U.S. District Court

Case: 26-4928, 11/23/2026, DktEntry: 17.1, (189 of 297)

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
Case Number: 3:22-CV-05937-CRB
PLTF / DEFT Exhibit No. 14
Date Admitted:
By:
Lashanda Scott, Deputy Clerk

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION

**Washington, D.C. 20549**

# FORM 10-K

**(Mark One)**

☒ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the fiscal year ended December 31, 2021**
**OR**

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**FOR THE TRANSITION PERIOD FROM TO**
**Commission File Number 001-36164**

# Twitter, Inc.

**(Exact name of registrant as specified in its charter)**

| | |
|---|---|
| **Delaware** | **20-8913779** |
| **(State or other jurisdiction of incorporation or organization)** | **(I.R.S. Employer Identification No.)** |

**1355 Market Street, Suite 900**
**San Francisco, California 94103**
*(Address of principal executive offices and Zip Code)*
**(415) 222-9670**
*(Registrant's telephone number, including area code)*

**Securities registered pursuant to Section 12(b) of the Act:**

| Title of each class | Trading Symbol(s) | Name of each exchange on which registered |
|---|---|---|
| Common Stock, par value $0.000005 per share | TWTR | New York Stock Exchange |

**Securities registered pursuant to Section 12(g) of the Act: None**

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes ☒ No ☐

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or 15(d) of the Act. Yes ☐ No ☒

Indicate by check mark whether the registrant: (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒ No ☐

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§ 232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files). Yes ☒ No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer", "accelerated filer", "smaller reporting company", and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| | | | |
|---|---|---|---|
| Large accelerated filer | ☒ | Accelerated filer | ☐ |
| Non-accelerated filer | ☐ | Smaller reporting company | ☐ |
| Emerging growth company | ☐ | | |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant has filed a report on and attestation to its management's assessment of the effectiveness of its internal control over financial reporting under Section 404(b) of the Sarbanes-Oxley Act (15 U.S.C. 7262(b)) by the registered public accounting firm that prepared or issued its audit report. ☒

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). YES ☐ NO ☒

The aggregate market value of the voting and non-voting common equity held by non-affiliates of the registrant, based on the closing price of a share of the registrant's common stock on June 30, 2021 as reported by the New York Stock Exchange on such date was approximately $53.55 billion.

The number of shares of the registrant's common stock outstanding as of February 10, 2022 was 800,641,166.

Portions of the registrant's Definitive Proxy Statement relating to the Annual Meeting of Stockholders are incorporated by reference into Part III of this Annual Report on Form 10-K where indicated. Such Definitive Proxy Statement will be filed with the Securities and Exchange Commission within 120 days after the end of the registrant's fiscal year ended December 31, 2021.

## NOTE REGARDING KEY METRICS

We review a number of metrics, including monetizable daily active usage or users, or mDAU, changes in ad engagements and changes in cost per ad engagement, to evaluate our business, measure our performance, identify trends affecting our business, formulate business plans and make strategic decisions. See the section titled “Management’s Discussion and Analysis of Financial Condition and Results of Operations— Key Metrics” for a discussion of how we calculate mDAU, changes in ad engagements and changes in cost per ad engagement.

We define mDAU as people, organizations, or other accounts who logged in or were otherwise authenticated and accessed Twitter on any given day through twitter.com, Twitter applications that are able to show ads, or paid Twitter products, including subscriptions[1]. Average mDAU for a period represents the number of mDAU on each day of such period divided by the number of days for such period. Changes in mDAU are a measure of changes in the size of our daily logged in or otherwise authenticated active total accounts. To calculate the year-over-year change in mDAU, we subtract the average mDAU for the three months ended in the previous year from the average mDAU for the same three months ended in the current year and divide the result by the average mDAU for the three months ended in the previous year. Additionally, our calculation of mDAU is not based on any standardized industry methodology and is not necessarily calculated in the same manner or comparable to similarly titled measures presented by other companies. Similarly, our measures of mDAU growth and engagement may differ from estimates published by third parties or from similarly-titled metrics of our competitors due to differences in methodology.

The numbers of mDAU presented in this Annual Report on Form 10-K are based on internal company data. While these numbers are based on what we believe to be reasonable estimates for the applicable period of measurement, there are inherent challenges in measuring usage and engagement across our large number of total accounts around the world. Furthermore, our metrics may be impacted by our information quality efforts, which are our overall efforts to reduce malicious activity on the service, inclusive of spam, malicious automation, and fake accounts. For example, there are a number of false or spam accounts in existence on our platform. We have performed an internal review of a sample of accounts and estimate that the average of false or spam accounts during the fourth quarter of 2021 represented fewer than 5% of our mDAU during the quarter. The false or spam accounts for a period represents the average of false or spam accounts in the samples during each monthly analysis period during the quarter. In making this determination, we applied significant judgment, so our estimation of false or spam accounts may not accurately represent the actual number of such accounts, and the actual number of false or spam accounts could be higher than we have estimated. We are continually seeking to improve our ability to estimate the total number of spam accounts and eliminate them from the calculation of our mDAU, and have made improvements in our spam detection capabilities that have resulted in the suspension of a large number of spam, malicious automation, and fake accounts. We intend to continue to make such improvements. After we determine an account is spam, malicious automation, or fake, we stop counting it in our mDAU, or other related metrics. We also treat multiple accounts held by a single person or organization as multiple mDAU because we permit people and organizations to have more than one account. Additionally, some accounts used by organizations are used by many people within the organization. As such, the calculations of our mDAU may not accurately reflect the actual number of people or organizations using our platform.

In addition, geographic location data collected for purposes of reporting the geographic location of our mDAU is based on the IP address or phone number associated with the account when an account is initially registered on Twitter. The IP address or phone number may not always accurately reflect a person’s actual location at the time they engaged with our platform. For example, someone accessing Twitter from the location of the proxy server that the person connects to rather than from the person’s actual location.

We regularly review and may adjust our processes for calculating our internal metrics to improve their accuracy.

---

[1] We have updated our mDAU definition in the fourth quarter of 2021 to also include "paid Twitter products, including subscriptions," so this key metric continues to accurately reflect our audience as our products evolve. This change had no material impact on the number of mDAU reported in the fourth quarter of 2021, and is unlikely to do so in the near future. This change is effective for the fourth quarter of 2021 and for future periods, and it did not affect prior periods.

## Item 1A. RISK FACTORS

*Investing in our common stock involves a high degree of risk. You should carefully consider the risks and uncertainties described below, together with all of the other information in this Annual Report on Form 10-K, including the section titled "Management's Discussion and Analysis of Financial Condition and Results of Operations" and our consolidated financial statements and related notes, before making a decision to invest in our common stock. The risks and uncertainties described below may not be the only ones we face. If any of the risks actually occurs, our business, financial condition, operating results, cash flows and prospects could be materially and adversely affected. In that event, the market price of our common stock could decline, and you could lose part or all of your investment.*

### Risk Factor Summary

Our business operations are subject to numerous risks and uncertainties, including those outside of our control, that could cause our business, financial condition or operating results to be harmed, including risks regarding the following:

*Business and Operational Factors*

- our ability to increase our mDAU, ad engagement or other general engagement on our platform;
- the loss of advertising revenue;
- competition for people to use our platform and for content and data partners;
- competition for advertising spend;
- our prioritization of the long-term health of our service;
- our prioritization of product innovation;
- our ability to maintain and promote our brand;
- our ability to hire, retain and motivate highly skilled personnel;
- the interoperability of our products and services across third-party services and systems;
- the impact of spam and fake accounts on our platform experience;
- actual or perceived security breaches or incidents, as well as errors, vulnerabilities or defects in our software and in products of third-party providers;
- our international operations;
- the impact of the COVID-19 pandemic and responsive measures;
- our significant past operating losses and any inability to maintain profitability or accurately predict fluctuations in the future;
- our reliance on assumptions and estimates to calculate certain key metrics;
- catastrophic events and interruptions by man-made problems;

*Intellectual Property and Technology*

- our ability to scale our existing technology and infrastructure;
- our failure to protect our intellectual property rights;
- our use of open source software;
- current and future litigation related to intellectual property rights;

*Regulatory and Legal*

- complex and evolving U.S. and foreign laws and regulations;
- regulatory investigations and adverse settlements;

- lawsuits or liability as a result of content published through our products and services;
- our ability to maintain an effective system of disclosure controls and internal control over financial reporting;
- our ability to obtain adequate insurance coverage or self-insure for potential exposures;

*Financial and Transactional Risks*

- our ability to make and successfully integrate acquisitions and investments or complete divestitures;
- our debt obligations;
- our tax liabilities;
- our ability to realize the anticipated benefits of our share repurchase programs;
- our ability to use our net operating loss carryforwards;
- the impairment of our goodwill or intangible assets;

*Governance Risks and Risks related to Ownership of our Capital Stock*

- provisions of Delaware law and our certificate of incorporation and bylaws could impair a takeover attempt if deemed undesirable by our board of directors;
- the volatility of the trading price of our common stock; and
- our note hedge and warrant transactions.

**Business and Operational Factors**

***If we fail to increase our mDAU, ad engagement or other general engagement on our platform, our revenue, business and operating results may be harmed.***

Our mDAU and their level of engagement with advertising are critical to our success and our long-term financial performance will continue to be significantly determined by our success in increasing the growth rate of our mDAU as well as the number of ad engagements. Our mDAU growth rate has fluctuated over time, and it may slow or decline in general or in certain geographies or among certain groups. To the extent our mDAU growth rate slows or the absolute number of mDAU declines, our revenue growth will become dependent on our ability to increase levels of engagement on Twitter, generate advertiser demand, and increase revenue growth from third-party publishers' websites and applications, data licensing and other offerings. We generate a substantial majority of our revenue based upon engagement with the ads that we display. A number of factors have affected and could potentially negatively affect mDAU growth and engagement, including if:

- accounts, including influential accounts, such as those of world leaders, government officials, celebrities, athletes, journalists, sports teams, media outlets and brands or certain age demographics, do not contribute unique or engaging content, or engage with other products, services or activities as an alternative to ours;
- we are unable to convince people of the value and usefulness of our products and services;
- there is a decrease in the perceived quality, usefulness, trustworthiness or relevance of the content generated by people on Twitter or by our content partners;
- the actions we take to better foster a healthy conversation or to improve relevancy negatively impact, or are perceived to negatively impact, people's experiences on the platform;
- there are concerns related to communication, privacy, data protection, safety, cybersecurity, spam, manipulation or other hostile or inappropriate usage or other factors, or our health efforts result in the removal of certain accounts;
- we remove certain influential accounts from our platform for violations of our terms of service or otherwise;
- our content partners terminate their relationships with us or do not renew their agreements on economic or other terms that are favorable to us;
- technical or other problems prevent us from delivering our products or services in a rapid and reliable manner or otherwise affect people's experiences on Twitter;

- people have difficulty installing, updating, or otherwise accessing our products or services on mobile devices as a result of actions by us or third parties that we rely on to distribute our products and deliver our services;

- changes in our products or services that are mandated by, or that we elect to make to address, laws (such as the General Data Protection Regulation (GDPR) and the California Consumer Protection Act (CCPA)) or legislation, inquiries from legislative bodies, regulatory authorities or litigation (including settlements or consent decrees) adversely affect our products or services;

- we fail to provide adequate customer service; or

- we do not maintain our brand image or reputation.

We have made certain projections regarding our mDAU growth. If we are unable to achieve these projections, or to generally increase our mDAU or engagement, or if these metrics decline, our products and services could be less attractive to people on Twitter, as well as to advertisers, content partners and platform partners, which would have a material and adverse impact on our business, financial condition and operating results.

***We generate the substantial majority of our revenue from advertising. The loss of advertising revenue could harm our business.***

The substantial majority of our revenue is currently generated from third parties advertising on Twitter. We generate substantially all of our advertising revenue through the sale of our Promoted Products: Promoted Ads, Twitter Amplify, Follower Ads and Twitter Takeover. As is common in our industry, our advertisers do not have long-term advertising commitments with us.

In addition, many of our advertisers purchase our advertising services through one of several large advertising agencies' holding companies. To sustain or increase our revenue, we must add new advertisers and encourage existing advertisers to maintain or increase the amount of advertising inventory purchased through our platform and adopt new features and functionalities that we add to our platform. However, advertising agencies and potential new advertisers may view our Promoted Products or any new products or services we offer as experimental and unproven, and we may need to devote additional time and resources to educate them about our products and services. Further, our advertisers’ ability to effectively target their advertising to our audience’s interests may be impacted by the degree to which people on Twitter agree in our settings to certain types of personalization or ad targeting, which could have an impact on our revenue. People that already have accounts may change their choices as a result of changes to our privacy control settings that we have implemented or may implement in the future, and people new to Twitter may choose varied levels of personalization, whether in connection with future changes we make to product privacy settings, regulations, regulatory actions, the customer experience, or otherwise.

Changes to operating systems’ practices and policies, such as Apple’s changes related to its App Tracking Transparency policy, have reduced and may continue to reduce the quantity and quality of the data and metrics that can be collected or used by us and our partners or harm our ability to target advertising. These limitations have affected and may continue to adversely affect both our and our advertisers' ability to effectively target advertisements and measure their performance, thereby reducing the demand and pricing for our advertising products and harming our business, and have led to us to retool some of our revenue products and adjust our product roadmap in light of Apple’s changes. The impact of these changes on the overall mobile advertising ecosystem, our business, and the developers, partners, and advertisers in the ecosystem are evolving and their ultimate impact is not yet clear. Over time, personalization rates will impact our ability to grow our performance advertising business. Advertisers also may choose to use our free products and services instead of our Promoted Products. Advertisers will not continue to do business with us, or they will reduce the prices they are willing to pay to advertise with us, if we do not deliver ads in an effective manner, or if they do not believe that their investment in advertising with us will generate a competitive return on investment relative to alternatives, including online, mobile and traditional advertising platforms. In addition, competition for advertising is becoming increasingly more intense, and our advertising revenue could be further impacted by escalating competition for digital ad spending.

Our advertising revenue growth is primarily driven by increases in mDAU, increases in ad pricing or number of ads shown and increases in our clickthrough rate. To date, our available advertising inventory has been greater than demand. Our future revenue growth, however, may be limited by available advertising inventory for specific ad types on certain days if we do not increase our mDAU or monetize our larger global audience. Our advertising revenue also could be affected by a number of other factors, including advertiser reaction to content published on our platform or our policies and responses thereto, bugs or other product issues that may impact our ability to effectively help advertisers target ads or share data with our measurement and ad partners. In addition, macroeconomic factors, such as supply chain disruptions and inflation, have caused advertisers to reduce or delay ad spending and may continue to do so. The occurrence of any of these factors could result in a reduction in demand for our ads, which may reduce the prices we receive for our ads, either of which would adversely impact our revenue, business, financial condition and operating results.

***If we are unable to compete effectively for people to use our platform, and for content and data partners, our business and operating results could be harmed.***

We face intense competition for people to use our platform, and for content and data partners. We compete for our audience against a variety of social networking platforms, messaging companies and media companies, some of which have greater financial resources, larger audiences or more established relationships with advertisers, such as Meta (including Facebook, Instagram and WhatsApp), Alphabet (including Google and YouTube), Microsoft (including LinkedIn), Snapchat, TikTok, Pinterest and Yahoo, or in certain regions WeChat, Kakao and Line. New or existing competitors may draw people towards their products or services and away from ours by introducing new product features, including features similar to those we offer, investing their greater resources in audience acquisition efforts or otherwise developing products or services that audiences choose to engage with rather than Twitter, any of which could decrease mDAU growth or engagement and negatively affect our business.

We also compete with respect to content generated by our content partners and the availability of applications developed by platform partners. We may not establish and maintain relationships with content partners who publish on our platform or platform partners who develop applications that integrate with our platform. Our content and platform partners may choose to publish content on, or develop applications for, other platforms, and if they cease to utilize our platform or decrease their use of our platform, then mDAU, engagement, and advertising revenue may decline.

We believe that our ability to compete effectively for audiences and content partners depends upon many factors both within and beyond our control, including:

- the popularity, usefulness, ease of use, performance and reliability of our products and services compared to those of our competitors, as well as our reputation and brand, and our ability to adapt to continuously evolving preferences and expectations of people on Twitter, advertisers, content partners, platform partners and developers;
- the amount, quality and timeliness of content generated on our platform, including the relative mix of ads;
- the timing and market acceptance of our products and services;
- the prominence of our applications in application marketplaces and of our content in search engine results, as well as those of our competitors;
- our ability, in and of itself, and in comparison to the ability of our competitors, to develop new products and services and enhancements to existing products and services, and to maintain the reliability and security of our products and services as usage increases globally;
- changes mandated by, or that we elect to make to address legislation, regulatory authorities or litigation, including settlements, antitrust matters, consent decrees and privacy, data protection and cybersecurity laws and regulations, some of which may have a disproportionate effect on us compared to our competitors; and
- the continued adoption and monetization of our products and services internationally.

Additionally, there have been significant acquisitions and consolidation by and among our actual and potential competitors. We anticipate this trend of consolidation will continue, which will present heightened competitive challenges for our business. Acquisitions by our competitors may result in reduced functionality of our products and services. For example, following Facebook's acquisition of Instagram, Facebook disabled Instagram's photo integration with Twitter such that Instagram photos were no longer viewable within Tweets and people are instead re-directed to Instagram to view Instagram photos through a link within a Tweet. As a result, people who use Twitter may be less likely to click on links to Instagram photos in Tweets, and people who use Instagram may be less likely to Tweet or remain active on Twitter. Any similar elimination of integration with Twitter in the future, whether by Facebook or other competitors, may adversely impact our business and operating results. Consolidation may also enable our larger competitors to offer bundled or integrated products that feature alternatives to our platform and provide alternative opportunities for advertisers.

If we are not able to compete effectively for audience, content and platform partners, our mDAU and engagement would decline and our business and operating results would be materially and adversely impacted.

***If we are unable to compete effectively for advertising spend, our business and operating results could be harmed.***

We face significant competition for advertiser spend. We compete against online and mobile businesses and traditional media outlets, such as television, radio and print, for advertising budgets. In order to grow our revenue and improve our operating results, we must increase our share of spending on advertising relative to our competitors, many of which are larger companies that offer more traditional and widely accepted advertising products. In addition, some of our larger competitors have substantially broader product or service offerings and leverage their relationships based on other products or services to gain additional share of advertising budgets.

We believe that our ability to compete effectively for advertiser spend depends upon many factors both within and beyond our control, including:

- the size and composition of our audience relative to those of our competitors;
- our ad targeting and measurement capabilities, and those of our competitors;
- the timing and market acceptance of our advertising services, and those of our competitors, including our ability to demonstrate to advertisers the value of our advertising services, particularly during the periods in which they are determining their budgets, which may be annually or biannually;
- our marketing and selling efforts, and those of our competitors;
- the pricing of our advertising services, including the actual or perceived return our advertisers receive from our advertising services, and those of our competitors; and
- our reputation and the strength of our brand relative to our competitors, including advertisers' perception of the health and safety of our platform.

If we are not able to compete effectively for advertiser spend, our mDAU and engagement would decline and our business and operating results would be materially and adversely impacted.

***Our prioritization of the long-term health of our service may adversely impact our short-term operating results.***

We believe that our long-term success depends on our ability to improve the health of the public conversation on Twitter. We have made this one of our top priorities and have focused our efforts on improving the quality of that conversation, including by devoting substantial internal resources to our strategy. These efforts include the reduction of abuse, harassment, spam, manipulation and malicious automation on the platform, as well as a focus on improving information quality (including information around elections and the COVID-19 pandemic), and the health of conversation on Twitter. Some of the health initiatives that we have implemented as part of our ongoing commitment to a healthy public conversation have negatively impacted, and may in the future negatively impact, our publicly reported metrics in a few ways.

First, our health efforts include the removal of accounts pursuant to our terms and services that are abusive, spammy, fake or malicious, and these accounts may have been included in our mDAU, as well as actions taken to detect and challenge potentially automated, spammy or malicious accounts during the sign-up process. If we make a sudden improvement to one of the algorithms we use to detect spammy or suspicious behavior, we may remove a larger number of accounts as a result and impact the year-over-year average of mDAU growth. Additionally, we may remove certain influential accounts for violations of our terms of service and the removal of such accounts has in the past reduced and may in the future reduce our mDAU growth and engagement.

Second, we are also making active decisions to prioritize certain health-related initiatives over other near-term product improvements that may drive more usage of Twitter as a daily utility. These decisions may not be consistent with the short-term expectations of our advertising customers or investors and may not produce the long-term benefits that we expect, in which case our mDAU growth and engagement, our relationships with advertisers and our business and operating results could be harmed.

Our decision to invest in the long-term health of our service may not produce the long-term benefits that we expect, in which case our mDAU growth and engagement, our relationships with advertisers and our business and operating results would be adversely impacted, and may not be consistent with the expectations of investors, which could have a negative effect on the trading price of our common stock.

***Our prioritization of innovations to improve the experience of people using our products and services and performance for advertisers in the long term may adversely impact our short-term operating results and our new or enhanced products, product features or services may fail to increase engagement on our platform or generate revenue.***

We encourage employees to quickly develop and help us launch new and innovative features. We focus on improving the experience for people using our products and services, which includes measures to help protect the privacy of people on Twitter. Similarly, we prioritize developing new and improved products and services for advertisers on our platform. We frequently make product, product feature and service decisions that may reduce our short-term operating results if we believe that the decisions are consistent with our goals to improve the long-term experience for people on Twitter and/or performance for advertisers, which we believe will improve our operating results over the long term. For example, in January 2022, we completed the sale of our MoPub business. The sale of MoPub enables us to accelerate the development of our core revenue products and drive growth across key areas of the business, including performance-based advertising, small and medium-sized business (SMB) offerings, and commerce initiatives on Twitter. While the product, engineering, and go-to-market teams associated with MoPub began to shift over to these key focus areas immediately upon the closing of the transaction, it will take time for their work to deliver results. As a result, we do not expect to recoup the full revenue loss associated with the sale of MoPub in 2022, but there are no changes to our long-term goals with an increased focus and additional resources working on increasing our market share within the addressable market for ads on our website and apps. However, we can provide no assurance that we will recoup the revenue impact from MoPub on the expected timeline, or at all.

Our industry is subject to rapid and frequent changes in technology, evolving customer needs and the frequent introduction by our competitors of new and enhanced offerings. We must constantly assess the playing field and determine whether we need to improve or re-allocate resources amongst our existing products and services or create new ones (independently or in conjunction with third parties). Our ability to increase mDAU and engagement, attract content partners, advertisers and platform partners and generate revenue will depend on those decisions. We may introduce significant changes to our existing products and services or develop and introduce new and unproven products and services, including technologies with which we have little or no prior development or operating experience. For example, we are in the early stages of exploring additional potential revenue product opportunities that could, if successful, complement our advertising business in the future, although we do not expect any significant revenue attributable to these opportunities in the near-term and these opportunities may not prove successful at all. We are also continuing our work to increase the stability, performance and scale of our ads platform and our Mobile Application Promotion (MAP) product, and such work will take place over multiple quarters, and any positive revenue impact will be gradual in its impact.

If our decisions to invest in product innovations rather than short-term results do not produce the long-term benefits that we expect, and if our new or enhanced products, product features or services fail to engage people on Twitter, content partners and advertisers, we may fail to attract or retain mDAU or to generate sufficient revenue or operating profit to justify our investments, and our business, financial condition and operating results would be adversely impacted.

***If we are unable to maintain and promote our brand, our business and operating results may be harmed.***

We believe that maintaining and promoting our brand is critical to increasing mDAU, content partners and advertiser spend. Maintaining and promoting our brand will depend largely on our ability to continue to provide timely, useful, reliable and innovative products and services with a focus on a positive experience on Twitter, which we may not do successfully. We may introduce new features, products, services or terms of service that people on Twitter, content partners, advertisers or platform partners do not like, which may negatively affect our brand. Additionally, the actions of content partners may affect our brand if people do not have a positive experience using third-party applications or websites integrated with Twitter or that make use of Twitter content. We will also continue to experience media, legislative or regulatory scrutiny of our decisions regarding privacy, data protection, cybersecurity, content (including our removal of certain influential accounts for violations of our terms of service) and other issues, which may adversely affect our reputation and brand. Our brand may also be negatively affected by the actions of people that are hostile or inappropriate to other people, by accounts impersonating other people, by accounts identified as spam, by use or perceived use, directly or indirectly, of our products or services by people (including governments and government-sponsored actors) to disseminate information that may be viewed as misleading (or intended to manipulate people's opinions), by accounts introducing excessive amounts of spam on our platform, by third parties obtaining control over people's accounts, such as the security breach in July 2020 whereby attackers gained control of certain highly-visible accounts, or by other security or cybersecurity incidents. Maintaining and enhancing our brand may require us to make substantial investments and these investments may not achieve the desired goals.

Additionally, we and our executive leadership receive a high degree of media coverage around the world. Negative publicity about our company or executives, including about the quality and reliability of our products or of content shared on our platform, changes to our products, policies and services, our privacy, data protection, policy enforcement and cybersecurity practices (including actions taken or not taken with respect to certain accounts or reports regarding government surveillance or compliance with government legal requests), litigation, regulatory activity, the actions of certain accounts (including actions taken by prominent accounts on our platform or the dissemination of information that may be viewed as misleading or manipulative), even if inaccurate, could adversely affect our reputation. Such negative publicity and reputational harm could adversely affect mDAU and their confidence in and loyalty to our platform and could result in decreased revenue or increased costs to reestablish our brand, which would adversely impact our business, financial condition and operating results.

- changes as a result of acquisitions or dispositions of assets or businesses;
- system failures resulting in the inaccessibility of our products and services;
- actual or perceived privacy or cybersecurity breaches or incidents, and the costs associated with remediating any such breaches or incidents;
- adverse litigation judgments, settlements or other litigation-related costs, and the fees associated with investigating and defending claims;
- changes in the legislative or regulatory environment, including with respect to security, tax, privacy, data protection, or content, or enforcement by government regulators, including fines, orders or consent decrees;
- changes in reserves or other non-cash credits or charges, such as establishment or releases of deferred tax assets valuation allowance, impairment charges or purchase accounting adjustments;
- changes in our expected estimated useful life of property and equipment and intangible assets;
- fluctuations in currency exchange rates and changes in the proportion of our revenue and expenses denominated in foreign currencies;
- changes in U.S. generally accepted accounting principles; and
- changes in global or regional business or macroeconomic conditions.

In January 2022, we completed the sale of our MoPub business. The sale of MoPub enables us to concentrate more of our efforts on the significant opportunity for performance-based advertising, SMB offerings, and commerce initiatives on Twitter. While the product, engineering, and go-to-market teams associated with MoPub largely began to shift over to these key focus areas immediately upon the closing of the transaction, it will take time for their work to deliver results. As a result, we do not expect to recoup the full revenue loss associated with the sale of MoPub in 2022, but there are no changes to our long-term goals with an increased focus and additional resources working on increasing our market share within the addressable market for ads on our website and apps. However, we can provide no assurance that we will recoup the revenue impact from MoPub on the expected timeline, or at all.

Given the rapidly evolving markets in which we compete, our historical operating results may not be useful to you in predicting our future operating results. If our revenue growth rate slows, we expect that the seasonality in our business may become more pronounced and may in the future cause our operating results to fluctuate. For example, advertising spending is traditionally seasonally strong in the fourth quarter of each year, and we believe that this seasonality affects our quarterly results, which generally reflect higher sequential advertising revenue growth from the third to fourth quarter compared to sequential advertising revenue growth from the fourth quarter to the subsequent first quarter. Additionally, certain new revenue products or product features may carry higher costs relative to our other products, which may decrease our margins, and we may incur increased costs to scale our operations if mDAU and engagement on our platform increase. If we are unable to generate adequate revenue growth and to manage our expenses, we may incur significant losses in future periods and may not be able to maintain profitability.

***We rely on assumptions and estimates to calculate certain of our key metrics, and real or perceived inaccuracies in such metrics may harm our reputation and negatively affect our business.***

We calculate our mDAU using internal company data that has not been independently verified. While these numbers are based on what we believe to be reasonable calculations for the applicable period of measurement, there are inherent challenges in measuring mDAU and mDAU engagement. For example, there are a number of false or spam accounts in existence on our platform. We estimate that the average of false or spam accounts during the fourth quarter of 2021 continued to represent fewer than 5% of our mDAU during the quarter. However, this estimate is based on an internal review of a sample of accounts and we apply significant judgment in making this determination. As such, our estimation of false or spam accounts may not accurately represent the actual number of such accounts, and the actual number of false or spam accounts could be higher than we have currently estimated. We are continually seeking to improve our ability to estimate the total number of spam accounts and eliminate them from the calculation of our mDAU, but we otherwise treat multiple accounts held by a single person or organization as multiple accounts for purposes of calculating our mDAU because we permit people and organizations to have more than one account. Additionally, some accounts used by organizations are used by many people within the organization. As such, the calculations of our mDAU may not accurately reflect the actual number of people or organizations using our platform. We regularly review and may adjust our processes for calculating our internal metrics to improve their accuracy. Our measures of mDAU growth and engagement may differ from estimates published by third parties or from similarly-titled metrics of our competitors due to differences in methodology. If advertisers, content or platform partners or investors do not perceive our metrics to be accurate representations of our total accounts or mDAU engagement, or if we discover material inaccuracies in our metrics, our reputation may be harmed and content partners, advertisers and platform partners may be less willing to allocate their budgets or resources to our products and services, which could negatively affect our business and operating results. Further, as our business develops, we may revise or cease reporting metrics if we determine that such metrics are no longer accurate or appropriate measures of our performance. If investors, analysts or customers do not believe our reported measures, such as mDAU, are sufficient or accurately reflect our business, we may receive negative publicity and our operating results may be adversely impacted.

***Our business is subject to the risks of earthquakes, fire, power outages, floods and other catastrophic events, and to interruption by man-made problems such as terrorism.***

A significant natural disaster, such as the COVID-19 pandemic or an earthquake, fire, flood or significant power outage could have a material adverse impact on our business, operating results, and financial condition. For example, the COVID-19 pandemic led to certain business disruptions, including travel bans and restrictions, shelter-in-place orders and the postponement or cancellation of major events, which adversely affected demand for our advertising products and the economy as a whole, and which may have an adverse effect on our business, financial condition and operating results in the future. We have offices and a significant number of employees in the San Francisco Bay Area, a region known for seismic activity. Additionally, despite any precautions we may take, the occurrence of a natural disaster or other unanticipated problems at our data centers could result in lengthy interruptions in our services. In addition, our employees, offices, and infrastructure have recently been the subject of increased threats by extremists. Acts of terrorism and other geo-political unrest could cause disruptions in our business. All of the aforementioned risks may be further increased if our disaster recovery plans prove to be inadequate. We have implemented a disaster recovery program, which allows us to move production to a back-up data center in the event of a catastrophe. Although this program is functional, we do not currently serve network traffic equally from each data center, so if our primary data center shuts down, there will be a period of time that our products or services, or certain of our products or services, will remain inaccessible or people may experience severe issues accessing our products and services. We do not carry business interruption insurance sufficient to compensate us for the potentially significant losses, including the potential harm to our business that may result from interruptions in our ability to provide our products and services. Any such natural disaster or man-made problem could adversely impact our business, financial condition and operating results.

## Intellectual Property and Technology

***Our business and operating results may be harmed by our failure to timely and effectively scale and adapt our existing technology and infrastructure.***

As accounts generate more content, including photos and videos hosted by Twitter, we may be required to expand and adapt our technology and infrastructure to continue to reliably store, serve and analyze this content. It may become increasingly difficult to maintain and improve the performance of our products and services, especially during peak usage times, as our products and services become more complex and our account traffic increases. In addition, because we lease our data center facilities, we cannot be assured that we will be able to expand our data center infrastructure to meet demand in a timely manner, or on favorable economic terms. If people are unable to access Twitter or we are not able to make information available rapidly on Twitter, people may seek other channels to obtain the information, and may not return to Twitter or use Twitter as often in the future, or at all. This would negatively impact our ability to attract new people to Twitter, content partners and advertisers and increase the frequency of people returning to Twitter. We expect to continue to make significant investments to maintain and improve the capacity, capability and reliability of our infrastructure. To the extent that we do not effectively address capacity constraints, upgrade our systems as needed and continually develop our technology and infrastructure to accommodate actual and anticipated changes in technology, our business and operating results may be harmed.

**Key Metrics**

We review a number of metrics, including the key metrics discussed below, to evaluate our business, measure our performance, identify trends affecting our business, formulate business plans and make strategic decisions.

*Monetizable Daily Active Usage or Users (mDAU)*. We define mDAU as people, organizations, or other accounts who logged in or were otherwise authenticated and accessed Twitter on any given day through twitter.com, Twitter applications that are able to show ads, or paid Twitter products, including subscriptions[2].

We believe that mDAU, and its related growth, is the best way to measure our success against our objectives and to show the size of our audience and engagement. Average mDAU for a period represents the number of mDAU on each day of such period divided by the number of days for such period. Changes in mDAU are a measure of changes in the size of our daily logged in or otherwise authenticated active total accounts. To calculate the year-over-year change in mDAU, we subtract the average mDAU for the three months ended in the previous year from the average mDAU for the same three months ended in the current year and divide the result by the average mDAU for the three months ended in the previous year. Additionally, our calculation of mDAU is not based on any standardized industry methodology and is not necessarily calculated in the same manner or comparable to similarly titled measures presented by other companies.

In the three months ended December 31, 2021, we had 217 million average mDAU, which represents an increase of 13% from the three months ended December 31, 2020. The increase was driven by product improvements, as well as global conversation around current events. In the three months ended December 31, 2021, we had 38 million average mDAU in the United States and 179 million average mDAU in the rest of the world, which represent increases of 2% and 15%, respectively, from the three months ended December 31, 2020.

---

[2] We have updated our mDAU definition in the fourth quarter of 2021 to also include "paid Twitter products, including subscriptions", so this key metric continues to accurately reflect our audience as our products evolve. This change had no material impact on the number of mDAU reported in the fourth quarter of 2021, and is unlikely to do so in the near future. This change is effective for the fourth quarter of 2021 and for future periods, and it did not affect prior periods.

**Exhibit 32.1**

**CERTIFICATIONS OF CHIEF EXECUTIVE OFFICER AND CHIEF FINANCIAL OFFICER PURSUANT TO 18 U.S.C. SECTION 1350, AS ADOPTED PURSUANT TO SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

I, Parag Agrawal, certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that the Annual Report on Form 10-K of Twitter, Inc. for the fiscal year ended December 31, 2021 fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934 and that information contained in such Annual Report on Form 10-K fairly presents, in all material respects, the financial condition and results of operations of Twitter, Inc.

Date: February 16, 2022

| | |
|---|---|
| By: | /s/ Parag Agrawal |
| Name: | Parag Agrawal |
| Title: | Chief Executive Officer |

I, Ned Segal, certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that the Annual Report on Form 10-K of Twitter, Inc. for the fiscal year ended December 31, 2021 fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934 and that information contained in such Annual Report on Form 10-K fairly presents, in all material respects, the financial condition and results of operations of Twitter, Inc.

Date: February 16, 2022

| | |
|---|---|
| By: | /s/ Ned Segal |
| Name: | Ned Segal |
| Title: | Chief Financial Officer |

E. Musk
05.07.25
Exhibit 89
Quyen N. Do

UNITED STATES
SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

# SCHEDULE 13G

**Under the Securities Exchange Act of 1934**
**(Amendment No. )***

**Twitter Inc.**
(Name of Issuer)

**Common Stock**
(Title of Class of Securities)

**90184L102**
(CUSIP Number)

**March 14, 2022**
(Date of Event which Requires Filing of this Statement)

Check the appropriate box to designate the rule pursuant to which this Schedule is filed:

[ ] Rule 13d-1(b)

[X] Rule 13d-1(c)

[ ] Rule 13d-1(d)

*The remainder of this cover page shall be filled out for a reporting person's initial filing on this form with respect to the subject class of securities, and for any subsequent amendment containing information which would alter the disclosures provided in a prior cover page.

The information required in the remainder of this cover page shall not be deemed to be "filed" for the purpose of Section 18 of the Securities Exchange Act of 1934 ("Act") or otherwise subject to the liabilities of that section of the Act but shall be subject to all other provisions of the Act (however, see the Notes).

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
Case Number: 3:22-CV-05937-CRB
PLTF / DEFT Exhibit No. 16
Date Admitted:
By:
Lashanda Scott, Deputy Clerk

<table>
<tr><td>1</td><td colspan="3">NAME OF REPORTING PERSONS<br><br>Elon R. Musk</td></tr>
<tr><td>2</td><td colspan="3">CHECK THE APPROPRIATE BOX IF A MEMBER OF A GROUP<br>(a) ☐<br>(b) ☐</td></tr>
<tr><td>3</td><td colspan="3">SEC USE ONLY</td></tr>
<tr><td>4</td><td colspan="3">CITIZENSHIP OR PLACE OF ORGANIZATION<br><br>United States</td></tr>
<tr><td colspan="2" rowspan="4">NUMBER OF SHARES BENEFICIALLY OWNED BY EACH REPORTING PERSON WITH</td><td>5</td><td>SOLE VOTING POWER<br><br>73,486,938</td></tr>
<tr><td>6</td><td>SHARED VOTING POWER<br><br>--</td></tr>
<tr><td>7</td><td>SOLE DISPOSITIVE POWER<br><br>73,486,938</td></tr>
<tr><td>8</td><td>SHARED DISPOSITIVE POWER<br><br>--</td></tr>
<tr><td>9</td><td colspan="3">AGGREGATE AMOUNT BENEFICIALLY OWNED BY EACH REPORTING PERSON<br><br>73,486,938 shares of Common Stock</td></tr>
<tr><td>10</td><td colspan="3">CHECK BOX IF THE AGGREGATE AMOUNT IN ROW (9) EXCLUDES CERTAIN SHARES<br>☐</td></tr>
<tr><td>11</td><td colspan="3">PERCENT OF CLASS REPRESENTED BY AMOUNT IN ROW (9)<br><br>9.2% of Common Stock</td></tr>
<tr><td>12</td><td colspan="3">TYPE OF REPORTING PERSON<br><br>IN</td></tr>
</table>

**Item 1.**

(a) Name of Issuer: Twitter Inc. (the "Issuer")
(b) Address of Issuer's Principal Executive Offices

1355 Market Street, Suite 900
San Francisco, CA 94103

**Item 2.**

(a) Name of Person Filing

Elon R. Musk

(b) Address of Principal Business Office or, if none, Residence

2110 Ranch Road 620 S. #341886
Austin, TX 78734

(c) Citizenship

United States

(d) Title of Class of Securities

Common Stock

(e) CUSIP Number

90184L102

**Item 3. If this statement is filed pursuant to §§240.13d-1(b) or 240.13d-2(b) or (c), check whether the person filing is a:**

Not applicable

**Item 4. Ownership.**

(a) Amount beneficially owned: 73,486,938 shares consisting of shares of Common Stock held by the Elon Musk Revocable Trust dated July 22, 2003 for which Elon Musk is the sole Trustee.

(b) Percent of class: 9.2% (based on 800,641,166 shares of Common Stock outstanding as of February 10, 2022 as reported in the Issuer's Annual Report on Form 10-K for the year ended December 31, 2021).

(c) Number of shares as to which the person has:

(i) Sole power to vote or to direct the vote: 73,486,938
(ii) Shared power to vote or to direct the vote: --
(iii) Sole power to dispose or to direct the disposition of: 73,486,938
(iv) Shared power to dispose or to direct the disposition of: --

**Item 5. Ownership of Five Percent or Less of a Class.**

If this statement is being filed to report the fact that as of the date hereof the reporting person has ceased to be the beneficial owner of more than five percent of the class of securities, check the following ☐.

**Item 6. Ownership of More than Five Percent on Behalf of Another Person.**

Not Applicable

**Item 7. Identification and Classification of the Subsidiary Which Acquired the Security Being Reported on By the Parent Holding Company.**

Not Applicable

**Item 8. Identification and Classification of Members of the Group.**

Not Applicable

**Item 9. Notice of Dissolution of Group.**

Not Applicable

**Item 10. Certification**

Not Applicable

**SIGNATURE**

After reasonable inquiry and to the best of my knowledge and belief, I certify that the information set forth in this statement is true, complete and correct.

Date: April 4, 2022

By: ______________________________
Elon R. Musk

SC 13D/A 1 tm2212748d1_sc13da.htm SC 13D/A

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
Case Number: 3:22-CV-05937-CRB
PLTF / DEFT Exhibit No. 36
Date Admitted:
By:
Lashanda Scott, Deputy Clerk

UNITED STATES
SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

AMENDMENT No. 2 to
SCHEDULE 13D/A
Under the Securities Exchange Act of 1934
(Amendment No. 2 to Schedule 13D)

Twitter Inc.
(Name of Issuer)

Common Stock
(Title of Class of Securities)

90184L102
(Cusip Number)

John Lutz
Heidi Steele
McDermott Will & Emery LLP
444 West Lake Street, Suite 4000
Chicago, IL 60657
(312) 984-3624
(Name, Address and Telephone Number of Person
Authorized to Receive Notices and Communications)

April 13, 2022
(Date of Event Which Requires Filing of this Statement)

If the filing person has previously filed a statement on Schedule 13G to report the acquisition that is the subject of this Schedule 13D, and is filing this schedule because of Rule 13d-1(e), 240.13d-1(f) or 240.13d-1(g), check the following box. ☒

*The remainder of this cover page shall be filled out for a reporting person's initial filing on this form with respect to the subject class of securities, and for any subsequent amendment containing information which would alter disclosures provided in a prior cover page.

The information required on the remainder of this cover page shall not be deemed to be "filed" for the purpose of Section 18 of the Securities Exchange Act of 1934 ("Act") or otherwise subject to the liabilities of that section of the Act but shall be subject to all other provisions of the act (however, see the Notes).

EXHIBIT
3-25-25
36
M. RINGLER

SCHEDULE 13D

CUSIP No. 90184L102

| | | |
|---|---|---|
| 1 | Name of Reporting Person: I.R.S. Identification Nos. of Above Person (entities only):<br><br>Elon R. Musk | |
| 2 | Check the Appropriate Box if a Member of a Group (See Instructions):<br>(a) ☐<br>(b) ☐ | |
| 3 | SEC Use Only: | |
| 4 | Source of Funds (See Instruction):<br><br>OO | |
| 5 | Check if Disclosure of Legal Proceedings is Required Pursuant to Items 2(d) or 2(e): ☒ | |
| 6 | Citizenship or Place of Organization:<br><br>USA | |
| Number of Shares Beneficially Owned by Each Reporting Person With | 7 | Sole Voting Power:<br><br>73,115,038 |
| | 8 | Shared Voting Power:<br><br>-- |
| | 9 | Sole Dispositive Power:<br><br>73,115,038 |
| | 10 | Shared Dispositive Power:<br><br>-- |
| 11 | Aggregate Amount Beneficially Owned by Each Reporting Person:<br><br>73,115,038 | |
| 12 | Check if the Aggregate Amount in Row (11) Excludes Certain Shares (See Instructions) ☐ | |
| 13 | Percent of Class Represented by Amount in Row (11):<br><br>9.1%[1] | |
| 14 | Type of Reporting Person (See Instructions):<br><br>IN | |

[1] Based on 800,641,166 shares of Common Stock outstanding as of February 10, 2022 as reported in the Issuer's Annual Report on Form 10-K for the year ended December 31, 2021.

SCHEDULE 13D

Explanatory Note: This statement on Schedule 13D amends the Schedule 13D of Elon Musk (the "Reporting Person") that was filed with the Securities and Exchange Commission on April 5, 2022, as amended on April 11, 2022 (collectively, the "Schedule 13D"), with respect to the Common Stock of Twitter Inc. (the "Issuer'). This amendment to the Schedule 13D constitutes Amendment No. 2 to the Schedule 13D. Capitalized terms used but not defined herein have the meanings given to such terms in the Schedule 13D. Except as set forth herein, the Schedule 13D is unmodified.

**Item 4. Purpose of Transaction.**

Item 4 of the Schedule 13D is amended and restated in its entirety to read as follows:

On April 13, 2022, the Reporting Person delivered a letter to the Issuer (the "Letter") which contained a non-binding proposal (the "Proposal") to acquire all of the outstanding Common Stock of the Issuer not owned by the Reporting Person for all cash consideration valuing the Common Stock at $54.20 per share (the "Proposed Transaction"). This represents a 54% premium over the closing price of the Common Stock on January 28, 2022, the trading day before the Reporting Person began investing in the Issuer, and a 38% premium over the closing price of the Common Stock on April 1, 2022, the trading day before the Reporting Person's investment in the Issuer was publicly announced.

The Proposal is non-binding and, once structured and agreed upon, would be conditioned upon, among other things, the (i) receipt of any required governmental approvals; (ii) confirmatory legal, business, regulatory, accounting and tax due diligence; (iii) the negotiation and execution of definitive agreements providing for the Proposed Transaction; and (iv) completion of anticipated financing.

There can be no assurance that a definitive agreement with respect to the Proposal will be executed or, if executed, whether the transaction will be consummated. There is also no certainty as to whether, or when, the Issuer may respond to the Letter, or as to the time table for execution of any definitive agreement. The Reporting Person reserves the right to withdraw the Proposal or modify the terms at any time including with respect to the amount or form of consideration. The Reporting Person may, directly or indirectly, take such additional steps as he may deem appropriate to further the Proposal.

If the Proposed Transaction is completed, the Common Stock would become eligible for termination of its registration pursuant to Section 12(g)(4) of the Securities Exchange Act of 1934, as amended, and would be delisted from the New York Stock Exchange.

The foregoing description is qualified in its entirety by reference to the full text of the Letter, a copy of which is attached hereto as Exhibit B and is incorporated herein by reference.

The Reporting Person has engaged Morgan Stanley as its financial advisor.

Neither the Letter nor this Schedule 13D is meant to be, nor should be construed as, an offer to buy or the solicitation of an offer to sell any of the Issuer's securities.

The Reporting Person intends to review his investment in the Issuer on a continuing basis. Depending on the factors discussed herein, the Reporting Person may, from time to time, acquire additional shares of Common Stock and/or retain and/or sell all or a portion of the shares of Issuer common stock held by the Reporting Person in the open market or in privately negotiated transactions, and/or may distribute the Common Stock held by the Reporting Person to other entities. Any actions the Reporting Person might undertake will be dependent upon the Reporting Person's evaluation of numerous factors, including, among other things, the outcome of any discussions referenced in this Schedule 13D, the price levels of the Common Stock, general market and economic conditions, ongoing evaluation of the Issuer's business, financial condition, operations and prospects, the relative attractiveness of alternative business and investment opportunities, investor's need for liquidity, and other future developments.

From time to time, the Reporting Person may engage in discussions with the Board and/or members of the Issuer's management team concerning, including, without limitation, the Proposal, potential business combinations and strategic alternatives, the business, operations, capital structure, governance, management, strategy of the Issuer and other matters concerning the Issuer. The Reporting Person may express his views to the Board and/or members of the Issuer's management team and/or the public through social media or other channels with respect to the Issuer's business, products and service offerings.

**SIGNATURE**

After reasonable inquiry and to the best of my knowledge and belief, I certify that the information set forth in this statement is true, complete and correct.

Date: April 13, 2022

By: /s/ Elon Musk
Elon Musk

SC 13D/A 1 tm2213229d1_sc13da.htm SC 13D/A

UNITED STATES
SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

AMENDMENT No. 3 to
SCHEDULE 13D
Under the Securities Exchange Act of 1934
(Amendment No. 3 to Schedule 13D)

# Twitter, Inc.

(Name of Issuer)

Common Stock

(Title of Class of Securities)

90184L102

(Cusip Number)

John Lutz
Heidi Steele
McDermott Will & Emery LLP
444 West Lake Street, Suite 4000
Chicago, IL 60606
(312) 372-2000

(Name, Address and Telephone Number of Person
Authorized to Receive Notices and Communications)

April 20, 2022

(Date of Event Which Requires Filing of this Statement)

If the filing person has previously filed a statement on Schedule 13G to report the acquisition that is the subject of this Schedule 13D, and is filing this schedule because of Rule 13d-1(e), 240.13d-1(f) or 240.13d-1(g), check the following box. ☒

*The remainder of this cover page shall be filled out for a reporting person's initial filing on this form with respect to the subject class of securities, and for any subsequent amendment containing information which would alter disclosures provided in a prior cover page.

The information required on the remainder of this cover page shall not be deemed to be "filed" for the purpose of Section 18 of the Securities Exchange Act of 1934 ("Act") or otherwise subject to the liabilities of that section of the Act but shall be subject to all other provisions of the act (however, see the Notes).

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
Case Number: 3:22-CV-05937-CRB
PLTF / DEFT Exhibit No. 47
Date Admitted:
By:
Lashanda Scott, Deputy Clerk

Exhibit 18
03/18/2025

PLAINTIFFS-000071

SCHEDULE 13D

CUSIP No. 90184L102

| | | |
|---|---|---|
| 1 | Name of Reporting Person: Elon R. Musk | I.R.S. Identification Nos. of Above Person (entities only): |
| 2 | Check the Appropriate Box if a Member of a Group (See Instructions): (a) ☐ (b) ☐ | |
| 3 | SEC Use Only: | |
| 4 | Source of Funds (See Instruction): OO | |
| 5 | Check if Disclosure of Legal Proceedings is Required Pursuant to Items 2(d) or 2(e): | ☒ |
| 6 | Citizenship or Place of Organization: USA | |

| | | |
|---|---|---|
| Number of Shares Beneficially Owned by Each Reporting Person With | 7 | Sole Voting Power: 73,115,038 |
| | 8 | Shared Voting Power: -- |
| | 9 | Sole Dispositive Power: 73,115,038 |
| | 10 | Shared Dispositive Power: -- |

| | | |
|---|---|---|
| 11 | Aggregate Amount Beneficially Owned by Each Reporting Person: | |
| | Check if the Aggregate Amount in Row (11) Excludes Certain Shares (See Instructions) 73,115,038 | ☐ |
| 13 | Percent of Class Represented by Amount in Row (11): 9.1%[1] | |
| 14 | Type of Reporting Person (See Instructions): IN | |

[1] Based on 800,641,166 shares of Common Stock outstanding as of February 10, 2022 as reported in the Issuer's Annual Report on Form 10-K for the year ended December 31, 2021.



**PLAINTIFFS-000072**

**ER-2638**

SCHEDULE 13D

Explanatory Note: This statement on Schedule 13D amends the Schedule 13D of Elon Musk (the "Reporting Person") that was filed with the Securities and Exchange Commission on April 5, 2022, as amended on April 11, 2022 and April 14, 2022 (collectively, the "Schedule 13D"), with respect to the Common Stock, par value $0.000005 per share (the "Common Stock"), of Twitter, Inc. (the "Issuer" or "Twitter"). This amendment to the Schedule 13D constitutes Amendment No. 3 to the Schedule 13D. Capitalized terms used but not defined herein have the meanings given to such terms in the Schedule 13D. Except as set forth herein, the Schedule 13D is unmodified.

**Item 4. Purpose of Transaction.**

Item 4 of the Schedule 13D is amended and restated in its entirety to read as follows:

On April 13, 2022, the Reporting Person delivered a letter to the Issuer (the "Letter") which contained a non-binding proposal (the "Proposal") to acquire all of the outstanding Common Stock of Twitter not owned by the Reporting Person for all cash consideration valuing the Common Stock at $54.20 per share (the "Proposed Transaction"). The foregoing description is qualified in its entirety by reference to the full text of the Letter, a copy of which is attached hereto as Exhibit B and is incorporated herein by reference.

The Proposal was (and remains) non-binding and, once negotiated and agreed upon, would be conditioned upon, among other things, the: (i) receipt of any required governmental approvals; (ii) confirmatory legal, regulatory, accounting and tax due diligence; and (iii) negotiation and execution of definitive agreements providing for the Proposed Transaction. At the time of delivery, the Proposal was also subject to the completion of financing and business due diligence, but it is no longer subject to financing as a result of the Reporting Person's receipt of the financing commitments described below and is no longer subject to business due diligence.

The Reporting Person is seeking to negotiate a definitive agreement for the acquisition of Twitter by the Reporting Person and is prepared to begin such negotiations immediately.

On April 15, 2022, Twitter adopted a rights agreement, dated as of April 15, 2022 (as it may be amended from time to time, the "Rights Agreement"), by and between Twitter and Computershare Trust Company, N.A., as rights agent, and declared a dividend of one right issued pursuant to the Rights Agreement for each outstanding share of Common Stock (the "Poison Pill").

Twitter has not responded to the Proposal. Given the lack of response by Twitter, the Reporting Person is exploring whether to commence a tender offer to acquire all of the outstanding shares of Common Stock (together with the associated rights issued pursuant to the Rights Agreement (the "Rights" and, together with the Common Stock, the "Shares")) that are issued and outstanding (and not held by the Reporting Person) at a price of $54.20 per share, net to the seller in cash, without interest and less any required withholding taxes, subject to certain conditions (the "Potential Offer"), but has not determined whether to do so at this time.

To finance the Proposed Transaction or a Potential Offer, entities related to the Reporting Person have received commitment letters committing to provide an aggregate of approximately $46.5 billion as follows:

(i) A debt commitment letter, dated April 20, 2022 (the "Debt Commitment Letter"), from Morgan Stanley Senior Funding, Inc. and certain other financial institutions party thereto as commitment parties (collectively, the "Commitment Parties") pursuant to which the Commitment Parties have committed to provide $13 billion in financing to the Reporting Person and related entities as follows: (a) a senior secured term loan facility in an aggregate principal amount of $6.5 billion, (b) a senior secured revolving facility in an aggregate committed amount of $500 million, (c) a senior secured bridge loan facility in an aggregate principal amount of up to $3 billion and (d) a senior unsecured bridge loan facility in an aggregate principal amount of up to $3 billion ((a) – (d) collectively, the "Debt Facilities");

(ii) A separate debt commitment letter, dated April 20, 2022 (the "Margin Loan Commitment Letter"), from Morgan Stanley Senior Funding, Inc. and certain other financial institutions party thereto as commitment parties (collectively, the "Margin Loan Commitment Parties") pursuant to which the Margin Loan Commitment Parties have committed to provide $12.5 billion in margin loans (the "Margin Loan Facility"), the proceeds of which will be distributed or otherwise made available to Purchaser; and

(iii) An equity commitment letter, dated April 20, 2022 (the "Equity Commitment Letter"), from the Reporting Person pursuant to which the Reporting Person has committed to provide equity financing for the Proposed Transaction or the Potential Offer sufficient to pay all amounts payable in connection with the Offer and the Merger (plus related fees and expenses), net of the amounts

to be funded pursuant to the Debt Commitment Letter and the Margin Loan Commitment Letter, which is currently expected to be approximately $21 billion (the "Equity Financing").

---

7. Entire Agreement; Amendments and Waivers. This letter agreement and the Offer represent the entire understanding and agreement between the parties hereto with respect to the subject matter hereof. This letter agreement may only be amended, restated, supplemented or otherwise modified or waived by a written instrument signed by each of the parties hereto. No action taken pursuant to this letter agreement, including any investigation by or on behalf of any party, shall be deemed to constitute a waiver by the party taking such action of compliance with any representation, warranty, covenant or obligation contained herein. The waiver by any party hereto of a breach of any provision of this letter agreement shall not operate or be construed as a further or continuing waiver of such breach or as a waiver of any other or subsequent breach. No failure on the part of any party to exercise, and no delay in exercising, any right, power or remedy hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of such right, power or remedy by such party preclude any other or further exercise thereof or the exercise of any other right, power or remedy.

8. Severability. If any condition, term or other provision of this letter agreement is invalid, illegal, or incapable of being enforced by any legal requirement or public policy, all other conditions, terms or provisions of this letter agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any party. Upon such determination that any term or other provision is invalid, illegal, or incapable of being enforced, the parties hereto shall negotiate in good faith to modify this letter agreement so as to effect the original intent of the parties as closely as possible in an acceptable manner in order that the transactions contemplated hereby are consummated as originally contemplated to the greatest extent possible.

9. Counterparts; Delivery by Email. This letter agreement may be executed in any number of counterparts (including counterparts transmitted in .pdf or similar format) with the same effect as if all signatory parties had signed the same document. All counterparts shall be construed together and shall constitute one and the same instrument. In addition, PDF signatures of authorized signatories of any party shall be valid and binding and delivery of a PDF signature by any party shall constitute due execution and delivery of this letter agreement.

10. WAIVER OF JURY TRIAL. THE PARTIES HERETO HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVE ANY RIGHT TO TRIAL BY JURY IN ANY ACTION, CAUSE OF ACTION, CLAIM, CROSS-CLAIM OR THIRD-PARTY CLAIM OR ACTION OF ANY KIND (WHETHER AT LAW, IN EQUITY, IN CONTRACT, IN TORT OR OTHERWISE) THAT MAY BE BASED UPON, ARISE OUT OF OR RELATE TO THIS LETTER AGREEMENT, OR THE NEGOTIATION, EXECUTION OR PERFORMANCE HEREOF (INCLUDING ANY ACTION, CAUSE OF ACTION, CLAIM OR LEGAL PROCEEDING OF ANY KIND OR DESCRIPTION BASED UPON, ARISING OUT OF OR RELATED TO ANY REPRESENTATION OR WARRANTY MADE IN OR IN CONNECTION HEREWITH) OR ANY TRANSACTION CONTEMPLATED HEREBY (INCLUDING THE AGGREGATE EQUITY COMMITMENT), WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER AT LAW, IN EQUITY, IN CONTRACT, IN TORT OR OTHERWISE. EACH PARTY HERETO CERTIFIES AND ACKNOWLEDGES THAT (I) NO REPRESENTATIVE OF ANY OTHER PARTY HERETO HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY HERETO WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER, (II) IT UNDERSTANDS AND HAS CONSIDERED THE IMPLICATIONS OF SUCH WAIVER, (III) IT MAKES SUCH WAIVER VOLUNTARILY AND (IV) IT HAS BEEN INDUCED TO ENTER INTO THIS LETTER AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 10.

[*The remainder of this page is intentionally left blank*]

Very truly yours.

ELON MUSK

/s/ Elon Musk

Accepted and acknowledged:

PURCHASER:

X HOLDINGS II, INC.

By: /s/ Elon Musk
Name: Elon R. Musk
Title: President, Treasurer and Secretary

PARENT:

X HOLDINGS I, INC.

By: /s/ Elon Musk
Name: Elon R. Musk
Title: President, Treasurer and Secretary

[Signature Page to Equity Commitment Letter]

EXHIBIT
Badawi Ex. 219
exhibitsticker.com

DEFA14A 1 d310843ddefa14a.htm DEFA14A

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**Washington, D.C. 20549**

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
Case Number: 3:22-CV-05937-CRB
PLTF / DEFT Exhibit No. 62
Date Admitted: ____________
By: ____________
Lashanda Scott, Deputy Clerk

# FORM 8-K

**CURRENT REPORT**
**Pursuant to Section 13 or 15(d)**
**of The Securities Exchange Act of 1934**

**Date of Report (Date of earliest event reported): April 25, 2022**

# Twitter, Inc.
**(Exact name of registrant as specified in its charter)**

| Delaware | 001-36164 | 20-8913779 |
|---|---|---|
| (State or other jurisdiction of incorporation) | (Commission File Number) | (IRS Employer Identification No.) |

**1355 Market Street, Suite 900**
**San Francisco, California 94103**
**(Address of principal executive offices, including zip code)**

**(415) 222-9670**
**(Registrant's telephone number, including area code)**

**Not Applicable**
**(Former name or former address, if changed since last report)**

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

☐ Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☒ Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐ Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐ Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Trading Symbol(s) | Name of each exchange on which registered |
|---|---|---|
| **Common Stock, par value $0.000005 per share** | **TWTR** | **New York Stock Exchange** |
| **Preferred Stock Purchase Rights** | **N/A** | **New York Stock Exchange** |

Indicate by check mark whether the registrant is an emerging growth company as defined in Rule 405 of the Securities Act of 1933 (17 CFR §230.405) or Rule 12b-2 of the Securities Exchange Act of 1934 (17 CFR §240.12b-2).

Emerging growth company ☐

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

**TABLE OF CONTENTS**


| | | |
|---|---|---|
| ARTICLE I DEFINITIONS | | 2 |
| ARTICLE II THE MERGER | | 13 |
| Section 2.1 | The Merger | 13 |
| Section 2.2 | The Closing | 13 |
| Section 2.3 | Effective Time | 13 |
| Section 2.4 | Certificate of Incorporation and Bylaws | 13 |
| Section 2.5 | Board of Directors | 14 |
| Section 2.6 | Officers | 14 |
| ARTICLE III EFFECT OF THE MERGER ON CAPITAL STOCK | | 14 |
| Section 3.1 | Effect on Securities | 14 |
| Section 3.2 | Payment for Securities; Exchange of Certificates | 15 |
| Section 3.3 | Lost Certificates | 17 |
| Section 3.4 | Transfers; No Further Ownership Rights | 17 |
| Section 3.5 | Dissenting Shares | 17 |
| Section 3.6 | Company Equity Awards | 18 |
| Section 3.7 | Company ESPP | 20 |
| ARTICLE IV REPRESENTATIONS AND WARRANTIES OF THE COMPANY | | 21 |
| Section 4.1 | Organization and Qualification; Subsidiaries | 21 |
| Section 4.2 | Capitalization | 21 |
| Section 4.3 | Authority Relative to Agreement | 23 |
| Section 4.4 | No Conflict; Required Filings and Consents | 23 |
| Section 4.5 | Permits; Compliance With Laws | 24 |
| Section 4.6 | Company SEC Documents; Financial Statements | 25 |
| Section 4.7 | Information Supplied | 25 |
| Section 4.8 | Disclosure Controls and Procedures | 25 |
| Section 4.9 | Absence of Certain Changes or Events | 26 |
| Section 4.10 | No Undisclosed Liabilities | 26 |
| Section 4.11 | Litigation | 26 |
| Section 4.12 | Employee Benefit Plans | 26 |
| Section 4.13 | Labor Matters | 28 |
| Section 4.14 | Intellectual Property | 28 |
| Section 4.15 | Taxes | 29 |
| Section 4.16 | Material Contracts | 30 |
| Section 4.17 | RESERVED | 30 |
| Section 4.18 | RESERVED | 30 |
| Section 4.19 | Takeover Statutes | 30 |
| Section 4.20 | Vote Required | 30 |
| Section 4.21 | Brokers | 30 |
| Section 4.22 | Opinions of Financial Advisors | 31 |
| Section 4.23 | Rights Agreement | 31 |
| Section 4.24 | RESERVED | 31 |

| | | |
|---|---|---|
| Section 4.25 | No Other Representations or Warranties | 31 |
| ARTICLE V REPRESENTATIONS AND WARRANTIES OF PARENT AND ACQUISITION SUB | | 31 |
| Section 5.1 | Organization and Qualification | 31 |
| Section 5.2 | Authority Relative to Agreement | 32 |
| Section 5.3 | No Conflict; Required Filings and Consents | 33 |
| Section 5.4 | Financing | 33 |
| Section 5.5 | Information Supplied | 35 |
| Section 5.6 | Brokers | 35 |
| Section 5.7 | Compliance With Laws | 36 |
| Section 5.8 | Ownership of Company | 36 |
| Section 5.9 | Solvency | 36 |
| Section 5.10 | Parent Guarantee | 36 |
| Section 5.11 | Acknowledgment of Disclaimer of Other Representations and Warranties | 37 |
| ARTICLE VI COVENANTS AND AGREEMENTS | | 37 |
| Section 6.1 | Conduct of Business by the Company Pending the Merger | 37 |
| Section 6.2 | Preparation of the Proxy Statement; Company Stockholders' Meeting | 40 |
| Section 6.3 | Efforts to Close; Regulatory Filings | 41 |
| Section 6.4 | Access to Information; Confidentiality | 43 |
| Section 6.5 | Non-Solicitation; Competing Proposals | 44 |
| Section 6.6 | Directors' and Officers' Indemnification and Insurance | 48 |
| Section 6.7 | Notification of Certain Matters | 50 |
| Section 6.8 | Public Announcements | 50 |
| Section 6.9 | Employee Benefits | 51 |
| Section 6.10 | Financing | 52 |
| Section 6.11 | Financing Cooperation | 56 |
| Section 6.12 | Acquisition Sub | 59 |
| Section 6.13 | Rule 16b-3 Matters | 59 |
| Section 6.14 | Delisting of Company Common Stock | 59 |
| ARTICLE VII CONDITIONS TO THE MERGER | | 59 |
| Section 7.1 | Conditions to the Obligations of Each Party | 59 |
| Section 7.2 | Conditions to the Obligations of Parent and Acquisition Sub | 60 |
| Section 7.3 | Conditions to the Obligation of the Company to Effect the Merger | 60 |
| ARTICLE VIII TERMINATION, AMENDMENT AND WAIVER | | 61 |
| Section 8.1 | Termination | 61 |
| Section 8.2 | Effect of Termination | 62 |
| Section 8.3 | Termination Fee | 63 |
| Section 8.4 | Amendment | 65 |
| Section 8.5 | Extension; Waiver | 65 |
| Section 8.6 | Expenses; Transfer Taxes | 66 |

| | | |
|---|---|---|
| ARTICLE IX GENERAL PROVISIONS | | 66 |
| Section 9.1 | Non-Survival of Representations, Warranties and Agreements | 66 |
| Section 9.2 | Notices | 66 |
| Section 9.3 | Interpretation; Certain Definitions | 68 |
| Section 9.4 | Severability | 69 |
| Section 9.5 | Assignment | 69 |
| Section 9.6 | Entire Agreement | 69 |
| Section 9.7 | No Third-Party Beneficiaries | 69 |
| Section 9.8 | Governing Law | 69 |
| Section 9.9 | Specific Performance | 70 |
| Section 9.10 | Consent to Jurisdiction | 71 |
| Section 9.11 | Counterparts | 71 |
| Section 9.12 | WAIVER OF JURY TRIAL | 71 |
| Section 9.13 | Debt Financing Source Related Part | 71 |

"**Company Material Adverse Effect**" means any change, event, effect or circumstance which, individually or in the aggregate, has resulted in or would reasonably be expected to result in a material adverse effect on the business, financial condition or results of operations of the Company and its Subsidiaries, taken as a whole; provided, however, that changes, events, effects or circumstances which, directly or indirectly, to the extent they relate to or result from the following shall be excluded from, and not taken into account in, the determination of Company Material Adverse Effect: (i) any condition, change, effect or circumstance generally affecting any of the industries or markets in which the Company or its Subsidiaries operate; (ii) any change in any Law or GAAP (or changes in interpretations of any Law or GAAP); (iii) general economic, regulatory or political conditions (or changes therein) or conditions (or changes therein) in the financial, credit or securities markets (including changes in interest or currency exchange rates) in the United States or any other country or region in the world; (iv) any acts of God, force majeure events, natural disasters, terrorism, cyberattack, data breach, armed hostilities, sabotage, war or any escalation or worsening of any of the foregoing; (v) any epidemics, pandemics or contagious disease outbreaks (including COVID-19) and any political or social conditions, including civil unrest, protests and public demonstrations or any other COVID-19 Measures that relate to, or arise out of, an epidemic, pandemic or disease outbreak (including COVID-19) or any change in such COVID-19 Measures, directive, pronouncement or guideline or interpretation thereof, or any continuation or of any of the foregoing, in the United States or any other country or region in the world; (vi) the negotiation, execution, announcement, performance, consummation or existence of this Agreement or the transactions contemplated by this Agreement, including (A) by reason of the identity of Elon Musk, Parent or any of their Affiliates or their respective financing sources, or any communication by Parent or any of its Affiliates or their respective financing sources, including regarding their plans or intentions with respect to the conduct of the business of the Company or any of its Subsidiaries and (B) any litigation, claim or legal proceeding threatened or initiated against Parent, Acquisition Sub, the Company or any of their respective Affiliates, officers or directors, in each case, arising out of or relating to the this Agreement or the transactions contemplated by this Agreement, and including the impact of any of the foregoing on any relationships with customers, suppliers, vendors, collaboration partners, employees, unions or regulators; (vii) any action taken pursuant to the terms of this Agreement or with the consent or at the direction of Parent or Acquisition Sub (or any action not taken as a result of the failure of Parent to consent to any action requiring Parent's consent pursuant to Section 6.1); (viii) any changes in the market price or trading volume of the Company Common Stock, any failure by the Company or its Subsidiaries to meet internal, analysts' or other earnings estimates or financial projections or forecasts for any period, any changes in credit ratings and any changes in any analysts' recommendations or ratings with respect to the Company or any of its Subsidiaries (provided that the facts or occurrences giving rise to or contributing to such changes or failure that are not otherwise excluded from the definition of "Company Material Adverse Effect" may be taken into account in determining whether there has been a Company Material Adverse Effect); and (ix) any matter disclosed in the Company SEC Documents filed by the Company prior to the date of this Agreement (other than any disclosures set forth under the headings "Risk Factors" or "Forward-Looking Statements").

"**Company Material Contract**" shall have the meaning set forth in Section 4.16(a).

"**Company Option**" shall mean each outstanding option to purchase shares of Company Common Stock granted to any employee or director of, or other Company Service Provider.

"**HSR Act**" shall mean the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, and the rules and regulations thereunder.

"**Intellectual Property Rights**" shall have the meaning set forth in Section 4.14(a).

"**IRS**" shall mean the Internal Revenue Service.

"**Knowledge**" means the actual knowledge of the directors and officers of the relevant party, following due inquiry of their direct reports and others who would be reasonably expected to have knowledge of the subject matter in question.

"**Law**" shall mean any and all domestic (federal, state or local) or foreign laws (including common law), rules, regulations, orders, judgments or decrees promulgated by any Governmental Authority.

"**Lien**" shall mean liens, claims, mortgages, encumbrances, pledges, security interests or charges of any kind.

"**Margin Loan Borrower**" shall have the meaning set forth in Section 5.4.

"**Margin Loan Commitment Letter**" shall have the meaning set forth in Section 5.4.

"**Margin Loan Financing**" shall have the meaning set forth in Section 5.4.

"**Merger**" shall have the meaning set forth in the Recitals.

"**Merger Consideration**" shall have the meaning set forth in Section 3.1(c).

"**Notice of Adverse Board Recommendation Change**" shall have the meaning set forth in Section 6.5(d).

"**Notice of Superior Proposal**" shall have the meaning set forth in Section 6.5(d).

"**Order**" shall mean any decree, order, judgment, injunction, temporary restraining order or other order in any suit or proceeding by or with any Governmental Authority.

"**Parent**" shall have the meaning set forth in the Preamble.

"**Parent Board**" shall have the meaning set forth in the Recitals.

"**Parent Disclosure Letter**" shall mean the disclosure letter delivered by Parent to the Company simultaneously with the execution of this Agreement.

"**Parent Material Adverse Effect**" shall mean any change, effect or circumstance which, individually or in the aggregate, has prevented or materially delayed or materially impaired, or would reasonably be expected to prevent or materially delay or materially impair, the ability of Parent or Acquisition Sub to consummate the Merger and the other transactions contemplated by this Agreement.

## ARTICLE II

## THE MERGER

Section 2.1 The Merger. Upon the terms and subject to the conditions of this Agreement, and in accordance with the DGCL, at the Effective Time, Acquisition Sub shall be merged with and into the Company, whereupon the separate existence of Acquisition Sub shall cease, and the Company shall continue under the name "Twitter, Inc." as the surviving corporation (the "**Surviving Corporation**") and shall continue to be governed by the laws of the State of Delaware.

Section 2.2 The Closing. Subject to the provisions of Article VII, the closing of the Merger (the "**Closing**") shall take place at 9:00 a.m. (Pacific Time) on a date to be specified by the parties hereto, but no later than the second (2nd) Business Day after the satisfaction or waiver of all of the conditions set forth in Article VII (other than those conditions that by their terms are to be satisfied at the Closing, but subject to the satisfaction or waiver of such conditions at the Closing). The Closing shall take place virtually by the electronic exchange of documents, unless another time, date or place is agreed to in writing by the parties hereto (such date, the "**Closing Date**").

Section 2.3 Effective Time.

(a) Concurrently with the Closing, the Company, Parent and Acquisition Sub shall cause a certificate of merger with respect to the Merger (the "**Certificate of Merger**") to be executed and filed with the Secretary of State of the State of Delaware (the "**Secretary of State**") in accordance with the relevant provisions of the DGCL and any other applicable Law of the State of Delaware. The Merger shall become effective on the date and time at which the Certificate of Merger has been duly filed with the Secretary of State or such other date and time as may be agreed to by Parent and the Company and as set forth in the Certificate of Merger in accordance with the DGCL (such date and time hereinafter referred to as the "**Effective Time**").

(b) The Merger shall have the effects set forth in this Agreement and in the applicable provisions of the DGCL. Without limiting the generality of the foregoing, from and after the Effective Time, (i) the Company shall be the surviving corporation in the Merger, (ii) all the property, rights, privileges, immunities, powers, franchises and liabilities of the Company and Acquisition Sub are vested in the Surviving Corporation, (iii) the separate existence of Acquisition Sub shall cease and (iv) the Company shall continue to be governed by the laws of the State of Delaware.

Section 2.4 Certificate of Incorporation and Bylaws. The parties will take all necessary actions so that at the Effective Time, the certificate of incorporation and the bylaws of Acquisition Sub, each as in effect immediately prior to the Effective Time, will be the certificate of incorporation and the bylaws, respectively, of the Surviving Corporation (except that the titles thereof shall read "Certificate of Incorporation of Twitter, Inc." and "Bylaws of Twitter, Inc.", respectively) until, subject to Section 6.6, thereafter amended in accordance with the applicable provisions of the DGCL and the certificate of incorporation and bylaws of the Surviving Corporation.

Section 2.5 Board of Directors. The board of directors of the Surviving Corporation effective as of, and immediately following, the Effective Time shall consist of the members of the Acquisition Sub Board immediately prior to the Effective Time, each to serve in accordance with the certificate of incorporation and bylaws of the Surviving Corporation until their respective successors shall have been duly elected and qualified, or until their earlier death, resignation or removal in accordance with the certificate of incorporation and bylaws of the Surviving Corporation.

Section 2.6 Officers. From and after the Effective Time, the officers of the Company at the Effective Time shall be the officers of the Surviving Corporation, until their respective successors are duly elected or appointed and qualified in accordance with applicable Law.

## ARTICLE III

## EFFECT OF THE MERGER ON CAPITAL STOCK

Section 3.1 Effect on Securities. At the Effective Time, by virtue of the Merger and without any action on the part of the Company, Parent, Acquisition Sub or the holders of any securities of the Company or Acquisition Sub:

(a) Conversion of Acquisition Sub Capital Stock. At the Effective Time, by virtue of the Merger and without any action on the part of the holder thereof, each share of common stock, $0.01 par value per share, of Acquisition Sub issued and outstanding immediately prior to the Effective Time shall be converted into and become one (1) fully paid share of common stock, $0.01 par value per share, of the Surviving Corporation and constitute the only issued or outstanding shares of capital stock of the Surviving Corporation.

(b) Cancellation of Certain Company Securities. Each share of common stock, par value $0.000005 per share, of the Company (the "**Company Common Stock**") held by the Company or any of its Subsidiaries or held, directly or indirectly, by the Equity Investor, Parent or Acquisition Sub immediately prior to the Effective Time (collectively, the "**Canceled Shares**") shall automatically be canceled and retired and shall cease to exist as issued or outstanding shares, and no consideration or payment shall be delivered in exchange therefor or in respect thereof.

(c) Conversion of Company Securities. Except as otherwise provided in this Agreement, each share of Company Common Stock issued and outstanding immediately prior to the Effective Time (other than any Canceled Shares or Dissenting Shares) shall be converted into the right to receive $54.20 per share of Company Common Stock in cash, without interest (the "**Merger Consideration**"). Each share of Company Common Stock to be converted into the right to receive the Merger Consideration as provided in this Section 3.1(c) shall no longer be issued or outstanding and shall be automatically canceled and shall cease to exist, and the holders of certificates (the "**Certificates**") or book-entry shares ("**Book-Entry Shares**") which immediately prior to the Effective Time represented such shares of Company Common Stock shall cease to have any rights with respect to such Company Common Stock other than the right to receive, upon surrender of such Certificates or Book-Entry Shares in accordance with Section 3.2(b), the Merger Consideration, without interest thereon.

## ARTICLE IV

## REPRESENTATIONS AND WARRANTIES OF THE COMPANY

Except as disclosed in the Company Disclosure Letter or in the Company SEC Documents filed by the Company prior to the date of this Agreement (other than any disclosures set forth under the headings "Risk Factors" or "Forward-Looking Statements" and any other disclosures included therein to the extent they are forward-looking in nature), the Company hereby represents and warrants to Parent and Acquisition Sub as follows:

Section 4.1 Organization and Qualification; Subsidiaries. Each of the Company and its Subsidiaries is a corporation, partnership or other entity duly organized, validly existing and (to the extent applicable) in good standing under the laws of the jurisdiction of its incorporation or organization and has the requisite entity power and authority to conduct its business as it is now being conducted, except where the failure to be duly organized, validly existing or in good standing or to have such power and authority would not have a Company Material Adverse Effect. Each of the Company and its Subsidiaries is duly qualified or licensed to do business and is in good standing in each jurisdiction in which the nature of the business conducted by it makes such qualification or licensing necessary, except where the failure to be so duly qualified or licensed and in good standing would not have a Company Material Adverse Effect. The Company's Amended and Restated Certificate of Incorporation (as may be further amended from time to time, the "**Company Certificate of Incorporation**") and the Company's Amended and Restated Bylaws (as may be further amended from time to time, the "**Company Bylaws**"), in each case, as currently in effect, are included in the Company SEC Documents.

Section 4.2 Capitalization.

(a) As of March 31, 2022, the authorized capital stock of the Company consists of (i) 5,000,000,000 shares of Company Common Stock, 763,577,530 of which were issued and outstanding (including 1,386,850 Company RSAs), and none of which were held in treasury, and (ii) 200,000,000 shares of preferred stock, par value $0.000005 per share, of the Company, none of which were issued and outstanding. As of March 31, 2022, there were (i) 953,365 Company Options outstanding, (ii) 2,900,689 Company PSUs outstanding (assuming attainment of the applicable performance metrics at the target level of performance), (iii) 67,575,223 Company RSUs outstanding, and (iv) shares of Company Common Stock subject to outstanding purchase rights under the Company ESPP. Except as described above and other than the Stockholder Rights, the Existing Convertible Notes, the Company Warrant Confirmations and any issuances or grants (or promises or offers to issue or grant) Company Equity Awards since March 31, 2022 in connection with employee hiring, retention or promotions in the ordinary course of business in an amount less than 5,000,000 Company Equity Awards (assuming attainment of the applicable performance metrics at the target level of performance) in the aggregate, as of the date of this Agreement, there are no additional existing and outstanding (i) options, warrants, calls, subscriptions or other rights, convertible securities, agreements or commitments of any character to which the Company or any of its Subsidiaries is a party obligating the Company or any of its

Subsidiaries to issue, transfer or sell any shares of capital stock or other equity interests in the Company or any of its Subsidiaries or securities convertible into or exchangeable for such shares or equity interests, (ii) contractual obligations of the Company or any of its Subsidiaries to repurchase, redeem or otherwise acquire any capital stock of the Company or any of its Subsidiaries, except pursuant to the other than the Company ASR Confirmations and the Company Bond Hedging Transactions or (iii) voting trusts or similar agreements to which the Company is a party with respect to the voting of the capital stock of the Company, other than the Silver Lake Investment Agreement.

(b) Except as would not be material to the Company and its Subsidiaries, taken as a whole, all of the outstanding shares of capital stock or equivalent equity interests of each of the Company's Subsidiaries are owned of record and beneficially, directly or indirectly, by the Company or the relevant wholly owned Subsidiary (except for de minimis equity interests held by a Third Party for local regulatory reasons) and free and clear of all Liens except for restrictions imposed by applicable securities laws and Permitted Liens.

(c) Prior to the Closing, the Company will provide Parent with a correct and complete list, as of such date, of all outstanding Company Equity Awards, including the holder (by employee identification number), type of Company Equity Award, date of grant, number of shares of Company Common Stock underlying such award (and, if applicable, assuming achievement of the applicable performance metrics at the target level of performance), whether such Company Equity Award is intended to qualify as an "incentive stock option" under Section 422 of the Code, the equity plan pursuant to which the Company Equity Award was granted, and, where applicable, the exercise price per share and expiration date.

Section 4.3 Authority Relative to Agreement.

(a) The Company has all necessary corporate power and authority to execute and deliver this Agreement and, assuming the accuracy of the representations and warranties set forth in the second sentence of Section 5.8 and subject to obtaining the Company Stockholder Approval and the occurrence of the stockholder advisory vote contemplated by Rule 14a-21(c) under the Exchange Act, regardless of the outcome of such advisory vote (the "**Company Stockholder Advisory Vote**"), to consummate the transactions contemplated by this Agreement, including the Merger. The execution, delivery and performance of this Agreement by the Company, and the consummation by the Company of the transactions contemplated by this Agreement, including the Merger, have been duly and validly authorized by all necessary corporate action by the Company, and assuming the accuracy of the representations and warranties set forth in the second sentence of Section 5.8 and except for the Company Stockholder Approval, the occurrence of the Company Stockholder Advisory Vote, no other corporate action or proceeding on the part of the Company is necessary to authorize the execution, delivery and performance of this Agreement by the Company and the consummation by the Company of the transactions contemplated by this Agreement, including the Merger. This Agreement has been duly executed and delivered by the Company and, assuming the due authorization, execution and delivery of this Agreement by the other parties hereto, constitutes a legal, valid and binding obligation of the Company, enforceable against the Company in accordance with its terms, except that such enforceability may be subject to applicable bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium or other similar Laws, now or hereafter in effect, affecting creditors' rights and remedies generally (the "**Enforceability Exceptions**").

(b) The Company Board has, by resolutions duly adopted by the unanimous vote of the directors at a duly held meeting (i) determined that the terms and conditions of this Agreement, the Merger and the other transactions contemplated by this Agreement are advisable and in the best interests of the Company and the Company's stockholders, (ii) authorized the execution and delivery of this Agreement and declared advisable and approved the consummation of the transactions contemplated by this Agreement, including the Merger, (iii) directed that this Agreement be submitted for consideration at a meeting of the Company's stockholders and (iv) subject to the terms of this Agreement, resolved to recommend that the Company's stockholders adopt this Agreement and approve the transactions contemplated hereby, including the Merger.

Section 4.4 No Conflict; Required Filings and Consents.

(a) Neither the execution and delivery of this Agreement by the Company nor the consummation by the Company of the transactions contemplated by this Agreement will (i) violate any provision of the Company Certificate of Incorporation or the Company Bylaws or (ii) assuming the accuracy of the representations and warranties set forth in the second sentence of Section 5.8 and that the Consents, registrations, declarations, filings and notices referred to in Section 4.4(b) have been obtained or made, any applicable waiting periods referred to therein have expired and any condition precedent to any such Consent has been satisfied, conflict with or violate any Law applicable to the Company or any of its Subsidiaries or by which any property or asset of the Company or any of its Subsidiaries is bound or affected or (iii) except with respect to the Existing Credit Agreement and the Existing Notes, result in any breach of, or constitute a default (with or without notice or lapse of time, or both) under, or give rise to any right of termination, acceleration or cancellation of, any Company Material Contract (other than any Company Benefit Plan) , other than, in the case of clauses (ii) and (iii) any such conflict, violation, breach, default, termination, acceleration or cancellation that would not have a Company Material Adverse Effect.

(b) No consent, approval, clearance, license, permit, order or authorization (each of the foregoing, a "**Consent**") of, or registration, declaration or filing with, or notice to, any Governmental Authority is required to be obtained or made by or with respect to the Company or any of its Subsidiaries under applicable Law in connection with the execution, delivery and performance of this Agreement or the consummation of the transactions contemplated by this Agreement, other than (i) the applicable reporting or other requirements of and filings with the SEC under the Exchange Act (including the filing of the Proxy Statement), (ii) the filing of the Certificate of Merger with the Secretary of State in accordance with the DGCL and appropriate documents with the relevant authorities of the other jurisdictions in which the Company or any of its Subsidiaries is qualified to do business, (iii) the applicable requirements under corporation or Blue Sky Laws of various states, (iv) such filings as may be required in connection with the Taxes described in Section 8.6, (v) filings with the New York Stock Exchange, (vi) such other items required solely by reason of the participation of Parent or Acquisition Sub or any of their Affiliates in the transactions contemplated by this Agreement, (vii) compliance with and filings or notifications under the HSR Act and any other applicable U.S. or foreign competition, antitrust or merger control Laws (together with the HSR Act, "**Antitrust Laws**"), (viii) compliance with and filings or notifications under any applicable Foreign Investment Laws, and (ix) such other Consents, registrations, declarations, filings or notices the failure of which to be obtained or made would not have a Company Material Adverse Effect.

Section 4.5 Permits; Compliance With Laws.

(a) As of the date of this Agreement, the Company and its Subsidiaries are in possession of all franchises, grants, authorizations, licenses, permits, easements, variances, exceptions, consents, certificates, approvals and orders necessary for the Company and its Subsidiaries to carry on their respective business as it is now being conducted (the "**Company Permits**") and all Company Permits are in full force and effect and no suspension or cancellation of any of the Company Permits is pending or, to the Knowledge of the Company, threatened, except where the failure to be in possession of or be in full force and effect, or the suspension or cancellation of, any of the Company Permits would not have a Company Material Adverse Effect.

(b) Neither the Company nor any of its Subsidiaries is in default or violation of any Law applicable to the Company, any of its Subsidiaries or by which any of their respective properties or assets are bound, except for any such defaults or violations that would not have a Company Material Adverse Effect. Notwithstanding the foregoing, no representation or warranty in Section 4.5(a) or this Section 4.5(b) is made with respect to Company SEC Documents or financial statements, "disclosure controls and procedures" or "internal control over financial reporting," employee benefits matters, Intellectual Property Rights matters, Tax matters, which are addressed exclusively in Section 4.6 (Company SEC Documents; Financial Statements), Section 4.8 (Disclosure Controls and Procedures), Section 4.12 (Employee Benefit Plans), Section 4.14 (Intellectual Property Rights), Section 4.15 (Taxes), respectively.

Section 4.6 Company SEC Documents; Financial Statements.

(a) Since January 1, 2022, the Company has filed or furnished with the SEC all material forms, documents and reports required to be filed or furnished prior to the date of this Agreement by it with the SEC (such forms, documents and reports filed with the SEC, including any amendments or supplements thereto and any exhibits or other documents attached to or incorporated by reference therein, the "**Company SEC Documents**"). As of their respective dates, or, if amended or supplemented, as of the date of the last such amendment or supplement, the Company SEC Documents complied in all material respects with the requirements of the Securities Act and the Exchange Act, as the case may be, and the applicable rules and regulations promulgated thereunder, and none of the Company SEC Documents at the time it was filed (or, if amended or supplemented, as of the date of the last amendment or supplement) contained any untrue statement of a material fact or omitted to state any material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances under which they were made, or are to be made, not misleading.

(b) The consolidated financial statements (including all related notes) of the Company included in the Company SEC Documents fairly present in all material respects the consolidated financial position of the Company and its consolidated Subsidiaries as at the respective dates thereof and its consolidated statements of operations and consolidated statements of cash flows for the respective periods then ended (subject, in the case of unaudited interim statements, to normal year-end audit adjustments, none of which would have a Company Material Adverse Effect, to the absence of notes and to any other adjustments described therein, including in any notes thereto) in conformity with GAAP (except, in the case of unaudited statements, as permitted by Form 10-Q, Form 8-K or any successor form or other rules under the Exchange Act).

Section 4.7 Information Supplied. None of the information supplied or to be supplied by or on behalf of the Company or any of its Subsidiaries expressly for inclusion or incorporation by reference in the proxy statement relating to the matters to be submitted to the Company's stockholders at the Company Stockholders' Meeting (such proxy statement and any amendments or supplements thereto, the "**Proxy Statement**") shall, at the time the Proxy Statement is first mailed to the Company's stockholders and at the time of the Company Stockholders' Meeting to be held in connection with the Merger, contain any untrue statement of material fact or omit to state any material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances under which they were made, not misleading at such applicable time, except that no representation or warranty is made by the Company with respect to statements made therein based on information supplied, or required to be supplied, by Parent or its Representatives in writing expressly for inclusion therein. The Proxy Statement will comply as to form in all material respects with the provisions of the Securities Act and the Exchange Act, and the rules and regulations promulgated thereunder.

Section 4.8 Disclosure Controls and Procedures. The Company has established and maintains "disclosure controls and procedures" and "internal control over financial reporting" (as such terms are defined in paragraphs (e) and (f), respectively, of Rule 13a-15 promulgated under the Exchange Act) as required by Rule 13a-15 promulgated under the Exchange Act. The Company has disclosed, based on its most recent evaluation of the Company's internal control over financial reporting prior to the date of this Agreement, to the Company's auditors and the

audit committee of the Company Board (i) any significant deficiencies and material weaknesses in the design or operation of its internal controls over financial reporting (as defined in Rule 13a-15(f) under the Exchange Act) that are reasonably likely to adversely affect the Company's ability to record, process, summarize and report financial information and (ii) any fraud to the Knowledge of the Company, whether or not material, that involves management or other employees who have a significant role in the Company's internal control over financial reporting.

Section 4.9 Absence of Certain Changes or Events. Since January 1, 2022 and until the date of this Agreement, (a) the businesses of the Company and its Subsidiaries have been conducted in the ordinary course of business (other than as a result of COVID-19 and COVID-19 Measures or with respect to the Existing 2030 Notes or the transactions contemplated hereby) and (b) there has not been any adverse change, event, development or state of circumstances that has had a Company Material Adverse Effect.

Section 4.10 No Undisclosed Liabilities. Except (a) as reflected, disclosed or reserved against in the Company's financial statements (as amended or restated, as applicable) or the notes thereto included in the Company SEC Documents, (b) for liabilities or obligations incurred in the ordinary course of business since December 31, 2021, (c) the Existing 2030 Notes, (d) for liabilities or obligations incurred in connection with the transactions contemplated by this Agreement, including the Merger, or (e) for liabilities or obligations that would not have a Company Material Adverse Effect, as of the date of this Agreement, the Company and its Subsidiaries do not have any liabilities of any nature, whether or not accrued, contingent or otherwise, that would be required by GAAP to be reflected on a consolidated balance sheet (or in the notes thereto) of the Company.

Section 4.11 Litigation. As of the date of this Agreement, there is no suit, action or proceeding pending or, to the Knowledge of the Company, threatened in writing against the Company or any of its Subsidiaries, that would have a Company Material Adverse Effect, nor is there any judgment of any Governmental Authority outstanding against, or, to the Knowledge of the Company, investigation by any Governmental Authority involving the Company or any of its Subsidiaries that would have a Company Material Adverse Effect. As of the date of this Agreement, there is no suit, action or proceeding pending or, to the Knowledge of the Company, threatened in writing seeking to prevent, hinder, modify, delay or challenge the Merger or any of the other transactions contemplated by this Agreement.

Section 4.12 Employee Benefit Plans.

(a) Prior to the Closing, the Company will provide a true and complete list, as of the date of this Agreement, of each material Company Benefit Plan (which list may reference a form of such Company Benefit Plan). Prior to the Closing, the Company will make available to Parent a true and complete copy of each material Company Benefit Plan and all amendments thereto and a true and complete copy of the following items (in each case, only if applicable): (i) each trust or other funding arrangement; (ii) each current summary plan description and current summary of material modifications; (iii) the most recently filed annual report on IRS Form 5500; and (iv) the most recently received IRS determination letter or IRS opinion letter.

(b) Except as would not have a Company Material Adverse Effect:

(i) each of the Company Benefit Plans has been maintained, operated, administered and funded in accordance with its terms and in compliance with applicable Laws;

(ii) there are no claims pending, or, to the Knowledge of the Company, threatened actions, suits, disputes or claims (other than routine claims for benefits) against or affecting any Company Benefit Plan, by any employee or beneficiary covered under such Company Benefit Plan, as applicable, or otherwise involving such Company Benefit Plan;

(iii) neither the Company nor its Subsidiaries has any material obligations for post-termination health or life insurance benefits under any Company Benefit Plan (other than for continuation coverage required to be provided pursuant to Section 4980B of the Code); and

(iv) each Foreign Plan (A) if required to be registered or approved by a non-U.S. Governmental Authority, has been registered or approved and has been maintained in good standing with applicable regulatory authorities, and, to the Knowledge of the Company, no event has occurred since the date of the most recent approval or application therefor relating to any such Foreign Plan that would reasonably be expected to adversely affect any such approval or good standing, (B) that is intended to qualify for special Tax treatment meets all requirements for such treatment, and (C) if required to be fully funded or fully insured, is fully funded or fully insured on an ongoing and termination or solvency basis (determined using reasonable actuarial assumptions) in compliance with applicable Laws.

(e) If, and to the extent, the execution or delivery of this Agreement or the consummation of the Merger (either alone or in combination with another event) will: (i) entitle any Company Service Provider to any material payment; (ii) materially increase the amount or value of any benefit or compensation or other obligation payable or required to be provided to any Company Service Provider; (iii) accelerate the time of payment or vesting of amounts due to any Company Service Provider or accelerate the time of any funding (whether to a trust or otherwise) of compensation or benefits in respect of any of the Company Benefit Plans; (iv) give rise to the payment of any amount by the Company or any of its Subsidiaries that would be non-deductible by reason of Section 280G of the Code, then, prior to the Closing, the Company will provide a true and complete list of each Company Benefit Plan that would trigger any of (i) through (iv) above. There is no contract, agreement, plan or arrangement to which the Company or any of its Subsidiaries is a party by which it is required by its terms to compensate, gross-up, indemnify, or otherwise reimburse any Person for excise Taxes imposed pursuant to Section 4999 or Section 409A of the Code.

(f) Except as would not have a Company Material Adverse Effect, there are no claims pending, or, to the Knowledge of the Company, threatened actions, suits, disputes or claims (other than routine claims for benefits) against or affecting any Company Benefit Plan, by any employee or beneficiary covered under such Company Benefit Plan, as applicable, or otherwise involving such Company Benefit Plan.

(g) Except as would not have a Company Material Adverse Effect, neither the Company nor its Subsidiaries has any material obligations for post-termination health or life insurance benefits under any Company Benefit Plan (other than for continuation coverage required to be provided pursuant to Section 4980B of the Code).

(h) Except as would not have a Company Material Adverse Effect, each Foreign Plan (i) has been maintained, operated and administered in compliance with its terms and in compliance with applicable Laws; (ii) if required to be registered or approved by a non-U.S. Governmental Authority, has been registered or approved and has been maintained in good standing with applicable regulatory authorities, and, to the Knowledge of the Company, no event has occurred since the date of the most recent approval or application therefor relating to any such Foreign Plan that would reasonably be expected to adversely affect any such approval or good standing; (iii) that is intended to qualify for special Tax treatment meets all requirements for such treatment; (iv) if required to be fully funded or fully insured, is fully funded or fully insured on an ongoing and termination or solvency basis (determined using reasonable actuarial assumptions) in compliance with applicable Laws; and (v) is not subject to any pending or, to the Knowledge of the Company, threatened claims by or on behalf of any participant in any Foreign Plan, or otherwise involving any such Foreign Plan or the assets of any Foreign Plan, other than routine claims for benefits.

Section 4.13 Labor Matters. If, and to the extent that, the Company or any of its Subsidiaries is a party to or bound by any works council or collective bargaining agreement and no employees of the Company or any of its Subsidiaries are represented by a labor organization with respect to their employment with the Company or any of its Subsidiaries, then, prior to the Closing, the Company will provide a true and complete list of each such works council or collective bargaining agreement, or labor organization, as applicable. There are no labor related strikes, walkouts or work stoppages pending or, to the Knowledge of the Company, threatened in writing.

Section 4.14 Intellectual Property.

(a) Except as would not have a Company Material Adverse Effect, the Company and its Subsidiaries solely and exclusively own all patents, trademarks, trade names, copyrights, Internet domain names, service marks, trade secrets and other intellectual property rights (the "**Intellectual Property Rights**") purported to be owned by the Company and its Subsidiaries (the "**Company Intellectual Property**"), free and clear of all Liens, except Permitted Liens.

(b) To the Knowledge of the Company, the conduct of the business of the Company and its Subsidiaries as currently conducted does not infringe, misappropriate or otherwise violate any Intellectual Property Rights of any other Person, except for any such infringement, misappropriation or other violation that would not have a Company Material Adverse Effect. To the Knowledge of the Company, no other Person is infringing, misappropriating or otherwise violating any Company Intellectual Property, except for any such infringement, misappropriation or other violation as would not have a Company Material Adverse Effect.

The Company and its Subsidiaries are in compliance with all applicable Laws, Contracts to which the Company or its Subsidiaries are bound, and internal- and external-facing policies of the Company or its Subsidiaries, in each case, relating to privacy, data protection, and the collection and use of information that constitutes "personal information" under applicable Laws ("**Personal Information**") collected, used or held for use by the Company or its Subsidiaries, except where the failure to be in compliance would not have a Company Material Adverse Effect.

(e) Neither the Company nor any of its Subsidiaries has experienced any unauthorized access to the information technology systems owned or used by the Company or its Subsidiaries or Personal Information collected, used, held for use or otherwise processed by the Company or its Subsidiaries, except as would not have a Company Material Adverse Effect.

Section 4.15 Taxes.

(a) Except as would not have a Company Material Adverse Effect, (i) the Company and its Subsidiaries have timely filed all Tax Returns (taking into account any extensions) required to be filed, and such Tax Returns (taking into account all amendments thereto) are complete and accurate, and (ii) all Taxes required to be paid by the Company and its Subsidiaries have been paid.

(b) Except as would not have a Company Material Adverse Effect, (i) neither the Company nor any of its Subsidiaries has received written notice of any audit, examination, investigation or other proceeding from any Governmental Authority in respect of liabilities for Taxes of the Company or any of its Subsidiaries, which have not been fully paid or settled; (ii) there are no Liens for Taxes on any of the assets of the Company or any of its Subsidiaries other than Permitted Liens; (iii) with respect to any tax years open for audit as of the date of this Agreement, neither the Company nor any of its Subsidiaries has granted any waiver of any statute of limitations with respect to, or any extension of a period for the assessment of, any Tax; and (iv) neither the Company nor any of its Subsidiaries has any liability for the Taxes of any Person (other than the Company and its Subsidiaries) pursuant to Treasury Regulation Section 1.1502-6 (or any similar provision of state, local or non-U.S. Law) as a transferee or successor, by contract (other than contracts entered into in the ordinary course of business the primary purpose of which does not relate to Tax) or otherwise by operation of law.

(c) Neither the Company nor any of its Subsidiaries has engaged in any "listed transaction" as defined in Treasury Regulation Section 1.6011-4(b)(2) in any tax year for which the statute of limitations has not expired.

(d) The Company is not nor has been during the applicable period specified in Section 897(c)(1)(A)(ii) of the Code a "United States real property holding corporation" within the meaning of Section 897(c)(2) of the Code.

(e) Except with respect to Section 4.12, the representations in this Section 4.15 are the sole and exclusive representations and warranties concerning Tax matters.

Section 4.16 Material Contracts.

(a) For purposes of this Agreement, "**Company Material Contract**" means any Contract (other than any Company Benefit Plan) to which the Company or any of its Subsidiaries is a party or by which their respective properties or assets are bound, except for this Agreement, that constitutes a "material contract" (as such term is defined in item 601(b)(10) of Regulation S-K of the Securities Act).

(b) Neither the Company nor any of its Subsidiaries is in breach of or default under the terms of any Company Material Contract where such breach or default would have a Company Material Adverse Effect. To the Knowledge of the Company, no other party to any Company Material Contract is in breach of or default under the terms of any Company Material Contract where such breach or default would have a Company Material Adverse Effect. Each Company Material Contract is a valid and binding obligation of the Company or its Subsidiary and, to the Knowledge of the Company, the other parties thereto, except such as would not have a Company Material Adverse Effect; provided that (i) such enforcement may be subject to the Enforceability Exceptions and (ii) the remedies of specific performance and injunctive and other forms of equitable relief may be subject to equitable defenses and to the discretion of the court before which any proceeding therefor may be brought.

Section 4.17 RESERVED.

Section 4.18 RESERVED.

Section 4.19 Takeover Statutes. Assuming the accuracy of the representation contained in Section 5.8, the Company Board has taken such actions and votes as are necessary to render the provisions of any "fair price," "moratorium," "control share acquisition" or any other takeover or anti-takeover statute or similar federal or state Law inapplicable to this Agreement, the Merger or any other transactions contemplated by this Agreement.

Section 4.20 Vote Required. Assuming the accuracy of the representation contained in Section 5.8, the adoption of this Agreement by the affirmative vote of a majority of the outstanding shares of Company Common Stock entitled to vote to adopt this Agreement (the "**Company Stockholder Approval**") are the only votes of holders of securities of the Company that are required to consummate the Merger.

Section 4.21 Brokers. Except for Goldman Sachs & Co. LLC ("**Goldman Sachs**"), J.P. Morgan Securities LLC ("**J.P. Morgan**") and Allen & Company LLC, each of whose fees and expenses shall be borne solely by the Company, no broker, finder, investment banker, consultant or intermediary is entitled to any investment banking, brokerage, finder's or similar fee or commission in connection with the Merger or any of the other transactions contemplated by this Agreement based upon arrangements made by or on behalf of the Company or any of its Subsidiaries.

Section 4.22 Opinions of Financial Advisors. The Company Board has received the oral opinion of Goldman Sachs (to be followed by delivery of a written opinion as of the date hereof), to the effect that, as of such date, and based upon and subject to the limitations, qualifications and assumptions set forth in the written opinion of Goldman Sachs, the Merger Consideration to be paid to the holders of Company Common Stock (other than the Equity Investor, Parent and their respective Affiliates) pursuant to this Agreement is fair from a financial point of view to such holders. On or prior to the date of this Agreement, the Company Board has received the opinion of J.P. Morgan to the effect that, as of the date of such opinion and subject to the assumptions, limitations, qualifications and other factors set forth therein, the Merger Consideration to be paid to holders of Company Common Stock pursuant to this Agreement is fair, from a financial point of view, to such holders.

Section 4.23 Rights Agreement. The Company has taken all action necessary to render the Stockholder Rights Plan, inapplicable to the Merger and this Agreement and the transactions contemplated hereby.

Section 4.24 RESERVED.

Section 4.25 No Other Representations or Warranties. Except for the representations and warranties expressly set forth in this Article IV, neither the Company nor any other Person makes or has made any representation or warranty of any kind whatsoever, express or implied, at Law or in equity, with respect to the Company or any of its Subsidiaries or their respective business, operations, assets, liabilities, conditions (financial or otherwise), notwithstanding the delivery or disclosure to Parent and the Acquisition Sub or any of their Affiliates or Representatives of any documentation, forecasts or other information with respect to any one or more of the foregoing. Without limiting the generality of the foregoing, neither the Company nor any other Person makes or has made any express or implied representation or warranty to Parent, Acquisition Sub or any of their respective Representatives with respect to (a) any financial projection, forecast, estimate or budget relating to the Company, any of its Subsidiaries or their respective businesses or, (b) except for the representations and warranties made by the Company in this Article IV, any oral or written information presented to Parent, Acquisition Sub or any of their respective Representatives in the course of their due diligence investigation of the Company, the negotiation of this Agreement or the course of the Merger, or the accuracy or completeness thereof.

## ARTICLE V

## REPRESENTATIONS AND WARRANTIES OF PARENT AND ACQUISITION SUB

Except as disclosed in the Parent Disclosure Letter, Parent and Acquisition Sub hereby jointly and severally represent and warrant to the Company as follows:

Section 5.1 Organization and Qualification.

(a) Each of Parent and Acquisition Sub is a corporation duly organized, validly existing and (to the extent applicable) in good standing under the laws of the jurisdiction of its incorporation and has the requisite corporate entity power and authority to conduct its business as it is now being conducted, except where the failure to be duly organized, validly existing or in good standing or to have such power and authority would not have a Parent Material Adverse Effect. Each of Parent and Acquisition Sub is duly qualified or licensed to do business and is in good standing in each jurisdiction in which the nature of the business conducted by it makes such qualification or licensing necessary, except where the failure to be so duly qualified or licensed and in good standing would not have a Parent Material Adverse Effect.

(including with respect to the foregoing clauses (i) and (ii)), or any other part of this Agreement shall require or obligate Parent, Acquisition Sub, or any of their respective Affiliates to (xx) propose, take, or agree to take any actions that would individually or in the aggregate have a material adverse effect on the business, assets, or financial condition of the Company and its Subsidiaries, taken as a whole or (yy) propose, negotiate, effect or agree to, the sale, divestiture, lease, license, hold separate, transfer, or disposition of, or any restriction on the freedom of action with respect to, any assets, business, or equity holdings of, or held or controlled directly or indirectly by, Equity Investor or any Affiliate of Parent (other than Parent, Acquisition Sub or Company after giving effect to the Merger and subject to the restrictions in subpart (xx) of this paragraph).

(c) Each of the parties hereto will furnish to the other such necessary information and reasonable assistance as the other may reasonably request in connection with the preparation of any required governmental filings or submissions and will cooperate in responding to any inquiry from a Governmental Authority, including (i) promptly informing the other party of such inquiry, (ii) consulting in advance before making any presentations or submissions to a Governmental Authority, (iii) cooperating in the filing of any analyses, presentations, memoranda, briefs, arguments, opinions or other written communications explaining or defending the Merger, articulating any regulatory or competitive argument or responding to requests or objections made by any Governmental Authority, (iv) providing each other with a reasonable advance opportunity to review and comment upon, and consider in good faith the views of the other with respect to, all material written communications (including applications, analyses, presentations, memoranda, briefs, arguments and opinions) with a Governmental Authority regarding the Merger or any other transactions, (v) giving the other party the opportunity to attend and participate in any substantive meetings or discussions with any Governmental Authority, to the extent reasonably practical and not prohibited by such Governmental Authority, and (vi) supplying each other with copies of all material correspondence, or communications between any party and any Governmental Authority with respect to this Agreement (provided that such materials may be limited to counsel as required or advisable under applicable Law and may be redacted to remove valuation material). The parties agree that Parent shall control the strategy for all filings, notifications, submissions, and communications, proposals and litigation in connection with any filing, notice, petition, statement, registration, submission of information, application or similar filing under the Antitrust Laws after consulting with, and considering in good faith the view of the Company relating to such strategy.

Section 6.4 Access to Information; Confidentiality. Upon reasonable notice, the Company shall (and shall cause each of its Subsidiaries to) afford to the representatives, officers, directors, employees, agents, attorneys, accountants and financial advisors (“**Representatives**”) of Parent reasonable access (at Parent’s sole cost and expense), in a manner not disruptive in any material respect to the operations of the business of the Company and its Subsidiaries, during normal business hours and upon reasonable written notice throughout the period commencing on the date of this Agreement until the earlier of the Effective Time and the termination of this Agreement pursuant to Article VIII, to the properties, books and records of the Company and its Subsidiaries and, during such period, shall (and shall cause each of its Subsidiaries to) furnish promptly to such Representatives all information concerning the business, properties and personnel of the Company and its Subsidiaries as may reasonably be requested in writing, in each case, for any reasonable business purpose related to the consummation of the transactions contemplated by this Agreement; provided, however, that nothing herein shall require the

Company or any of its Subsidiaries to disclose any information to Parent or Acquisition Sub if such disclosure would, in the reasonable judgment of the Company, (i) cause significant competitive harm to the Company or its Subsidiaries if the transactions contemplated by this Agreement are not consummated, (ii) violate applicable Law or the provisions of any agreement to which the Company or any of its Subsidiaries is a party, or (iii) jeopardize any attorney-client or other legal privilege. No investigation or access permitted pursuant to this Section 6.4 shall affect or be deemed to modify any representation or warranty made by the Company hereunder. Each of Parent and Acquisition Sub agrees that it will not, and will cause its Representatives not to, use any information obtained pursuant to this Section 6.4 (or otherwise pursuant to this Agreement) for any competitive or other purpose unrelated to the consummation of the transactions contemplated by this Agreement. Parent will use its reasonable best efforts to minimize any disruption to the respective business of the Company and its Subsidiaries that may result from requests for access under this Section 6.4 and, notwithstanding anything to the contrary herein, the Company may satisfy its obligations set forth above by electronic means if physical access is not reasonably feasible or would not be permitted under applicable Law as a result of COVID-19 or any COVID-19 Measures. Prior to any disclosure, the Company and Parent shall enter into a customary confidentiality agreement with respect to any information obtained pursuant to this Section 6.4 (or otherwise pursuant to this Agreement).

Section 6.5 Non-Solicitation; Competing Proposals.

(a) From the date of this Agreement until the earlier of the Effective Time or the date, if any, on which this Agreement is terminated pursuant to Section 8.1, the Company shall, and shall cause each of its directors, executive officers and Subsidiaries to, and shall instruct its other Representatives to, immediately cease and cause to be terminated any existing solicitation of, or discussions or negotiations with, any Third Party relating to any Competing Proposal, and the Company further agrees that it shall promptly request that all non-public information previously provided in the past twelve (12) months by or on behalf of the Company or any of its Subsidiaries to any Persons that might reasonably be expected to consider making a Competing Proposal be promptly returned or destroyed in accordance with the terms of the applicable confidentiality agreement. Except as otherwise provided in this Section 6.5, from the date of this Agreement until the earlier of the Effective Time or the date, if any, on which this Agreement is terminated pursuant to Section 8.1, the Company shall not, shall cause each of its directors, executive officers and Subsidiaries not to, and shall instruct its other Representatives not to, (i) solicit, initiate, knowingly encourage or knowingly facilitate, whether publicly or otherwise, any substantive discussion, offer or request that constitutes, or would reasonably be expected to lead to, a Competing Proposal and (ii) engage in negotiations or substantive discussions with (it being understood that the Company may inform Persons of the provisions contained in this Section 6.5), or furnish any material non-public information to, any Person relating to a Competing Proposal or any inquiry or proposal that would reasonably be expected to lead to a Competing Proposal; provided that, notwithstanding the foregoing, the Company shall be permitted to grant a waiver of or terminate any "standstill" or similar obligation of any Person with respect to the Company or any of its Subsidiaries to allow such Person to submit a Competing Proposal.

(f) Nothing in this Agreement is intended to, or will be construed to, release, waive or impair any rights to directors' and officers' insurance claims pursuant to any applicable insurance policy or indemnification agreement that is or has been in existence with respect to the Company or any of its Subsidiaries for any of their respective directors, officers or other employees, it being understood and agreed that the indemnification provided for in this Section 6.6 is not prior to or in substitution for any such claims pursuant to such policies or agreements. Following the Effective Time, the obligations of Parent and the Surviving Corporation under this Section 6.6 shall not be terminated or modified in any manner adverse to the rights of any D&O Indemnified Party without the consent of such affected D&O Indemnified Party.

Section 6.7 Notification of Certain Matters. From and after the date of this Agreement until the earlier of the Effective Time or the date, if any, on which this Agreement is terminated pursuant to Section 8.1, the Company shall give prompt notice to Parent, and Parent shall give prompt notice to the Company, of (a) any notice or other communication received by such party from any Governmental Authority in connection with this Agreement, the Merger or the other transactions contemplated by this Agreement, or from any Person alleging that the consent of such Person is or may be required in connection with the Merger or the other transactions contemplated by this Agreement, if the subject matter of such communication or the failure of such party to obtain such consent could be material to the Company, the Surviving Corporation or Parent, and (b) any actions, suits, claims, investigations or proceedings commenced or, to such party's Knowledge, threatened against, relating to or involving or otherwise affecting such party or any of its Subsidiaries which relate to this Agreement, the Merger or the other transactions contemplated by this Agreement. The parties agree and acknowledge the Company's, on the one hand, and Parent's, on the other hand, compliance or failure of compliance with this Section 6.7 shall not be taken into account for purposes of determining whether the condition referred to in Section 7.2(a) or Section 7.3(a), respectively, shall have been satisfied with respect to performance in all material respects with this Section 6.7.

Section 6.8 Public Announcements. Except as otherwise contemplated by Section 6.5, so long as this Agreement is in effect, the Company, Parent and Acquisition Sub shall consult with each other before issuing any press release or otherwise making any public statements with respect to this Agreement or the transactions contemplated by this Agreement, and none of the parties hereto or their Affiliates shall issue any such press release or make any public statement prior to obtaining the other parties' consent (which consent shall not be unreasonably withheld or delayed), except that no such consent shall be necessary to the extent disclosure may be required by Law, Order or applicable stock exchange rule or any listing agreement to which any party hereto is subject, in which case the party required to make such disclosure shall use its reasonable best efforts to allow, to the extent legally permitted, each other party reasonable time to comment on such disclosure in advance of its issuance, or is consistent with prior communications previously consented to by the other parties. In addition, the Company may, without Parent or Acquisition Sub's consent, communicate to its employees, customers, suppliers and consultants; provided that such communication is consistent with prior communications of the Company or any

communications plan previously agreed to by Parent and the Company, in which case such communications may be made consistent with such plan. Notwithstanding the foregoing, the restrictions set forth in this Section 6.8 shall not apply in connection with any Adverse Board Recommendation Change or dispute between the parties regarding this Agreement or the transactions contemplated hereby. Notwithstanding the foregoing, the Equity Investor shall be permitted to issue Tweets about the Merger or the transactions contemplated hereby so long as such Tweets do not disparage the Company or any of its Representatives.

Section 6.9 Employee Benefits.

(a) Continuing Employee Benefits. Employees of the Company or its Subsidiaries immediately prior to the Effective Time who remain employees of Parent, the Surviving Corporation or any of their Affiliates following the Effective Time are hereinafter referred to as the "**Continuing Employees**." For the period commencing at the Effective Time and ending on the one-year anniversary of the Effective Time (the "**Continuation Period**"), Parent shall, or shall cause the Surviving Corporation or any of their Affiliates to, provide for each Continuing Employee (i) at least the same base salary and wage rate, (ii) short- and long-term target incentive compensation opportunities that are no less favorable in the aggregate than those provided to each such Continuing Employee immediately prior to the Effective Time (provided that Parent shall not be obligated to provide such incentives in the form of equity or equity-based awards) and (iii) employee benefits (excluding equity and equity-based awards) which are substantially comparable in the aggregate (including with respect to the proportion of employee cost) to those provided to such Continuing Employee immediately prior to the Effective Time. Without limiting the generality of the foregoing, during the Continuation Period, Parent shall provide, or shall cause the Surviving Corporation or any of their Affiliates to provide severance payments and benefits to each Continuing Employee whose employment is terminated during such period that are no less favorable than those applicable to the Continuing Employee immediately prior to the Effective Time under the Company Benefit Plans.

(b) Parent agrees that the Surviving Corporation shall cause the Surviving Corporation's employee benefit plans established following the Closing Date (if any) and any other employee benefit plans covering the Continuing Employees following the Effective Time (collectively, the "**Post-Closing Plans**"), to recognize the service of each Continuing Employee (to the extent such service was recognized by the Company) for purposes of eligibility, vesting and determination of the level of benefits (but not for benefit accrual purposes under a defined benefit pension plan) under the Post-Closing Plans, to the extent such recognition does not result in the duplication of any benefits.

(c) For the calendar year including the Effective Time, the Continuing Employees shall not be required to satisfy any deductible, co-payment, out-of-pocket maximum or similar requirements under the Post-Closing Plans that provide medical, dental and other welfare benefits (collectively, the "**Post-Closing Welfare Plans**") to the extent amounts were previously credited for such purposes under comparable Company Benefit Plans that provide medical, dental and other welfare benefits.

(d) As of the Effective Time, any waiting periods, pre-existing condition exclusions and requirements to show evidence of good health contained in such Post-Closing Welfare Plans shall be waived with respect to the Continuing Employees (except to the extent any such waiting period, pre-existing condition exclusion or requirement to show evidence of good health was already in effect with respect to such employees and has not been satisfied under the applicable Company Benefit Plan in which the participant then participates or is otherwise eligible to participate as of immediately prior to the Effective Time).

(e) Nothing contained in this Section 6.9, expressed or implied, shall (i) be treated as the establishment, amendment or modification of any Company Benefit Plan, Post-Closing Plan or other employee benefit plan or constitute a limitation on rights to amend, modify, merge or terminate after the Effective Time any Company Benefit Plan, Post-Closing Plan or other employee benefit plan, (ii) give any Company Service Provider (including any beneficiary or dependent thereof) or other Person any third-party beneficiary or other rights or (iii) obligate Parent or any of its Affiliates to (A) maintain any particular Company Benefit Plan, Post-Closing Plan or (B) retain the employment or services of any Company Service Provider.

Section 6.10 Financing.

(a) Each of the Equity Investor, Parent and Acquisition Sub shall take or cause to be taken, and shall cause their respective Affiliates and its and their respective Representatives to take, or cause to be taken, all actions and to do, or cause to be done, all things necessary, proper or advisable to arrange, obtain and consummate the Financing at or prior to the Closing on the terms and subject to the conditions set forth in the Financing Commitments (including any “flex” provisions), including executing and delivering all such documents and instruments as may be reasonably required thereunder and:

(i) complying with and maintaining in full force and effect the Financing and the Financing Commitments (and, once entered into, the Financing Agreements) in accordance with the terms and conditions thereof and negotiating and entering into definitive financing agreements with respect to the Debt Financing on the terms and conditions set forth in the Debt Commitment Letters (including any “flex” provisions) and containing no (I) conditions to the consummation of all or any portion of the Debt Financing other than the conditions set forth in Exhibit E to the Bank Debt Commitment Letter or Exhibit B to the Margin Loan Commitment Letter, as the case may be, in each case, as in effect on the date hereof, or (II) provisions that could reasonably be expected to prevent, impede, delay or adversely affect the availability of any of the Debt Financing or the consummation of the Merger and the other transactions contemplated by this Agreement (such definitive agreements, the “**Financing Agreements**”) so that the Financing Agreements are in full force and effect no later than the Closing;

(ii) satisfying, or obtaining the waiver of, as promptly as practicable and on a timely basis (and in any event, no later than the Closing) all conditions to the Debt Financing contemplated by the Debt Commitment Letters and Financing Agreements that are within its or their control, including, without limitation:

(A) on or prior to the Closing Date, transferring Tesla Shares to the Margin Loan Borrower and causing the Margin Loan Borrower to credit to collateral accounts pledged to the applicable Debt Financing Sources in respect of the Margin Loan Financing and held through the facilities of DTC, in each case, sufficient Tesla Shares, which shall be free from all transfer restrictions and restrictive conditions (other than permitted restrictions contemplated under the Financing Documents in respect of the Margin Loan Financing), to cause the LTV Ratio (as defined in the Margin Loan Commitment Letter) not to exceed 20% as of the Closing Date;

(B) ensuring the absence of (1) any default or event of default (or any equivalent term) under the Financing Agreements in respect of the Margin Loan Financing, or (2) any Potential Adjustment Event or Mandatory Prepayment Event (in each case, under and as defined in the Margin Loan Commitment Letter);

(C) (x) maintaining the Margin Loan Borrower as a wholly owned subsidiary of Parent and Elon Musk, and (y) causing the organizational documents of the Margin Loan Borrower not to contain, and causing the Margin Loan Borrower not to enter into any Contract, that would (1) impede or prevent the Margin Loan Borrower or any of its Affiliates from enforcing or the Margin Loan Borrower's rights in respect of the Debt Financing Sources under the Margin Loan Commitment Letter or any Financing Agreement in respect thereof or (2) impede or prevent the Margin Loan Borrower or any of its Affiliates from applying the proceeds of the loans to pay any Funding Obligations; and

(D) causing Elon Musk to (1) fully and unconditionally guarantee all obligations of the Margin Loan Borrower under the Margin Loan Financing to the extent required to consummate the Margin Loan Financing and (2) at all times through and including the Closing Date to own (beneficially and of record), directly or indirectly, all of the outstanding equity interests of, and Control, the Margin Loan Borrower;

(iii) accepting (and complying with) to the fullest extent all "flex" provisions contemplated by the Debt Commitment Letters;

(iv) causing the Financing Sources to fund the Financing no later than the Closing (including by enforcing its rights under the Debt Commitment Letters and/or Financing Agreements, as applicable).

(b) None of the Equity Investor, Parent, Acquisition Sub or the Margin Loan Borrower or any of their respective Affiliates shall agree to or permit any amendment, supplement, modification or replacement of, or grant any waiver of, any condition, remedy or other provision under any Financing Commitment or Financing Agreement, or permit any Financing Agreement to contain any provision, without the prior written consent of the Company, if such amendment, supplement, modification, replacement, waiver or provision would or would reasonably be expected to (i) reduce (or would reasonably be expected to have the effect of reducing) the aggregate amount of the Financing (or the cash proceeds available therefrom) from that contemplated by the Financing Commitments delivered as of the date hereof, (ii) impose new or additional conditions or contingencies to the Financing or otherwise expand, amend or modify any of the existing conditions to the receipt of the Financing, or otherwise add, expand, amend or modify any other provision of, or remedies under, the Financing Commitments as in effect on the date hereof, in a manner that would reasonably be expected to delay, impede or prevent the consummation

or funding of the Financing (or satisfaction of the conditions to obtaining any portion of the Financing) at the Closing or impair the ability or likelihood of the Closing or impair the ability of Parent and/or Acquisition Sub to timely consummate the Merger and the other transactions contemplated by this Agreement, (iii) make it less likely that any portion of the Financing would be funded (including by making the satisfaction of the conditions to obtaining any portion of the Financing less likely to occur) or otherwise prevent, impede or delay or impair the availability of any of the Financing or impair the ability or likelihood of the Closing or Parent and/or Acquisition Sub to timely consummate the transactions contemplated by this Agreement (including by requiring any additional filings, consents or approvals of any Governmental Authority) or (iv) adversely impact the ability of Parent, Acquisition Sub or the Margin Loan Borrower, or any of their respective Affiliates, to enforce their respective rights against the other parties to the Financing Commitments or the Financing Agreements; provided, however, subject to compliance with the other provisions of this Section 6.10, Parent, Acquisition Sub or their respective Affiliates may amend, modify, supplement or waive any provision of any Debt Commitment Letter (A) to add lenders, lead arrangers, bookrunners, syndication agents or similar entities that have not executed such Debt Commitment Letter as of the date hereof or (B) amend any Debt Commitment Letters to implement any "market flex" provisions applicable thereto. The Equity Investor, Parent, Acquisition Sub, the Margin Loan Borrower and their respective Affiliates shall not agree to the withdrawal, termination, repudiation or rescission of any Financing Commitment without the prior written consent of the Company, and shall not release or consent to the termination of the commitments or obligations of any Debt Financing Source under any Debt Commitment Letter, in each case, unless such Financing Commitment is contemporaneously replaced with a new Financing Commitment that complies with the first sentence of this Section 6.10(b). Upon any permitted amendment, supplement, modification or replacement of, or waiver of, any Financing Commitment in accordance with this Section 6.10(b), Parent shall promptly deliver to the Company a true, correct and complete copy of each Financing Agreement and each amendment, supplement, modification, replacement or waiver to any Financing Commitment or any Financing Agreement and references herein to "Financing Commitments", "Bank Debt Commitment Letter", "Margin Loan Commitment Letter", "Debt Commitment Letters", "Equity Commitment Letter" and "Financing Agreements" shall include and mean such documents as amended, supplemented, modified, replaced or waived in compliance with this Section 6.10(b), as applicable, and references to "Financing", "Bank Debt Financing", "Margin Loan Financing" and "Equity Financing" shall include and mean the financing contemplated by the Financing Commitments or Financing Agreements as amended, supplemented, modified, replaced or waived in compliance with this Section 6.10(b), as applicable.

(c) In the event that (x) all or any portion of the Debt Financing expires, terminates, becomes or could reasonably be expected to become unavailable on the terms and conditions (including any "flex" provisions) or from the sources contemplated in the applicable Debt Commitment Letters or (y) any of the Debt Commitment Letters or the Financing Agreements shall be withdrawn, terminated, repudiated or rescinded, in whole or in part, for any reason, (i) Parent shall promptly so notify the Company in writing and (ii) Parent and/or its Affiliates shall use their respective reasonable best efforts to arrange and obtain, as promptly as practicable following the occurrence of such event (and in any event no later than the Closing),

and to negotiate and enter into definitive agreements with respect to, alternative financing from the same or alternative sources with terms and conditions (including market flex provisions) not less favorable taken as a whole to Parent than the terms and conditions set forth in the applicable Debt Commitment Letter and which shall not include any conditions or contingencies to the Financing not otherwise included in the Debt Commitment Letters as of the date hereof or include any provision that would reasonably be expected to materially delay or prevent the consummation or funding of the Financing (or satisfaction of the conditions to obtaining any portion of the Financing) at the Closing or materially impair the ability or likelihood of the Closing or Parent and/or Acquisition Sub to timely consummate the Merger and the other transactions contemplated by this Agreement (the "**Alternative Financing**") in an amount sufficient to consummate the transactions contemplated by this Agreement (or replace any unavailable portion of the Debt Financing). In the event any Alternative Financing is obtained and any new debt commitment letters are entered into in accordance with this Section 6.10(c) (each such letter, an "**Alternative Financing Debt Commitment Letter**"), Parent shall promptly deliver a copy thereof to the Company (it being understood that any fee letters related thereto may be redacted in the same manner as the fee letters delivered on or prior to the date of this Agreement) and references herein to (A) "Financing Commitments" and "Debt Commitment Letters" shall be deemed to include any Alternative Financing Debt Commitment Letter to the extent then in effect, and (B) "Financing", "Bank Debt Financing", "Margin Loan Financing" or "Debt Financing" shall include the debt financing contemplated by such Alternative Financing Debt Commitment Letter. Parent, Acquisition Sub and Elon Musk shall be subject to the same obligations with respect to any Alternative Financing as set forth in this Agreement with respect to the Debt Financing.

(d) The Equity Investor, Parent, Acquisition Sub and/or the Margin Loan Borrower shall (i) give the Company prompt written notice of any default, breach or threatened default or breach (or any event or circumstance that, with or without notice, lapse of time or both, would reasonably be expected to give rise to any default or breach) by any party to any of the Financing Commitments or the Financing Agreements of which Parent or any of its Affiliates or their respective Representatives becomes aware or any withdrawal, termination, repudiation or rescission or threatened withdrawal, termination, repudiation or rescission thereof, (ii) give the Company prompt notice of any dispute or disagreement between or among any parties to the Debt Commitment Letters, (iii) notify the Company promptly if for any reason Parent, Acquisition Sub or their respective Affiliates no longer believes in good faith that it will be able to obtain all or any portion of the Financing contemplated by the Financing Commitments, (iv) promptly provide and respond to any updates reasonably requested by the Company with respect to the status of Parent's efforts to arrange and finalize the Financing (or any Alternative Financing) and (v) otherwise keep the Company reasonably informed on a current basis of the status of its efforts to arrange and finalize the Financing (or any Alternative Financing). In no event shall Parent or any of its Affiliates be required to provide access to or disclose information that Parent or any of its Affiliates reasonably determines could jeopardize any attorney-client privilege of, or conflict with any confidentiality requirements applicable to, Parent or any of its Affiliates.

(e) Each of Parent and the Equity Investor acknowledges and agrees that it shall be fully responsible for the Equity Financing and each shall take (or cause to be taken) all actions, and do (or cause to be done) all things necessary, proper or advisable to obtain the Equity Financing, including taking all actions necessary to (i) comply with the terms of and maintain in effect the Equity Commitment Letter, (ii) satisfy on a timely basis all conditions and obligations in such Equity Commitment Letter and (iii) consummate and fund the Equity Financing at or prior to the Closing. Parent further agrees that it shall take (or cause to be taken) all actions, and do (or cause to be done) all things necessary, proper or advisable to fully enforce its rights (including through litigation) under the Equity Commitment Letter.

(f) Parent acknowledges and agrees that neither the obtaining of the Financing or any alternative financing, nor the completion of any issuance of securities contemplated by the Financing or any alternative financing (including the Alternative Financing), is a condition to the Closing, and reaffirms its obligation to consummate the transactions contemplated by this Agreement irrespective and independently of the availability of the Financing or any alternative financing (including the Alternative Financing), or the completion of any such issuance, subject to the applicable conditions set forth in Article VII.

(g) Each of the Equity Investor, Parent and the Acquisition Sub shall on or prior to the Closing Date cause the Margin Loan Borrower to apply the cash proceeds of the Margin Loan Financing to payment of the Funding Obligations under this Agreement.

Section 6.11 Financing Cooperation.

(a) The Company shall and shall cause its Subsidiaries to, and shall use its commercially reasonable best efforts to cause each of its Representatives to, at Parent's sole expense, provide any reasonable cooperation reasonably requested by Parent in writing in connection with (i) the arrangement of the Bank Debt Financing and any other debt financing expressly contemplated by the Bank Debt Commitment Letter, including senior unsecured notes and senior secured notes, and (ii) subject to the requirements of Section 6.11(b), the payoff, redemption, defeasance, discharge or other satisfaction of the Existing Credit Agreement and the Existing Senior Notes on or subsequent to the Closing Date, in each case as is necessary, customary and reasonably requested in writing by Parent; provided that any notice of, or documentation with respect to, any such payoff, redemption or other satisfaction of existing indebtedness of the Company pursuant to this Section 6.11(a)(ii) shall provide that the obligation to repay, redeem or satisfy such indebtedness shall, as applicable, be subject to and is conditioned upon the occurrence of the Closing; provided, further, that such requested cooperation with respect to clauses (i) and (ii) of this Section 6.11(a) does not unreasonably or materially interfere with the ongoing operations of the Company and its Subsidiaries. Notwithstanding anything in this Agreement to the contrary, (A) neither the Company nor any of its Subsidiaries shall be required to pay any commitment or other similar fee, incur or reimburse any costs or expenses, enter into any binding agreement or commitment or incur any other liability, indemnity or obligation in connection with the Bank Debt Financing or the cooperation required by this Section 6.11(a) that would be effective prior to the Closing, (B) no director, manager, officer or employee or other Representative or equityholder of the Company or any of its Subsidiaries shall be required to execute, deliver, enter into, approve or perform any agreement, commitment, document, instrument or certificate or take any other action pursuant to this Section 6.11(a) to the extent any such action could reasonably be expected to result in personal liability to such Representative or equityholder, (C) neither the Company nor any of its Subsidiaries (nor any of their respective boards of directors (or similar governing bodies) shall be required to adopt any resolutions, execute any consents or otherwise take any corporate or similar action or deliver any certificate, document, instrument or agreement in connection to the Bank Debt Financing or the incurrence of

indebtedness thereby or any cooperation required by this Section 6.11(a) and (D) no cooperation under this Section 6.11(a) shall (I) require the Company or any of its Subsidiaries to provide, or cause to be provided, any information the disclosure of which is prohibited or restricted under applicable Law or any binding agreement with a third party or is legally privileged or consists of attorney work product or could reasonably be expected to result in the loss of any applicable legal privilege, (II) require the Company or any of its Subsidiaries to take any action that would reasonably be expected to conflict with or violate its organizational documents or any Laws or would reasonably be expected to result in (with or without notice, lapse of time, or both) a violation or breach of, or default under, or give rise to any right of termination, cancellation or acceleration of any right or obligation of such Person or to a loss of any benefit or privilege to which such Person is entitled under, any agreement to which the Company or any of its Subsidiaries is a party or result in the creation or imposition of any Lien on any asset of the Company or any of its Subsidiaries, except any Lien that becomes effective only upon the Closing, (III) cause (or require the taking of any action that would cause) any representation or warranty in this Agreement to be breached or cause any condition to Closing to fail to be satisfied or otherwise cause any breach of this Agreement or require the Company to waive or amend any terms of this Agreement, (IV) require the Company to disclose any material, non-public information other than to recipients of such information that agree to confidentiality arrangements as contemplated under Section 6.11(b) and Section 6.4 or any adjustments or assumptions used in connection therewith, (V) require the Company to prepare or provide any financial statements or other financial information (other than those financial statements (and any other financial information) from time to time filed by the Company with the SEC (and nothing in this Section 6.11(a) shall create or be implied to create any obligation to make any such filings or other readily available financial information), (VI) waive or amend any terms of this Agreement, (VII) require the Company or its Subsidiaries to take any action that, in the good faith determination of the Company or such Subsidiary would create a risk of damage or destruction to any property or assets of the Company or such Subsidiary, (VIII) require the Company or any of its Subsidiaries or any of their Representatives to deliver any legal opinions or reliance letters, (IX) file or furnish any reports or information with the SEC or change any fiscal period or accelerate the Company's preparation of its SEC reports or financial statements, or (X) prepare or provide any (1) information regarding officers or directors prior to consummation of the Merger, executive compensation and related party disclosure or any Compensation Discussion and Analysis or information required by Item 302 (to the extent not so provided in SEC filings) or 402 of Regulation S-K under the Securities Act and any other information that would be required by Part III of Form 10-K (except to the extent previously filed with the SEC), (2) any description of all or any component of the Bank Debt Financing or other information customarily provided by the Financing Sources or their counsel, (3) risk factors relating to all or any component of the Bank Debt Financing, (4) information regarding affiliate transactions that may exist following consummation of the Merger, or (5) other information that is not available to the Company without undue effort or expense. The parties hereto agree that any information with respect to the prospects, projections and plans for the business and operations of the Company and its Subsidiaries in connection with the Financing will be the sole responsibility of Parent, and none of the Company, any of its Subsidiaries or any of their respective Representatives shall be required to provide any information or make any presentations with respect to capital structure, the incurrence of the Financing, other pro forma information relating thereto or the manner in which Parent intends to operate, or cause to be operated, the business of the Company or its Subsidiaries after the Closing. Nothing contained in this Section 6.11 or

otherwise shall require the Company or any of its Subsidiaries, prior to the Closing, to be a borrower, an issuer, a guarantor or other obligor with respect to the Debt Financing. For the avoidance of doubt, the parties hereto acknowledge and agree that the provisions contained in this Section 6.11, represent the sole obligation of the Company, its Subsidiaries and their respective Representatives with respect to cooperation in connection with the arrangement of any financing (including the Financing) to be obtained by the Equity Investor, Parent, Acquisition Sub, the Margin Loan Borrower or any of their respective Affiliates with respect to the transactions contemplated by this Agreement and no other provision of this Agreement (including the Exhibits and Schedules hereto) shall be deemed to expand or modify such obligations. In no event shall the receipt or availability of any funds or financing (including, for the avoidance of doubt, the Financing) by the Equity Investor, Parent, Acquisition Sub, the Margin Loan Borrower or any of their respective Affiliates or any other financing or other transactions be a condition to any of the Equity Investor's, Parent's, Acquisition Sub's or the Margin Loan Borrower's obligations under this Agreement. Notwithstanding anything to the contrary contained in this Agreement, the Company will be deemed to be in compliance with this Section 6.11(a), and neither Parent nor any of its Affiliates shall allege that the Company is or has not been in compliance with this Section 6.11(a), unless Parent's failure to obtain the Bank Debt Financing was due solely to a deliberate action or omission taken or omitted to be taken by the Company in material breach of its obligations under this Section 6.11(a).

(b) On or prior to any applicable date of the Company's payoff, redemption or other satisfaction of the Existing Credit Agreement and/or Existing Senior Notes contemplated by Section 6.11(a), or if applicable, date of satisfaction and discharge, Parent shall deposit or cause to be deposited funds with the applicable paying agent sufficient to effect such payoff, redemption and/or satisfaction, as applicable, as required pursuant to the terms of the agreements governing such indebtedness (and in the event of any delay of the anticipated Effective Time, Parent shall deposit additional funds with the applicable paying agents sufficient to satisfy such payoff, redemption or other satisfaction of the Existing Credit Agreement and/or Existing Senior Notes, as required pursuant to the terms of the agreements governing such indebtedness); provided that the release of any such funds shall be subject to the occurrence of the Effective Time. Parent shall, promptly upon request by the Company, reimburse the Company for all reasonable and documented out-of-pocket costs and expenses (including outside attorneys' fees and disbursements) incurred by the Company, its Affiliates and their respective Representatives in connection with the cooperation contemplated by Section 6.11(a). Parent acknowledges and agrees that the Company, its Affiliates and their respective Representatives shall not have any responsibility for, or incur any liability to any Person under, any financing that Parent may raise in connection with the transactions contemplated by this Agreement or any cooperation provided pursuant to Section 6.11(a), and shall indemnify and hold harmless the Company, its Affiliates and their respective Representatives, from and against any and all losses suffered or incurred by any of them in connection with the Debt Financing, any cooperation provided pursuant to Section 6.11(a) or any alternative financing and any information utilized in connection therewith, except to the extent any such cost or expense, judgment, fine, loss, claim, or damage results directly from the bad faith, willful misconduct or gross negligence of the Company or its Representatives or controlled Affiliates as determined by a court of competent jurisdiction in a final and non-appealable judgment. All non-public or other confidential information provided by or behalf of the Company to Parent or its Affiliates or any of their respective Representatives pursuant to this Section 6.11 shall be kept confidential in accordance with the terms of Section 6.4; provided that

Parent and its Affiliates may share any confidential information with respect to the Company and its Subsidiaries with any Debt Financing Sources, and that Parent, such Debt Financing Sources and their respective Affiliates may share such information with potential Debt Financing Sources in connection with any marketing efforts with respect to the Debt Financing; provided, however, that the recipients of such confidential information contemplated to be provided by the preceding proviso shall agree to be bound by confidentiality obligations no less restrictive than those set forth in Section 6.4.

Section 6.12 Acquisition Sub. Parent and the Equity Investor shall take all actions necessary to (a) cause Acquisition Sub to perform its obligations under this Agreement and to consummate the Merger on the terms and conditions set forth in this Agreement and (b) ensure that, prior to the Effective Time, Acquisition Sub shall not conduct any business, or incur or guarantee any indebtedness or make any investments, other than as specifically contemplated by this Agreement. Parent hereby (a) guarantees the due, prompt and faithful payment performance and discharge by Acquisition Sub of, and compliance by Acquisition Sub with, all of the covenants and agreements of Acquisition Sub under this Agreement and (b) agrees to take all actions necessary, proper or advisable to ensure such payment, performance and discharge by Acquisition Sub under this Agreement. Parent agrees that any breach by Acquisition Sub of a representation, warranty, covenant or agreement in this Agreement shall also be a breach of such representation, warranty, covenant or agreement by Parent.

Section 6.13 Rule 16b-3 Matters. Prior to the Effective Time, the Company may take such further actions, if any, as may be reasonably necessary or appropriate to ensure that the dispositions of equity securities of the Company (including any derivative securities) pursuant to the transactions contemplated by this Agreement by any officer or director of the Company who is subject to Section 16 of the Exchange Act are exempt under Rule 16b-3 promulgated under the Exchange Act.

Section 6.14 Delisting of Company Common Stock. Parent shall, with the reasonable cooperation of the Company, take, or cause to be taken, all actions reasonably necessary to cause the Company's securities to be delisted from the New York Stock Exchange and deregistered under the Exchange Act as soon as reasonably practicable following the Effective Time.

## ARTICLE VII

## CONDITIONS TO THE MERGER

Section 7.1 Conditions to the Obligations of Each Party. The respective obligations of each party hereto to consummate the Merger, are subject to the satisfaction or waiver by the Company and Parent at or prior to the Effective Time of the following conditions:

(a) the Company Stockholder Approval shall have been obtained;

(b) any waiting period (or any extension thereof) applicable to the consummation of the Merger under the HSR Act shall have expired or early termination thereof shall have been granted; and each Consent or approval that is required under any Antitrust Laws or Foreign Investment Laws of the jurisdictions set forth on Schedule A with respect to the transactions contemplated by this Agreement, including the Merger shall have been made, obtained or received (or, as applicable, the waiting periods with respect thereto shall have expired or been terminated); and

(c) no Governmental Authority of the jurisdictions set forth on Schedule A shall have enacted, issued, promulgated, enforced or entered any Law or Order which is then in effect and has the effect of restraining, enjoining, rendering illegal or otherwise prohibiting consummation of the Merger, or causing the Merger to be rescinded following the completion thereof.

Section 7.2 Conditions to the Obligations of Parent and Acquisition Sub. The obligations of Parent and Acquisition Sub to consummate the Merger, are, in addition to the conditions set forth in Section 7.1, further subject to the satisfaction or waiver by Parent at or prior to the Effective Time of the following conditions:

(a) the Company shall have performed or complied, in all material respects, with its obligations required under this Agreement to be performed or complied with by the Company on or prior to the Closing Date;

(b) (i) each of the representations and warranties of the Company contained in this Agreement (except for the representations and warranties contained in Section 4.2(a) and Section 4.2(b)), without giving effect to any materiality or "Company Material Adverse Effect" qualifications therein, shall be true and correct as of the Closing Date (except to the extent such representations and warranties are expressly made as of a specific date, in which case such representations and warranties shall be so true and correct as of such specific date only), except for such failures to be true and correct as would not have a Company Material Adverse Effect; and (ii) each of the representations and warranties contained in Section 4.2(a) and Section 4.2(b) shall be shall be true and correct in all material respects as of the Closing Date (except to the extent such representations and warranties are expressly made as of a specific date, in which case such representations and warranties shall be so true and correct in all material respects as of such specific date only); and

(c) no Company Material Adverse Effect shall have occurred and be continuing.

Section 7.3 Conditions to the Obligation of the Company to Effect the Merger. The obligation of the Company to consummate the Merger, is, in addition to the conditions set forth in Section 7.1, further subject to the satisfaction or waiver by the Company at or prior to the Effective Time of the following conditions:

(a) Parent and Acquisition Sub shall have performed or complied, in all material respects, with its obligations required under this Agreement to be performed or complied with by Parent or Acquisition Sub, as the case may be, on or prior to the Closing Date; and

(b) each of the representations and warranties of Parent and Acquisition Sub contained in this Agreement, without giving effect to any materiality or "Parent Material Adverse Effect" qualifications therein, shall be true and correct as of the Closing Date, except for such failures to be true and correct as would not have a Parent Material Adverse Effect (except to the extent such representations and warranties are expressly made as of a specific date, in which case such representations and warranties shall be so true and correct as of such specific date only).

## ARTICLE VIII

## TERMINATION, AMENDMENT AND WAIVER

Section 8.1 Termination. Notwithstanding anything contained in this Agreement to the contrary, this Agreement may be terminated at any time prior to the Effective Time, whether before or after the Company Stockholder Approval is obtained (except as otherwise expressly noted), as follows:

(a) by mutual written agreement of each of Parent and the Company;

(b) by either Parent or the Company:

(i) if the Merger shall not have been consummated on or before 5:00 p.m. (Pacific Time) on October 24, 2022 (as such date may be extended pursuant to the terms hereof, the "**Termination Date**"); provided, however, that (x) the right to terminate this Agreement pursuant to this Section 8.1(b)(i) shall not be available to any party if the failure of such party to perform or comply with any of its obligations under this Agreement has been the principal cause of or resulted in the failure of the Closing to have occurred on or before such date and (y) the Termination Date shall be extended for an additional six (6) months if, as at the Termination Date, the condition set forth in Section 7.1(b) or Section 7.1(c) shall not have been satisfied;

(ii) if, prior to the Effective Time, any Governmental Authority of competent jurisdiction shall have enacted, issued, promulgated, enforced or entered any Law or Order or taken any other action permanently restraining, enjoining, rendering illegal or otherwise prohibiting the consummation of the transactions contemplated by this Agreement, and such Law or Order or other action shall have become final and non-appealable; provided, however, that the party seeking to terminate this Agreement pursuant to this Section 8.1(b)(ii) shall have used the efforts required by this Agreement to remove such Law, Order or other action; provided, further, that the right to terminate this Agreement under this Section 8.1(b)(ii) shall not be available to a party if the issuance of such Law or Order or taking of such action was primarily due to the failure of such party, and, in the case of Parent, the failure of Acquisition Sub or the Equity Investor, to perform any of their obligations under this Agreement; or

(iii) if the Company Stockholder Approval shall not have been obtained at the Company Stockholders' Meeting duly convened therefor or at any adjournment or postponement thereof at which this Agreement and the transactions contemplated by this Agreement have been voted upon; or

(c) by the Company:

(i) if Parent, Acquisition Sub or the Equity Investor shall have breached or failed to perform any of their respective representations, warranties, covenants or other agreements set forth in this Agreement, which breach or failure to perform (A) would give rise to the failure of any condition set forth in Section 7.3(a) or Section 7.3(b) and (B) is not capable of being cured, or is not cured, by Parent, Acquisition Sub or the Equity Investor on or before the earlier of (x) the Termination Date and (y) the date that is thirty (30) calendar days following the Company's delivery of written notice to Parent, Acquisition Sub or the Equity Investor, as applicable, of such breach; provided, however, that the Company shall not have the right to terminate this Agreement pursuant to this Section 8.1(c)(i) if the Company is then in material breach of any of its representations, warranties, covenants or agreements hereunder;

(ii) if the Company Board shall have authorized the Company to enter into a definitive agreement with respect to a Superior Proposal; provided that, substantially concurrently with such termination, the Company enters into such definitive agreement and pays (or causes to be paid) at the direction of Parent the Termination Fee as specified in Section 8.3(a); or

(iii) if (A) the conditions set forth in Section 7.1 and Section 7.2 (other than those conditions that by their nature are to be satisfied at the Closing, which conditions are capable of being satisfied if the Closing were to occur at such time) have been satisfied or waived in accordance with this Agreement and Parent and Acquisition Sub shall have been notified in writing of the same, (B) Parent and Acquisition Sub fail to consummate the Merger within three (3) Business Days following the date on which the Closing should have occurred pursuant to Section 2.2 and (C) during such three (3)-Business Days period described in clause (B), the Company stood ready, willing and able to consummate the Merger and the other transactions contemplated hereby;

(d) by Parent:

(i) if the Company shall have breached or failed to perform any of its representations, warranties, covenants or other agreements set forth in this Agreement, which breach or failure to perform (A) would give rise to the failure of any condition set forth in Section 7.2(a) or Section 7.2(b), and (B) is not capable of being cured, or is not cured, by the Company on or before the earlier of (x) the Termination Date and (y) the date that is thirty (30) calendar days following Parent's delivery of written notice to the Company of such breach; provided, however, that Parent shall not have the right to terminate this Agreement pursuant to this Section 8.1(d)(i) if Parent, Acquisition Sub or the Equity Investor is then in material breach of any of its representations, warranties, covenants or agreements hereunder; or

(ii) prior to the receipt of the Company Stockholder Approval, if the Company Board shall have made an Adverse Board Recommendation Change.

Section 8.2 Effect of Termination. In the event that this Agreement is terminated and the Merger abandoned pursuant to Section 8.1, written notice thereof shall be given to the other party or parties, specifying the provisions of this Agreement pursuant to which such termination is made, and this Agreement shall forthwith become null and void and of no effect without liability on the part of any party hereto (or any of its Representatives), and all rights and obligations of any

party hereto shall cease; provided, however, that, except as otherwise provided in Section 8.3 or in any other provision of this Agreement, no such termination shall relieve any party hereto of any liability or damages (which the parties acknowledge and agree shall not be limited to reimbursement of Expenses or out-of-pocket costs, and, in the case of liabilities or damages payable by Parent and Acquisition Sub, would include the benefits of the transactions contemplated by this Agreement lost by the Company's stockholders) (taking into consideration all relevant matters, including lost stockholder premium, other combination opportunities and the time value of money), which shall be deemed in such event to be damages of such party, resulting from any knowing and intentional breach of this Agreement prior to such termination, in which case, except as otherwise provided in Section 8.3, the aggrieved party shall be entitled to all rights and remedies available at law or in equity; and provided, further, that the expense reimbursement and indemnification obligations contained in Section 6.11 and Section 6.12, and the provisions of this Section 8.2, Section 8.3, Section 8.6 and Article IX shall survive any termination of this Agreement pursuant to Section 8.1 in accordance with their respective terms.

Section 8.3 Termination Fee.

(a) In the event that:

(i) (A) a Third Party shall have made a Competing Proposal after the date of this Agreement, (B) this Agreement is subsequently terminated by (x) the Company or Parent pursuant to Section 8.1(b)(iii) or (y) Parent pursuant to Section 8.1(d)(i), and at the time of such Company Stockholders' Meeting in the case of clause (x) or at the time of such breach in the case of clause (y), a Competing Proposal has been publicly announced and has not been withdrawn, and (C) within twelve (12) months of such termination of this Agreement, the Company consummates a transaction involving a Competing Proposal or enters into a definitive agreement providing for the consummation of a Competing Proposal and such Competing Proposal is subsequently consummated; provided, however, that for purposes of this Section 8.3(a)(i), the references to "fifteen percent (15%)" in the definition of Competing Proposal shall be deemed to be references to "fifty percent (50%)";

(ii) this Agreement is terminated by the Company pursuant to Section 8.1(c)(ii); or

(iii) this Agreement is terminated by Parent pursuant to Section 8.1(d)(ii), then

the Company shall (A) in the case of clause (i) above, no later than two (2) Business Days following the date of the consummation of such transaction involving a Competing Proposal, (B) in the case of clause (ii) above, prior to or substantially concurrently with such termination, and (C) in the case of this clause (iii), no later than two (2) Business Days after the date of such termination, pay, or cause to be paid, by wire transfer of immediately available funds, at the direction of Parent, the Termination Fee; it being understood that in no event shall the Company be required to pay the Termination Fee on more than one occasion.

(b) In the event that:

(i) the Agreement is terminated by the Company pursuant to Section 8.1(c)(i);

(ii) the Agreement is terminated by the Company pursuant to Section 8.1(c)(iii), then

Parent shall no later than two (2) Business Days after the date of such termination, pay, or cause to be paid, by wire transfer of immediately available funds, at the direction of the Company, the Parent Termination Fee; it being understood that in no event shall Parent be required to pay the Parent Termination Fee on more than one occasion.

(c) Notwithstanding anything to the contrary set forth in this Agreement, but subject to Section 9.9, (i) except in the case of a knowing and intentional breach of this Agreement by the Company (in which case Parent shall be entitled to seek monetary damages, recovery or award from the Company in an amount not to exceed the amount of the Termination Fee in the aggregate), Parent's right to receive payment from the Company of the Termination Fee pursuant to Section 8.3(a), shall constitute the sole and exclusive monetary remedy of Parent and Acquisition Sub against the Company and its Subsidiaries and any of their respective former, current or future general or limited partners, stockholders, members, managers, directors, officers, employees, agents, Affiliates or assignees of any of the foregoing (collectively, the "**Company Related Parties**") for all losses and damages suffered as a result of the failure of the transactions contemplated by this Agreement to be consummated or for a breach or failure to perform hereunder, and upon payment of such amount, none of the Company Related Parties shall have any further liability or obligation relating to or arising out of this Agreement or the transactions contemplated by this Agreement (except that the Company shall also be obligated with respect to Section 8.6); provided, that, in no event shall the Company be subject to an aggregate amount for monetary damages (including any payment of the Termination Fee) in excess of an aggregate amount equal to the Termination Fee (except in all cases that the Company shall also be obligated with respect to its applicable obligations under Section 8.3(d) and Section 8.6), and (ii) except in the case of a knowing and intentional breach of this Agreement by the Equity Investor, Parent or Acquisition Sub (in which case the Company shall be entitled to seek monetary damages, recovery or award from the Equity Investor, Parent or Acquisition Sub in an amount not to exceed the amount of the Parent Termination Fee, in the aggregate), the Company's right to receive payment from Parent of the Parent Termination Fee pursuant to Section 8.3(b), shall constitute the sole and exclusive monetary remedy of the Company against the Parent, Acquisition Sub and the Equity Investor and any of their respective former, current or future general or limited partners, stockholders, members, managers, directors, officers, employees, agents, Affiliates or assignees of any of the foregoing (collectively, the "**Parent Related Parties**") for all losses and damages suffered as a result of the failure of the transactions contemplated by this Agreement, the Equity Commitment Letter or the Parent Guarantee to be consummated or for a breach or failure to perform the applicable provisions hereunder, and upon payment of such amount, none of the Parent Related Parties shall have any further liability or obligation relating to or arising out of this Agreement, the Equity Commitment Letter or the Parent Guarantee or the transactions contemplated by thereby (except in all cases that Parent shall also be obligated with respect to its expense reimbursement and indemnification obligations contained in Section 6.11 and its

applicable obligations under Section 8.3(d)(iii) and Section 8.6(b)); provided, that, in no event shall Equity Investor, Parent or Acquisition Sub collectively be subject to an aggregate amount for monetary damages (including any payment of the Parent Termination Fee) in excess of an aggregate amount equal to the Parent Termination Fee (except in all cases that Parent shall also be obligated with respect to its expense reimbursement and indemnification obligations contained in Section 6.11 and its applicable obligations under Section 8.3(d)(iii) and Section 8.6(b)). For the avoidance of doubt, any liability or obligation of the Parent, Acquisition Sub or Equity Investor hereunder shall be subject to the terms of the Equity Commitment Letter and the Parent Guarantee.

(d) Each of the parties hereto acknowledges that (i) the agreement contained in this Section 8.3 is an integral part of the transactions contemplated by this Agreement, (ii) the Termination Fee is not a penalty, but is liquidated damages, in a reasonable amount that will compensate Parent and its Affiliates in the circumstances in which such fee is payable for the efforts and resources expended and opportunities foregone while negotiating this Agreement and in reliance on this Agreement and on the expectation of the consummation of the transactions contemplated by this Agreement, which amount would otherwise be impossible to calculate with precision, and (iii) without the agreement contained in this Section 8.3, the parties would not enter into this Agreement, accordingly, if the Company or Parent, as the case may be, fails to timely pay any amount due pursuant to this Section 8.3 and, in order to obtain such payment, either Parent or the Company, as the case may be, commences a suit that results in a judgment against the other party for the payment of any amount set forth in this Section 8.3, such paying party shall pay the other party its costs and Expenses in connection with such suit, together with interest on such amount at the annual rate of five percent (5%) plus the prime rate as published in *The Wall Street Journal* in effect on the date such payment was required to be made through the date such payment was actually received, or such lesser rate as is the maximum permitted by applicable law.

Section 8.4 Amendment. This Agreement may be amended by mutual agreement of the parties hereto by action taken by or on behalf of their respective boards of directors at any time before or after receipt of the Company Stockholder Approval; provided, however, that (i) after the Company Stockholder Approval has been obtained, there shall not be any amendment that by Law or in accordance with the rules of any stock exchange requires further approval by the Company's stockholders without such further approval of such stockholders nor any amendment or change not permitted under applicable Law and (ii) any amendment of this Section 8.4, Section 8.3(b), Section 8.3(c), Section 9.4, Section 9.7, Section 9.8, Section 9.10, Section 9.12 or Section 9.13, in each case, to the extent such amendment would adversely affect the rights of a Debt Financing Source party to the Debt Commitment Letter under such Section, shall also be approved by such Debt Financing Source. This Agreement may not be amended except by an instrument in writing signed by each of the parties hereto.

Section 8.5 Extension; Waiver. At any time prior to the Effective Time, subject to applicable Law, the Company may (a) extend the time for the performance of any obligation or other act of Parent or Acquisition Sub, (b) waive any inaccuracy in the representations and warranties of Parent or Acquisition Sub contained herein or in any document delivered pursuant hereto and (c) waive compliance with any agreement or condition by Parent or Acquisition Sub contained herein. Any such extension or waiver shall only be valid if set forth in an instrument in writing signed by the party or parties to be bound thereby. Notwithstanding the foregoing, no failure or delay by the Company, Parent or Acquisition Sub in exercising any right hereunder shall operate as a waiver thereof nor shall any single or partial exercise thereof preclude any other or further exercise of any other right hereunder. Any agreement on the part of a party hereto to any such extension or waiver shall be valid only if set forth in an instrument in writing signed on behalf of such party.

Section 8.6 Expenses; Transfer Taxes.

(a) Except as expressly set forth herein, all Expenses incurred in connection with this Agreement and the transactions contemplated by this Agreement shall be paid by the party incurring such Expenses.

(b) Parent shall timely and duly pay all (i) transfer, stamp and documentary Taxes or fees, (ii) sales, use, gains, real property transfer and other similar Taxes or fees arising out of or in connection with entering into and carrying out this Agreement and (iii) filing fees incurred in connection with any applications and filings under any Antitrust Laws or Foreign Investment Laws.

## ARTICLE IX

## GENERAL PROVISIONS

Section 9.1 Non-Survival of Representations, Warranties and Agreements. The representations, warranties, covenants and agreements in this Agreement and any certificate delivered pursuant hereto by any Person shall terminate at the Effective Time or, except as provided in Section 8.2, upon the termination of this Agreement pursuant to Section 8.1, as the case may be, except that this Section 9.1 shall not limit any covenant or agreement of the parties which by its terms contemplates performance after the Effective Time or after termination of this Agreement, including those contained in Section 6.6 and Section 6.9.

Section 9.2 Notices. All notices, consents and other communications hereunder shall be in writing and shall be given (and shall be deemed to have been duly given upon receipt) by hand delivery, by prepaid overnight courier (providing written proof of delivery) or by confirmed electronic mail, addressed as follows:

if to Parent or Acquisition Sub:

***

Attn: Elon Musk

with a copy (which shall not constitute notice) to:

Skadden, Arps, Slate, Meagher & Flom LLP
525 University Ave, Suite 1400
Palo Alto, California 94301
Attn: Mike Ringler
Sonia K. Nijjar
Dohyun Kim

Section 9.4 Severability. If any term, provision, covenant or restriction of this Agreement is held by a court of competent jurisdiction or other authority to be invalid, void, illegal, unenforceable or against its regulatory policy, the remainder of the terms, provisions, covenants and restrictions of this Agreement shall remain in full force and effect and shall in no way be affected, impaired or invalidated. Upon such determination that any term or other provision is invalid, void, illegal, unenforceable or against its regulatory policy, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties hereto as closely as possible in a mutually acceptable manner in order that the transactions contemplated by this Agreement, including the Merger, be consummated as originally contemplated to the fullest extent possible.

Section 9.5 Assignment. Neither this Agreement nor any of the rights, interests or obligations hereunder shall be assigned by any of the parties hereto (whether by operation of Law or otherwise) without the prior written consent of the other parties. Subject to the preceding sentence, this Agreement will be binding upon, inure to the benefit of and be enforceable by the parties and their respective permitted successors and assigns. Any attempted assignment in violation of this Section 9.5 shall be null and void.

Section 9.6 Entire Agreement. This Agreement (including the exhibits, annexes and appendices hereto) constitutes, together with the Company Disclosure Letter and the Parent Disclosure Letter, the entire agreement, and supersedes all other prior agreements and understandings, both written and oral, among the parties, or any of them, with respect to the subject matter hereof.

Section 9.7 No Third-Party Beneficiaries. Subject to Section 9.13, this Agreement is not intended to and shall not confer upon any Person other than the parties hereto any rights or remedies hereunder; provided, however, that it is specifically intended that (A) the D&O Indemnified Parties (with respect to Section 6.6 from and after the Effective Time), (B) the Company Related Parties (with respect to Section 8.3) are third-party beneficiaries and (C) the Parent Related Parties (with respect to Section 8.3) are third-party beneficiaries.

Section 9.8 Governing Law. This Agreement and all actions, proceedings or counterclaims (whether based on contract, tort or otherwise) arising out of or relating to this Agreement, or the actions of Parent, Acquisition Sub or the Company in the negotiation, administration, performance and enforcement thereof, shall be governed by, and construed in accordance with, the laws of the State of Delaware, without giving effect to any choice or conflict of laws provision or rule (whether of the State of Delaware or any other jurisdiction) that would cause the application of the Laws of any jurisdiction other than the State of Delaware.

IN WITNESS WHEREOF, each of Parent, Acquisition Sub, the Company and, solely with respect to the Specified Provisions, the undersigned individual, have caused this Agreement to be executed as of the date first written above in their individual capacity or by their respective officers thereunto duly authorized, as applicable.

X HOLDINGS I, INC.

By: /s/ Elon R. Musk
Name: Elon R. Musk
Title: President, Secretary and Treasurer

X HOLDINGS II, INC.

By: /s/ Elon R. Musk
Name: Elon R. Musk
Title: President, Secretary and Treasurer

[Signature Page to Agreement and Plan of Merger]

Case: 26-4928, 11/23/2026, DktEntry: 17.1, (257 of 297)

TWITTER, INC.

By: /s/ Bret Taylor
Name: Bret Taylor
Title: Chair of the Board of Directors

[Signature Page to Agreement and Plan of Merger]

SOLELY WITH RESPECT TO THE SPECIFIED PROVISIONS:

ELON R. MUSK

/s/ Elon R. Musk

[Signature Page to Agreement and Plan of Merger]

IN WITNESS WHEREOF, the parties hereto have caused this Amendment to be duly executed as of the day and year first written above.

**TWITTER, INC.**

By: /s/ Ned Segal
Name: Ned Segal
Title: Chief Financial Officer

**COMPUTERSHARE TRUST COMPANY, N.A.**

By: /s/ David L. Adamson
Name: David L. Adamson
Title: Senior Vice President

[Signature Page to Amendment No. 1 to Preferred Stock Rights Agreement]

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
Case Number: 3:22-CV-05937-CRB
PLTF / DEFT Exhibit No. 78
Date Admitted:
By:
Lashanda Scott, Deputy Clerk

Message

**From**: Anthony.Armstrong@morganstanley.com [Anthony.Armstrong@morganstanley.com]
**Sent**: 5/6/2022 3:02:39 PM
**To**: Britton, Sam [sam.britton@gs.com]
**Subject**: Re: Potential discussion topics

On timing: thinking not more than two hours and we would take the under. But he also has no back-end constraint so…

---

**From:** Britton, Sam <sam.britton@gs.com>
**Sent:** Friday, May 6, 2022 9:05:58 AM
**To:** Armstrong, Anthony (IBD) <Anthony.Armstrong@morganstanley.com>
**Subject:** RE: Potential discussion topics

Received, thank you

---

**From:** Anthony.Armstrong@morganstanley.com <Anthony.Armstrong@morganstanley.com>
**Sent:** Friday, May 06, 2022 8:58 AM
**To:** Britton, Sam [IBD] <sam.britton@ny.ibd.email.gs.com>
**Subject:** Potential discussion topics

Hi Sam,
With all the qualifiers we discussed live, please see below.
Look forward to seeing you all later today. And will let you know on back-end timing if/when I get info.
Thanks,
Anthony

---

Potential topics that E might want to address
-----

**May 6 Discussion Topics**

**Users**

1. How many users are verified and what is the verification process? How many verified users are in each category that you identify (e.g. types of public figures, corporations, governments and agencies, NGOs, non-profit organizations)
2. How do you estimate that fewer than 5% of mDAU are false or spam accounts?

**Product**

3. How does content moderation function? What is the cost and # of employees/contractors?
4. How are updates to the home feed algorithm made? What is the cost and # of employees/contractors?
5. What are the top three product initiatives and what is the cost of each?

**Sales & Marketing**

6. How is sales and marketing organized and what is the cost and # of employees/contractors in this category?

**Infrastructure/CapEx**

7. How would you assess your "tech debt"? What are the top three software initiatives and what is the cost of each?
8. What is your strategy for datacenters vs cloud and what are the costs of each?

**Employees**

9. How do you assess employee performance?

**Margin Profile**

10. How do you forecast the path from 29% 2021 EBITDA to your Analyst Day target of 40-45% excluding TAC

**Data Requests**

1. All contracts where the Company has obligations to make payments to third party vendors
2. RSU vesting schedule
   a. What is the impact of change in control on executive and key employee RSUs?
   b. What happened in Q1 to grow the RSU count so significantly?
3. Cash forecast for 2023
   a. Forecast changes in net working capital
   b. Lease/capex commitments
   c. Please confirm cash in cash balances are not restricted outside of those reported in other assets
4. Cost of revenue breakout by component and details on TAC
   a. How many partners have these revenue sharing agreements? What is the revenue share for a typical contract?
   b. Are these contracts cancellable?
5. Headcount by COR / R&D / S&M / G&A function / location / average cost per employee (including benefits) and contractors

---

IMPORTANT INFORMATION: This information has been prepared solely for information purposes and is not an offer to buy or sell or a solicitation of an offer to buy or sell any security or instrument. This information may be confidential and/or material non-public information and is being distributed solely to the intended recipient hereof. If you have received this communication in error, please destroy all electronic and paper copies and notify the sender immediately. Mistransmission is not intended to waive confidentiality or privilege. Morgan Stanley reserves the right, to the extent permitted under applicable law, to monitor electronic communications. No representation or warranty can be given with respect to the accuracy or completeness of the information, or with respect to the terms of any future offer of transactions conforming to the terms hereof. We do not undertake to update this information. Morgan Stanley and its affiliates disclaim any and all liability relating to this information, including without limitation, any express or implied representations or warranties for statements contained in, or omissions from, this information. Morgan Stanley does not give investment, tax, accounting and legal or regulatory advice, and prospective investors should consult with their professional advisors. This communication is not a product of Morgan Stanley's Research Department. It is directed only to those persons who are eligible counterparties or professional clients. This communication is not intended to be provided to and may not be used by any person or entity in any jurisdiction where the provision or use thereof would be contrary to applicable laws, rules, or regulations and is not intended to be and must not be acted on or relied upon by retail clients (as defined in the FCA Handbook). This message is subject to the Morgan Stanley general disclaimers available at the following link http://www.morganstanley.com/disclaimers If you cannot access this link, please notify us by reply message and we will send the contents to you. By messaging with Morgan Stanley you acknowledge that you have read, understand and consent (where applicable) to the foregoing and the Morgan Stanley general disclaimers. You may have certain rights regarding the information that Morgan Stanley collects about you. Please see our Privacy Pledge http://www.morganstanley.com/privacy-pledge for more information about your rights.

---

This e-mail may contain information that is confidential, privileged or otherwise protected from disclosure. If you are not an intended recipient of this e-mail, do not duplicate or redistribute it by any means. Please delete it and any attachments and notify the sender that you have received it in error. Unintended recipients are prohibited from taking action on the basis of information in this e-mail.
E-mail messages may contain computer viruses or other defects, may not be accurately replicated on other systems, or may be intercepted, deleted or interfered with without the knowledge of the sender or the intended recipient. If you are not comfortable with the risks associated with e-mail messages, you may decide not to use e-mail to communicate with Goldman Sachs.
Goldman Sachs reserves the right, to the extent and under circumstances permitted by applicable law, to retain, monitor and intercept e-mail messages to and from its systems. See the http://www.gs.com/disclaimer/afg/ for important information regarding this message and your reliance on information contained in it.

Interest Rate Benchmark Transition Risk Disclosure: LIBOR and several other benchmark interest rates will likely soon stop being published and be replaced by alternative rates, or will be subject to substantial reform. Please refer to the Interest Rate Benchmark Transition Notice for more details.

---

Your Personal Data: We may collect and process information about you that may be subject to data protection laws. For more information about how we use and disclose your personal data, how we protect your information, our legal basis to use your information, your rights and who you can contact, please refer to: www.gs.com/privacy-notices

---

IMPORTANT INFORMATION: This information has been prepared solely for information purposes and is not an offer to buy or sell or a solicitation of an offer to buy or sell any security or instrument. This information may be confidential and/or material non-public information and is being distributed solely to the intended recipient hereof. If you have received this communication in error, please destroy all electronic and paper copies and notify the sender immediately. Mistransmission is not intended to waive confidentiality or privilege. Morgan Stanley reserves the right, to the extent permitted under applicable law, to monitor electronic communications. No representation or warranty can be given with respect to the accuracy or completeness of the information, or with respect to the terms of any future offer of transactions conforming to the terms hereof. We do not undertake to update this information. Morgan Stanley and its affiliates disclaim any and all liability relating to this information, including without limitation, any express or implied representations or warranties for statements contained in, or omissions from, this information. Morgan Stanley does not give investment, tax, accounting and legal or regulatory advice, and prospective investors should consult with their professional advisors. This communication is not a product of Morgan Stanley's Research Department. It is directed only to those persons who are eligible counterparties or professional clients. This communication is not intended to be provided to and may not be used by any person or entity in any jurisdiction where the provision or use thereof would be contrary to applicable laws, rules, or regulations and is not intended to be and must not be acted on or relied upon by retail clients (as defined in the FCA Handbook). This message is subject to the Morgan Stanley general disclaimers available at the following link http://www.morganstanley.com/disclaimers If you cannot access this link, please notify us by reply message and we will send the contents to you. By messaging with Morgan Stanley you acknowledge that you have read, understand and consent (where applicable) to the foregoing and the Morgan Stanley general disclaimers. You may have certain rights regarding the information that Morgan Stanley collects about you. Please see our Privacy Pledge http://www.morganstanley.com/privacy-pledge for more information about your rights.

Lorrie L. Marchant, CSR# 10523, RMR, CRR, CCRR, CRC
EXHIBIT 34
WITNESS: Ned Segal
CASE: Twitter vs. Musk
CASE No.: 2022-0613-KSJM
DATE: Wednesday, September 28, 2022

Answer pending in purple
Answer confirmed in blue

**May 6 Discussion Topics**

**Users**

1. How many users are verified and what is the verification process? How many verified users are in each category that you identify (e.g. types of public figures, corporations, governments and agencies, NGOs, non-profit organizations)

407.6k users are verified

The verification process is governed by this policy: customers apply through our public application form, and reviewers compare their application to the policy to determine whether or not they should be verified

Verification long predates this policy and process, the vast majority of verified accounts were received before it was implemented, so we actually don't know the breakdown of verified accounts by category [from B Astrella]

Reference website: Twitter Verification requirements - how to get the blue check

2. How do you estimate that fewer than 5% of mDAU are false or spam accounts?

This comes by sampling mDAU periodically through the quarter and doing a human eval of the account to check if we believe it is spam or not [from Todd Doughty]

In practice: essentially we sample 100 mDAU every day. At the end of the month we take those ~3k users and send them over to HCOMP for labeling, and they use their process for labeling to determine how many of the users are spam accounts/fake accounts, then those labels are used to calculate the % of spam users (that's a simple calc) [from Kane Merrill]

**Product**

3. How does content moderation function? What is the cost and # of employees/contractors?

[Parag to answer at a high level]

2021 TwS spend for content moderation is ~$63M and we had ~2,386 agents + ~22 FTEs. Additionally, there are some people from the Health and Trust & Safety team that work on content moderation [from Bonnie Datta]

4. How are updates to the home feed algorithm made? What is the cost and # of employees/contractors?

[Parag to answer updates to the home feed algorithm at a high level]

This is a very generic question. The "algorithm" that most people talk about deciding which tweets are shown to the user when they are not using reverse chronological. The "algorithm" is really a multi-level set of machine learning models that learn from user behavior and personalize the experience. Changes are made by several teams within my org [from Arnaud Weber]

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
Case Number: 3:22-CV-05937-CRB
PLTF / DEFT Exhibit No. 82
Date Admitted:
By:
Lashanda Scott, Deputy Clerk


MUSK-PAMPENA-0687695

2021 home timeline cost is ~$17M and we have ~43 FTEs that are dedicated 100% to work only on the home timeline [from Bonnie Datta]

5. What are the top three product initiatives and what is the cost of each?

[Parag to answer at a high level]

**Sales & Marketing**

6. How is sales and marketing organized and what is the cost and # of employees/contractors in this category?

Sales and marketing expenses consist primarily of personnel-related costs, including salaries, commissions, benefits, and stock-based compensation for our employees engaged in sales, sales support, business development and media, marketing, corporate communications, partnership support, and customer service functions. In addition, marketing and sales-related expenses also include advertising costs, market research, trade shows, branding, marketing, public relations costs, amortization of acquired intangible assets, allocated facilities costs, and other supporting overhead costs. [Source: 10-Q]

Cost included in data request # 5 below

**Infrastructure/CapEx**

7. How would you assess your "tech debt"? What are the top three software initiatives and what is the cost of each?

[Parag to answer this question]

8. What is your strategy for datacenters vs cloud and what are the costs of each?

[Answer at a high level for strategy]

Operating Expense Costs: In 2021, we spent ~$670M in on-prem infrastructure which includes data center costs, networking, and server depreciation. We spent ~$238M in 3rd party hosting costs.

Capex: We also have $727M of Capex spend for Infrastructure.

**Employees**

9. How do you assess employee performance?

[Parag can answer at a high level - annual performance reviews, including scores, etc.]

**Margin Profile**

10. How do you forecast the path from 29% 2021 EBITDA to your Analyst Day target of 40-45% excluding TAC

[Ned can answer at a high level]

**Data Requests**

1. All contracts where the Company has obligations to make payments to third party vendors

[This will take a while to pull together - is there a $ threshold?]



Confidential

MUSK-PAMPENA-0687696

2. RSU vesting schedule
    1. What is the impact of change in control on executive and key employee RSUs?

We have a double trigger change of control ("CoC") & involuntary termination plan covering 12 senior executives. If there is a CoC and the executive is involuntarily terminated by the company or by the executive for good reason within 12 months following the CoC (and in the case of the CEO only 3 months prior to the CoC), then 50% to 100% of their equity is accelerated. All performance-based awards with open performance cycles are deemed achieved at-target. [Source Mark Schobinger]

    2. What happened in Q1 to grow the RSU count so significantly?

**Commented [1]:** @mani@twitter.com this doesn't really answer the question. Can you get more from Mike on strategy?
_Assigned to Manish Chabria_

**Commented [2]:** They're looking at the Q and they're noticing a high granted RSU count

Two major drivers:
- HC growth was 35% in 2021
- Share price for Q1 refresh grants was $35.73 (significantly lower than Q1'21 grants $67.25)

We grew HC 35% in 2021 and employees who started before Oct 1st 2021 are eligible for equity refresh in Q1'2022. RSU grants as part of the merit comp cycle were granted in Q1 of 2022 vs our historical date which is granted in April. The grants are based on intended $ value. Grants in Q1 were granted using an average Feb 2022 price of $35.73 vs April 2021 grants at $67.25 [Source 10-Q, Mike FoleyMark SchobingerBraden AmundsenJennifer Chou]

3. Cash forecast for 2023
    1. Forecast changes in net working capital

2021 as a proxy - note Accounts Receivable is -$189.9M. As revenue goes up, change in net working capital goes down because we don't collect all the cash from the revenue earned in Q4. In 2021, we got a benefit for accrued and other liabilities (mostly because of PBP - we accrued $185M of expense but our payout in 2021 for 2020 was $78M so net +$107M on change in net working capital)

| | **2021** |
|---|---|
| Accounts Receivable | (189,946) |
| Prepaids | (121,501) |
| Accounts Payable | 20,869 |
| Accrued and other liabilities | 260,475 |
| Operating lease right of use assets / (liaibilities) | 35,136 |
| **Total change in net working capital** | **5,033** |

Included in the Proxy P&L pdf -$259M

    2. Lease/capex commitments

Our principal commitments consist of obligations under the Notes (including principal and coupon interest), finance and operating leases for equipment, office space and co-located data center facilities, as well as non-cancelable contractual commitments. Refer to Note 6, Operating and Finance Leases; Note 11, Convertible Notes and Senior Notes; and Note 16, Commitments and Contingencies, of the Notes to Consolidated Financial Statements under Part II, Item 8 of this Annual Report on Form 10-K for more details.

The Company's unconditional obligations are non-cancelable contractual commitments primarily related


MUSK-PAMPENA-0687697

to the Company's infrastructure services and other services arrangements. The following table summarizes the Company's commitments to settle unconditional obligations in cash as of December 31, 2021:

| | |
|---|---|
| 2022 | $ 213,578 |
| 2023 | 385,854 |
| 2024 | 387,446 |
| 2025 | 382,469 |
| 2026 | 197,428 |
| Thereafter | 7,985 |
| Total | $ 1,574,760 |

3. Please confirm cash in cash balances are not restricted outside of those reported in other assets

Confirmed, restricted cash is in Other Assets [from Fai Cheung]

4. Cost of revenue breakout by component and details on TAC [Included in the financials here]
    1. How many partners have these revenue sharing agreements? What is the revenue share for a typical contract?
    2. Are these contracts cancellable?

[Ned to give high level response]

5. Headcount by COR / R&D / S&M / G&A function / location / average cost per employee (including benefits) and contractors

Exit 2021 HC by function is as follows:
COR = 456 (6% of total company)
R&D = 3,165 (42%) [Redbird ~1,277]
S&M = 2,219 (30%) [Direct sales ~650]
G&A = 1,684 (22%) [Counsel 589, People & REW 444, Finance 281, IT 214, Eng Cortex 146, Other 10]



Confidential

MUSK-PAMPENA-0687698

Staff breakout as of May 2nd 2022:

| | **Current HC as of May 2nd** |
|---|---|
| BlueBird | 1,536 |
| GoldBird | 826 |
| RedBird | 2,115 |
| Customers | 1,391 |
| Executive | 7 |
| Marketing & Comms | 455 |
| Counsel | 635 |
| People & REW | 485 |
| Finance | 456 |
| **Total** | **7,906** |

Exit 2021 HC by regions:
North America = 5,675 (75%)
Europe = 874 (12%)
Asia Pacific = 848 (11%)
Latin America = 127 (2%)

Average Cash cost per employee in 2021 which includes compensation and fringe benefits:
COR = $244k
R&D = $270k
S&M = $214k
G&A = $217k

**Commented [3]:** pls include SBC
**Commented [4]:** added

Average GAAP cost per employee in 2021 which includes compensation and fringe benefits + stock-based compensation:
COR = $352k
R&D = $439k
S&M = $268k
G&A = $280k

**Commented [5]:** pls include SBC
**Commented [6]:** added

Total Contractor spend in 2021 is $94M + Total Consulting costs in 2021 is $180M

**Commented [7]:** does not look right?
**Commented [8]:** added consulting costs

[Source: Oracle EPM]


Confidential

MUSK-PAMPENA-0687699

**From:** Martin, Katharine <kmartin@wsgr.com>
**To:** board
**CC:** Vijaya Gadde; Ned Segal; Leslie Berland; Korman, Martin; Klein, Alan M; Sean Edgett (sedgett@twitter.com)
**Sent:** 5/7/2022 5:26:55 AM
**Subject:** Summary of Meeting (Privileged & Confidential)
**Attachments:** image001.jpg; image002.png; image003.png; image004.png; image005.png; image006.png

**Privileged and Confidential**

Dear Twitter Board,

At the request of Parag and Ned, we wanted to provide you with a brief update on the meeting that was held today with Elon Musk and his representatives. The good news is that the meeting went very well.

The meeting was held in person at the Company's HQ is SF. Elon brought with him two ex-public company CFOs, the head of his family office, three representatives from MS and antitrust counsel. On the Twitter side, Ned attended in person and Parag attended via zoom (as he is still under the weather). Marty and I, as well as our antitrust partner along with representatives from GS and JPM, also attended.

Elon asked a lot of questions. Parag and Ned were excellent in how they responded, and had a very engaging, constructive conversation with him. Elon focused his questions on revenue and costs, users, product, employees, engineering, sales and marketing, and infrastructure/capex. The tone of the meeting was positive and upbeat with everyone aligned around the goal of working to get the deal closed as quickly as possible. The meeting lasted about 2-1/2 hours, and Parag and Ned agreed to follow up with more detail in a number of areas, and also to schedule at least two more meetings for Elon to meet more of the team and to do deeper dives in certain areas of focus. In response to a question from Parag, Elon briefly reviewed his vision for the Company (which included a variety of revenue growth opportunities as well as his unambiguous belief that the cost structure needed attention both in terms of significant headcount reduction as well as opportunities for technology infrastructure cost reduction), and also agreed to speak at a town hall to the Company's employees. Lastly, he expressed some willingness to consider retention awards (especially if it looks like the deal is going to take more than a few months to close). Parag, Ned, Marty and I can provide more detail about the conversation, but overall we believe the meeting could not have gone better.

Please let us know if you have any questions.

Thanks,
Katie

WILSON
SONSINI

**Katharine Martin | Partner, Chair of the Board | Wilson Sonsini Goodrich & Rosati**
650 Page Mill Road | Palo Alto, CA 94304-1050
direct: 650.565-3522| mobile: 408.332.0069 | kmartin@wsgr.com

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
Case Number: 3:22-CV-05937-CRB
PLTF / DEFT Exhibit No. 84
Date Admitted: 
By: 
Lashanda Scott, Deputy Clerk

This email and any attachments thereto may contain private, confidential, and privileged material for the sole use of the intended recipient. Any review, copying, or distribution of this email (or any attachments thereto) by others is strictly prohibited. If you are not the intended recipient, please contact the sender immediately and permanently delete the original and any copies of this email and any attachments thereto.

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
Case Number: 3:22-CV-05937-CRB
PLTF / DEFT Exhibit No. 88
Date Admitted: ______
By: ______
Lashanda Scott, Deputy Clerk

Message

**From:** Fox, Bill [Bill.Fox@gs.com]
**Sent:** 5/10/2022 9:46:29 PM
**To:** Anthony.Armstrong@morganstanley.com; Steve.Weiner@morganstanley.com; Silverstein, Stefani T [Stefani.Silverstein@gs.com]; Kate.Claassen@MorganStanley.com
**CC:** Britton, Sam [sam.britton@gs.com]; Marco Caggiano [marco.j.caggiano@jpmorgan.com]; Eric Menell [eric.menell@jpmorgan.com]; Owen.O'Keeffe@morganstanley.com; Julian.Mettmann@morganstanley.com; Posnett, Kim-Thu [kim-thu.posnett@gs.com]; GS-Twitter-Core@ny.email.gs.com [GS-Twitter-Core@gs.com]; JPM Advisory [JPM_Tundra_Advisory@jpmorgan.com]
**Subject:** RE: Twitter | follow-up

Thanks Anthony – Very clear and helpful, and understood on prioritization and timing.

As mentioned below, we're working with the Twitter team to get these high priority items shared with you ASAP. From there, we'll get the calls scheduled.

Thanks,
Bill

---

**From:** Anthony.Armstrong@morganstanley.com <Anthony.Armstrong@morganstanley.com>
**Sent:** Tuesday, May 10, 2022 7:51 PM
**To:** Fox, Bill [IBD] <Bill.Fox@ny.ibd.email.gs.com>; Steve.Weiner@morganstanley.com; Silverstein, Stefani T [IBD] <Stefani.Silverstein@ny.ibd.email.gs.com>; Kate.Claassen@MorganStanley.com
**Cc:** Britton, Sam [IBD] <sam.britton@ny.ibd.email.gs.com>; Marco Caggiano <marco.j.caggiano@jpmorgan.com>; Eric Menell <eric.menell@jpmorgan.com>; Owen.O'Keeffe@morganstanley.com; Julian.Mettmann@morganstanley.com; Posnett, Kim-Thu [IBD] <kim-thu.posnett@ny.ibd.email.gs.com>; GS-Twitter-Core <GS-Twitter-Core@ny.email.gs.com>; JPM Advisory <JPM_Tundra_Advisory@jpmorgan.com>
**Subject:** Re: Twitter | follow-up

Hi Bill,
I will let the team respond to other items but as it relates to the two most important calls (users and financial model) that Elon is focused on: Attendees for those calls will be Elon and likely ~3 others (combination of Morgan Stanley and finance exec). Agenda will be to dig into the raw data you provide for each session (without seeing the raw materials, it's hard to be more specific than that) and requested attendees on your end would simply be the twitter employees who are best equipped to talk to the underlying materials you provide for those sessions.

In both cases, if you provide information in advance we could try to be a bit more specific — but even then our client's bias is going to be to jump on a call/zoom ASAP and have you walk us through the raw materials.

Thanks and feel free to call if I can clarify further.
Anthony

---

**From:** Fox, Bill <Bill.Fox@gs.com>
**Sent:** Tuesday, May 10, 2022 3:29 PM
**To:** Armstrong, Anthony (IBD); Weiner, Steve (IBD); Silverstein, Stefani T; Claassen, Kate (IBD)
**Cc:** Britton, Sam; Marco Caggiano; Eric Menell; O'Keeffe, Owen (IBD); Mettmann, Julian (IBD); Posnett, Kim-Thu; GS-Twitter-Core@ny.email.gs.com; JPM Advisory
**Subject:** RE: Twitter | follow-up

MS Team –

EXHIBIT 29
CLAASSEN
9/16/22
Reported by: Laura Axelsen
CSR 6173


MSCO-0173709



MUSK-PAMPENA-0678175

We wanted to give you an update on where we stand on the diligence process:

- **Data Requests**
  - We synced with the Twitter team, and reiterated the high priority items that you mentioned below. They are in the process of assembling the data to address the tracker requests, and will be sharing via Box (*see next bullet*) what is ready over the course of today / tomorrow for at least the highest priority items
  - Know that the key contracts were already shared with Skadden via Box, so please let us know if you have been given access to that Box, as we will be using that to share documents. Else, would be great if you could share the necessary emails from your side so we can get you access
- **Diligence Calls**
  - Know that you are waiting for the data on a few of the calls, but would be great to get a list of expected attendees on your side for each call and a proposed agenda. From there we can ensure we have the right people on from our side, and start scheduling

Let us know if any further questions / points to highlight.

Thanks,
Bill

---

**From:** Anthony.Armstrong@morganstanley.com <Anthony.Armstrong@morganstanley.com>
**Sent:** Monday, May 9, 2022 8:26 PM
**To:** Steve.Weiner@morganstanley.com; Silverstein, Stefani T [IBD] <Stefani.Silverstein@ny.ibd.email.gs.com>; Kate.Claassen@MorganStanley.com
**Cc:** Britton, Sam [IBD] <sam.britton@ny.ibd.email.gs.com>; Marco Caggiano <marco.j.caggiano@jpmorgan.com>; Eric Menell <eric.menell@jpmorgan.com>; Owen.O'Keeffe@morganstanley.com; Julian.Mettmann@morganstanley.com; Posnett, Kim-Thu [IBD] <kim-thu.posnett@ny.ibd.email.gs.com>; GS-Twitter-Core <GS-Twitter-Core@ny.email.gs.com>; JPM Advisory <JPM_Tundra_Advisory@jpmorgan.com>
**Subject:** Re: Twitter | follow-up

Hi Stefani,
Sorry for multiple emails but I want to highlight two specific asks that came out of the Friday meeting:
i. Users Data Dump: We'd like to do a small group zoom/meeting on Users as soon as possible. We are not asking for new analysis and will leave it to you to compile the most relevant data that's readily available. Goal is to look at all metrics from as many angles as possible.
ii. Deep Dive Financial Model. Whatever the Company already has (vs created for this discussion) is most helpful. As Elon mentioned on Friday, he has a strong bias to see the raw model. We would like to see that then schedule a follow-up call.
(Sam, the above captures what I had mentioned to you earlier today.)

Appreciate the help.
Anthony

---

**From:** Weiner, Steve (IBD) <Steve.Weiner@morganstanley.com>
**Sent:** Monday, May 9, 2022 3:39 PM
**To:** Silverstein, Stefani T; Claassen, Kate (IBD); Armstrong, Anthony (IBD)
**Cc:** Britton, Sam; Marco Caggiano; Eric Menell; O'Keeffe, Owen (IBD); Mettmann, Julian (IBD); Posnett, Kim-Thu; GS-Twitter-Core@ny.email.gs.com; JPM Advisory
**Subject:** RE: Twitter | follow-up

OK. Thanks Stef.


MUSK-PAMPENA-0678176

**Steve Weiner, Executive Director**
Morgan Stanley | Investment Banking Division
2725 Sand Hill Road, Suites 100 & 200, 2nd Floor | Menlo Park, CA 94025
Phone: +1 650 234-5547 | Mobile: +1 415 516-3776
Steve.Weiner@MorganStanley.com

---

**From:** Silverstein, Stefani T <Stefani.Silverstein@gs.com>
**Sent:** Monday, May 9, 2022 3:34 PM
**To:** Weiner, Steve (IBD) <Steve.Weiner@morganstanley.com>; Claassen, Kate (IBD) <Kate.Claassen@MorganStanley.com>; Armstrong, Anthony (IBD) <Anthony.Armstrong@morganstanley.com>
**Cc:** Britton, Sam <sam.britton@gs.com>; Marco Caggiano <marco.j.caggiano@jpmorgan.com>; Eric Menell <eric.menell@jpmorgan.com>; O'Keeffe, Owen (IBD) <Owen.O'Keeffe@morganstanley.com>; Mettmann, Julian (IBD) <Julian.Mettmann@morganstanley.com>; Posnett, Kim-Thu <kim-thu.posnett@gs.com>; GS-Twitter-Core@ny.email.gs.com <GS-Twitter-Core@gs.com>; JPM Advisory <JPM_Tundra_Advisory@jpmorgan.com>
**Subject:** RE: Twitter | follow-up

Thanks for this, Steve

We're working through all with mgmt and will provide an update on timing / next steps tmrw afternoon

Best,
Stef

---

**From:** Steve.Weiner@morganstanley.com <Steve.Weiner@morganstanley.com>
**Sent:** Monday, May 9, 2022 5:40:17 PM
**To:** Kate.Claassen@MorganStanley.com <Kate.Claassen@MorganStanley.com>; Anthony.Armstrong@morganstanley.com <Anthony.Armstrong@morganstanley.com>; Silverstein, Stefani T [IBD] <Stefani.Silverstein@ny.ibd.email.gs.com>
**Cc:** Britton, Sam [IBD] <sam.britton@ny.ibd.email.gs.com>; Marco Caggiano <marco.j.caggiano@jpmorgan.com>; Eric Menell <eric.menell@jpmorgan.com>; Owen.O'Keeffe@morganstanley.com <Owen.O'Keeffe@morganstanley.com>; Julian.Mettmann@morganstanley.com <Julian.Mettmann@morganstanley.com>
**Subject:** RE: Twitter | follow-up

Stefani – could you let us know when we can expect to start receiving the info requests? For your convenience, we've dropped the below items into the attached tracker. There are no new data requests from yesterday, but please note the request to discuss the following 4 topics with management:

- Users
- Advertisers
- Expenses / Cost structure
- Content Moderation

A number of the data requests center around those topics so it would be helpful to receive the information in advance. Please let me know if it would be helpful to connect live to discuss.

Thanks,
Steve

**Steve Weiner, Executive Director**
Morgan Stanley | Investment Banking Division
2725 Sand Hill Road, Suites 100 & 200, 2nd Floor | Menlo Park, CA 94025
Phone: +1 650 234-5547 | Mobile: +1 415 516-3776
Steve.Weiner@MorganStanley.com

**From:** Weiner, Steve (IBD)
**Sent:** Sunday, May 8, 2022 6:34 PM
**To:** Claassen, Kate (IBD) <Kate.Claassen@MorganStanley.com>; Armstrong, Anthony (IBD) <Anthony.Armstrong@morganstanley.com>; Silverstein, Stefani T <Stefani.Silverstein@gs.com>
**Cc:** Britton, Sam <sam.britton@gs.com>; Marco Caggiano <marco.j.caggiano@jpmorgan.com>; Eric Menell <eric.menell@jpmorgan.com>; O'Keeffe, Owen (IBD) <Owen.O'Keeffe@morganstanley.com>; Julian Mettmann (IBD) (Julian.Mettmann@morganstanley.com) <Julian.Mettmann@morganstanley.com>
**Subject:** RE: Twitter | follow-up

Stefani – a few additional requests noted as items 11-13 below. Thanks.

----------------------------------

**Comprehensive List**
***Discussion Topics***

**Users**
1. How many users are verified and what is the verification process? How many verified users are in each category that you identify (e.g. types of public figures, corporations, governments and agencies, NGOs, non-profit organizations)
2. How do you estimate that fewer than 5% of mDAU are false or spam accounts?

**Product**
3. How does content moderation function? What is the cost and # of employees/contractors?
4. How are updates to the home feed algorithm made? What is the cost and # of employees/contractors?
5. What are the top three product initiatives and what is the cost of each?

**Sales & Marketing**
6. How is sales and marketing organized and what is the cost and # of employees/contractors in this category?

**Infrastructure/CapEx**
7. How would you assess your "tech debt"? What are the top three software initiatives and what is the cost of each?
8. What is your strategy for datacenters vs cloud and what are the costs of each?

**Employees**
9. How do you assess employee performance?

**Margin Profile**
10. How do you forecast the path from 29% 2021 EBITDA to your Analyst Day target of 40-45% excluding TAC

***Data Requests***
1. All contracts where the Company has obligations to make payments to third party vendors
2. RSU vesting schedule
a. What is the impact of change in control on executive and key employee RSUs?
b. What happened in Q1 to grow the RSU count so significantly?
3. Cash forecast for 2023
a. Forecast changes in net working capital
b. Lease/capex commitments
c. Please confirm cash in cash balances are not restricted outside of those reported in other assets
4. Cost of revenue breakout by component and details on TAC


MUSK-PAMPENA-0678178

a. How many partners have these revenue sharing agreements? What is the revenue share for a typical contract?
b. Are these contracts cancellable?
5. Headcount by COR / R&D / S&M / G&A function / location / average cost per employee (including benefits) and contractors
6. User database containing key metrics including, but not limited to, number of users, number of verified users, number of monthly active users, number of handles, etc.
7. All documentation related to the outstanding convertible notes (including bond hedge and warrant confirmations, any side letters etc.)?
8. Detailed breakout of planned capex for 2022 and 2023 identifying all key projects split between growth and maintenance
9. Detailed schedule of all equity awards (e.g., RSAs, PSUs, RSUs and Options) split between vested and unvested. For unvested awards, please provide detailed vesting schedule. For options, please include strike price.
10. All documentation related to outstanding debt (including documentation, lender presentation, RAP)
11. Distribution of users / ad revenue per user (following up on discussion of 80/20 dynamic) – aka % revenue by user decile
12. Distribution of advertisers / revenue per advertiser – aka % revenue of top 10, 20, 50 advertisers
13. Engagement and cost per engagement, US and international (the absolute numbers underneath the growth reported)

**Steve Weiner, Executive Director**
Morgan Stanley | Investment Banking Division
2725 Sand Hill Road, Suites 100 & 200, 2nd Floor | Menlo Park, CA 94025
Phone: +1 650 234-5547 | Mobile: +1 415 516-3776
Steve.Weiner@MorganStanley.com

---

**From:** Weiner, Steve (IBD)
**Sent:** Saturday, May 7, 2022 5:17 PM
**To:** Claassen, Kate (IBD) <Kate.Claassen@MorganStanley.com>; Armstrong, Anthony (IBD) <Anthony.Armstrong@morganstanley.com>; Silverstein, Stefani T <Stefani.Silverstein@gs.com>
**Cc:** Britton, Sam <sam.britton@gs.com>; Marco Caggiano <marco.j.caggiano@jpmorgan.com>; Eric Menell <eric.menell@jpmorgan.com>; O'Keeffe, Owen (IBD) <Owen.O'Keeffe@morganstanley.com>; Julian Mettmann (IBD) (Julian.Mettmann@morganstanley.com) <Julian.Mettmann@morganstanley.com>
**Subject:** RE: Twitter | follow-up

Thanks. In addition to the discussion topics and diligence requests shared for yesterday's meeting, it would be helpful to receive the following items. For convenience, we've included a comprehensive list further below (yesterday's items + new requests).

1. User database containing key metrics including, but not limited to, number of users, number of verified users, number of monthly active users, number of handles, etc.
2. All documentation related to the outstanding convertible notes (including bond hedge and warrant confirmations, any side letters etc.)?
3. Detailed breakout of planned capex for 2022 and 2023 identifying all key projects split between growth and maintenance
4. Detailed schedule of all equity awards (e.g., RSAs, PSUs, RSUs and Options) split between vested and unvested. For unvested awards, please provide detailed vesting schedule. For options, please include strike price.

---------------------------------

**Comprehensive List**
***Discussion Topics***

**Users**

1. How many users are verified and what is the verification process? How many verified users are in each category that you identify (e.g. types of public figures, corporations, governments and agencies, NGOs, non-profit organizations)
2. How do you estimate that fewer than 5% of mDAU are false or spam accounts?

**Product**

1. How does content moderation function? What is the cost and # of employees/contractors?
2. How are updates to the home feed algorithm made? What is the cost and # of employees/contractors?
3. What are the top three product initiatives and what is the cost of each?

**Sales & Marketing**

4. How is sales and marketing organized and what is the cost and # of employees/contractors in this category?

**Infrastructure/CapEx**

5. How would you assess your "tech debt"? What are the top three software initiatives and what is the cost of each?
6. What is your strategy for datacenters vs cloud and what are the costs of each?

**Employees**

7. How do you assess employee performance?

**Margin Profile**

8. How do you forecast the path from 29% 2021 EBITDA to your Analyst Day target of 40-45% excluding TAC

***Data Requests***

1. All contracts where the Company has obligations to make payments to third party vendors
2. RSU vesting schedule
   a. What is the impact of change in control on executive and key employee RSUs?
   b. What happened in Q1 to grow the RSU count so significantly?
3. Cash forecast for 2023
   a. Forecast changes in net working capital
   b. Lease/capex commitments
   c. Please confirm cash in cash balances are not restricted outside of those reported in other assets

1. Cost of revenue breakout by component and details on TAC
   a. How many partners have these revenue sharing agreements? What is the revenue share for a typical contract?
   b. Are these contracts cancellable?

1. Headcount by COR / R&D / S&M / G&A function / location / average cost per employee (including benefits) and contractors
2. User database containing key metrics including, but not limited to, number of users, number of verified users, number of monthly active users, number of handles, etc.
3. All documentation related to the outstanding convertible notes (including bond hedge and warrant confirmations, any side letters etc.)?
4. Detailed breakout of planned capex for 2022 and 2023 identifying all key projects split between growth and maintenance
5. Detailed schedule of all equity awards (e.g., RSAs, PSUs, RSUs and Options) split between vested and unvested. For unvested awards, please provide detailed vesting schedule. For options, please include strike price.

**Steve Weiner, Executive Director**
Morgan Stanley | Investment Banking Division


MUSK-PAMPENA-0678180

2725 Sand Hill Road, Suites 100 & 200, 2nd Floor | Menlo Park, CA 94025
Phone: +1 650 234-5547 | Mobile: +1 415 516-3776
Steve.Weiner@MorganStanley.com

---

**From:** Claassen, Kate (IBD) <Kate.Claassen@MorganStanley.com>
**Sent:** Saturday, May 7, 2022 5:08 PM
**To:** Armstrong, Anthony (IBD) <Anthony.Armstrong@morganstanley.com>; Silverstein, Stefani T <Stefani.Silverstein@gs.com>
**Cc:** Britton, Sam <sam.britton@gs.com>; Marco Caggiano <marco.j.caggiano@jpmorgan.com>; Eric Menell <eric.menell@jpmorgan.com>; O'Keeffe, Owen (IBD) <Owen.O'Keeffe@morganstanley.com>; Weiner, Steve (IBD) <Steve.Weiner@morganstanley.com>
**Subject:** RE: Twitter | follow-up

+steve is sending the ?s over shortly and can coordinate our data room access, and know that you have the initial list from Friday session as well

**Kate Claassen, Managing Director**
Morgan Stanley | Head of West Coast Technology Investment Banking
2725 Sand Hill Road | Menlo Park, CA 94025
Phone: +1 650 234-5638
Mobile: +1 650 644-6204
Kate.Claassen@MorganStanley.com

---

**From:** Armstrong, Anthony (IBD) <Anthony.Armstrong@morganstanley.com>
**Sent:** Saturday, May 7, 2022 4:56 PM
**To:** Silverstein, Stefani T <Stefani.Silverstein@gs.com>
**Cc:** Britton, Sam <sam.britton@gs.com>; Marco Caggiano <marco.j.caggiano@jpmorgan.com>; Eric Menell <eric.menell@jpmorgan.com>; Claassen, Kate (IBD) <Kate.Claassen@MorganStanley.com>; O'Keeffe, Owen (IBD) <Owen.O'Keeffe@morganstanley.com>
**Subject:** Re: Twitter | follow-up

+Kate and Owen.

Thank you Stefani for the follow up.
Kate is running point on diligence for us and she will connect you with rest of our team as we dig in.

---

**From:** Silverstein, Stefani T <Stefani.Silverstein@gs.com>
**Sent:** Saturday, May 7, 2022 3:08 PM
**To:** Armstrong, Anthony (IBD)
**Cc:** Britton, Sam; Marco Caggiano; Eric Menell
**Subject:** Twitter | follow-up

Hi Anthony -

We wanted to reach out regarding next steps following yesterday's highly productive session

Feel free to connect Eric & me with your team so we can align on the outstanding followup sessions and data requests, and we'll coordinate with Ned and team to get scheduling and responses underway accordingly

Best,
GS/JPM


MUSK-PAMPENA-0678181

Stefani T. Silverstein
Goldman Sachs
212-357-2807 (o)
508-864-9923 (m)

---

This e-mail may contain information that is confidential, privileged or otherwise protected from disclosure. If you are not an intended recipient of this e-mail, do not duplicate or redistribute it by any means. Please delete it and any attachments and notify the sender that you have received it in error. Unintended recipients are prohibited from taking action on the basis of information in this e-mail.
E-mail messages may contain computer viruses or other defects, may not be accurately replicated on other systems, or may be intercepted, deleted or interfered with without the knowledge of the sender or the intended recipient. If you are not comfortable with the risks associated with e-mail messages, you may decide not to use e-mail to communicate with Goldman Sachs.
Goldman Sachs reserves the right, to the extent and under circumstances permitted by applicable law, to retain, monitor and intercept e-mail messages to and from its systems. See the http://www.gs.com/disclaimer/afg/ for important information regarding this message and your reliance on information contained in it.
Interest Rate Benchmark Transition Risk Disclosure: LIBOR and several other benchmark interest rates will likely soon stop being published and be replaced by alternative rates, or will be subject to substantial reform. Please refer to the Interest Rate Benchmark Transition Notice <https://www.goldmansachs.com/disclosures/interest-rate-benchmark-transition-notice.pdf> for more details.

---

Your Personal Data: We may collect and process information about you that may be subject to data protection laws. For more information about how we use and disclose your personal data, how we protect your information, our legal basis to use your information, your rights and who you can contact, please refer to: www.gs.com/privacy-notices<http://www.gs.com/privacy-notices>

---

IMPORTANT INFORMATION: This information has been prepared solely for information purposes and is not an offer to buy or sell or a solicitation of an offer to buy or sell any security or instrument. This information may be confidential and/or material non-public information and is being distributed solely to the intended recipient hereof. If you have received this communication in error, please destroy all electronic and paper copies and notify the sender immediately. Mistransmission is not intended to waive confidentiality or privilege. Morgan Stanley reserves the right, to the extent permitted under applicable law, to monitor electronic communications. No representation or warranty can be given with respect to the accuracy or completeness of the information, or with respect to the terms of any future offer of transactions conforming to the terms hereof. We do not undertake to update this information. Morgan Stanley and its affiliates disclaim any and all liability relating to this information, including without limitation, any express or implied representations or warranties for statements contained in, or omissions from, this information. Morgan Stanley does not give investment, tax, accounting and legal or regulatory advice, and prospective investors should consult with their professional advisors. This communication is not a product of Morgan Stanley's Research Department. It is directed only to those persons who are eligible counterparties or professional clients. This communication is not intended to be provided to and may not be used by any person or entity in any jurisdiction where the provision or use thereof would be contrary to applicable laws, rules, or regulations and is not intended to be and must not be acted on or relied upon by retail clients (as defined in the FCA Handbook). This message is subject to the Morgan Stanley general disclaimers available at the following link http://www.morganstanley.com/disclaimers If you cannot access this link, please notify us by reply message and we will send the contents to you. By messaging with Morgan Stanley you acknowledge that you have read, understand and consent (where applicable) to the foregoing and the Morgan Stanley general disclaimers. You may have certain rights regarding the information that Morgan Stanley collects about you. Please see our Privacy Pledge http://www.morganstanley.com/privacy-pledge for more information about your rights.

---

This e-mail may contain information that is confidential, privileged or otherwise protected from disclosure. If you are not an intended recipient of this e-mail, do not duplicate or redistribute it by any means. Please delete it and any attachments and notify the sender that you have received it in error. Unintended recipients are prohibited from taking action on the basis of information in this e-mail.
E-mail messages may contain computer viruses or other defects, may not be accurately replicated on other systems, or may be intercepted, deleted or interfered with without the knowledge of the sender or the intended recipient. If you are not comfortable with the risks associated with e-mail messages, you may decide not to use e-mail to communicate with Goldman Sachs.
Goldman Sachs reserves the right, to the extent and under circumstances permitted by applicable law, to retain, monitor and intercept e-mail messages to and from its systems. See the http://www.gs.com/disclaimer/afg/ for important information regarding this message and your reliance on information contained in it.
Interest Rate Benchmark Transition Risk Disclosure: LIBOR and several other benchmark interest rates will likely soon stop being published and be replaced by alternative rates, or will be subject to substantial reform. Please refer to the Interest Rate Benchmark Transition Notice for more details.

---

Your Personal Data: We may collect and process information about you that may be subject to data protection laws. For more information about how we use and disclose your personal data, how we protect your information, our legal basis to use your information, your rights and who you can contact, please refer to: www.gs.com/privacy-notices

---

IMPORTANT INFORMATION: This information has been prepared solely for information purposes and is not an offer to buy or sell or a solicitation of an offer to buy or sell any security or instrument. This information may be confidential and/or material non-public information and is being distributed solely to the intended recipient hereof. If you have received this communication in error, please destroy all electronic and paper copies and notify the sender immediately. Mistransmission is not intended to waive confidentiality or privilege. Morgan Stanley reserves the right, to the extent permitted under applicable law, to monitor electronic communications. No representation or warranty can be given with respect to the accuracy or completeness of the information, or with respect to the terms of any future offer of transactions conforming to the terms hereof. We do not undertake to update this information. Morgan Stanley and its affiliates disclaim any and all liability relating to this information, including without limitation, any express or implied representations or warranties for statements contained in, or omissions from, this information. Morgan Stanley does not give investment, tax, accounting and legal or regulatory advice, and prospective investors should consult with their professional advisors. This communication is not a product of Morgan Stanley's Research Department. It is directed only to those persons who are eligible counterparties or professional clients. This communication is not intended to be provided to and may not be used by any person or entity in any jurisdiction where the provision or use thereof would be contrary to applicable laws, rules, or regulations and is not intended to be and must not be acted on or relied upon by retail clients (as defined in the FCA Handbook). This message is subject to the Morgan Stanley general disclaimers available at the following link http://www.morganstanley.com/disclaimers If you cannot access this link, please notify us by reply message and we will send the contents to you. By messaging with Morgan Stanley you acknowledge that you have read, understand and consent (where applicable) to the foregoing and the Morgan Stanley general disclaimers. You may have certain rights regarding the information that Morgan Stanley collects about you. Please see our Privacy Pledge http://www.morganstanley.com/privacy-pledge for more information about your rights.

---

This e-mail may contain information that is confidential, privileged or otherwise protected from disclosure. If you are not an intended recipient of this e-mail, do not duplicate or redistribute it by any means. Please delete it and any attachments and notify the sender that you have received it in error. Unintended recipients are prohibited from taking action on the basis of information in this e-mail.
E-mail messages may contain computer viruses or other defects, may not be accurately replicated on other systems, or may be intercepted, deleted or interfered with without the knowledge of the sender or the intended recipient. If you are not comfortable with the risks associated with e-mail messages, you may decide not to use e-mail to communicate with Goldman Sachs.
Goldman Sachs reserves the right, to the extent and under circumstances permitted by applicable law, to retain, monitor and intercept e-mail messages to and from its systems. See the http://www.gs.com/disclaimer/afg/ for important information regarding this message and your reliance on information contained in it.
Interest Rate Benchmark Transition Risk Disclosure: LIBOR and several other benchmark interest rates will likely soon stop being published and be replaced by alternative rates, or will be subject to substantial reform. Please refer to the Interest Rate Benchmark Transition Notice for more details.

---

Your Personal Data: We may collect and process information about you that may be subject to data protection laws. For more information about how we use and disclose your personal data, how we protect your information, our legal basis to use your information, your rights and who you can contact, please refer to: www.gs.com/privacy-notices

---

IMPORTANT INFORMATION: This information has been prepared solely for information purposes and is not an offer to buy or sell or a solicitation of an offer to buy or sell any security or instrument. This information may be confidential and/or material non-public information and is being distributed solely to the intended recipient hereof. If you have received this communication in error, please destroy all electronic and paper copies and notify the sender immediately. Mistransmission is not intended to waive confidentiality or privilege. Morgan Stanley reserves the right, to the extent

permitted under applicable law, to monitor electronic communications. No representation or warranty can be given with respect to the accuracy or completeness of the information, or with respect to the terms of any future offer of transactions conforming to the terms hereof. We do not undertake to update this information. Morgan Stanley and its affiliates disclaim any and all liability relating to this information, including without limitation, any express or implied representations or warranties for statements contained in, or omissions from, this information. Morgan Stanley does not give investment, tax, accounting and legal or regulatory advice, and prospective investors should consult with their professional advisors. This communication is not a product of Morgan Stanley's Research Department. It is directed only to those persons who are eligible counterparties or professional clients. This communication is not intended to be provided to and may not be used by any person or entity in any jurisdiction where the provision or use thereof would be contrary to applicable laws, rules, or regulations and is not intended to be and must not be acted on or relied upon by retail clients (as defined in the FCA Handbook). This message is subject to the Morgan Stanley general disclaimers available at the following link http://www.morganstanley.com/disclaimers If you cannot access this link, please notify us by reply message and we will send the contents to you. By messaging with Morgan Stanley you acknowledge that you have read, understand and consent (where applicable) to the foregoing and the Morgan Stanley general disclaimers. You may have certain rights regarding the information that Morgan Stanley collects about you. Please see our Privacy Pledge http://www.morganstanley.com/privacy-pledge for more information about your rights.

---

This e-mail may contain information that is confidential, privileged or otherwise protected from disclosure. If you are not an intended recipient of this e-mail, do not duplicate or redistribute it by any means. Please delete it and any attachments and notify the sender that you have received it in error. Unintended recipients are prohibited from taking action on the basis of information in this e-mail.
E-mail messages may contain computer viruses or other defects, may not be accurately replicated on other systems, or may be intercepted, deleted or interfered with without the knowledge of the sender or the intended recipient. If you are not comfortable with the risks associated with e-mail messages, you may decide not to use e-mail to communicate with Goldman Sachs.
Goldman Sachs reserves the right, to the extent and under circumstances permitted by applicable law, to retain, monitor and intercept e-mail messages to and from its systems. See the http://www.gs.com/disclaimer/afg/ for important information regarding this message and your reliance on information contained in it.
Interest Rate Benchmark Transition Risk Disclosure: LIBOR and several other benchmark interest rates will likely soon stop being published and be replaced by alternative rates, or will be subject to substantial reform Please refer to the Interest Rate Benchmark Transition Notice for more details.

---

Your Personal Data: We may collect and process information about you that may be subject to data protection laws For more information about how we use and disclose your personal data, how we protect your information, our legal basis to use your information, your rights and who you can contact, please refer to.
www.gs.com/privacy-notices



MUSK-PAMPENA-0678184

Exhibit 8

**From:** Fox, Bill <bill.fox@gs.com>
**To:** Stacey Conti
**CC:** GS-Twitter-Core@ny.email.gs.com
**Sent:** 5/13/2022 5:43:28 PM
**Subject:** RE: New Model
**Attachments:** image001.png

Stacey –

Just tried you, but assume you are discussing with the team.

We wanted to talk through the main follow ups (which we have shared below) – Let us know if this aligns with your thinking (or if we missed anything).

Thanks,
Bill

---

**Project X | Key Follow Ups**

- **Audience** *(Note: Include all information in Excel)*
  - mMAU breakout of recast (i.e. before and after recast)
  - Breakout of 2M reduced accounts by # of people (i.e. was it 2M people or only 1M people with 2 duplicative accounts)
  - Confirm how the new user funnel numbers (p6) compare to the signup data (p8)
    - Include refreshed version of Page 8 (to correct for any issues)
  - Time series of Page 6 (New user funnel over time)
  - Provide Android data
  - Data & Methodology underneath 5% spam accounts
    - Detail on selection and evaluation of 3,000 accounts
- **Financials** *(Note: Include all information in Excel)*
  - Further breakout of revenue components (e.g. Takeover $ underneath Awareness $)
  - Further breakout of cost of revenue
  - CPM data by US, Japan, and ROW
  - Breakdown of identified and anticipated savings
    - Detailed break out of the costs (by Headcount, location, etc
  - What portion of this is and isn't factored into current operating plan
- **Other**
  - Any breakout/analysis of the value of 3rd party data

**From:** Fox, Bill [IBD] <Bill.Fox@ny.ibd.email.gs.com>
**Sent:** Friday, May 13, 2022 1:16 AM
**To:** Stacey Conti <sconti@twitter.com>
**Cc:** GS-Twitter-Core <GS-Twitter-Core@ny.email.gs.com>
**Subject:** RE: New Model

Stacey -

Thank you very much - Definitely more detail.

Any chance that we can get this in Excel too? That was the specific request and will help expedite their review as well.

Thanks,

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
Case Number: 3:22-CV-05937-CRB
PLTF / DEFT Exhibit No. 105
Date Admitted: ____
By: ____
Lashanda Scott, Deputy Clerk




Confidential

MUSK-PAMPENA-0240126

Bill

**From:** Stacey Conti <sconti@twitter.com>
**Sent:** Friday, May 13, 2022 1:09:41 AM
**To:** Fox, Bill [IBD] <Bill.Fox@ny.ibd.email.gs.com>
**Subject:** New Model

Will ship to Box shortly. LMK if you are good to go

--

Stacey Fix Conti | M&A Integration | Twitter, Inc.
1355 Market Street, Suite 900, San Francisco, CA 94103
sconti@twitter.com - 415-361-9144 - @Stacey_Conti

---

This e-mail may contain information that is confidential, privileged or otherwise protected from disclosure. If you are not an intended recipient of this e-mail, do not duplicate or redistribute it by any means. Please delete it and any attachments and notify the sender that you have received it in error. Unintended recipients are prohibited from taking action on the basis of information in this e-mail.
E-mail messages may contain computer viruses or other defects, may not be accurately replicated on other systems, or may be intercepted, deleted or interfered with without the knowledge of the sender or the intended recipient. If you are not comfortable with the risks associated with e-mail messages, you may decide not to use e-mail to communicate with Goldman Sachs.
Goldman Sachs reserves the right, to the extent and under circumstances permitted by applicable law, to retain, monitor and intercept e-mail messages to and from its systems. See the http://www.gs.com/disclaimer/afg/ for important information regarding this message and your reliance on information contained in it.
Interest Rate Benchmark Transition Risk Disclosure: LIBOR and several other benchmark interest rates will likely soon stop being published and be replaced by alternative rates, or will be subject to substantial reform. Please refer to the Interest Rate Benchmark Transition Notice for more details.

---

Your Personal Data: We may collect and process information about you that may be subject to data protection laws. For more information about how we use and disclose your personal data, how we protect your information, our legal basis to use your information, your rights and who you can contact, please refer to: www.gs.com/privacy-notices




Confidential
MUSK-PAMPENA-0240127

**Elon Musk** @elonmusk · May 13

Twitter deal temporarily on hold pending details supporting calculation that spam/fake accounts do indeed represent less than 5% of users



reuters.com

Twitter estimates spam, fake accounts comprise less than 5% of users -...

Twitter Incestimated in a filing on Monday that false or spam accounts represented fewer than 5% of its monetizable daily active users during ...

26K 40K 236.2K

**Elon Musk**

@elonmusk

To find out, my team will do a random sample of 100 followers of @twitter.

I invite others to repeat the same process and see what they discover …

6:47 PM · May 13, 2022 · Twitter for iPhone

**10.4K** Retweets **2,604** Quote Tweets **125.9K** Likes

**ER-2708**

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
Case Number: 3:22-CV-05937-CRB
PLTF / DEFT Exhibit No. **114**
Date Admitted: __________
By: __________
Lashanda Scott, Deputy Clerk

E. Musk - VOL. II
05.19.25
**Exhibit 168**
Quyen N. Do



**Elon Musk**
@elonmusk

Replying to @PPathole

Exactly. I have yet to see *any* analysis that has fake/spam/duplicates at <5%.

2:23 AM · May 15, 2022 · Twitter for iPhone

**433** Retweets **24** Quote Tweets **6,098** Likes



**Zack** @BLKMDL3 · May 15
Guarantee is 25%+

8 19 541



**Elon Musk**
@elonmusk

Replying to @BLKMDL3 and @PPathole

There is some chance it might be over 90% of daily active users, which is the metric that matters to advertisers.

Very odd that the most popular tweets of all time were only liked by ~2% of daily active users.

2:39 AM · May 15, 2022 · Twitter for iPhone

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
Case Number: 3:22-CV-05937-CRB
PLTF / DEFT Exhibit No. 118
Date Admitted:
By:
Lashanda Scott, Deputy Clerk

ER-2709

Jane Rose Reporting
**Swan Ex. 12**
09/12/22

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
Case Number: 3:22-CV-05937-CRB
PLTF / DEFT Exhibit No. 119
Date Admitted:
By:
Lashanda Scott, Deputy Clerk

Parag Agrawal @parage

Let's talk about spam. And let's do so with the benefit of data, facts, and context...

9:26 AM · May 16, 2022

2K 2.9K 16K 1.4K

Post your reply Reply

Parag Agrawal @paraga · May 16, 2022

First, let me state the obvious: spam harms the experience for real people on Twitter, and therefore can harm our business. As such, we are strongly incentivized to detect and remove as much spam as we possibly can, every single day. Anyone who suggests otherwise is just wrong.

307 394 3.5K

Parag Agrawal @paraga · May 16, 2022

Next, spam isn't just 'binary' (human / not human). The most advanced spam campaigns use combinations of coordinated humans + automation. They also compromise real accounts, and then use them to advance their campaign. So – they are sophisticated and hard to catch.

133 328 3K

Parag Agrawal @paraga · May 16, 2022

Some final context: fighting spam is incredibly *dynamic*. The adversaries, their goals, and tactics evolve constantly – often in response to our work! You can't build a set of rules to detect spam today, and hope they will still work tomorrow. They will not.

79 272 2.8K

Parag Agrawal @paraga · May 16, 2022

We suspend over half a million spam accounts every day, usually before any of you even see them on Twitter. We also lock millions of accounts each week that we suspect may be spam – if they can't pass human verification challenges (captchas, phone verification, etc).

271 602 3.4K

Parag Agrawal @paraga · May 16, 2022

The hard challenge is that many accounts which look fake superficially – are actually real people. And some of the spam accounts which are actually the most dangerous – and cause the most harm to our users – can look totally legitimate on the surface.

140 383 2.9K

Parag Agrawal @paraga · May 16, 2022

Our team updates our systems and rules constantly to remove as much spam as possible, without inadvertently suspending real people or adding unnecessary friction for real people when they use Twitter: none of us want to solve a captcha every time we use Twitter.

97 193 2.2K

Parag Agrawal @paraga · May 16, 2022

Now, we know we aren't perfect at catching spam. And so this is why, after all the spam removal I talked about above, we know some still slips through. We measure this internally. And every quarter, we have estimated that <5% of reported mDAU for the quarter are spam accounts.

92 200 1.9K

Parag Agrawal @paraga · May 16, 2022

Now, we know we aren't perfect at catching spam. And so this is why, after all the spam removal I talked about above, we know some still slips through. We measure this internally. And every quarter, we have estimated that <5% of reported mDAU for the quarter are spam accounts.

92 200 1.9K

Parag Agrawal @paraga · May 16, 2022

Our estimate is based on multiple human reviews (in replicate) of thousands of accounts, that are sampled at random, consistently over time, from *accounts we count as mDAUs*. We do this every quarter, and we have been doing this for many years.

63 181 1.9K

Parag Agrawal @paraga · May 16, 2022

Each human review is based on Twitter rules that define spam and platform manipulation, and uses both public and private data (eg, IP address, phone number, geolocation, client/browser signatures, what the account does when it's active…) to make a determination on each account.

223 278 2.9K

Parag Agrawal @paraga · May 16, 2022

The use of private data is particularly important to avoid misclassifying users who are actually real. FirstnameBunchOfNumbers with no profile pic and odd tweets might seem like a bot or spam to you, but behind the scenes we often see multiple indicators that it's a real person.

157 335 2.2K

Parag Agrawal @paraga · May 16, 2022

Our actual internal estimates for the last four quarters were all well under 5% – based on the methodology outlined above. The error margins on our estimates give us confidence in our public statements each quarter.

142 194 1.8K

Parag Agrawal @paraga · May 16, 2022

Unfortunately, we don't believe that this specific estimation can be performed externally, given the critical need to use both public and private information (which we can't share). Externally, it's not even possible to know which accounts are counted as mDAUs on any given day.

964 524 3.4K

Parag Agrawal @paraga · May 16, 2022

There are LOTS of details that are very important underneath this high-level description. We shared an overview of the estimation process with Elon a week ago and look forward to continuing the conversation with him, and all of you.

309 199 1.9K

Parag Agrawal @paraga · May 16, 2022

For those of you who want to learn more in the meantime:

blog.twitter.com/en_us/topics/c…

blog.twitter.com/content/blog-t…

blog.x.com

Bot or not? The facts about platform manipulation or

Going back a few years, there's been a lot of discussion of "bots" online. Over time, however, it'…

569 392 2.1K

E. Musk - VOL. II
05.19.25
**Exhibit 171**
Quyen N. Do



**Elon Musk**
@elonmusk

20% fake/spam accounts, while 4 times what Twitter claims, could be *much* higher.

My offer was based on Twitter's SEC filings being accurate.

Yesterday, Twitter's CEO publicly refused to show proof of <5%.

This deal cannot move forward until he does.

12:32 AM · May 17, 2022

110.3K Reply Share

Read 9.3K replies



UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
Case Number: 3:22-CV-05937-CRB
PLTF / DEFT Exhibit No. 130
Date Admitted: ____
By: ____
Lashanda Scott, Deputy Clerk

E. Musk - VOL. II
05.19.25
**Exhibit 173**
Quyen N. Do

Message

**From:** Anton.Mayr@morganstanley.com [Anton.Mayr@morganstanley.com]
**Sent:** 5/17/2022 5:16:51 PM
**To:** Steve.Weiner@morganstanley.com; Stacey Conti [sconti@twitter.com]; DeCenzo, Brian [IBD] [/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=451ab92f71b746948f3d022d30858e0b-bdecenzo]; Silverstein, Stefani T [IBD] [/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=b714325e1e6c4862927e97a6faa29213-Silverstein]; Creamer, Tim JJ. [IBD] [/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=fb026884cbb1426e9870923c272d9480-Creamer, Ti]; Fox, Bill [IBD] [/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=19bb846aad0946dcaef2b511ff09a18b-Fox, Bill []; Villarreal, Nico [IBD] [/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=86d5f6f284074827b1b9af9863693113-vilnic]; Lamb, Charlsea [IBD] [/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=dd68095cd6e0415087d8d960fd8b6ab3-lambcha]; McKenna, Alex J [IBD] [/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=849f39ef196345b2975193a9a969a30c-mcalej]; OSullivan, Hannah S [IBD] [/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=f2a762fbbe644dfd8219746ead40d2ed-osulha]; noah.wintroub@jpmorgan.com; michael.millman@jpmorgan.com; eric.menell@jpmorgan.com; david.m.gruen@jpmorgan.com; sherry.y.fang@jpmorgan.com; sonya.huang@jpmorgan.com; marco.j.caggiano@jpmorgan.com; jack.levendoski@jpmorgan.com; matthew.chisick@jpmorgan.com; liam.li@jpmorgan.com; david.freedman@jpmorgan.com; kyle.w.wolkwitz@jpmorgan.com; Kate.Claassen@MorganStanley.com; Kyle.Corcoran@morganstanley.com; Alan.Lee@morganstanley.com; Julian.Mettmann@morganstanley.com; Melissa.MacPherson@morganstanley.com; Michelle.Lu@morganstanley.com
**CC:** Ned Segal [nedsegal@twitter.com]; Parag Agrawal [paraga@twitter.com]; Sean Edgett [sedgett@twitter.com]; Kevin Cope [kcope@twitter.com]; Evan White [ewhite@twitter.com]; Jonathan Chen [jonathanchen@twitter.com]; Julianna Hayes [jhayes@twitter.com]; Robert Kaiden [rkaiden@twitter.com]; Manish Chabria [mani@twitter.com]; John Buchta [jbuchta@twitter.com]; Olivia Salfiti [osalfiti@twitter.com]
**Subject:** RE: CONFIDENTIAL: Project Tundra Data Room
**Attachments:** Tundra - Diligence Tracker (5.17.2022).xlsx

EXHIBIT
PENGAD 800-631-6989
Silverstein
38
9/21/22

Stacey,

Thank you for the additional responses.

We've updated the tracker (attached) which also includes additional requests.

---

**From:** Weiner, Steve (IBD) <Steve.Weiner@morganstanley.com>
**Sent:** Monday, May 16, 2022 10:58 PM
**To:** Stacey Conti <sconti@twitter.com>; brian.decenzo@gs.com; Silverstein, Stefani T <stefani.silverstein@gs.com>; tim.creamer@gs.com; Fox, Bill <bill.fox@gs.com>; Villarreal, Nico <nico.villarreal@gs.com>; Lamb, Charlsea <charlsea.lamb@gs.com>; Alex McKenna <alex.mckenna@gs.com>; hannah.osullivan@gs.com; noah.wintroub@jpmorgan.com; michael.millman@jpmorgan.com; eric.menell@jpmorgan.com; david.m.gruen@jpmorgan.com; sherry.y.fang@jpmorgan.com; sonya.huang@jpmorgan.com; marco.j.caggiano@jpmorgan.com; jack.levendoski@jpmorgan.com; matthew.chisick@jpmorgan.com; liam.li@jpmorgan.com; david.freedman@jpmorgan.com; kyle.w.wolkwitz@jpmorgan.com; Claassen, Kate (IBD) <Kate.Claassen@MorganStanley.com>; Corcoran, Kyle (IBD) <Kyle.Corcoran@morganstanley.com>; Mayr, Anton J (IBD) <Anton.Mayr@morganstanley.com>; Lee, Alan (IBD) <Alan.Lee@morganstanley.com>; Mettmann, Julian (IBD) <Julian.Mettmann@morganstanley.com>; MacPherson, Melissa (IBD) <Melissa.MacPherson@morganstanley.com>; Lu,

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
Case Number: 3:22-CV-05937-CRB
PLTF / DEFT Exhibit No. 131
Date Admitted:
By:
Lashanda Scott, Deputy Clerk


MUSK-PAMPENA-0689620

Michelle J (IBD) <Michelle.Lu@morganstanley.com>; Tay, Daniel (GCM) <Daniel.Tay@morganstanley.com>; Zhang, Chris (GCM) <Chris.Zhang2@morganstanley.com>; LiuHuang, Ching (GCM) <Ching.LiuHuang@morganstanley.com>; Sanderson, Brian (GCM) <Brian.Sanderson@morganstanley.com>; Doherty, Andrew (GCM) <Andrew.Doherty@morganstanley.com>
**Cc:** Ned Segal <nedsegal@twitter.com>; Parag Agrawal <paraga@twitter.com>; Sean Edgett <sedgett@twitter.com>; Kevin Cope <kcope@twitter.com>; Evan White <ewhite@twitter.com>; Jonathan Chen <jonathanchen@twitter.com>; Julianna Hayes <jhayes@twitter.com>; Robert Kaiden <rkaiden@twitter.com>; Manish Chabria <mani@twitter.com>; John Buchta <jbuchta@twitter.com>; Olivia Salfiti <osalfiti@twitter.com>
**Subject:** Re: CONFIDENTIAL: Project Tundra Data Room

Thank you Stacey. Could you also upload the bond hedge and warrant documents related to the convertible notes? We'll add that to our tracker as well.

Best,
Steve

---

**From:** Stacey Conti <sconti@twitter.com>
**Sent:** Monday, May 16, 2022 8:55:23 PM
**To:** brian.decenzo@gs.com <brian.decenzo@gs.com>; Silverstein, Stefani T <stefani.silverstein@gs.com>; tim.creamer@gs.com <tim.creamer@gs.com>; Fox, Bill <bill.fox@gs.com>; Villarreal, Nico <nico.villarreal@gs.com>; Lamb, Charlsea <charlsea.lamb@gs.com>; Alex McKenna <alex.mckenna@gs.com>; hannah.osullivan@gs.com <hannah.osullivan@gs.com>; noah.wintroub@jpmorgan.com <noah.wintroub@jpmorgan.com>; michael.millman@jpmorgan.com <michael.millman@jpmorgan.com>; eric.menell@jpmorgan.com <eric.menell@jpmorgan.com>; david.m.gruen@jpmorgan.com <david.m.gruen@jpmorgan.com>; sherry.y.fang@jpmorgan.com <sherry.y.fang@jpmorgan.com>; sonya.huang@jpmorgan.com <sonya.huang@jpmorgan.com>; marco.j.caggiano@jpmorgan.com <marco.j.caggiano@jpmorgan.com>; jack.levendoski@jpmorgan.com <jack.levendoski@jpmorgan.com>; matthew.chisick@jpmorgan.com <matthew.chisick@jpmorgan.com>; liam.li@jpmorgan.com <liam.li@jpmorgan.com>; david.freedman@jpmorgan.com <david.freedman@jpmorgan.com>; kyle.w.wolkwitz@jpmorgan.com <kyle.w.wolkwitz@jpmorgan.com>; Claassen, Kate (IBD) <Kate.Claassen@MorganStanley.com>; Corcoran, Kyle (IBD) <Kyle.Corcoran@morganstanley.com>; Mayr, Anton J (IBD) <Anton.Mayr@morganstanley.com>; Weiner, Steve (IBD) <Steve.Weiner@morganstanley.com>; Lee, Alan (IBD) <Alan.Lee@morganstanley.com>; Mettmann, Julian (IBD) <Julian.Mettmann@morganstanley.com>; MacPherson, Melissa (IBD) <Melissa.MacPherson@morganstanley.com>; Lu, Michelle J (IBD) <Michelle.Lu@morganstanley.com>; Tay, Daniel (GCM) <Daniel.Tay@morganstanley.com>; Zhang, Chris (GCM) <Chris.Zhang2@morganstanley.com>; LiuHuang, Ching (GCM) <Ching.LiuHuang@morganstanley.com>; Sanderson, Brian (GCM) <Brian.Sanderson@morganstanley.com>; Doherty, Andrew (GCM) <Andrew.Doherty@morganstanley.com>
**Cc:** Ned Segal <nedsegal@twitter.com>; Parag Agrawal <paraga@twitter.com>; Sean Edgett <sedgett@twitter.com>; Kevin Cope <kcope@twitter.com>; Evan White <ewhite@twitter.com>; Jonathan Chen <jonathanchen@twitter.com>; Julianna Hayes <jhayes@twitter.com>; Robert Kaiden <rkaiden@twitter.com>; Manish Chabria <mani@twitter.com>; John Buchta <jbuchta@twitter.com>; Olivia Salfiti <osalfiti@twitter.com>
**Subject:** Re: CONFIDENTIAL: Project Tundra Data Room

Team,

Please find Box data room links for the following:

Box Data Room Link: 8.1.03.2 User Metrics- pdf
Box Data Room Link: 8.1.03.2 User Metrics - xls

Please reach out if you have any questions.

Thank you

Twitter Team

On Mon, May 16, 2022 at 12:47 PM Stacey Conti <sconti@twitter.com> wrote:

Team,

For convenience, all Supplemental requests will be in 8.0 Supplemental Asks Folder. We will add documents when the become available. Please find Box Data Room links for the following:

Box Data Room Link 8.3.08.2 Financial Model - pdf
Box Data Room Link 8.3.08.2 Financial Model - xls

Please reach out if you have any questions or have further supplemental requests - they are indexed here in Box folder.

Thank you.

Twitter Team

On Thu, May 12, 2022 at 11:16 PM Stacey Conti <sconti@twitter.com> wrote:

Hi team,

Due to the late night additions, we wanted to highlight that we have added the four documents to the data room.

Please find Box Data Room Links for the following:

1.03.1 Supplemental Key Audience Metrics
3.08.1 Supplemental Financial Model
3.03.1 Top Commercial Partnerships
3.05 Revenue By User - No Ads/Low Ads Analysis

Please reach out if you have any questions or have further supplemental requests.

Thank you.

Twitter Team

On Thu, May 12, 2022 at 9:03 AM Stacey Conti <sconti@twitter.com> wrote:

Team,

Access is now open to EXTERNAL: Project Tundra Data Room.

The data room is hosted in Box. Please look out for an email from me providing access.

Few notes:

1. Not all documents have been provided yet. We prioritized the highest priority items, especially those that will aid in the closing of the transaction, and we will continue to populate the data room over time. Many of the items related to "run the business" will come later or be addressed through our deep dive discussions.
2. There are two items that we expect today or tomorrow. The 80/20 Advertising/Subscription analysis and the Top 50 Partner list.

3. Please filter any supplemental requests to me at sconti@twitter.com.

We are confirmed for a Principal's Deep Dive on Friday 8:30 - 10:30 AM PT to answer any questions that you may have on the information provided.

Thank you

Twitter Team

--
Stacey Fix Conti | M&A Integration | Twitter, Inc.
1355 Market Street, Suite 900, San Francisco, CA 94103
sconti@twitter.com - 415-361-9144 - @Stacey_Conti

--
Stacey Fix Conti | M&A Integration | Twitter, Inc.
1355 Market Street, Suite 900, San Francisco, CA 94103
sconti@twitter.com - 415-361-9144 - @Stacey_Conti

--
Stacey Fix Conti | M&A Integration | Twitter, Inc.
1355 Market Street, Suite 900, San Francisco, CA 94103
sconti@twitter.com - 415-361-9144 - @Stacey_Conti

--
Stacey Fix Conti | M&A Integration | Twitter, Inc.
1355 Market Street, Suite 900, San Francisco, CA 94103
sconti@twitter.com - 415-361-9144 - @Stacey_Conti

---

IMPORTANT INFORMATION: This information has been prepared solely for information purposes and is not an offer to buy or sell or a solicitation of an offer to buy or sell any security or instrument. This information may be confidential and/or material non-public information and is being distributed solely to the intended recipient hereof. If you have received this communication in error, please destroy all electronic and paper copies and notify the sender immediately. Mistransmission is not intended to waive confidentiality or privilege. Morgan Stanley reserves the right, to the extent permitted under applicable law, to monitor electronic communications. No representation or warranty can be given with respect to the accuracy or completeness of the information, or with respect to the terms of any future offer of transactions conforming to the terms hereof. We do not undertake to update this information. Morgan Stanley and its affiliates disclaim any and all liability relating to this information, including without limitation, any express or implied representations or warranties for statements contained in, or omissions from, this information. Morgan

Stanley does not give investment, tax, accounting and legal or regulatory advice, and prospective investors should consult with their professional advisors. This communication is not a product of Morgan Stanley's Research Department. It is directed only to those persons who are eligible counterparties or professional clients. This communication is not intended to be provided to and may not be used by any person or entity in any jurisdiction where the provision or use thereof would be contrary to applicable laws, rules, or regulations and is not intended to be and must not be acted on or relied upon by retail clients (as defined in the FCA Handbook). This message is subject to the Morgan Stanley general disclaimers available at the following link http://www.morganstanley.com/disclaimers If you cannot access this link, please notify us by reply message and we will send the contents to you. By messaging with Morgan Stanley you acknowledge that you have read, understand and consent (where applicable) to the foregoing and the Morgan Stanley general disclaimers. You may have certain rights regarding the information that Morgan Stanley collects about you. Please see our Privacy Pledge http://www.morganstanley.com/privacy-pledge for more information about your rights.


MUSK-PAMPENA-0689624

DOCUMENT PRODUCED IN NATIVE FORMAT


MUSK-PAMPENA-0689625

| | A | C | D | E | F | H | I |
|---|---|---|---|---|---|---|---|
| 1 | | | | | | | |
| 2 | | 9/20/2022 16:14 | | | | | |
| 3 | | | | | | | |
| 4 | | **Request Index #** | **Item Description** | **Item Type** | **Date Requested** | **Priority** | **VDR Index #** |
| 5 | | **1.0** | **Business / Users** | | | | |
| 6 | | 1.01 | How many users are verified and what is the verification process? How many verified users are in each category that you identify (e.g. types of public figures, corporations, governments and agencies, NGOs, non-profit organizations) | Discussion Topic | 5/6/2022 | High | |
| 7 | | 1.02 | How do you estimate that fewer than 5% of mDAU are false or spam accounts? | Discussion Topic | 5/6/2022 | High | |
| 8 | | 1.03 | User database containing key metrics including, but not limited to, number of users, number of verified users, number of monthly active users, number of handles, etc. | Info Request | 5/9/2022 | High | |
| 9 | | 1.04 | How many accounts did Twitter suspend in each of the past 72 months that had been registered on the platform for at least thirty days? | Info Request | 5/17/2022 | High | |
| 10 | | 1.05 | How many accounts did Twitter suspend in each of the past 72 months that had been counted in MAU, DAU or mDAU in any previous 10-Q? (Please include accounts that could have been counted if a statistical method were employed for calculating MAUs, DAUs or mDAUs.) | Info Request | 5/17/2022 | High | |
| 11 | | 1.06 | How many ads were rendered in each of the past three years to accounts that were later suspended for any reason? | Info Request | 5/17/2022 | High | |
| 12 | | | DATA REQUEST - Please provide the complete log of the compliance firehose suspend action action for the past 72 months with each user id (snowflake in their terminology) joined to their activity. | | | | |
| 13 | | | a.) For Each row, provide counts of the following events for each of the time periods proximate to suspension action: L15, L30, L90 and L360 (Last 15, Last 30, etc) | | | | |
| 14 | | | * Login from desktop | | | | |
| 15 | | | * Login from mobile | | | | |
| 16 | | | * Unique mobile devices | | | | |
| 17 | | | * Unique Desktop clients. | | | | |
| 18 | | | * Tweet | | | | |
| 19 | | | * Replies | | | | |
| 20 | | | * Favoriting | | | | |
| 21 | | | * DM | | | | |
| 22 | | | * Video view | | | | |
| 23 | | | * Video view to end | | | | |
| 24 | | | * Ads rendered | | | | |
| 25 | | 1.07 | * Ads engaged with | Info Request | 5/17/2022 | High | |
| 26 | | | * API connection events from third party service (including TweetDeck) | | | | |
| 27 | | | * API actions from key owned by account. | | | | |
| 28 | | | b.) For each row provide the following | | | | |
| 29 | | | * Number of times account was reported by other users | | | | |
| 30 | | | * If account's suspension was contested. | | | | |
| 31 | | | * If reactivated, date of reactivation. | | | | |
| 32 | | | * If reactivated and re-suspended, date of final suspension. | | | | |
| 33 | | | c.) For each row provide the following: | | | | |
| 34 | | | * Account creation date | | | | |
| 35 | | | * Number of unique countries account IP address was resolved from. | | | | |
| 36 | | | * Country of account as determined by Twitter. | | | | |
| 37 | | | d.) For each row provide | | | | |
| 38 | | | * The reason the account was suspended (please reference policy that was in effect at the time.) | | | | |
| 39 | | | * If human review was involved in the suspension. | | | | |
| 40 | | 1.08 | What is the total amount of money Twitter refunded to advertisers or enterprise data consumers (eg. PowerTrack) in each of the past three years for rendering to inauthentic accounts? Please send us all advertising agreements. | Info Request | 5/17/2022 | High | |
| 41 | | 1.09 | Please provide the number of new accounts that were created in each of the past 72 months, broken down by region and country. | Info Request | 5/17/2022 | High | |
| 42 | | 1.10 | Access to Firehose product for 100% of tweets, likes and engagements. (See https://developer.twitter.com/en/docs/twitter-api/enterprise). The same for the historical endpoints | Info Request | 5/17/2022 | High | |

| | J | K | L | M |
|---|---|---|---|---|
| 1 | | | | |
| 2 | | | | |
| 3 | | Tango | Principal | |
| 4 | Status | Commentary | Commentary | |
| 5 | | | | |
| 6 | Open | | Please provide record of applications and resulting verfied users | |
| 7 | Open | | Please provide commentary with detail across entire process | |
| 8 | Open | | Please provide bridge from quarterly signup/reactivations to quarterly mMAU onboarding/returning states of engagement. | |
| 9 | Open | | | |
| 10 | Open | | | |
| 11 | Open | | | |
| 12 | Open | | | |
| 13 | | | | |
| 14 | | | | |
| 15 | | | | |
| 16 | | | | |
| 17 | | | | |
| 18 | | | | |
| 19 | | | | |
| 20 | | | | |
| 21 | | | | |
| 22 | | | | |
| 23 | | | | |
| 24 | | | | |
| 25 | | | | |
| 26 | | | | |
| 27 | | | | |
| 28 | | | | |
| 29 | | | | |
| 30 | | | | |
| 31 | | | | |
| 32 | | | | |
| 33 | | | | |
| 34 | | | | |
| 35 | | | | |
| 36 | | | | |
| 37 | | | | |
| 38 | | | | |
| 39 | | | | |
| 40 | Open | | | |
| 41 | Open | | | |
| 42 | Open | | | |

| | A | C | D | E | F | H | I |
|---|---|---|---|---|---|---|---|
| 43 | | **2.0** | **Technology / Product** | | | | |
| 44 | | 2.01 | How would you assess your "tech debt"? What are the top three software initiatives and what is the cost of each? | Discussion Topic | 5/6/2022 | Medium | |
| 45 | | 2.02 | How does content moderation function? What is the cost and # of employees/contractors? | Discussion Topic | 5/6/2022 | Medium | |
| 46 | | 2.03 | How are updates to the home feed algorithm made? What is the cost and # of employees/contractors? | Discussion Topic | 5/6/2022 | Medium | |
| 47 | | 2.04 | What are the top three product initiatives and what is the cost of each? | Discussion Topic | 5/6/2022 | Medium | |
| 48 | | 2.05 | What is your strategy for datacenters vs cloud and what are the costs of each? | Discussion Topic | 5/6/2022 | Medium | |
| 49 | | **3.0** | **Finance / Accounting** | | | | |
| 50 | | 3.01 | How do you forecast the path from 29% 2021 EBITDA to your Analyst Day target of 40-45% excluding TAC | Discussion Topic | 5/6/2022 | High | |
| 51 | | 3.02 | Cash forecast for 2023<br>a. Forecast changes in net working capital<br>b. Lease/capex commitments<br>c. Please confirm cash in cash balances are not restricted outside of those reported in other assets | Info Request | 5/6/2022 | High | |
| 52 | | 3.03 | Cost of revenue breakout by component and details on TAC<br>a. How many partners have these revenue sharing agreements? What is the revenue share for a typical contract?<br>b. Are these contracts cancellable? | Info Request | 5/9/2022 | High | |
| 53 | | 3.04 | Detailed breakout of planned capex for 2022 and 2023 identifying all key projects split between growth and maintenance | Info Request | 5/9/2022 | High | |
| 54 | | 3.05 | Distribution of users / ad revenue per user (following up on discussion of 80/20 dynamic) – aka % revenue by user decile | Info Request | 5/9/2022 | High | |
| 55 | | 3.06 | Distribution of advertisers / revenue per advertiser – aka % revenue of top 10, 20, 50 advertisers | Info Request | 5/9/2022 | High | |
| 56 | | 3.07 | Engagement and cost per engagement, US and international (the absolute numbers underneath the growth reported) | Info Request | 5/9/2022 | High | |
| 57 | | 3.08 | Monthly 2022 Cash / Cash flow forecast | Info Request | 5/12/2022 | High | |
| 58 | | 3.09 | Please confirm that outstanding debt balance is going to be substantially the same at closing (next 1-6 months) | Info Request | 5/12/2022 | High | |
| 59 | | 3.10 | Please describe identified vs. anticipated savings and break savings into opex category | Info Request | 5/17/2022 | High | |
| 60 | | **4.0** | **Capitalization and Structure** | | | | |
| 61 | | 4.01 | RSU vesting schedule<br>a. What is the impact of change in control on executive and key employee RSUs?<br>b. What happened in Q1 to grow the RSU count so significantly? | Info Request | 5/6/2022 | High | |
| 62 | | 4.02 | All documentation related to the outstanding convertible notes (including bond hedge and warrant confirmations, any side letters etc.)? | Info Request | 5/9/2022 | High | |
| 63 | | 4.03 | Detailed schedule of all equity awards (e.g., RSAs, PSUs, RSUs and Options) split between vested and unvested. For unvested awards, please provide detailed vesting schedule. For options, please include strike price. | Info Request | 5/9/2022 | High | |
| 64 | | **5.0** | **Commercial / Go-to-Market** | | | | |
| 65 | | 5.01 | How is sales and marketing organized and what is the cost and # of employees/contractors in this category? | Discussion Topic | 5/6/2022 | Medium | |
| 66 | | **6.0** | **HR / Employees** | | | | |
| 67 | | 6.01 | How do you assess employee performance? | Discussion Topic | 5/6/2022 | High | |
| 68 | | 6.02 | Headcount by COR / R&D / S&M / G&A function / location / average cost per employee (including benefits) and contractors | Info Request | 5/6/2022 | High | |


MUSK-PAMPENA-0689628

| | J | K | L | M |
|---|---|---|---|---|
| 43 | | | | |
| 44 | Open | | | |
| 45 | Open | | | |
| 46 | Open | | | |
| 47 | Open | | | |
| 48 | Partial | | Please detail datacenter and cloud compute split and interchangability | |
| 49 | | | | |
| 50 | Open | | Please provide backup used for public statements of 40-45% long term margin | |
| 51 | Open | | | |
| 52 | Partial | | Need to understand terms of contracts, also require what has already been identified as an expense saving since data is as of the end of 2021 | |
| 53 | Open | | Please provide details / raw data, we have the filings | |
| 54 | Closed | | | |
| 55 | Closed | | | |
| 56 | Open | | Please provide absolute data behind the public disclosure of growth rates | |
| 57 | Open | | | |
| 58 | Open | | | |
| 59 | Open | | | |
| 60 | | | | |
| 61 | Partial | | For each employee with potential CoC payments / single or double trigger, please provide a detailed schedule of potential maximum payments (equity or non-equity) to them in a change of control | |
| 62 | Closed | | | |
| 63 | Partial | | Please also provide basic shares outstanding as of 5/11/22. Please also confirm if you expect any substantial new equity award grants until closing (next 1-6 months), need fully detailed backup with names and employee IDs (no aggregation) to cross reference across files and to understand vesting | |
| 64 | | | | |
| 65 | Open | | | |
| 66 | | | | |
| 67 | Open | | Please provide details on employee performance and not the process itself, need distribution of employee performance by band and number | |
| 68 | Partial | | Please provide detailed employee census (need at least employee IDs) with title, department, location, salary, recent performance data, and RSUs. Please don't aggregate data | |

| | A | C | D | E | F | H | I |
|---|---|---|---|---|---|---|---|
| 69 | | **7.0** | **Material Contracts and Agreements** | | | | |
| 70 | | 7.01 | All contracts where the Company has obligations to make payments to third party vendors | Info Request | 5/6/2022 | High | |
| 71 | | 7.02 | All documentation related to outstanding debt (including documentation, lender presentation, RAP) | Info Request | 5/6/2022 | High | |
| 72 | | | | | | | |
| 73 | | | | | | | |
| 74 | | Open | 23 | 70% | | | |
| 75 | | Partial | 6 | 18% | | | |
| 76 | | Closed | 4 | 12% | | | |
| 77 | | | | | | | |
| 78 | | **Total** | **33** | **100%** | | | |


MUSK-PAMPENA-0689630