# No. 26-4928

IN THE

# United States Court of Appeals

FOR THE NINTH CIRCUIT

GIUSEPPE PAMPENA, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED; STEVE GARRETT; NANCY PRICE; JOHN GARRETT; BRIAN BELGRAVE; TWITTER INVESTOR GROUP,

*Plaintiffs-Appellees*,

v.

ELON MUSK,

*Defendant-Appellant*.

*On Appeal From The United States District Court*
*For The Northern District Of California*
*Honorable Charles R. Breyer*
*No. 3:22-cv-05937-CRB*

# OPENING BRIEF OF DEFENDANT-APPELLANT

Michael T. Lifrak
Stephen A. Broome
Alex Bergjans
QUINN EMANUEL URQUHART & SULLIVAN, LLP
865 S. Figueroa St., 10th Floor
Los Angeles, CA 90017
(213) 443-3000

Alex Spiro
Ellyde R. Thompson
Jesse A. Bernstein
Marielle P. Greenblatt
Chelsea Sincox
QUINN EMANUEL URQUHART & SULLIVAN, LLP
295 Fifth Avenue
New York, NY 10016
(212) 849-7100

*Counsel for Defendant-Appellant*

November 23, 2026

# TABLE OF CONTENTS

**Page**


PRELIMINARY STATEMENT ....1

STATEMENT OF JURISDICTION....3

STATEMENT OF THE QUESTIONS PRESENTED....4

STATEMENT OF THE CASE....4

A. The Class Action Lawsuit Against Musk Related To His Purchase Of Twitter....4

B. The Trial....6

1. Musk's Offers To Purchase Twitter And The Merger Agreement....7

2. Musk's Requests For Spam Information From Twitter....8

3. The May 13 Tweet And Twitter's Response....10

4. The Dispute Between Musk And Twitter And Resulting Litigation That Delays Closing....13

5. Plaintiffs' Assertion Of Class-Wide Damages....16

C. The Jury Verdict And Post-Trial Motions....17

SUMMARY OF ARGUMENT....19

STANDARD OF REVIEW....22

ARGUMENT....22

I. THIS COURT SHOULD ENTER JUDGMENT FOR MUSK....22

A. Plaintiffs Failed To Prove Material Falsity As A Matter Of Law....23

B. Plaintiffs Failed To Prove Damages As A Matter Of Law....28

1. Plaintiffs' Expert Admitted He Did Not Conduct The Damages Analysis The Law Requires....28

2. Plaintiffs Failed To Disaggregate Damages....31

C. Plaintiffs Failed To Prove Loss Causation As A Matter Of Law....33

1. No Evidence Established That The Alleged Misrepresentation Proximately Caused Plaintiffs' Losses....34

2. Plaintiffs Failed To Prove A Corrective Disclosure....37

D. Plaintiffs Failed To Prove Scienter As A Matter Of Law....................40

E. Plaintiffs Lacked Legally Sufficient Evidence To Establish Reliance For The Class Period ..........................................................43

II. IN THE ALTERNATIVE, THE COURT SHOULD GRANT A NEW TRIAL BASED ON INSTRUCTIONAL AND EVIDENTIARY ERRORS ..........................................................................................45

A. The District Court's Instructional Errors Require A New Trial .........46

1. The District Court Improperly Instructed The Jury On The Element Of Loss Causation .............................................46

2. The District Court Improperly Instructed The Jury On The Scienter Requirement.......................................................49

B. The District Court Abused Its Discretion In Admitting Evidence Of Musk's Alleged Non-Compliance With SEC Disclosure Requirements For His Pre-Class Period Stock Purchases ..........................................................................50

III. THE COURT ABUSED ITS DISCRETION IN CERTIFYING THE CLASS AND WRONGFULLY DEPRIVED MUSK OF AN OPPORTUNITY TO CHALLENGE INDIVIDUAL RELIANCE ..............53

A. The District Court Legally Erred In Certifying The Class .................53

B. The District Court Erred By Prohibiting Musk From Challenging Individual Reliance Post-Trial.......................................58

CONCLUSION ..........................................................................................60

REQUEST FOR ORAL ARGUMENT ...................................................................61

STATEMENT OF RELATED CASES ..................................................................62

CERTIFICATE OF COMPLIANCE.....................................................................63

CERTIFICATE OF SERVICE ..........................................................................64

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds*,
568 U.S. 455 (2013) ..... 26

*Basic Inc. v. Levinson*,
485 U.S. 224 (1988) ..... 6, 23, 43, 44, 45

*In re Bofl Holding Inc. Sec. Litig.*,
977 F.3d 781 (9th Cir. 2020) ..... 36, 37

*Bricklayers & Trowel Trades Int'l Pension Fund v. Credit Suisse Sec. (USA) LLC*, 752 F.3d 82 (1st Cir. 2014) ..... 35, 36

*Brody v. Transitional Hosps. Corp.*,
280 F.3d 997 (9th Cir. 2002) ..... 25, 26

*Caballero v. City of Concord*,
956 F.2d 204 (9th Cir. 1992) ..... 50

*In re Cadence Design Systems, Inc. Sec. Litig.*,
654 F. Supp. 2d 1037 (N.D. Cal. 2009) ..... 49

*Caremark Inc. v. Coram Healthcare Corp.*,
113 F.3d 645 (7th Cir. 1997) ..... 28

*Chuman v. Wright*,
76 F.3d 292 (9th Cir. 1996) ..... 46

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605 (9th Cir. 2017) ..... 41, 49

*Comet Techs. USA, Inc. v. XP Power, LLC*,
181 F.4th 988 (9th Cir. 2026) ..... 48

*In re Convergent Techs. Sec. Litig.*,
948 F.2d 507 (9th Cir. 1991) ..... 23

*Crawford v. City of Bakersfield*,
944 F.3d 1070 (9th Cir. 2019) ..... 52

*Dang v. Cross*,
422 F.3d 800 (9th Cir. 2005) ....................................................46

*In re Daou Sys., Inc.*,
411 F.3d 1006 (9th Cir. 2005) ....................................................41, 43

*Defeo v. IonQ, Inc.*,
134 F.4th 153 (4th Cir. 2025) ....................................................36

*Doyle v. Chrysler Grp., LLC*,
663 F. App'x 576 (9th Cir. 2016) ....................................................28

*Dura Pharms., Inc. v. Broudo*,
544 U.S. 336 (2005)........................................ 29, 30, 34, 37, 38, 39, 40, 48

*Duran v. City of Maywood*,
221 F.3d 1127 (9th Cir. 2000) ....................................................52

*Engquist v. Oregon Dep't of Agric.*,
478 F.3d 985 (9th Cir. 2007), *aff'd sub nom. Engquist v. Oregon Dep't of Agric.*, 553 U.S. 591 (2008) ....................................................50

*Ernst & Ernst v. Hochfelder*,
425 U.S. 185 (1976)....................................................40

*Gantt v. City of Los Angeles*,
717 F.3d 702 (9th Cir. 2013) ....................................................22

*Glickenhaus & Co. v. Household Int'l, Inc.*,
787 F.3d 408 (7th Cir. 2015) ........................................34, 38, 39, 47, 58

*Guangyi Xu v. ChinaCache Int'l Holdings Ltd.*,
2017 WL 114401 (C.D. Cal. Jan. 9, 2017)....................................................23

*Halliburton Co. v. Erica P. John Fund, Inc.*,
573 U.S. 258 (2014)........................................ 37, 43, 53, 56, 58, 59

*Hsu. v. Puma Biotechnology, Inc.*,
2019 WL 11637311 (C.D. Cal. May 22, 2019)....................................................59

*Hsu v. Puma Biotechnology, Inc.*,
2021 WL 2644100 (C.D. Cal. June 11, 2021)....................................................59

*In re Imperial Credit Indus., Inc. Sec. Litig.*,
252 F. Supp. 2d 1005 (C.D. Cal. 2003), *aff'd sub nom. Mortensen v. Snavely*, 145 F. App'x 218 (9th Cir. 2005)....................................................31

*In re Intuitive Surg. Sec. Litig.*,
2016 WL 7425926 (N.D. Cal. Dec. 22, 2016)..................................................56

*In re IPO Sec. Litig.*,
471 F.3d 24 (2d Cir. 2006) ..........................................................................54, 57

*Irving Firemen's Relief & Ret. Fund v. Uber Techs., Inc.*,
998 F.3d 397 (9th Cir. 2021) ..............................................................................34

*In re Kosmos Energy Ltd. Sec. Litig.*,
299 F.R.D. 133 (N.D. Tex. 2014) ......................................................................56

*Lakeside-Scott v. Multnomah Cnty.*,
556 F.3d 797 (9th Cir. 2009) ..............................................................................37

*Lawrence E. Jaffe Pension Plan v. Household Int'l, Inc.*,
2005 WL 3801463 (N.D. Ill. Apr. 18, 2005)...............................................58, 59

*Lloyd v. CVB Fin. Corp.*,
811 F.3d 1200 (9th Cir. 2016) ......................................................................39, 47

*Loos v. Immersion Corp.*,
762 F.3d 880 (9th Cir. 2014) ..............................................................................33

*Lytle v. Nutramax Lab'ys, Inc.*,
114 F.4th 1011 (9th Cir. 2024) ...........................................................................22

*Matrixx Initiatives, Inc. v. Siracusano*,
563 U.S. 27 (2011)........................................................................................41, 50

*In re McKesson HBOC, Inc. Sec. Litig.*,
126 F. Supp. 2d 1248 (N.D. Cal. 2000)........................................................26, 27

*Medtronic, Inc. v. White*,
526 F.3d 487 (9th Cir. 2008) ..............................................................................46

*Merrick v. Paul Revere Life Ins. Co.*,
500 F.3d 1007 (9th Cir. 2007) ......................................................................51, 52

*In re Methionine Antitrust Litig.*,
2003 WL 22048232 (N.D. Cal. Aug. 26, 2003) ....................54

*Metzler Inv. GMBH v. Corinthian Colleges, Inc.*,
540 F.3d 1049 (9th Cir. 2008) ....................37

*Miller v. Asensio & Co.*,
364 F.3d 223 (4th Cir. 2004) ....................32

*Miller v. Thane Int'l, Inc.*,
615 F.3d 1095 (9th Cir. 2010) ....................54

*Mineworkers' Pension Scheme v. First Solar Inc.*,
881 F.3d 750 (9th Cir. 2018) ....................20, 35, 47

*In re Nektar Therapeutics Sec. Litig.*,
34 F.4th 828 (9th Cir. 2022) ....................34, 47

*Nguyen v. Nissan N. Am., Inc.*,
932 F.3d 811 (9th Cir. 2019) ....................30, 31

*Nuveen Mun. High Income Opportunity Fund v. City of Alameda*,
730 F.3d 1111 (9th Cir. 2013) ....................34, 35, 46, 48

*In re NVIDIA Corp. Sec. Litig.*,
768 F.3d 1046 (9th Cir. 2014) ....................22

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
575 U.S. 175 (2015)....................26, 41

*Peralta v. Dillard*,
744 F.3d 1076 (9th Cir. 2014) ....................22

*Ravens v. Iftikar*,
174 F.R.D. 651 (N.D. Cal. 1997)....................45

*In re REMEC Inc. Sec. Litig.*,
702 F. Supp. 2d 1202 (S.D. Cal. 2010)....................31, 32, 37

*In re Rigel Pharms., Inc. Sec. Litig.*,
697 F.3d 869 (9th Cir. 2012) ....................42

*Rookaird v. BNSF Ry. Co.*,
908 F.3d 451 (9th Cir. 2018) .......................................................................22

*Semerenko v. Cendant Corp.*,
223 F.3d 165 (3d Cir. 2000) .........................................................................45

*Sneed v. Talphera, Inc.*,
147 F.4th 1123 (9th Cir. 2025) ..............................................................23, 25

*Strategic Diversity, Inc. v. Alchemix Corp.*,
666 F.3d 1197 (9th Cir. 2012) .....................................................................28

*Swinton v. Potomac Corp.*,
270 F.3d 794 (9th Cir. 2001) ...............................................................49, 50

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
551 U.S. 308 (2007)..............................................................................43, 49

*TSC Indus., Inc. v. Northway, Inc.*,
426 U.S. 438 (1976)........................................................................23, 27, 28

*United States v. McCourt*,
925 F.2d 1229 (9th Cir. 1991) .....................................................................52

*Van v. LLR, Inc.*,
61 F.4th 1053 (9th Cir. 2023) ......................................................................53

*In re Verifone Sec. Litig.*,
784 F. Supp. 1471 (N.D. Cal. 1992), *aff'd sub nom. In re VeriFone Sec. Litig.*, 11 F.3d 865 (9th Cir. 1993) .................................................56

*Vignola v. Fat Brands, Inc.*,
2020 WL 1934976 (C.D. Cal. Mar. 13, 2020)..............................................56

*In re Vivendi Universal, S.A. Sec. Litig.*,
765 F. Supp. 2d 512 (S.D.N.Y. 2011), *aff'd sub nom. In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223 (2d Cir. 2016)...............................................58

*In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223 (2d Cir. 2016).......................29, 30, 48

*Waggoner v. Barclays PLC*,
875 F.3d 79 (2d Cir. 2017) .................................................................31, 32, 33

*Wang v. Chinese Daily News, Inc.*,
737 F.3d 538 (9th Cir. 2013) ....................22

*Westways World Travel, Inc. v. AMR Corp.*,
265 F. App'x 472 (9th Cir. 2008) ....................54

*Wilkerson v. Wheeler*,
772 F.3d 834 (9th Cir. 2014) ....................22

*Zimmerman v. Bell*,
800 F.2d 386 (4th Cir. 1986) ....................57

**Statutes And Regulations**

15 U.S.C. § 78j ....................5, 30

17 C.F.R. § 240-10b-5 ....................5, 6, 17, 19, 22, 53

28 U.S.C. § 1291 ....................3

28 U.S.C. § 1331 ....................3

**Other Authorities**

Fed. R. Civ. P. 23 ....................53, 54, 56, 57

Fed. R. Evid. 105 ....................51

## PRELIMINARY STATEMENT

This appeal concerns whether a single tweet on May 13, 2022 caused billions of dollars of damages to a class of investors encompassing all sellers of Twitter's stock from May 13 to October 4, 2022. In April 2022, Appellant Elon R. Musk entered into an agreement to purchase Twitter. On May 13, 2022, he posted on Twitter: "Twitter deal temporarily on hold pending details supporting calculation that spam/fake accounts do indeed represent less than 5% of users." Musk ultimately terminated the parties' agreement on July 8, and only announced he would proceed with the transaction on October 4, 2022, months after Twitter sued Musk to enforce the agreement. A jury found Musk liable for securities fraud based on the May 13 tweet, awarding damages for each day of the nearly five-month class period. The district court (Breyer, J.) denied Musk's post-trial motions, and entered judgment in favor of the plaintiff class. This Court should reverse.

*First*, judgment should be entered for Musk because no reasonable juror could conclude that the plaintiff class ("Plaintiffs") proved that the alleged misrepresentation in the May 13 tweet satisfied the elements of securities fraud. Plaintiffs sought to hold Musk liable based simply on the fact that Twitter's stock price dropped after Musk posted his tweet. But nothing linked that stock price drop to any material falsity. In fact, the evidence at trial confirmed the gist of Musk's tweet—he was waiting for information from Twitter to confirm the accuracy of

Twitter's prior SEC disclosures on the amount of spam on the platform and did not plan to close the transaction until he received it. As to damages, Plaintiffs' expert admitted that he never conducted the legally required analysis. Plaintiffs' expert likewise testified that the stock may have experienced the same price drop if Musk had tweeted what Plaintiffs asserted was the true state of affairs, meaning that Plaintiffs offered no legally sufficient evidence of loss causation. Even if they had, Musk's termination of the parties' agreement on July 8 severed any causal link between Musk's May 13 tweet and investors who sold after July 8. As to scienter, Twitter's executives shared Musk's view that he was entitled to the information he requested. And, given that the market had available to it the facts that would permit an assessment of the alleged falsity of Musk's tweet, Plaintiffs could not possibly have proven fraud-on-the-market reliance for the entirety of the nearly five-month class period.

*Second*, and in the alternative, the Court should grant a new trial based on instructional and evidentiary errors. The district court refused to instruct the jury on proximate causation and corrective disclosure, impermissibly allowing the jury to find liability based only on the fact that the stock price dropped after the tweet. And the district court wrongly permitted the jury to find scienter based on the standard for *pleading* scienter, thereby relieving Plaintiffs of their burden to *prove* scienter by a preponderance of the evidence. Separately, the court improperly allowed evidence

and argument implying that Musk had committed wrongdoing related to his pre-class period purchases of Twitter stock—an issue irrelevant to the claims at issue and highly prejudicial. The district court then exacerbated the prejudice by declining Musk's repeated requests for a limiting instruction.

*Finally*, the district court legally erred in certifying the class in the first place because it ignored binding Supreme Court precedent requiring courts to assess at class certification whether individual issues of reliance predominate. Here, evidence strongly suggested that many investors did not rely on the alleged misrepresentation in the tweet in deciding to sell stock, with the district court even refusing to name one investor as a class representative due to his lack of reliance. At a minimum, even if the Court grants no other relief, it should vacate the Court's premature class-wide judgment because Musk retains the right to challenge the individual reliance of absent class members post-verdict.

## STATEMENT OF JURISDICTION

The district court had jurisdiction under 28 U.S.C. § 1331. This Court has jurisdiction pursuant to 28 U.S.C. § 1291. The trial court entered a class-wide judgment on April 3, 2026. 1-ER-41-42. On July 31, 2026, Musk filed a timely notice of appeal. 12-ER-3049-3051.

## STATEMENT OF THE QUESTIONS PRESENTED

1. Whether the Court should enter judgment for Musk because no reasonable juror could conclude that the May 13 tweet was materially false or made with scienter, or that Plaintiffs' provided legally sufficient proof of economic loss, loss causation, or reliance.

2. Whether the Court should vacate the judgment and remand for a new trial because the district court's jury instructions relieved Plaintiffs of their burden to prove loss causation and scienter or because the district court admitted inherently prejudicial testimony that tainted the jury's verdict.

3. Whether the Court should vacate the class-wide judgment and grant judgment for Musk because individual issues of reliance precluded class certification or, in the alternative, vacate and remand the premature class-wide judgment to permit Musk to challenge the individual reliance of absent class members post-verdict.

## STATEMENT OF THE CASE

### A. The Class Action Lawsuit Against Musk Related To His Purchase Of Twitter

The underlying action arises out of Musk's agreement to purchase Twitter. On April 25, 2022, Twitter and Musk executed a Merger Agreement for Musk's purchase of Twitter. 3-ER-331-333. After Musk terminated the Agreement, and

Twitter sued to force Musk to close, Musk announced on October 4, 2022 that he would close the transaction at its original price of $54.20 per share. 3-ER-341.

The underlying action was filed on October 10, 2022 as a putative class action for securities fraud on behalf of Twitter shareholders who sold Twitter stock from May 13, 2022 to October 4, 2022 (the "Class Period."). Dkt. 1. Plaintiffs asserted one cause of action for violation of Section 10(b) of the Exchange Act and Rule 10b-5. 3-ER-384-85. Plaintiffs identified a series of purportedly false statements, including Musk's May 13 tweet. 3-ER-360-371. Plaintiffs alleged that Musk's statements were false because the Merger "was not, in fact, 'temporarily on hold,'" Twitter had not agreed to put the Merger on hold, and Musk did not have the right to refuse to close if he was unsatisfied with "due diligence" on whether "spam/fake accounts do indeed represent less than 5% of users" because he had "waived due diligence." 3-ER-337, 350, 360. Plaintiffs pled a "corrective disclosure" theory of loss causation alleging that "[t]he truth…emerged," 3-ER-378, on October 4, 2022 when Musk announced that he would close the merger on its original terms, damaging class members who sold at artificially depressed prices from May 13 until October 4, 3-ER-382; 3-ER-378-381.

The Court denied Musk's motion to dismiss in part, concluding that Plaintiffs stated a claim as to the May 13 tweet because "Defendant waived due diligence as a condition to the Merger Agreement…and thus that Twitter had no obligation under

the Merger Agreement to provide information supporting its bot calculations." 2-ER-307. Two other statements—a May 16 podcast statement and May 17 tweet—also survived the motion to dismiss. 2-ER-309-12.

Plaintiffs moved for class certification, invoking the rebuttable fraud-on-the-market presumption of class wide reliance of *Basic Inc. v. Levinson*, 485 U.S. 224 (1988). 2-ER-277. Musk opposed, including on the ground that individual issues of reliance predominated because public information allowed investors to assess the accuracy of his statements. 2-ER-206. The district court granted Plaintiffs' motion. 1-ER-70; 1-ER-75. Musk petitioned this Court for permission to appeal, which the Court denied. *Pampena v. Musk*, Case No. 23-6249, ECF 7.

### B. The Trial

After denying cross-motions for summary judgment in a two-sentence order, Dkt. 302, the district court permitted Plaintiffs to pursue four Rule 10b-5 claims at trial: (a) three misrepresentation claims based on May 13, 16, and 17 statements, and (b) a so-called fraudulent scheme liability claim encompassing "everything that happened between" the start and end of the Class Period. 3-ER-414; *see* 2-ER-91-94.

Before trial, juror questionnaires revealed that the venire held overwhelmingly negative opinions of Musk to an extent the district court had "never seen before." 3-ER-415. Nonetheless, the court declined to excuse all potential

jurors "who had a negative view of Mr. Musk" because "that would be 80 percent" of the venire. 3-ER-425.

1. <u>Musk's Offers To Purchase Twitter And The Merger Agreement</u>

In mid-April 2022, Musk publicly offered to acquire Twitter at $54.20 per share—a price his Morgan Stanley advisors proposed. 7-ER-1787-1788; 3-ER-351. Following his bankers' advice, Musk updated his offer and public SEC filing a week later to remove financing and pre-signing business due diligence conditions. 10-ER-2637-39. The parties signed, and publicly filed with the SEC, the Merger Agreement on April 25, 2022. 10-ER-2643-2685; 9-ER-2143. The Merger Agreement contained a representation and warranty from Twitter that its SEC filings were accurate in all material respects. 10-ER-2655.

Since 2016, Twitter had stated in its SEC filings that spam or false accounts made up "less than 5%" of its monetizable user base, known as "mDAU," or monetizable daily active users. 11-ER-2789-2798; 10-ER-2616, 2624. According to Twitter's filings, mDAU was a "key metric" and "the best way to measure our success" and "the size of our audience and engagement." 10-ER-2625. Musk's bankers believed that mDAU—Twitter's real users who could view advertisements—was the "primary driver of value." 7-ER-1783-1784.

Musk was skeptical of Twitter's "less than 5 percent" disclosure based on his experience as a prolific Twitter user, but recognized "perhaps [his] experience was

different from the average user[]." 5-ER-1127. His advisors vouched for the reliability of a public company's SEC filings, which they had "never doubted." 7-ER-1780-1781; 8-ER-1974; 7-ER-1787. Musk executed the Merger Agreement with the understanding that he could refuse to close if Twitter's representations and warranties were materially inaccurate and that he had "information rights" that "gave [him] the right to verify…the SEC statement about the 5 percent." 5-ER-1127; *see also* 10-ER-2655, 2662-2663, 2674.

Section 6.4 of the Merger Agreement, the "Access to Information" covenant, gave Musk the right to obtain from Twitter information "for any reasonable business purpose related to the consummation of the" Merger. 10-ER-2662-2663. This covenant controlled "what the buyer is allowed to ask for and what the seller has to give" post-signing and pre-closing. 4-ER-752. As Plaintiffs' mergers and acquisitions expert testified, a "violation of the access to information covenant could potentially warrant a buyer's termination." 4-ER-765-766; 10-ER-2674 (section 7.2(a)).

2. Musk's Requests For Spam Information From Twitter

The parties intended to close the Merger quickly, targeting June 2022. 8-ER-1954-55. Twitter and Musk's team promptly began the post-signing information exchange and integration process. 8-ER-1955; 4-ER-681, 758-760, 765-766; 11-ER-2799-2800. Ahead of a meeting with Twitter, 7-ER-1791-1792, Musk's bankers

sent their Twitter counterparts—an investment banking team from Goldman Sachs—an agenda that included a request to discuss "How [] you estimate that fewer than 5% of mDAU are false or spam accounts," 10-ER-2686.

In that meeting on May 6, Twitter CFO Ned Segal answered that Twitter "sample[s] 100 mDAU every day" of 200 million mDAU on Twitter, which human reviewers would label following an internal process for determining "how many of the users are spam accounts/fake accounts." 6-ER-1414-1415, 1335; 8-ER-1958-59; 11-ER-2833-2834; 10-ER-2689-2693. Musk and his team testified that they were surprised—in some cases "stunned"—by Segal's answer. 7-ER-1802-1803. Some thought Segal misspoke, 7-ER-1802-1803, and others formed the impression that it was "the sort of process that you would design if you didn't really want to know the answer," 8-ER-1959.

In response, Musk and his team requested more information on the spam audit process and methodology, along with the underlying data. 6-ER-1423. Twitter agreed, both in that meeting and follow-up communications, to provide it. 10-ER-2694; 8-ER-1960; 7-ER-1795-1806. At no time before Musk's May 13 tweet did Twitter indicate that Musk was not contractually entitled to this information. 7-ER-1806.

As he left the May 6 meeting, Musk expressed to his team serious concerns about Twitter's spam disclosures, indicating he would not close the Merger without

additional information. 8-ER-1960-1961; 4-ER-837-840, 858-859; *see* 5-ER-1135-1136. On May 8, Musk texted one of his bankers that "[a]n extremely fundamental due diligence item is understanding exactly how Twitter confirms that 95% of their daily active users are both real people and not double-counted" and explained "[i]f that number is more like 50% or lower…then they have been fundamentally misrepresenting the value of Twitter to advertisers and investors." 11-ER-2801. He made clear "this deal moves forward if it passes due diligence, but obviously not if there are massive gaping issues." 11-ER-2801. Musk made a similar statement to his biographer on May 6 or 7, explaining that "[t]here's no way to move forward after what [Twitter] said." 6-ER-1239.

On May 12, 2022, Twitter provided its further response with four sentences that simply repeated what Twitter had told Musk on May 6. 11-ER-2802-2807; 6-ER-1434-1437. The Twitter staff responsible for exchanging information with Musk's team knew that "[Musk] will hate this." 6-ER-1293-1294. Upon receiving this response, one of Musk's lead bankers believed that Twitter was "no longer going to provide us the information that they had agreed to provide us," and recommended canceling a May 13 meeting with Twitter. 8-ER-1970-73.

3. The May 13 Tweet And Twitter's Response

Aware that Twitter had failed to provide the information it had promised, *see* 4-ER-839, Musk posted a tweet on May 13 stating: "Twitter deal temporarily on

hold pending details supporting calculation that spam/fake accounts do indeed represent less than 5% of users," 11-ER-2808. By that point, it had been a week since Twitter had agreed to provide additional information on the calculation of its spam estimate. 11-ER-2835-2842; 10-ER-2694; 8-ER-1960; 7-ER-1795-1806; 6-ER-1436.

Musk testified that his tweet meant that "the deal would not close until [he] receiv[ed] the information" he requested. 5-ER-1034. One of Musk's bankers described the May 13 tweet as a "public airing" of Musk's private May 8 texts to him. 11-ER-2884. Another of Musk's bankers testified that Musk was "waiting on details about spam and fake accounts" and that Twitter's failure to provide those details was "an obstacle to getting the deal done." 8-ER-1971-1972, 1850.

At trial, Twitter's CEO Parag Agrawal did not disagree. Agrawal testified that he "didn't believe that" Musk "wasn't entitled to" details supporting Twitter's spam calculation. 7-ER-1565. He "thought [Twitter] would productively share additional information." 7-ER-1565. But, in a May 16 Twitter post, Agrawal indicated that Twitter had not yet provided Musk with the necessary information. 10-ER-2710-2711; 7-ER-1546.

While waiting for additional information, Musk publicly stated on May 16 that a price renegotiation was "not out of the question," Mot. to Transmit Video, Ex. 1 at 24:03-24:20, and, on May 21, responded "absolutely" to a tweet stating that "[i]f

25% of the users are bots then the Twitter acquisition deal should cost 25% less," 11-ER-2832. Class Representative Brian Belgrave testified that he interpreted "temporarily on hold" to mean "the deal is in jeopardy" with a risk that it was "not going to go through." 3-ER-546-547. In fact, Belgrave *bought* Twitter stock after the May 13 tweet, believing Musk was attempting to renegotiate a lower price. *See* 3-ER-539-540. Belgrave testified that he already knew that Musk had "waived presigning due diligence" after reading it in the *Wall Street Journal*, 3-ER-543, and thus believed Musk had no right to the information referenced in the tweet, 3-ER-550.

Plaintiffs' damages and loss causation expert David Tabak testified that "[e]veryone knew that Twitter did not agree to put the deal on hold" and that the market also knew that Musk "can't put it on hold." 9-ER-2174-2175. According to Tabak, the market learned this information from Twitter "at the same time as the May 13th news" of Musk's tweet, which the market "folded in" to Twitter's stock price on the same day. 6-ER-1366; 9-ER-2174-2175.

Days later, when Musk announced that his team continued to work toward closing the deal by adjusting the financing, Twitter's stock price had no statistically significant movement. 9-ER-2175-2176; 11-ER-2772. Tabak admitted that this lack of any price reaction to news that Musk had *not* stopped working on the merger indicated that the market already knew that information or that it did not consider it

material. 9-ER-2173-2174. And Tabak testified that the market already knew what rights Musk had under the Merger Agreement and had incorporated that information into Twitter's stock price before the May 13 tweet. 9-ER-2143.

#### 4. The Dispute Between Musk And Twitter And Resulting Litigation That Delays Closing

Behind the scenes, Musk's team continued to push Twitter for information supporting its spam disclosures. 10-ER-2706-2707. In public, Musk invited others to "figur[e] out what the real numbers or real percentage of real users is." 5-ER-1142-1144; *see also* 10-ER-2708, 2709; 11-ER-2784.[1] On May 15, a report based on public information concluded that "19.42%, nearly four times Twitter's Q4 2021 estimate, fit a conservative definition of fake or spam accounts." 11-ER-2814-2830, 2809-2813; 5-ER-1089-1090. The report—along with Segal's inadequate explanation and the lack of further information from Twitter—caused the Morgan Stanley team to begin to doubt the accuracy of Twitter's SEC disclosures. *See* 8-ER-1975-1977.

On a podcast on May 16, 2022, the hosts asked Musk to give his estimate of the real percentage of spam on Twitter. Mot. to Transmit Video, Ex. 1 at 3:07-3:13. He responded, "I think it's some number that is probably at least four or five times

---

[1] The district court permitted Plaintiffs to argue that these tweets were "deceptive and dishonest," 3-ER-475-76, even though none was pleaded as false or misleading in the operative complaint, *see* 3-ER-360-362.

that number." *Id.* at 3:14-3:20. That same day, Twitter CEO Agrawal posted a series of tweets containing more information about Twitter's process than had been disclosed to Musk's team to that point. *Compare* 10-ER-2710-2711 *with* 11-ER-2802-2807. Agrawal stated that Twitter's calculation could not be "performed externally." 10-ER-2711. In response to Agrawal's posts, Musk posted a May 17 tweet reiterating that "20% fake/spam accounts, while 4 times what Twitter claims, could be *much* higher. My offer was based on Twitter's SEC filings being accurate. Yesterday, Twitter's CEO publicly refused to show proof of <5%. This deal cannot move forward until he does." 10-ER-2712. Twitter's stock price did not have any statistically significant response to Musk's May 17 tweet. 8-ER-2107.

The dispute over Musk's right to information persisted. 11-ER-2739-2742, 2757-2764. At trial, Twitter's witnesses conceded that the company refused to provide Musk with the private data necessary to audit Twitter's spam estimation process and verify the accuracy of its SEC disclosures. 6-ER-1434.

Musk provided Twitter notice of breach on June 6, 2022 and sent a termination notice on July 8, 2022, publicly filed with the SEC the same day. 11-ER-2757-2764; 8-ER-2110. The letter summarized the parties' interactions since May 2022 and provided the basis for Musk's termination—including Twitter's material breach of the Access to Information covenant in failing to provide "[i]nformation related to

Twitter's process for auditing the inclusion of spam and fake accounts in mDAU." 11-ER-2759.

Twitter's stock fell more than ten percent on the news of Musk's termination. 11-ER-2773. Twitter sued Musk in Delaware state court to force him to close. 7-ER-1401. Musk countersued. 4-ER-665-666. Eventually, the Delaware court ordered Twitter to produce the information it previously had withheld from Musk—the "very private information" "necessary for [] Musk to verify that 5 percent number." 6-ER-1434. Segal admitted that, prior to Twitter's compliance with that court order, "there was no way that [Musk] could verify that 5 percent number." 6-ER-1434.[2]

After the Delaware court ordered Twitter to provide this information, Musk agreed to purchase Twitter pursuant to the Merger Agreement. 5-ER-1097. On October 4, 2022, Musk announced his intention to close the transaction. 11-ER-2765-2770. The announcement made no reference to Musk's May 13 tweet, whether

[2] The district court otherwise precluded Musk from offering evidence about his defense in the Delaware litigation or the spam analyses his team conducted. 5-ER-1218-1220; 6-ER-1228-1235; 8-ER-1915-1926, 1938-1941; 9-ER-2234-2248, 2254-2257. The district court did so even though Plaintiffs argued that Musk "didn't even put up a defense" in the Delaware action, described Musk's position in the litigation as "gaslighting" and "BS," and faulted Musk for not presenting "a piece of paper" showing that spam on Twitter exceeded 5 percent. 3-ER-484, 586; 10-ER-2481-2482.

the deal was "on hold," or Twitter's spam disclosures. 11-ER-2765-2770. Twitter's stock price increased from $42.54 to $52.00. 11-ER-2771-2774.

5. Plaintiffs' Assertion Of Class-Wide Damages

Plaintiffs sought damages for every class member who sold stock or call options or purchased put options during the Class Period. 1-ER-41. Plaintiffs' expert identified two statistically significant declines in Twitter's stock price that he attributed to Musk's statements: (1) a two-day decline spanning May 13 to May 16, 2022, which he opined Musk's May 13 tweet caused even though Twitter's stock did not move in a statistically significant manner for hours on the afternoon of May 13; and (2) a decline on July 11, 2022, which he opined Musk's July 8 termination letter and alleged fraudulent scheme caused. 8-ER-2109-2110; 9-ER-2153-2154, 2157-2159. Tabak conceded that the May 16 podcast statement and the May 17 tweet did not cause any stock price decline. 9-ER-2146-2147, 2150-2151.

Although Tabak typically uses the "corrective disclosure" method "to test whether an allegedly false statement causes a stock price reaction" by "measur[ing] how the stock reacts when the supposed truth is revealed," he did not use it here. 9-ER-2172-2173. Tabak did "not claim[] that any information"—including the October 4 announcement—"was corrective of [] Musk's alleged false statement." 9-ER-2173. Instead, he offered a "direct causation" theory of loss causation, based on the mere fact that a statistically significant stock decline followed an alleged

misstatement. 9-ER-2130-2132. Tabak did not opine that the market reacted to any of Plaintiffs' proffered theories of falsity. 9-ER-2130-2131. Rather, Tabak offered an opinion only comparing Twitter's actual stock price with the but-for-price had Musk said nothing. 9-ER-2166-2169. Tabak admitted that investor concerns over "a dispute between [] Musk and Twitter, regardless of the merit, may result in a lower closing price." 9-ER-2172. He did not rule out the fact that the market perceived the tweet—as Belgrave did—to communicate that the deal was "in jeopardy" or that Musk wanted a lower price. 9-ER-2167-2170. He had no opinion on whether Twitter's stock price reaction would have been any different had Musk tweeted that "he was going to renegotiate the price," "Twitter deal in jeopardy" or "Twitter deal temporarily not closing," instead of "temporarily on hold." 9-ER-2167-2170. And he did not analyze whether the stock would have dropped to the same price or even "fallen more" after Musk's July 8 termination if Musk had not tweeted on May 13. 9-ER-2184-2185.

### C. The Jury Verdict And Post-Trial Motions

Following Plaintiffs' closing argument that the trial was "all about a message, and the message is: Are we going to allow people like [the class representatives] and the millions of people in between to not be protected?" 10-ER-2560, the jury deliberated for four days, 12-ER-3109-3111. The jury returned a split verdict, finding Musk liable under Rule 10b-5 for the May 13 tweet and May 17 tweet. 2-

ER-91-94. It adopted Tabak's damages calculations for the entire Class Period. 2-ER-95-101.

The district court entered a class-wide judgment on April 3, 2026. 1-ER-41-42. The district court denied Musk's post-trial motion as to the May 13 tweet, rejecting Musk's arguments that Plaintiffs failed to present sufficient evidence of damages, concluding that silence was synonymous with telling the truth. 1-ER-16-17. As to loss causation, the district court concluded that Tabak's admission that "everyone knew that 'Twitter did not agree to put the deal on hold'" was irrelevant because "Twitter's public statements had nothing to do with Musk and *his* position on the merger." 1-ER-6. The court further held that Plaintiffs did not need a corrective disclosure to prove loss causation in a sellers' class but that Plaintiffs "provided substantial evidence of a corrective disclosure on October 4, 2022." 1-ER-8. And the court concluded that Tabak's admission that he "did not analyze whether Twitter's share price would have fallen to the same level" on July 8 even if he had never tweeted on May 13 "undermine[d] Plaintiffs' position" but did "not mean the jury was without sufficient evidence of loss causation after July 8." 1-ER-8-9.

In rejecting Musk's arguments as to material falsity, the district court failed to undertake the required legal analysis, concluding only that Musk "did not instruct his team or lawyers to stop work on the deal," 1-ER-11, and, separately, that the

information in the tweet was material, 1-ER-12. The court also found sufficient evidence of scienter and fraud-on-the-market reliance. 1-ER-12-16. The court did, however, grant Musk judgment on Plaintiffs' May 17 claim because the jury lacked legally sufficient evidence of loss causation. 1-ER-10.

The court denied Musk's motion for a new trial and separate motion to decertify the class, 1-ER-3, and granted Plaintiffs' claims administration motion, foreclosing Musk from challenging the individual reliance of absent class members, 1-ER-34.

## SUMMARY OF ARGUMENT

This class-wide verdict—covering a nearly five-month class period based on a single tweet for which the market possessed the information necessary to evaluate its accuracy during the Class Period—cannot stand.

I. Judgment should be granted for Musk because Plaintiffs failed to prove any of the necessary elements of their Rule 10b-5(b) claim as a matter of law. The record lacks any legally sufficient evidence that the May 13 tweet was materially false—that the difference between the true state of affairs and the alleged misrepresentation was significant to a reasonable investor. The district court wrongly excused this failure post-trial by failing to apply the correct legal standard. As to damages, the district court correctly instructed the jury to measure damages against the but-for price had the tweet "reflected the true state of affairs," 1-ER-62,

but Plaintiffs' expert only measured against the but-for price had Musk said nothing, 9-ER-2168-2169. And Plaintiffs' damages model improperly charged Musk with losses caused by the market's reaction to the truthful content of the tweet and with general market movement.

Plaintiffs likewise offered no evidence "tracing the loss to the very facts about which the defendant lied," *Mineworkers' Pension Scheme v. First Solar Inc.*, 881 F.3d 750, 753 (9th Cir. 2018), and thus failed to prove loss causation. Indeed, Plaintiffs pled a corrective-disclosure theory, but no evidence showed the October 4 announcement corrected any misstatement from May 13. And Plaintiffs offered nothing to show that any loss after July 8 was caused by the tweet, rather than the Merger's termination.

As to scienter, no evidence showed Musk lacked a sincere belief he was entitled to spam information or that he intended to communicate that all work on the merger stopped. And his conduct contradicted any claim of an intent to deceive.

Finally, Plaintiffs had to establish the fraud-on-the-market presumption applied for the entire Class Period to prove class-wide reliance, but the trial evidence showed that the market knew the "truth" from public sources months before the Class Period ended. Such evidence defeats the presumption, and Plaintiffs presented no evidence of individual reliance at trial.

II. In the alternative, the Court should grant a new trial due to instructional and evidentiary error. The district court refused to instruct the jury on the correct standard for loss causation, improperly permitting the jury to base its verdict on only transaction—not proximate—causation. On scienter, the district court wrongly instructed the jury on the "strong inference" standard used at the pleading stage, relieving Plaintiffs of their burden to prove scienter by a preponderance of the evidence. And the district court abused its discretion in allowing Plaintiffs to present inherently prejudicial argument and evidence implying that Musk committed wrongdoing related to his pre-Class Period purchase of Twitter stock that was irrelevant to the questions before the jury. The district court then compounded the prejudice by rejecting Musk's repeated requests for a limiting instruction.

III. Finally, the district court abused its discretion in certifying the class because individual issues of reliance predominated. The class certification evidence showed that many market participants had sufficient information to assess the accuracy of Musk's tweet during the Class Period. Even if Plaintiffs established the rebuttable fraud-on-the-market presumption, individual issues predominated because reliance would depend on whether each investor was aware of such information. At a minimum, the Court should vacate the class-wide judgment to permit Musk to challenge the individual reliance of investors post-trial, as the Supreme Court has recognized due process requires.

## STANDARD OF REVIEW

This Court "review[s] de novo a district court's denial of a motion for judgment as a matter of law." *Rookaird v. BNSF Ry. Co.*, 908 F.3d 451, 455 (9th Cir. 2018). This Court also "review[s] de novo whether an instruction states the law correctly," *Peralta v. Dillard*, 744 F.3d 1076, 1082 (9th Cir. 2014), requiring vacatur and remand for new trial, "unless the error is more probably than not harmless," *Gantt v. City of Los Angeles*, 717 F.3d 702, 707 (9th Cir. 2013). This Court reviews the decision to certify the class for abuse of discretion, *see Wang v. Chinese Daily News, Inc.*, 737 F.3d 538, 542, 545-46 (9th Cir. 2013), and reviews "the district court's determination of underlying legal questions" de novo, *see Lytle v. Nutramax Lab'ys, Inc.*, 114 F.4th 1011, 1023 (9th Cir. 2024), *cert. denied*, 145 S. Ct. 1308 (2025) (citation omitted). The Court reviews evidentiary errors for an abuse of discretion. *Wilkerson v. Wheeler*, 772 F.3d 834, 838 (9th Cir. 2014).

## ARGUMENT

### I. THIS COURT SHOULD ENTER JUDGMENT FOR MUSK

To prove their Rule 10b-5 claim, Plaintiffs had to prove Musk made, with scienter, a material misrepresentation, upon which Plaintiffs relied, loss causation, and economic loss. *See In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1052 (9th Cir. 2014). Plaintiffs failed to provide legally sufficient evidence on any of these elements, and the failure as to any one requires judgment for Musk.

### A. Plaintiffs Failed To Prove Material Falsity As A Matter Of Law

The Court should grant judgment for Musk because Plaintiffs failed to present legally sufficient evidence of material falsity—that the difference between the actual state of affairs and the misrepresentation in the May 13 tweet was significant to a reasonable investor.

Material falsity looks at whether the allegedly false statement conveyed that the "state of affairs [] differs in a material way from the one that actually exists." *Sneed v. Talphera, Inc.*, 147 F.4th 1123, 1131 (9th Cir. 2025) (citation omitted). A plaintiff must "'demonstrate that a particular statement, when read in light of all the information then available to the market…conveyed a false or misleading impression.'" *Guangyi Xu v. ChinaCache Int'l Holdings Ltd.*, 2017 WL 114401, at *5 (C.D. Cal. Jan. 9, 2017) (omission in original) (quoting *In re Convergent Techs. Sec. Litig.*, 948 F.2d 507, 512 (9th Cir. 1991), *as amended on denial of reh'g* (Dec. 6, 1991)). "[A] plaintiff must show that the statements were *misleading* as to a *material* fact. It is not enough that a statement is false or incomplete, if the misrepresented fact is otherwise insignificant." *Basic*, 485 U.S. at 238. A plaintiff instead must prove that the difference between the actual state of affairs and the alleged misrepresentation would have been significant to a reasonable investor. *See TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976).

At trial, Plaintiffs presented no legally sufficient evidence of material falsity. The May 13 tweet read: "Twitter deal temporarily on hold pending details supporting calculation that spam/fake accounts do indeed represent less than 5% of users." 11-ER-2808. Although Plaintiffs may quibble with the tweet's precise words, the evidence confirmed the gist of it. Both Musk and Twitter agreed that, under the Merger Agreement, Musk had the right to information from Twitter prior to closing. 10-ER-2662-2663; 7-ER-1545-1546, 1564-1565. Exercising those rights, Musk asked for information on how Twitter "estimate[s] that fewer than 5% of mDAU are false or spam accounts"—a reference to Twitter's SEC disclosure that Twitter represented and warranted in the Merger Agreement was materially accurate. 10-ER-2686, 2655. As Plaintiffs' mergers and acquisition expert testified, checking a target company's "representations and warranties…is related to consummation of a merger agreement" and a target company's failure to provide such information "could potentially warrant a buyer's termination." 4-ER-764-766.

After the May 6 meeting, Musk's team asked Twitter for more details about the estimation process, along with the data underlying the calculation, 6-ER-1423, and Twitter agreed to provide it, 10-ER-2694-2695; 8-ER-1960; 7-ER-1795-1806. Musk explained in private text messages in early May—days before his tweet—that the deal could not move forward without verifying this figure. 11-ER-2801. Twitter's further response on May 12 contained no additional details, 11-ER-2802-

2807; 6-ER-1434-1436, even though Twitter's CEO agreed that Musk was entitled to more information—"one of the several items we were working through in order to close the deal." 7-ER-1565. As Musk explained, the tweet communicated that "the deal would not close until [he] receiv[ed] the information," a sentiment consistent with Twitter's CEO's understanding. 7-ER-1563-1565. Without a satisfactory response after weeks of effort, Musk sent notice terminating the Merger Agreement on July 8. 6-ER-1259-1261; 11-ER-2739-2764; 11-ER-2778-2783.

Plaintiffs' expert did not opine that Twitter's stock price would have been any different if the accurate facts underlying the tweet had been disclosed. 9-ER-2167-2170. Nor did he find any statistically significant price reaction when Musk publicly stated on May 16 that a price renegotiation was "not out of the question," when Musk tweeted on May 17 that the deal "cannot move forward," or when Musk "suggested in a series of tweets" on May 21 "that he could be seeking to reduce the price" of the Merger "by up to 25 percent." Mot. to Transmit, Ex. 1 at 24:03-24:20; 3-ER-556-558; 9-ER-2150-2151, 2146; 10-ER-2712. In any event, the Merger Agreement, which set forth Musk's information rights, had been public for weeks. 10-ER-2643-2685; 4-ER-675.

Based on this evidence, no reasonable juror could conclude that Plaintiffs proved that the true "state of affairs [differed] in a material way from the" May 13 tweet. *Sneed*, 147 F.4th at 1131; *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997,

1006 (9th Cir. 2002) ("Often, a statement will not mislead even if it is incomplete or does not include all relevant facts."). Indeed, to the extent a dispute existed as to whether Musk's opinion of his legal rights was accurate, such a statement cannot give rise to securities fraud. *See Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 185-86 (2015) (holding sincerely held legal opinion that "turned out to be wrong" not actionable as securities fraud).

Likewise, while Plaintiffs focused on the accuracy of the specific words "temporarily on hold," their own expert testified that the market already knew or quickly learned that the deal was not literally on hold, 9-ER-2173-2175, and "there was no statistically significant stock reaction to" news that the deal was not technically "on hold," 9-ER-2175-2176. This lack of a statistically significant stock price reaction demonstrates the alleged "on hold" misstatement was immaterial. *See Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds*, 568 U.S. 455, 464 (2013) ("[I]mmaterial misrepresentations and omissions by definition do not affect stock prices in an efficient market." (quotation marks and citation omitted)). Even Belgrave testified that he understood "on hold" to mean that "the deal is in jeopardy" with a risk it was "not going to go through." 3-ER-546-547.

Thus, as a matter of law, Plaintiffs failed to establish that the "correction of the misstated fact" under any theory of material falsity offered at trial "would have been viewed by the reasonable investor as having significantly altered the 'total mix'

of information made available." *In re McKesson HBOC, Inc. Sec. Litig.*, 126 F. Supp. 2d 1248, 1259 (N.D. Cal. 2000) (alteration adopted) (quoting *TSC*, 426 U.S. at 449).[3]

In denying Musk's post-trial motion, the district court misapplied the legal standard for material falsity. 1-ER-11-12. The district court concluded that Musk's May 13 tweet was false because "Musk did not instruct his team or lawyers to stop work on the deal" on or before May 13, 1-ER-11, but no evidence suggested that the market viewed that fact as material. The testimony the district court cited from Musk and Belgrave did not address whether the delta between the impression that Musk's tweet conveyed—that the deal was "in jeopardy," 3-ER-546-547—and the true state of affairs was material. *See In re McKesson*, 126 F. Supp. 2d at 1259. Indeed, in conducting its analysis, the district court misunderstood this Court's decision in *In re Alphabet, Inc. Securities Litigation*, which assessed whether the "market reaction…alleged by the complaint to have occurred after disclosure [of the omitted fact] support[s] the materiality of the misleading omission." 1 F.4th 687, 703 (9th Cir. 2021). The materiality test turns on whether the "*disclosure of the omitted fact*…significantly altered the 'total mix' of information"—not on the initial price

---

[3] In fact, during deliberations, the jury asked a question related to the falsity element, 2-ER-110, and the court declined Musk's request to read to the jury the materiality instruction in answering the question, 2-ER-112.

reaction to the alleged misstatement. *TSC*, 426 U.S. at 449 (emphasis added). The district court conflated a *post-corrective disclosure* stock drop with a *post-statement* stock drop, rendering its determination erroneous as a matter of law.

**B. Plaintiffs Failed To Prove Damages As A Matter Of Law**

Plaintiffs also failed to adduce legally sufficient evidence of damages tied to any materially false statement in the May 13 tweet because Plaintiffs' expert conceded at trial that he did not perform the legally required analysis and, separately, failed to disaggregate damages between the alleged misrepresentation and other factors.

1. Plaintiffs' Expert Admitted He Did Not Conduct The Damages Analysis The Law Requires

To establish damages, a securities fraud plaintiff must prove "the difference between the fair value of what was received and the fair value of what one would have received," *Strategic Diversity, Inc. v. Alchemix Corp.*, 666 F.3d 1197, 1208 (9th Cir. 2012)—that is, "the difference between the price of the stock and its value on the date of the transaction if the full truth had been known," *Caremark Inc. v. Coram Healthcare Corp.*, 113 F.3d 645, 649 n.6 (7th Cir. 1997). "The proposed damages model must measure only the damages that are attributable to the theory of liability." *Doyle v. Chrysler Grp., LLC*, 663 F. App'x 576, 579 (9th Cir. 2016); *see also Comcast*, 569 U.S. at 35 (damages model "must measure only those damages attributable to that theory" and otherwise "cannot possibly establish [] damages").

And because the "proper question" is "not what might have happened had a [defendant] remained silent, but what would have happened if [he] had spoken truthfully," damages must measure the difference between the actual and but-for stock price "if [the defendant] had spoken truthfully." *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 258 (2d Cir. 2016); *see also Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 344-45 (2005).

Here, the district court properly instructed the jury that the measure of damages was the difference between the price at which the stock sold and the price at which it "would have sold had the statement or fraudulent acts *reflected the true state of affairs*." 1-ER-62 (emphasis added). But Plaintiffs never offered any proof that could meet that standard because their expert expressly and unequivocally testified that he did not analyze what Twitter's stock price would have been if Musk's May 13 tweet had reflected the truth. 9-ER-2166-2167. The district court confirmed as much in its own questioning, with Plaintiffs' expert acknowledging it was "fair" to say his analysis was "just comparing if [] Musk had said nothing versus what [] Musk said." 9-ER-2168-2169. And Plaintiffs' expert admitted he was not looking at what would have happened had Musk made a but-for disclosure that was "true and accurate" unless "that but-for disclosure is essentially saying nothing." 9-ER-2168-2169. That analysis is deficient as a matter of law. *See In re Vivendi*, 838 F.3d at 258. Plaintiffs' measure of damages impermissibly "provide[s] investors

with broad insurance against market losses" for any speech, instead of "protect[ing] them against those economic losses that misrepresentations actually cause." *Dura*, 544 U.S. at 346.

In declining to grant judgment for Musk on this ground, the district court deemed Tabak's analysis acceptable because silence would equate to Musk "essentially not presenting that misrepresentation." 1-ER-17-18 (emphasis omitted). The securities laws, however, do not mandate that a market participant remain silent but rather provide that "at the moment the [defendant] chooses to speak, [he] takes upon [him]self the obligation to *speak truthfully*, and it is the breach of *that* obligation which forms the basis for the § 10(b) claim." *In re Vivendi*, 838 F.3d at 258 (emphasis in original).

Calculating damages in the way Plaintiffs did improperly charges Musk for speaking at all. That is particularly true in this case because any news of a dispute between Twitter and Musk likely would cause Twitter's stock to decline. 9-ER-2171-2172. And, as the district court recognized post-trial, the evidence showed that Musk began to have "buyer's remorse" and "second thoughts" about acquiring Twitter before the May 13 tweet. *See* 1-ER-2-3.

As the Supreme Court has emphasized, a "plaintiff's damages case must be consistent with its liability case." *Comcast*, 569 U.S. at 35; *see also Nguyen v. Nissan N. Am., Inc.*, 932 F.3d 811, 817 (9th Cir. 2019). Plaintiffs did not contend

"nothing" had changed with the Merger—they argued Musk was "looking for an excuse to renegotiate." 3-ER-471. The but-for world in which Musk said nothing contradicts Plaintiffs' theory of liability and the district court's own findings.

2. Plaintiffs Failed To Disaggregate Damages

Independently, Plaintiffs failed to adduce legally sufficient evidence of damages because their expert failed to disaggregate damages caused by the allegedly false information in the May 13 tweet from any decline attributable to the disclosure of truthful, company-specific information during the Class Period—including in the May 13 tweet—or other general market factors.

Because a defendant is liable only for damages caused by the alleged misrepresentation, the "proper measure of damages in the securities context [] requires elimination of that portion of the price decline or price difference which is unrelated to the alleged wrong." *In re Imperial Credit Indus., Inc. Sec. Litig.*, 252 F. Supp. 2d 1005, 1014-15 (C.D. Cal. 2003) (citation omitted), *aff'd sub nom. Mortensen v. Snavely*, 145 F. App'x 218 (9th Cir. 2005). To do so, a damages model must "separate the loss caused by" the alleged fraud "from loss caused by the disclosure of other company-specific information," *In re REMEC Inc. Sec. Litig.*, 702 F. Supp. 2d 1202, 1273-74 (S.D. Cal. 2010), and "isolate company–specific changes in stock price from changes resulting from outside factors such as

fluctuations in the stock market generally or the particular industry," *Waggoner v. Barclays PLC*, 875 F.3d 79, 90 (2d Cir. 2017).

Here, Plaintiffs' expert failed to isolate the stock price drop on May 13 and May 16 caused by the alleged fraud from "other contributing forces," *i.e.*, truthful, company-specific information in the tweet, rendering his testimony insufficient to "determin[e] recoverable damages." *Miller v. Asensio & Co.*, 364 F.3d 223, 233 (4th Cir. 2004) (emphasis omitted) (citation omitted). Tabak admitted that the market may have interpreted the May 13 tweet as conveying truthful information that Musk had "heightened concerns about going forward with the deal," and opined that the dispute brewing between Musk and Twitter, "regardless of the merit, may result in a lower closing price." 9-ER-2170-2172. He conceded that he "didn't do anything to isolate the impact" of that truthful information on Twitter's stock and instead attributed the entire drop to the alleged fraud. 9-ER-2171. As a result, his calculations "reveal very little about" the damages caused by the allegedly false information in the tweet "in relation to" its truth. *See REMEC*, 702 F. Supp. 2d at 1274-75 (judgment appropriate where plaintiff's expert failed to consider "other new, negative, company-specific information" in the same statement).[4]

---

[4] While the district court pointed post-trial to Tabak's use of "event studies and a constant percentage measure of deflation," 1-ER-18, that does not excuse this defect. Tabak's model excluded only two events on two specific dates in the nearly five-

Separately, Tabak's model produced per-share damages that rose and fell with the stock market, even though Musk cannot be held responsible for those losses. For example, an investor who sold on May 24 could recover approximately $1 more per share in damages than one who sold on May 13 because the NASDAQ traded lower on May 24. 11-ER-2786; 9-ER-2177. And Plaintiffs' evidence of damages fails to account for investors, like Belgrave, who benefitted from the alleged fraud by buying stock at an artificially deflated price after the May 13 tweet and later sold those same shares at a loss, even though their losses were driven entirely by general market movements or Musk's non-fraudulent termination. 11-ER-2786-2788. Plaintiffs thus failed to account for "factors such as fluctuations in the stock market generally." *Waggoner*, 875 F.3d at 90.

On this record, no reasonable jury could find the economic-loss element met and judgment should be entered for Musk.

### C. Plaintiffs Failed To Prove Loss Causation As A Matter Of Law

Plaintiffs also failed to carry their burden to prove loss causation, which "refers to the causal relationship between a material misrepresentation and the economic loss suffered by an investor." *Loos v. Immersion Corp.*, 762 F.3d 880, 887 (9th Cir. 2014), *as amended* (Sept. 11, 2014).

---

month long class period, 11-ER-2785, and nowhere separated out the true content of the May 13 tweet from the allegedly false element of Musk's statement.

Loss causation asks "whether the defendant's misstatement, as opposed to some other fact, foreseeably caused the plaintiff's loss." *In re Nektar Therapeutics Sec. Litig.*, 34 F.4th 828, 838 (9th Cir. 2022) (quotation omitted). "It's tempting to think that inflation"—or, in this case, deflation—"can be measured by observing what happens to the stock immediately after a false statement is made. But that assumption is often wrong." *Glickenhaus & Co. v. Household Int'l, Inc.*, 787 F.3d 408, 415 (7th Cir. 2015); *see also Irving Firemen's Relief & Ret. Fund v. Uber Techs., Inc.*, 998 F.3d 397, 407 (9th Cir. 2021) (rejecting the idea that "mere [de]flation is enough").

Because Plaintiffs failed to prove "a causal connection between the material misrepresentation and the loss," *Dura*, 544 U.S. 341-42, this Court should reverse and enter judgment for Musk.

1. <u>No Evidence Established That The Alleged Misrepresentation Proximately Caused Plaintiffs' Losses</u>

*First*, Plaintiffs failed to adduce evidence of proximate causation. To establish loss causation, Plaintiffs were required to "prove that the defendant's misrepresentation … proximately caused the plaintiff's economic loss." *Dura*, 544 U.S. at 346; *see also Nuveen Mun. High Income Opportunity Fund v. City of Alameda*, 730 F.3d 1111, 1118 (9th Cir. 2013) (holding loss causation requires "'proximate' or 'legal' cause"). As this Court has explained, plaintiffs must "show a causal connection between the fraud and the loss, by tracing the loss back to the

very facts about which the defendant lied." *Mineworkers' Pension Scheme*, 881 F.3d at 753 (internal quotation marks and citations omitted).

Plaintiffs adduced no evidence at trial tending to show a causal connection between Plaintiffs' loss and the facts about which Musk allegedly lied in the May 13 tweet. Plaintiffs' expert Tabak admitted that he had no opinion linking the price drop to the alleged falsity; just that the price would not have fallen if Musk stayed silent. 9-ER-2168-2170. But the question is whether the market reacted to an affirmative statement from Musk that was untruthful, not whether Musk had made *any* statement to which the market reacted.

The district court's loss causation analysis post-trial only confirmed that Plaintiffs did not prove the element. The district court reasoned that "Tabak explained that Musk's heightened concerns could potentially play a part in the market's interpretation." 1-ER-6. But the district court already had determined that such "heightened concerns" represented the truth—not any fraudulent statement. *See* 1-ER-2-3 (describing Musk's "buyer's remorse"). While the district court pointed to *Nuveen* for the idea that "misrepresentations" need not be "the sole reason for…the decline in" share price, 730 F.3d at 1119 (emphasis omitted) (citation omitted), Plaintiffs neglected to show that the alleged misrepresentation was *any reason at all* for the loss—as opposed to the truth. And the Court ignored that Plaintiffs' decision not to disaggregate "confounding information that entered the

market on the event date," *Bricklayers & Trowel Trades Int'l Pension Fund v. Credit Suisse Sec. (USA) LLC*, 752 F.3d 82, 90 (1st Cir. 2014), meant that Plaintiffs could not carry their "burden of showing that their losses were attributable to the revelation of the fraud and not the myriad other factors that affect a company's stock price," *id.* at 95 (alterations adopted) (internal quotation marks omitted)).

*Second*, Plaintiffs failed to prove that Twitter's stock fell on May 13 because the market was deceived by Musk's allegedly false statement. "The relevant question for loss causation purposes is whether the market reasonably *perceived* [the defendant's] allegations as true and acted upon them accordingly." *In re BofI Holding Inc. Sec. Litig.*, 977 F.3d 781, 792 (9th Cir. 2020) (emphasis in original). But the only evidence at trial established the opposite: that the market knew that Musk did not put the deal on hold, had no right to do so, and had waived due diligence, 3-ER-543, 550, 624-25; 10-ER-2639, as Tabak admitted, *see* 9-ER-2174-2175. This "revelation came *at the same time* as the May 13th news" and was "*folded in* with May 13th and May 16th['s]" stock price. 9-ER-2175 (emphasis added). This testimony forecloses any finding of loss causation because "if investors already know the truth, false statements won't affect the price." *Defeo v. IonQ, Inc.*, 134 F.4th 153, 162 (4th Cir. 2025)) (internal quotation marks omitted).

Indeed, Tabak conceded that public news that Musk continued to work on the deal led to "no statistically significant stock reaction." 9-ER-2175-76. That directly

undermines a showing of loss causation, which requires that "the decline in stock price caused by the revelation of th[e] truth must be significantly significant." *In re REMEC Inc. Sec Litig.*, 702 F. Supp. 2d at 1273-75 (citing *Dura*, 544 U.S. at 342-47, and *Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1063 (9th Cir. 2008)). While the district court disregarded this testimony, stating that, "[t]o the public, it could have been entirely possible that Musk was unilaterally holding up the deal," 1-ER-6, that conclusion rests on speculation. Plaintiffs have to prove what "the market reasonably *perceived*" about the allegedly false statement, and how the market "acted upon" that reasonable perception. *In re Bofl Holding Inc.*, 977 F.3d at 792 (emphasis in original). Plaintiffs presented no evidence that the public—or any investor—held that belief. That the district court resorted to speculation to uphold the verdict proves that judgment for Musk is "appropriate" here. *Lakeside-Scott v. Multnomah Cnty.*, 556 F.3d 797, 803 (9th Cir. 2009) ("JMOL is appropriate when the jury could have relied only on speculation to reach its verdict.").

2. <u>Plaintiffs Failed To Prove A Corrective Disclosure</u>

Additionally, Plaintiffs failed to prove loss causation as a matter of law because they pled, but never proved, a corrective disclosure theory of loss causation.

As a general matter, loss causation may be proven through "corrective disclosures" that "caused the company's stock price to drop and investors to lose money." *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 264 (2014))

("*Halliburton II*"). "The best way to determine the impact of a false statement is to observe what happens when the truth is finally disclosed and use that to work backward, on the assumption that the lie's [negative] effect on the share price is equal to the additive inverse of the truth's [positive] effect." *Glickenhaus*, 787 F.3d at 415.

Plaintiffs' only evidence of a corrective disclosure was the fact that Twitter's stock price increased on October 4, 2022 when Musk announced he would close the deal. 9-ER-2133-2136. Yet Tabak explicitly stated he was "not claiming that any information" corrected Musk's alleged false statement. 9-ER-2173. The district court acknowledged in ruling on Musk's post-trial motions, that "whether or not the disclosure was, in fact, *corrective* was not a part of [Tabak's] opinion." 1-ER-9.

In the absence of proof of a corrective disclosure, Plaintiffs lacked evidence from which a reasonable juror could determine the impact of the allegedly false statement. That is because the initial price drop alone is legally insufficient to establish loss causation because it fails to account for other factors that may have caused the drop. *See Dura*, 544 U.S. at 343. And, despite the district court's insinuation, 1-ER-9, it cannot be inferred from the jury's verdict that the jury implicitly found a corrective disclosure, because the jury was never instructed as to that requirement. *See infra*, at pp. 46-48.

That the district court concluded that Plaintiffs were not required to prove a corrective disclosure because, "in a seller case, loss is realized before a corrective disclosure," 1-ER-8, does not identify any evidence linking the allegedly false statement to the alleged deflation. As the Supreme Court held in *Dura*, "an inflated purchase price will not itself constitute or proximately cause the relevant economic loss." 544 U.S. at 342. The same is true here—a deflated sales price, without more, cannot itself constitute or proximately cause the relevant economic loss. *Id.*; *see also Glickenhaus*, 787 F.3d at 415. Before the truth is revealed, not only can an investor who sells at an artificially deflated price buy stock back at the same artificially deflated price, but also one cannot reliably determine the misstatement's impact on the stock price without measuring whether—and to what extent—the truth affected the price. *See Glickenhaus*, 787 F.3d at 415

3. In Any Event, The July 8 Termination Notice Severed Any Connection Between Claimed Losses And The May 13 Tweet

In any event, Plaintiffs presented no evidence that any investor who sold after July 8 suffered any injury as a result of the alleged misrepresentation on May 13. Thus, at a minimum, judgment should be reversed as to all class members who sold after July 8.

To prove loss causation, a plaintiff "must demonstrate that an economic loss was caused by the defendant's misrepresentations, *rather than some intervening event*." *Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1209 (9th Cir. 2016) (emphasis

added). As the Supreme Court explained, a stock's "lower price" later in a class period "may reflect, not the earlier misrepresentation, but…new industry-specific or firm-specific facts, conditions, or other events, which taken separately or together account for some or all of that lower price." *Dura*, 544 U.S. at 343.

Musk's public termination of the Merger Agreement on July 8 was an intervening event that severed any causal connection between the May 13 tweet and Twitter's price. As of July 8, the deal was no longer "temporarily on hold" (whatever the market perceived that to mean)—it was terminated. Tabak testified that the July 8 termination independently caused Twitter's stock to suffer a statistically significant decline, 8-ER-2109-2110, as "would be expected." 9-ER-2183. Tabak did not analyze whether Twitter's stock price would have fallen to the same price following the July 8 termination *or even lower* had Musk never issued the May 13 tweet. 9-ER-2184-2186. Thus, no evidence exists that anyone who sold after July 8 suffered any loss because of Musk's alleged misrepresentations.

### D. Plaintiffs Failed To Prove Scienter As A Matter Of Law

Nor could any reasonable juror find that Musk acted with scienter.

A plaintiff must establish that the defendant acted with "a mental state embracing intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976). To establish scienter, a plaintiff must prove that a defendant acted with knowledge that the statement was false or, under the current

law of this Circuit, with deliberate recklessness as to whether his statement was true or false. *In re Daou Sys., Inc.*, 411 F.3d 1006, 1015 (9th Cir. 2005), *abrogated on other grounds by Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27 (2011)). *But see infra*, at p. 50-51.

Plaintiffs did not adduce legally sufficient evidence that Musk possessed the requisite mental state. To the extent Plaintiffs argued that the May 13 tweet conveyed any message about Musk's contractual rights, Plaintiffs failed to establish that Musk did not sincerely hold that belief, as required for any statement about one's legal rights. *See City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 621 (9th Cir. 2017) (concluding "good faith but mistaken determination" negates scienter); *see also Omnicare*, 575 U.S. at 185-86. The trial evidence established that Musk believed he had the contractual right to obtain further information from Twitter to verify its spam SEC disclosures. *See supra*, at pp. 8-12. Musk advanced the same interpretation of the contract in subsequent correspondence with Twitter and in terminating the Merger Agreement. *See supra,* at pp.13-16.

To the extent Plaintiffs argued that the May 13 tweet was materially false because work on the Merger continued, Musk testified, without impeachment or contradiction, that he intended for his statement "temporarily on hold" to mean that "there's a slight delay" and that "the deal would not close until [he] receiv[ed] the information" he requested. 5-ER-1034. Musk's private text messages pre-dating

the May 13 tweet confirmed his intent. 11-ER-2801. And while the district court relied on the fact that Musk did "not actually tell[]…his team that the deal was on hold" as strong evidence of scienter, 1-ER-14, Musk had told the team that he would not proceed until he got the requested information, 11-ER-2884 (Morgan Stanley testimony that the May 13 tweet was "public airing" of private May 8 text message exchange); *see also supra*, at pp. 8-10, pp.13-16.

Indeed, Musk's public disclosures and communications with the market after May 13 and during the Class Period confirm the lack of scienter. On May 24, Musk filed disclosures with the SEC showing that his team continued to work toward closing. 11-ER-2733-2738. Both Twitter and Musk publicly discussed the merger and shared their positions on the dispute from mid-May to early July. *See* 9-ER-2176. And, on July 8, Musk publicly disclosed, in great detail, that his team had been working with Twitter continuously from May 9 through the end of the June to obtain information necessary to close. 11-ER-2757-2764. Musk's openness with the market that work continued on the Merger throughout the Class Period directly contradicts any claim that he intended to inform the market otherwise. *See In re Rigel Pharms., Inc. Sec. Litig.*, 697 F.3d 869, 885 (9th Cir. 2012) (explaining defendant's voluntary disclosure of facts contradicting allegedly false statement was inconsistent with intent to conceal truth).

While financial motive may be relevant to draw inferences of scienter, 1-ER-13, it is not sufficient proof of scienter on its own. *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 325 (2007). Rather, a plaintiff must still present evidence that the defendant knew, or was deliberately reckless to the fact that the allegedly actionable statement was false. *See In re Daou Sys., Inc.*, 411 F.3d at 1015. On this trial record, no reasonable juror could find that Musk acted with scienter.

### E. Plaintiffs Lacked Legally Sufficient Evidence To Establish Reliance For The Class Period

Plaintiffs also failed to prove reliance for the Class Period as a matter of law.

In a securities fraud class action, the only way to prove that absent class members relied on the alleged misrepresentation is to prove the fraud-on-the-market presumption. *See Halliburton II*, 573 U.S. at 268-69. That requires proof that "the plaintiff traded the stock between when the misrepresentations were made and when the truth was revealed." *Id.* at 277-78. The public correction of any misstatement or revelation of information sufficient to assess the accuracy of the challenged statement ends the presumption of class-wide reliance. *Basic*, 485 U.S. at 248-49 ("[I]f, despite [defendants'] allegedly fraudulent attempt to manipulate market price, [the truth] credibly entered the market and dissipated the effects of the misstatements, those who traded...after the corrective statements would have no direct or indirect connection with the fraud."). Absent the presumption, an individual plaintiff may prove reliance by establishing he actually relied on the

alleged misrepresentation in deciding to trade the stock. *See Halliburton II*, 573 U.S. at 268-69.

The trial record establishes that information sufficient to assess any misstatement in the May 13 tweet entered the market well before the October 4, 2022 end of the Class Period, such that Plaintiffs failed to prove reliance. The market learned from Twitter that it had not put the deal "on hold," 9-ER-2175, and that credible news from an insider was "folded in[to]" Twitter's May 13 stock price, 9-ER-2175, "dissipat[ing] the effects of the misstatements," *Basic*, 485 U.S. at 249. Both the Merger Agreement itself and Musk's so-called waiver of pre-signing due diligence were disclosed to the market in *April 2022*, before the Class Period began. 10-ER-2637-2642, 2643-2685. Musk's team filed statements with the SEC—signed by Musk himself—on May 24 indicating that he continued to work toward closing the deal. 11-ER-2733-2738. And, on July 8, Musk publicly disclosed that he was terminating the Merger Agreement. 11-ER-2757-2764. That letter made clear that Musk's team continued to work with Twitter on the Merger from May 9 through July 8 and, in any event, certainly conveyed that the Merger was no longer "on hold"—it was terminated. 11-ER-2758-2759. As Tabak testified, there was "a lot of" information "regarding the merger and the parties' positions about the dispute" shared with the market "between May 16th and July 8th." 9-ER-2176.

These disclosures "dissipated the effects of the misstatements" such that anyone "who traded after…the corrective statements"—whether on May 13, 24, or certainly July 8—"would have no direct or indirect connection with the fraud." *Basic*, 485 U.S. at 248-49; *see also Semerenko v. Cendant Corp.*, 223 F.3d 165, 181 (3d Cir. 2000) (holding subsequent disclosure warning investors not to rely on prior financial statements, followed by an immediate decline in market price, rendered prior misrepresentations "immaterial as a matter of law" and foreclosed reliance thereafter); *Ravens v. Iftikar*, 174 F.R.D. 651, 670 (N.D. Cal. 1997), *on reconsideration* (July 16, 1997) ("[T]he class period comes to an end when corrective information is publicly announced or otherwise effectively disseminated to the public.").

The law thus forecloses reliance based upon the fraud-on-the-market presumption for the entirety of the Class Period. And because, as Plaintiffs conceded, 2-ER-79, 82-83, 86, and the district court found, 1-ER-29-30, Plaintiffs presented no evidence of individual reliance, judgment should be entered for Musk.

## II. IN THE ALTERNATIVE, THE COURT SHOULD GRANT A NEW TRIAL BASED ON INSTRUCTIONAL AND EVIDENTIARY ERRORS

In the alternative, the Court should vacate the judgment and grant a new trial. Instructional errors improperly relieved Plaintiffs of their burden of proof as to loss causation and scienter. And the district court abused its discretion in permitting

Plaintiffs to offer highly prejudicial evidence accusing Musk of wrongdoing related to his pre-Class Period purchases of Twitter stock.

### A. The District Court's Instructional Errors Require A New Trial

"Jury instructions must be formulated so that they fairly and adequately cover the issues presented, correctly state the law, and are not misleading." *Chuman v. Wright*, 76 F.3d 292, 294 (9th Cir. 1996). "Failure to give an instruction on a party's theory of the case is reversible error if the theory is legally sound and evidence in the case makes it applicable." *Dang v. Cross*, 422 F.3d 800, 811 (9th Cir. 2005) (brackets and quotation omitted). "Where an error in instructing the jury is found, prejudice is presumed and 'the burden shifts to the appellee to demonstrate that it is more probable than not that the jury would have reached the same verdict had it been properly instructed.'" *Medtronic, Inc. v. White*, 526 F.3d 487, 493-94 (9th Cir. 2008) (brackets and quotation omitted).

#### 1. <u>The District Court Improperly Instructed The Jury On The Element Of Loss Causation</u>

The district court erred by failing to instruct the jury as to Plaintiffs' obligation to prove the alleged fraud caused Plaintiffs' loss and omitting any instruction on the corrective disclosure theory that Plaintiffs pled. These failures impermissibly "rendered the concept of loss causation meaningless by collapsing it into transaction causation," *Nuveen*, 730 F.3d at 1118-19, relieving Plaintiffs of their burden to prove an essential element of their case.

To prove loss causation, a plaintiff must "show a causal connection between the fraud and the loss by tracing the loss back to the very facts about which the defendant lied." *In re Nektar*, 34 F.4th at 838 (quotation omitted). Typically, a plaintiff makes that showing by proving that the "defendant revealed the truth through 'corrective disclosures'" that in turn caused the stock price reaction. *Lloyd*, 811 F.3d at 1209.

Here, Musk requested a corrective disclosure instruction, 2-ER-186-187, 2-ER-198-200, but the district court refused to give it, 2-ER-159. That was error. Musk's proposed instruction had a basis in the facts—Plaintiffs had pleaded and pursued a corrective disclosure theory. 3-ER-382. And Musk's requested instruction accurately stated the law. *Compare* 2-ER-186-187, *with Glickenhaus*, 787 F.3d at 417, 421. Indeed, when plaintiffs "plead a causation theory," the court "naturally evaluates whether plaintiffs have pleaded or proved the facts relevant to their theory." *Mineworkers' Pension Scheme*, 881 F.3d at 754. The jury should have been instructed on the theory Plaintiffs advanced.

The district court separately erred in failing to give Musk's proposed instruction that "[a] material misrepresentation or deceptive act is a proximate cause of a plaintiff's loss if it caused Twitter's stock price to be lower than it would be if the statement had reflected the truth, not what might have happened had the defendant remained silent." 2-ER-132, 159. As courts have recognized, when

determining loss causation, "the proper question…is not what might have happened had a company remained silent, but what would have happened if it had spoken *truthfully*." *In re Vivendi*, 838 F.3d at 258 (emphasis in original).

By omitting these instructions, the district court allowed the jury to find loss causation simply by showing that Twitter's stock price fell following the May 13 tweet. The district court's instructions absolved Plaintiffs of any burden to link falsity to price—which *Dura* and *Nuveen* forbid as a matter of law—effectively writing out the loss causation requirement altogether. *See Dura*, 544 U.S. at 342-48; *Nuveen*, 730 F.3d at 1121.

These errors require vacatur and a new trial. Plaintiffs' expert admittedly offered no opinion that any information revealed during the Class Period corrected the May 13 tweet and did not measure whether Twitter's stock would have traded at a different price had Musk spoken truthfully on May 13. *See supra*, at pp. 16-17. As a result of the lack of evidence necessary to satisfy the proper legal standard, these instructional errors cannot be deemed harmless. *See Comet Techs. USA, Inc. v. XP Power, LLC*, 181 F.4th 988, 1001 (9th Cir. 2026) (declining to deem instructional error harmless in light of "conflicting evidence" that "presented the sorts of disputes a properly instructed jury must decide").

2. The District Court Improperly Instructed The Jury On The Scienter Requirement

The district court's scienter instruction likewise misstated the law and prejudiced Musk.

In this Circuit, "[t]he 'required state of mind'…is the knowing, intentional, or deliberately reckless disclosure of false or misleading statements." *In re Cadence Design Systems, Inc. Sec. Litig.*, 654 F. Supp. 2d 1037, 1045 (N.D. Cal. 2009) (citation omitted). Although a plaintiff need only *plead* facts supporting a "strong inference" that the defendant acted with scienter, a plaintiff must *prove* scienter by a "preponderance of the evidence." *Tellabs,* 551 U.S. at 328-29.

Here, the district court erred in instructing the jury—over Musk's objections, 2-ER-128-129, 116-117—that the jury could find scienter based upon "a strong interference" of recklessness, 1-ER-58. That suffices only at the pleading stage—not at trial. *Compare id. with Align Tech., Inc.*, 856 F.3d at 619. At trial, Plaintiffs had to establish scienter by a preponderance of the evidence, a greater burden than the "strong inference" required at the pleading stage. *See Tellabs*, 551 U.S. at 328-329.

Such framing undoubtedly prejudiced Musk, given the lack of evidence of scienter. *See supra*, at pp. 40-43. Indeed, the court never defined "strong inference," leaving the jury to speculate as to the required showing. *See Swinton v. Potomac Corp.,* 270 F.3d 794, 802 (9th Cir. 2001) (holding "prejudicial error results" when

jury instructions fail to fairly and correctly convey applicable law). Because "nothing about th[e] verdict indicates that the result would have been the same without the error," *Caballero v. City of Concord,* 956 F.2d 204, 207 (9th Cir. 1992) (alteration adopted), the error prejudiced Musk, requiring reversal.

Separately, the district court erred in instructing that recklessness—including the Ninth Circuit's "deliberate recklessness" standard—satisfies the scienter standard. 2-ER-191-195, 116-117. The Supreme Court has not approved of recklessness satisfying the scienter requirement. *See Matrixx*, 563 U.S. at 48 (reserving question whether recklessness suffices). Particularly in this case, in which the "temporarily on hold" language was susceptible to multiple interpretations, the jury should have been required to find that Musk knowingly made a materially false statement.

### B. The District Court Abused Its Discretion In Admitting Evidence Of Musk's Alleged Non-Compliance With SEC Disclosure Requirements For His Pre-Class Period Stock Purchases

Independently, a new trial is warranted because the district court abused its discretion in admitting evidence of Musk's failure to report his pre-class period Twitter stock purchases and refusing to give a limiting instruction to minimize the prejudice inherent in such evidence.

A new trial is required when a prejudicial evidentiary error "more probably than not tainted the verdict." *Engquist v. Oregon Dep't of Agric.*, 478 F.3d 985,

1009 (9th Cir. 2007), *aff'd sub nom. Engquist v. Oregon Dep't of Agric.*, 553 U.S. 591 (2008). "When evidence is admissible for a limited purpose, the opponent is entitled to a limiting instruction admonishing the jury not to use the evidence for a forbidden purpose." *Merrick v. Paul Revere Life Ins. Co.*, 500 F.3d 1007, 1017 (9th Cir. 2007); *see also* Fed. R. Evid. 105.

At trial, the district court permitted Plaintiffs to introduce evidence suggesting that Musk violated securities laws in connection with his acquisition of Twitter stock before the Class Period. From January to early April 2022, Musk purchased around $2 billion in Twitter stock, 10-ER-2627-2631; 5-ER-930-931, but did not disclose this purchase until April, an alleged violation of securities laws and the subject of a separate SEC enforcement action and class action lawsuit, 2-ER-289. When Musk moved *in limine* to exclude any evidence or argument on this topic, the district court explicitly ruled: "To the extent they would argue or suggest that [Musk was] violating the securities laws" in connection with these pre-Class Period purchases of Twitter stock, "it's out." 3-ER-411.

Yet Plaintiffs repeatedly raised these issues at trial, asking multiple witnesses about them, 4-ER-528; 5-ER-931-937, telling the jury that Musk "didn't file reports with the SEC" about his stock purchases and "kept it secret to keep all that extra money in his own pocket," 3-ER-462-463, and emphasizing it during closing argument, 10-ER-2182. On cross-examination, Plaintiffs' counsel asked Musk three

times whether he filed "SEC forms" to "disclose [these purchases] to the investing public" and accused him of "try[ing] to keep [his] share purchases secret." 5-ER-931-937. Musk repeatedly requested a limiting instruction, which the district court denied. 2-ER-123, 136, 176-177, 168-169; 9-ER-2333-2338.

The district court abused its discretion in admitting evidence it recognized as inherently prejudicial because Plaintiffs did not claim that those disclosures (timely or not) caused them any harm, as the district court acknowledged pre-trial. 2-ER-289; 3-ER-412; *see Duran v. City of Maywood*, 221 F.3d 1127, 1133 (9th Cir. 2000) (affirming exclusion of similar incident due to risk of unfair prejudice and confusing the issues); *United States v. McCourt*, 925 F.2d 1229, 1235-36 (9th Cir. 1991) ("[O]ur system of justice should not permit the trier of fact to infer that because someone was a bad guy once, he is likely to be a bad guy again."). And the district court compounded the prejudice by refusing to give Musk's proposed limiting instruction. These failures warrant a new trial. *Crawford v. City of Bakersfield*, 944 F.3d 1070, 1081 (9th Cir. 2019) (granting new trial based on evidentiary error); *Merrick*, 500 F.3d at 1017-18 (vacating and remanding for failure to give requested limiting instruction).

## III. THE COURT ABUSED ITS DISCRETION IN CERTIFYING THE CLASS AND WRONGFULLY DEPRIVED MUSK OF AN OPPORTUNITY TO CHALLENGE INDIVIDUAL RELIANCE

As demonstrated above, this verdict cannot stand. But this case never should have made it to trial because Plaintiffs failed to satisfy the predominance requirement for class certification, and the district court legally erred in certifying the class. At a minimum, if the Court grants no other relief, the Court should vacate the class-wide judgment to permit Musk to challenge the reliance of the absent class members in the post-trial proceedings.

### A. The District Court Legally Erred In Certifying The Class

A class action may be certified under Federal Rule of Civil Procedure 23 only if "questions of law or fact common to class members predominate over any questions affecting only individual members." *Van v. LLR, Inc.*, 61 F.4th 1053, 1062 (9th Cir. 2023). The Supreme Court held in *Basic* that Rule 10b-5 plaintiffs may satisfy Rule 23(b)'s predominance requirement by invoking a rebuttable presumption of class-wide reliance pursuant to the fraud-on-the-market theory. *Halliburton II*, 573 U.S. at 268-69. But the Supreme Court has made clear that a defendant may rebut the presumption at the class certification stage by showing that investors would have "sold the stock even" if they were "aware that the stock's price was tainted by fraud," thus "sever[ing] the link between the alleged misrepresentation." *Id.* at 269 (internal quotation marks omitted). A class cannot

be certified if "individual inquiries as to the knowledge [or lack thereof] of each member of the class" predominate. *In re IPO Sec. Litig.*, 471 F.3d 24, 43-44 (2d Cir. 2006), *decision clarified on denial of reh'g sub nom. In re IPO Sec. Litig.*, 483 F.3d 70 (2d Cir. 2007); *see also Westways World Travel, Inc. v. AMR Corp.*, 265 F. App'x 472, 476 (9th Cir. 2008) (affirming decertification where "claims would require individualized inquiries" that "would predominate over common questions of law and fact"); *In re Methionine Antitrust Litig.*, 2003 WL 22048232 at *5 (N.D. Cal. Aug. 26, 2003) (decertifying class when it became clear predominance requirement no longer met). "Due process concerns require that class certification meet rigorous standards in securities cases." *Miller v. Thane Int'l, Inc.*, 615 F.3d 1095, 1103 (9th Cir. 2010).

Here, Plaintiffs asserted at the class certification stage that the May 13 tweet falsely communicated that the Merger Agreement permitted Musk to condition closing on his receipt of "details supporting calculation that spam/fake accounts do indeed represent less than 5% of users." 2-ER-274. But the market had the information necessary to allow investors to assess the accuracy of that statement during the nearly five-month Class Period, thus "precipitat[ing] individual inquiries as to the knowledge [or lack thereof] of each member of the class," *In re IPO*, 471 F.3d at 44, and precluding Plaintiffs from satisfying Rule 23(b)(3)'s predominance requirement.

To start, as of May 13, 2022, the Merger Agreement was already public. 10-ER-2643-2685 (available at Dkt. 12-1); *see also* 2-ER-222. Hours after the May 13 tweet, a Bloomberg column linked to the Agreement, noted "[l]ots of people reading the contract this morning," and opined that it "does not allow Musk to walk away if it turns out that 'spam/fake accounts' represent more than 5% of Twitter users." 2-ER-243-246. Similar analyses were published throughout the Class Period, including a July 18 Wells Fargo research report examining Musk's information rights and concluding that Musk could not show Twitter had "breached the information covenant." 2-ER-254.

On May 25, 2022, Plaintiffs' *own lawyers* filed a securities fraud class action lawsuit against Musk that alleged—based only on public information—that the May 13 tweet was false because Musk did not have the rights allegedly misrepresented. 2-ER-226, 232-233. That complaint pled the same theory of falsity Plaintiffs alleged in this case. *Compare* 3-ER-328-386 *with* 2-ER-226-239.

As of July 8, investors may have sold not in reliance on any false statement in the May 13 tweet but in response to Musk's termination letter—the event that caused the largest stock price drop during the Class Period. 11-ER-2775-2777. As the district court recognized, Musk's July 8 termination notice could "'sever[]' any causal chain." 1-ER-72-73. On this ground, the district court disqualified a class representative. 1-ER-72-73.

Thus, although the district court certified a class from May 13 to October 4, 2022, investors had a range of information[5] available to them during that time period. Indeed, that the July 8 termination notice could sever the causal link for one investor suggests that it might do so as well for other investors who sold after July 8—the majority of the five-month class period. Likewise, any investor who—like Plaintiffs' counsel—could interpret the Merger Agreement or read Bloomberg had the "ability to glean" the purported truth from day one and thus did not rely on the alleged fraud. *In re Kosmos Energy Ltd. Sec. Litig.*, 299 F.R.D. 133, 153 (N.D. Tex. 2014) (denying class certification where "some investors within the putative class may or may not have been aware of [] publicly-available information" revealing the truth "based on their varying levels of due diligence"). As a result, individualized issues of knowledge necessarily predominated. *Vignola v. Fat Brands, Inc.*, 2020 WL 1934976, at *4-5 (C.D. Cal. Mar. 13, 2020) (collecting cases) ("[I]ndividualized issues regarding knowledge can be sufficient to defeat class certification.").

---

[5] The district court was wrong to conclude (1-ER-69-70) that these articles and the May 25 complaint were not "information" that could inform investor knowledge. *See In re Verifone Sec. Litig.*, 784 F. Supp. 1471, 1479 (N.D. Cal. 1992), *aff'd sub nom. In re VeriFone Sec. Litig.*, 11 F.3d 865 (9th Cir. 1993) (explaining "information" comes from market analysts and financial and trade press); *In re Intuitive Surg. Sec. Litig.*, 2016 WL 7425926, at *14 (N.D. Cal. Dec. 22, 2016) (same).

In reasoning that, "[o]nce a plaintiff proves that the *Basic* presumption applies, the predominance requirement of Rule 23(b)(3) is met," 1-ER-71, the district court ran afoul of the Supreme Court's acknowledgement in *Halliburton II* that the presumption does not relieve plaintiffs of the burden of satisfying the predominance requirement. 573 U.S. at 276. A securities fraud plaintiff must always "prove that the claimant traded in ignorance of the fact that the price was affected by the alleged manipulation." *In re IPO*, 471 F.3d at 43 (internal quotation marks and citation omitted); *see also Zimmerman v. Bell*, 800 F.2d 386, 390 (4th Cir. 1986) ("[I]ndividual class members must demonstrate that the omitted information was not otherwise available to them."). The district court legally erred—and thus abused its discretion—in relieving Plaintiffs of this obligation at the class certification stage.

That the jury found the reliance element met does not change this conclusion because only the district court examined whether individual issues of reliance predominated. Fed. R. Civ. P. 23(c)(1)(A) (reserving issue for court). In any event, the verdict omitted any question on whether the evidence satisfied the fraud-on-the-market theory. *See* 2-ER-90-101. That Plaintiffs admit the trial record lacks any evidence of individual reliance, *see* 2-ER-82-83, only confirms that individual issues predominated—specifically, that *some* shareholders had knowledge of Musk's rights under the public Merger Agreement. *See, e.g.*, 3-ER-543.

Because the district court legally erred in certifying the class, and because Plaintiffs conceded the trial record lacks any evidence of individual reliance, *see supra*, at 43-45, the Court should enter judgment for Musk.

### B. The District Court Erred By Prohibiting Musk From Challenging Individual Reliance Post-Trial

At a minimum, the Court should vacate the judgment to allow Musk to challenge the individual reliance of absent class members post-trial, as the Supreme Court has expressly contemplated.

When a plaintiff class invokes the *Basic* presumption of reliance, a defendant must be "afford[ed]…an opportunity to rebut the presumption of reliance with respect to an individual plaintiff by showing that he did not rely on the integrity of the market price in trading stock." *Halliburton II*, 573 U.S. at 276. Accordingly, "courts in securities fraud actions have consistently recognized that issues of individual reliance can and should be addressed *after* a class-wide trial, through separate jury trials if necessary." *In re Vivendi Universal, S.A. Sec. Litig.*, 765 F. Supp. 2d 512, 584-85 (S.D.N.Y. 2011), *aff'd sub nom. In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223 (2d Cir. 2016) (emphasis added); *see also Glickenhaus*, 787 F.3d at 430-31 (issues bifurcated with second phase on individual reliance issues); *Lawrence E. Jaffe Pension Plan v. Household Int'l, Inc.*, 2005 WL 3801463, at *4 (N.D. Ill. Apr. 18, 2005) (reserving reliance for resolution after determination of class-wide liability).

In entering class-wide judgment, the district court failed to follow this rule, requiring vacatur. The district court reasoned that Musk had an opportunity to rebut the presumption at trial and that additional "trials runs contrary to the purpose of the class action device." 1-ER-35. But Musk never had an opportunity to challenge whether absent class members—who remain *unknown* to Musk until they submit claims—relied on the May 13 tweet. *See Household*, 2005 WL 3801463, at *4 ("[A] rebuttal of reliance by a particular class member must necessarily be on an individual basis."); *Hsu. v. Puma Biotechnology, Inc.*, 2019 WL 11637311, at *1 (C.D. Cal. May 22, 2019) (recognizing "the verdict doesn't settle the question of whether [d]efendants may rebut the presumption as to absent class members," and that "defendants have a right to challenge reliance on an individualized basis"). Denying Musk his right to rebut individualized reliance runs contrary to Supreme Court authority requiring an opportunity to do so. *Halliburton II*, 573 U.S. at 268. The district court thus erred in entering class-wide judgment because it wrongly deprives Musk of the right afforded defendants under *Basic*.

While the right to challenge individualized reliance post-verdict exists apart from the right to conduct discovery into absent class members, the district court also wrongly denied Musk his right to such discovery. 1-ER-36. Musk did not forfeit his right to post-verdict discovery for absent class members. The district court held otherwise, relying on *Hsu v. Puma Biotechnology, Inc.*, 2021 WL 2644100, at *2

(C.D. Cal. June 11, 2021). But, unlike in *Hsu*, Musk did not wait "two years" after the verdict to seek such discovery. 2021 WL 2644100, at *2. Once Musk has knowledge of the class members seeking recovery, he will promptly seek discovery from them. Any order on remand should clarify that he may do so.

## **CONCLUSION**

The Court should reverse the judgment of the district court and enter judgment in favor of Musk. In the alternative, the Court should vacate the judgment and remand for a new trial or, at a minimum, remand with instructions to vacate the class-wide judgment and permit challenges to individual reliance.

Dated: November 23, 2026

Respectfully submitted,

/s/ Ellyde R. Thompson

Alex Spiro
Ellyde R. Thompson
Jesse A. Bernstein
Marielle P. Greenblatt
Chelsea Sincox
QUINN EMANUEL URQUHART & SULLIVAN, LLP
295 Fifth Avenue
New York, NY 10012
(212) 849-7100

Michael T. Lifrak
Stephen A. Broome
Alex Bergjans
QUINN EMANUEL URQUHART & SULLIVAN, LLP
865 S. Figueroa St., 10th Floor
Los Angeles, CA 90017
(213) 443-3200

*Counsel for Defendant-Appellant*

## REQUEST FOR ORAL ARGUMENT

Defendant-Appellant respectfully requests that this Court hear oral argument in this appeal.

## STATEMENT OF RELATED CASES

Defendant-Appellant is not aware of any related cases pending in this Court.

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)** 26-04928

I am the attorney or self-represented party.

**This brief contains** 13,860 **words,** including 0 words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

- [x] complies with the word limit of Cir. R. 32-1.
- [ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.
- [ ] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).
- [ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.
- [ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
  - [ ] it is a joint brief submitted by separately represented parties.
  - [ ] a party or parties are filing a single brief in response to multiple briefs.
  - [ ] a party or parties are filing a single brief in response to a longer joint brief.
- [ ] complies with the length limit designated by court order dated ______.
- [ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** /s/ Ellyde R. Thompson **Date** Nov. 23, 2026

*(use "s/[typed name]" to sign electronically-filed documents)*

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing Opening Brief Of Defendant-Appellant and the accompanying Excerpts of Record with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Dated: November 23, 2026 /s/ Ellyde R. Thompson
Ellyde R. Thompson